IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                        Criminal No. 3:08-CR-132

EDWARD H. OKUN,

        Defendant.

### MEMORANDUM OPINION

This matter is before the Court on the Defendant's, Edward H. Okun's ("Okun"), Motion for an Evidentiary Hearing Pursuant to Franks v. Delaware (Docket No. 122) and Motion to Suppress Illegally Seized Documents (Docket No. 123). Through these motions, Okun seeks a pre-trial evidentiary hearing to test the validity of a search warrant issued pursuant to a sworn affidavit filed by United States Postal Inspector John Barrett, Jr. (Def. Franks Mem. at 1.) He also seeks suppression of all evidence recovered during the search conducted pursuant to that search warrant on the ground that the officers conducting the search exceeded the scope of the warrant. (Def. Supp. Mem. at 1.)

The United States argues that Okun lacks standing to challenge the search warrant and that, therefore, both of these

-1-

motions should be denied. (Gov. Franks Mem. at 1.) The United States further argues that, even if Okun is found to have standing, he has not made a sufficient preliminary showing to warrant a Franks hearing and that, in any event, the officers did not exceed the scope of the warrant. (Gov. Franks Mem. at 1; Gov. Supp. Mem. at 1.)  For the reasons set forth below, the motions will be denied.

## I. FACTS

The United States charges Hugh Edward Okun ("Okun") in a twenty-seven county indictment with, inter alia, mail fraud, wire fraud, money laundering, and various counts of conspiracy. (Superseding Indictment, *hereinafter* SSI, at 5, 17, 19.)  These charges arise from Okun's connection with the 1031 Tax Group ("1031TG"), Okun Holdings, and a number of other qualified intermediary ("QI") companies.  Okun was the sole shareholder and owner of these corporations, though they did have other employees and officers. (Def. Franks Mem. at 3.)

The Superseding Indictment alleges that Okun was using money deposited in the QI companies by individuals, known as exchangers, for his own benefit.  The exchangers deposited the proceeds from the sales of various taxable capital assets with the QIs, seeking to take advantage of Section 1031 of the Internal Revenue Code.  That section allows individuals to avoid

-2-

the tax on the capital gains on such assets if they deposit the proceeds from the sales of those assets with a QI and convert those proceeds to an equivalent piece of property within a specified time period.

Okun allegedly removed the money deposited with the QIs from the insured bank accounts into which that money was to be deposited. Okun then is said to have spent that money to purchase assets for his own use and to support his lifestyle. It is further alleged that Okun, his companies, and the related officers and employees were deceiving the exchangers as to the disposition of their deposited funds and the financial situation of the QIs. According to the Superseding Indictment, Okun also was using some of the proceeds from those QIs to purchase other QIs for the purpose of using the funds deposited in those companies to keep his ever-expanding corporate family afloat. In sum, the Superseding Indictment essentially charges Okun with running a large, somewhat unconventional Ponzi scheme.

Okun has moved the Court to hold a hearing under Franks v. Delaware to test the validity of an affidavit supporting a search warrant that authorized the search of Okun Holdings, Inc and 1031TG. 438 U.S. 154, 171 (1978); (Def. Franks Mem. at 1.) The search warrant was issued on April 26, 2007 by Magistrate Judge Lauck pursuant to a sworn affidavit filed by a United

States Postal Inspector John Barrett, Jr. ("Barrett"). The affidavit informed Judge Lauck of Barrett's information and beliefs concerning the illegal activities of Okun and his related corporate entities. The primary source of the information in the affidavit was a confidential source (CS-1), later identified as Janet Dashiel ("Dashiel"). The information from Dashiel was corroborated by evidence produced before the Grand Jury and by a second confidential informant (CS-2).

The affidavit included a description of the fraud purportedly committed by Okun and his confederates. The affidavit contains three main assertions on this issue: First, that the exchange agreements between the QIs and the depositors required that the deposited funds be maintained in insured bank accounts. (Affidavit at ¶ 13.) Second, that 1031TG lacked sufficient funds to repay the depositors. (Id. at ¶ 18.) Finally, that individuals associated with 1031TG and Okun had made misrepresentations to depositors concerning the disposition of their deposits. (Id. at ¶¶ 22, 23, 25.) The affidavit also included an allegation that Okun had retained these deposited funds for his own benefit. (Id. at ¶ 24.) When taken together, Barrett stated - and Magistrate Judge Lauck agreed - that this information created probable cause to believe that mail and/or wire fraud had been committed, and that evidence concerning

-4-

those crimes would be located at the 1031TG and Okun Holding

offices. (Id. at ¶ 8.)

The search warrant authorized the searching agents to

retrieve

> All communications between and among 1031 Tax
> Group clients and officers and employees of Okun
> Holdings and its subsidiaries and related
> companies. . .
>
> All documents and data regarding the movement of
> money between Edward Okun, Okun Holdings, Okun
> Holdings' Subsidiaries and other related entities
> and third parties. . .
>
> All bank records . . . of Edward Okun, Okun
> Holdings and its subsidiaries and other Okun-
> related companies. . .
>
> Any retained copies of tax returns filed by Edward
> Okun, Okun Holdings and its subsidiaries and other
> Okun-related entities. . .

(Affidavit at Attachment B.)  On April 27, 2007, federal law

enforcement agents undertook a thorough search of the offices of

various entities and corporations associated with Okun and 1031TG

at the location specified in the warrant.  The product of that

search was a large quantity of documentary evidence relating to

Okun and his transactions with the various companies with which

he was involved. (Def. Supp. Mem. at 4, 6.)

Okun now challenges both the issuance of the search warrant

and the conduct of the search itself.  The Supreme Court's

decision in Franks provides that a district court should hold an

evidentiary hearing to review the issuance of a search warrant when the party challenging the warrant makes a preliminary showing that the warrant was based on false information or conclusions. See 438 U.S. at 155-56. Okun alleges that the search warrant affidavit has essentially three defects. (Def. Mem. at 9.) First, Barrett showed reckless disregard for the truth in his conclusion that, under the controlling documents, Okun was not allowed to use QI funds. (Id.) Second, Barrett should have included in the affidavit that Okun believed he was authorized to use those funds. (Id.) Third, Okun states that Barrett's conclusion that 1031TG lacked the funds to repay the QI investors was erroneous. (Id.) These arguments will be analyzed in greater detail below.

In his second motion, Okun argues that the agents who executed the search warrant exceeded the scope of the warrant. (Def. Supp. Mem. at 4.) According to Okun, the search warrant did not permit the agents to seize communications to which 1031TG was not a party. (Id. at 6.)

As a preliminary matter, the United States argues that Okun lacks standing to challenge the search warrant, as it authorized a search of Okun Holdings, 1031TG, and various other corporate entities associated with Okun and not of Okun himself. (Gov. Franks Mem. at 1.) The United States also argues that

-6-

Okun has not made a sufficient preliminary showing of falsity to warrant a Franks hearing. (Id.)  In response to Okun's second motion, the United States argues that the items seized were squarely within the class of documentary evidence contemplated by the warrant. (Id.)

## II. DISCUSSION

### A. Standing

To establish standing to challenge a search warrant, the party challenging the search must show that he has a legitimate expectation of privacy in the place searched. See Rakas v. Illinois, 439 U.S. 128, 143 (1978).  An individual has such a legitimate expectation of privacy "when the individual seeking Fourth Amendment protection maintains a 'subjective expectation of privacy' in the area searched that 'society [is] willing to recognize ... as reasonable.'" Doe v. Broderick, 225 F.3d 440, 450 (4th Cir. 2000) (quoting California v. Ciraolo, 476 U.S. 207, 211 (1986)).  The Fourth Circuit has emphasized that this right is a personal one which cannot be asserted vicariously. See United States v. Rusher, 966 F.2d 868, 874-75 (4th Cir. 1992); United States v. Taylor, 857 F.2d 210, 214 (4th Cir. 1988); accord United States v. Padilla, 508 U.S. 77, 81 (1993) ("It has long been the rule that a defendant can urge the suppression of evidence . . . only if that defendant demonstrates that *his*

-7-

Fourth Amendment rights were violated by the challenged search or seizure.") (emphasis in original).

Thus, to challenge the search warrant executed against Okun Holdings and 1031TG, Okun first must demonstrate that he had a reasonable expectation of privacy in the offices searched. See United States v. Beckford, 962 F.Supp. 767, 770 (E.D.Va. 1997). Okun's primary argument in support of his standing to object to this search is that he is the sole owner of the business at which the search was directed. (Def. Franks Mem. at 3.)   Okun is correct that a property interest in searched property is an important factor in determining whether his Fourth Amendment rights were put at hazard by the search. See Rusher, 966 F.2d at 874-75.   As Okun himself admits, however, determination of a property interest does not end the analysis. See (Def. Supp. Rep. at 4); U.S. v. Ealy, 363 F.3d 292, 296 n.1 (4th Cir. 2004) (owner of garage had no standing to challenge search of the premises because premises were used in a business by another individual and were open to the public).

While the Fourth Circuit has not directly ruled on the issue, the weight of precedent in this area clearly indicates that the possessory interest attendant to sole ownership of a corporation is not, in and of itself, sufficient to confer upon the owner Fourth Amendment standing as to all corporate property.

-8-

See, e.g., U.S. v. Mohney, 949 F.2d 1397, 1403 (6th Cir. 1991); Williams v. Kunze, 806 F.2d 594, 599-600 (5th Cir. 1986); U.S. v. Moscatiello, 771 F.2d 589, 600-601 (1st Cir. 1985), rev'd on other grounds by Carter v. United States, 476 U.S. 1138 (1986); U.S. v. Vicknair, 610 F.2d 372, 379-80 (5th Cir. 1980); U.S. v. Dall, 608 F.2d 910, 914 (1st Cir. 1979); U.S. v. Kelly, 529 F.2d 1365, 1369-70 (8th Cir. 1976). Indeed, as the Eight Circuit stated in Kelly, a case relied upon by Okun for the purpose of attempting to establish his standing: "a bare assertion of a property interest, without a supporting expectation of privacy, will not give rise to a cognizable Fourth Amendment claim." 529 F.2d at 1369. Therefore, while Okun's ownership of the corporations against which the search was conducted is surely a relevant and important consideration, that consideration is but one factor in deciding whether Okun possessed the required "reasonable expectation of privacy" necessary to have standing to challenge the search. See Rusher, 966 F.2d at 874-75.

The Sixth Circuit in Mohney confronted a circumstance quite similar to that presented by the instant case. See 949 F.2d at 1403-04. There, the defendant was the owner of two closely held corporations which were searched pursuant to search warrants issued against the corporations themselves. Id. The offices searched were rarely visited by the defendant, were primarily

inhabited by other corporate employees, and the defendant was not the primary author of the documentary evidence seized. Id. Furthermore, the investigation that gave rise to the search warrants was not primarily directed at Mohney, but was mainly concerned with a string of arsons unrelated to his financial crimes. Id.

The similarities between the factual scenarios in Mohney and this case are evident: although Okun did prepare a small minority, the vast majority of the documents seized were corporate documents not personally prepared by Okun; Okun admitted that he was rarely present at the offices searched; and other corporate employees were the primary inhabitants of the offices searched. (See Gov. Franks Mem. at 2-3.) The sole significant factual difference between the two cases, for purposes of determining a privacy interest, therefore, is the fact that the investigation in this case was targeted at Okun. (See id.)[1] That factor, however, was identified by the Supreme Court in Rakas to be a disfavored one upon which to base a

---

[1] It is for these same reasons that Okun's reliance on United States v. Smith is misplaced; Smith similarly bases standing upon an individual privacy right in the areas searched, and notes that standing would not be present if the products of the search warrant were not taken from the defendant's personal office space or were documents not personally prepared by the defendant. See 898 F.Supp. 464, 468 (W.D.Ky. 1995).

finding of a legitimate expectation of privacy. See 439 U.S. at 134-38.[2]

The Fifth Circuit similarly has held that the owners of a closely held corporation did not possess a privacy interest in offices of the corporation out of which they did not personally work or in corporate documents not primarily prepared by the defendants. See U.S. v. Judd, 889 F.2d 1410, 1413 (5th Cir. 1989). It is therefore clear that Okun's standing as sole shareholder of the corporate entities does not, in and of itself, grant him a legitimate expectation of privacy in the offices which were searched.

Furthermore, because Okun did not regularly use the offices which were searched, because those offices were typically used by other corporate employees, because Okun was not the primary author of the vast majority of documents seized, and because the vast majority of documents seized were corporate records, it is quite clear that Okun did not have a legitimate expectation of privacy in the offices of 1031 TG and Okun Holdings that were searched under the ambit of the search warrant in question.

---

[2] This disfavoring of the "target theory" calls into question Okun's reliance on Kelly, where the finding that the corporate owner had a legitimate expectation of privacy in various materials was based on that theory. See 529 F.2d at 1369-70; see also Dall, 608 F.2d at 914-15 (noting Kelly's reliance on the target theory and the rejection of the theory by the Supreme Court).

Therefore, Okun's motions could rightly be denied on that basis alone. See Rusher, 966 F.2d at 874-75. However, because the rights at issue are of critical importance and because whether Okun, as a sole owner of the corporations, has a legitimate expectation of privacy has not been decided by the Fourth Circuit, it is appropriate to assess the merits of Okun's motions challenging the search warrant.

## B. Franks Showing

### 1. Standard of Review

The Supreme Court, in Franks v. Delaware, held that, in certain very limited circumstances, a defendant may challenge a facially sufficient search warrant affidavit. See 438 U.S. at 171. To overcome the strong presumption of validity enjoyed by such documents and thereby to provide a basis for an evidentiary hearing, Okun must make a two-part showing. See id. at 155-56. First, he must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." Id. Second, he must also demonstrate that the false information was material, i.e., "essential to the probable cause determination." U.S. v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990). Omissions of material facts which make the affidavit misleading as a whole can also create the basis for a

-12-

Franks hearing. Id.   A party seeking a Franks hearing on the basis of omissions, however, has a much heavier burden. See U.S. v. Tate, 524 F.3d 449, 454-55 (4th Cir. 2008).   This preliminary showing must be more than conclusory – it must be a detailed offer of proof. Colkley, 899 F.2d at 300.

### 2. Violation of Exchange Agreements

As noted above, Okun alleges three defects in Barrett's affidavit. (Def. Franks Mem. at 10.)   First, Okun claims that Barrett demonstrated a reckless disregard for the truth in presenting his conclusion that the exchange agreements required that funds deposited with the QIs be held in insured bank accounts. (Id.)   Okun's argument mischaracterizes Barrett's affidavit on this point. (See Affidavit at ¶ 13.)

Barrett stated in the affidavit that he had "obtained exchange agreements between two of the 1031 Tax Group companies and their depositors which do, in fact, require that deposited funds be maintained in secured bank accounts." (Id.)   The examination of these two agreements was undertaken to corroborate the allegations of CS-1 that this handling of deposited funds was required. (Id.)   Barrett also inspected two websites of other 1031 Tax Group companies which stated that deposited funds would be maintained in secured accounts. (Id.)   Thus, Barrett did not, in fact, claim that exchange agreements uniformly required that

-13-

deposited funds be held in insured accounts; he merely stated that CS-1 had alleged that to be the case and that his independent investigations had at least partially corroborated her allegations. (See id.)

To the extent that the affidavit suggested that the exchange agreements were uniform in this regard, therefore, it is clear that Barrett was relying on the information provided by CS-1. Reliance on an informant is significant for purposes of the Franks analysis because it means that Barrett's statements could not have been "intentionally or recklessly misleading unless he had strong reason to believe that [the informant] was lying." U.S. v. Akinkoye, 185 F.3d 192, 199 (4th Cir. 1999). Okun has not proffered any facts that would support a conclusion that Barrett had reason to know that CS-1 was not being fully accurate in her assessment of the exchange agreements. It is true, as Okun alleges, that Barrett could have conducted a more searching review of the exchange agreements; however, he had no "strong reason" to do so in the face of CS-1's allegations and the corroboration of those allegations provided by his review of the exchange agreements. See id.; see also U.S. v. Perez, 393 F.3d 457, 461-62 (4th Cir. 2002) (probable cause can be found from affidavits founded on the allegations of confidential informants; such allegations are entitled more weight when corroborated).

-14-

Even if Okun's characterization of later exchange agreements providing for alternate use of the deposited funds is correct and, as discussed below, that fact would not permit to an inference that Barrett thereby intentionally mischaracterized the facts or acted recklessly. (See Def. Franks Mem. at 4-5.)  As Akinkoye makes clear, Barrett was entitled to rely on the statements made by his confidential source, absent some showing that that reliance was misplaced. See 185 F.3d at 199.  Okun has made no showing that Barrett had a reason to disbelieve CS-1's representations concerning the exchange agreements or, indeed, that Barrett had reason to believe that the exact terms of the exchange agreements varied over time.

Second, it appears from the record that only five of the approximately three hundred and forty exchange agreements contained the text on which Okun basis the contention that Barrett falsely reported the contents of the exchange agreements. Thus, any misrepresentation about the contents of the exchange agreements would not be material even if the agreements are given the interpretation pressed by Okun.

Finally, even if Barrett had examined a different session of the exchange agreements than he did examine (i.e., those after the February 2007 revisions), the examination would not have revealed a fact dispositive of the probable cause decision. See

-15-

Colkley, 899 F.2d at 301 (to warrant a Franks hearing, an omitted fact must be dispositive). The revised version of exchange agreements provide that exchanger funds should be held in insured accounts until "invested by QI for its own account." (Def. Franks Mem. at Ex. A ¶ 5; see also Ex. B ¶ 5 (requiring same).) Barrett, and the Magistrate Judge, could reasonably have concluded that funds being used to fund Okun's lifestyle, as the record indicates these were, were not being used as QI investments. (See, e.g., Def. Franks Mem. at Ex. F-2 pp. 83-84 (detailing Okun's use of exchanger funds to support his lifestyle).) Thus, even if Barrett had investigated the post-revision exchange agreements, they would have supported, rather than altered, his conclusion that exchange funds were being misused.

For the foregoing reasons, the first asserted ground of falsity actually is without merit. It certainly does not provide the basis for a Franks hearing.

### 3. Ability to Repay Exchangers

Okun also claims that Barrett's affidavit was misleading in its characterization of 1031TG's financial situation. (Def. Franks Mem. at 5.) Paragraph 18 of the affidavit, the portion in question, states

> CS1 has informed me that on a daily basis, 1031
> Tax Group clients either close on substitute

-16-

property, and so need their deposited funds, or decide not to purchase new property and request that their deposits be returned. Because client funds have not been maintained in insured bank accounts, and have instead been used by the subjects for various investments and personal expenses, their funds are not available to be returned. Instead, for at least the last several weeks, 1031 Tax Group has been using the money deposited by new clients to re-pay other clients who need or are demanding their funds immediately. CS1 has informed me that 1031 Tax Group has not had enough money over the past several weeks to pay several of their clients. In conversations between David Field and CS1, recorded with the consent of CS1, Field confirmed that 1031 Tax Group does not have sufficient funds to repay its clients. During one of those conversations, Field stated that Edward Okun was working on re-financing deals that would bring more money into the 1031 Tax Group companies, but that in the meantime, the companies should continue to bring in new clients so that their deposits can be used to pay the clients currently demanding their money.

Okun characterizes these statements as alleging that there are a group of exchangers who will never be paid back the money that they deposited. (Def. Franks Mem. at 6-7.)   Instead, as the text self-evidently shows, Barrett is stating that he has been informed that 1031TG does not have the funds on hand to pay back those exchangers who are currently requesting the return of their funds, but that the corporation is investigating financing options that would allow for the exchangers to be paid. (See Affidavit at ¶ 18.)   This reading of paragraph 18 is supported by paragraph 26, which states that CS-2 corroborated the fact

-17-

presented by that 1031 TG had insufficient assets to cover its liabilities to depositors seeking a return of their money.

Furthermore, the tape recorded conversations between Field and CS-1 support the affidavit. (See Def. Franks Mem. at Ex. G.) For example, Field indicates that Okun has used the exchanger funds to fund his lifestyle. (See id. at 10-11.) Similarly, a significant amount of the conversation was evidently concerned with the efforts of 1031TG-related individuals to arrange the situation so that the financial state of the company would not be clear to the exchangers. (See id. at 11-14.) Other conversations between the two concerned the same matters. (See, e.g., Def. Franks Mem. at Ex. F pp. 92-93.) Thus, it is clear from the recording that Barrett had a significant basis from which to form the opinion that exchanger funds were being misused, and that that misuse was being hidden from the exchangers.

Okun alleges that Barrett failed to inform the Magistrate Judge that 1031 TG was pursuing financing options. To the contrary, he clearly did so. (Affidavit at ¶ 18.) ("Field stated that Edward Okun was working on re-financing deals that would bring more money into the 1031 Tax Group companies.") Indeed, while Okun characterizes the purpose of this paragraph as putting forth the allegation that exchangers are permanently losing money, a more accurate portrayal of Barrett's affidavit is that

-18-

it demonstrates the misuse of that money by Okun and 1031TG. Therefore, Okun's second argument alleging intentional falsity in the affidavit fails, as it is based on an elementary misreading of the text of the affidavit.

Furthermore, the record is consistent that exchangers were, in fact, at risk of losing money. While it may have been the case, as Okun alleges, that no exchanger had lost any money at the time and that Field was confident that no loss would occur, there is an ample basis in the record to support Barrett's concern over Okun's use of exchanger funds and the risk thereby presented. (Def. Rep. at 8-9.) The uncertainty in the financial condition of Okun's 1031 exchange companies, including several of the QIs, was the topic of a great deal of discussion between CS-1, Field, Okun, and other principals. (See Def. Franks Mem. at Ex. F-1 pp. 29-30, 44-45, 57, 62-64, 66; Ex. F-2 pp. 79, 82-83, 103-04, 106-07, 111, 119; Ex. G. at 12-13, 22.) As a whole, these conversations, as well as Barrett's interviews with CS-1 and CS-2, provided a solid evidentiary basis for belief that the financial condition of Okun Holdings, 1031TG, and other companies was such that there likely would not be a full return of exchanger funds. (Affidavit at ¶¶ 18, 26.)

The report of an interview conducted by Barrett of Daniel McCabe, president of a related QI and alleged by Okun to be CS-2,

-19-

does not rebut Barrett's point. (See Def. Franks Rep. at 7-8.)[3]
The report of the interview indicates that McCabe was, along with
CS-1, Field, and other, uncertain as to the financial situation
of Okun Holdings and the related companies. (See Def. Franks Rep.
at Ex. A p. 4 ("Okun had stepped up to the plate to fund the
shortage . . . McCabe was aware that the company was trying to
move funds to pay for some delays.") Therefore, any implication
of concern for the availability of exchange funds in the search
warrant affidavit was not made in reckless disregard of the
truth. See Colkley, 899 F.2d at 300.

Indeed, even if Barrett's characterization of the financial
situation of 1031TG was incorrect, Okun has not made a sufficient
showing of intentional or reckless falsity to warrant a Franks
hearing. See Colkley, 899 F.2d at 300. Barrett was reasonably
relying on the representations of CS-1 and CS-2 in his
assessment. (See Affidavit at ¶¶ 18, 26); see also Akinkoye, 185
F.3d at 199. Additionally, the tape recorded conversations
between CS-1 and Field support the Barrett's central allegation,
thereby corroborating this informant information. (See Def.

---

[3] Whether McCabe is, in fact, CS-2 as Okun claims, Barrett
unquestionably had access to the information provided by McCabe,
as the interview memorialized in the report took place prior to
the writing of the search warrant affidavit. Hence, it is
proper to consider the information contained in the report when
making a determination of what Barrett knew or should have
known.

Franks Mem. at Ex. G.)    Thus, that asserted ground of misrepresentation also falls short of the preliminary showing necessary to warrant a Franks hearing. See Colkley, 899 F.2d at 300.

### 4. Okun's Knowledge of Illegality

Okun also alleges that the affidavit is intentionally misleading in asserting that he knew that the actions he was taking were illegal. (Def. Franks Mem. at 10.)    This is essentially an allegation of misleading by omission because Okun claims that Barrett's supposed failure to include Field's statements (to the effect that Okun's lawyers had advised him that his conduct was legal) constituted an intentional misrepresentation that made the affidavit misleading as a whole. (Id.)    Therefore, it is important to note that, on this contention, Okun has a higher burden to meet if he is to demonstrate the necessity for a Franks hearing. See Tate, 524 F.3d at 454-55.

An affidavit offered to procure a search warrant "cannot be expected to include . . . every piece of information gathered in the course of an investigation." Id. (quoting Colkley, 899 F.2d at 300.)    To warrant a Franks hearing, the information omitted must have been dispositive, that is, the omission was "necessary to the finding of probable cause." Id. at 455 (internal quotation

-21-

omitted). Furthermore, because every omission is, _ipso facto_, an intentional omission, a higher standard of _mens rea_ applies in deciding that the affiant acted with intentional or reckless falsity. See _id._ at 455. The party seeking a _Franks_ hearing must demonstrate that the omission was "'designed to mislead' or must be made 'in reckless disregard of whether [it] would mislead." _Id._ (quoting _Colkley_, 899 F.2d at 301).

The statements that Okun alleges should have been included in the affidavit indicate that Field and Okun had discussed Okun's use of exchanger funds with attorneys and that those attorneys had advised the two that no criminal liability would attach to their actions "as long as the funds [could] be repaid." (Def. _Franks_ Rep. at 11.) The analysis of that argument begins by noting that Field did not tell Barrett that Richard Simring clearly had informed Okun and Field that Okun's conduct was lawful. (See Def. _Franks_ Mem. at Ex. G. pp. 12-13.) Furthermore, Field actually was less than certain about what Okun had been told by lawyers. (See _id._ ("Well, I think lawyer, lawyers have told him that there are no restrictions. . . I believe from what I have been told. . .").) Therefore, the statements that Okun argues should have been included are not actually exonerating of Okun. Indeed, in the only detailed firsthand account of a conversation with an attorney, Field told

-22-

Barrett that Simring had "[come] right out of his chair" over concern about Okun's conduct. (Id. at 13.)

On this record, Okun has not made a sufficient showing on the omission of the statements at issue to warrant a Franks hearing. Indeed, on this record, it is reasonable to believe that Barrett simply decided that Field's statements were insufficiently reliable to be worth including. See Tate, 524 F.3d at 455.

Furthermore, the substantive qualification on Field's statement (i.e., that there would be no liability so long as the funds were repaid) is a very important one respecting the question of materiality. As explained above, Barrett was given information that Okun Holdings and the associated companies would be unable to repay the exchangers. See Part II.B.3, supra. Assuming that Barrett did, to some degree, credit Field's representations of the attorney's advice, he reasonably could have believed that criminal liability nonetheless would attach because of the evidence that the exchangers could not be repaid. (Affidavit at ¶¶ 18, 26.) Because Field's representations about the lawyer's opinions indicate that criminal liability is avoided only if the exchangers are repaid, the inclusion of those representations would not have necessarily negated the probable

-23-

cause otherwise present in the affidavit and, as such, they are not material. See Colkley, 899 F.2d at 301-02.

Even if Barrett is credited with the knowledge that reliance on the advice of counsel could serve as a defense[4] to mail and wire fraud (which is, of course, the basis upon which Okun's argument concerning this information rests), the most that can be said is that Barrett omitted the information that related to a possible defense. See Colkley, 899 F.2d at 301 (showing of the omission of information that the affiant simply believes is not relevant to probable cause is insufficient to warrant a Franks hearing).

Additionally, because the affidavit, even with the inclusion of Field's statements, would have contained a sufficient basis for a finding probable cause, the omission of those statements was not material. See U.S. v. Shorter, 328 F.3d 167, 171 (4th Cir. 2003) (defendant's self-serving denial not providing a full defense was not sufficiently material to warrant inclusion). The Franks materiality standard is not merely one of relevance - the omitted information must in and of itself be sufficient to necessitate a change in the probable cause determination. See Colkley, 899 F.2d at 302 (exculpatory but not exonerating

---

[4] The elements of this defense are "(a) full disclosure of all pertinent facts to an expert, and (b) good faith reliance on the expert's advice." U.S. v. Miller, 658 F.2d 235, 237 (4th Cir. 1981).

-24-

information is not material). Thus, Field's statements concerning the lawyer's comments were not material under the Franks standard.

For all of the foregoing reasons, Okun has not put forth a sufficiently substantial preliminary showing to warrant a Franks hearing.

## C. Scope of the Search

If, however, it is assumed that Okun has standing (which he does not) and that he has met the requisites for a Franks hearing (which he has not), the motion to suppress evidence would be denied as lacking merit.

The predicate for a valid search pursuant to a warrant is a valid warrant. U.S. v. Uzenski, 434 F.3d 690, 705-06 (4th Cir. 2006). To be valid, a search warrant must "particularly describe the place to be searched, and the persons or things to be seized." Id. at 706. The scope of any search under a search warrant is, therefore, limited. Officers may not "grossly exceed the scope of a search warrant" in seizing evidence pursuant to that warrant. Id. (internal quotations omitted). Typically, the remedy for a search that exceeds the scope of a warrant is the suppression of only the evidence seized that exceeded that scope. Blanket suppression, i.e., suppression of all the evidence

seized, is only appropriate as a remedy when the officers have flagrantly disregarded the scope of the warrant. See id.

The Fourth Circuit recently has had occasion to consider the appropriate standard for evaluating whether a search conducted under the aegis of a search warrant was within the scope of that warrant. See U.S. v. Srivastava, 540 F.3d 277, 289-90 (4th Cir. 2008). As an initial matter, the warrant is not to be "assessed in a hypertechnical manner." Id. at 289.  Rather, the reviewing court is to use a plain, common sense reading of the terms of the warrant. See id. at 289-90.

The warrant in this case conferred fairly broad authority on the searching officers.  The warrant provided the authority to search the relevant offices and to seize

> All communications between and among 1031 Tax Group clients and officers and employees of Okun Holdings and its subsidiaries and related companies. . .
>
> All documents and data regarding the movement of money between Edward Okun, Okun Holdings, Okun Holdings' Subsidiaries and other related entities and third parties. . .

(Affidavit at Attachment B.)  Okun claims that the agents executing this search warrant exceeded the scope of the warrant by seizing "voluminous hard copy and electronic documents reflecting communications involving, on the one hand, officers and employees of Okun Holdings or a related company and, on the

other hand, other officers and employees of Okun Holdings or a related company." (Def. Supp. Mem. at 4.) Okun provides three examples of documents seized by the warrant fall within this category, each of which is an email between principals involved in 1031TG, Okun Holdings, or related QIs. (Id. at 6.) Okun, therefore, reads the warrant to permit seizures only of those communications to which a 1031TG client was a party. (Id.) Under Okun's reading of the warrant, communications between employees of Okun Holdings would be beyond the scope of the warrant. (Id.)

The seizure of the category of documents of which Okun complains did not exceed the scope of the search permitted by the warrant. By its plain terms, the warrant allowed the seizure of communications "between and among" officers and employees of Okun-related companies. (Affidavit at Attachment B.) Okun's construction of the search warrant would read the word "among" out of that warrant. Under the interpretive standard set forth in Srivastava, the Court is to use the plain meaning of the terms setting forth the scope of the warrant. See 540 F.3d at 289-90. The word "among," in its relevant plain usage, means "intermingled with." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 72 (2002). Taken in context, the first sentence of the attachment defining the scope of the warrant therefore permits seizures of communications between any client, officer, or employee of 1031TG

-27-

or Okun Holdings and any other individual who is also a member of one of those classes.[5] The categories of material alleged by Okun to be outside the scope of the warrant thus fall directly into the class of communications described on the face of the warrant.[6]

Furthermore, even if Okun's suggested reading of the search warrant were correct (which it is not), exclusion of the fruits of the search would be inappropriate. In United States v. Patterson, 278 F.3d 315, 317-18 (4th Cir. 2004), the Fourth Circuit held that, when government agents make honest mistakes in the execution of a search warrant, the resulting search does not violate the Fourth Amendment. The relevant question is whether the agents executing the warrant had an "objectively reasonably belief" that the items seized were within the scope of the

---

[5] Using this definition, the three examples of communications seized under the search warrant provided by Okun in his reply are within the scope of the warrant, as each involves communications between individuals who are officers, employees, or clients of the relevant companies. (See Def. Supp. Rep. at 6, Exs. A, B, C.)

[6] It is also true, as the Government argues, that the specific documents selected for illustrative purposes by Okun in his original motion would also have been subject to seizure under the second sentence of Attachment B, as they detailed the movement of money between and among Okun-related entities and individuals. (Gov. Supp. Resp. at 6-7.) As Okun has defined the class of allegedly improperly seized documents by reference to the parties to those communications, however, the Court will rule on the allegedly improper class, rather than simply on these illustrative examples, as they may have simply been improvidently selected representatives from that class.

warrant. Id. at 318 (citing Maryland v. Garrison, 480 U.S. 79, 88 (1987)); see also Srivastava, 540 F.3d at 293-94. On that basis, the Fourth Circuit in Patterson upheld the search of a vehicle located on property not within the scope of the warrant, because the vehicle appeared to be on the property identified for search. See id. at 318.

Similarly, the agents searching the 1031TG and Okun Holdings offices reasonably could have held an objectively reasonable belief that the communications documents to which Okun objections are directed were to be seized by virtue of the text of either the first or second categories of documents identified in Attachment B because those communications appear on their face to fall within the purview of either or both of those sections. 278 F.3d at 318. The communications detail the movement of money as relevant to the second paragraph of Attachment B. The agents also could have reasonably read the first paragraph to include communications by any Okun Holdings-related individual. Thus, under an objective analysis, the seizure of those documents was not unreasonable under the facts and circumstances as known to the officers at the time of the search. See Srivastava, 540 F.3d at 294. Hence, even assuming that Okun's reading of the search warrant is correct, there is no basis upon which to exclude the products of that search.

-29-

### III. CONCLUSION

For the reasons set forth above, the Motion for an Evidentiary Hearing Pursuant to <u>Franks v. Delaware</u> (Docket No. 122) and the Motion to Suppress Illegally Seized Documents (Docket No. 123) will be denied.

It is so ORDERED.

_____  /s/      _REP_
Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date: ~~January 30,~~ 2009
       _February 2,_
              _REP_

-30-