IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                           Criminal No. 3:08-CR-132

EDWARD H. OKUN

MEMORANDUM OPINION

This matter is before the Court on the United States'
Motion in Limine to Preclude Defendants from Presenting Evidence
or Argument Related to Their Intent/Ability to Repay. (Docket
Number 57.)   The United States filed the motion because it
apprehends that the Defendant, Edward H. Okun, plans to use
evidence of his intent, or ability, to repay the money that he
allegedly misappropriated from clients, which according to
the United States, is legally irrelevant, and,
therefore, should be excluded. (Gov. Mem. at 2-3.)   Okun's
response has changed to some degree over time, but, in essence,
it is that his intent (and ability) to repay might become
relevant to his intent at the time of the alleged mail and wire
fraud. (Def. Supp. at 3, 8.)  Okun also argues the related point
that advice of counsel respecting the circumstances under which

-1-

he could have access to client funds, even if it falls short of a full-fledged defense, may be admissible respecting the knowledge and intent elements of the mail and wire fraud charges.

For the reasons set forth below, a definitive ruling on this motion is premature, and, hence, it will be denied without prejudice. However, the briefs and oral argument have shown the need to frame the legal landscape on these issues with a view to assuring that the parties know the Court's views respecting how, if at all, evidence on these issues may be presented so that manner in which they conduct the case will not confuse the jury.

## I. BACKGROUND

The United States charges Okun in a twenty-seven count Superseding Indictment with, inter alia, mail fraud, wire fraud, money laundering, and various counts of conspiracy. (Superseding Indictment, hereinafter SSI, at 5, 17, 19.) These charges arise from Okun's connection with the 1031 Tax Group ("1031TG"), Okun Holdings, and a number of other qualified intermediary ("QI") companies. Okun was the sole shareholder and owner of these corporations, each of which had its own employees and officers. However, according to the United States, the companies were run pursuant to Okun's instructions and for his financial benefit.

The SSI alleges that Okun was using money that was deposited in the QI companies by individuals, known as exchangers, for his own benefit. The exchangers deposited the proceeds from the sales of various taxable capital assets with the QIs, seeking to take advantage of Section 1031 of the Internal Revenue Code which allows individuals to avoid the capital gains tax on such assets if the exchangers deposit the proceeds from the sales of those assets with a QI and thereafter use those proceeds to purchase an equivalent piece of property within a specified time period. By virtue of the tax code and the transaction which it permits, the QIs were repositories of significant quantities of cash.

According to the SSI, Okun removed the money deposited with the QIs from the insured bank accounts into which that money had been deposited. Okun then spent that money to purchase assets for his own use, to support his lifestyle, to pay executives significant salaries, and to purchase other QIs for the purpose of using the funds deposited in those companies to keep his ever-expanding corporate family afloat. It is further alleged that Okun, his companies, and the related officers and employees were deceiving the exchangers as to the disposition of their deposited funds and the financial situation of the QIs.

In essence, the SSI charges Okun with running a large, somewhat unconventional Ponzi scheme. Okun characterizes the cash removal transactions as loans from the QIs, and thereby from the exchangers, that he intended to repay as they came due. (Def. Mem. at 4.) Okun further states that he had received advice from lawyers that his conduct was lawful. (Id.)

The motion *in limine* filed by the United States seeks to exclude from presentation at trial any evidence relating to Okun's intent (or ability) to repay the money he is said to have fraudulently obtained from the QIs and the exchangers. (Gov. Mem. 1.) Okun has responded that evidence on those points is relevant to the questions of his intent when purchasing the QIs and when obtaining the exchangers' funds from the QIs and to the more general question of his good faith belief in the truth of the representations at issue. (Id. at 4.)

At the hearing on these issues held on October 3, 3008, the Defendant advanced several arguments that had not been raised in the initial briefing. In light of the new arguments, the Court ordered further briefing, which the parties have provided. The parties then provided further argument on these issues in a hearing held on February 3, 2009.

-4-

## II. DISCUSSION

### A. General Principles

The SSI charges Okun with, _inter alia_, both mail and wire fraud under 18 U.S.C. § 1341 and §1343, respectively.  The mail and wire fraud statutes proscribe two species of fraud that are involved in this case.  18 U.S.C. §§ 1341 and 1343.  Section 1341 criminalizes the devising of "any scheme or artifice to defraud" or any scheme "for the purpose of obtaining money or property by false or fraudulent pretenses, representations, or promises" and the use of the mails in executing such a scheme.  Section 1343 criminalizes the same kind of schemes or artifices and the use of wire, radio or television communication in executing the particular scheme or artifice.

The elements of either specie of mail or wire fraud require proof, _inter alia_, that the defendant knowingly devised or participated in the scheme or artifice that is alleged. O'Malley, Grenig and Lee, _Federal Jury Practice and Instructions_, § 47.03 (5th ed. 2000); 2 L. Sand, _et al._, _Modern Federal Jury Instructions-Criminal_, ¶ 44.01, Inst. No. 44-3 (2007).  If the scheme or artifice is to defraud, the defendant must also know of its fraudulent nature.  _Id._  If the scheme or artifice was to obtain money by false representation, he must know that the representations were false.  _Id._

-5-

The United States also must prove that the defendant possessed the specific intent to defraud. Id.; see South Atlantic Ltd. Partnership of Tennessee v. Riese, 284 F.3d 518, 531 (4th Cir. 2002). The existence of a specific intent to defraud may "be inferred from the totality of the circumstances and need not be proven by direct evidence." United States v. Godwin, 272 F.3d 659, 666 (4th Cir. 2001) (internal quotations omitted). Intent to defraud is not necessarily an intent to cause permanent economic harm to the victim; rather it is simply the intent to acquire target property by means of a deception. See Allen, 491 F.3d at 186 (citing United States v. Kenrick, 221 F.3d 19, 29 (1st Cir. 2000)).

The Fourth Circuit is unequivocal that "[t]he intent to repay eventually is irrelevant to the question of guilt for fraud." Allen, 491 F.3d at 186 (quoting Curry, 461 F.3d at 458). This bright-line rule is based on the premise that the crime of mail or wire fraud is complete when the defendant makes a knowingly false statement and obtains the target money or property. See id. Thus, the defendant's intention ultimately to repay the money or to restore the property is irrelevant once a fraud has been committed to secure the money or property because the crime already has been successfully completed when the money or property is obtained. See id. Indeed, even actual (rather

-6-

than simply intended) reimbursement of defrauded property is insufficient to demonstrate a lack of intent to defraud. See Godwin, 272 F.3d at 667.

The Fourth Circuit's rule on this issue is entirely clear and has been consistently applied for years. In Allen, the defendant orchestrated a financial scheme involving leases of computer equipment. That scheme was materially similar to the scheme to defraud that is alleged in the SSI in this case. See id. at 185-86. In Allen, the Fourth Circuit held that the defendant was not entitled to use intent to repay as a failure of proof defense as to the mens rea required for a fraud conviction. Id. Then, in Curry, the Fourth Circuit held that a defendant who actually had issued refunds of some fraudulently obtained funds similarly was not entitled to use his intent to repay as a defense to fraud. See 461 F.3d at 452.

Thus, it is settled, at least in this circuit, that an intent to repay a defrauded party is never a defense to mail or wire fraud.

## B. Knowing Misrepresentations and Good Faith

Nonetheless, Okun argues that evidence of his intent to repay should be admissible as relevant to what he calls a "good faith defense." Of course, that is a term of no real meaning

-7-

because "good faith," untethered to an element of a crime, provides no defense to criminal conduct.

Okun is correct that a defendant's good faith belief that the representations he made were, in fact, truthful eliminates the specific intent to defraud required to sustain a mail or wire fraud conviction. See South Atlantic Ltd., 284 F.3d at 531-32. In essence, a defendant must be acquitted if he did not know that the representations he made to the victims of the fraud were false. See id. (citing United States v. Alkins, 925 F.2d 541, 549-50 (2d Cir. 1991)). However, the well-intentioned belief that a business venture in which a defendant was involved would be successful and would allow for repayment of money taken from victims does not supply a basis for a defense that there was a good faith belief that a representation was true. See Godwin, 272 F.3d at 666-67.

In support of his argument that an intent to repay is relevant to a demonstration of good faith representations, Okun points to United States v. Foshee, which involved two defendants charged with mail fraud based on what was essentially a check kiting scheme. (Def. Supp. at 8); 569 F.2d 401, 402 (5th Cir. 1978), aff'd on reh'g, 578 F.2d 629 (5th Cir. 1978) (per curiam). The defendants in Foshee allegedly issued checks that they did not have a "reasonable expectation" of being able to pay the

-8-

checks as written. 578 F.2d at 633. The fraudulent misrepresentation involved was the promise to repay when repayment was never intended. See id. Thus, evidence that the defendants believed that they could repay their obligations would be relevant to the question of whether they had the specific intent to defraud because the alleged fraudulent misrepresentation was that they had the ability to repay. See id. at 631-32.

The holding in Foshee is consistent with the Fourth Circuit's statements in Godwin and South Atlantic: evidence that a representation was not knowingly false is admissible to demonstrate that the defendant lacked the required mens rea for a fraud conviction. However, nothing in Foshee alters the basis precepts in Allen and Curry that, if there is a knowingly false misrepresentation and property is obtained in reliance on that misrepresentation, an intent to repay the fraudulently obtained property is not a defense to mail or wire fraud.

The decisions in Allen and Curry also are supported by the well-reasoned decision in United States v. Masquelier, 210 F.3d 756 (7th Cir. 2000). There, the Seventh Circuit was confronted with a situation in which the defendant had certified requests for progress payments under a government contract for expenses that he had not actually incurred. See 210 F.3d at 757. The

defendant sought to introduce evidence in his defense that would establish that he had intended to make good on the contract, and needed the progress payment as a sort of ersatz bridge loan. See id. The Seventh Circuit held that his intent to fulfill the contract was essentially an intent to repay the "advance" he had received by fraud and thus was irrelevant to a determination of whether he had committed the fraud. See id. at 759. In essence, the Seventh Circuit in Masquelier articulated the same basic principle on which the Fourth Circuit relied in deciding Godwin, Allen, and South Atlantic: if a knowing misrepresentation has been made, intent to repay the property taken pursuant to that misrepresentation is irrelevant.

Of course, that principle is based upon the existence of a knowing misrepresentation. Even the United States agrees that "a legitimate good faith defense would be that Okun did not know that what he was saying . . . were misrepresentations." (Gov. Supp. at 7.) Therefore, there is a limited factual circumstance in which Okun's intent to repay the exchangers' funds might be relevant. That circumstance would be presented if there was evidence that Okun did not believe the representations that he made were false. See Godwin, 272 F.3d at 667. In order to determine whether evidence about Okun's putative intent to repay is relevant, therefore, it is first necessary to determine the

-10-

content of the representations that the United States claims were fraudulent.

The United States was directed to file a Bill of Particulars identifying the general content of the allegedly fraudulent representations and the parties to whom those representations were made. The Bill of Particulars alleges that Okun made essentially two categories of misrepresentations.

First, it is alleged that Okun and his co-conspirators made misrepresentations to the owners of the QIs before Okun bought the QIs. The alleged misrepresentations were to the effect that the QIs would be operated in the same fashion after they were acquired and that client funds would remain in extant bank accounts. (Bill of Particulars at ¶¶ 3.a, 3.c). If there is evidence that, in good faith, Okun believed such representation to be true when made, that evidence could negate the "knowing misrepresentation" aspect of the mail and wire fraud offense, as well as the specific intent element.[1]

The Defendant's briefs allude to possible evidence of an intent to repay or the ability to repay, but neither of those

---

[1]     Many, indeed most, of the misrepresentations made before acquisition of the QIs (as set forth in paragraph 3 of the Bill of Particulars) are alleged to be deliberate omissions and concealments. Neither party has addressed how an intent to repay would apply to this type of representation, but it is difficult to see how evidence of that ilk would apply, given the decisions in Allen and Curry.

-11-

topics appear to bear on the truth vel non of the misrepresentations respecting the manner in which the QIs would be operated after Okun purchased them or the retention of the QI funds in extant bank accounts.   Hence, it is difficult to understand how the intent or ability to repay the funds "borrowed" from the QI accounts could provide a defense to representations of that sort.   However, if it is made to appear that there is evidence that does bear on the good faith belief in the truth of these two sorts of misrepresentatives, the parties now know the parameters in which its admissibility will be assessed.

The Bill of Particulars, however, does posit a set of misrepresentations respecting the purchase of the QI known as 1031 Advance that bear further assessment.   In paragraph 3.f, the Bill of Particulars recites that:

> Okun informed the owners of 1031 Advance that Okun sometimes used QI client exchange funds as short term loans to purchase investment properties but that he: (1) never utilized more than 30% of the client exchange funds for such short term loans; (2) that attorneys had stated this practice was permissible; (3) that the loans were always documented; and (4) that Okun always paid the QI companies 8% interest on the loans of the client exchange.

Thus, the United States appears to be alleging that the owners of 1031 Advance relied on, at least in part, Okun's

-12-

representation that he would take loans from the exchanger funds held by that company and pay them back with interest. In order for this representation to have been a "knowing misrepresentation," Okun must not have intended to pay those funds back with interest. See Godwin, 272 F.3d at 666-67; Painter, 314 F.2d at 943 ("[T]he scheme to defraud may consist of suggestions and promises as to the future, not made in good faith but with deceptive intent."). Okun's intent to repay, as it existed at the time the representation was made to the 1031 Advance, therefore would appear to be relevant whether that particular representation was made in good faith.

Second, a kind of misrepresentation allegedly was made to exchangers who signed exchange agreements with the various QIs after Okun purchased them. (See Bill of Particulars at ¶¶ 5, 6.) Though the exchange agreements differed, in essence, each promised that the exchanger funds would either be kept in insured bank accounts or invested for the benefit of the QIs. (See id.) The SSI alleges that Okun knew of the content of these exchange agreements and that they were entered into with exchangers at his direction.

None of the exchange agreements indicate that Okun represented to the exchangers that he personally would accept the funds, use them for his own benefit, and then repay them. The

representations in the exchange agreements were that the funds deposited with the QI would be handled in a certain way; an intent to repay the funds after handling them in a different way than that promised would appear to be irrelevant. Indeed, it appears that representations of that sort closely modeled those made by the defendant in Godwin, in which the Fourth Circuit held that his intent to repay was irrelevant. See Godwin, 272 F.3d at 667; see also United States v. Painter, 314 F.2d 939, 943 (4th Cir. 1963) (defendant's evidence of intent to repay irrelevant when he knowingly made false promises to investors). Therefore, evidence of Okun's intent (or ability) to repay appears to be irrelevant because such an intent offers no proof of his good faith belief that these representations were true.

In addition to alleging that Okun represented that he intended to repay the loans from 1031 Advance exchange funds, the United States also alleges that Okun represented that his lawyers had indicated that his course of conduct was legal. (Bill of Particulars at ¶ 3.f.)   Evidence concerning statements made to Okun by his legal counsel is relevant to the same extent, and for the same purpose, as evidence concerning his intent to repay: the United States has put the veracity of Okun's statements at issue, and he is perforce permitted to demonstrate that veracity. See Godwin, 272 F.3d at 666-67.   The possibility of such evidence

-14-

being used to support a broader good faith defense to the charges, instead of simply bearing on the particular representations made to the previous owners of 1031 Advance, will be discussed below.

## C. Good Faith Reliance on Counsel

Okun also asserts that based on advice of counsel, he believed that

> he could obtain loans from his own companies as long as the exchanges were funded when they were due. Evidence regarding his intent and ability to fulfill his obligation to fund the exchangers is therefore relevant to his good faith belief. Accordingly, this court should allow the defense to present any evidence at trial, including evidence of Mr. Okun's intent and ability to fund the exchange agreements, in support of these two defenses ["good faith" and "reliance on the advice of counsel"].

(Def. Mem. at 4.) This statement of the theories of defense conflates and confuses several concepts. It is therefore necessary to address the conflated components.

First, there is a defense which often is referred to as "good faith reliance on the advice of counsel." That is to say: good faith reliance on the advice of counsel is a defense to specific intent crimes such as mail and wire fraud because such reliance tends to negate the required mens rea. See United States v. Butler, 211 F.3d 826, 833 (4th Cir. 2000); United States v. Dyer, 750 F.Supp. 1278, 1293 (E.D.Va. 1990). The elements of

-15-

this defense are "(a) full disclosure of all pertinent facts to an expert, and (b) good faith reliance on the expert's advice." United States v. Miller, 658 F.2d 235, 237 (4th Cir. 1981).

It is therefore clear that, if the record contains evidence on each of these elements, Okun is entitled to a jury instruction on this defense. See United States v. O'Connor, 158 F.Supp.2d 697, 728 (E.D.Va. 2001). It is worth emphasizing, however, that there must be evidence on each and every element of the defense to warrant the giving of an instruction on the advice of counsel defense. See United States v. West, 2 F.3d 66, 70 (4th Cir. 1993).

In supplemental briefing and at oral argument, Okun's contention shifted from assertion of a full-fledged good faith reliance on advice of counsel to the contention that evidence of statements by counsel to Okun, even if insufficient to support an advice of counsel defense, were admissible nonetheless as probative of Okun's lack of specific intent to defraud. If Okun is not able to furnish sufficient evidence to warrant an instruction on the good faith reliance on counsel defense, any evidence of attorney advice presented might be relevant to the issue of specific intent. See United States v. Custer Channel Wing Corp., 376 F.2d 675, 683 (4th Cir. 1967) (citing Linden v. United States, 254 F.2d 560, 568 (4th Cir. 1958)). Relevance is

-16-

intended to "present[] a low barrier to admissibility," as the
evidence in question "need only be worth consideration by the
jury;" allowing evidence of what Okun was told by counsel
comports with that general policy. See United States v. Williams,
445 F.3d 724, 736 (4th Cir. 2006) (quoting United States v.
Leftenant, 341 F.3d 338, 346 (4th Cir. 2005)).

     As the Fourth Circuit explained in Linden: "That the
defendants proceeded under advice of a lawyer is a fact to be
considered together with other facts in determining the question
of the defendants' good faith . . ." 254 F.2d at 568;[2] accord
United States v. Van Allen, 525 F.3d 814, 823 (7th Cir. 2008);
United States v. Wenger, 427 F.3d 840, 853 (10th Cir. 2005);
United States v. Taglione, 546 F.2d 194, 200 (5th Cir. 1977). A
similar decision was reached in Painter, in which the Fourth
Circuit held that, "[in] judging whether the defendant's behavior
was honest or corrupt, [good faith reliance on counsel's advice]
is a circumstance the jury was entitled to weigh and consider as
a part of the entire context of the case." 314 F.2d at 943.

     The good faith at issue, however, is not a free-floating
state of mind.   Rather, it must be tethered to the charges at

---

[2] In Linden, the "good faith" issue was not well-explained by the
Court of Appeals.   However, it appears that the advice of
counsel was offered to "negative criminal intent." Id. at 565.
It is therefore reasonable to construe the reference to "good
faith" as relating to the specific intent element.

issue because good faith is relevant in assessing the defendant's state of mind only where state of mind or knowledge are elements of the offense. Thus, if a scheme to defraud is charged, evidence that the defendant had a good faith belief that the conduct in which the defendant engaged was lawful is pertinent to whether the defendant participated in a scheme he knew to be fraudulent. See 2 L. Sand, et al., Modern Federal Jury Instructions-Criminal, ¶¶ 8.01, 44.01, Inst. Nos. 8-1, 44-3 (2007). Evidence of advice of counsel, depending on its substance, could also be relevant to whether a defendant possessed the specific intent to defraud.

If the charge is a scheme to obtain property by false representations, advice of counsel (depending on what that advice was) might be pertinent to whether the defendant knowingly made a false statement. See id. Also, the advice could be relevant to the specific intent to defraud component of such a charge.

Whether advice of counsel respecting: (1) a good faith belief in the truth of a statement; (2) the knowledge of a scheme's fraudulent nature; or (3) defendant's specific intent is admissible depends on the substance of the advice and whether it actually is linked to one of those three questions. Here, the

substance of the written advice made known to the Court[3] is of dubious, if any, probative force on the three points to which advice of counsel conceptually might relate.    However, Okun's counsel asserted, at argument, that there is other evidence about advice of counsel.    Evidence that the United States says that it intends to offer on that topic may also supply further context to the written advice now known.    Hence, a ruling on admissibility now is premature.

There is a related issue respecting admissibility of evidence concerning Okun's reliance on counsel that requires some further attention.    Notwithstanding that relevance presents a low bar to admissibility, the Fourth Circuit is clear, and the Court now holds, that evidence of the advice of counsel, whether offered in support of a full-fledged advice of counsel defense or as probative of Okun's knowledge of state of mind would be relevant only to those actions which took place after the statements of counsel were made known to the defendant.    United States v. Polytarides, 584 F.2d 1350, 1352 (4th Cir. 1978).    In Polytarides, the defendant received advice from an individual

---

[3]    Eric Perkins November 7, 2006 Mem.; Eric Perkins November 21, 2006 Mem.; Kutak Rock Mem., attached as Ex. 2 to Def. Mem., at 1; KPKB Mem., attached as Ex. 1 to Def. Mem., at 1.    As explained below, however, the dates on which Okun received these memoranda will affect whether the advice contained therein is admissible.

purporting to be an attorney that his partially-completed arms sale was legal.  The Fourth Circuit explained that "[a] crucial element in the defense of acting upon the advice of counsel is that defendant secured the advice on the lawfulness of his Possible [sic] future conduct." Id. at 1353.[4]  This restriction on evidence of advice of counsel also applies when the evidence is simply offered as relevant to the question of good faith, because such evidence cannot be relevant if the defendant "had already manifested his intent to [take the action in question]." Id.

It is critical to admissibility that the advice was received by the defendant "before taking action." O'Connor, 158 F.Supp.2d at 728.  Like Polytarides, the defendants in O'Connor already had set their scheme in motion by the time the legal advice in question was received. Id. at 729.  Thus, their attempt to rely on that advice failed because the defendants had formed the intent carry out their scheme before they received the advice. Id.  In short, a defendant who takes "significant steps" toward the completion of his criminal action cannot avail himself of

---

[4] The Fifth Circuit in Taglione appears to have held to the contrary. See 546 F.2d at 194.  That decision is unexplained and is contrary to both logic and the decisions in the Fourth Circuit.

later-received advice of counsel respecting the lawfulness of that action. Id.

Therefore, any evidence concerning advice received by attorneys offered by Okun to support either a full defense of reliance on the advice of counsel or purportedly relevant to his knowledge or intent is only relevant respecting actions that Okun took after he received of that advice. See Polytarides, 584 F.2d at 1352. In either event, the substance of the advice must reasonably be susceptible to an interpretation that would negate knowledge or intent.

### III. CONCLUSION

For the reasons set forth above, the GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE DEFENDANTS FROM PRESENTING EVIDENCE OR ARGUMENTS RELATED TO THEIR INTENT/ABILITY TO REPAY (Docket No. 57) will be denied without prejudice.

_____ /s/   REP_____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: February 18, 2009