1

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF VIRGINIA
2                RICHMOND DIVISION

3  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                    :
4  UNITED STATES OF AMERICA         :
                                    :
5                                   :
   v.                               :   Criminal No.
6                                   :   3:08CR00132-01
   EDWARD HUGH OKUN                 :
7                                   :   March 9, 2009
   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:
8

9

10

          COMPLETE TRANSCRIPT OF JURY TRIAL DAY 5
11         BEFORE THE HONORABLE ROBERT E. PAYNE
                UNITED STATES DISTRICT JUDGE
12

13

14

15  APPEARANCES:

16  MICHAEL DRY, Assistant United States Attorney
   BRIGHAM CANNON, Assistant United States Attorney
17  JESSICA A. BRUMBERG, Assistant United States Attorney
   Richmond, Virginia
18
          Counsel on behalf of the United States
19
   CAROLYN V. GRADY, Assistant Federal Public Defender
20  ROBERT J. WAGNER, Assistant Federal Public Defender
   Richmond, Virginia
21  and
   MILLER & CHEVALIER
22  Washington, D.C. 20005
   BY:  BARRY J. POLLACK, ESQ.
23
          Counsel on behalf of the Defendant.
24
               DIANE J. DAFFRON, RPR
25             OFFICIAL COURT REPORTER
            UNITED STATES DISTRICT COURT

1                          I N D E X

2

3                          DIRECT   CROSS   REDIRECT

4   JEFFREY ZACARIAS           5       69       101

5   DAVID FIELD              105      209       --

6

7                       E X H I B I T S

8   **GOVERNMENT'S EXHIBITS**                         Page

9   No.   20  12/12/05 e-mail                          11

10  No.   43  5/19/06 e-mail                           13

11  No.   55  7/11/06 e-mail                           18

12  No.   60  7/26/06 e-mail                           19

13  No.   61  7/27/06 e-mail                           21

14  No.   89  10/4/06 e-mail                           38

15  No.   96  10/10/06 e-mail                          41

16  No.   98  10/11/06 e-mail                          44

17  No.  107  11/2/06 e-mail                           47

18  No.  145  11/15/06 e-mail                          50

19  No.  146  11/15/06 e-mail                          53

20  No.  148  11/17/06 e-mail                          54

21  No.  166  11/23/06 e-mail                          55

22  No.  172  11/29/06 e-mail                          57

23  No. 2012  Bank Statement                           58

24  No.  112  11/5/06 e-mail                          134

25

1                    I N D E X (Continued)

2
                                                        Page
3     **GOVERNMENT'S EXHIBITS**

4     No. 125   11/8/06 e-mail                           138

5     No. 127   11/9/06 e-mail                           139

6     No. 138   11/13/06 e-mail                          142

7     No. 139   1/13/06 e-mail                           146

8     No. 146   11/15/06 e-mail                          148

9     No. 156   11/20/06 e-mail                          151

10    No. 191   12/20/06 e-mail                          156

11    No. 217   2/27/07 e-mail                           189

12    No. 239   3/28/07 e-mail                           193

13    No. 245   4/9/07 e-mail                            195

14    No. 247   4/17/07 e-mail                           198

15    No. 252   4/19/07 e-mail                           200

16    No. 258   4/25/07 e-mail                           203

17    No. 265   4/25/07 e-mail                           206

18    No. 266   4/26/07 e-mail                           208

19
      **DEFENDANT'S EXHIBITS**
20
      No.  17   11/30/06 e-mail                           82
21
      No.  18   11/25/06 e-mail                           87
22
      No.  19   11/1/06 e-mail                            97
23

24

25

```
 1              (The proceedings in this matter commenced at

 2  9:30 a.m.)

 3

 4              THE CLERK:  Criminal case No. 3:08CR132, the

 5  United States of America vs. Edward Hugh Okun.  The

 6  United States is represented by Michael Dry, Brigham

 7  Cannon and Jessica Brumberg.  The defendant is

 8  represented by Robert Wagner, Carolyn Grady and Barry

 9  Pollack.

10              Are counsel ready to proceed?

11              MR. DRY:  The United States is ready to

12  proceed.

13              MR. WAGNER:  Mr. Okun is ready, Your Honor.

14              THE COURT:  All right.

15              Good morning, ladies and gentlemen.

16              THE JURY:  Good morning.

17              THE COURT:  All right.  Counsel, good

18  morning.

19              MR. DRY:  Good morning, Your Honor.

20              THE COURT:  Your next witness?

21              MR. DRY:  The United States would call

22  Jeffrey Zacarias to the stand.

23              THE COURT:  Call Mr. Zacarias.

24

25
```

1    **JEFFREY S. ZACARIAS**, called by the United States,

2  first being duly sworn, testified as follows:

3

4    DIRECT EXAMINATION

5  BY MR. DRY:

6  Q    Mr. Zacarias, please state your full name for the

7  record.

8  A    Jeffrey Scott Zacarias.

9  Q    Please spell your last name, sir?

10 A    Z-a-c-a-r-i-a-s.

11 Q    Sir, where do you currently live?

12 A    5861 Columbia Circle, Greenwood, Indiana 46142.

13 Q    What do you do for a living?

14 A    I am a county manager for Simon Properties, Inc.

15 Q    Are you a certified public accountant?

16 A    No, sir, I'm not.

17 Q    Sir --

18        THE COURT:  Excuse me.  Let me tend to an

19 administrative matter.

20        Strike the witness's address from the record

21 and please don't ask them the address, so we don't have

22 the editing problem to take care of.

23        MR. DRY:  Yes, Your Honor.

24 Q    Sir, when did you first meet Edward Okun?

25 A    It was approximately August of 2005.

1  Q      How did that come about?

2  A      I had a friend that worked for Ed and he

3  introduced me to Ed.

4  Q      What was the purpose of those discussions with

5  Edward Okun?

6  A      I was to interview for a position that he was

7  creating as a chief financial officer for Investment

8  Properties of America.

9  Q      Where did you meet?

10  A      We met at an office in Indianapolis.

11  Q      During those discussions, did Mr. Okun describe

12  what he wanted you to do?

13  A      Yes.

14  Q      Please relate that to the jury.

15  A      He wanted somebody to assist in creating an

16  accounting system that would be able to properly

17  identify the profits and losses of the company and also

18  correct balance sheets and billings.

19  Q      Why were you creating those kinds of documents?

20  A      At that time he felt that his existing system

21  wasn't keeping enough of an accurate description of the

22  profits and losses of the company.

23  Q      Were those documents going to be shared with

24  anybody such as banks?

25  A      Yes.

1  Q    For what purpose?

2  A    Banks for financing and for internal review for

3  profit and loss.

4  Q    When did you come to work for Investment

5  Properties of America?

6  A    In August of 2005.

7  Q    What was your title?

8  A    Chief financial officer.

9  Q    At the time that you came to work for Investment

10 Properties of America did you know that Edward Okun

11 owned a qualified intermediary company?

12 A    No, sir, I did not.

13 Q    Did you subsequently learn that he did?

14 A    Yes.

15 Q    When did you learn that?

16 A    It was soon afterwards that I found out.

17 Q    Now, you're the chief financial officer for

18 Investment Properties of America.  Initially, when you

19 were first hired, did your duties include any of the

20 accounting for Atlantic Exchange Company?

21 A    No, sir, they did not.

22 Q    Did Mr. Okun and you have discussions about that?

23 A    I was told that those were two separate companies

24 and my focus was to be on the property management side.

25 Q    Who told you that?

1  A      Ed Okun.

2  Q      Did Mr. Okun describe who was going to be doing

3  the accounting for Atlantic Exchange Company?

4  A      Yes.

5  Q      Who did he say?

6  A      Lara Coleman.

7  Q      Did you know who Lara Coleman was?

8  A      Yes, sir.

9  Q      What was your understanding of what she did at

10 Investment Properties of America?

11 A      At that time she was a chief operating officer.

12 Q      Late 2005 or December of '05 or January of 2006,

13 did you become involved at all in Atlantic Exchange

14 Company?

15 A      In one instance I did, yes.

16 Q      Describe that for the jury.

17             THE COURT:  When was this?

18             THE WITNESS:  It was in either late December

19 or early January.

20 Q      That was 2005?

21 A      Late December of 2005 or early January of 2006.

22 Q      Can you describe why you in that one instance

23 became involved in Atlantic Exchange Company?

24 A      A check was written from a client to Atlantic

25 Exchange Company for an exchange, and the check was

1 sent to Richmond, Virginia, to Lara Coleman to be

2 deposited.  And that check was never deposited into the

3 bank.  It was sitting on her desk.

4      The client subsequently wanted to get his money

5 back from the exchange, and Atlantic Exchange Company

6 assumed that since they had not been notified --

7           MR. WAGNER:  Objection to what they assumed,

8 Your Honor.

9           MR. DRY:  I'm asking for his understanding of

10 what --

11 Q    The Atlantic Exchange Company paid the exchanger?

12 A    Yes, Atlantic Exchange Company paid the exchanger

13 back his the money that they received from the check

14 that he wrote.

15 Q    Was that check good?

16 A    No, it was not.

17 Q    Okay.  What were you instructed to do regarding

18 the situation?

19 A    I was instructed to go to Atlantic Exchange

20 Company and find out why the client was paid back their

21 money without the check in the bank.

22 Q    Who instructed you to do that?

23 A    Edward Okun.

24 Q    Did you subsequently go to Atlantic Exchange

25 Company?

1  A      Yes, I did.

2  Q      What did you discover when you were there?

3  A      I discovered that the check had been given to Lara

4  Coleman to deposit.  That check had not been deposited

5  until after the client received their money back.

6  Q      What did you discover regarding the financial

7  controls of Atlantic Exchange Company?

8  A      That there wasn't a good control of the cash that

9  was coming in or the cash that was going out.

10  Q      When you say "control," were they tracking how

11  much money was coming in or going out of Atlantic

12  Exchange Company effectively?

13  A      No, they were not.

14  Q      Did you have a conversation with Mr. Okun about

15  that fact?

16  A      Yes, I asked Mr. Okun what policies and procedures

17  were in place at the time, and I was told that that was

18  still not my responsibility, that Lara Coleman was

19  taking care of the accounting.

20  Q      Did you recommend that they hire an accountant or

21  controller for Atlantic Exchange Company to Mr. Okun?

22  A      Yes, I did.

23  Q      What was his response?

24  A      That that was not my responsibility.

25  Q      Okay.  I'm going to now show you what's previously

1 been marked as Government's Exhibit 20.  And it has not

2 been admitted in to evidence.

3      Mr. Zacarias, what is this?

4 A    This is an e-mail asking Lara Coleman --

5 Q    Just describe who it's from and who it's to?

6 A    It's from me to Lara Coleman.

7 Q    Is anybody courtesy-copied?

8 A    Lydia Renka.

9           MR. DRY:  At this time I'd like to admit

10 Government's Exhibit 20 into evidence.

11           MR. WAGNER:  No objection.

12           THE COURT:  It's admitted.

13           (Government's Exhibit 20 is admitted into

14 evidence.)

15 BY MR. DRY:

16 Q    Sir, can you describe this bottom e-mail to the

17 jury?

18 A    This e-mail was a listing of cash that was going

19 to be required to pay our monthly operating expenses,

20 as well as some additional taxes that were to be paid

21 for West Oaks Mall.

22 Q    Can you read the bottom line, sir?

23 A    "Total approximate immediate cash needs,

24 2,970,000."

25 Q    Describe to the members of the jury the cash

1 position of Investment Properties of America around

2 this time.

3          MR. WAGNER:  Objection.  Foundation.

4          MR. DRY:  He's the chief financial officer of

5 the company, Your Honor.

6          MR. WAGNER:  Still requires a foundation for

7 him to testify to it.

8          THE COURT:  I would think he can just ask him

9 to explain the condition.  Who is better able to do it

10 and what better foundation do you need if the fellow is

11 the CFO?

12          MR. WAGNER:  What information he relied on

13 for that cash position.

14          THE COURT:  Overruled.

15 Q    Describe the cash position of Investment

16 Properties of America at this time.

17 A    Investment Properties of America did not have

18 enough cash available from income to pay its operating

19 expenses.

20 Q    I'd like to now direct your attention to

21 Government's Exhibit 43, which has not been admitted in

22 to evidence.  Referring to the top e-mail, please, who

23 is this e-mail from and to?

24 A    This is from me to Mr. Okun.

25 Q    Who is courtesy-copied?

1 A     Lara Coleman.

2 Q     What is the date of the e-mail?

3 A     May 24, 2006.

4       MR. DRY:  At this time I'd like to admit

5 Government's Exhibit 43 into evidence.

6       MR. WAGNER:  If I can have a moment, Your

7 Honor.

8       No objection.

9       THE COURT:  It's admitted.

10      (Government's Exhibit No. 43 is admitted into

11 evidence.)

12 BY MR. DRY:

13 Q    Sir, this string of e-mails, what are you relaying

14 to Mr. Okun at this time?

15 A    I was relaying how much cash would be required to

16 pay operating expenses for the short term.

17 Q    We just looked at an e-mail from January.  This

18 one is from May.  From January to May of 2006, what was

19 the cash -- how would you describe the cash position of

20 Investment Properties of America?

21 A    It was not sufficient cash available to continue

22 to pay general operating expenses.

23      MR. WAGNER:  Same objection, Your Honor.

24 Foundation.

25      THE COURT:  Overruled.

1   Q      When there was insufficient cash, how would

2   Investment Properties of America obtain the cash to

3   meet its obligations?

4   A      I would contact Mr. Okun and Ms. Coleman.  Let

5   them know how much cash was required.  And then they

6   would wire funds into those accounts.

7   Q      Now, initially, what was your understanding of

8   where that money was coming from?

9   A      Initially, my understanding was it was coming from

10  Ed's personal wealth.

11  Q      Did you subsequently learn that it was coming from

12  the qualified intermediaries?

13  A      Yes, sir, I did.

14  Q      When was that approximately, sir?

15  A      It would have been sometime in the late spring of

16  2006.

17  Q      Did you understand whether that money was coming

18  from client exchange accounts or the profits of the

19  qualified intermediary companies?

20  A      At that juncture I did not know where it was

21  coming from.

22  Q      Did you have any knowledge about qualified

23  intermediary companies around this time?

24  A      No, sir, I did not.

25  Q      Did the fact that you learned that the qualified

1 intermediary companies were providing cash to

2 Investment Properties of America raise any red flags

3 for you at that time?

4 A     No, sir, at that time it did not.

5 Q     Were you ever asked by Mr. Okun to provide any due

6 diligence on real estate exchange services?

7 A     Yes, sir, I was.

8 Q     What, specifically, did Mr. Okun ask you to do?

9 A     Mr. Okun asked me to review the financial

10 statements of REES company in Florida.

11            THE COURT:  REES is what?

12            THE WITNESS:  Real Estate Exchange Services.

13            THE COURT:  That's an acronym for Real Estate

14 Exchange Services?

15            THE WITNESS:  Yes, sir.

16            THE COURT:  R-E-E-S, is that it?

17            THE WITNESS:  Yes, sir.

18 BY MR. DRY:

19 Q     What did you create in response to this request?

20 A     I created a pretty simple pro forma outlining the

21 profits and losses of the company and also a balance

22 sheet of how much existing cash was in the company.

23 Q     Did you give that to Mr. Okun?

24 A     Yes, sir, I did.

25 Q     What was his response?

1  A    Mr. Okun was not concerned with the profit and

2  loss statements.  He was concerned with the --

3         MR. WAGNER:  Objection to what he was

4  concerned with.  It's what he said.

5         THE COURT:  That's correct.

6  Q    What did he say to you?

7  A    He specifically said, "I'm not interested in a

8  profit and loss statement.  I want to know how much

9  cash is coming in, what the cycle of cash is coming in,

10  and how much cash we can expect to get in the future."

11         THE COURT:  Have you given us any time frame

12  for this?

13         MR. DRY:  I'm sorry, sir.

14  Q    The Real Estate Exchange Services acquisition, was

15  that in June of 2006?

16  A    I don't recall the specific date.  It was either

17  June or July of 2006.

18  Q    Were you performing this due diligence before the

19  acquisition?

20  A    Yes, sir, I was.

21  Q    How much, if you know, in relationship to the

22  actual acquisition, how much earlier were you doing

23  this?  Was it two months, a month, a week?

24  A    I don't recall the specific length of time, but I

25  believe it was a very short period of time.  It was

1  probably -- I can't remember the specific time.   I

2  would say more than a week or two weeks.

3  Q    Were you ever given instructions by Mr. Okun

4  regarding keeping the Real Estate Exchange Services

5  acquisitions secret?

6  A    Yes, sir.

7  Q    Describe that for the jury.

8  A    I was specifically told to not tell Todd Pajonas

9  or anybody at the other exchange companies that Real

10 Estate Exchange Services was purchased by Mr. Okun.

11 Q    Did Mr. Okun make any statements regarding what

12 would happen if you violated those orders?

13 A    Yes, he did.

14 Q    What were those?

15 A    That in the event I did tell anybody about that,

16 that I could possibly be terminated.

17 Q    What was the reason that Mr. Okun gave you

18 regarding keeping the Real Estate Exchange Services

19 acquisitions secret?

20 A    He told me that Mr. Todd Pajonas had looked at the

21 company, didn't feel that it was a good acquisition,

22 and Mr. Okun disagreed and purchased the company.

23 Q    Going now to Government's Exhibit 55, top e-mail,

24 please.  Please tell the members of the jury who this

25 is from, the date, and who it is to, sir.

1 A    It's from me to Laura Coleman and a copy to

2 Mr. Okun.

3         MR. DRY:  At this time I would like to admit

4 Government's Exhibit 55 into evidence.

5         THE COURT:  Any objection to 55?

6         MR. WAGNER:  Just a moment, Your Honor.

7         No objection.

8         THE COURT:  It's admitted.

9         (Government's Exhibit 55 is admitted into

10 evidence.)

11 BY MR. DRY:

12 Q    Sir, please describe what information you were

13 providing Mr. Okun and Ms. Coleman at this time.

14 A    Yes, sir.  I was listing out the cash acquirements

15 of the company.

16 Q    What's the last sentence in this?

17 A    "We have about 650,000 available in cash."

18 Q    How much was the total that you were informing

19 them was necessary?

20 A    1.74 million.

21 Q    How would you describe Investment Properties of

22 America cash position at this time?

23 A    It was the same as it was from when I started.  It

24 was not sufficient cash available to pay its general

25 operating expenses.

1 Q    Okay.  Turning your attention to Government's

2 Exhibit 60, please.

3          MR. DRY:  At this time I'd like to admit

4 Government's Exhibit 60 into evidence.

5          THE COURT:  Any objection?

6          MR. WAGNER:  No objection.

7          THE COURT:  It's admitted.

8          (Government's Exhibit 60 is admitted into

9 evidence.)

10 BY MR. DRY:

11 Q    Sir, the bottom e-mail, do you remember what this

12 was in relationship to?

13 A    Yes.  It was in relation to Mr. Okun purchasing a

14 helicopter.

15          THE COURT:  Purchasing a what?

16          THE WITNESS:  A helicopter.

17 Q    If you could bring the mic closer and speak up a

18 little bit, sir.

19          If you could read Ms. Coleman's e-mail at the top.

20 A    "Okay.  I'm not sure how he plans to do this.  I'm

21 meeting with him tomorrow and I'll ask."

22 Q    At this time did Investment Properties of America

23 have sufficient cash to pay for a helicopter for

24 Mr. Okun?

25 A    No, sir, it did not.

1  Q    I'd like to now show you Government's Exhibit 61,

2  please.  It's not been admitted into evidence.  The top

3  e-mail, please.  Actually, go down to the bottom,

4  please.  I'm sorry.  You're right.

5       On the top e-mail, please say who this is from and

6  who it's to.

7  A    From Mr. Okun to Lara Coleman.

8  Q    Did you eventually receive a copy of this e-mail?

9  A    Yes, sir, I did.

10          MR. DRY:  At this time I'd like to admit

11 Government's Exhibit 61 into evidence.

12          MR. WAGNER:  Objection.  Eventually receiving

13 a copy of this doesn't make him competent to introduce

14 this into evidence.  We need more of a foundation, Your

15 Honor.

16          MR. DRY:  Actually, Your Honor, it's been

17 stipulated as to authenticity by the defense.  It's a

18 party opponent statement by Mr. Okun, so it gets in

19 over the hearsay objection.  All we're asking Mr.

20 Zacarias is whether he recollects the purchase, and how

21 Mr. Okun describes it is not a hearsay statement.

22          THE COURT:  You did agree to its

23 authenticity?

24          MR. WAGNER:  No question, Your Honor.  The

25 objection is to foundation and to competency of the

1  witness to testify to this particular event.

2          THE COURT:  Overruled.

3          (Government's Exhibit No. 61 is admitted into

4  evidence.)

5  BY MR. DRY:

6  Q    Sir, this e-mail is referencing the helicopter; is

7  that correct?

8  A    Yes, sir.

9  Q    Could you please read how Mr. Okun describes it?

10 A    "Our new toy.  Check it out.  Ed."

11 Q    Go to the second page of the exhibit.  And you

12 recall seeing this at this time?

13 A    Yes, sir.

14 Q    Okay.  Now, up until August of 2006, were you

15 involved in the qualified intermediary accounting?

16 A    I was not involved in the day-to-day accounting.

17 Q    At some point did you become involved in the

18 accounting at the qualified intermediary companies?

19 A    At one point I did.  My first involvement was

20 strictly to interview a person that was going to be the

21 controller prior to me be coming actively involved in

22 the company.

23 Q    Who directed you to become involved in the

24 accounting at the qualified intermediary companies?

25 A    Mr. Okun and Ms. Coleman.

1  Q     What did Mr. Okun tell you that he wanted you to

2  do?  What was the purpose of you becoming involved?

3  A     My involvement was to get their financial

4  statements in order and to assist in putting together

5  an accounting system that would be able to track all of

6  the incoming cash as well as any outgoing cash.

7            THE COURT:  When was this?

8  Q     When was this, sir?

9  A     It was approximately August of 2006.

10 Q     What did you do in response to Mr. Okun's

11 instructions?

12 A     Since I didn't know anything about the qualified

13 intermediary companies or how they worked, I met with

14 Real Estate Exchange Services in Florida, and I met

15 with IXG in Denver, Colorado.

16 Q     Who did you meet with at Real Estate Exchange

17 Services in Florida?

18 A     David Shefman.

19 Q     Did Mr. Shefman ask you any questions while you

20 were there?

21 A     Yes, sir, he did.

22 Q     What did he ask you?

23            MR. WAGNER:  Objection.  Hearsay, Your Honor.

24            MR. DRY:  It's not a statement.  It's a

25 question.  He's saying that Mr. Shefman asked him a

 1  question.

 2              MR. WAGNER:  As long as it's a question.

 3              THE COURT:  Overruled.

 4  Q    What did Mr. Shefman ask you?

 5  A    Mr. Shefman asked me what happened to the cash

 6  that was transferred from his exchange accounts to

 7  exchange accounts that were controlled by Mr. Okun.

 8  Q    Who did you meet with at Investment Exchange Group

 9  in Colorado?

10  A    I chatted with Drew McCabe.

11  Q    Did they ask you any questions?

12  A    Yes, sir.

13  Q    What did they ask you?

14  A    They asked me what happened to the cash that was

15  transferred from their client exchange accounts to

16  exchange accounts that were controlled by Mr. Okun.

17  Q    Did you answer their questions?

18  A    Yes, I did.

19  Q    What did you say?

20  A    I said that that's an issue that he needs to talk

21  to Mr. Okun about.

22  Q    Did you inform Mr. Okun about the questions that

23  you received?

24  A    Yes, sir, I did.

25  Q    What was his response?

1  A    That he would take care of discussing those issues

2  with them.

3  Q    Did he say whether you should be involved in that?

4  A    He said I should not be involved in those

5  discussions.

6  Q    Did you go up to Security 1031 Services as part --

7  A    Yes, I did.

8  Q    What was your understanding of what was occurring

9  at Security 1031 Services at this time regarding --

10        THE COURT:  At which time?

11        MR. DRY:  I'm sorry.

12  Q    When did you go up there, approximately?

13  A    Approximately, the end of July, first of August of

14  2006.

15  Q    What was your understanding at the end of July,

16  early August of 2006, of what they were doing regarding

17  the accounting?

18  A    They hired a company called Citrin Cooperman to

19  review its financial statements and put together a

20  financial package for 2005, and they had hired a

21  controller, Bob Bredenberg, to put together an

22  accounting system and to start the process of putting

23  together an accounting system from January 1st of

24  2006 going forward.

25  Q    As far as Atlantic Exchange Company, you

1  previously testified that Ms. Coleman was supposed to

2  be keeping those books.  Did Ms. Coleman provide

3  information to Mr. Bredenberg or yourself regarding

4  what had happened in the past?

5  A    She provided a file that was a Quick Books file.

6  Unfortunately, when Mr. Bredenberg got the file, he was

7  unable to open it because he didn't have any of the

8  passwords.

9  Q    Did you yourself begin reviewing the bank balances

10 to track cash coming into the qualified intermediaries

11 and cash going out?

12 A    Yes, sir, I did.

13 Q    As part of that review, did you discover anything

14 about Mr. Okun's use of the qualified intermediary

15 funds for personal uses?

16 A    Yes, sir, I did.

17 Q    Describe that for the jury.

18 A    As I was reviewing the bank statements, I found

19 that there was money that was going from a pooled --

20         MR. WAGNER:  I would object.  This calls for

21 expert opinion testimony.  He's reviewing statements

22 and drawing conclusions from those statements.

23         MR. DRY:  No, Your Honor.  He's the CFO.

24 He's merely tracking cash going in and out, and he, as

25 he'll testify, realizes that the money is going for a

1  nonexchange-related purpose.  He's not a CPA.  He's not

2  using any expertise.  And he's the CFO describing what

3  happened at the time and how he discovered it.

4          MR. WAGNER:  It still requires some expertise

5  unless more of a foundation is drawn by the government

6  as to what --

7          THE COURT:  It's lay opinion testimony based

8  on his own observations of the books for which he's

9  supposed to be examining.

10          MR. WAGNER:  What particular observations

11  they were then?

12          THE COURT:  What does that mean?

13          MR. WAGNER:  Well, if he can point to certain

14  lines in the bank statements that he was looking at

15  which told him that money was going for personal

16  expenses of Mr. Okun, then a foundation would be laid.

17          THE COURT:  Your objection is to lack of

18  foundation?

19          MR. WAGNER:  Yes.

20          THE COURT:  So the other objections are

21  overruled.  It's proper lay opinion testimony by the

22  CFO of IPofA, who was also examining the books at the

23  instruction of Okun, that is the books of the QIs, at

24  the instruction of Mr. Okun.  That objection is

25  overruled or withdrawn.  I'm not sure which.  If it's

1  not withdrawn, it's overruled.

2           As to foundation, do you want him to explain

3  what he examined to do that?

4           MR. WAGNER:  The objection is not withdrawn,

5  Your Honor, as to expertise.

6           THE COURT:  All right.  It's overruled then.

7  BY MR. DRY:

8  Q    I believe you testified you were reviewing bank

9  records.  Were you reviewing back records at the time

10 you made this discovery?

11 A    Yes, sir, I was reviewing the original bank

12 statements.

13 Q    Do you remember which company?

14 A    For Atlantic Exchange Company, as well as the 1031

15 Exchange Company, and also as individual -- it was the

16 Atlantic Exchange Company bank statements and the 1031

17 Tax Group bank statements.

18 Q    When you're reviewing those, what did you

19 discover?

20 A    When I was reviewing those statements, I

21 discovered that there was money --

22          MR. WAGNER:  Can we have a time period,

23 Judge?

24          THE COURT:  You were reviewing the AEC bank

25 statements and what other company?

1          THE WITNESS:  SOS.  1031 SOS.

2          THE COURT:  Is 1031 the same thing as SOS,

3   what you-all are calling SOS, Mr. Zacarias?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  So you were reviewing those bank

6   statements.  When were you doing that?

7          THE WITNESS:  It was approximately August of

8   2006.

9          THE COURT:  All right.  Go ahead.

10  BY MR. DRY:

11  Q    What did you discover in August of 2006 based on

12  your review of those bank records?

13  A    While I was reviewing those bank records, I saw

14  withdrawals leaving Atlantic Exchange Company and wires

15  going directly into Ed's personal bank account.

16  Q    Did you recognize what those were used for?

17  A    In some instances, yes.

18  Q    In one particular instance regarding Simone 1 and

19  Simone 2 Condos?

20  A    Yes, sir.  It was a wire that went from AEC --

21         MR. WAGNER:  Objection to foundation.  We

22  need to know when this was and what bank statements he

23  was looking at.

24         THE COURT:  He's reviewing August of 2006 and

25  looking at the AEC bank statements.

1          MR. WAGNER:  But which particular bank

2  statement is he referring to for this particular

3  instance, Your Honor?  He's talking about Simone 2

4  Condos.

5          MR. DRY:  Judge, he doesn't need to describe

6  the exact bank statement he was reviewing.  He's merely

7  saying, "I looked at a bank statement.  I saw money

8  went from AEC's bank account to Okun's personal

9  account."

10          THE COURT:  Look, I know what he's saying.  I

11  know what he testified to.  That's not a proper

12  response to the objection.  I don't know what the

13  objection is yet.  What is the objection?

14          MR. WAGNER:  It's a foundation objection,

15  Your Honor.

16          THE COURT:  A lack of foundation.  What's the

17  foundation for his testimony about this particular

18  entry?  Is there a bank statement to back it up?

19          MR. DRY:  There's a bank statement to back it

20  up.  In fact --

21          THE COURT:  He can testify about it first and

22  then go to the bank statement.  It doesn't make any

23  difference, but one way or the other there needs to be

24  a foundation laid for what he's testifying from or

25  about.

1              So do you have the bank statement?  Let him

2  look at it.

3              MR. DRY:  I don't have the bank statement

4  with me, Your Honor.

5              THE COURT:  Well, are you going to get it

6  later?  Send somebody to get it.  Go on and ask him the

7  question because you're going to produce a bank

8  statement.

9              MR. DRY:  Let me just do it this way.

10 BY MR. DRY:

11 Q     Did you tell anyone else about Mr. Okun's use of

12 personal funds?

13 A     Yes, sir, I did.

14 Q     Who did you tell?

15 A     Eric Perkins, the chief legal officer.

16 Q     But around the time you discovered it in August of

17 2006, August and September, did you tell Mr. Pajonas?

18             MR. WAGNER:  Objection, Your Honor, leading

19 the witness.  He testified he told Eric Perkins and now

20 he's suggesting another person he may have told.

21             MR. DRY:  Your Honor, I merely said --

22             THE COURT:  I know what you said.  I heard

23 you.

24             MR. DRY:  Okay, Your Honor, I apologize.

25             THE COURT:  What practice is this?  We don't

1  do that.

2           So what are you going to do?  Come on.  Did

3  you tell anybody else that you can recall?  If he says,

4  no, then he can't recall.  If he says yes, then the

5  next question is:  Who is it?  If he can't, he can't.

6  Move on.

7           MR. DRY:  Okay.

8           THE COURT:  But you can't say:  Did you tell

9  Joe?

10          MR. DRY:  Okay, Your Honor.

11          THE COURT:  Objection sustained.

12  BY MR. DRY:

13  Q    Was there anybody else that you told regarding

14  what you had discovered?

15  A    Yes, sir.

16  Q    Did you participate -- who was that?

17  A    That was Mr. Todd Pajonas.

18  Q    Did you participate in a meeting in which

19  Mr. Pajonas confronted anyone with that information?

20  A    Yes, sir, I did.

21  Q    When was that?

22  A    It was late August or possibly early September.

23  Q    Describe where that was at.

24  A    The meeting took place on Mr. Okun's yacht.

25  Q    Who participated in it?

1  A    Mr. Todd Pajonas, Ms. Lara Coleman, and Mr. Barry

2  Powlishen.

3  Q    Who did Mr. Pajonas confront with that

4  information?

5  A    He asked Ms. Coleman if Edward Okun had taken any

6  money from any of the qualified intermediary accounts

7  and deposited them or used them for any personal use.

8  Q    What was Ms. Coleman's response?

9  A    She told Mr. Pajonas, "Absolutely not."

10 Q    Describe how Mr. Pajonas was confronting

11 Ms. Coleman?

12 A    It was very verbal, loud, and confrontational.

13 Q    Did Mr. Pajonas subsequently confront Ms. Coleman

14 again about Mr. Okun's use of the qualified

15 intermediary funds?

16 A    Yes, he did.

17 Q    When was that?

18 A    It was at a subsequent meeting we had, and once

19 again, that meeting took place on Mr. Okun's yacht.

20         THE COURT:  When was the first meeting?  What

21 month and year?

22         THE WITNESS:  It was late August or early

23 September of 2006.

24         THE COURT:  When was the second meeting?

25         THE WITNESS:  I don't recall the specific

1 date, but it was --

2          THE COURT:  What month and year?

3          THE WITNESS:  September of 2006 or possibly

4 October of 2006.

5 BY MR. DRY:

6 Q    How long after the first meeting do you estimate

7 the second meeting occurred?

8 A    I don't recall specifically.  It was a couple

9 weeks.

10 Q    Okay.  Describe Mr. Pajonas confronting

11 Ms. Coleman at this meeting?

12 A    Mr. Pajonas, once again, confronted Ms. Coleman

13 and asked her again specifically if Mr. Okun had been

14 using any of the qualified intermediary companies for

15 personal use or even using that money for any other

16 type of acquisitions.

17 Q    Did Ms. Coleman justify what had been occurring in

18 any way?

19          THE COURT:  What did Ms. Coleman say?  Come

20 on.

21 Q    What did Ms. Coleman say?

22          THE COURT:  It may be a good idea to explain

23 who was present, too.

24          Again, you all have to remember, you all know

25 everything about the case.  The jury doesn't know.  I

1 don't know.  You all have to explain it to the people

2 who have to make the decisions.

3 Q    Who was present at the second meeting?

4 A    At the second meeting it was Mr. Todd Pajonas,

5 Ms. Lara Coleman, and Mr. Barry Powlishen and myself.

6 Q    And Mr. Pajonas confronted Ms. Coleman.  What did

7 Ms. Coleman say in response?

8 A    Ms. Coleman said that he was using money for other

9 purposes; however, he did have a legal opinion that

10 indicated that what he was doing with the money was

11 okay.

12 Q    Around this time frame of this meeting, did you

13 speak to Mr. Okun about the concerns regarding what was

14 occurring?

15 A    Yes, we did.

16 Q    What did Mr. Okun say?

17         MR. WAGNER:  Excuse me.  "We?  Yes, we did?"

18 Q    Who did you have a conversation with?

19 A    I had a conversation with Mr. Okun at one time.  I

20 had a conversation with Ms. Coleman and also with

21 Mr. Pajonas.

22 Q    But just going to your conversation with Mr. Okun,

23 when do you think this occurred?

24 A    That conversation would have occurred sometime in

25 October of 2006.

1  Q    Who else participated?  Did anybody else

2  participate?

3  A    There were several conversations.

4        THE COURT:  The question is:  Was there

5  anything the first conversation?

6        THE WITNESS:  The first conversation I had

7  with Mr. Okun, you know, I expressed my concerns, and

8  he said that this is the way the business is done.

9  Other qualified intermediary companies are doing the

10 same thing, that he's talked to -- he named the

11 specific name of another qualified intermediary company

12 and said he was doing the same thing with those funds,

13 and it's a normal part of business.

14 Q    During that conversation, was Mr. Okun expressing

15 concern that qualified intermediaries --

16       THE COURT:  What else did Mr. Okun say?

17 Q    What else did Mr. Okun say?

18       THE COURT:  If anything.

19 A    He said he had a legal opinion indicating that

20 these transactions were okay.

21 Q    Was there a meeting with Mr. Okun on his yacht to

22 discuss the situation?

23 A    Yes, sir, there was.

24 Q    When approximately did that occur?

25 A    That occurred sometime towards the latter part, I

1 believe, of October 2006.

2           MR. DRY:  Would you bring up Government's

3 Exhibit 85, please.  The second page of that, please.

4 This is not for publication to the jury.

5 BY MR. DRY:

6 Q     Reviewing this document, sir, does this refresh

7 your recollection of when the meeting occurred?

8 A     At the end of September -- September 21, 2006.

9 Q     Okay, sir.

10           MR. DRY:  You can take that down.

11 Q     During this meeting, who attended?

12 A     Barry Powlishen, Mr. Todd Pajonas, Mr. Ed Okun,

13 and Lara Coleman, and myself.

14 Q     Who did most of the talking?

15 A     Mr. Todd Pajonas.

16 Q     What did Mr. Pajonas tell Mr. Okun?

17 A     He told Mr. Okun that he felt that what he was

18 doing was not legal and that he wanted all the money to

19 be paid back to the qualified intermediary companies

20 that he took, and he wanted Mr. Okun to sign an

21 investment policy that was created by Barry Powlishen,

22 Todd Pajonas and myself that limited the use of funds

23 that Mr. Okun would have access to.

24 Q     And turning your attention now to Government's 85,

25 which had been admitted into evidence, what is this,

1  sir?

2  A     This is the investment policy that we created.

3  Q     Who was on the investment policy committee?

4  A     Mr. Edward Okun, Mr. Todd Pajonas, Mr. Barry

5  Powlishen, myself, and Mr. Kenneth Bolton.

6  Q     How many people would be required to authorize any

7  loans from the QI client funds?

8  A     It would have to be a majority of the listed

9  individuals.

10 Q     What was the purpose of that?

11 A     The purpose was so that Mr. Todd Pajonas,

12 Mr. Barry Powlishen and myself could tell Mr. Okun that

13 if he wanted to take cash out of the company, we would

14 be in a position to not allow him to do that.

15 Q     Did Mr. Okun sign any promissory notes on that

16 yacht?

17 A     Yes, sir, he did.

18 Q     How many promissory notes would you estimate?

19 A     I don't recall the specific number of promissory

20 notes.  It was a very large stack of promissory notes.

21 Q     What was the financial condition of Investment

22 Properties of America at this time on a cash basis?

23 A     Investment Properties of America continued to not

24 have enough cash readily available to pay its general

25 operating expenses.

1  Q    Okay.  Turning to Government's Exhibit 89, which

2  has not been admitted into evidence.  What is this top

3  portion of this e-mail, sir?

4  A    Pardon me?

5  Q    Who was this from and to?

6  A    It's from me to Mr. Todd Pajonas and Mr. Barry

7  Powlishen.

8         MR. DRY:  First of all, I'd like to admit

9  Government's Exhibit 89 into evidence.

10         THE COURT:  Any objection?

11         MR. WAGNER:  No objection, Your Honor.

12         THE COURT:  It's admitted.

13         (Government's Exhibit No. 89 is admitted into

14  evidence.)

15  Q    Why did you write this e-mail?

16  A    I wrote this e-mail after a conversation that I

17  had had with Mr. Okun, and he instructed me to roll out

18  this policy to all of our qualified intermediaries

19  throughout the whole company.

20  Q    What was the policy going to be?

21  A    The policy was going to be that we needed to

22  become more customer service friendly and that we

23  needed to start calling our clients on a daily basis to

24  find out when they were going to be using the exchange

25  money that they deposited with us, and also contact

1  anybody who had requested information from the exchange

2  companies to find out from them when we may be able to

3  get cash, and if we were going to be able to get cash,

4  when was it going to be and how much was it going to

5  be.

6  Q    What with was the financial condition of the

7  qualified intermediary companies at this time?

8         MR. WAGNER:  Objection to foundation, Your

9  Honor.  He says that he was the CFO and dealing with

10  IPofA and their cash flow.  We don't know how much he's

11  learned about the other QIs at this point.

12  BY MR. DRY:

13  Q    At this point had your duties changed?

14  A    Yes, sir, they had.

15  Q    Describe those to the members of the jury.

16  A    My responsibilities changed in that I was in

17  Connecticut where the corporate office of the exchange

18  companies was, where Mr. Pajonas, Mr. Powlishen, as

19  well as the staff was.

20       We were reviewing the financial statements of the

21  company.  We were putting together financial statements

22  for 2006, as well as reviewing the current existing

23  cash position of the company as it relates to the

24  liabilities that we had to our the escrow holders.

25         THE COURT:  Which company?

1           THE WITNESS:  All of the companies.  All of

2  the exchange companies.

3  Q    So all of the qualified intermediary companies?

4  A    Yes.

5  Q    Were you the de facto chief financial officer for

6  the qualified intermediaries at this time?

7  A    Yes, sir, I was.

8           MR. DRY:  I believe I've laid the proper

9  foundation.

10  Q    Describe to the members of the jury the financial

11  condition of 1031 Tax Group or the qualified

12  intermediary companies at this time?

13  A    At this time the qualified intermediary companies

14  had very small amounts of cash readily available to pay

15  the exchanges that were ultimately coming due.

16  Q    Turn your attention to Government's Exhibit 96,

17  please, which has not been admitted in to evidence.

18           THE COURT:  Ninety what?

19           MR. DRY:  Ninety-six, Your Honor.

20  Q    Did you receive this e-mail.

21  A    Yes, sir, I did.

22  Q    Who was this sent from?

23  A    This was sent from Mr. Okun, and it was to Kevin

24  Mahieu, Bob O'Grady, myself, Fisher Paty, Katie Duff,

25  Amy Duff, Lara Coleman, David Field, and Lydia Renka.

1          MR. DRY:  I'd like to move that Government's

2    Exhibit No. 96 be admitted into evidence.

3          MR. WAGNER:  No objection.

4          THE COURT:  Admitted.

5          (Government's Exhibit No. 96 is admitted into

6    evidence.)

7    BY MR. DRY:

8    Q    Turning down to the fifth line, can you read to

9    the members of the jury the rest of e-mail starting

10   with "We have been feeding"?

11   A    "We have been feeding our properties to the tune

12   of $900,000 per month, and obviously there is something

13   radically wrong.  Please cooperate with the new

14   guidelines and procedures until we figure out how to

15   fix this.  Thank you for your cooperation.  Ed Okun."

16   Q    What did feeding the properties $900,000 per month

17   mean?

18   A    That the properties --

19          MR. WAGNER:  Objection, unless he spoke to

20   Mr. Okun and it was explained to him.  These are

21   Mr. Okun's words, Your Honor.

22          THE COURT:  So you're asking him for what

23   Mr. Okun meant?

24          MR. DRY:  No.  What I'm asking him for is --

25          THE COURT:  Well, but you did ask him that.

1  So that question then is objectionable.  It is

2  sustained.  If you want to ask him something else, go

3  ahead.  If not, let's go on.

4  BY MR. DRY:

5  Q    Based on your experience as the chief financial

6  officer of Investment Properties of America, were you

7  aware of how much -- did it surprise you that $900,000

8  per month was the shortfall of Investment Properties of

9  America?

10 A    No, sir, that did not surprise me.

11 Q    Had you had discussions with Mr. Okun regarding

12 that shortfall, cash shortfall, for Investment

13 Properties of America?

14 A    Yes, sir, I did.

15 Q    How often?

16 A    Frequently.

17 Q    What did you tell him?

18 A    I told him that the properties were not generating

19 enough cash to be able to pay their expenses.

20 Q    Okay.

21       THE COURT:  What properties?

22 Q    Which properties?

23 A    West Oaks Mall, Richmond Square, Columbus Works,

24 Parkway Plaza, Crooked Creek, 5201 West 86 Street, and

25 Salina Mall.

1          THE COURT:  Who owned those properties?

2          THE WITNESS:  They were owned by various

3   entities.  Mr. Okun held the master lease on some of

4   them to investors, tenant in common investors.  And

5   Mr. Okun may have owned the master lease for those

6   properties.

7          THE COURT:  How did you know anything about

8   what their conditions was?  You were the CFO of IPofA.

9          THE WITNESS:  Excuse me, sir?  I don't

10   understand the question.

11          THE COURT:  Maybe I don't understand the

12   relationship.  You just said those properties were

13   owned by somebody other than IPofA.  You were the CFO

14   of IPofA, and I'm trying to find out -- I don't

15   understand how you know about the conditions of

16   properties not owned by IPofA.

17          THE WITNESS:  Investment Properties of

18   America was the management company that was hired by

19   the master lessee to manage the property, manage the

20   cash of the properties.

21          THE COURT:  Who was the master lessee?

22          THE WITNESS:  Mr. Okun.

23          THE COURT:  So IPofA managed all these other

24   properties?

25          THE WITNESS:  Yes, sir.

1  BY MR. DRY:

2  Q    Turn to Government's Exhibit 98, please.  Who is

3  this from and who is this to?

4           MR. DRY:  This has not been admitted into

5  evidence.

6  A    This is from Mr. Okun to me and copy to Lara

7  Coleman.

8           MR. DRY:  I'd like to admit Government's

9  Exhibit 98?

10          MR. WAGNER:  No objection.

11          THE COURT:  It's admitted.

12          (Government's Exhibit No. 98 is admitted into

13  evidence.)

14  Q    Please read this for the jury.

15  A    "Jeff, where are we on the float?  How are you

16  coming on the indebtedness?  What is coming in an what

17  is going out?"

18  Q    What was your understanding of what Mr. Okun was

19  asking you at this point?

20  A    My understanding was he wanted to know how much

21  money we had available to be able to pay the

22  liabilities from the exchanges.

23  Q    Did you previously testify about the

24  implementation of the investment policy on

25  September 21?

1  A      Yes, sir.

2  Q      After the investment policy was implemented, were

3  there any other transfers of qualified intermediary

4  exchange funds?

5  A      Yes, sir, there was.

6  Q      To who?

7  A      From qualified intermediary companies to Mr. Okun.

8  Q      At some point you became aware that Investment

9  Properties of America's in-house counsel became

10  involved in the issue?

11  A      Yes, sir.

12  Q      When was that?

13  A      Approximately -- I believe it was at the end of

14  October, the first of November.

15  Q      I'd like to show you what has previously been

16  marked as Government's Exhibit 107.  It's not been

17  admitted into evidence.

18        Who is this e-mail from and to?

19  A      It is from me to Eric Perkins, Mr. David Field,

20  Mr. Todd Pajonas, and Ms. Lara Coleman.

21            MR. DRY:  I'd like to introduce Government's

22  Exhibit 107 into evidence.

23            MR. WAGNER:  Objection on foundational

24  grounds, Your Honor.  It tracks a whole series of

25  transfers.  It draws conclusions from those transfers.

1 I believe it's expert opinion, and it requires a much

2 greater foundation than has been laid at this point.

3          MR. DRY:  It's not expert opinion, Your

4 Honor.  He's testified that he reviewed the bank

5 accounts of AEC at the time.  Now he's relaying what

6 he's seen from those bank accounts.  It says on the

7 document, "The bank statements received."  And it just

8 describes his personal review at the time of those bank

9 statements.

10          THE COURT:  Well, maybe it does, maybe it

11 doesn't.  I haven't heard him say that, though.

12          MR. WAGNER:  Additionally, Your Honor, this

13 document talks about financial statements that were

14 prepared by a different company, by a different

15 accounting company, Citrin Cooperman, and it appears

16 that he relied on statements by Citrin Cooperman in

17 order to draw these conclusions with these figures.

18          THE COURT:  Are you going to lay a

19 foundation?

20          MR. DRY:  Yes, sir.  If I could have a

21 moment, I will lay a foundation.

22 BY MR. DRY:

23 Q    Mr. Zacarias, the information related in this

24 e-mail, was this information based on your personal

25 review of the bank statements of Atlantic Exchange

1  Company?

2  A     Yes, sir, they were.

3  Q     Were you required to rely on Citrin Cooperman's

4  analysis in order to ascertain these figures?

5  A     No, sir.

6  Q     This was all done, your review of these bank

7  statements, was a direct result of Mr. Okun's

8  instructions for you to become involved in the

9  accounting of the qualified intermediary companies?

10  A     Yes, sir.

11          MR. DRY:  At this time I'd like to admit

12  Government's Exhibit No. 107 into evidence, Your Honor.

13          THE COURT:  Any objection?

14          MR. WAGNER:  Object again on the grounds of

15  the expert testimony and a proper foundation I don't

16  believe has been laid for introducing all of these

17  figures based on the testimony he's provided.

18          THE COURT:  Anything else?

19          MR. DRY:  No, Your Honor.

20          THE COURT:  Overruled.

21          (Government's Exhibit No. 107 was admitted

22  into evidence.)

23  BY MR. DRY:

24  Q     Sir, what was your purpose in sending this e-mail?

25  A     My purpose was to reply to earlier e-mails sent by

1 Mr. Perkins asking about the status of the 1031

2 company.

3 Q    And each of these transactions you reviewed and

4 traced the money from an AEC account to the payee

5 account?

6 A    Yes, sir, I did.

7 Q    Turning to the second page of your e-mail, sir,

8 can you read the top paragraph, the total, starting

9 with the total?

10 A    "The total outstanding as of December 31, 2005,

11 was $55,060,601.24."

12 Q    If you could go to the second paragraph, the first

13 sentence, sir.

14 A    "I was not tasked with getting involved in the

15 operation or accounting of the 1031 exchange companies

16 until sometime around the first week of August 2006."

17 Q    Okay.  Nothing further on that document.

18     This has previously been admitted into evidence.

19 Did you receive this e-mail, sir, from Mr. Okun with a

20 memorandum?

21 A    Yes, sir, I did.

22 Q    Did you review the memorandum?

23 A    Yes, sir, I did.

24 Q    Did you discuss the memorandum at or near the time

25 you received it with Mr. Okun?

1  A     Yes, sir, I did.

2  Q     What did you tell Mr. Okun?

3  A     I told him I was concerned about the e-mail that I

4  just received.

5  Q     What was Mr. Okun's response?

6  A     His response was the same as what it was

7  previously; that qualified intermediary companies do

8  this; that they utilize the funds for their own

9  purposes; and that he had a legal opinion stating that

10 it was okay, and he felt that this opinion was fine.

11 Q     Did you have discussions on whether the practice

12 would continue in the future?

13 A     Yes, sir.

14 Q     What did he say?

15 A     He said yes, he was.

16 Q     Going to Government's Exhibit 145, please.

17          THE COURT:  Exhibit what?

18          MR. DRY:  145, Your Honor.

19 Q     Who is this e-mail from and to?

20 A     The e-mail is from Lara Coleman to Barry Powlishen

21 and the copies were David Field, myself, and Mr. Ed

22 Okun.

23 Q     At this time had you been providing information to

24 the in-house attorneys?

25 A     Yes, sir, I was.

1  Q     And Mr. Powlishen?

2  A     Yes, sir, he was.

3          MR. DRY:  At this time I'd like to admit

4  Government's Exhibit 145 into evidence.

5          MR. WAGNER:  No objection.

6          THE COURT:  It's admitted.

7          (Government's Exhibit No. 145 is admitted

8  into evidence.)

9  BY MR. DRY:

10 Q     Please read the top e-mail to the jury.

11 A     "Barry and Jeff, please do me a favor.  Do not

12 correspond with the lawyers anymore.  Please send all

13 correspondence to David and I, and we will distribute.

14 Thanks.  Lara."

15 Q     Mr. Okun was included on this?

16 A     Yes, sir.

17 Q     Did you obey those instructions?

18 A     No, sir, I did not.

19 Q     Who did you talk to?

20 A     I spoke with Mr. Eric Perkins.

21 Q     Going to Government's Exhibit 146, please.

22         MR. DRY:  One moment, Your Honor.  I

23 apologize.  This has not been admitted into evidence.

24 Q     Turning your attention to the bottom e-mail --

25         THE COURT:  Of what?

1            MR. DRY:  146, Your Honor.

2   Q     Is this an e-mail that you sent to Lara Coleman

3   and David Field?

4   A     Yes, sir, it is.

5            MR. DRY:  I'd like to admit Government's

6   Exhibit 146 into evidence.

7            MR. WAGNER:  Your Honor, as to that portion,

8   I don't have any objection, but on the top it appears

9   to be an e-mail that was sent by Mr. Okun to

10  Ms. Coleman.  It does not appear that Mr. Zacarias was

11  copied on it.  So he doesn't appear to be a competent

12  witness to allow for the admission of that portion of

13  the exhibit.

14           MR. DRY:  Your Honor, this is the same

15  objection that he lodged earlier.  It's stipulated as

16  to authenticity, and Mr. Okun is a party opponent, so

17  it's not hearsay.

18           MR. WAGNER:  I don't even know if he received

19  that portion of the exhibit, Your Honor.

20           THE COURT:  That's irrelevant.  You

21  stipulated to the authenticity of it.

22           MR. WAGNER:  But he still needs to be a

23  competent witness to put this exhibit in.

24           MR. DRY:  Your Honor, there's no requirement

25  that Mr. Zacarias received the e-mail.  We could put an

1 agent on the stand as long as it's authentic and it

2 overcomes a hearsay objection.  It's admissible.

3          I'm not aware of what rule of evidence

4 Mr. Wagner is referring to regarding the personal

5 competence.

6          THE COURT:  The witness has to be competent

7 by virtue of personal knowledge or a basis for

8 information before he or she testifies about it, I

9 think.

10          Is that what you're talking about?

11          MR. WAGNER:  Yes, Your Honor.

12          MR. DRY:  But Mr. Zacarias is not going to

13 testify about any inferences from receiving the e-mail

14 or anything else like that.  All he's being used to do

15 is introduce the exhibit through.  We're not going to

16 ask him:  What did Mr. Okun mean by this?  Did you have

17 discussions with Mr. Okun about this particular e-mail?

18 If he didn't receive it, he didn't receive it, Your

19 Honor.

20          THE COURT:  Well,the correct answer is that

21 you, I suppose, need Ms. Coleman to introduce it.

22          MR. DRY:  Or Mr. Field.

23          THE COURT:  Or Mr. Field.

24          MR. DRY:  Okay.  Let's redact the top portion

25 of the e-mail, please.

1          THE COURT:  What about it?  I didn't hear

2   what you said about the top portion.

3          MR. DRY:  I'm sorry.  I was asking Ms. Taylor

4   to redact that portion of the e-mail, Your Honor.

5          THE COURT:  All right.

6          MR. WAGNER:  There's no objection now.

7          (Government's Exhibit 146 is admitted into

8   evidence.)

9   BY MR. DRY:

10  Q    Did you receive this e-mail on November 15, sir?

11  I'm sorry.  Did you send this e-mail to Ms. Coleman and

12  Mr. Field on October 15?

13  A    Yes, sir, I did.

14  Q    Will you please read the first sentence at the

15  bottom and then we'll go to the second page.

16  A    "Hello.  I received a few calls, three calls, and

17  an e-mail within 15 minutes from Shirley McCabe."

18  Q    And just the next three sentences?

19  A    "Today around noon she was very concerned about

20  the status of the funds, 69 million, that IXG turned

21  over to IPofA at the time of their purchase.  She wants

22  to have an accurate accounting of where all the money

23  is as of today.  She said that this money is the

24  client's, not IPofA's own investment pool."

25  Q    Okay.  Going to the first page, did you inform --

1 were their discussions -- the following e-mail, which

2 you are on that Lara Coleman sent to Mr. Okun.  The

3 next one up.  There we go.  Did you participate in this

4 conference call that Ms. Coleman refers to in this

5 e-mail?

6 A    No, sir, I did not.

7 Q    In fact, what were your instructions from Mr. Okun

8 on how to respond to Ms. McCabe's inquiries?

9 A    I was told that -- well, I was specifically told I

10 was not in a position to make any decisions on what was

11 taking place with the money, and I was instructed not

12 to tell her anything.

13 Q    Going to Government's Exhibit 148, please, did you

14 receive this e-mail?

15 A    Yes, sir, I did.

16 Q    Who is it from and who is it to?

17 A    It's from David Field to Barry Powlishen and

18 myself.

19         MR. DRY:  I'd like to admit it into evidence

20 at this time, Your Honor.

21         MR. WAGNER:  No objection.

22         THE COURT:  It's admitted.

23         (Government's Exhibit No. 148 is admitted

24 into evidence at this time.)

25 Q    Please read it to the members of the jury.

1   A    "I am going to call Shirley to answer questions

2   about the float.  Don't either of you do this.  I am

3   trying to get to her this afternoon if I can reach her.

4   Feel free to tell her that I'm going to call if she

5   presses you."

6   Q    Going to Government's Exhibit 166, please, who is

7   this e-mail from and to?

8   A    This e-mail is from Mr. Okun to myself with a copy

9   to Lara Coleman and David Field.

10   Q    What is the date of the e-mail?

11   A    November 23, 2006.

12         MR. DRY:  I'd like to admit Government's

13   Exhibit 166 into evidence.

14         MR. WAGNER:  No objection.

15         THE COURT:  It's admitted.

16         (Government's Exhibit No. 166 is admitted

17   into evidence.)

18   BY MR. DRY:

19   Q    Please read the first two sentences.

20   A    "Jeff, happy holidays to you and your family.

21   Could you contact each of the QI offices since Barry

22   has not done what I asked and have him start calling on

23   each open file reaching out to our customers every two

24   weeks to find out when their deals are anticipated to

25   close, when is the anticipated debt and equity coming

1  in, if they have ID'ed their exchange target, when is

2  their anticipated acquisition date for their

3  replacement property acquisition.  Do they need any

4  help with their sale or the acquisition?  Do they need

5  any financing?  Do they need help finding a replacement

6  property and would they be interested in a TIC."

7  Q    And then just the next one sentence?

8  A    "Above all, do you have any anticipated sale or

9  exchange coming in that we could be of service?"

10 Q    Government's Exhibit 172, please.  How would you

11 describe the financial conditions of the qualified

12 intermediary companies at the end of November of 2006?

13 A    At the end of November of 2006 there was not

14 enough cash available to be able to pay the existing

15 liabilities or exchanges.

16 Q    Were you personally involved in tracking how much

17 money was coming in and how much money was slated going

18 out of the qualified intermediaries?

19 A    Yes, sir.

20 Q    Were there concerns at that time?

21 A    Yes, there was.

22 Q    What was the concern?

23 A    The concern was that we could not pay the next

24 exchange that was coming in.

25           MR. DRY:  I'd like to admit Government's

1 Exhibit 172 into evidence.

2          MR. WAGNER:  No objection.

3          THE COURT:  It's admitted.

4          (Government's Exhibit No. 172 is admitted

5 into evidence.)

6 BY MR. DRY:

7 Q    Top portion, please.  Describe for the members of

8 the jury what information you're relaying in the top

9 portion of this e-mail.

10 A    The top portion of the e-mail indicates that the

11 funds that we have available to pay out client

12 exchanges was 17 million.  We had some bank accounts

13 that were set up as segregated funds that we didn't

14 have access to.  They were specifically designed or

15 dedicated to one person's specific exchange.  So those

16 were segregated funds that we didn't have access to.

17 We needed $6.3 million to cover the wires that were

18 going to be sent out that day to cover the client's

19 exchanges, and that we were short as of noon that day

20 of $1.8 million.

21 Q    I'd like now to show you Government's Exhibit

22 2012.

23          MR. DRY:  Just one moment.  I apologize, Your

24 Honor.

25          THE COURT:  Does defense have one?

1          MR. DRY:  Yes, sir.

2  Q     Turning to the first page of the exhibit, what is

3  Government's Exhibit 2012?

4  A     This is a bank account from a bank statement from

5  Atlantic Exchange Company.

6          MR. DRY:  At this time I'd like to admit

7  Government's 2012 into evidence?

8          MR. WAGNER:  No objection.

9          THE COURT:  It's admitted.

10          (Government's Exhibit No. 2012 was admitted

11  into evidence.)

12  Q     Turning to December 9 of 2005, are there two

13  transactions on there related to the Simone 1 and

14  Simone 2 Condos?

15  A     Yes, sir, there are.

16  Q     Were those the bank statements that you were

17  reviewing when you made the discovery we talked about

18  earlier?

19  A     Yes, sir, it is.

20          THE COURT:  Where are they?  December what?

21          MR. DRY:  December 9 of 2005.

22  Q     What page in the statement are you referring to?

23  A     Page 51.  I'm sorry, page 6 of 10.

24          THE COURT:  I've got it.

25          MR. DRY:  Okay.

1  Q    Just going back, you were reviewing that bank

2  statement.  What were you able to discern from

3  reviewing that bank statement?

4  A    Yes, sir.  As I was reviewing this bank statement,

5  I saw a transaction on December 9, and as I was

6  reviewing the wire that was being sent from the

7  Atlantic Exchange Company, I saw a wire that was being

8  sent out for Simone Condo 2 for $1.35 million and also

9  a wire that was being sent out for Simone Condo 1 for

10 $1.274 million.

11 Q    Going back to Government's Exhibit 107, please,

12 which has been admitted into evidence, going to the

13 bottom of that, the very last entry, is that entry

14 based on your review of those bank records?

15 A    Yes, sir, it is.

16 Q    Regarding the Simone 1 and Simone 2 Condos?

17 A    Yes, sir.

18 Q    You just described the financial condition as of

19 November 29 of 2006.  When did you resign?

20 A    November 30 of 2006.

21 Q    Describe to the members of the jury the offense

22 that led up to your decision to resign?

23 A    I was instructed by Mr. Okun that he was going to

24 start closing some of the qualified intermediary

25 offices, specifically the office in Connecticut that

 1  had Mr. Todd Pajonas and Mr. Barry Powlishen in it, as

 2  well as the rest of the team that was doing the

 3  accounting, and that I was to close the office.  I was

 4  to hire a locksmith to come out and change all of the

 5  locks, and then I was to have all of the documentation

 6  packed up and sent down to the Richmond office.

 7       And in addition to that, I was also asked to start

 8  closing out the bank accounts and start wiring the

 9  money to accounts that Mr. Okun had and Ms. Coleman had

10  control over.

11  Q    Who instructed you to do all that?

12  A    Mr. Okun.

13  Q    When did he instruct you to do that?

14  A    He instructed me to do that on November 30.

15  Q    And did you follow those instructions?

16  A    No, sir, I did not.

17  Q    Why not?

18  A    I did not feel that any control of those funds

19  based on my previous findings should go to Mr. Okun.

20  Q    And --

21  A    And that potentially --

22          MR. WAGNER:  Objection.  Unresponsive, Your

23  Honor.

24          THE COURT:  Well, I'm not sure it is.  He was

25  finishing his answer, it sounded to me like.  Go ahead.

1 Potentially -- he's explaining why he didn't do it, I

2 think.

3 A    Potentially, the actions that were taking place

4 could potentially be illegal based on two memos

5 received from Mr. Perkins, and that I was not going to

6 actively participate in anything that I felt was

7 potentially illegal.

8 Q    Okay.

9         THE COURT:  Do you have any objection now as

10 unresponsive?

11         MR. WAGNER:  No, Your Honor.

12 BY MR. DRY:

13 Q    Before all of that happened, you were present in

14 the office at SOS on November 30?

15 A    Yes, sir, I was.

16 Q    And you were present when Mr. Pajonas was upset?

17 A    Yes, sir, I was.

18 Q    And did you overhear him making phone calls to

19 Mr. Okun, Ms. Coleman, and Mr. Field?

20 A    Yes, sir, I heard one side of the conversation;

21 Mr. Pajonas's.

22 Q    You resigned on November 30.  Did you have any

23 conversations with Mr. Okun after you resigned?

24 A    Yes, sir, I did.

25 Q    When did that occur?

1 A    I believe it was the following day on a Saturday.

2 Q    What did Mr. Okun say?

3 A    That he thought I was making a rash decision, and

4 that he would like me to come back, and that everything

5 was going to be okay, and that he wanted me to think

6 about it again over the weekend, and he wanted me to

7 meet with Mr. Kenny Bolton to discuss it.

8 Q    Who is Mr. Kenny Bolton?

9 A    I really never knew exactly what his function was

10 in the company.  He just happened to be a person that

11 knew --

12 Q    Was he a lawyer?

13 A    I have no idea what he was.  I knew he worked -- I

14 thought he had worked for the brokerage company that

15 Mr. Okun tried to acquire.

16 Q    That's fine.  You resigned from Investment

17 Properties of America.  Did you continue any role in

18 Investment Properties of America?

19 A    Yes, I did.

20 Q    What did you do?

21 A    I continued as more of an adviser and consultant

22 with Investment Properties of America and also with the

23 exchange companies.

24 Q    And that adviser role, did you have any access or

25 decision-making authority over client money?

1  A     No, sir, I did not.

2  Q     Now, you described a lot of conversations with

3  Mr. Okun.  During your time at Investment Properties of

4  America, how would Mr. Okun describe the client money

5  held at the qualified intermediaries?

6          MR. WAGNER:  Objection to the form of the

7  question, Your Honor.  If he knew.  I mean, how would

8  Mr. Okun describe --

9          THE COURT:  You mean, the conversations with

10 him?

11 Q     How did Mr. Okun describe qualified intermediary

12 client money to you?

13 A     Mr. Okun would say that the qualified intermediary

14 companies were unregulated companies, that there was no

15 control over how you can use the cash, and that they

16 were like his personal piggy bank.

17         MR. DRY:  Nothing further, Your Honor.

18         THE COURT:  All right.  At this time I think

19 we'll just take the morning recess for 20 minutes.

20 Then well have cross-examination.  Just take your pads

21 with you.

22         (The jury is out at 10:55 a.m.)

23         THE COURT:  All right.  We're going to take a

24 recess.  Is there anything we need to take up?  I need

25 to know from you-all, the government, when you're going

1 to call -- is it Mr. Massell?  How do you pronounce his

2 name?

3          MR. DRY:  I believe, if everything goes

4 smoothly, Your Honor, maybe as early as tomorrow

5 afternoon.

6          THE COURT:  We're going to have to deal with

7 the objections to that, I think.  All the briefing is

8 in, is it not?

9          MR. DRY:  I believe so, Your Honor.

10          THE COURT:  What did I tell you I was going

11 to do?

12          MR. DRY:  You didn't indicate definitively

13 one way or the other.

14          THE COURT:  I didn't say anything about

15 having a little hearing on it and having some testimony

16 maybe on a Saturday?  Did I say that?  I guess not.

17          MR. DRY:  I believe you did mention that you

18 sometimes handled situations by having the witness

19 testify.  I don't remember you saying Saturdays.

20          THE COURT:  How long is his testimony going

21 to be?

22          MR. DRY:  I would estimate 30 to 45 minutes,

23 Your Honor.  Very quickly.

24          THE COURT:  And you think that you're

25 planning to call him tomorrow afternoon?

1          MR. DRY:  Yes, Your Honor.

2          THE COURT:  You-all said that you wanted an

3  evidentiary hearing on the crime fraud exception.  What

4  do you want to do about an evidentiary hearing?  Who is

5  going to address that?  Isn't that in the brief that

6  you wanted an evidentiary hearing?

7          MR. POLLACK:  Well, I think what is in the

8  brief is that on the papers we believe the government

9  hasn't met its burden, so that resolves the issue.  But

10  if the Court believes they have made a prima facie

11  showing of some sort, then yes, there ought to be an

12  evidentiary hearing to make an actual finding that

13  crime fraud applies to the particular documents that

14  they are intending to introduce.

15          THE COURT:  What do you see the outline of

16  the evidentiary hearing being?

17          MR. POLLACK:  Well, I would imagine it would

18  entail calling Mr. Rosen to talk about how it was those

19  communications were used or were not used with respect

20  to the testimony that was given that is the subject

21  matter of the false statement account to see whether or

22  not it was actually used.

23          THE COURT:  How they were used?

24          MR. POLLACK:  Yes.  Whether or not there's

25  anything about the communication, that the

1 communication itself was actually used in furtherance

2 of a crime or a fraud.

3          THE COURT:  Communication doesn't have to be

4 used in furtherance of it.  It has to be closely

5 related to it.

6          MR. POLLACK:  No, Your Honor, I don't think

7 that's the proper standard.

8          THE COURT:  Actively used, is that what you

9 said?

10          MR. POLLACK:  Yes, Your Honor.  I don't think

11 that's the proper standard.  I think this is addressed

12 primarily in the reply brief when we cite the Fourth

13 Circuit case law.  But "related to" has been defined to

14 mean "be used in furtherance of."  As I indicated in

15 the papers, that merely "related to," that standard

16 would almost always be met.  The fact that it is

17 relevant or that it has probative value or even that it

18 has a lot of probative value doesn't mean that it's not

19 privileged.  The only way it becomes unprivileged is if

20 it was actually used to perpetrate the fraud or the

21 crime.  It doesn't mean the attorney had to be a

22 knowing participant.  He might have been an unwitting

23 participant, but there has to actually be some use of

24 the communication in a way to further the perpetration

25 of the crime or the fraud.

1          THE COURT:  Well, I'll hear argument on this

2    later when I hear argument about it.  It occurs to me

3    that one of the things that needs to be addressed is

4    the extent to which the principles that apply here have

5    analogues in the law that deal with statements given

6    that aren't properly warned under Miranda.  And the law

7    is if there's an improper warning, they can't be used

8    in the case-in-chief, but if the defendant gets on the

9    witness stand, they can be used as impeachment.

10          And neither one of you seem to have focused

11    on that in your papers, but it occurs to me that it is

12    raised by the statement of the United States that this

13    whole issue isn't an issue that Mr. Okun is not going

14    to testify about, the question of personal

15    representation, and I suppose that that in turn --

16    well, I know that that in turn led me to believe how do

17    I proceed with this whole issue, and to what extent

18    does that principle that I just mentioned come into

19    play in a case such as this regarding privilege.

20    Privilege being a matter that is not even a matter of

21    constitutional protection.

22          All right.  So you-all may want to give some

23    thought to that.

24          MR. POLLACK:  I'm sorry, Your Honor.  May I

25    ask just a question about that?  Maybe I either didn't

1 understand the government's position correctly or I

2 didn't understand what the Court just said.  Is it the

3 Court's understanding that it is the government's

4 position that it would not be seeking to introduce the

5 documents in its case-in-chief, and it would only be

6 seeking to introduce the documents on

7 cross-examination?

8           THE COURT:  That's the way I read their

9 brief.  I may not have read it properly, but that is

10 the conclusion I drew from reading the government's

11 brief.  I do have it here.  I can find it.  I read them

12 over the weekend.

13           MR. DRY:  Your Honor --

14           THE COURT:  It says it's not even an issue if

15 he doesn't testify about it or something to that

16 effect.

17           MR. DRY:  I apologize if the government's

18 brief was a little unclear.  We were stating that we

19 believed that the waiver had already occurred.  We

20 believe that crime fraud did apply.  We did want to use

21 it in our case-in-chief, and we were pointing out to

22 the Court the unfairness aspect if the Court says no,

23 there has been no waiver, there is no crime fraud, and

24 it allows Mr. Okun to get on the stand and testify

25 without the government being able to use it for

1  impeachment value.

2          We said, This portion of our brief might not

3  be an issue unless Mr. Okun testifies, but we wanted to

4  bring it to the Court's attention because, frankly, we

5  were concerned about it.

6          THE COURT:  I guess, I didn't read correctly

7  because I did have that impression.  I guess we have

8  the issue whether or not.  We have a broader issue.

9  But the issue that I raised respecting the

10 applicability of that line of authority, I think, still

11 comes into play.

12         MR. POLLACK:  I understand, Your Honor.

13 Thank you for that clarification.

14         THE COURT:  All right.  We'll be in recess

15 for 20 minutes.  If you will let the jury know that.

16         (Recess taken from 11:05 a.m. to 11:30 a.m.)

17         THE COURT:  All right.  I remind you, Mr.

18 Zacarias, you're under the oath which you took earlier.

19         THE WITNESS:  Yes, sir.

20         MR. WAGNER:  Thank you, Your Honor.

21

22    CROSS-EXAMINATION

23 BY MR. WAGNER:

24 Q   Mr. Zacarias, prior to your testimony, you met

25 with federal agents a numbers of times; isn't that

1 true?

2 A    Yes, sir.

3 Q    How many times would you say that you met with

4 federal agents?

5 A    I believe it was twice.

6 Q    Is it possible that it was three times?

7 A    Yes, you're correct.  It was three times.

8 Q    Once on the 27th of July 2007; is that right?

9 A    I don't recall the specific date.

10 Q    Do you know if summaries of the statements that

11 you gave to the officers were prepared?

12 A    Yes, sir.

13 Q    Have you reviewed those statements?

14 A    No, sir.

15 Q    The second time you met was the 7th of May of

16 2008; is that right?

17 A    I don't remember the specific date.

18 Q    And as recently as November of 2008?

19 A    Yes, sir.

20 Q    Do you remember how long those meetings were?

21 A    The first one was most of a day.  The second one

22 was maybe half of a day.  And let's see.  The third one

23 was just a portion of a day.

24 Q    Did you actually meet with Mr. Dry to prepare your

25 testimony?

1  A     Yes, sir.

2  Q     Now, you were hired as the CFO for IPofA; is that

3  correct?

4  A     IPofA, yes, sir.

5  Q     But your role changed over time, isn't that right,

6  in the company?

7  A     Yes, sir.

8  Q     But principally, initially, you were hired to

9  oversee and monitor the flow of cash with the malls;

10 isn't that right?

11 A     Yes, sir.

12 Q     Your experience prior to coming to IPofA was with

13 malls; isn't that right?

14 A     Yes, sir.

15 Q     With looking at the inflow and outflow of money as

16 it relates to the management of malls; isn't that

17 right?

18 A     Yes, sir.

19 Q     And another one of your responsibilities at IPofA

20 initially was to put in a new accounting system; isn't

21 that right?

22 A     Yes, sir.

23 Q     And you spent a lot of time working to put in

24 place a better accounting system for IPofA; isn't that

25 right?

1  A     That's correct.

2  Q     It was your job to try to increase cash flow for

3  the company; isn't that right?

4  A     No, sir, I would not say it was my job to increase

5  cash flow.

6  Q     Or to try to see that more money was coming in

7  from the malls, that they were working for efficiently?

8  A     No, sir, that was the responsibility of the

9  individuals that actually ran the day-to-day operations

10 of the shopping centers.

11 Q     Did you have any involvement with the TIC side of

12 IPofA at that time?

13 A     No, sir, I did not.

14 Q     Were you aware of the TIC money that was coming

15 in?

16 A     I was aware of the money that was coming in, but

17 not specifically tracking the individual TIC receipts.

18 Q     Were you aware of the plan of the company to

19 develop the properties for IPofA and sell them out as

20 TIC properties?

21           MR. DRY:  Objection, relevancy.

22           MR. WAGNER:  Well, this witness has testified

23 about cash flow, and I think it's important to

24 understand the underlying principles and plan of the

25 company.  It's not just cash flow that's important,

1  it's the sale of the properties and the taking out of

2  the properties at this point.

3            THE COURT:  What's that got to do with

4  anything in this case?

5            MR. WAGNER:  Because he talked about the cash

6  flow, Judge.

7            THE COURT:  That and a nickel will get you a

8  Coke in the words of Bear Bryant.  Why is that

9  relevant?  I'm not following.

10            MR. WAGNER:  Because he's talking about the

11  cash-strapped status of IPofA.

12            THE COURT:  But the point is they were.

13            MR. WAGNER:  They may have been, but there

14  was also a lot of involvement in planning to sell these

15  properties out as TICs, and I think that's important to

16  balance out, to relate to the cash problems that the

17  company was having.

18            THE COURT:  I don't understand why those are

19  relevant to what's going on.  Maybe you can lay a

20  foundation, but I don't understand it yet.

21            MR. WAGNER:  Very well.  I'll move on.

22  BY MR. WAGNER:

23  Q    Were you aware of the previous TIC sales that

24  Mr. Okun had made for IPofA before you got the company?

25            MR. DRY:  Objection, relevancy.

1          MR. WAGNER:  I'm trying to lay a foundation,

2 Judge.

3          THE COURT:  Let me see what you're doing.  I

4 think you're on the wrong track, but we'll see.  You

5 can deal with it as he gets closer.  I'm still trying

6 to figure out what he's doing.

7 Q    Were you aware of the TIC sales that were made,

8 the purchases that were made by TIC owners of the

9 properties that Mr. Okun controlled?

10         THE COURT:  Are you all right?

11         A JUROR:  I'm fine.

12         THE COURT:  Do you need a cough drop?

13         A JUROR:  I'm fine.

14         THE COURT:  Water?  Okay.

15         MR. DRY:  Your Honor, I'm going to object on

16 hearsay grounds.  When he says --

17         THE COURT:  Don't do that because I was

18 talking to the juror and didn't hear what he said.  So

19 let him try again.

20         MR. DRY:  Okay, Your Honor.

21 BY MR. WAGNER:

22 Q    Were you aware of the TIC sales made by IPofA

23 prior to your getting --

24         MR. DRY:  Objection.  It would call for a

25 hearsay response, Your Honor.

1          THE COURT:  It may or may not if his answer

2 is yes or no.

3 A    After I --

4          THE COURT:  I think the question is:  Were

5 you aware?  Then the question is:  When?

6 BY MR. WAGNER:

7 Q    At the time you were hired as CFO or soon

8 thereafter?

9          THE COURT:  Yes or no?

10 A    Yes.

11 Q    How did he become aware of the TIC sales?

12 A    I was informed by Mr. Okun.

13          MR. DRY:  Objection, hearsay.

14 BY THE COURT:

15 Q    Did you read any documents?

16          THE COURT:  I think right now I'm going to

17 strike his answer to the preceding question about

18 whether he's even aware of it.  If that's how he found

19 out, that's hearsay.

20 Q    Did you read any documents regarding previous TIC

21 sales for IPofA?

22 A    No, sir, I didn't.

23 Q    Did you help in any of the sales of the properties

24 as tenants in common properties?

25 A    No, sir.

1  Q     We'll move on then.

2        Now, you indicated that you left IPofA for reasons

3  that arose principally on November the 30th of 2006; is

4  that right?

5  A     That was the culmination of several events that

6  ultimately made me make that decision to leave.

7  Q     And you indicated that you were concerned that

8  there were things potentially illegal that were going

9  on in the company, correct?

10 A     Yes, sir.

11 Q     And you were concerned about money being taken

12 from a QI and then being put in the management and

13 control of IPofA; is that right?

14 A     Yes, sir.

15 Q     Management and control of Lara Coleman and Ed

16 Okun, correct?

17 A     Yes, sir.

18 Q     Ed Okun owned the company, didn't he?

19 A     Yes, sir.

20 Q     And he had the management authority over the money

21 in the QIs, didn't he?

22 A     At the day of my resignation, he would not have

23 had control because he had signed a document regarding

24 investment policy, so he would not have had control of

25 those funds directly.

1   Q     On the day that you resigned, there was some

2   heated discussions between Mr. Okun and Mr. Pajonas

3   that you overheard; is that right?

4   A     Yes, sir.

5   Q     And on that day Mr. Pajonas actually threw a chair

6   at you, didn't he?

7   A     He did not throw it at me.  He threw it at a wall

8   that was in the same office I was in.

9   Q     Did he throw it in your direction?

10  A     No, it was not really in my direction.

11  Q     Mr. Pajonas had a bad temper, didn't he?

12  A     Yes.

13         MR. DRY:  Objection, relevancy.

14         MR. WAGNER:  It goes to why he left that

15  particular day, Your Honor.

16         THE COURT:  Then ask him that question

17  instead of getting into something that doesn't make any

18  difference.

19         MR. WAGNER:  I asked him if he had a bad

20  temper.  I think that's one of the reasons why he left.

21         THE COURT:  I think the proper question then

22  would be:  Did you leave because of Mr. Pajonas's

23  temper, bad or otherwise?

24         MR. WAGNER:  All right.

25         THE COURT:  Do you want to ask him that

1  question?

2  Q    Did you leave because of the way Mr. Pajonas

3  treated you?

4  A    Not specifically the way he treated me.  It was

5  the environment that was taking place.  There was a lot

6  of conflict, and, you know, there was a lot of conflict

7  in the company, and I left because of the conflict that

8  that was happening within the company, as well as the

9  potential illegality of the transactions that were

10 occurring.

11 Q    These potential legalities, did you rely on your

12 reading of the Perkins memo?

13 A    I relied on my readings of the Perkins memo as

14 well as individual counsel that I hired personally.

15 Q    Did you rely on your reading of the Kutak memo?

16 A    Yes.  Part of that decision was also based on the

17 Kutak memo.

18 Q    And you are not a lawyer; is that right?

19 A    No, sir.

20 Q    Now, isn't it true that after the hiring of

21 Mr. Field in I believe it was August of 2006, you felt

22 as though you were being demoted; isn't that right?

23 A    At one point, yes, I felt a little threatened by

24 David Field coming on as the Okun Holdings' CFO.

25 Q    And Mr. Field called you a bookkeeper, didn't he?

1  A     Yes, sir.

2  Q     And that disturbed you, didn't it?

3  A     Yes, sir.

4  Q     He said that you were so low on the totem pole

5  that people would not give you a second thought; is

6  that right?

7  A     Yes, sir, that's correct.

8  Q     And you were given less responsibility with the

9  hiring of Mr. Field; isn't that right?

10  A     I don't believe my responsibility decreased at

11  all.  I was still the CFO of all the companies

12  individually.  Mr. Field was hired to take over Okun

13  Holdings, which was a company that I don't believe was

14  ever fully created, and he was doing that for both tax

15  purposes as well as having one person being able to

16  look at both from a financial perspective as well as a

17  tax perspective.

18  Q     Isn't it fair to say that Mr. Field had greater

19  responsibility to you over all of the accounting of the

20  company than you did?

21          THE COURT:  Had great greater responsibility

22  to him?

23          MR. WAGNER:  Over the company.

24          THE COURT:  To him?

25          MR. WAGNER:  Excuse me.  Than him.  I'm

1  sorry.  I misspoke.

2  A    Yes, sir, he had greater authority than I did.

3  Q    In the summer of 2006, a company called Boardwalk

4  was brought in to help improve mall management; is that

5  right?

6  A    That's correct.

7  Q    And that was your principal responsibility, right?

8  A    Not to hire Boardwalk.  That was done from the

9  Richmond office.  I'm not quite certain who

10 specifically hired Boardwalk.

11 Q    But your responsibility was for the accounting of

12 the mall management; is that correct?

13 A    The accounting for the management, yes.

14 Q    Now, it was the instructions to you by Mr. Okun on

15 the 30th of November of 2006 that you were, one, to

16 fire Mr. Pajonas, right?

17 A    I don't remember if it was to specifically fire

18 Todd.  My understanding at the time was that there was

19 already negotiations for Mr. Pajonas to leave the

20 company.  So I wasn't given specific direction to fire

21 him.

22 Q    You were told to clear out the office; is that

23 right?

24 A    That's correct.

25 Q    And to put locks on the doors, correct?

1  A      To have locks changed, correct.

2  Q      And to take the money from SOS and send it down to

3  IPofA of Richmond?

4  A      That's correct.

5  Q      Closing all the bank accounts, right?

6  A      Yes, sir.

7  Q      Now, isn't it true at that time that Lara Coleman

8  had sent out an e-mail instructing that all of the

9  money from all of the QIs were to be sent to Richmond?

10  A      I don't recall that specific memo.

11  Q      If I could show you what we'll call Defense

12  Exhibit 17.  It's a November 30, 2006 e-mail between

13  Lara Coleman, yourself, and Lydia Renka.

14         If you will look not to the top portion there,

15  look at the bottom, from Lara Coleman to Jeff Zacarias.

16  Do you recognize that portion of this document?

17  A      If I could have an opportunity to read it first.

18  Q      Please.

19  A      Yes, sir.

20  Q      You do recognize that?

21  A      Yes, sir.

22  Q      You received that e-mail on the 30th of November

23  approximately 1:30 in the afternoon?

24  A      Yes, sir.

25             MR. WAGNER:  I who would move this into

1 evidence at this time, Your Honor.

2          THE COURT:  Any objection?

3          MR. DRY:  No, Your Honor.

4          THE COURT:  It's admitted.

5          (Defendant's Exhibit No. 17 was admitted into

6 evidence.)

7 Q    I want to direct your attention to that paragraph

8 that's indicated as No. 1 there.  Can you read that to

9 the jury, please?

10 A    "Call IXG, NES and REES.  Let them know that they

11 are to immediately begin transferring exchange monies

12 to the Wachovia 1031 Tax Group account.  If they have

13 any bank accounts, the funds should be transferred to

14 this account."

15 Q    You can stop there.  So clearly there were

16 instructions from Richmond for other QIs to send money

17 in to Richmond; is that right?

18 A    Yes, sir.

19 Q    Now, on November the 30th of 2006, that wasn't

20 your last day working with IPofA; is that right?

21 A    That's correct.

22 Q    In fact, you stayed on for an extended period of

23 time, didn't you?

24 A    Yes, sir.

25 Q    You stayed on at the request of Mr. Field; isn't

1 that right?

2 A    Yes, sir.

3 Q    And you stayed on on a part-time basis; isn't that

4 right?

5 A    That's right.

6 Q    But you earned a full salary, didn't you?

7 A    Yes, sir, I did.

8 Q    At that time you were earning $300,000 a year; is

9 that right?

10 A    Yes, sir, I was.

11         MR. DRY:  Are you done with that exhibit?

12         MR. WAGNER:  Yes.  You can take that down.

13 Thank you.

14 BY MR. WAGNER:

15 Q    You knew about the borrowing at that point that Ed

16 Okun was making from the QIs, is that right, after your

17 resignation on the 30th of November, right?

18 A    Yes.

19 Q    You knew about the money that Mr. Okun owed to the

20 QIs, right?

21 A    Yes, sir.

22 Q    You knew about the personal expenses, the money

23 was going to him personally, right?

24 A    Yes, sir.

25 Q    You knew about the legal memos that came out,

1  correct?

2  A      Yes, sir.

3  Q      But you still after November 30 continued to take

4  money from IPofA; is that right?

5  A      Yes, sir, I was acting as an adviser and continued

6  to get the same paycheck I was receiving.

7  Q      Now, regarding the exchange agreements, did there

8  come a time where you obtained knowledge and

9  information about changes that Mr. Pajonas was going to

10 make to the exchange agreements?

11 A      Yes, sir.

12 Q      Did you believe that he was working to change the

13 agreements in late summer of 2006?

14         MR. DRY:  Objection, Your Honor.  Foundation.

15 I believe that this is going to call for a hearsay --

16 his knowledge is based on hearsay.

17         THE COURT:  Why don't you ask him how he

18 learned that.

19 BY MR. WAGNER:

20 Q      Did you learn this information through

21 conversations with Mr. Pajonas?

22 A      Yes, sir, I did.

23 Q      Did you actually observe him working on changing

24 the exchange agreements when you were there in

25 Connecticut?

1   A      No, sir, I didn't.

2   Q      But he told you he was working on them?

3   A      Yes, sir.

4   Q      Now, you have indicated you first learned of the

5   borrowings by Mr. Okun of the QI money in, I believe

6   you said, August or the summer of 2006; is that right?

7   A      That's when I had firsthand knowledge of

8   specifically being able to look at transactions that

9   happened on bank statements.  Prior to that there were

10  some schedules that Ms. Coleman had requested I

11  prepare.  She just called them loan documents or loan

12  amortizations.

13         So there was on a miscellaneous day I would

14  receive an e-mail from her, and she'd say, "Hey, we got

15  a loan.  I need an amortization schedule."  So I would

16  prepare an amortization schedule showing the interest

17  and what the initial principal was.  So there were

18  loans that were being done prior to me specifically

19  knowing where those funds were coming from.

20  Q      But as early as November of 2005, you received

21  communications with information about the loans, the

22  borrowings, by Mr. Okun; is that correct?

23  A      That's correct.

24  Q      In fact, let me show you an e-mail dated

25  November 25, 2005.  And we can make this Defense

1 Exhibit No. 18, I believe.

2      Let's me show you a copy of this.  Do you

3 recognize this particular e-mail?

4 A    Yes, sir, I do remember seeing this.

5 Q    And you received this on the 29th of November,

6 2005; is that correct?

7 A    Yes, sir.

8           MR. WAGNER:  I move this into evidence at

9 this time, Your Honor.

10           THE COURT:  Any objection?

11           MR. DRY:  Yes, Your Honor.  What portion of

12 the --

13           THE CLERK:  Can you put it up, Pam?

14           MS. BISHOP:  What's the Bates number on it,

15 Mr. Wagner?

16           MR. WAGNER:  RICHE1601256.

17           THE COURT:  The jury doesn't have it, but I

18 need to see it if I'm going to rule on it.

19           MR. WAGNER:  I think it's up now, Judge.

20           THE COURT:  Okay.  All right.  So what's the

21 objection?

22           MR. DRY:  Objection to the bottom part of the

23 e-mail.  The top Mr. Zacarias received, but the bottom

24 between Mr. Cassis and Koony he's not on there.

25 BY MR. WAGNER:

1  Q     Did you receive the bottom part of this e-mail?

2  A     Yes, sir, I did.

3            MR. WAGNER:  I move it into evidence at this

4  time, Your Honor.

5  A     I received it after it was forwarded to me.

6            THE COURT:  Any objection?

7            MR. DRY:  No.

8            THE COURT:  It's admitted.

9            (Defendant's Exhibit No. 18 is admitted into

10 evidence.)

11 BY MR. WAGNER:

12 Q     If you would turn to the second page about a

13 quarter of the way up from the bottom there, this is an

14 e-mail from folks at Wachovia Lending.  And a copy of

15 this e-mail has been sent to you and Lara Coleman; is

16 that correct?

17 A     Yes, sir.

18 Q     In it, it specifically says Wachovia is requesting

19 information about the borrowing from the QIs, correct?

20 A     Yes, sir.

21 Q     How much does Ed owe the QIs; is that right?

22 A     Yes, sir.

23 Q     So, clearly, at this time, November 29 of 2005,

24 you knew about Ed Okun's borrowings from the QIs,

25 didn't you?

1   A      Yes, sir.

2   Q      And Wachovia Bank knew about the borrowings from

3   the QIs, didn't they?

4   A      Yes, sir.

5   Q      In summer, in August of 2006, you were tasked with

6   trying to find out -- well, to do an accounting of the

7   QIs to find out how much cash was in the QI balances;

8   is that right?

9   A      That's correct.

10  Q      And also to find out about the borrowings and

11  paybacks of Mr. Okun and IPofA from the QIs; is that

12  correct?

13  A      Yes, sir.

14  Q      And to the QIs; is that correct?

15  A      That's correct.

16  Q      You also traveled to Connecticut with Ms. Renka in

17  trying to determine those numbers; is that right?

18  A      That's correct.

19  Q      And you were instructed when you went to the QIs

20  that you were to put the financial reporting structure

21  in place; is that right?

22  A      That's correct.

23           MR. DRY:  Objection, Your Honor.  Hearsay.

24           MR. WAGNER:  Well, I can do it this way:

25           THE COURT:  I, frankly, thought that that's

1 part of what he testified to on direct.

2          MR. DRY:  I apologize.

3          THE COURT:  What bothers me is why are we

4 just going back over what was done on direct because

5 the jury listened.  So far, basically, all we've heard

6 with one exception is what he said already.

7          MR. WAGNER:  I'm going to try to get to the

8 point, Judge.

9          THE COURT:  All right.  Let's go.

10 BY MR. WAGNER:

11 Q    There were some problems that you had in putting

12 together these accountings; is that right?

13 A    Yes, there was.

14 Q    The accountings were, in your own words, "screwed

15 up"; isn't that right?

16 A    That's correct.

17          THE COURT:  Are you talking about the

18 accounting of the QI?

19          MR. WAGNER:  The QIs.

20          THE COURT:  I think it's a good idea since he

21 was talking about two different things during the

22 direct testimony about an accounting system at IPofA

23 and another accounting whatever he was doing up at the

24 QIs.  It's a good idea to focus on not only the time

25 frame, but the substance of what he was doing.

1          MR. WAGNER:  Very well.

2  BY MR. WAGNER:

3  Q    For the purposes of these questions, we're talking

4  about August of 2006 to November of 2006.  We're

5  talking about the accounting for the QIs, okay?

6  A    Uh-huh.

7  Q    Now, in order to put together an accurate

8  accounting for the QIs, you needed reliable

9  information, didn't you, from the people who were

10 running the QIs; isn't that right?

11 A    That's correct.

12 Q    You needed a complete list of bank accounts from

13 the people that you were looking into on these QIs,

14 correct?

15 A    Yes, sir.

16 Q    Now, you also needed accurate information from

17 IPofA, isn't that right, at this time to put together

18 these accountings, correct?

19          THE COURT:  Accountings for the QI?

20          MR. WAGNER:  The QIs.

21 A    I guess I don't understand the question.

22 Q    Well, basically, you're trying to track borrowings

23 going from the QIs to IPofA, right?

24 A    That's correct.

25 Q    So you needed all of the bank accounts from IPofA;

1 isn't that right?

2 A    That's correct, yes.

3 Q    So you relied on Lara Coleman for a lot of the

4 information from IPofA at that time doing the

5 accountings for the QIs; is that right?

6 A    I relied on her to provide the bank statements.

7 Q    And you relied on Todd Pajonas to provide you

8 those bank statements for AEC and SOS; is that correct?

9 A    That's correct.

10 Q    And so if Todd Pajonas was hiding bank statements

11 from Richmond or hiding bank statements, bank accounts

12 from the folks at IPofA, you would not have known about

13 those bank statements, correct?

14 A    That's correct.

15 Q    Now, in terms of the larger scale of your project

16 of doing the accountings for IPofA, you started the

17 process the first week of August, correct?

18 A    Approximately, yes.

19 Q    And it was important at that time that you

20 determine every bank that you could find that you knew

21 about, right?

22 A    That's correct.

23 Q    Now, isn't it true that around mid October of 2006

24 you determined that there was no way to know how much

25 money Mr. Okun had borrowed?

1 A    As of that date, I was not able to determine what

2 was borrowed as of that date.  We had made it only

3 partially through all the bank statements.  So I didn't

4 know a specific dollar amount on that day.

5 Q    There was also no way to know at that date how

6 much Mr. Okun had paid back, correct?

7 A    That's correct.

8 Q    Isn't it also true that you knew that there were

9 not sufficient records to determine the full extent of

10 the loans, nor was there a list of all the loans from

11 the 1031 Tax Group?

12 A    That's correct.

13 Q    And the same would apply --

14        THE COURT:  You're talking about as of

15 October 2006?

16        MR. WAGNER:  As of October of 2006, correct.

17 A    Other than what was specifically documented, prior

18 to that I would not have known what had taken place

19 through that specific date.

20 Q    And the same would apply to paybacks for the

21 loans; is that right?

22 A    That's correct.

23 Q    Isn't it true you started an Excel spreadsheet to

24 document the loans, but stopped because there were so

25 many transactions that you didn't know about?

1  A     I stopped because I ultimately resigned.  I hadn't

2  completed my analysis yet, but there were bank

3  statements that I don't know whether I was aware of

4  them.  I had requested them, and, you know, was told

5  that I was getting all the bank statements.

6  Q     In your interview on the 7th of May of 2008,

7  didn't you state to the government, to I believe it was

8  Agent Onks that you were speaking with, that you

9  stopped because there were so many transactions that

10 you did not know about?

11 A     Well, that was one of the of the reasons.  I

12 didn't really stop.  I never stopped through the whole

13 process.  I mean, I stopped -- if a road ended, if I

14 was looking at a bank statement and it said that this

15 money was wired out to this other bank account, if I

16 didn't have that other bank account, then yes, I would

17 have to stop because there was no way to trace the

18 other end of it.

19 Q     Now, in putting together the financials for 2005,

20 which you've seen through a government exhibit, you

21 relied on Bob Bredenberg and John Guerra to put the

22 financials together, right?

23 A     Who was to second person?

24 Q     I'm sorry.  Jorge Guerra.

25 A     Yes, as well as my personal review of the bank

1 statements.

2 Q    Bob Bredenberg created the details of the

3 day-to-day transactions through the QIs; is that

4 correct?

5 A    For which year?

6 Q    This would have been for all of the accounting or

7 auditing that he was trying to do.

8 A    Citrin Cooperman, which was Jorge Guerra, was

9 working for creating 2005.  Bob Bredenberg was creating

10 2006.

11 Q    So there was no crossover between Bredenberg and

12 Guerra?

13 A    Other than exchanges of information -- I mean,

14 they were working on two separate projects.

15 Q    Jorge Guerra was from Citrin Cooperman, correct?

16 A    Yes.

17 Q    And he was going through bank accounts and

18 exchange folders; is that right?

19 A    That's correct.

20 Q    He was creating Quick Book files?

21 A    Yes, sir.

22 Q    Do you have copies of those Quick Book files?

23 A    No, sir.

24 Q    They weren't provided to you?

25 A    I may have received them.  I don't recall

1  specifically.  I got a lot of information, so I don't

2  recall if I specifically received every single

3  document.

4  Q    In putting together your 2005 findings of the

5  borrowings and paybacks of money, you relied initially

6  on what Mr. Guerra put together, correct?

7  A    Yes, along with my personal review of bank

8  statements.

9  Q    But you don't know if Mr. Guerra had all relevant

10 bank records, do you?

11 A    No, sir, I don't.

12 Q    You don't know if he had all relevant information

13 from IPofA, do you?

14 A    I didn't know if he had all of the relevant

15 information.

16 Q    You don't know if you had all of the relevant bank

17 records that you needed in preparing your 2005 figures,

18 correct?

19 A    That's correct.

20 Q    In fact, you recognized in early November of 2007

21 that you may not have had all of the relevant bank

22 records that you needed; is that right?

23 A    That's correct.

24 Q    And you sent out an e-mail requesting that several

25 people provide you with a full statement of all of the

1 bank records that were out there for the QIs, correct?

2 A   That's correct.

3 Q   Let me show you the November 1, 2006, e-mail.  Is

4 this the e-mail that you sent?

5 A   Yes, sir, it is.

6 Q   And you sent this to Mr. Sosa.  Who was Mr. Sosa?

7 A   He was a person that was at AEC that was assisting

8 with tracking the exchanges for AEC.

9 Q   Fred Wallace?

10 A   Also doing the same thing.

11 Q   Mr. Subert?

12 A   With AEC.

13 Q   Mr. Bredenberg?

14 A   Yes.

15 Q   Mr. Bush?

16 A   Yes.

17 Q   Mr. Powlishen?

18 A   Yes.

19 Q   And Mr. Pajonas?

20 A   That's correct.

21        MR. WAGNER:  We would move this into evidence

22 at this time, Your Honor.

23        THE COURT:  What exhibit?

24        MR. WAGNER:  It's Exhibit No. 19.

25        THE COURT:  Any objection?

1          MR. DRY:  One moment, Your Honor.

2          No objection Your Honor.

3          THE COURT:  It's admitted.

4          (Defendant's Exhibit 19 is admitted into

5 evidence.)

6 BY MR. WAGNER:

7 Q    The very next day after sending this out, you

8 prepared the findings for the borrowings and paybacks

9 that have been presented today in court; is that right?

10 A    I don't recall what happened the next day.

11 Q    The next day you sent out the November 2 e-mail

12 that's been presented in evidence at this time?

13 A    Yes, sir.

14 Q    Earlier today.  And you had not heard back from

15 all the parties that you requested bank records from

16 when you sent this e-mail out, correct?

17 A    When I prepared the e-mail, I didn't hear back

18 from everybody.

19 Q    And you made no changes to the findings that you

20 made in the November 2, 2006 e-mail that you sent out,

21 correct?

22 A    Correct.

23 Q    And you were concerned when you sent out this

24 November 2 e-mail that you had all of the appropriate

25 bank records that you needed, correct?

1  A     Correct.

2  Q     Now, at this point in time, isn't it true that

3  IPofA was paying the QIs' payroll, their rent, their

4  overhead, and their expenses?

5  A     That IPofA was paying them?

6  Q     Yes.

7  A     I don't specifically recall that.

8  Q     You don't know or --

9  A     I don't recall.  I don't recall that.

10 Q     Do you know if IPofA paid any exchanges directly

11 from IPofA's accounts?

12 A     I don't know if they did or not.

13 Q     If a check went directly from a QI to IPofA, that

14 wouldn't necessarily have been captured in your

15 accounting here; is that correct?

16 A     The --

17 Q     Let me make that a little more -- an exchanger's

18 check.

19          THE COURT:  Start again.

20 Q     If an exchanger's check was received by the QI and

21 sent directly to IPofA, your accounting would not have

22 captured that transfer; is that correct?

23          MR. DRY:  Objection.  A check is not a

24 transfer until it's deposited.

25          THE COURT:  I think that's a correct

1 statement.

2 BY MR. WAGNER:

3 Q    Your accounting would not have accounted for that

4 situation; is that correct?

5 A    Yes, it would have.

6 Q    It would have?

7 A    If, as an example, IXG were to do a transaction

8 and collect cash from a client, then their records to

9 us would have indicated that they received it, and we

10 would have had a liability on our books.  So we would

11 have had a liability, and we would have had a cash

12 account it would have went to.  So I guess I don't

13 understand the question.

14 Q    What I'm getting to is --

15        THE COURT:  I think the problem is you're

16 asking about a check from an exchanger.

17        MR. WAGNER:  Right.

18        THE COURT:  So far I have never heard in the

19 whole series of events any instance where an exchanger

20 put a check into the company.  Do you want to maybe

21 establish that that kind of thing did occur?

22        MR. WAGNER:  That's exactly what I'm getting

23 at.

24        THE COURT:  Well, let's go ahead and ask

25 about that.

1                MR. WAGNER:  I will.

2    BY MR. WAGNER:

3    Q    Wasn't there a $100,000 check that Lara Coleman

4    received that was sort of the signal to you that there

5    were problems with the account?  Didn't you testify

6    about that earlier today?  About a check that bounced?

7    A    Yes.

8    Q    And that came from the exchanger?

9    A    Yes.

10   Q    And that check was not necessarily accounted for

11   by the QIs; is that right?

12   A    That's correct.

13   Q    Now, isn't it true that you did not specifically

14   account for all inter-QI transfers of money?  In other

15   words, money from AEC to SOS, SOS to IXG?

16   A    That was part of my review when I was looking at

17   each individual bank statement was to find out what

18   type of intercompany transactions were taking place.

19   Q    But you didn't account for all of the intercompany

20   transactions, did you?

21   A    I don't know if I accounted for all of them or

22   not.

23   Q    Did you put them on an Excel spreadsheet?

24   A    All of the ones that I found, yes.

25                MR. WAGNER:  That's all I have.

1        REDIRECT EXAMINATION

2 BY MR. DRY:

3 Q    Mr. Wagner asked you about how you concluded that

4 what was occurring would potentially be illegal, and he

5 mentioned the Perkins memo, the Kutak Rock memo, and

6 then you responded your review of those memos, and in

7 addition, your personal attorney.  What did you mean by

8 that?

9 A    I hired a personal attorney for myself to

10 represent me and to investigate whether or not the

11 transactions that were occurring, whether or not I

12 would have any personal liability in the event it was

13 illegal, and whether or not those transactions were

14 legal.

15 Q    On November 30, when Mr. Okun instructed you to

16 move the client funds to Richmond, did you contact your

17 attorney?

18 A    Yes, I did.

19 Q    Without going into the substance, did your

20 attorney give you any advice?

21 A    Yes, he did.

22 Q    As a result of that advice, in part, what did you

23 do?

24 A    As part of that advice, I made a conscientious

25 decision to resign.

1  Q    Okay.  Now, Mr. Wagner mentioned a conversation

2  that you had with Mr. Field in which Mr. Field said

3  that you were so low on the totem pole nobody would

4  worry about you.  What was the context of that

5  conversation?

6  A    The conversation centered on that even if it was

7  ultimately decided that it was illegal, that I was so

8  low on the totem pole that I wouldn't be affected by

9  it.

10  Q    Now, Mr. Wagner mentioned I think it was Defense

11  Exhibit 18, and he showed it to you.  And it was the

12  exhibit where Wachovia mentioned loans from the QIs as

13  early as November 2005.  Did you understand or what was

14  your understanding of whether those loans were coming

15  from qualified intermediary profits or from exchange

16  funds?

17  A    At that time I didn't have any idea even what a

18  qualified intermediary was, so I didn't know how those

19  loans were being taken care of.

20          MR. DRY:  Can you do me a favor and show

21  Defense Exhibit 19 for me?  Thank you.

22  BY MR. DRY:

23  Q    Under the Wachovia accounts, it asks for Ed Okun's

24  personal account.  Why was it necessary to get bank

25  statements from Mr. Okun's personal account in order to

1 determine the flow of funds or what had been done with

2 the client exchange funds?

3 A    I'd seen transactions leave AEC.  I knew what Mr.

4 Okun's personal account numbers were and wanted to make

5 sure I was getting both sides.  When I saw the money

6 leaving going into the REES accounts, and I wanted to

7 have an accurate bank statement on his side, on

8 Mr. Okun's side, showing those transactions.

9 Q    When you say "those transactions," client funds

10 going directly to Mr. Okun?

11 A    Yes, sir.

12 Q    Ms. Coleman mentioned loan amortization schedules

13 that were prepared to reflect the borrowings of client

14 exchange funds.  Did you notice whether repayments were

15 made in the ordinary course of business according to

16 that schedule?

17 A    They were not made in the ordinary course of that

18 schedule.  They were made just infrequently.

19 Q    Infrequently?

20 A    Yes.

21 Q    Was Investment Properties of America in a

22 financial cash flow position in order to make those

23 payments according to that amortization schedule?

24 A    No, sir, they were not.

25         MR. DRY:  Nothing further, Your Honor.

1          THE COURT:  Can he be excused permanently?

2          MR. DRY:  He can from the United States, Your

3  Honor.

4          MR. WAGNER:  Yes, sir.

5          THE COURT:  All right.

6          Mr. Zacarias, thank you for being with us and

7  giving us your evidence.  You are released from your

8  subpoena and may go back to your business.

9          (The witness was excused from the witness

10  stand.)

11          THE COURT:  Next witness, please.

12          MR. CANNON:  Your Honor, the government has

13  two witnesses which we could call.  One is a victim

14  witness that would take 20 to 30 minutes in total.  The

15  other is Mr. Field, which would take substantially

16  longer.  We can call either now depending on how Your

17  Honor would like to take the lunch break.

18          THE COURT:  We'll take the lunch break around

19  1 o'clock, but it's up to you to decide who you want to

20  call.  If you finish with one witness before we take

21  the lunch break, we'll call the next one and get

22  started.

23          MR. CANNON:  We'll call Mr. Field.

24          THE COURT:  All right.  Mr. Field.

25

1      ROBERT D. FIELD, II, called by the United States,

2  first being duly sworn, testified as follows:

3

4      DIRECT EXAMINATION

5  BY MR. CANNON:

6  Q     Good morning, Mr. Field.  Please state and spell

7  your full name for the record.

8  A     Robert D. Field, II.  F-i-e-l-d.

9  Q     What is your educational background, Mr. Field?

10 A     I have a bachelor of science degree in economics

11 from the State University of New York, College of

12 Oswego, and a master of science degree in accountancy

13 from the University of Missouri, Columbia.  I'm a CPA.

14 Q     Just a brief overview of where you have worked.

15 A     My career includes I've been a CPA for about 32

16 years.  About half of that has been with large

17 international accounting firms including Arthur Young

18 and Deloitte, Haskins and Sells, both of which have

19 merged with other firms now, and then several years

20 with a regional accounting firm.  I had my own firm for

21 10 years.  All as a tax guy.

22 Q     At some point, Mr. Field, did you come to work for

23 Okun Holdings?

24 A     I did.

25 Q     Mr. Field, before we discuss that in detail, as a

1  result of what happened during your employment at Okun

2  Holdings, did you enter into a plea agreement with the

3  United States?

4  A     I did.

5  Q     In connection with that plea agreement, you signed

6  a plea agreement that the United States also signed?

7  A     I did, yes.

8  Q     What was it that you pled guilty to, Mr. Field?

9  A     Conspiracy to commit mail fraud and money

10 laundering.

11 Q     Do you understand that in connection with that

12 plea agreement, there's a maximum sentence that can be

13 imposed?

14 A     Yes, sir.

15 Q     Do you know what is that sentence?

16 A     Five years and some monetary damage.

17 Q     Mr. Field, in connection with that plea agreement,

18 is there a requirement that you cooperate with the

19 United States in our investigation?

20 A     Yes.

21 Q     What do you understand that cooperation to entail?

22 A     To be truthful and make myself available when

23 requested.

24 Q     Do you understand that your testimony today is

25 included in that cooperation?

1  A    Yes, sir.

2  Q    Mr. Field, do you understand, however, that if you

3  give testimony that is not truthful, that that plea

4  agreement can be voided?

5  A    Yes.

6  Q    And that you could be charged with that again,

7  with other counts?

8  A    Yes.

9        MR. POLLACK:  I object to the leading nature.

10 He just asked the witness what he understands the

11 agreement to entail.

12       THE COURT:  Overruled.

13 BY MR. CANNON:

14 Q    Do you understand, Mr. Field, that you can be

15 charged with perjury if you don't testify truthfully

16 today?

17 A    I do.

18 Q    Now, going back to the time line --

19       THE COURT:  Excuse me just a minute.

20       Ladies and gentlemen, the only reason that

21 you are hearing about this is to give you information

22 about which I will instruct you later that has a

23 bearing on the credibility, that is the determination

24 or extent to which, if at all, you rely on the

25 witness's testimony, which I will tell you later is all

1  going to be up to you.  And that's why you're hearing

2  the testimony about his plea agreement.

3            You may not take from the fact that this

4  witness entered a plea of guilty to charges that are

5  arising out of this case, that that's evidence that Mr.

6  Okun is guilty at all because that decision for this

7  person to plead guilty is solely his decision and

8  relates to his guilt and not to Mr. Okun's, and you may

9  not consider it for that purpose at all.

10           Any other instructions you wish, folks?

11           MR. CANNON:  None from the government, Your

12  Honor.

13           MR. POLLACK:  None at this time, Your Honor

14  thank you.

15           THE COURT:  There will be further

16  instructions.

17           Mr. Cannon?

18           MR. CANNON:  Yes.

19           THE COURT:  Throughout this in the evidence

20  and throughout the case, you-all have made some point,

21  the import of which I don't know, that Okun Holdings

22  never got formed, and yet you've asked this witness if

23  he is employed by an unformed company.  And I'm having

24  trouble understanding that, and I expect the jury might

25  also if they remember it.

1          MR. CANNON:  Yes, Your Honor.  I'll get into

2    that right away, Your Honor.  Thank you, Your Honor for

3    those instructions.

4    BY MR. CANNON:

5    Q     Now, going back to the time line, Mr. Field, you

6    mentioned just before that you were employed by Okun

7    Holdings.  Could you explain -- well, first of all, how

8    is it that you came to be employed by Okun Holdings?

9    A     Ms. Coleman -- I dealt with Ms. Coleman as --

10   Investment Properties of America was a client of the

11   accounting firm that I worked for, and I was partner on

12   the account.  So I had dealings with Ms. Coleman.

13   She --

14   Q     Excuse me, Mr. Field.  What time period is this?

15   A     Probably -- well, we started doing the accounting

16   work for Investment Properties of America in the spring

17   of 2005.  And she approached me probably in March or

18   April of 2006 with the thought that with the addition

19   of other businesses besides real estate, they had in

20   their mind to form a holding company, which would

21   ultimately own the direct ownership of all of these

22   various businesses.

23   Q     Is that what you understood to be Okun Holdings?

24   A     Yes, that was intended to be Okun Holdings.

25   Q     Now, going back to your work, what was the name of

1 your accounting firm?

2 A    Cherry, Bekaert & Holland.

3 Q    When you were at Cherry, Bekaert & Holland, and

4 you worked for IPofA, did that work include working on

5 the qualified intermediary companies?

6 A    No.

7 Q    So what was the job that Ms. Coleman described to

8 you?

9 A    She felt that there was a need for the companies

10 to have someone who was strategic and tax oriented

11 within the company and for Mr. Okun.

12 Q    And we're talking about the time frame in sort of

13 the spring of '06?

14 A    Yes.

15 Q    What were the job responsibilities that you would

16 have and the job that was being pitched?

17 A    Well, primarily the coordination of the

18 acquisitions and higher level tax planning, you know,

19 as the entities related to each other.  Potentially

20 some overall management, which would make it efficient

21 for all of the companies to operate together.

22 Q    Did you understand that these responsibilities

23 would extend to the qualified intermediary or QI

24 companies?

25 A    That would have been one of the companies that

1  would have been owned by Okun Holdings, yes.

2  Q     What were going to be your responsibilities

3  regarding the QI companies?

4  A     Each of the specific business units would have

5  their own chief financial officer, and I would

6  coordinate with those people on financial matters, tax

7  reporting.  Ultimately, it included overseeing human

8  resources, computer technology.

9  Q     Would you have direct responsibility for each of

10 the QI companies' internal accounting?

11 A     No.

12 Q     At that time that you were hired in sort of the

13 summer of 2006, did you have any personal experience

14 with the QI industry?

15 A     No.

16 Q     Did you ultimately accept this job?

17 A     Yes, I did.  And I started August 1st, 2006.

18 Q     If you were to refer to yourself, what title would

19 you give yourself at that time?

20 A     Well, at that time I was without title, without

21 portfolio because Okun Holdings had not been formed.

22 So I was the future CFO of Okun Holdings.

23 Q     So what was the state of Okun's companies?

24 A     Investment Properties of America was in existence

25 and had been for some time.  Jeff Zacarias was the CFO.

1 There was a trucking company, whose name escapes me.

2 I'm sorry.  And the QI companies.  And there was a

3 negotiation in process to acquire a brokerage firm

4 named Montauk Financial.

5 Q    When you first started, what were your primary --

6           THE COURT:  Excuse me.  You say you were

7 hired.  Who hired you?

8           THE WITNESS:  Lara Coleman.

9           THE COURT:  Well, for what company?

10          THE WITNESS:  Well, initially, I was on the

11 payroll of Investment Properties of America.

12          THE COURT:  So you got paid by Investment

13 Properties of America?

14          THE WITNESS:  I did, yes.

15          THE COURT:  Because there wasn't any such

16 thing as Okun Holding?

17          THE WITNESS:  That's correct.

18          THE COURT:  And there never came a time when

19 there was Okun Holdings; is that right?

20          THE WITNESS:  Okun Holdings as an entity was

21 legally formed, I believe, on December 31 of 2006 or

22 approximately that.  It did not go into operation as

23 anything until about mid February 2007, and at that

24 time it was considered to be a common services company,

25 meaning that it never did own any of the trucking

1 company, the QI, or the real estate company.  But it

2 did provide HR services, computer technology services,

3 marketing services to all of those entities.

4          THE COURT:  Did you start receiving your

5 paycheck from Okun Holdings in 2007 or did you always

6 receive your paycheck from Investment Properties of

7 America or somebody else?

8          THE WITNESS:  I believe it was Investment

9 Properties of America.

10          THE COURT:  Thank you.

11 BY MR. CANNON:

12 Q    How were you spending most of your time after you

13 began in August of 2006?

14 A    First few weeks were getting to know people and

15 what was happening.  Very quickly I was directed to

16 focus my attention on the acquisition of the brokerage

17 firm Montauk Financial.

18 Q    And who directed your responsibilities in that

19 regard with Montauk?

20          THE COURT:  Speak up, please.

21 BY MR. CANNON:

22 Q    Who directed your responsibilities -- directed you

23 to focus your attention on Montauk?

24 A    I was taking most of my direction from Lara

25 Coleman.

1  Q    Did you have any responsibilities to prepare taxes

2  for Mr. Okun's companies?

3  A    Not as an employee.  As a partner in the

4  accounting firm, I was responsible for signing and

5  approving and reviewing the tax returns while I was

6  still a partner.

7  Q    But you didn't have -- that responsibility ended

8  when you came over as an employee?

9  A    Yes.  The accounting firm retained that work.

10  Q    Did you work with the accounting firm to prepare

11  taxes?

12  A    Yes, we provided them financial statements from

13  various divisions, information about depreciation

14  assets that we owned.

15          THE COURT:  This is good background.  Now,

16  are you ready to go?

17          MR. CANNON:  Yes.

18          THE COURT:  All right.

19  BY MR. CANNON:

20  Q    Were you able to get all the information you

21  needed for the taxes, to prepare the taxes, in that

22  fall, August, early fall time frame of 2006?

23  A    Yes.  Well, the tax return was filed timely on or

24  about October 15.

25  Q    Mr. Field, did there come a time when you planned

1 a trip to Connecticut to visit a QI company?

2 A    Yes.  It was about the third week of August.

3 There was an opportunity to go up and just meet and

4 greet.

5 Q    What was in Connecticut?  Which company?

6 A    It was the 1031 Tax Group.

7 Q    Who specifically up there were you going to meet?

8 A    Jeff Zacarias was the CFO.  He was going to be

9 there, and I had worked with Jeff earlier in 2006 as we

10 prepared the tax returns, and I knew him, and he was

11 going to introduce me to others at that company.

12 Q    Did you make that planned trip?

13 A    No, I did not.

14 Q    Why didn't you make that trip?

15 A    About two hours before the flight was to take off,

16 I got an e-mail from Mrs. Coleman telling me that I

17 should allocate my time other places, and I should not

18 involve myself in the 1031 Tax Group.

19 Q    Now, about the same time frame, September of 2006,

20 did you learn that Mr. Okun had taken money out of the

21 qualified intermediaries?

22 A    Yes.  During the first week of September, one of

23 the bookkeeping employees who used to work for me at

24 the accounting firm pulled me aside and asked me if I

25 knew that some of the funds, customer funds, from the

1  QI companies was being used to pay bills.

2          MR. POLLACK:  I'm going to object on hearsay

3  grounds.

4          THE COURT:  I think he's just asking for a

5  question; is that right?

6          MR. CANNON:  That was the testimony, Your

7  Honor.  There was a question asked of Mr. Field.

8          THE COURT:  But in the question there was an

9  assertion, I suppose.

10          MR. CANNON:  There was an assertion.  To the

11  extent there was an assertion, it's not being offered

12  for the truth of the matter asserted.  Just to explain

13  what Mr. Field does in the coming weeks and months.

14          MR. POLLACK:  Mr. Field can explain what he

15  does without reference to what a third party

16  out-of-court declarant said:  Did you have a

17  conversation?  Yes, I did.  As a result of that

18  conversation, what action did you take?  He doesn't

19  need to relay the conversation.

20          THE COURT:  Isn't that right?

21          MR. CANNON:  It is correct, Your Honor.

22          THE COURT:  Sustained.

23          Just disregard his answer to that.

24          Did you have a conversation with one of your

25  former employees from the accounting firm in September

1  of 2006?

2           THE WITNESS:  I did.

3           THE COURT:  As a result of that conversation,

4  did you take certain actions?

5           THE WITNESS:  Yes.

6           THE COURT:  What actions did you take?

7           Isn't that what you want to do?

8           MR. CANNON:  That's correct.

9           THE COURT:  Let's go.

10  BY MR. CANNON:

11  Q    Let me ask you who was that employee?

12  A    Lydia Renka.

13  Q    What actions did you take, Mr. Field?

14  A    I was scheduled to visit Connecticut the following

15  Monday for part of the day to meet with Jeff to

16  determine some tax return required information as it

17  relates to the 1031 Tax Group.

18  Q    Mr. Field, Jeff being whom?

19  A    I'm sorry.  Jeff Zacarias, who was CFO of the 1031

20  Tax Group.  So I met with him.

21  Q    And as a result of that conversation, did you form

22  an opinion or did you then have knowledge or a belief

23  that Mr. Okun had taken money from the QI companies?

24           MR. POLLACK:  Objection.  That would be based

25  purely on hearsay.  Again, he can ask what he did as a

1  result of that conversation.

2          THE COURT:  How do you get the conversation

3  in?  It's hearsay, don't you think?

4          MR. CANNON:  Your Honor, it's hearsay if it's

5  being offered for the truth of the matter asserted.

6  We're not offering it for the truth of the matter

7  asserted.

8          THE COURT:  Well, what's the nonhearsay

9  purpose?  How does it survive 403?

10         MR. CANNON:  Well, Your Honor, first of all,

11 there's been plenty of testimony in terms of the 403

12 determination that these loans were actually taken.  So

13 I don't believe it's unduly prejudicial or confusing at

14 this point.

15         Mr. Field, after this conversation, then goes

16 and begins to have conversations --

17         MR. POLLACK:  I object to preview of

18 testimony that may be in admissible.

19         MR. CANNON:  I'm not trying to preview in any

20 specific way.

21         THE COURT:  But you're not addressing the

22 issue.

23         MR. CANNON:  Well, the issue is that it's not

24 for the -- it just explains and provides background,

25 helpful background to the jury.

1          THE COURT:  Why don't you get to what you

2 want to ask him.

3          Objection sustained.

4          MR. CANNON:  Okay.

5 BY MR. CANNON:

6 Q    Shortly after your trip to Connecticut where you

7 had a conversation with Jeff Zacarias, did you have a

8 plane trip with Ms. Coleman?

9 A    I did.  The next day, Tuesday.

10 Q    Did you talk about Ed Okun taking money out of the

11 qualified intermediary companies with her?

12 A    Yes, I said to her that I had heard that the other

13 companies --

14          MR. POLLACK:  I'm going to object.  It's

15 multiple layers of hearsay.  He's going to repeat

16 hearsay that he then again in a hearsay fashion

17 relayed.

18          MR. CANNON:  Your Honor --

19          THE COURT:  Mr. Cannon, did you ask

20 Ms. Coleman whether he had taken any monies?  Yes or

21 no.  If the answer is yes, what did Ms. Coleman say?

22 Then he says.  Otherwise, we don't need to get into all

23 of these hearsay statements.

24 BY MR. CANNON:

25 Q    Mr. Field, did you ask Ms. Coleman whether

1  Mr. Okun had taken money from the qualified

2  intermediary companies?

3  A    I did, yes.

4  Q    What did she say?

5  A    She --

6        MR. POLLACK:  Objection on 801(d) grounds,

7  but I know the Court will address that later.

8        THE COURT:  All right.  Objection overruled.

9        What did she say?

10 A    She said that money was being used by the other

11 companies and that Mr. Okun had a legal opinion saying

12 that it was okay for him to do that.

13 Q    When you said "the other companies," what

14 companies was she referring to?

15 A    The Investment Properties of America primarily.

16 Q    So I guess just to be clear, what was it that she

17 was describing to you?

18        THE COURT:  Whose money is --

19 Q    Whose money is being taken and where is it going?

20 A    Customer money.  Money received by the 1031 Tax

21 Group from customers was being loaned to or borrowed by

22 Investment Properties of America.

23 Q    And she mentioned that there was an opinion from

24 an attorney in Boston?

25 A    Yes.

1  Q     Did you ask her to see that opinion?

2  A     I said I would like to see that.

3  Q     What was her response?

4  A     She said fine, she would get it for me.

5  Q     And so moving forward, do you remember

6  approximately the time that you had this airplane trip

7  with Ms. Coleman?

8  A     It was probably about Tuesday, September 10th,

9  11th.  Right in that time frame.

10 Q     So did you ever see the opinion from the Boston

11 attorney?

12 A     No.

13 Q     Did you have any further conversations with

14 Ms. Coleman about the opinion?

15 A     Yes.  Several days later she told me that she

16 could not find it in the files of the company and that

17 she had requested from the law firm a duplicate copy.

18 Q     Did you subsequently talk to her after that

19 request about the opinion?  About whether she got the

20 opinion?

21 A     There was an e-mail that I saw that was from the

22 law firm in Boston which said that they could not find

23 such a legal opinion.

24 Q     And how did that news affect you or how did that

25 information that there was no -- this e-mail from the

1 attorney in Boston, how did that affect your opinion?

2            MR. POLLACK:  Objection.  His opinion as to

3 what?

4            THE COURT:  Sustained.

5 Q    How did it affect your state of mind regarding

6 taking of the client money from the qualified

7 intermediaries?

8            MR. POLLACK:  Same objection.  I'm not sure

9 what the relevance is of his opinion.

10           THE COURT:  Well, that's a different

11 question.  It's not his opinion.  Listen to the

12 question before you object.

13           Ask it again.

14 BY MR. CANNON:

15 Q    How did the information from the attorney in

16 Boston's e-mail that he couldn't find the opinion, how

17 did that affect your opinion regarding the taking of

18 money from the qualified intermediaries?

19           THE COURT:  That isn't what you asked him.

20 What you asked him was how did it affect his actions

21 respecting it, not his opinion.  But if your question

22 is how did it affect his opinion, then I'm going to

23 sustain the objection.

24           MR. CANNON:  I believe it goes to his state

25 of mind, Your Honor, and moving forward what he does.

1          THE COURT:  Why don't you just ask him how it

2 affection his actions.  Then you can later ask him why

3 he did it if it's called for.

4          That's the end of Evidence 101.  Okay?

5 BY MR. CANNON:

6 Q   Mr. Field, what did you do when you received the

7 e-mail or when you saw the e-mail from the attorney in

8 Boston?

9 A   I had a subsequent conversation with Ms. Coleman

10 where she informed me that she was going to ask a

11 different law firm, Kutak Rock, for an opinion on that

12 matter.

13 Q   And did you have any conversations with Mr. Okun

14 at this point about the legal opinions?

15 A   No, I don't believe so.

16 Q   Did you ultimately receive an opinion from Kutak

17 Rock?

18 A   Yes, in mid October, I believe, an opinion was

19 received by Eric Perkins, who forwarded -- I saw a copy

20 of that.

21 Q   Mr. Field, what did you do after you saw that

22 opinion?

23 A   I read through the opinion and it didn't seem to

24 answer the question that rose in my mind.

25 Q   What was the question that was in your mind that

1  was relevant?

2  A    The question that I had was whether it was legal

3  under state law whether these funds could be borrowed

4  and used by Ed as they were being borrowed and used.

5  Q    In your mind, the Kutak Rock opinion did not

6  address that?

7  A    It did not.

8  Q    Again, you testified that this was in mid October

9  of 2006?

10 A    Yes.

11 Q    So, Mr. Field, in late October, did you have a

12 conversation with Mr. Pajonas?

13 A    Yes.

14 Q    Did you have any conversations with Mr. Okun prior

15 to your conversation with Mr. Pajonas regarding your

16 upcoming meeting with Mr. Pajonas?

17 A    Yes.

18 Q    What was the purpose of your visit?

19 A    My purpose of the meeting with Mr. Pajonas was to

20 try and resolve a disagreement between what Mr. Okun

21 believed his arrangement with Mr. Pajonas was relative

22 to his employment status and the earning of some stock.

23 Q    Was that based on conversations with Mr. Okun?

24 A    Yes.

25 Q    Describe to me the meeting you ultimately had with

1 Mr. Pajonas.

2 A    I went to his home to meet with him.  He did not

3 want to meet at the company facility.  He immediately

4 launched into a --

5 Q    Stop right there.  We'll deal with that.

6      Did your conversation ultimately center on the

7 topic of his employment agreement?

8 A    We covered it, but it was not the bulk of the time

9 spent.

10 Q    Did you have a conversation with Mr. Pajonas about

11 Mr. Okun's takings of qualified intermediary funds?

12 A    Yes, he raised that issue.

13 Q    And based on that conversation, did you feel more

14 or less comfortable with Mr. Okun's taking money out of

15 the qualified intermediaries?

16         MR. POLLACK:  Objection.  Again, the

17 relevance of his opinion or comfort level as opposed to

18 what it caused him to do.

19         THE COURT:  Why is his comfort level

20 relevant?

21         MR. CANNON:  Because, Your Honor --

22         THE COURT:  If it is not, then you need to

23 have another question.  If it is, I will overrule the

24 objection, but the objection is to relevance.

25         MR. CANNON:  I believe it's relevant, Your

1 Honor, because it goes to Mr. Field's state of mind at

2 the time and to his subsequent actions and

3 conversations with Mr. Okun.

4          THE COURT:  Overruled.

5 A    I was quite concerned about the situation that

6 Mr. Pajonas explained to me.

7 Q    So when you returned to Richmond subsequent to

8 that conversation, and again what is the time frame of

9 that conversation to the best of your recollection?

10 A    That was a Thursday, late in October.

11 Q    After you returned to Richmond, did you have a

12 conversation with Ms. Coleman about your conversation

13 with Mr. Pajonas?

14 A    Yes.  I spent two hours with her on Friday

15 discussing the comments of Mr. Pajonas and what the

16 reality of the borrowings and activity between the

17 companies were.

18 Q    What were you concerns surrounding those

19 activities?

20 A    Whether the issue -- whether it was legal or

21 proper.

22 Q    What did you do after your conversation with

23 Ms. Coleman?

24 A    That was on Friday.  Over the weekend I thought

25 through these issues.  Monday -- either Monday or

1  Tuesday, I believe it was Tuesday, I think we had

2  people in the office on Monday, I called Mr. Okun from

3  my car as I was driving to work I believe on Tuesday

4  morning.  I expressed concern as to all of the issues

5  that Mr. Pajonas had raised and urged --

6  Q    So what was it that you related to Mr. Okun?

7  A    I told him that Mr. Pajonas had said that the

8  borrowing of the money was illegal, that Mr. Pajonas

9  was concerned about his personal legal situation and

10 thought that the whole thing was improper.

11 Q    What was Mr. Okun's response?

12 A    I asked him -- I advised him that I thought it

13 would be appropriate to get lawyers to look at this

14 issue, and I asked him permission to hire a law firm to

15 look specifically at these issues, and he agreed.

16 Q    Did Mr. Okun agree or disagree?  What if any level

17 of agreement did Mr. Okun offer about what you related

18 about Mr. Pajonas's statements?

19 A    He only said it was important that we get it right

20 and that he authorized me to hire a law firm and said

21 hire two, if necessary.

22 Q    Did he dispute with you what you had related to

23 him that Mr. Pajonas said?

24         MR. POLLACK:  Objection.  It's been asked and

25 answered.  He asked what level of disagreement there

1  was and the witness said, "None."  He testified, "Get a

2  law firm and get it right."

3          MR. CANNON:  I don't believe the witness said

4  "none," Your Honor.

5          THE COURT:  He didn't say "none," I don't

6  think, but the jury will recall that.

7          Objection overruled.

8  A    I'm sorry.  Could you ask me the question again?

9  Q    Sure.

10         Did Mr. Okun dispute any of the allegations that

11  Mr. Pajonas had raised?

12  A    No.

13  Q    So what did you do following the conversation with

14  Mr. Okun?

15  A    I arrived at the office.  I went to see

16  Ms. Coleman.  I told her of my conversation with

17  Mr. Okun, that I was going to call Mr. Perkins, the

18  chief legal officer over.  I was going to convey to him

19  all the information I had learned from all sources

20  about the activity of these loans, and that I thought

21  that Ms. Coleman should participate in that

22  conversation.

23  Q    So did you have that conversation with Mr. Perkins

24  on that day?

25  A    I did.

1  Q     And you explained to him everything you had

2  learned?

3  A     Every detail that I had heard I passed along.

4  Q     Then, Mr. Field, did you and Mr. Perkins reach out

5  to a law firm?

6  A     Yes, I asked Mr. Perkins to join me in a call and

7  we called Bob McElroy at McGuire Woods.

8  Q     What is McGuire Woods?

9  A     McGuire Woods is a very large -- it's certainly

10 the largest firm in Richmond and has offices in

11 different places around the country and I think

12 internationally.

13 Q     And so you called Mr. McElroy at McGuire Woods

14 with Mr. Perkins?

15 A     Yes.

16 Q     What did you relay to Mr. McElroy?

17 A     I provided McElroy -- I asked him to -- I told him

18 all the information that I had available about the

19 borrowings and the uses of those borrowings, and I

20 asked him if he would get some people together and look

21 into this activity.

22 Q     Do you remember roughly or approximately the date

23 of that conversation?

24 A     It's like October, I think 29th or 30th, I would

25 guess.

1  Q    In that time frame, did Mr. Perkins and the

2  in-house counsel staff to the best of your recollection

3  or to your knowledge begin their own investigation of

4  these issues?

5  A    They must have in that they issued a memorandum on

6  November 7.

7  Q    In the meantime, in between that call from McGuire

8  Woods and the memo you just mentioned on November 7,

9  did you have discussions with the in-house counsel?

10 A    I participated.  Mr. McElroy asked for copies of

11 documentation used in the exchanges by the 1031 Tax

12 Group.  And I facilitated -- we sent out an inquiry to

13 each of the groups asking for that information to be

14 forwarded to us.  And then we forwarded it on to

15 McElroy.

16      Some of it came through me and some of it came

17 through the attorney, and also the attorney worked with

18 a law firm to develop an engagement letter, which I was

19 not a part of, but I was aware it happened.

20           MR. CANNON:  At this time, Your Honor, I'd

21 like to show the witness what's been admitted already

22 as Government's Exhibit 111.

23           THE COURT:  All right.

24 BY MR. CANNON:

25 Q    Mr. Field, could you describe to the jury what

1  this memo is?  Who is it from, to, and the date?

2  A    This is an e-mail from MichiganAce, which was

3  Mr. Okun, on Sunday, November the 5th at 2:16 a.m.

4  addressed to Lara Coleman with a copy to me regarding

5  Chris Hoctor, Eric Perkins, and Kelley, our in-house

6  legal staff.

7  Q    Can you please read the beginning of that e-mail

8  up until "transactional lawyers" out loud for the jury?

9  A    I'm sorry.  From the very beginning?

10  Q    From "obviously another sleepless night" through

11  "transactional lawyers," which is about four lines

12  down.

13  A    "Obviously another sleepless night, which I cannot

14  put up with much more.  Here are my observations.  Todd

15  is a lunatic and shit disturber.  Chris and Eric love

16  to shit disturb like Todd, and Kelley I'm not sure

17  about.  Therefore, Chris and Eric need to have all

18  involvement and all pending matters removed from their

19  control and farmed out to Brian Eades exclusively and

20  other securities and transactional lawyers."

21  Q    Backing out of that and going down to about the

22  middle, a little above the middle, after "Rick

23  Chess...in the interim."  Do you see where that is?

24  A    "They aren't team players," is that what you're

25  referring to?

1  Q    No.  "In the interim," could you read that

2  sentence?

3  A    "In the interim, we will use outside counsel and

4  it won't be a Virginia firm.  Let's just use Kutak for

5  now and we will shop around.  West Oaks will be my last

6  1031 deal.  So if I'm burning a bridge, that's okay."

7  Q    And then down at the bottom, "In conclusion."

8  It's not quite at the bottom.  Do you see that

9  sentence, Mr. Field?  Could you please read that

10 sentence?

11 A    I haven't picked it up yet.

12 Q    I believe the pointer is --

13 A    You're right.  "In conclusion, Chris and Eric are

14 out of here.  Attorney-client privilege and all.  And

15 Todd either behaves himself or he can get the"

16 expletive "out of my life, too, and I will go fix the

17 QI myself.  I believe that" --

18 Q    That's fine right now.

19      Mr. Field, in this time, in between the time that

20 you talked to McGuire Woods and the time that Eric

21 Perkins releases this memo on the 7th, do you have any

22 conversations with Mr. Okun and Ms. Coleman about the

23 in-house counsel?

24 A    Nothing specific comes to my mind.

25      MR. CANNON:  Can you pull up only for the

1 witness, it's not been admitted, Government's Exhibit

2 112?

3          THE COURT:  Has Government's Exhibit 111 been

4 admitted?

5          MR. CANNON:  It was admitted through

6 Mr. Perkins.

7          THE COURT:  All right.

8          MR. CANNON:  At least that's my recollection,

9 Mr. Neal.

10          THE COURT:  I just didn't know what you said

11 about it.  I have no recollection.

12          MR. CANNON:  I don't think we discussed it at

13 all at that time.

14          THE COURT:  All right.

15 BY MR. CANNON:

16 Q    Mr. Field, what is Government's Exhibit 112?  Who

17 is it from, to, and the date?

18 A    It's pretty small, but it's from MichiganAce on

19 Monday, November 6 at 12:12 a.m. to me.  There's no

20 subject line.

21 Q    And then going down to the bottom, this is an

22 e-mail chain, correct?  It starts with an e-mail, this

23 e-mail at the bottom.  What is that e-mail?

24 A    This is an originating e-mail that, again, is from

25 MichiganAce on Sunday, November 5 at 9:28 a.m. to Lara

1  Coleman with a copy to me.

2           MR. CANNON:  At this time the government

3  moves the admission of Government's Exhibit 112.

4           THE COURT:  Any objection?

5           MR. POLLACK:  No objection, Your Honor.

6           THE COURT:  It's admitted.

7           (Government's Exhibit 112 is admitted into

8  evidence.)

9  BY MR. CANNON:

10 Q    Can you read the text at the bottom e-mail, the

11 initiating e-mail from November 5?

12 A    "Lara and David.  Thanks for reading my venting.

13 Those are my sentiments, but as Lara said, let everyone

14 calm down and work through the issues in a logical

15 manner.  Eric and Chris are good lawyers, which are

16 hard to find.  We will resume Monday.  All have a nice

17 Sunday.  Best, Ed."

18 Q    Then, Mr. Field, could you read the top portion,

19 the top e-mail, beginning with "At the moment

20 patience," all the way through "representing me"?

21 A    "At the moment patience is the wisest course;

22 however, nothing has changed legally since last year

23 regarding the QI and I am growing very weary of our

24 in-house lawyers saying things without clear basis.  If

25 they would like to resign, I would welcome that as far

1  as Chris and Eric, as they can be replaced, and I will

2  never feel comfortable with them, and I certainly don't

3  want them representing me.  As for" --

4  Q    That's fine for now.

5       Mr. Field, you mentioned that on November 7, the

6  following day, that Mr. Perkins and the in-house

7  counsel come out with a memo?

8  A    Yes.

9  Q    What is your recollection of that memo?

10 A    The memo came out.  I was not expecting it given

11 that we had McGuire Woods working on this.  As I

12 recall, it basically presented the factual situation as

13 Mr. Perkins and I had discussed.

14 Q    Specifically, what was the factual situation?

15 A    That money had been borrowed by Investment

16 Properties of America from the client funds of the 1031

17 Tax Group and were used for a number of purposes.

18 Q    What was Mr. Okun's response to this memorandum?

19 Did you have any conversations with Mr. Okun about this

20 memorandum?

21 A    He was very unhappy that the memo had been

22 written, that he felt like this was an issue that

23 McGuire Woods had been hired to handle, and that this

24 was a CYA. cover your behind, memo on the part of the

25 lawyers.

1  Q    Mr. Field, we just read in Government Exhibit 111

2  that Mr. Okun wanted to get rid of Eric Perkins and

3  Chris Hoctor.  Did that change after the memo came out?

4  A    Oh, yeah.

5           MR. CANNON:  Your Honor, at this point this

6  might be a good place to break sequentially.

7           THE COURT:  All right.  We'll have the

8  luncheon recess now.  Ladies and gentlemen, you can

9  leave your pads with Mr. Neal.

10           Today, I think, to avoid giving you the

11  impression that you are in captivity, we'll take an

12  hour for lunch, and you can go outside and enjoy the

13  nice weather outside.  There's a place across the

14  street at 7th and Broad Street that has a restaurant

15  down in the City Hall Building, which is out the door

16  to the right and across the street.  There's a

17  delicatessen called Padow's.  If you go out the

18  building, turn to the right, and turn right down 8th

19  Street there's Wall Street Delicatessen about two

20  blocks down the street, and I think there are other

21  places around.  There's a cafeteria, a place to get

22  sandwiches and warm food, in the basement here, too.

23           So go ahead and enjoy your lunch and be back

24  in an hour.  Thank you.

25           (The jury is out at 1:00 p.m.)

1          THE COURT:  If you all are eating in the

2   building, be careful not to be discussing anything

3   because the jury may be down in the basement also

4   eating at the cafeteria.

5          Anything else we need to go over?  All right.

6   We'll be in recess for an hour.

7          (Luncheon recess taken from 1:00 p.m. to 2:00

8          p.m.)

9          THE COURT:  Mr. Field, I remind you you're

10  under the same oath you took earlier today.

11         THE WITNESS:  Yes, sir.

12  BY MR. CANNON:

13  Q    Mr. Field, directing your attention to what's been

14  marked for identification as Government's Exhibit

15  No. 125 coming up on your screen, it's not yet been

16  admitted, can you describe what this e-mail is, who

17  it's from and to, and the date?

18  A    The top side memo is from MichiganAce.  On

19  Wednesday, November 8, to me regarding attorney

20  contracts.  And it says, "Great information.  Thanks.

21  Ed."

22         MR. CANNON:  I move the admission of

23  Government's Exhibit 125.

24         THE COURT:  Any objection?

25         MR. POLLACK:  I think it's already been read

1  to the jury, so why not.

2          THE COURT:  The one that I have --

3          MR. POLLACK:  No objection, but in the future

4  if we'd not have the witness read the exhibit before

5  it's in evidence.

6          MR. CANNON:  I apologize.

7          THE COURT:  Any objection?  None.

8          MR. POLLACK:  None.  No, Your Honor.  Thank

9  you.

10          (Government's Exhibit No. 125 is admitted

11  into evidence.)

12  BY MR. CANNON:

13  Q    Mr. Field, what are you doing -- I guess the

14  bottom e-mail is from you to Ms. Coleman and Edward

15  Okun?

16  A    Yes.  It's to Mr. Okun with a copy to Lara

17  Coleman.

18  Q    What is it that you were -- what information were

19  you providing?

20  A    I had been asked to summarize some pertinent

21  information off of the employment agreements of each of

22  the attorneys employed by the firm.

23  Q    Who asked you to do that?

24  A    Mr. Okun.

25          MR. CANNON:  Mr. Neal, I think it's been

1  admitted.  We can publish it to the jury.  Thank you.

2  Q    Now, Mr. Field, if I could direct your attention

3  to Government's Exhibit 127.  This is not been

4  admitted.  Can you --

5           THE COURT:  I don't think anybody can read it

6  anyway even if it got on the screen.

7  BY MR. CANNON:

8  Q    Could you explain who this e-mail is from and to

9  and the date?

10 A    It's from MichiganAce.  It was sent Thursday,

11 November 9 at 1:29 a.m.  It's to me with a copy to

12 Ms. Coleman.  The subject is "Forward of IPofA-1031 Tax

13 Group meeting."

14           MR. CANNON:  I move the admission of

15 Government's Exhibit 127.

16           MR. POLLACK:  No objection.

17           THE COURT:  It's admitted.

18           (Government's Exhibit No. 127 is admitted

19 into evidence.)

20 BY MR. CANNON:

21 Q    Mr. Field, could you please read the top e-mail

22 beginning with "David" and ending with "He won't have a

23 choice, nor will I"?

24 A    "David, a lawyer's self-serving e-mail.  Please

25 don't respond to him.  Kenny will speak with him

1  tomorrow.  Sorry, but an exodus form" should be from

2  "the firm won't happen.  No one is going to leave their

3  livelihood with someone that can't be in the business.

4  Tomorrow if he persists in this manner, I will enjoin

5  him forthwith, tender and interplead the payment to the

6  Court for his one-year severance, dismiss him

7  forthwith, and pursue him to the ends of the earth.  If

8  he communicates with our people and stirs up more shit,

9  he won't have a choice, nor will I."

10 Q    Who is Mr. Okun referencing in this e-mail?

11 A    I believed Todd Pajonas.

12 Q    And the bottom portion of this e-mail, if we can

13 scroll down to that on the screen, what is the subject

14 of that e-mail?

15 A    That is an e-mail from Todd Pajonas to me with a

16 copy to Mr. Okun, Lara Coleman, and Barry who worked at

17 1031 Tax Group.  It was sent Wednesday, November 8, at

18 8:52 p.m., subject: "IPofA 1031 Tax Group meeting."

19 Q    Is it in response to this e-mail from Mr. Pajonas

20 that we just read from?

21 A    Yes.

22 Q    Now, Mr. Field, if I could, before the lunch break

23 we talked a little bit about your interaction with

24 McGuire Woods and the hiring of McGuire Woods.  What

25 was your understanding about -- what was McGuire Woods

1 tasked to do?

2 A    McGuire Woods was to look at all the factors

3 involved to determine if what we were doing was legal

4 and appropriate.

5 Q    Did they also have a role with respect to

6 Mr. Pajonas?

7 A    Yes.  We subsequently asked them to become

8 involved in guiding the firm in the termination of

9 Mr. Pajonas.

10 Q    Were there any special issues regarding the

11 termination of Mr. Pajonas?

12 A    Could you clarify?

13 Q    I will.  Were there any complications or potential

14 problems with terminating Mr. Pajonas?

15          THE COURT:  I'm not sure he understands yet.

16          Do you?

17          THE WITNESS:  No.

18          Are you referring to the timing?

19 Q    How about if I can direct your attention to

20 Government's Exhibit 138, which has not been admitted

21 yet.  Who is this e-mail from and to?

22 A    Not up yet.

23 Q    When it comes up.

24          THE COURT:  Are you having trouble with it

25 coming up?

1          MR. CANNON:  Apparently, we are.

2          THE COURT:  We have a system problem?  Come

3 on if you can help.  You are always welcome.

4          Can you read it?

5          MR. CANNON:  Just enlarge the top portion.  I

6 appreciate it.  Thank you.

7 A    This is from me, sent Monday, November 13 at 11:44

8 a.m. to Robert McElroy at McGuire Woods, subject is

9 Todd Pajonas.

10 Q    Why were you sending this e-mail to Mr. McElroy?

11 A    As I said, Mr. Okun wanted to discharge

12 Mr. Pajonas, and we wanted McGuire Woods' assistance in

13 that process.

14 Q    Was this e-mail sent at Mr. Okun's direction?

15 A    Yes.

16          MR. CANNON:  I'd move the admission of

17 Government's Exhibit 138.

18          MR. POLLACK:  No objection, Your Honor.

19          THE COURT:  It's admitted.

20          (Government's Exhibit No. 138 is admitted

21 into evidence.)

22 Q    Now, if you could go down to the text of that

23 e-mail, the last line, the last sentence starting with

24 "The other is."

25 A    "The other is potential criminal liability issues

1 and keeping him from becoming a whistleblower."

2 Q    So what were these potential criminal liability

3 issues?

4 A    These were the issues that were raised.  I believe

5 this e-mail was sent after -- I'm sorry.  Can I go back

6 and look at the date on this so I can refresh my memory

7 of when this was sent?

8     Yes.  This was after a telephone conversation that

9 I participated in with McGuire Woods.

10 Q    Did the issue of criminal liability and

11 whistleblowers come up in that telephone call?

12 A    Yes.

13 Q    Were you concerned or was there a concern that

14 Todd Pajonas might be a whistleblower?

15 A    Yes.

16      MR. POLLACK:  Objection with respect to who

17 participated in the call and whose concern we're

18 talking about.

19      THE COURT:  I think the whole question can be

20 reformulated.  Objection to the form of the questions,

21 actually two questions, are sustained.

22      Start again, please.

23 Q    In the course of the November 9 phone call, did

24 you discuss with McGuire Woods whistleblower issues?

25 A    Yes.

1          MR. POLLACK:  Objection.  We still haven't

2    established who was on that call.

3    Q    Who was on that call?

4    A    I believe I was on the call, Eric Perkins was on

5    the call, Bob McElroy was on the call from McGuire

6    Woods, and there was another attorney who's first name

7    was Tim.  I don't remember his last name, but he was a

8    former U.S. Attorney.

9    Q    Did you discuss the whistleblower issues in that

10   call?

11   A    Yes.

12   Q    What was the discussion surrounding whistleblower

13   issues?

14   A    The question was whether or not the whole

15   borrowing of funds would -- what would the U.S.

16   Attorney do if they became aware of all of the factors

17   involved in the loans.

18   Q    And how might the U.S. Attorney's Office become

19   aware of the loans?

20   A    One of the ways was for a failure that would

21   result in a customer that was not repaid his money.

22   Another was a whistleblower or someone who went to them

23   and raised an issue.

24   Q    And so moving forward then to Government's Exhibit

25   138, are you talking about Todd Pajonas as a

1 whistleblower in that context?

2 A    Yes.

3 Q    So what was your concern with Todd Pajonas then?

4 A    That if he chose to want to cause trouble for the

5 company, he could, in fact, go and make assertions to

6 some governmental authority.

7 Q    What, if any, discussions did you have with

8 Mr. Okun about the Todd Pajonas whistleblower issue?

9 A    We were -- he was concerned that --

10      THE COURT:  I think the question is:  What

11 discussions did you have?  And why don't you just

12 handle that by saying:  What did he say?

13 Q    Did you have any discussions with Mr. Okun about

14 the Todd Pajonas whistleblower issue?

15 A    Yes.

16 Q    What did Mr. Okun tell you?

17 A    He wanted to do everything and anything he could

18 do to prevent that and be sensitive to it in the

19 termination process.

20      MR. CANNON:  Now, if we could look at

21 Government's Exhibit 139.

22      THE CLERK:  Has that been published?

23      MR. CANNON:  It has not.  I apologize, Mr.

24 Neal.

25      THE CLERK:  That's all right.

1  Q    Do you recognize this, Mr. Field?

2  A    Yes, sir.

3           MR. CANNON:  I move admission of Government's

4  Exhibit 139.

5           THE COURT:  Any objection?

6           MR. POLLACK:  No, Your Honor.

7           THE COURT:  It's admitted.

8           (Government's Exhibit No. 139 is admitted

9  into evidence.)

10  Q    Moving to the second page of the exhibit, what is

11  this?

12  A    This is a memo that I wrote to Mr. Okun and

13  Ms. Coleman regarding the tenure of Todd Pajonas and

14  reasons on which he can be terminated for cause.

15  Q    If we can go to the third page of the exhibit,

16  second to the last page of the memo, go down to the

17  bottom.  "Recommendations for action" at the bottom.

18  If you could read, Mr. Field, the last paragraph

19  starting with "My opinion."

20  A    "My opinion is that we should terminate Todd's

21  relationship with the company, but we should do so in a

22  methodical and well-considered manner.  We are working

23  with fire here in many ways and we could easily get

24  burnt."

25  Q    What did you mean you could get burnt?

1  A    Meaning that Mr. Pajonas could cause an uproar,

2  could cause publicity, justified or not, that would

3  damage the companies.

4  Q    And based on your -- was Mr. Okun relating to you

5  in your conversations with him those same concerns?

6  A    Yes.

7  Q    Now, I'd like to move onto Government's Exhibit

8  146, which I think was admitted with a redaction.

9         THE COURT:  It was admitted with the

10 exception of the top part because it was being

11 discussed with Mr. Zacarias, and I said you had to

12 remove the top part, redact it, and I think we admitted

13 it.  But if we didn't, it can be admitted as a whole

14 with Mr. Field if the top part can get admitted through

15 him.

16         MR. CANNON:  That's what I'd like to do at

17 this point, Your Honor.

18 Q    Mr. Field, do you recognize this e-mail or could

19 you explain what the top part of the e-mail is?

20 A    This is an e-mail from MichiganAce sent Wednesday,

21 November 15, 11:35 p.m. to Lara Coleman with a copy to

22 me regarding IXG-Shirley McCabe.

23         MR. CANNON:  I move the admission of the

24 entire exhibit into evidence.

25         THE COURT:  Any objection?

1          You were handling this, Mr. Wagner.  Do you

2  want to handle it or, Mr. Pollack, do you want to

3  handle it?  I don't care who does it as long as one of

4  you handles it?

5          MR. POLLACK:  Am I correct in understanding

6  that it's all admitted with the exception of the top

7  e-mail?  That the only thing we're discussing at this

8  point is whether the top e-mail comes in?

9          THE COURT:  That's my understanding.

10          MR. POLLACK:  Okay.  I have no objection to

11  the top e-mail.

12          THE COURT:  Then just for purposes of the

13  record, the whole exhibit is in.

14          MR. POLLACK:  Thank you, Your Honor.

15          THE COURT:  Because part of it is already in.

16  All right.

17          (Government's Exhibit No. 146 is admitted

18  into evidence.)

19  BY MR. CANNON:

20  Q    Now, Mr. Field, do you recall at this time

21  conversations about Shirley McCabe?

22  A    Yes.

23  Q    Did you have any discussions with Mr. Okun about

24  Shirley McCabe?

25  A    Yes.

1  Q     Describe those discussions.

2          THE COURT:  Who is Shirley McCabe?

3          THE WITNESS:  Shirley McCabe is a former

4  owner of the IXG qualified intermediary company in

5  Denver, and she was retained and I believe was an

6  officer, continued to be an officer -- certainly was an

7  employee of IXG in Denver.

8  Q     Is it your understanding at this time that

9  Ms. McCabe was asking questions about what was being

10 done with the QI funds?

11 A     Yes.

12 Q     And you had discussions about that topic with

13 Mr. Okun?

14 A     Yes.

15 Q     So I'd like you to read "From the beginning, as

16 discussed," through "Whether Greg stays or not."

17 A     I'm sorry.  How far did you want to go?

18 Q     Through "Whether Greg stays or not."

19 A     "As discussed earlier, the message needs to be

20 like David said, with the lawyer's blessing, a vague

21 response.  She is looking to hang her hat on something

22 and we won't give her a thing to do that.  All

23 accounting needs to come to Richmond for security and

24 confidentiality whether Greg stays or not."

25 Q     Based on your conversations with Mr. Okun, what's

1 your understanding of what he's saying with "vague

2 response"?  First of all, what are the questions that

3 Ms. McCabe is asking?

4 A    She would like to know the exact status of client

5 funds, particularly for those exchanges that IXG

6 initiated.

7 Q    What is Mr. Okun's response to you when you

8 discussed those issues with him?

9 A    He did not believe that once the company was

10 purchased by him, that the former owners had any right

11 or need to know the disposition of the funds and how

12 the company operated to make its money.

13 Q    Did you discuss with Mr. Okun any need for the

14 former owners, now QI managers, to stay on in the

15 business?

16 A    No, I don't recall that conversation.

17 Q    If we can go to the end here.  Not the end of the

18 exhibit, but the end of that section and beginning with

19 "If she doesn't like it," which is three lines up from

20 the bottom, can you read that to the end?

21 A    "If she doesn't like it, tough.  They sold the

22 place.  No audit rights, no profits, interest, etc.

23 Maybe we should rethink the profits interest situation

24 a little more to keep them in tow.  Ed."

25 Q    What did Mr. Okun mean by keeping them in tow?

1          MR. POLLACK:  Objection.

2          THE COURT:  Sustained.

3  Q    Based on your conversations with Mr. Okun, did

4  this idea or did in any of your conversations with

5  Mr. Okun this idea of keeping them in tow come up?

6  A    Yes.

7  Q    In what context did they come up?

8  A    In order for the company to continue to operate,

9  we needed the sales force to be fully active and

10 engaged.

11 Q    Okay.  Thank you.

12          Now, moving on in the same time period and, again,

13 this is mid November of 2006, directing your attention

14 to Government's Exhibit 156, please describe the from

15 and to of this e-mail.

16 A    This is from MichiganAce sent Monday, November 20,

17 at 11:16 p.m. to me regarding QI.

18          MR. CANNON:  I move admission of Government's

19 Exhibit 156.

20          MR. POLLACK:  No objection.

21          THE COURT:  It's admitted.

22          (Government's Exhibit No. 156 is admitted

23 into evidence.)

24 Q    Mr. Field, can you please read -- are you having

25 conversations around this time period with Mr. Okun

1  about the QIs?

2  A    Yes.

3  Q    With great frequency?

4  A    Pretty regularly.

5  Q    Could you please read the first sentence of this

6  e-mail?

7  A    "David, as you know, all of this turmoil has been

8  very hard on us all."

9  Q    And then, I'm sorry, the next sentence.

10  A    "Eric resigned today."

11  Q    So was that a fair description of the time period,

12  that there was a lot of turmoil?

13  A    Oh, yes, absolutely.

14  Q    I'd like to go down to the middle of the e-mail, a

15  little below the middle, starting with "I am also going

16  to hire local counsel."

17  A    "I am also going to hire local counsel here to

18  also handle the day-to-day of the QIs since our

19  in-house guys can't do it."

20  Q    Continue on.

21  A    "I look to McGuire Woods to complete what they are

22  doing, documents, website, guidance, etc.  Day-to-day

23  legal will be done down here, too.  Let's discuss this

24  tomorrow."

25  Q    That's fine for now, Mr. Field.  I appreciate it.

1   And then just one last, the very last sentence

2   beginning with "also."

3   A    "Also I want things kept confidential about my

4   business and all of this is no one's business.

5   Thanks."

6   Q    So at this point was it your understanding that

7   McGuire Woods was going to continue to handle the

8   QI-related legal work?

9   A    Yes.

10  Q    Did you come to learn that that changed?

11  A    Yes.

12  Q    How did you learn that?

13  A    I believe Ms. Coleman told me that McGuire Woods

14  had resigned.

15  Q    Did you have any conversations with Mr. Okun about

16  what was going to be done with the legal work going

17  forward?

18  A    At that time Ms. Coleman told me that Florida

19  counsel would be engaged.

20  Q    Would Florida counsel be engaged to basically take

21  over where McGuire Woods left off?

22  A    Yes.

23  Q    Is that in this time frame of late November 2006?

24  A    Yes.

25  Q    Later in that year did you have a conversation

1  with Mr. Okun about the result of seeking legal advice

2  in Florida?

3  A    Yes.

4  Q    What did Mr. Okun tell you about the legal advice

5  he received in Florida?

6  A    In mid December, probably the 13th, 14th, Mr. Okun

7  called me to tell me that the legal work had been

8  concluded by the law firm in Florida, that everything

9  we were doing was fine.  There were no legal problems

10 with it.  That they considered the monies to be loans

11 from the customer to the 1031 group, and as such, it

12 had no restrictions on what could be done with the

13 funds.

14 Q    Did you also discuss with Mr. Okun what business

15 practice he would follow going forward with the QIs?

16 A    Yes.  He said that he believed that he had

17 borrowed too high a percentage of the total customer

18 funds and that he was going to repay in entirety all of

19 the loans taken from the QI, borrowed from the QI

20 companies, and in the future should he have any need to

21 again borrow these funds, he would limit it to

22 30 percent of the total customer money.

23 Q    Again, the time frame for this conversation is

24 roughly when, Mr. Field?

25 A    Mid December, 13th. 14th.

1  Q    Did you have any conversations with Mr. Okun in

2  this time period about changing the exchange

3  agreements?

4  A    Earlier it was given to McGuire Woods as a job to

5  rewrite all of the exchange agreements, including

6  websites or whatever, and he said now the Florida law

7  firm, Kaplan and Poretz, or whatever that is, would now

8  undertake that project, to rewrite them all in a timely

9  manner.

10 Q    Were you personally involved in the dealings with

11 the law firm or the lawyers in Miami?

12 A    No, I had no dealings with them at this time.

13 Q    Now, near the end of December 2006, did it come to

14 your attention that Mr. Okun purchased another

15 qualified intermediary company?

16 A    Yes.

17 Q    What was that company.  Do you recall the name?

18 A    1031 Advance, I believe, in California.

19 Q    Now, I'd like you to look at what's been marked

20 for identification as Government's Exhibit 191.  Go

21 down to the bottom of the e-mail.  Then will you

22 describe who is this from, to, and the date?

23 A    This is -- the originating e-mail is from Lydia

24 Renka.  It was sent Wednesday, December 20 at

25 12:57 p.m. to me, subject:  Heads up.

1  Q    And the top e-mail, scroll up to that, is that

2  your response?

3  A    Yes.

4            MR. CANNON:  I move the admission of

5  Government's Exhibit 191.

6            MR. POLLACK:  I'm going to object on hearsay

7  grounds.

8            MR. CANNON:  These are statements of the

9  conspiracy by co-conspirators.  804.

10            THE COURT:  That's what you're getting it in

11  for, offering it for?

12            MR. CANNON:  Yes, sir.

13            THE COURT:  Anything to say?

14            MR. POLLACK:  Subject to our prior

15  discussions.

16            THE COURT:  Overruled.

17            (Government's Exhibit 191 is admitted into

18  evidence.)

19  BY MR. CANNON:

20  Q    Mr. Field, in this bottom e-mail from Ms. Renka,

21  what are you discussing there?

22  A    She is advising me that Lara, Ms. Coleman, had

23  instructed her to move $5 million from the 1031 Tax

24  Group into IPofA so that we could clear up all yearend

25  payables and cover payroll and bonuses.

1  Q    What was your response?  I mean, do you recall

2  this subject coming up?

3  A    Yes.

4  Q    Who had you discussed that with near the end of

5  the year?

6  A    As a part of yearend tax planning, I had discussed

7  with Mr. Okun and Ms. Coleman the need to get as many

8  expenses on the books as possible before yearend.  All

9  of the companies that Mr. Okun owned were what are

10 called cash basis taxpayers, which means that an item

11 is an item of income when cash is received, and it is

12 an item of expense only when the bill is actually paid.

13 So in order to get the maximum deduction and offset the

14 income, you would want to have as much of the bills

15 paid as possible by yearend.

16 Q    So 1031 Tax Group, what was that?

17 A    It was a limited liability company.

18 Q    What was contained within 1031 Tax Group?

19 A    The five or six QI companies were owned by the

20 1031 Tax Group and they held the customer funds.

21 Q    Did that include 1031 Advance?

22 A    It did eventually.  I don't recall the exact date

23 that 1031 Advance was purchased.  So I don't know that.

24 Q    The $5 million that was discussed in this e-mail,

25 was that client funds?

1  A     Yes, I believe so.

2            MR. POLLACK:  Objection, lack of foundation.

3            THE COURT:  Do you want to lay a foundation?

4            MR. CANNON:  Sure.  Yes, Your Honor.

5  Q     Did you understand what money or funds the 1031

6  Tax Group held?

7  A     Yes.

8  Q     What were those funds?

9  A     They were virtually all client funds.

10 Q     Would 1031 Tax Group at this time have $5 million

11 in funds that were not client funds?

12 A     No.

13 Q     So the $5 million that you were discussing in

14 those e-mails, were those client funds?

15 A     Yes.

16 Q     Did you have any specific conversations with

17 Mr. Okun about this transfer of funds?

18 A     No.

19 Q     Was Mr. Okun, based on your experience and

20 interactions with him, was he aware of the movement of

21 funds between 1031 Tax Group and IPofA?

22            MR. POLLACK:  Objection.  He just said he

23 didn't have any discussions about this transfer, so

24 he's got no basis of knowledge on this.  The question

25 is in general?  I'm not clear whether the question is

1 related to this transfer or not.

2          THE COURT:  Why don't you try again with the

3 question.

4 BY MR. CANNON:

5 Q    Mr. Field, based on your conversations with

6 Mr. Okun and your interactions with Mr. Okun as chief

7 financial officer of Okun Holdings or in your role

8 there, what was your impression of Mr. Okun's level of

9 knowledge about the flow of funds within his companies?

10          MR. POLLACK:  I'm going to object on a lack

11 of foundation.

12 Q    Did you have conversations with Mr. Okun about the

13 flow of funds within his companies?

14 A    Yes, routinely.

15 Q    Based on those conversations, what was your

16 impression of his level of knowledge about the movement

17 of funds within his companies?

18          MR. POLLACK:  I object to impression.  He can

19 testify to what Mr. Okun said.

20          THE COURT:  Well, he's asking for a lay

21 opinion, I suppose.

22          Why don't you start with what Mr. Okun said

23 about that topic?

24 Q    You had conversations with Mr. Okun about the

25 movement of funds within his companies?

1  A      Yes.

2  Q      Frequently?

3  A      Yes.

4  Q      What was the context of those conversations?   What

5  would he say or --

6          THE COURT:   Not what would he say; what did

7  he say about the flow of funds.

8          MR. CANNON:   Thank you, Your Honor.

9          THE COURT:   In the course of your discussions

10 with him.

11 A     My experience was that no money, no substantial

12 amounts of money, moved anywhere within any of the

13 companies without Mr. Okun's knowledge.

14         THE COURT:   Well, that's your impression.   I

15 think the question was:   What did he say?   What did he

16 say about the flow of funds within the company, if he

17 said anything?

18         THE WITNESS:   Regarding this specific

19 transaction?

20         THE COURT:   About the flow of funds in the

21 company generally in his companies.

22         THE WITNESS:   It is my experience that he was

23 always involved and wanted to be directing the flow of

24 funds.

25         THE COURT:   I think the question is:   Did he

1 tell you that?

2          THE WITNESS:  Yes.  Yes.  There are a number

3 of e-mails where he is saying that he wants to be

4 controlling.

5          THE COURT:  All right.  Objection overruled.

6 BY MR. CANNON:

7 Q    In this time frame in connection with the purchase

8 of 1031 Advance, were you aware that there was a broker

9 involved in that transaction?

10 A    Ultimately, I became aware of that.

11 Q    Do you recall the broker's name?

12 A    No.

13 Q    If I showed you a document, would it refresh your

14 recollection?

15 A    Probably.

16          MR. CANNON:  For purposes of refreshing the

17 witnesses recollection, I'd like to show him Exhibit

18 191A.

19          THE CLERK:  I'm sorry.  Again, the number?

20          MR. CANNON:  Government's Exhibit 191A, the

21 second page.

22          MR. POLLACK:  Your Honor, while the witness

23 is refreshing his recollection, I'm going to object to

24 the line of questions again on lack of foundation and

25 relevance.  He's told us that he became aware of it

1  after the fact.  This is no foundation that he had

2  firsthand knowledge of anything pertaining to this

3  subject.

4            THE COURT:  Subject of what?  191A?

5            MR. POLLACK:  I think the subject is a broker

6  that was used for purposes of the purchase of 1031

7  Advance.

8            THE COURT:  I don't think there's a question

9  on the table right now.  I can't rule on an objection

10  unless there's a question.

11           So do you want to ask your questions, then

12  I'll deal with it.  Now you're focusing on Exhibit

13  191A?

14           MR. CANNON:  That's correct.

15  BY MR. CANNON:

16  Q    Mr. Field, does that refresh your recollection

17  about the broker for that transaction?

18  A    Yes.

19  Q    I'm talking about the transaction to purchase 1031

20  Advance?

21  A    Yes.

22  Q    Do you remember his name?

23           MR. POLLACK:  Objection.  If the only way

24  that he remembers the name is from being refreshed

25  about hearsay, there's not a foundation for him to

1  testify about.

2          MR. CANNON:  Your Honor, I think that --

3          THE COURT:  Assuming that this is a document

4  prepared by him, does the document contain the name?

5          MR. CANNON:  Yes, it does.

6          THE COURT:  Well, that's not hearsay.

7  Objection overruled.

8          Do you remember the name now that you have

9  looked at the document?

10         THE WITNESS:  Yes, sir.

11         THE COURT:  All right.

12  BY MR. CANNON:

13  Q    What was the name?

14  A    Michael J. Voynovich.

15  Q    Was Mr. Voynovich paid for his services?

16  A    Yes.

17  Q    How was Mr. Voynovich paid for his services?

18         MR. POLLACK:  Objection.  The e-mail that was

19  used to refresh was not an e-mail offered by Mr. Field.

20  It was an e-mail offered by Darcy Hickman.  There's

21  still no foundation laid that Mr. Field had any

22  firsthand knowledge about this broker.

23         MR. CANNON:  It's an e-mail.

24         THE COURT:  An e-mail doesn't establish

25  firsthand knowledge about what was going on.  It just

1 establishes that seeing the name on the e-mail

2 refreshes his recollection.

3          Do you know what the broker did?  Are you

4 going to ask him or move on?

5          MR. CANNON:  It's just for a very limited

6 purpose.

7          THE COURT:  I don't care what it's for.  You

8 have to ask it right.

9 BY MR. CANNON:

10 Q    Do you know how Mr. Voynovich was paid?

11          THE COURT:  Yes or no?  Do you know how he

12 was paid?

13          THE WITNESS:  No, not off the top of my head.

14 Q    If I show you a document, could it refresh your

15 recollection?

16 A    Yes.

17 Q    Turning to the first page of 191A, the top portion

18 of it.

19 A    This was paid from the funds of the 1031 Tax

20 Group.

21          THE COURT:  "This was paid" meaning what?

22          THE WITNESS:  The broker's commission.

23          THE COURT:  All right.

24          THE WITNESS:  I believe it's at the bottom of

25 this e-mail.

1 BY MR. CANNON:

2 Q    Moving on to 2007, Mr. Field, did Mr. Okun

3 continue to take money out of the 1031 Tax Group?

4 A    Yes.

5 Q    Directing your attention to Government's Exhibit

6 212 --

7        MR. CANNON:  I move admission of Government's

8 Exhibit 212.

9        THE COURT:  Any objection?

10        MR. POLLACK:  It is hearsay.  There has not

11 been a proffer as to why it meets 801(d), and so I

12 would object on that basis.

13        THE COURT:  It's hearsay.  That's what he

14 says.  What do you say about that?

15        MR. CANNON:  I believe that it's a statement

16 of co-conspirators in furtherance of the conspiracy

17 Your Honor, within the time frames of the conspiracy.

18        THE COURT:  Any comment on that?

19        MR. POLLACK:  Yes.  There has been no

20 testimony that there was a conspiracy that existed that

21 Mr. Field was a participant or that this was in

22 furtherance of that conspiracy.  I understand that the

23 Court is not going to give me a James hearing on these

24 topics.

25        THE COURT:  I'm going to take up whether they

1 have met their requirements under the applicable

2 Supreme Court decisions.

3          MR. POLLACK:  I would expect there to be some

4 proffer as to how that is going to happen before --

5          THE COURT:  Maybe we don't need to talk about

6 that now.

7          MR. POLLACK:  Then I'll sit down.

8          MR. CANNON:  I move admission of Government's

9 Exhibit 212.

10          THE COURT:  Ladies and gentlemen, I'm going

11 to give you-all a little recess now so I can see if I

12 can deal with this situation.

13          (The jury is out at 2:49 p.m.)

14          THE COURT:  All right.

15          MR. POLLACK:  Your Honor, I --

16          THE COURT:  The United States has to

17 establish that there is a conspiracy, that the

18 declarant was a member of the conspiracy, that the

19 defendant against whom the statement was offered was a

20 member of the conspiracy, that the statement was made

21 during the conspiracy and in furtherance of these

22 things.

23          The first thing you have to do is establish a

24 conspiracy.  Have you or not?

25          MR. POLLACK:  Your Honor, may I ask that the

1 witness be excused for this discussion?

2           THE COURT:  Yes.  You can step down.  Please

3 go outside.

4           (The witness is excluded from the courtroom.)

5           THE COURT:  You-all told me that you were

6 going to establish that there was a conspiracy, and you

7 were going to establish it by subsequent evidence, and

8 you have had a number of people testify now who were

9 alleged members of the conspiracy.  Now, have you done

10 it or not?  If so, how did you do it?

11           Who's going to handle that?  Mr. Dry or

12 Mr. Cannon?  You understand what you have to meet?

13           MR. DRY:  I do, Your Honor, but I just want

14 to make sure I have all the elements.  There has been a

15 conspiracy.  Mr. Field --

16           THE COURT:  What's the proof of the

17 conspiracy?

18           MR. DRY:  First of all, there's been --

19           THE COURT:  You don't have to link it to

20 Field.  It applies to all of the testimony, otherwise

21 the testimony about what Okun has said, and Lara

22 Coleman has said, and anybody who is an indicted or

23 unindicted coconspirator is out if there's no proof of

24 a conspiracy, so your case is gone.  There will be a

25 mistrial.

1          If you have a proof of a conspiracy, you told

2    me you were going to prove it, what is it?

3          MR. DRY:  Yes, Your Honor.

4          THE COURT:  What's the conspiracy?

5          MR. DRY:  We have had several witnesses who

6    have testified.  First of all, Mr. Pajonas testified

7    regarding the transfers of the client funds regarding

8    the secrecy and the fact that the client exchangers

9    were not being told what was being done with their

10   funds.

11         The Court has received into evidence

12   documents that show that Mr. Okun, Mr. Field,

13   Mr. Pajonas, and Ms. Coleman were actively

14   participating and hiding what had been done with the

15   client exchange funds both from the QI owners as well

16   as the client exchangers themselves.

17         The Court has heard from Mr. Dowdall who was

18   told nothing about Mr. Okun's plans for what he planned

19   on doing with the money, which immediately after he

20   purchased Atlantic Exchange Company he started

21   misappropriating client funds.

22         The Court has heard from Mr. Pajonas, the

23   Security 1031 Services owner, who was initially not

24   informed what was going to be done with the funds.

25   Mr. Pajonas testified that he subsequently became

1  aware, knew that it was wrong, and did it anyway.

2        The Court has seen document after document in

3  which Mr. Okun is talking about nobody needs to know

4  what's being done.  They want secrecy.

5        You have had testimony about Mr. Pajonas

6  being paid off to be quiet.  The government has

7  overwhelmingly met its burden to prove that it was a

8  conspiracy at the time of these statements.

9        THE COURT:  All right.  What else do you have

10 to prove?

11       MR. DRY:  We have to prove that the

12 statements were in furtherance of the conspiracy.

13       THE COURT:  And during it.

14       MR. DRY:  And during the conspiracy.  The

15 government has proven that the conspiracy started upon

16 Mr. Okun's first acquisition of Atlantic Exchange

17 Company for the reasons I've stated earlier and the

18 conspiracy continued.

19       At this point we're in February of 2007.  The

20 particular e-mail itself that we're talking about,

21 Mr. Field and Ms. Renka, that document is in

22 furtherance of the conspiracy.  One of the charged

23 purposes of the conspiracy was to allow Mr. Okun to

24 enjoy his lavish lifestyle.  This e-mail is talking

25 about Mr. Okun's draws of client funds, Mr. Okun's

1 personal spending.

2          At the time some of the co-conspirators are
3 trying to get control over Mr. Okun's spending habits,
4 but that doesn't mean that's not in furtherance of the
5 conspiracy, Your Honor.  These people knew what
6 Mr. Okun was doing and participated in the conspiracy
7 to conceal that from both the QI owners and the client
8 exchangers.

9          The Court has also heard from the victims
10 themselves, several of which have testified "I put my
11 money in the qualified intermediaries.  Here's my
12 contract.  This is how I thought my money was going to
13 be held.  And, ultimately, it wasn't held that way."

14          THE COURT:  And you have to prove that the
15 declarant against whom the statement is offered, all of
16 these are statements by Mr. Okun or offered against
17 Mr. Okun, excuse me, that the person against who the
18 statements are offered, the defendant is a member of
19 the conspiracy.  Have you shown that?

20          MR. DRY:  Yes, Your Honor, we have.

21          THE COURT:  All right.

22          MR. DRY:  Mr. Okun -- almost every witness
23 that has hit that stand has testified consistently that
24 Mr. Okun was directing the members of the conspiracy on
25 what they should do.  He was the one directing the

1 transfers of the client exchange funds.  He was the one

2 directing people to be quiet.

3           Even the e-mail in which Ms. Coleman informs

4 Mr. Zacarias and Mr. Powlishen not to talk to the

5 lawyers anymore, concealing it from IPofA's in-house

6 counsel, Mr. Okun is on that e-mail.  All of the

7 evidence shows that Mr. Okun was a member of the

8 conspiracy, was directing the conspiracy, was the

9 mastermind of the conspiracy, Your Honor.

10           THE COURT:  All right.  Mr. Pollack.

11           MR. POLLACK:  Can I do it from the table or

12 the podium?  Do you care?

13           THE COURT:  I think it's easier for the court

14 reporter and everybody if you do it from the lectern.

15           How about moving your stuff out of the way,

16 Mr. Cannon, so he can put his materials down there.

17           MR. POLLACK:  Your Honor, without conceding

18 that the government has established the existence of a

19 conspiracy or Mr. Okun's participation in it, I'd like

20 to focus on two of the other elements.

21           One is whether Mr. Field was a member of such

22 a conspiracy and, specifically, whether he was a member

23 of such a conspiracy as of February 16, 2007, when he

24 authored Government's Exhibit 212.

25           Mr. Field has been on the stand on direct, I

1 believe, for about a couple of hours now.  I don't

2 think he's testified that he agreed to do something

3 that he believed to be illegal, that he agreed to

4 participate in an unlawful enterprise.  The government

5 hasn't asked him that question, but it certainly

6 hasn't -- two hours into his testimony they haven't

7 asked that question, and he certainly hasn't

8 volunteered that in response to any of his answers.

9          This particular e-mail, I think, is what

10 Mr. Dry referred to as efforts by others within the

11 business to - I think Mr. Dry's phrase was - get

12 control of the borrowing or limit the borrowing or end

13 the borrowing.

14          THE COURT:  Which is this particular e-mail?

15          MR. POLLACK:  Government's 212.  That's the

16 exhibit that I raised the objection over.

17          THE COURT:  All right.

18          MR. POLLACK:  What he's saying in the e-mail

19 is thanks for telling me about these recent draws that

20 Mr. Okun has taken.  It gives me good ammunition to go

21 back to Mr. Okun and tell him don't take any more

22 draws.

23          That's not in furtherance of the conspiracy.

24 That's counter to the conspiracy.  He wants to tell

25 Mr. Okun not to take any more borrowings.  So the

1  government has not established that Mr. Field was in

2  any conspiracy at this point.  Regardless, has not

3  established that this particular communication was in

4  furtherance of that conspiracy.  This is not a

5  communication to allow Mr. Okun to take borrowings.

6          THE COURT:  Do you want to be heard on any of

7  the issues of is there a conspiracy and whether

8  Mr. Okun is a member?  Test being met by preponderance

9  of the evidence.

10          MR. POLLACK:  Your Honor, with respect to the

11  conspiracy and whether he's a member, I guess it breaks

12  down to a couple of different points.  One is an issue

13  that we have discussed at some length pretrial, and

14  that is whether an effort to misappropriate funds that

15  were obtained from clients before Mr. Okun arrived on

16  the scene, not based on any representation or omission

17  made by Mr. Okun, are simply conversion or

18  misappropriation or theft, but cannot be a conspiracy

19  to commit mail fraud or wire fraud.  I would submit

20  that the vast majority of the evidence that the

21  government alludes to falls into that category.

22          With respect to new exchanges, that is

23  exchanges that took place after Mr. Okun took over the

24  company, the government has not demonstrated an intent

25  by Mr. Okun to defraud.  What it has demonstrated is or

1   what it has proffered is a breach of contract, but the

2   evidence has shown that Mr. Okun was directing that the

3   contracts be changed, not that he was intending to make

4   misrepresentations.  Just the opposite.  That he was

5   intending not to make misrepresentations.

6            In terms of, I guess, the government's

7   subsidiary theory that there were misrepresentations or

8   omissions to the prior exchange owners, the government

9   cites Mr. Dowdall as an example of that.  But

10  Mr. Dowdall testified and Mr. Burr testified that

11  before the purchase of Mr. Dowdall's exchange was

12  consummated, Mr. Dowdall specifically raised the issue

13  of, Hey, this is how I'd like to see the funds be

14  managed.  And what he was told by Mr. Burr at

15  Mr. Okun's direction is, We're not promising you that

16  the funds are going to be managed that way.  In fact,

17  just the opposite.  We're putting you on notice.  We're

18  telling you before you consummate this deal that if you

19  consummate the deal, you're no longer owner of the

20  company; you're management.  And all decision-making

21  authority will be with Mr. Okun.

22           So not only was there not a misrepresentation

23  or an omission, it was just the opposite.  There was

24  full disclosure by Mr. Okun that Mr. Dowdall was not

25  going to control funds management after the sale was

1  consummated.  And he had every opportunity not to go

2  through with the sale if he didn't like that.

3           THE COURT:  All right, Mr. Dry.

4           MR. DRY:  Your Honor, just very briefly.

5           Mr. Field does not need to get on that stand

6  and sit there and say that he believed that he did

7  something illegal to establish him as a coconspirator.

8  In fact, knowledge of illegality or an absence of

9  belief that his actions were illegal would not make

10 him -- would not have any effect on him being a

11 coconspirator.  The government's proffered a jury

12 instruction that knowledge of illegality is immaterial.

13          What Mr. Field needed to know was that the

14 exchangers didn't know what was being done with their

15 money.  He knew that.  He had been warned by -- he had

16 received the Perkins memorandum.  He had been on the

17 phone with McGuire Woods and a former federal

18 prosecutor who explained the mail fraud and wire fraud

19 statutes to him.  And whether Mr. Field gets on that

20 stand and says, Yes, I knew for a fact what I was doing

21 was illegal is immaterial in the coconspirator

22 analysis.

23          I would like to say that Mr. Pollack

24 conflates this breach of contract versus intent to

25 defraud.  The simple fact of the matter is that when

1  the victims gave their money to Mr. Okun, they did not

2  know how their money was going to be used by Mr. Okun.

3  The crime was complete for obtaining their money under

4  false pretenses.

5          These victims were not told, Yes, I'm going

6  to use your client exchange funds that I told you in

7  the contract is going to be held in a bank knowing that

8  I'm about to go buy a yacht with it.

9          As far as Mr. Burr telling Mr. -- in an

10  e-mail, Mr. Dowdall --

11          THE COURT:  What evidence have you offered

12  right now as of this time about the people who put in

13  money after the qualified intermediaries were purchased

14  by Mr. Okun?

15          MR. DRY:  I believe that each and every one

16  of our victims testified that they deposited their

17  funds after Mr. Okun had bought that particular

18  qualified intermediary, Your Honor, and each and every

19  one of them got on that stand and said that they did

20  not know what was being done with their money, that

21  they would not --

22          THE COURT:  How about when they signed the

23  agreements?

24          MR. DRY:  That's what I'm saying, Your Honor.

25  At the time that they signed their agreements, they

1  testified that they would not have given Mr. Okun or

2  the qualified intermediaries their money had they known

3  that anything other than effectuating their exchange

4  would have been used -- that their money would go to

5  that use.

6          Finally -- well, two points.  Mr. Burr

7  sending an e-mail to Mr. Dowdall saying, "Mr. Okun is

8  the owner of the company and has final decision-making

9  authority" is quite a different proposition than

10 Mr. Dowdall being informed after he sends an e-mail to

11 Mr. Okun stating, "Here are the operating procedures.

12 We cannot do anything with the preexisting client

13 exchange funds that we hold without the client's

14 consent."

15         Mr. Burr doesn't send an e-mail to

16 Mr. Dowdall stating, Oh, by the way, Mr. Okun plans on

17 taking $2 million four days later after buying your

18 company and routing it through Parkway Trust, and then

19 to his personal account.

20         Mr. Burr, nor Mr. Okun, informed Mr. Dowdall

21 that, in fact, Mr. Okun is purchasing that qualified

22 intermediary in order to get access to those client

23 funds.  It's a temporal connection what the United

24 States has put forward from the purchase on August 25

25 of 2005 of Atlantic Exchange Company.

1            And if the Court looks at Mr. Zacarias's

2  e-mail where he breaks out when money was taken, five

3  days after purchasing AEC, Mr. Okun is transferring the

4  client exchange funds.

5            Immediately, almost immediately, upon the

6  purchase of AEC, the Court heard testimony from Mr.

7  Dowdall that the funds were transferred to Mr. Okun and

8  Ms. Coleman's control, and that Mr. Okun promised that

9  Mr. Dowdall would be able to receive information about

10  those clients exchange funds, and was never

11  forthcoming, and, ultimately, he was fired.

12            Finally, the e-mail in which Mr. Field tells

13  Ms. Renka thank you for telling me about Mr. Okun's

14  draws is in furtherance of the conspiracy.  The mere

15  fact that a coconspirator is trying to get control or

16  trying to suggest to Mr. Okun, Hey, you've got to slow

17  down on your spending, this is out of control, the

18  government posits that was an attempt so that the

19  conspiracy would not blow up.  If Mr. Okun kept

20  spending on the rate he was, especially in this time

21  frame, the Court will hear testimony that the QI

22  companies were getting in worse and worse financial

23  condition.  From this point forward the co-conspirators

24  knew that it was very likely that they might miss an

25  exchange and, thereby, their conspiracy would be

1 discovered, Your Honor.

2          THE COURT:  Is it your position that

3 Mr. Field is a member of the conspiracy?

4          MR. DRY:  Absolutely, Your Honor.  In fact,

5 he's pled guilty to being a member of the conspiracy in

6 the statement of facts in which he pleads guilty.

7          THE COURT:  But have you put that in here

8 into evidence?  Mr. Pollack says you haven't.

9          MR. DRY:  We do not have to put Mr. Field's

10 statement of facts into evidence.

11          THE COURT:  I'm not talking about the

12 statement of facts.  You have to establish that a

13 declarant, if it's a hearsay statement offered under

14 the coconspirator exception, was a member of the

15 conspiracy, don't you?

16          MR. DRY:  I agree, Your Honor.

17          THE COURT:  You have to establish it.

18          MR. DRY:  I'm sorry.  Respectfully, Your

19 Honor, it's the government's understanding that it does

20 not have to present that evidence to the Court or to

21 the jury.  That this would be a 104 situation.

22          THE COURT:  Have you presented it?

23          MR. DRY:  I believe I --

24          THE COURT:  Why don't you have to present it

25 to the jury?

1          MR. DRY:  Because this is a preliminary issue

2  for the Court to determine --

3          THE COURT:  Well, it is, but why don't you

4  have to present it to the jury?  The instructions we

5  give the jury say, among other things, on the

6  conspiracy, one of the lengthy recitations of

7  conspiracy law is that once you find that a conspiracy

8  exists, and you find that there is a declaration made

9  by somebody who is a member of the conspiracy, it is

10 chargeable against everybody in the conspiracy as if

11 they had made it themselves because they are all

12 agents, one for another, in a criminal partnership.

13 That's Horne book law, and you tell the jury that.  You

14 tell them that's how you have to consider it.

15          So in considering the evidence of, say,

16 Mr. Field, don't they have to know that he was a member

17 of the conspiracy?

18         MR. DRY:  Yes.

19         THE COURT:  Well, then you have to show it in

20 evidence, don't you, before the end of the trial?

21         MR. DRY:  Before the end of the trial.

22         THE COURT:  But you haven't done it yet.

23         MR. DRY:  But I don't believe we have to.

24         THE COURT:  Are you going to do it now?

25         MR. DRY:  I believe that Mr. Cannon is going

1  to establish that Mr. Field was a member of the

2  conspiracy.  My only point, Your Honor, was for the

3  purposes --

4            THE COURT:  Why don't you do it now since

5  we're in a 104 hearing.  Why don't you do it now.  You

6  said you had to do it in a 140 hearing.  Why don't you

7  do it now.

8            MR. DRY:  Your Honor --

9            THE COURT:  As to Mr. Field.

10           MR. DRY:  Would you like me to do that

11  through a statement of facts or --

12           THE COURT:  How do you want to do it?

13           MR. DRY:  I would like to do it through a

14  statement of facts.

15           THE COURT:  Unless you want to consult with

16  Mr. Pollack and ask him how he wants you to do it.  He

17  can give you some advice.

18           MR. DRY:  I would rather not.

19           THE COURT:  Then probably he can attack it.

20  I don't know.

21           MR. DRY:  Your Honor, I'd like to admit

22  Government's Exhibit 286 in evidence.  It's Mr. Field's

23  statement of facts.

24           THE COURT:  Do you have that, Mr. Pollack?

25  You are familiar with it, I assume.

1          MR. POLLACK:  I am.

2          Again, so I understand, are we moving the

3 admission for purposes of including it in the record

4 for the Court to makes its determination or is the

5 question whether this is being moved into evidence to

6 be offered to the jury?

7          MR. DRY:  I'm not moving Mr. Field's

8 statement of facts into evidence for the jury, Your

9 Honor.

10          THE COURT:  For 104 purposes of the Court.

11          MR. POLLACK:  No objection then, Your Honor.

12          THE COURT:  Hand it up.

13          It will be placed in the record.  It will not

14 go to the jury.  And I'm going to take it, once I look

15 at it, I'm going to hand it back to you, and I'm

16 looking to expect you to keep it, and keep it away from

17 anything that goes to the jury, and I want you-all to

18 check that because I don't want a Lentz problem.

19          MR. DRY:  Yes, Your Honor.  I'll put it in my

20 briefcase.  Nothing ever comes out of that.

21          THE COURT:  It looks remarkably like the

22 allegations in the superseding indictment.

23          MR. DRY:  Your Honor, I apologize.  Can the

24 Court check to see if that's a signed and executed

25 version?  Because if not, we'll have to get one.

1          THE COURT:  It is not signed by anybody.

2          MR. DRY:  Okay, Your Honor.  I apologize.

3 We're going to have to get --

4          THE COURT:  Well, is this a copy of the

5 signed version?

6          MR. DRY:  Yes, sir, Your Honor.

7          THE COURT:  It's just unsigned?

8          MR. DRY:  Yes, Your Honor.  But I will get

9 you a copy of the signed, filed statement of facts,

10 Your Honor.

11          THE COURT:  Where is the part that you say

12 shows that Field is a member of the conspiracy?

13          MR. DRY:  I believe it says from November of

14 2006 until April or May of 2007, Your Honor.  I'd have

15 to look at it.  I apologize.

16          THE COURT:  Well, the first reference I see

17 is in paragraph 25.  It says, "Throughout this period,

18 Okun, Field, and others concealed the misappropriation

19 of client exchange funds from various executives."

20 Paragraph 26 says the same thing.  To conceal

21 misappropriations and worsening financial condition,

22 that Okun and Field did certain things.

23          Paragraph 27 and 28, paragraph 30 and 31,

24 that's what comes to sight right here in this document

25 so far.  And I think there are some earlier references

1 to Field, but I'm not sure that they are anything other

2 than establishing there is knowledge of the illegality

3 of it as of November of 2006.  The rest of it talks

4 about what he did thereafter.

5          MR. DRY:  Yes, Your Honor.

6          THE COURT:  Basically, is what I get out of

7 this.  All right.

8          MR. DRY:  Yes, Your Honor.

9          THE COURT:  All right.  Anything else?

10          MR. DRY:  Nothing from the United States,

11 Your Honor.

12          MR. POLLACK:  Your Honor, if I might, just

13 one brief point in response to Mr. Dry's comments.  And

14 that is, again, focused on the question of whether even

15 assuming that they establish the existence of a

16 conspiracy, assuming they establish that Field was a

17 member of the conspiracy on February 16, 2007, and even

18 assuming that they have established that Mr. Okun was a

19 member of the conspiracy on that date, whether or not

20 this document, Government's Exhibit 212, is in

21 furtherance of the conspiracy, Mr. Dry posited an

22 interpretation of this document that he wasn't saying

23 to Mr. Okun, Stop borrowing funds because he really

24 didn't want Mr. Okun to borrow funds and didn't want to

25 participate in this conspiracy.  He was saying, Hey,

1  stop borrowing funds so fast because we're going to get

2  caught.  And, actually, we'll be able to continue the

3  conspiracy longer if you'd just slow down a little bit.

4         There's simply been no evidence that that is,

5  in fact, what Mr. Field was intending.  And so based on

6  the state of the actual record, again, there's nothing

7  that demonstrates that this document is in furtherance

8  of a conspiracy.  And if the Court were inclined to

9  allow the government to offer the document based on

10  that interpretation of the document, I would request

11  that Mr. Field be put on the stand outside of the

12  presence of the jury first to inquire as to what he

13  actually meant by the document to see if there's an

14  evidentiary basis for that.

15         THE COURT:  All right.  The indictment

16  alleges two conspiracies:  Count One and Count Two, a

17  wire fraud and mail fraud conspiracy.

18         There is by a preponderance of the evidence

19  the record establishes the existence of both kinds of

20  conspiracies.  It establishes by a preponderance of the

21  evidence that Mr. Okun was a member of the conspiracies

22  that were alleged, and all the statements that have

23  been admitted so far against Mr. Okun have been made

24  upon the judgment that the declarants making those

25  statements, that is, where the coconspirator predicate

1   for admission has been the basis for statements against

2   Mr. Okun, that the declarant was a member of the

3   conspiracy, and the record so proves where that's the

4   basis for allowing the evidence in.

5            The statements have all been made during and

6   in furtherance of the conspiracies, one or the other or

7   both, and the question now comes as to 212.  I allowed

8   the government to establish a foundation to prove these

9   conspiracies and to prove that Mr. Okun was a member of

10  them.  And I now allow all those statements in because

11  those two predicates have been made.

12           Of course, there's plenty of statements made

13  that are attributable to Mr. Okun or about Mr. Okun and

14  things he said or did that are based on other rules of

15  evidence, not just the coconspirator rule.  But as to

16  this particular document, No. 212, I'm having trouble

17  understanding where it is in furtherance of the

18  conspiracy.  I think it is definitely during the

19  conspiracy.  And it conceivably could be made in

20  furtherance of the conspiracy, but you're going to have

21  to establish through Mr. Field that in fact it was

22  because all this document does is to talk about the

23  amount of Mr. Okun's takings during calendar year 2007

24  as of February 16, 2007, at which time he had pulled

25  out $1.8 million, according to this document.

1          Now, in the record, is there Ms. Renka's

2  notation of what his borrowings are?  What exhibit is

3  that?

4          MR. DRY:  No, Your Honor, there's not.

5          THE COURT:  There's no predicate for this.

6  So I can't tell from anything that's come in so far

7  what this means.

8          Let me tell you what I think you both need to

9  focus on.  You don't try lawsuits by throwing documents

10 up every minute and saying, Look at this document, da,

11 da.

12         Establish with a question what's going on.

13 And then if a document helps prove the point, use the

14 document to prove the point.  But you lead people into

15 the wilderness of confusion by just relying on

16 documents.

17         Right now Mr. Pollack's objection would be

18 well taken as to Exhibit 212.

19         MR. DRY:  Your Honor, we'll --

20         THE COURT:  But we haven't finished with the

21 examination of Mr. Field, and you have told me that you

22 are going to establish a number of things, including

23 that he's a member of the conspiracy.

24         And now I find that from the statement of

25 facts he is a member of the conspiracy, if one existed,

1 and by a preponderance of the evidence I've found that

2 there's one that exists, but that's not for consumption

3 by the jury.

4          So what about 212?

5          MR. DRY:  Your Honor, in the interest of

6 speeding this process along, the government will not

7 seek to introduce Exhibit 212 and will merely ask

8 Mr. Field about his conversations with Mr. Okun at

9 around this time that relate to Mr. Okun's spending.

10          THE COURT:  Then the objection is withdrawn

11 and the exhibit is withdrawn.

12          What time is it?

13          MR. DRY:  It's 3:25.

14          THE COURT:  They have been out for a while.

15 Do you want to take the afternoon break now and then

16 we'll go a little longer?

17          MR. DRY:  Yes, Your Honor.

18          THE COURT:  All right.  We'll take the

19 afternoon break.  Let the jury know we'll be out for

20 about 20 minutes.  Then we'll go back.

21          (Recess taken from 3:25 p.m. to 3:50 p.m.)

22          THE COURT:  Mr. Field, I remind you you're

23 under the same oath you took earlier today.

24          THE WITNESS:  Yes, sir.

25          THE COURT:  All right, Mr. Cannon.

1 BY MR. CANNON:

2 Q    Mr. Field, before we took the break, you testified

3 that Mr. Okun continued to borrow or take money out of

4 the qualified intermediaries into 2007.  I'd like you

5 to look at what's been marked for identification as

6 Government's Exhibit 217.

7           MR. CANNON:  I move admission of 217.

8           THE COURT:  Any objection?

9           MR. POLLACK:  No objection.

10          THE COURT:  It's admitted.

11          (Government's Exhibit No. 217 is admitted

12 into evidence.)

13 BY MR. CANNON:

14 Q    Mr. Field, what is it that you're discussing with

15 Mr. Okun here in this e-mail?

16 A    This is a preparation, a note borrowing funds from

17 the 1031 Tax Group for the operation of the other

18 companies.

19 Q    Going up to the top, what is Mr. Okun's response?

20 A    "This is fine."

21 Q    At this time in February or March of 2007, did you

22 have discusses with Mr. Okun regarding his personal use

23 and expenditures of funds?

24 A    Yes.

25 Q    How did those conversations come about?

1 A    Lydia Renka --

2            THE COURT:  What?

3 Q    Go ahead, Mr. Field.  I apologize.

4 A    Lydia Renka brought to my attention the amount of

5 money that had been drawn by Mr. Okun for his personal

6 purposes in the first month and a half of the year.

7 And that caught my attention.  And I did some

8 additional work that would project that for the whole

9 year, and I went to Mr. Okun and asserted that the

10 company could not afford for him to draw that much

11 money out of the company.

12            THE COURT:  Which company?

13            THE WITNESS:  Any of the companies, but

14 IPofA.

15 Q    What were the ballpark figures, the figures that

16 you came up with in your investigation?

17 A    I estimated between 9- and $10 million of actual

18 cash expenditures.

19 Q    Over what period of time?

20 A    For a year, himself.

21 Q    What did Mr. Okun say in response to your raising

22 this claim?

23 A    One of the suggested solutions was the sale of the

24 yacht Simone.

25 Q    Who made that suggestion?

1  A      I did.

2  Q      What did Mr. Okun say when you raised that?

3  A      We discussed it and he agreed.

4  Q      Did you have a follow-up conversation subsequent

5  to that with Mr. Okun where the sale of the yacht was

6  discussed?

7  A      Yes.  Perhaps a week or ten days later I inquired

8  as to how that was going, and he told me he had decided

9  not to sell the yacht.

10  Q      Did he tell you why?

11  A      Yes.

12  Q      What did he say?

13  A      He said that when he told his wife that they were

14  going to sell the yacht, and that the yacht was named

15  after his wife, she became upset, and he decided not to

16  sell the yacht.

17  Q      In this time frame, Mr. Field, in February or

18  March, the beginning of 2007, did Mr. Okun purchase a

19  plane?

20  A      Yes.

21  Q      Did you have any conversations with Mr. Okun about

22  purchasing that plane?

23  A      Yes.

24  Q      First, what did you tell Mr. Okun about this

25  purchase?

1 A    Well, we did not have the funds to purchase

2 another jet.

3 Q    When you say "we"?

4 A    The companies.

5 Q    Was that IPofA and the QIs?

6        THE COURT:  What?

7 Q    Both IPofA and the 1031 Tax Group, and the QI

8 companies?

9 A    Yes, the combined group of companies.

10 Q   What was Mr. Okun's response?

11 A   That this was an outstanding purchase price.  It

12 was a distressed sale, and that this would be worth

13 many times what he was paying for it, and that he was

14 going to purchase it.

15 Q   Did he ultimately purchase it?

16 A   Yes.

17 Q   I'd like to direct your attention, Mr. Field, to

18 Government's Exhibit 239, which has not been admitted

19 into evidence.

20        MR. CANNON:  I move the admission of

21 Government's Exhibit 239.

22        THE COURT:  Any objection?

23        MR. POLLACK:  Just a moment, Your Honor.

24        No objection.

25        THE COURT:  It's admitted.

1            (Government's Exhibit No. 239 is admitted

2 into evidence.)

3 BY MR. CANNON:

4 Q    Now, Mr. Field, can you describe the bottom

5 e-mail, what is going on in that e-mail from Shannah

6 Robinson to Kim Watts, if you know?

7 A    This is an e-mail from Shannah Robinson, who was

8 at that time the receptionist for the company, on

9 Tuesday, March 27, to Kim Watts.  Kim was a manager in

10 IPofA, the real estate company.

11 Q    Where was she located?

12 A    In Richmond.  And it relates to money from West

13 Oaks Mall.

14 Q    Okay.  And then moving up.  What's Kim's response?

15 A    "David who?"

16 Q    Is "David" in the e-mail, is that referring to

17 you?

18 A    Yes, I believe so.

19 Q    Can you please read Ms. Coleman's response about

20 that?

21 A    Do you want from and to?

22 Q    From and to.

23 A    From Laura Coleman to MichiganAce on Wednesday,

24 March 28, 9:36 a.m.  Forward:  The money from West Oaks

25 Mall.

1       "Given that not everyone understands or should

2 know about the QI, it seems prudent that we not handle

3 things in this manner.  Kim just lets us know when the

4 closing takes place and how much will be wired.  Lydia

5 should be instructed to move the money."

6 Q    And in this time frame -- let's go on to the next

7 point.  In this time period, sort of March and now

8 moving into April of 2007, did you have any

9 conversations with Mr. Okun about segregated accounts?

10 A    There was a discussion about one in particular

11 that I recall in a Texas bank.

12 Q    How did that conversation come up?

13 A    I believe that the controller of the 1031 group

14 discovered that there was a sum of money, which I

15 believe was --

16          MR. POLLACK:  I'm going to object on hearsay

17 grounds and lack of foundation for personal knowledge.

18 BY MR. CANNON:

19 Q    How about this, Mr. Field:  Did you have

20 conversations with Mr. Okun about this Texas-based

21 account?

22 A    Yes.

23 Q    What did you inform Mr. Okun about what if any

24 restrictions apply to this account?

25 A    I said that I was aware or had been informed that

1 the account was required under the terms of that

2 contract with the customer that those funds would be

3 held in that particular bank.

4 Q    What was Mr. Okun's response?

5 A    He wanted to move it to the common 1031 account.

6 Q    If I could direct your attention to Government's

7 Exhibit 245.

8        MR. CANNON:  I move admission of that

9 exhibit.

10        MR. POLLACK:  No objection.

11        THE COURT:  It's admitted.

12        (Government's Exhibit No. 245 is admitted

13 into evidence.)

14 BY MR. CANNON:

15 Q    Ultimately, was that money moved?

16 A    I don't believe it was.

17        THE COURT:  You don't believe it was?

18        THE WITNESS:  I do not believe it was, no.

19 Q    Was that because -- did Mr. Okun tell you not to

20 move it?

21 A    No.  I think it got moved back to the customer.

22 Q    Okay.  Now, moving sort of into the late part of

23 April, mid to late part of April, Mr. Field, did you

24 have conversations with Mr. Okun about difficulties in

25 satisfying exchange requests from exchangers?

1 A     Yes.

2 Q     How did those conversations arise with Mr. Okun?

3 A     We were receiving requests from various customers

4 to fund their exchanges and we did not have the cash

5 available to do that.

6 Q     Did you relay these concerns to Mr. Okun?

7 A     Yes, sir.

8 Q     Did you discuss with Mr. Okun how you would

9 respond to the request for funds?

10 A     Yes.

11 Q     What did Mr. Okun want you to say?

12 A     That the funds had been invested for a higher

13 yield and that the funds were not currently available,

14 that the slowdown in the real estate market in the

15 spring had not been anticipated, and we would have the

16 money shortly.  And for the inconvenience of delaying

17 the funding of their account, we would move the

18 interest rate up to a higher percentage.

19 Q     Now, did you discuss with Mr. Okun a level of

20 specificity with which you should explain -- that you'd

21 explain the issues, the funding issues, with the QI

22 managers?

23 A     Could you rephrase that?

24 Q     Yes, I will.  Why don't we look at Government's

25 Exhibit 247.  It's not been admitted.

1          MR. CANNON:  I move admission of Government's

2 Exhibit 247.

3          THE COURT:  Any objection?

4          MR. POLLACK:  Your Honor, this is a lengthy

5 string of e-mails.  The top one of which is from

6 Mr. Field to Mr. Okun and Mr. Simring.  What is unclear

7 to me is whether the entire string beneath it was

8 forwarded to Mr. Okun.  If we could establish that, if

9 that's the case, I don't have an objection.  If not, I

10 don't object to the one that did go to Mr. Okun, but I

11 would object to all the preceding ones.

12 Q    Mr. Field, is it your recollection that the bottom

13 portion of the e-mail was forwarded to Mr. Okun?

14          MR. POLLACK:  Not just the bottom portion.

15 There's page after page after page of e-mails.

16          THE COURT:  Do you understand there's a whole

17 bunch of stuff here?

18          MR. CANNON:  Yes, I do, Your Honor.

19          THE COURT:  Are you offering all of it?

20          MR. CANNON:  Yes, Your Honor.

21          THE COURT:  Establish a foundation.

22 BY MR. CANNON:

23 Q    Mr. Field, did you forward this string of e-mails

24 along with your message to Mr. Okun?

25          MR. POLLACK:  I don't think the witness can

1 even see the string of e-mails.

2 Q    Have you had a chance to review this document

3 before your testimony here today?

4 A    I did, yes.

5 Q    Did you forward the entire string of e-mails to

6 Mr. Okun along with your message?

7 A    Yes.

8            THE COURT:  Any objection?

9            MR. POLLACK:  No, Your Honor.  Thank you.

10           THE COURT:  It's admitted.

11           (Government's Exhibit No. 247 is admitted

12 into evidence.)

13 BY MR. CANNON:

14 Q    Now, just a second ago we discussed questions

15 about funding exchanges.  Were these questions from the

16 QI managers?

17 A    Yes.

18 Q    This e-mail at the top, is William Bennett one of

19 the QI managers?

20 A    Yes.

21 Q    And you explained to him what you're prepared to

22 tell him?  What was it you're prepared to tell him?

23           THE COURT:  I don't understand the question.

24 He's getting ready to object and he should.  Sustained.

25 BY MR. CANNON:

1  Q    Mr. Field, again, did you have discussions with

2  Mr. Okun about what to tell -- we talked about or you

3  testified about discussions you had with Mr. Okun about

4  what to tell the QI managers; is that correct?

5  A    Yes.

6  Q    Did you discuss with Mr. Okun whether or not you

7  should tell the QI managers the source or where the

8  money was being held or where it was tied up?

9  A    We did discuss it and he did not want that

10 information given out.

11 Q    Why did he want to keep that information from the

12 QI managers?

13          MR. POLLACK:  Objection.

14          MR. CANNON:  I'm not sure I understand the

15 objection.

16 Q    Did he give you a reason for --

17          THE COURT:  Now you understand the objection.

18          MR. CANNON:  I'm not the sharpest knife in

19 the drawer, but I'll get there.

20 Q    Did he give you a reason for keeping this

21 information from the managers?

22 A    He had consistently held that where the money was

23 and what it was invested in was proprietary information

24 to management and that individuals at the individual

25 QIs did not need to know.

1  Q    Was there a business reason for keeping this

2  information from the managers?

3           MR. POLLACK:  Is this asking for Mr. Field's

4  personal lay opinion?

5  BY MR. CANNON:

6  Q    Would you please read the last sentence of the

7  e-mail of Government's Exhibit 247?

8  A    "I think the troops are not selling for fear of

9  the situation."

10  Q    Was that an issue that you had discussed with

11  Mr. Okun?

12  A    Yes.

13  Q    Why was it important for the troops to sell?

14  A    Because we needed additional new business, new

15  cash inflow to maintain a cash balance in the company

16  and meet the needs of exchanges which were coming due.

17  Q    Did you have discussions with Mr. Okun about that

18  particular point?

19  A    Yes.

20  Q    I direct your attention, Mr. Field, to what's been

21  marked for identification as Government's Exhibit 252.

22           MR. CANNON:  I move the admission of 252.

23           MR. POLLACK:  No objection.

24           THE COURT:  It's admitted.

25           (Government's Exhibit No. 252 is admitted

1  into evidence.)

2  Q    Mr. Field, can you please read the bottom portion

3  of the e-mail that's from you?

4  A    This is an e-mail from me to MichiganAce and

5  Richard Simring, subject:  QI.

6       "From a comment Lara made to Beth" - Beth McNamee

7  was the H.R. director for Okun Holdings - "I understand

8  that Lara knows you will likely close the QI.  What was

9  a situation we might have been able to control, now for

10 all intensive purposes is public knowledge.  How long

11 before Janet hears from the grapevine of Lara, Katie,

12 Amy or someone else?  We needed this operation to

13 continue for several more months of cash inflows.  I

14 doubt we now have that luxury."

15 Q    Is that a reiteration of what we just talked

16 about, money coming in?

17 A    Yes.

18 Q    In addition to dealing with the QI managers like

19 Bill Bennett, did you have discussions with Mr. Okun

20 about interacting with particular exchangers who are

21 requesting their funds?

22 A    Yes.

23 Q    Did Mr. Okun give you instructions on how to deal

24 with the particular exchangers?

25 A    Yes.  The similar argument that we talked about

1 just a minute ago, that the funds were invested in a

2 longer-term note.  Cash was not available at this

3 moment, but it would be, and that, therefore, the

4 customer's inconvenience of not being able to fund his

5 exchange when requested, that we would pay a higher

6 interest rate.

7 Q    Did you have a discussion with Mr. Okun why you

8 wouldn't just pay the exchange late?  I'll rephrase it.

9 Did you have a discussion with Mr. Okun about why it

10 was important to make sure each exchange was funded?

11 A    Yes.

12 Q    Please describe that discussion to the jury.

13 A    Well, the there was a need to deal with a customer

14 who was expecting a cash transfer on a certain date to

15 meet his real estate needs for the closing of his

16 transaction.

17 Q    Did you discuss with Mr. Okun the consequences for

18 not funding those transactions?

19 A    Yes.

20 Q    What were the consequences?

21 A    That more than likely the customer -- that he

22 would be or either the company would be liable for any

23 penalties for failure of that customer to make his real

24 estate deal, that the customer would very likely take

25 some sort of legal action to recover his funds.

1  Q    I'd like to direct your attention to Government's

2  Exhibit 258.

3           MR. CANNON:  I move admission of 258.

4           MR. POLLACK:  No objection.

5           THE COURT:  It's admitted.

6           (Government's Exhibit No. 258 is admitted

7  into evidence.)

8  BY MR. CANNON:

9  Q    Mr. Field, in this e-mail you're discussing the

10 communication with one of the particular exchangers?

11 A    His attorney.

12 Q    You mean the attorney for an exchanger?

13 A    An attorney for the customer, yes.

14 Q    If you could, read in the middle from "He is very"

15 to the end of that paragraph.

16 A    "He is very reasonable and understands the

17 business issues we have regarding the liquidity.  He is

18 asking for something from us to use in assuring his

19 client that the security of funds is there and it truly

20 is just a, quote, temporary cash liquidity issue,

21 unquote.

22 Q    Mr. Field, we talked about with QI managers.

23 There was kept from the QI managers the source of the

24 liquidity crisis.  Did you have a similar discussion

25 with Mr. Okun about the QI exchangers and the source of

1  the liquidity issue?

2           MR. POLLACK:  I'm going to object to the

3  characterization of the prior testimony which is not an

4  accurate characterization of the prior testimony.

5           THE COURT:  Well, it may or may not be.  The

6  jury can figure that out.

7           But why don't you ask the question without

8  characterizing the prior testimony.  Just ask the

9  question.  So the objection to the form of the question

10 is sustained, but for a different reason.

11 BY MR. CANNON:

12 Q    Mr. Field, did you have any discussions with

13 Mr. Okun about whether you should discuss with the

14 exchangers directly the source of the liquidity issue?

15 A    Yes.

16 Q    Was that something that you were going to discuss

17 with the exchangers?

18 A    No.

19 Q    Did Mr. Okun specifically instruct you not to tell

20 the exchangers?

21 A    Yes.

22 Q    Your efforts to deal with the exchange, the QI

23 managers, did that satisfy the concerns?

24           THE COURT:  What?

25 Q    Did your communications with the QI managers about

1 the liquidity, the problems funding the exchanges, did

2 that satisfy the QI managers' concerns?

3 A    I don't believe in total, no.

4 Q    At this time, Mr. Field, are you in discussions

5 with Mr. Okun about a loan to make up for some of the

6 shortfall?

7 A    Yes.

8         MR. POLLACK:  I'm sorry.  The time frame

9 here?

10         MR. CANNON:  In April.

11         THE COURT:  I think he said "at this time" at

12 the beginning of the question, but I don't know if it

13 was sufficiently audible for you to hear.

14         So why don't you put a time frame on the

15 question.

16         MR. POLLACK:  Actually, I heard the "at this

17 time."  I just didn't know what that referred to.

18 BY MR. CANNON:

19 Q    In April 2007, did you have discussions with

20 Mr. Okun about a loan?

21 A    Yes, sir.

22 Q    Do you recall the amount of that loan?

23 A    Ultimately, it was to be close to $250 million.

24 Q    Was there a subset of that loan?

25 A    Yes, it was to be broken down in draws and pieces.

1  The first piece being about $40 million.

2  Q    I'd like to direct your attention to Government's

3  Exhibit 265.

4           MR. CANNON:  I move the admission of 265.

5           MR. POLLACK:  No objection.

6           THE COURT:  It's admitted.

7           (Government's Exhibit No. 265 is admitted

8  into evidence.)

9  BY MR. CANNON:

10 Q    Mr. Field, could you read who this is from and to

11 and the single line of text in the e-mail?

12 A    This is from me on Wednesday, April 25, 2:14 p.m.

13 It's to MichiganAce and Mr. Kominsky.  And it's subject

14 is loan uses.  And the body of the text says, "Attached

15 is the proposed final sources and uses worksheet for

16 the $40 million loan."

17 Q    Turning your attention to the second page, to the

18 attachment of this e-mail, the total of the loan was

19 40 million?

20 A    Yes.

21 Q    How much was to be used for the 1031 Tax Group

22 repayment?

23 A    $16,500,000.

24 Q    How much was to be used for Okun Holdings accounts

25 payable and payroll?

1   A      Looks like about ten million five.

2   Q      And IPofA, how much was paid there?

3           THE COURT:  Wait a minute.

4   Q    I think, Mr. Field, you may have added one extra

5   number in there.

6   A    I'm sorry.  I thought you said Okun Holdings

7   accounts payable and payroll.  I'm sorry.  The first

8   two lines there, two million five.  A little less than

9   two million five.

10  Q      And for IPofA in total?

11  A      About two million six.

12  Q      For Okun Air?  What are these charges for Okun Air

13  for, if you can read those?

14  A      This is a short-term note on the Gulfstream G11B,

15  $1,750,000.  Accounts payable, maintenance, $127,000.

16  Accounts payable, general operating, $200,000.

17  Q      Is this Gulfstream the jet that we talked about a

18  few minutes ago?

19  A      Yes, I believe it is.

20  Q      For Okun Water?

21  A      Okun Water, there's a payment for the Wachovia

22  note on the yacht for $47,000 and accounts payable of

23  $188,000.

24  Q      And Okun Water, what does that mean?

25  A      That was the operations of the yacht Simone.

1  Q    And for Ed Okun personal?

2  A    The accounts payable was $336,500,000.  The

3  Hibiscus house mortgage was $14,063.  The New Hampshire

4  mortgage was $32,500.  And the Indianapolis mortgage

5  was $35,333.

6  Q    Now, one last exhibit, Mr. Field, and one last

7  area to cover.

8       Again, in late April, in this same few days --

9          THE COURT:  April 2007.

10  Q   April of 2007.  Mr. Field, did you have to -- was

11  there another borrowing of 1031 Tax Group money?

12  A    Yes, I believe late in April it was a borrowing to

13  make payroll.

14  Q    And I bring your attention to Government's Exhibit

15  266.

16          MR. CANNON:  I move the admission of

17  Government's Exhibit 266?

18          MR. POLLACK:  No objection.

19          THE COURT:  It's admitted.

20          (Government's Exhibit No. 266 is admitted

21  into evidence.)

22  BY MR. CANNON:

23  Q    Now, the bottom portion of that first page --

24  A    Yes.

25  Q    Could you explain what this e-mail is?

1  A    This is an e-mail from me to Richard Simring with

2  a copy to MichiganAce on Thursday, April 26, 7:49 a.m.

3  Subject:  Request to borrow funds.

4  Q    How much are you requesting to borrow?

5  A    On that, the bottom paragraph, it's $450,000.

6  Q    And moving up, Mr. Field, what's Mr. Okun's

7  response?

8  A    "Yes, this is fine."

9         MR. CANNON:  The Court's indulgence for just

10  one moment.

11         I pass the witness, Your Honor.

12         THE COURT:  Mr. Pollack, before you do

13  there's something I'm confused about.  This document

14  about the $40 million loan and how to use the proceeds

15  of the loan, was the loan ever made?  Was there ever a

16  $40 million loan?

17         THE WITNESS:  No.

18         THE COURT:  All right.  Excuse me,

19  Mr. Pollack.

20

21      CROSS-EXAMINATION

22  BY MR. POLLACK:

23  Q    Good afternoon, Mr. Field.

24  A    Good afternoon.

25  Q    Okay.  When you were originally hired, you were

1  hired believing that you were going to work for a

2  holding company that was going to be set up essentially

3  to hold all of Mr. Okun's business interests; is that

4  correct?

5  A    That is true.

6  Q    But when you got there, you found out or as time

7  passed that the holding company wasn't formed or at

8  least wasn't formed for some considerable period of

9  time; is that right?

10  A    That's correct.

11  Q    So as a result, you took on a slightly different

12  role than what you had originally anticipated?

13  A    Yes.

14  Q    And when you got there that role was effectively

15  the chief financial officer of IPofA, correct?

16  A    No.

17  Q    Okay.  Tell me then how would you describe your

18  role when you got there?

19  A    When I got there, I was essentially a special

20  projects person directed to work on the acquisition of

21  Montauk Financial.

22  Q    Was that an entity that was going to be owned by

23  IPofA or was that going to be yet another entity?

24  A    At that time it was a separate entity.  A new

25  entity had been created to buy the stock.

1  Q    Did there come a time that that was no longer your

2  primary focus and your role sort of evolved?

3  A    Yes.

4  Q    Okay.  Can you describe for me when that occurred

5  and what you would describe as your next role?

6  A    Mr. Zacarias, who was the CFO of Investment

7  Properties of America and also CFO of the 1031 Tax

8  Group, resigned, I believe, effective November 30.

9           THE COURT:  2006?

10          THE WITNESS:  2006.  You're correct, Your

11  Honor.

12  A    The 1031 group at that point had officers, a

13  controller in place in Connecticut.  So he picked up

14  the financial roles for the 1031 Tax Group and Lara

15  Coleman, effectively, in addition to her job as running

16  the Real Estate Investment Properties of America,

17  picked up the financial responsibility, as well, and

18  there was a controller of the real estate company in

19  place in Indianapolis.

20  Q    Maybe I missed it, but I'm still not clear what

21  your role became at that point.

22  A    For that next month, things went on sort of that

23  way in the sense that a vision still held the

24  responsibility for their day-to-day financial

25  operations and management.

1          Moving on into January --

2   Q    I'm sorry.  Before we move on to January, I'm

3   still unclear as to you, Mr. Field, what was your role

4   in that period of time?

5   A    I was functioning to worry about the acquisition

6   of Montauk Financial as my primary responsibility.

7   Q    So that remained your primary responsibility

8   throughout all of 2006?

9   A    Oh, yes.

10  Q    Okay.  Did you have an understanding in the latter

11  half of 2006 generally what it was that IPofA did?

12  A    Yes.

13  Q    And it was your understanding that, essentially,

14  its business model was to buy real estate and then

15  hopefully sell it for a profit; is that correct?

16  A    Yes.

17  Q    And it was not particularly significant to that

18  business model whether IPofA was losing money in the

19  short term because the goal was to sell property at a

20  profit down the road; is that correct?

21          MR. CANNON:  Objection, Your Honor.

22  Relevance.

23          THE COURT:  What does the profitability of

24  IPofA have to do with it?

25          MR. POLLACK:  There's been a lot of

1  testimony, most of it elicited by the government about

2  liquidity cash flow problems within IPofA, and so the

3  question is what significance, if any, should be

4  attached to that?  And understanding that the business

5  model allowed for short-term cash flow problems with

6  the idea that you were going to sell pieces of

7  property, a few big deals, and make your money that

8  way.  That puts the issue of whether or not there's a

9  short-term liquidity problem within IPofA into context.

10         MR. CANNON:  From the government's

11 perspective, the extent that the cash position of IPofA

12 has been discussed, it's for purposes of establishing a

13 motive for the crime.  Whether there was some ultimate

14 desire on IPofA to flip this property is not a question

15 that's relevant for the jury.

16         THE COURT:  I don't think it is either.

17 Sustained.

18 BY MR. POLLACK:

19 Q    You're aware, are you not, Mr. Field, that during

20 the 2006 time frame, in fact, IPofA did sell a

21 substantial piece of real estate for a profit?

22         MR. CANNON:  Objection.  Relevance, Your

23 Honor.

24         THE COURT:  Sustained.

25         MR. POLLACK:  Your Honor, it directly rebuts

1 the government's proffered reason for offering the

2 testimony in the first place.

3          THE COURT:  I've already ruled on it, I

4 think, Mr. Pollack.

5          MR. POLLACK:  Thank you, Your Honor.

6 BY MR. POLLACK:

7 Q    You were aware that Mr. Okun was the hundred

8 percent owner of IPofA?

9 A    Yes.

10 Q    And as the hundred percent owner of the company,

11 Mr. Okun was entitled to take profits out of that

12 company; is that correct?

13 A    Yes.

14 Q    Of course, taking profits means there will have to

15 be profits, right?

16 A    Yes.

17 Q    And you testified a little bit ago that at some

18 point early in 2007 you did some calculations about if

19 Mr. Okun continued to take draws or profits at that

20 same rate throughout all of 2007, he would end up

21 taking something like 9- to $10 million; was that

22 correct?

23 A    Yes.

24 Q    And I want to be clear.  You weren't testifying

25 that he had taken 9- to $10 million.  Just after the

1 first month of the year, if he continued taking at that

2 rate for the next 11 months, that's what it would be?

3 A    It was after the first two months, but your

4 analogy is correct.

5 Q    So what you wanted to do is you wanted to tell

6 him, Hey. there aren't profits to support taking draws

7 at that continued pace; is that correct?

8 A    Correct.

9 Q    And you did report that to him?

10 A    Yes.

11 Q    And at some point Mr. Okun purchased or one of his

12 entities purchased an airplane?  You testified about

13 that.

14 A    Yes.

15 Q    And you had indicated to him in the same way, that

16 you didn't think the company could support taking draws

17 at that point, that you didn't think the company had

18 the resources to buy an airplane at that point; is that

19 correct?

20 A    That's correct.

21 Q    And Mr. Okun indicated to you that he thought that

22 the airplane was a good investment; is that correct?

23 A    Yes.

24 Q    In other words, he was buying it at a good price

25 and thought he could sell it later at a greater price,

1  correct?

2  A    Yes, significantly greater.

3  Q    And that would allow him to, for example, that

4  would allow IPofA, if they sold that at a profit, to

5  repay some of the borrowings that it had borrowed from

6  the QI?

7              MR. CANNON:  Objection, Your Honor.

8  Relevance.

9              THE COURT:  You brought out all of this

10  evidence, Mr. Cannon.  It came out on the direct

11  testimony.  So why isn't it relevant?

12              MR. CANNON:  Well, the next step of the

13  analysis that Mr. Pollack is going to go into, which is

14  beyond the question that I asked about, is his

15  conversation with Mr. Okun.  That is to say what

16  Mr. Okun might be able to do with those funds.

17              THE COURT:  So your objection is to what

18  might be payable with the funds?

19              MR. CANNON:  That's correct.  It's not

20  relevant.

21              THE COURT:  Objection sustained.

22  BY MR. POLLACK:

23  Q    Well, you understood that Mr. Okun or his entities

24  already owned a couple of planes, correct?

25  A    Yes, sir.

1  Q    Mr. Okun didn't need this plane to fly around in,

2  right?  He had planes to fly around in.

3  A    He had two planes available.

4  Q    He believed it was an investment that could make

5  money for the company; is that correct?

6         MR. CANNON:  Objection, Your Honor.

7  Speculation.

8         THE COURT:  Overruled.  That's exactly what

9  you had him testify to on direct.  Other than the fact

10 that Mr. Pollack is replowing old ground, there's no

11 basis for objection.

12 A    Yes.

13 Q    And your understanding was that the QIs had loaned

14 money to IPofA, correct?

15 A    Yes.

16 Q    IPofA was going to make investments, correct?

17 A    Yes.

18 Q    And when those investments were successful, as

19 Mr. Okun anticipated they would be, the money would be

20 paid back to the QIs, correct?

21         MR. CANNON:  Objection, Your Honor.

22         MR. POLLACK:  I'm asking for Mr. Field's

23 understanding.

24         MR. CANNON:  It's hearsay.  It's almost

25 certainly based on hearsay.  And then also it's not

1  relevant.

2          THE COURT:  Sustained.

3  BY MR. POLLACK:

4  Q    Mr. Field, let me go back to this issue of the

5  holding company that you were originally hired to do.

6  You explained in your direct testimony that the purpose

7  of Okun Holdings sort of evolved over time; is that

8  fair?

9  A    Yes.

10 Q    Originally, it was conceived to be a holding

11 company to own all of the other Okun businesses?

12 A    Correct.

13 Q    Ultimately, it was actually established as a

14 services company, correct?

15 A    Yes.

16 Q    So that would be an entity that would provide

17 various services to all the other Okun entities?

18 A    Correct.

19 Q    I think you mentioned human resources as an

20 example of that?

21 A    Yes.

22 Q    From your experience, is there anything unusual

23 about having a service company, a single service

24 company, provide services to related companies?

25 A    No, it's not unusual.

1  Q    And for that matter, is anything unusual about

2  establishing a holding company to own a number of

3  related companies?

4  A    No, not at all.

5  Q    Mr. Field, I want to turn to a different subject.

6  I want to talk about Todd Pajonas for a second.

7  A    Okay.

8  Q    It was your understanding, was it not, that

9  Mr. Pajonas was supposed to come up with a uniform

10 exchange agreement that would allow for Mr. Okun to

11 borrow client funds; is that correct?

12            MR. CANNON:  Objection, hearsay.

13            THE COURT:  Well --

14            MR. CANNON:  Your Honor, maybe it's better to

15 put a foundation objection at this point.

16            THE COURT:  Yeah, I think at this point

17 that's a correct objection.  There's no foundation laid

18 yet.

19 BY MR. POLLACK:

20 Q    Mr. Field, in the course of your work with regard

21 to the termination of Todd Pajonas, did you look into

22 what responsibilities Mr. Pajonas had been given and

23 whether or not he had carried out those

24 responsibilities?

25 A    Yes, uh-huh.

1  Q     Was one of those responsibilities to come up with

2  a uniform exchange agreement for the various QI

3  companies?

4  A     That's what Mr. Okun advised me as we discussed

5  that.

6             MR. CANNON:  Your Honor, I move to strike the

7  answer as hearsay from Mr. Okun.

8             THE COURT:  Mr. Pollack, how does it get in

9  over a hearsay objection?

10            MR. POLLACK:  Well, let me do it another way.

11            THE COURT:  Okay.  That objection is

12 sustained.

13 BY MR. POLLACK:

14 Q     Let's look at Government's Exhibit 139, which is

15 already in evidence.  Mr. Field, this is a memorandum

16 that you prepared for Mr. Okun and Ms. Coleman on

17 November 13, 2006, correct?

18 A     That is true, yes.

19 Q     And it pertained to the issues surrounding Mr.

20 Pajonas's continued employment as the president of the

21 1031 Tax Group, correct?

22 A     Yes, sir.

23 Q     I'd like to draw your attention to the middle

24 paragraph, "Legal situation."  Why don't you go ahead

25 and read to the jury what you said in that paragraph.

1 A    "Legal situation.  At least two major legal issues

2 exist.  First, are we operating in accord with our

3 existing contracts and public assertions?  Second,

4 under state law, can the company loan funds to an

5 affiliate?  Todd failed to identify the first issue and

6 take action to minimize the exposure to the company.

7 If, back in May, decisive action had been taken to

8 adjust our legal documents and advertising to conform

9 to the actual operations of the company, most of the

10 contracts which currently present serious issues would

11 no longer be relevant.  This is a serious failure to

12 recognize the situation and take corrective action."

13 Q    Mr. Field, did that accurately reflect your

14 conclusions with respect to Mr. Pajonas's failings

15 regarding the exchange agreements?

16 A    As those responsibilities were described to me by

17 Mr. Okun, it does.

18           MR. CANNON:  Objection, Your Honor.  Hearsay.

19           THE COURT:  Well, it's kind of an anomalous

20 issue here given that you put the document into

21 evidence presumably as a business record of some sort,

22 which is an exception to the hearsay rule.  So how do

23 you -- I don't even think I need Mr. Pollack to

24 respond.  I think you need to explicate your objection.

25           MR. CANNON:  I'd love to, Your Honor.  This

1  is a memo that's written to Mr. Okun.  It puts him on

2  notice of certain issues and puts knowledge in his

3  head.  It was not admitted as a business record.

4          THE COURT:  It wasn't admitted as a business

5  record; is that what you said?

6          MR. CANNON:  No, it was not.  I don't believe

7  this specific document -- there was a specific reason

8  offered for its admission, but it goes to the notice to

9  Mr. Okun.

10         MR. POLLACK:  I'm not sure --

11         THE COURT:  I don't know if it was admitted

12 as a business record or not.

13         MR. POLLACK:  I'm not sure, frankly, it

14 matters.  It's in evidence.  I can certainly discuss an

15 exhibit that's in evidence.  The government put it into

16 evidence.  And it is relevant to Mr. Okun's state of

17 mind because it's what Mr. Field communicated to

18 Mr. Okun.

19         THE COURT:  Yes.  Objection overruled.

20 BY MR. POLLACK:

21 Q    Now, with respect to Mr. Pajonas's termination,

22 Mr. Field, it's correct, is it not, that Mr. Okun never

23 told you that he wanted to keep Mr. Pajonas quiet; is

24 that fair?

25 A    May I repeat that?  He never said that he wanted

1  to keep Mr. Pajonas quiet?  I disagree with that.

2  Q    Mr. Field, Mr. Okun never told you that he wanted

3  to keep Mr. Pajonas quiet; is that correct?

4  A    He did say he wanted to keep him quiet.

5  Q    Mr. Field, you've talked to the government agents

6  in this case, that's specifically FBI agents, on a

7  number of occasions; is that fair?

8  A    Yes, sir.

9  Q    Not including time you may have spent with the

10 government preparing for your testimony in the last day

11 or two, would it be a fair estimate that you have

12 spoken to government agents about this case at least

13 half a dozen times?

14 A    Yes.

15 Q    And you've known each and every time that you have

16 spoken with them that it was important to be truthful

17 with them; is that correct?

18 A    Yes.

19 Q    In fact, you have known each and every time you

20 have spoken with them that it is a federal felony to

21 lie to federal agents in the course of an

22 investigation; is that correct?

23 A    Yes, sir.

24 Q    And do you recall speaking to the FBI and other

25 government agents on November 6 of 2008?

224

1  A     I'm sorry.  Give me the date again.

2  Q     November 6, 2008.

3  A     I don't remember the specific situation, but yes,

4  I was certainly in there around that time.

5  Q     And you recall telling them that you don't recall

6  any specific conversation with Mr. Okun in which he

7  said that he wanted to keep Mr. Pajonas quiet?

8  A     No, I don't remember that.

9            MR. POLLACK:  If I can show Mr. Okun page 6

10 of the 302 dated 11/6/2008 to see if it will refresh

11 his recollection.

12           THE COURT:  Mr. Okun?

13           MR. POLLACK:  I apologize.  Mr. Field.

14           THE COURT:  I'm sorry.

15           MR. POLLACK:  I apologize.

16           THE COURT:  He was looking over there.

17           MR. POLLACK:  I was wondering why I caused

18 such confusion.

19           Mr. Field, I apologize.

20           THE COURT:  It won't refresh his recollection

21 unless he's seen it.  Do you want to ask him if he's

22 seen it before?

23           MR. POLLACK:  No, Your Honor.  I can use

24 anything to see if it refreshes his recollection.  It

25 does not need to be a document that he's adopted.

1          I'm not going to have him read it to the

2  jury.

3          THE COURT:  Okay.

4  BY MR. POLLACK:

5  Q    I'd have you look at the beginning of the second

6  paragraph, Mr. Field, on the page that it's turned to.

7          I don't want you to read the document or refer to

8  it.  You can go ahead and put it down.

9          THE COURT:  The question is:  Does that

10 refresh your recollection about whether Mr. Okun, etc.

11 Go ahead and ask it about whether Mr. Okun had ever

12 said he wanted to keep Mr. Pajonas quiet.

13 BY MR. POLLACK:

14 Q    Did he ever say that to you?

15 A    He did want to keep Mr. Pajonas quiet.

16 Q    That was not the question.

17         THE COURT:  Now, listen to the question.  The

18 question is whether he ever said that to you, not

19 whether he wanted to because you thought he wanted to

20 or you deduced that he wanted to, but did Mr. Okun ever

21 say to you, "I want to keep Mr. Pajonas quiet" or words

22 to that effect?

23         That's your question, isn't it?

24         MR. POLLACK:  Yes, Your Honor.  Thank you.

25 A    Yes, he did say that to me.

1  Q     The attorneys down in Miami at KPKB, I think

2  that's the acronym for the law firm; is that correct?

3  A     Yes.

4  Q     They are the ones that negotiated the severance

5  package with Mr. Pajonas?

6           MR. CANNON:  Objection, foundation.

7  BY MR. POLLACK:

8  Q     If you know.

9  A     Yes, that is correct.

10 Q     And your understanding was that that -- let me

11 start again.  Your understanding was that that

12 severance agreement would have a confidentiality

13 provision; is that correct?

14 A     Yes.

15 Q     And such a provision of confidentiality clause is

16 standard a severance agreement; is that correct?

17 A     Yes, very common.

18 Q     Now, let me go back to I believe it was 138.  Did

19 I get the number right?

20           THE COURT:  A long contract?

21           MR. POLLACK:  No, no.  The document we just

22 used a moment ago, the November 13 memo.  Was it 139?

23 139, I apologize.

24 BY MR. POLLACK:

25 Q     If we can go to the second page of the memo, and

1  there's a section called "Recommendations For Action"

2  about three-quarters of the way down.  And, again, this

3  is your memo to Mr. Field and Ms. Coleman about the

4  potential termination of Mr. Pajonas, correct?

5  A    Yes.

6  Q    And you discussed this middle point, this middle

7  bullet point, under "Recommendations For Action" with

8  Mr. Cannon.  "We need to understand Todd's legal

9  position and his opportunity to cause damage to the

10 company and individuals if he were terminated."  And

11 you testified that you were concerned about Mr. Pajonas

12 making claims about the company either justified or

13 unjustified; is that your testimony?

14 A    Yes.

15 Q    Mr. Pajonas had made claims prior to this point

16 that he believed that the loans from the QIs were

17 illegal; is that correct?

18 A    Yes.

19 Q    But you didn't put a lot of stock in Mr. Pajonas's

20 claims that they were illegal; is that correct?

21         MR. CANNON:  Objection, relevance.

22         THE COURT:  Overruled.

23 A    I wanted to have lawyers who had no position to

24 enhance or to promote to look at this.

25 Q    I appreciate that you --

1          THE COURT:  Excuse me a minute.  I think the

2  question, though, maybe you didn't understand it when

3  he put a lot of stock in it.  The question was:  You

4  didn't put a lot of stock in Mr. Pajonas's opinions,

5  did you?

6          Wasn't that the question?

7          MR. POLLACK:  Specifically, his claim that

8  the loans were illegal, yes.

9          THE COURT:  Is that correct or not?

10 A    And I did not put a lot of stock at that time in

11 Mr. Pajonas's opinion.

12 Q    In fact, you did not find Mr. Pajonas to be a very

13 truthful person, did you?

14 A    I'm not sure that I formed an opinion on that.

15 Q    Well, haven't you characterized Mr. Pajonas as a

16 fast-talking snake?

17 A    I don't remember using that term.

18 Q    Well, let me see if I can refresh your

19 recollection.  I'd like to show you the 302 -- I'm

20 sorry.  Your June 19, 2007, interview with the FBI and

21 other government agents and direct your attention to

22 the second sentence on that page, page 7.

23          THE COURT:  Just read it to yourself.

24 A    (Complying)  I did use that phrase.

25 Q    And I take it you didn't mean a truthful

1 fast-talking snake?

2 A    True.

3         MR. POLLACK:  I am through with that

4 document.  Thank you.

5 BY MR. POLLACK:

6 Q    I'm going to now switch subjects.  I'm no longer

7 on the subject of Mr. Pajonas, but, specifically, the

8 conversation you had testified on direct that you had

9 had with Ms. Coleman, and I believe that you placed

10 this conversation as September 10 or September 11,

11 2006; do you recall that?  The conversation that I'm

12 talking about is you had a conversation with her

13 where --

14 A    Was this on the plane?

15 Q    That I'm not sure about.  It was a conversation

16 where she told you that she had a legal opinion.

17 A    Yes.

18 Q    That was on a plane?

19 A    That was on a plane.

20 Q    That was on September 10 or 11, 2006?

21 A    It was that Tuesday, whatever date that was.

22 Q    Just making sure we're talking about the same

23 conversation here.

24 A    Uh-huh.

25 Q    When she told you that she had a legal opinion,

1 she was saying that she had a legal opinion saying that

2 borrowing funds from the qualified intermediaries was

3 legal; was that your understanding of what she was

4 saying?

5 A    Yes.  I believe she actually said that Ed has an

6 opinion.

7 Q    Did she specifically say that there was a written

8 opinion and that she had seen the written opinion?

9 A    No.

10 Q    Ultimately, you came to learn that -- well, let me

11 strike that.

12      The airplane conversation, the September 10,

13 September 11 conversation.  She was specifically

14 talking about a legal opinion from the firm in Boston,

15 Foley & Lardner; is that correct?

16 A    Yes.

17 Q    That would be Mr. Burr's law firm?  Do you recall?

18 A    I don't recall exactly, but I believe so.

19 Q    Okay.  Did you come to learn later that Foley &

20 Lardner had indicated that qualified intermediaries are

21 unregulated but had not, in fact, issued any sort of a

22 formal written legal opinion?

23 A    They sent an e-mail indicating that.

24 Q    Had you discussed with Mr. Okun what it was that

25 Foley & Lardner had said on the subject of the

1 regulations governing borrowings from QIs?

2 A     I did not.

3 Q     You did not discuss that with Mr. Okun?

4 A     I did not.

5 Q     Now, in October of 2006, did I understand your

6 testimony on direct correctly that in that time frame

7 you had some concerns about whether the borrowings were

8 legal under various state laws?

9 A     Yes.

10 Q     And also in that same time frame, October of 2006,

11 you talked to Ms. Coleman about whether the loans were

12 legal or proper?

13 A     Yes.

14 Q     And I want to be real sure that I'm clear on this.

15 This is October of 2006.  Now, you don't start talking

16 to McGuire Woods until what, the beginning of November?

17 A     No.  I believe that the Coleman conversation was

18 like the last Friday in October, and I believe that the

19 next Tuesday was the time that we got on the phone with

20 McGuire Woods.

21 Q     So it was before your first conversation with

22 McGuire Woods?

23 A     That I spoke with Ms. Coleman?  Yes.

24 Q     So you had concerns about whether the borrowings

25 were legal before you ever spoke to McGuire Woods?

1  A     Yes.

2  Q     Mr. Field, isn't it a fact that October of 2006,

3  you weren't thinking about whether the loans were legal

4  at all?  You were just simply concerned whether they

5  were a good or a bad business decision?

6  A     Until I had my visit with Mr. Pajonas, which

7  happened the day before my conversation with

8  Mrs. Coleman, I really had not focused on -- I wasn't

9  personally a part of that company, wasn't as concerned,

10 yes, that's true.

11 Q     Well, let's break that down a little bit.  Wasn't

12 as concerned.  The fact of the matter is you weren't

13 concerned at all about legality.  You weren't even

14 thinking about legality.  You were only thinking about

15 in terms of whether or not it was a wise business

16 decision; is that correct?

17 A     Those were my initial concerns when I spoke with

18 Ms. Coleman.

19            THE COURT:  When you spoke with whom?

20            THE WITNESS:  Mrs. Coleman on the plane.

21            THE COURT:  Excuse me.

22 BY MR. POLLACK:

23 Q     What raised the concern for you was that the

24 fast-talking snake that you didn't put a lot of stock

25 in had suggested they might be illegal?

1  A     I had also talked to Mr. Zacarias the day before I

2  spoke to Mr. Pajonas, and he expressed concern that

3  raised my interest in the issue.

4  Q     Because he also had been speaking to Mr. Pajonas?

5            MR. CANNON:  Objection, Your Honor.

6  Q     If you know.

7            THE COURT:  Sustained.

8  BY MR. POLLACK:

9  Q     Now, you had talked on direct about the fact that

10 you didn't disclose the fact of the borrowings from the

11 QIs to the lower level QI employees, is that correct,

12 the folks that were not in senior management?

13 A     Yes.

14 Q     The fact of the matter is that while you never did

15 that, Mr. Okun never told you or directed you not to

16 disclose information about the QI loans?

17 A     Oh, he did.

18 Q     Do you recall on June 19, 2007, when you met with

19 the government agents understanding that it was a

20 federal felony to lie to them, on that occasion did you

21 tell them that you were never directed by Mr. Okun not

22 to disclose information about the QI loans?

23 A     No.

24           MR. POLLACK:  Your Honor, I would like to

25 move not for the truth of the matter, but as a prior

1  inconsistent statement, the statement at page 11 of the

2  June 19, 2007, 302 where Mr. Field says that he was

3  never directed by --

4          THE COURT:  I tell you what.  We'll deal with

5  that out of the presence of the jury after you finish

6  your examination.

7          MR. POLLACK:  Okay.  Thank you, Your Honor.

8  BY MR. POLLACK:

9  Q    Now, you testified that you received a copy of the

10  memorandum that was done by Kutak Rock on the subject

11  of the permissibility of borrowings from the qualified

12  intermediaries?

13  A    I did.

14  Q    And you believed that Kutak Rock's analysis kind

15  of missed the boat; is that fair?

16  A    Yes.

17  Q    And that's because that analysis was premised on a

18  QI having an escrow or trust relationship with the

19  exchanger, correct?

20  A    It absolutely is.

21  Q    In fact, a qualified intermediary could not be an

22  escrow or have a trust relationship with an exchanger,

23  correct?

24  A    True.

25  Q    So as a result, all of Kutak Rock's analysis was

1 simply irrelevant to qualified intermediaries?

2 A    That was my view.

3         MR. POLLACK:  Can I have you put up

4 government 111, which is already in evidence.

5 Q    Now, this is an e-mail that Mr. Okun sends to

6 Ms. Coleman with a CC to you in the early morning hours

7 of November 5, 2006; is that correct?

8 A    Yes.  Sunday, November 5, as I read it.

9 Q    Maybe I just completely screwed up the numbers

10 there.  November 5, 2006?

11 A    Yes.

12 Q    When I say "early morning hours," 2:15 in the

13 morning?

14 A    Right.

15 Q    Now, this is fair to characterize this as somewhat

16 an intemperate e-mail?

17 A    Yes.

18 Q    Do you know what "a shit disturber" is?

19 A    I'd heard the term prior to this.

20 Q    It's not a term of art used by CPAs?

21 A    No.

22 Q    By the way, do you send out your most thoughtful

23 pieces of analysis at 2:15 in the morning?

24 A    I like to think when I send something out it's

25 well written whatever time I send it out.

1  Q     Okay.  Very good.  Let's look at Government 112.

2  Let's go down to the bottom.  So that would be the

3  earliest in time of the e-mails.  This is November 5,

4  '06, at 9:28 a.m., right?

5  A     Yes.

6  Q     So this is just seven hours later from the last

7  e-mail; is that right?

8  A     Yes.

9  Q     And he says, "Thanks for reading my venting,"

10  correct?

11  A     Yes.

12  Q     And he's apparently in a better mood after a

13  night's sleep?

14         MR. CANNON:  Objection, Your Honor.

15  Speculation.

16         THE COURT:  Well, I think the document speaks

17  for itself.  Sustained.

18  BY MR. POLLACK:

19  Q     At any rate, he's changed his viewpoint; is that

20  fair?

21  A     Yes.

22  Q     From what he had communicated a few hours earlier?

23  A     Yes.

24  Q     And yet, nonetheless, in the top e-mail, and it's

25  now the next day, November 6, he is saying that he

1  would welcome having Chris or Eric resign.  Do you see

2  that?

3  A    Yes.

4  Q    "I've grown very weary of our in-house lawyers

5  saying things without clear basis.  If they would like

6  to resign, I would welcome that."

7  A    Yes.

8  Q    I want to make sure we're clear that we're talking

9  about you understand Chris to be a reference to Chris

10  Hoctor, who was an in-house counsel at IPofA?

11  A    Yes.

12  Q    And Chris Hoctor worked for Mr. Perkins?

13  A    Yes.

14  Q    And Mr. Perkins was the chief legal officer for

15  IPofA?

16  A    Yes.

17  Q    And when he refers to Eric, you understand that to

18  be a reference to Mr. Perkins?

19  A    Yes.

20  Q    And this is on November 6.  Mr. Perkins's

21  memorandum goes out on November 7, correct?

22  A    Yes.

23  Q    So before Mr. Perkins ever sends out that

24  memorandum, Mr. Okun has already expressed that he has

25  some concerns about Mr. Perkins has lost confidence in

1 him; is that fair?

2 A    Yes, it would appear to be, uh-huh.

3 Q    By the way, he goes on and he says, "As they can

4 be replaced, and I will never feel comfortable with

5 them, and I certainly don't want them representing me."

6 Do you see that?

7 A    Yes.

8 Q    Now, it's fair to say that the in-house lawyers at

9 IPofA, such as Mr. Perkins, let's say Mr. Perkins in

10 particular, were at Mr. Okun's beck and call; is that

11 an accurate description?

12 A    Yes.  Although that is my assumption.  I don't

13 know the relationship between Mr. Perkins and Mr. Okun.

14          THE COURT:  Well, then strike the testimony

15 and don't pay attention to it, ladies and gentlemen,

16 since he said he was basing it on an assumption and

17 didn't know.

18 BY MR. POLLACK:

19 Q    What you do know is that he is not expressing that

20 in this e-mail that he views Mr. Perkins solely as

21 IPofA's counsel?  He's saying, "I don't want them

22 representing me," meaning Ed Okun; is that how you

23 understood this e-mail?

24          MR. CANNON:  Objection, Your Honor.  The

25 document speaks for itself.  And anything further would

1    be speculation on Mr. Field's part.

2             THE COURT:  Sustained.

3    BY MR. POLLACK:

4    Q    On November 7 when Mr. Perkins sent out his memo,

5    do you know from your firsthand interactions with

6    Mr. Okun or your observations of him whether or not he

7    was upset about the way that the memo was disseminated?

8             THE COURT:  The question is:  Do you know

9    from your personal observations or interactions with

10   Mr. Okun?

11   A    Yes, I think he was upset.

12            THE COURT:  All you have need to do is answer

13   yes.

14            THE WITNESS:  I'm sorry.

15            THE COURT:  Or no.  So he says yes.  Now go

16   ahead.

17   BY MR. POLLACK:

18   Q    What did you observe or what led you to that

19   conclusion?

20   A    I had a conversation with Mr. Okun.

21            MR. CANNON:  Objection, Your Honor.  Hearsay.

22            THE COURT:  All right.  He had a

23   conversation.  He's relating a hearsay conversation.

24   How does it get in?  I can't think of any way that it

25   comes in, but maybe you can help me.

1          MR. POLLACK:  Your Honor, if you can't think

2    of one, I'm sure that I can't.

3          THE COURT:  Okay.

4    BY MR. POLLACK:

5    Q    Do you know whether Mr. Perkins had discussed the

6    issues that were in that memo with Mr. Okun in advance

7    of sending it out?

8    A    I do not know that.

9    Q    Are you aware that Mr. Okun shared Mr. Perkins's

10   memo with Mr. Pajonas?

11   A    In a meeting that was held, I believe, two days

12   later on the 9th, Ms. Coleman made a remark.

13         MR. CANNON:  Objection, Your Honor.  Hearsay.

14         THE COURT:  All right.  I think the question

15   is:  Do you know whether Mr. Okun shared the memo, the

16   Perkins memo of November 7, with Mr. Pajonas?  Do you

17   know whether Mr. Okun did?

18         THE WITNESS:  Not directly myself, I do not

19   know that.

20         THE COURT:  So no is the answer.

21   BY MR. POLLACK:

22   Q    Do you know whether Mr. Perkins was upset that

23   Mr. Okun had shared that memo?

24   A    When Mr. Perkins learned --

25         THE COURT:  No, do you know; yes or no?

1          THE WITNESS:  I observed --

2          THE COURT:  Do you know; yes or no?

3          THE WITNESS:  Yes.

4          THE COURT:  And then the next question can

5   come:  How do you know?  And then we might get

6   somewhere.

7          THE WITNESS:  Sorry.

8   Q    How do you know?

9   A    In a meeting on November 9 --

10         MR. CANNON:  Objection.  This question is

11  going to lead to hearsay.

12         THE COURT:  Well, you know what?  You're good

13  if you can figure that one out.  I may strike it.  I

14  don't know the answer.  You-all are ahead of me.  Go

15  ahead.

16         How did you learn?

17         THE WITNESS:  In that meeting, Ms. Coleman

18  made a statement that the memo was in Mr. Pajonas's

19  hands and Mr. Perkins was very upset that privilege had

20  been broken.

21         THE COURT:  Objection?

22         MR. CANNON:  Objection for hearsay.

23         THE COURT:  Overruled.

24  BY MR. POLLACK:

25  Q    It was not your understanding that Mr. Okun was

1 trying to hide what was in Mr. Perkins' memo, correct?

2 Just the opposite, people were upset that he had shared

3 it?

4 A     Mr. Perkins was upset that it was shared.

5            MR. POLLACK:  (Drinking water)  Excuse me.  I

6 apologize.  The weather has turned nice, but some how

7 my cold --

8            THE COURT:  You don't have much there.  You

9 can snag some from the government since they are

10 closest, if you want to drink it.

11            MR. POLLACK:  I would make a glass half full,

12 half empty, but --

13            THE COURT:  I left myself open for that one.

14 BY MR. POLLACK:

15 Q     After Mr. Perkins's memo came out, you had a

16 conversation with Mr. Okun where it was your

17 recommendation that the company hire some outside

18 lawyers to do further research on the issue of the

19 permissibility of borrowing money from the qualified

20 intermediaries; is that correct?

21 A     I'm sorry.  Would you restate the question?

22 Q     Sure.  Some point after Mr. Perkins's November 7,

23 2006 memo came out or was distributed, you had a

24 conversation with Mr. Okun, correct?

25 A     I had lots of conversations.

1  Q     Okay.  In particular, you had a conversation with

2  him where you talked to him about hiring external

3  lawyers, an outside law firm, to do further research

4  and analysis on the issue of whether or not it was

5  permissible to borrow funds from the qualified

6  intermediaries?

7  A     No.

8  Q     You testified on direct about a conversation that

9  you had with Mr. Okun about hiring the outside lawyers.

10 When did that take place?

11 A     The same.  That would have been the morning the

12 day we talked to McGuire Woods, which I believe was

13 Tuesday, October 31, maybe the 30th.

14 Q     Okay.  So this was even before Mr. Perkins's memo?

15 A     Oh, yes.

16 Q     It was after the Kutak Rock memo, correct?

17 A     Well after.

18 Q     But before Mr. Perkins's memo?

19 A     Yes.

20 Q     And what was your reason for wanting to hire

21 outside lawyers to look at this issue?

22 A     I was coming back from meeting with Mr. Pajonas

23 who had raised several issues that I had not been fully

24 aware of or concerned about before, and so I felt

25 before we could move forward on the issues related to

1   Mr. Pajonas's employment status, Mr. Okun needed to

2   know exactly whether this was legal or not legal.

3   Q    Okay.  But my specific question was:  Your

4   recommendation was not just to hire lawyers generally

5   or to have lawyers generally look at it.  You wanted to

6   have outside lawyers look at it; is that correct?

7   A    Yes.

8   Q    And my question is why is it that you wanted to

9   have outside lawyers look at it?

10  A    I felt that the -- and I had at that time with

11  that recommendation, I recommended specifically McGuire

12  Woods to do this because of their substantial presence,

13  size, capability, and capacity in any number of areas

14  of the law.

15  Q    And Mr. Okun readily agreed to that suggestion; is

16  that correct?

17  A    He did.

18  Q    In fact, your instructions were "to make it

19  right," correct?

20  A    I don't remember those exact words being used.

21  Q    Do you recall using those words on direct?

22  A    In that conversation?

23  Q    Yes.

24  A    He said -- I asked could I hire outside counsel to

25  do this.  And he said, "Yes, hire two.  Let's get it

1  right."

2  Q     "Let's get it right"?

3  A     Yes.

4  Q     Okay.  Let's look at government's 138, which is in

5  evidence.  Is 138 an e-mail from Mr. Field to Mr.

6  McElroy at McGuire Woods?

7          THE COURT:  With a whole lot more attached.

8          MR. POLLACK:  Then maybe I'm looking at the

9  wrong document.  The document that I'm looking at is

10  RICH-E-0017710, although I can't tell if there's

11  another digit.

12          Mr. Cannon says that is Government 138.

13          THE COURT:  Well, 138 is a memo, an e-mail

14  from Field to McElroy, an employment agreement, and

15  attached is some information about Mr. Pajonas, and

16  then an employment agreement of many pages.

17          MR. POLLACK:  It's that cover e-mail, the

18  first page.

19          THE COURT:  All you're interested in is the

20  first page?

21          MR. POLLACK:  Yes, correct.

22          THE COURT:  It's the first page of Government

23  138.

24          MR. POLLACK:  Thank you.

25  BY MR. POLLACK:

1  Q    This is an e-mail from you to Mr. McElroy and

2  Mr. McElroy was one of the law firm partners at McGuire

3  Woods?

4  A    Right.

5  Q    And you tell him that you want to talk to him

6  about issues pertaining to the termination of

7  Mr. Pajonas, right?

8  A    Yes.

9  Q    And you describe the issues, including his

10  severance, his non-compete, and his confidentiality

11  issues as straight, normal contract pieces, correct?

12  A    Correct.

13  Q    You also say you want to talk about potential

14  criminal liability issues and keeping him from becoming

15  a whistleblower.  And I take it the "him" in that

16  sentence is Mr. Pajonas?

17  A    That's correct.

18  Q    And this goes back to your statement earlier that

19  you were concerned about him making claims either

20  justified or unjustified, correct?

21  A    Yes.

22  Q    And in the conversation that you had, this is

23  November 13, you had had a conversation a couple days

24  earlier that you participated in with some McGuire

25  Woods lawyers?

1  A    Yes.

2  Q    And that included Mr. Tim Heaphy, does that name

3  sound right?

4  A    Yes.

5  Q    His actual first name is Tim, not Former Federal

6  Prosecutor?

7  A    Yes.

8  Q    And he had said that one issue related to criminal

9  liability that could be of significance is if somebody

10  positioned themselves as a whistleblower; is that

11  right?

12  A    Yes.

13  Q    What he said, though, is even if that happened, it

14  would be unlikely that there would be any criminal

15  prosecution as long as the exchange contracts were

16  being paid; is that correct?

17  A    He did not make a definitive statement one way or

18  the other.  He hedged on that.  He did not know whether

19  that would precipitate something further or not.

20  Q    When he hedged, you were talking to him on

21  November 9, right?

22  A    Yes.

23  Q    You had first contacted McGuire Woods on

24  November 1, correct?

25  A    Yes.

1 Q    And Mr. Heaphy was not a participant in that

2 November 1st call?

3 A    That is correct.

4 Q    And he was brought in to participate in the

5 November 9th call?

6 A    Yes.

7 Q    Based on his comment, was it fair to say that it

8 was your impression that he had not done much, if any,

9 research and he was just giving you his initial

10 off-the-cuff reactions?

11 A    That's correct.

12 Q    And with respect to the Todd Pajonas termination

13 issues, Mr. Okun directed that be done through McGuire

14 Woods, correct?

15 A    Yes.

16 Q    And he wanted the lawyers to take care of that and

17 figure out what was permissible and what was not

18 permissible with respect to Mr. Pajonas's severance?

19 A    Yes.

20        MR. POLLACK:  Let me look at I think it's

21 Government 156.  Is that an e-mail from Mr. Field to

22 Mr. Okun and Ms. Coleman and Mr. Perkins dated

23 November 13, 2006?

24        MR. CANNON:  Yes.

25        THE COURT:  No, that's not 156.  156 is an

1  e-mail from Mr. Okun to Mr. Field.

2            MS. GRADY:  What number do you want?

3            MR. POLLACK:  Let me see a copy of 156.  Is

4  156 in evidence?

5            MR. CANNON:  Yes.

6            MR. POLLACK:  Do you have it, Ms. Bishop?

7  No.  Do you have a copy of it?  You can put it up.

8  Okay.

9            THE COURT:  Does Mr. Neal have to switch

10 screens or something?

11           MS. BISHOP:  I can do it.

12           MR. POLLACK:  About the middle of the page

13 there's a sentence at the end that says, "I am also

14 going to hire local counsel."  Do you see that,

15 Ms. Bishop?  A rather dense e-mail.

16           THE COURT:  Well, it's not up.

17           MR. POLLACK:  This can be published to the

18 jury.

19           THE COURT:  It is now.  Okay.

20           MR. POLLACK:  Why don't you just go to the

21 top for a second so Mr. Fields can see what it is we're

22 looking at.

23 BY MR. POLLACK:

24 Q    So this is a November 20 e-mail from Mr. Okun to

25 yourself?

1 A    Yes.

2 Q    And this is after you had the conversations with

3 McGuire Woods?

4 A    Yes.

5 Q    And one of the things you had talked about with

6 McGuire Woods was not only the language that was in the

7 exchange agreements, but anything that was said on the

8 websites of the various qualified intermediaries with

9 respect to what uses would or would not be made of the

10 funds, correct?

11 A    Yes.

12 Q    And if you go down to the sentence and start to

13 highlight, and highlight the rest of that sentence,

14 Mr. Okun also wanted McGuire Woods -- and you can keep

15 going to the next sentence.  I'm also going to hire

16 local counsel here to also handle the day-to-day of the

17 QIs since our in-house guys can't do it.  I look to

18 McGuire Woods to complete what they are doing on the

19 website, guidance, etc., correct?

20 A    Yes.

21 Q    So it was your understanding that Mr. Okun was

22 directing outside counsel to take care of those issues,

23 correct?

24 A    Yes.

25        THE COURT:  Mr. Pollack, how much longer do

1  you have?

2          MR. POLLACK:  I've got --

3          THE COURT:  I'm not trying to rush you.  I'm

4  trying to make a decision.

5          MR. POLLACK:  I have more than a few minutes.

6          THE COURT:  All right.  Ladies and gentlemen,

7  I think we'll break for the evening.  If you will give

8  Mr. Neal your pads, we'll see you at 9:30.  Drive

9  carefully and remember my admonition about keeping

10 yourself free from media exposure and talking about the

11 matter.

12          Thank you for your careful attention.

13          A JUROR:  What time?

14          THE COURT:  9:30.

15          A JUROR:  Thank you.

16          (The jury is leaving the courtroom at 5:25

17 p.m. to return at 9:30 tomorrow.)

18          THE COURT:  Mr. Field, you can step down.

19 You need to be back here ready to go at 9:30 in the

20 morning.

21          Mr. Field, don't discuss your testimony with

22 anybody but the lawyers in the case.

23          THE WITNESS:  Thank you.

24          (Mr. Field is leaving the courtroom at this

25 time.)

1           THE COURT:  Now, Mr. Dry, you said you were

2   going to get to Mr. Massel tomorrow?

3           MR. DRY:  I might have been optimistic, Your

4   Honor.  At the earliest I believe that he would be our

5   last witness for tomorrow, but more probably on

6   Wednesday, Your Honor.

7           THE COURT:  How long do you think your direct

8   testimony is going to be of him?  That is, forget about

9   qualifying him, what he did, I don't mean qualifying

10  him, but introducing him and telling what his job was

11  and where he went.  What's the meat of it?  How long

12  does that take?

13          MR. DRY:  I would say approximately half and

14  hour to 45 minutes, Your Honor.

15          THE COURT:  What are you going to have him

16  say?  What are you going to ask him?

17          MR. DRY:  Mr. Massel is basically going to

18  explain to the jury that his firm, Penta, was hired in

19  December of 2006.  That he personally was responsible

20  for tracking the amount of money that had been taken

21  out of the qualified intermediary companies; that he

22  had supervised three temporary employees to assist him

23  in that, and that they went through each of the bank

24  statements, and as a result of that they created a

25  spreadsheet.  And, ultimately, they came up with

1  numbers representing the amount of transfers of QI

2  client funds for the year of 2006, Your Honor.

3          And he's going to testify about what that

4  number was that they determined at the time.

5          THE COURT:  You said that in about three and

6  a half minutes.  Why can't he say it in about three and

7  a half minutes?

8          MR. DRY:  I will try to shorten it up.  It's

9  just some of the terms involved, but I will do my best

10  to make it as short as possible, I can assure you.

11          THE COURT:  I'm talking about really

12  understanding what he did so I can make a ruling on it.

13          MR. DRY:  Your Honor, he did very much

14  exactly what Mr. Zacarias did at the time and we

15  admitted that testimony.  He's basically looking at the

16  bank records in 2006 for the qualified intermediary

17  companies and tracking the cash in and cash out as

18  reflected in those bank statements.

19          THE COURT:  Well, I think what I'd like to do

20  is you're going to have him on Wednesday morning.  I'll

21  probably hear him a little early on Wednesday morning,

22  just the guts of what he did, so I understand the

23  process.  What he concluded is not really within the

24  ambit of the motion in limine.  It really is what he

25  did that is dispositive of the motion in limine.

1          MR. DRY:  Very good, Your Honor.

2          THE COURT:  I'll hear him Wednesday morning.

3          What about the rest of these people?  Are you

4 calling the rest of these people?

5          MR. DRY:  Your Honor, we've informed defense

6 counsel that we have shifted some of our witnesses to

7 the end, and we may save those witnesses for our

8 rebuttal case.  Quite frankly, we're looking to see how

9 the rest of the evidence comes in, but I don't believe

10 we'll be calling all 30 witnesses in any shape or form.

11          THE COURT:  We're not going to be as glacial

12 as we've been with Mr. Field.

13          MR. DRY:  I understand, Your Honor.

14          THE COURT:  All right.  Roughly, long do you

15 have, Mr. Pollack, tomorrow with Mr. Field?  Just

16 ballpark.

17          MR. POLLACK:  Ballpark 20 minutes to half an

18 hour.

19          THE COURT:  Forty-five minutes to an hour.

20          MR. POLLACK:  I thought that's what I said.

21          THE COURT:  All right.  I'll see you-all at

22 9:30 in the morning.  Thank you very much.

23          Is there anything else we need to do?

24          MR. DRY:  Your Honor, the Rosen issue.  We

25 filed our surreply brief.  Is the Court going to take

1  that up on Wednesday as well?

2          THE COURT:  Well, I'll tell you what I'd like

3  to do is read it.  You-all filed it just about the time

4  I came in here, and I haven't studied it.  So I'm going

5  to finish reading it.  I read everything else over the

6  weekend, but I haven't really read that.  I don't

7  really I know what the point is.  And I have to decide

8  about the need for a hearing, as well.

9          I have this question with respect to the

10  crime fraud exception.  The first part of the crime

11  fraud test is that there is the enlistment of the aid

12  of a lawyer to commit a crime.  What is the crime that

13  is alleged -- either to commit or to further a crime.

14  What is the crime that is allegedly being committed or

15  furthered in the analysis that I need to make from the

16  standpoint of the government?

17          MR. DRY:  It's the government's position that

18  Mr. Rosen's services were used to formulate a strategy

19  by Mr. Okun in which he could decide what story was

20  going to be most beneficial to him in order to maximum

21  his opportunity to be successful in a motion to quash

22  as laid out in our surreply brief, which I understand

23  you haven't had an opportunity to read yet.

24          THE COURT:  So the crime is perjury?

25          MR. DRY:  Yes, Your Honor.

1          THE COURT:  It's not to further the

2  underlying crime?

3          MR. DRY:  That is absolutely correct, Your

4  Honor.

5          THE COURT:  I see.  All right.  Thank you

6  very much.  It will help my reading.  Thank you.  See

7  you at 9:30.

8

9          (The proceedings were adjourned for the day

10  at 5:35 to resume tomorrow at 9:30 a.m.)

11

12          I, Diane J. Daffron, certify that the

13  foregoing is a true and accurate transcription of my

14  stenographic notes.

15

16          _____    _____

17          DIANE J. DAFFRON, RPR, CCR      DATE

18

19

20

21

22

23

24

25