IN THE UNITED STATES DISTRICT COURT OF
THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION


UNITED STATES OF AMERICA,

           Plaintiff,

       v.              Criminal No.:  3:08CR132

EDWARD HUGH OKUN,

           Defendant.




Before:  THE HONORABLE ROBERT E. PAYNE, JUDGE

EXCERPT OF THE TESTIMONY OF

JOSEPH O. KAVAN

and

PARTIAL DIRECT EXAMINATION OF TODD PAJONAS




March 5, 2009


Richmond, Virginia


CHANDLER & HALASZ, INC.
Registered Professional Reporters
P.O. Box 9349
Richmond, Virginia 23227
(804) 730-1222
Reported by:  Valarie L. Schmit May, RPR

1    Appearances:

2

3            UNITED STATES ATTORNEY'S OFFICE

4            600 East Main Street, 18th Floor

5            Richmond, Virginia 23219

6            804.819.5400

7            By:  MICHAEL STEVEN DRY, ESQ.

8                 JESSICA ABER BRUMBERG, ESQ.

9            Assistant United States Attorneys

10

11           UNITED STATES DEPARTMENT OF JUSTICE

12           1400 New York Avenue NW, 3rd Floor

13           Washington, D.C. 20530

14           202.307.0593

15           By:  BRIGHAM CANNON, ESQ.

16           Special Assistant United States Attorney

17

18           MILLER & CHEVALIER

19           655 Fifteenth Street NW, Suite 900

20           Washington, D.C. 20005

21           202.626.5830

22           By:  BARRY JOEL POLLACK, ESQ.

23           Attorney, of counsel for Defendant

24

25

1    Appearances Continued:

2

3            OFFICE OF THE FEDERAL PUBLIC DEFENDER

4            701 East Broad Street, Suite 3600

5            Richmond, Virginia 23219

6            804.343.0800

7            By:  CAROLYN V. GRADY, ESQ.

8                 ROBERT JAMES WAGNER, ESQ.

9            attorneys, of counsel for Defendant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

WITNESSES

JOSEPH O. KAVAN

Examination By:                                              Page

Direct      - Mr. Dry                                          5

Cross       - Mr. Pollack                                     48

Redirect    - Mr. Dry                                         74


               TODD PAJONAS

Direct      - Mr. Dry                                         76

1          THE CLERK:  Criminal Number

2     3:08CR00132-01, the United States of America v. Edward

3     Hugh Okun.  Mr. Michael Dry, Mr. Brigham Cannon and

4     Ms. Jessica A. Brumberg represent the United States.

5     Mr. Robert J. Wagner, Ms. Carolyn V. Grady and

6     Mr. Barry J. Pollack represent the defendant.

7               Are counsel ready to proceed?

8               MR. DRY:  United States is ready to

9     proceed.

10              MR. WAGNER:  Defendant's ready.

11              THE COURT:  Good morning, Ladies and

12    Gentlemen.  Good morning, Counsel.

13              All right.  Your next witness?

14              MR. DRY:  United States would call Joseph

15    Kavan to the stand.

16

17                    JOSEPH O. KAVAN,

18         having been sworn, testified as follow:

19

20                    DIRECT EXAMINATION

21    BY MR. DRY:

22         Q    Mr. Kavan, please state your full name for

23    the record.

24         A    Joseph O. Kavan.

25         Q    And, sir, please give your educational

1  background.

2       A     I have an undergraduate degree in

3  political science from Creighton University.  I have a

4  juris doctorate degree from Creighton University

5  School of Law.  And I have a graduate degree in

6  banking from University of Washington.

7       Q     And, sir, what type of -- what type of

8  attorney are you?

9       A     I'm what would be known as a corporate

10 finance lawyer.  What we do is represent -- we

11 draft/negotiate loan agreements.  We represent clients

12 in the purchase and sale and financing of businesses

13 and assets.

14            THE COURT:  Excuse me.  Would you spell

15 your last name, please?

16            THE WITNESS:  I'm sorry, Your Honor?

17            THE COURT:  Spell your last name, please.

18            THE WITNESS:  K-A-V, as in Victor, A-N.

19 BY MR. DRY:

20       Q     When you say "we," what law firm do you

21 work at?

22       A     I'm sorry.  I'm a partner with Kutak Rock,

23 L.L.P.

24       Q     And where is that located?

25       A     At 1650 -- it's headquartered at 1650

1    Farnam Street, Omaha, Nebraska.

2         Q      At some point did you start representing

3    Investment Properties of America?

4         A      We did.

5         Q      And when was that, approximately?

6         A      Approximately January of 2005.

7         Q      And how did that representation come

8    about?

9         A      In the fall, early winter of 2004, I got a

10   call from Lara Coleman and asked if we knew anything

11   about 1031 exchanges.  And we had done a little bit of

12   work in that area, and we -- the more we talked, she

13   asked if we'd be interested in doing a little bit of

14   work for them.

15        Q      Okay.  Now, when you were first

16   representing Investment Properties of America, what

17   type of work were you -- first of all, what did you

18   understand Investment Properties of America to be,

19   what kind of business?

20        A      It's my understanding that they were

21   selling partial interests in real estate to people who

22   needed an exchange -- needed to do a real estate

23   exchange under the tax law.

24        Q      What type of work did you -- did the law

25   firm perform for Investment Properties of America?

1        A      Well, we helped them in the sale of those

2    partial interests to the investors or to the people

3    who wanted to buy these interests, and we represented

4    the company to make sure all the documents were in

5    order and the sale was a legal sale.

6        Q      When you say "a partial interest," is that

7    commonly referred to as a tenant-in-common

8    transaction?

9        A      That is correct.

10       Q      Okay.  Now, you weren't -- were you doing

11   any work on behalf -- well, in January of 2005 when

12   you first started working for Investment Properties of

13   America, were you aware whether Investment Properties

14   of America had any qualified intermediary companies of

15   their own?

16       A      When we first started?

17       Q      Yes.

18       A      Absolutely not.  I had no idea.

19       Q      Okay.  When did you -- and were you aware

20   of who owned Investment Properties of America?

21       A      I became aware of who owned Investment

22   Properties of America within a month or so of --

23       Q      And who was that?

24       A      It was Ed Okun.

25       Q      Okay.  When did you first become aware

 1  that Edward Okun was contemplating buying a qualified

 2  intermediary company?

 3      A     It was in the late summer, I believe, of

 4  2005, like August of 2005.

 5      Q     And how did you become aware of that?

 6      A     I believe Mr. Okun called me -- my

 7  recollection is that Mr. Okun called me and indicated

 8  that he was going to be acquiring a qualified

 9  intermediary.  And at that time I asked him whether

10  there was anything we could do to help or, you know,

11  what he needed us to do, if anything.

12      Q     And what did he tell you?

13      A     He said at that time, no, that a gentleman

14  by the name of Stephen Burr with -- I believe at the

15  time he was with Foley and Lardner had brought him the

16  opportunity and that he'd be handling the documents.

17      Q     And what was your understanding from

18  Mr. Okun regarding why he was going to buy a qualified

19  intermediary company?

20      A     Well, in that conversation, you know,

21  he -- he recanted the fact -- or he told me the fact

22  that he thought it was a great opportunity as a feeder

23  or a marketing device for his properties.

24      Q     And how would that -- how would that have

25  worked, sir, when you say "a marketing device"?

1          A      Well, qualified intermediaries hold the

2     cash for people who have sold a piece of property and

3     need -- and want to defer the gain under the tax law.

4     So there's a lot of people that the qualified

5     intermediary would be holding money for.  They may be

6     looking for property to put that cash into to replace

7     the property.  So it made some sense.

8          Q      So they were -- the replacement properties

9     could be Mr. Okun's partial interests?

10         A      Sure.  Absolutely.

11         Q      Okay.  What role did you have -- did

12    Mr. Okun tell you which qualified intermediary he was

13    contemplating buying?

14         A      I don't recall.  He may have told me where

15    it was.  I don't recall whether he told me the name at

16    that time.

17              MR. DRY:  Okay.  At this time I'd like to

18    show the witness, to refresh his recollection,

19    Government's Exhibit 12.

20    BY MR. DRY:

21         Q      Just referring to the first sentence, sir,

22    do you remember which qualified intermediary Mr. Okun

23    was contemplating buying?

24         A      Oh, yes.  I found out within a day after

25    he called me what the name of it was.

1        Q      Okay.

2               MR. DRY:  Can I get that back?  Sorry.

3    BY MR. DRY:

4        Q      What was the name of the qualified

5    intermediary he was going to buy?

6        A      The acronym for it was AEC.  I thought it

7    was American Exchange Company or -- I don't recall

8    what the acronym meant.

9        Q      Okay.  But it was AEC was the qualified --

10       A      That's correct.

11       Q      Okay.  What role did you have regarding

12   Okun's purchase of AEC?

13       A      Nothing.

14       Q      Okay.  Did you do any work regarding the

15   financing for Atlantic Exchange Company on behalf of

16   Okun?

17       A      We did a little bit of work associated

18   with some work with a gentleman by the name of Roy

19   MacDowell and there -- for the acquisition of the

20   property, yeah.

21       Q      What kind of work was that?

22       A      We represented -- we got a communication,

23   and this was maybe within a month of the phone call,

24   that said he wanted to acquire this company and he was

25   looking to finance the acquisition of this company.

1    And I believe Lara Coleman contacted me and said that

2    they were going to get a loan from Roy MacDowell and

3    that -- and then within a day or so I saw what the

4    terms were of that loan.  And then maybe a day later I

5    saw the loan agreement from Mr. MacDowell's lawyer.  I

6    reviewed it, made some minor -- very minor changes to

7    it, and it was over.

8            Q    Just to be clear, this is the loan

9    agreement to finance Mr. Okun's purchase of AEC?

10           A    I believe so.

11           Q    Okay.  When you say you reviewed the terms

12   of that loan, did you have any reaction to those?

13           A    Sure.

14           Q    What was it?

15           A    Well, they -- they were pretty onerous.

16           Q    When you say "onerous" --

17           A    In my view, they were onerous.

18           Q    What do you mean by "onerous"?

19           A    For example, the -- for the term, the

20   length of the loan and for the amount of interest, it

21   was a very, very high rate of interest.

22           Q    What type of experience did you have at

23   this time -- I believe this is in late August of '05;

24   is that correct?

25           A    That's correct.

1      Q     What type of experience did you have at

2   that time regarding qualified intermediaries, legal

3   expertise, and what they could do with client money?

4      A     Very little.  We knew what a qualified

5   intermediary was and we understood the tax law with

6   respect to what they were, but we had no experience

7   representing any.

8      Q     Okay.  Did you have a discussion with

9   Mr. Okun regarding AEC's client funds in late August

10   of 2005?

11      A     I had a discussion with Mr. Okun somewhere

12   around that period of time with respect to whether

13   funds could be moved from one bank to another bank.

14      Q     And what was --

15           THE COURT:  Funds of who?

16           THE WITNESS:  I'm sorry, Your Honor.  The

17   funds -- AEC had a bank account that they held the

18   funds of their clients in a bank account.

19           THE COURT:  So it was whether AEC's funds

20   could be moved from one account -- one bank to

21   another?

22           THE WITNESS:  That's correct.  I'm sorry.

23   BY MR. DRY:

24      Q     And what did Mr. Okun -- describe that

25   conversation for the jury.

1          A       Well, he had mentioned that they were

2      being held in a local bank.  And it wasn't a,

3      necessarily, small bank, but it was a smaller bank.

4      And he expressed to me that he had some concerns about

5      the size of the bank from the standpoint of safety and

6      soundness and asked me whether these accounts could be

7      moved to, I believe, Wachovia, into a Wachovia

8      account.

9          Q       So what was your understanding of the

10     reason that Mr. Okun was considering moving the money

11     from one bank -- a smaller bank to a larger bank?

12         A       Safety and soundness of the smaller bank.

13         Q       Okay.  Did you become aware -- I'm sorry,

14     sir.  I'm going to show you -- this is not an

15     exhibit.  I'm going to show you RICH-E 1966928.

16                 THE COURT:  What is it?

17                 MR. DRY:  It's just to refresh his

18     recollection, Your Honor.  It's not a Government's

19     exhibit.

20     BY MR. DRY:

21         Q       Do you remember the date, approximately,

22     of your phone call with Mr. Okun about moving the

23     funds?

24         A       It appears to be at the end of August

25     2005.

 1          Q      Okay.  When did you first become aware

 2     that Mr. Okun was considering using AEC client funds

 3     as loans?

 4          A      I think right around that same time, end

 5     of August/September of 2005.

 6          Q      And how did you become aware of this?

 7          A      We were asked to draft some loan documents

 8     with respect to a loan from AEC to, I believe -- I'm

 9     not sure which of the -- which one was the first loan,

10     but there was a series of about three loans within a

11     couple of weeks, maybe as -- maybe a month.  And we

12     were going to draft the loan documents from AEC to

13     Investment Property of America.

14          Q      And when you say you were asked, who asked

15     you to do that?

16          A      Lara Coleman.

17          Q      Okay.  In your conversations with Coleman

18     regarding these loans, was there discussion regarding

19     who you represented in these loans from AEC to IPofA?

20          A      Absolutely.

21          Q      And what did you tell Ms. Coleman?

22          A      We wanted to make sure who we represented

23     when we drafted this document and -- or these

24     documents, these sets of documents, because we wanted

25     to avoid any conflicts of interest.  We wanted to make

1    sure, you know, that we knew who our client was.  And

2    so I told her that we would -- we don't know anything

3    about AEC.  We didn't really know anything.  We didn't

4    do the deal.  We never represented them before.  We

5    never represented a qualified intermediary.  So I told

6    her that we would represent the borrower, Investment

7    Property of America, and that someone else would have

8    to represent AEC.

9         Q    And did you have a conversation regarding

10   whether it was appropriate for AEC to loan its client

11   money to IPofA?

12        A    Whether it was a conversation and/or an

13   e-mail.  I think it was maybe both and -- yes.

14        Q    And what were you told regarding whether

15   it was appropriate or not?

16        A    Lara had indicated to me that -- that

17   she -- that they were going to have a lawyer represent

18   AEC, that AEC was going to have their own lawyer

19   represent them, and that their own lawyer had said

20   that it's fine, that it can make those kind of loans.

21   And then I just said, Well, just -- you know, even

22   though I'm on the other side of this transaction, I

23   just caution you that I -- I would try and get an

24   opinion to that effect.

25        Q    Which lawyer did she identify?

1        A        She told me that the lawyer from Foley and

2    Lardner was going to represent them.

3        Q        Did you have any concerns regarding the

4    appropriateness of these loans?

5        A        Well, I -- I mean, I -- I questioned

6    whether you could do it.  It didn't make sense to me,

7    but, then again, we'd never represented those before.

8        Q        Generally, did you consider Investment

9    Properties of America and AEC to be affiliated

10   companies?

11       A        By definition, sure.

12       Q        Because they had the same owner?

13       A        Exactly.

14       Q        And loans between affiliates, as a

15   transactional lawyer, does that cause you less concern

16   or more concern?

17       A        It causes me a great deal of concern.

18       Q        And why is that?

19       A        Well, there's a number of prohibitions

20   in -- you know, and please take this in the correct

21   context.  You know, from the standpoint of the rules

22   with the SEC, from the standpoint of the rules --

23   banking law rules, et cetera, et cetera, your antenna

24   goes up a little bit when it's an affiliate

25   transaction.  There's prohibitions in banking laws for

```
 1    affiliated transactions between banks.  There's

 2    prohibitions in the SEC rules and the various

 3    securities act about prohibitions between directors

 4    and shareholders, et cetera.  You just become pretty

 5    aware of that kind of stuff.

 6        Q    Okay.  I'm going to show you, not for

 7    publication to the jury, but Government's Exhibit 12,

 8    please.

 9              And, sir, what is this?

10              THE COURT:  He doesn't have it up, does

11    he?  Can you see it?  There.

12        A    This is an e-mail from me to Lara Coleman

13    with -- with a copy to MichiganAce, which was

14    Mr. Okun, with respect to AEC loans to trusts.

15              MR. DRY:  At this time I'd like to admit

16    Government's Exhibit 12.

17              MR. POLLACK:  Pursuant to the Court's

18    ruling yesterday, subject to it being tied up later

19    on, no objection.

20              MR. DRY:  I'm unclear about what --

21              MR. POLLACK:  I'm assuming it's being

22    offered under 801(d), and as I understand the Court's

23    ruling yesterday, the Court was going to -- we're not

24    going to have a -- a James hearing or even a specific

25    proffer for each document as to why it's admissible.
```

1    We're going to revisit it later on to see whether or

2    not the foundation has, in fact, been laid.

3                    MR. DRY:  Your Honor, this is an e-mail --

4                    THE COURT:  Not for each document.  That

5    doesn't -- that issue doesn't even come up with

6    respect to each document in the case.

7                    MR. POLLACK:  No, only the documents that

8    are being proffered under Rule 801(d).

9                    MR. DRY:  This is not being offered under

10   801(d).  This is an e-mail from Mr. Kavan to Okun.

11   It's for effect on the listener.

12                    THE COURT:  So is there any objection?

13                    MR. POLLACK:  Maybe -- no, there's not.  I

14   apologize, Your Honor.

15                    THE COURT:  All right.

16   BY MR. DRY:

17        Q      Okay.  Sir, why did you send this e-mail?

18        A      Just as a follow up to my conversation

19   with Lara.

20        Q      And you included Mr. Okun on the e-mail?

21        A      I did.

22        Q      Okay.  Going to the -- please read the

23   first two full sentences.

24        A      Lara, I think you need some protection

25   concerning the AEC loans.  As we have discussed, I

CHANDLER and HALASZ, INC.
(804)730-1222

1    will represent the borrower in the two transactions in

2    which Parkway Virginia Trust will borrow $2 million

3    from Atlantic Exchange Company in the first

4    transaction and Columbus Works Virginia Trust will

5    borrow $27 million from Atlantic Exchange Company in

6    the second.

7         Q    What was your understanding of the purpose

8    of those two loans?

9         A    The Parkway Virginia Trust was, I believe,

10   to complete -- it was either to complete the

11   acquisition of a property or for business purposes of

12   Parkway Virginia properties, and the Columbus Works

13   Virginia Trust loan was to buy out one of Mr. Okun's

14   partners.

15        Q    Going to --

16        A    In that particular property.  I'm sorry.

17        Q    Going to seven lines from the bottom.  It

18   says, "We have not."  Can you please read that?

19        A    Oh, "We have not"?

20        Q    Don't -- and don't touch the screen.

21             Could you please read starting from there?

22        A    From --

23        Q    "We have not."

24        A    We have not and will not be able to render

25   any opinion or counsel with respect to the lender side

1    of this transaction, including the legality or

2    appropriateness of Atlantic Exchange Company making

3    these loans.  It is my understanding that Foley and

4    Lardner's Boston office has expressed the opinion that

5    Atlantic Exchange Company may make these loans under

6    Massachusetts law, and I would encourage you to have

7    an opinion rendered by them in that respect for your

8    protection.  As such, I am making Massachusetts law

9    the governing law for these transactions.  Please let

10   me know if you have any questions.

11        Q     And what was your purpose in sending this

12   e-mail?

13        A     I wanted to document the fact of who we

14   represented.  And I also wanted to remind Lara that

15   she ought to get an opinion.

16        Q     Okay.  Was there a third loan that you

17   became aware of that AEC's funds were going to be used

18   for?

19        A     There was.

20        Q     What was that going to be used for?

21        A     It was a personal -- it was a loan from

22   AEC to Mr. Okun for the purpose of acquiring a

23   personal residence in Florida.

24        Q     What was your understanding of how quickly

25   that was going to be paid off?

1          A     Within -- certainly within 30 days.  It

2     may have been less.

3          Q     And did you draft the loan documents for

4     that?

5          A     Our firm did, yes.

6          Q     You had been involved in reviewing loans

7     and assisting Mr. Okun and IPofA in getting loans from

8     mezzanine lenders and other lenders related to his

9     properties, correct, before this?

10          A     Before these loans?

11          Q     Yes.

12          A     Yes.

13          Q     And can you compare the terms of those

14     loans versus how much interest rate Mr. Okun was going

15     to pay on these loans?

16               THE COURT:  Which loans you talking about?

17     You've got -- first you're talking about whether there

18     was a third loan in Florida.

19               MR. DRY:  Yes, sir.

20               THE COURT:  You never did follow through

21     what that was, and then you go on and talk about a

22     bunch of other loans.  And I think we're all sort of

23     left wondering what that's about.  So if you want to

24     talk about the third loan, or whatever it was, talk

25     about that and then talk about the other.  Get one

1     topic finished before you go to the next one.

2               MR. DRY:  I apologize, Your Honor.  I

3     believe Mr. Kavan --

4     BY MR. DRY:

5          Q    Did you testify that the third loan was

6     for the purchase of a residence in Florida?

7          A    That's correct.

8               THE COURT:  Who was it from?

9               THE WITNESS:  It was from AEC.

10              THE COURT:  And who was it to?

11              THE WITNESS:  It's my -- I believe it was

12    to Ed Okun personally.

13              THE COURT:  You through with that topic?

14              MR. DRY:  Yes, sir.

15              THE COURT:  All right.  Go on to something

16    else.

17    BY MR. DRY:

18         Q    Sir, before these three loans, you

19    assisted Mr. Okun in getting other loans from

20    mezzanine lenders and traditional financing for

21    commercial real estate; is that correct?

22         A    That is correct.

23         Q    How much interest was he typically paying

24    on those loans compared to how much interest he was

25    proposing to pay on these?

```
 1                    THE COURT:  "Those loans" meaning the

 2        mezzanine.

 3                    MR. DRY:  The mezzanine loans.

 4                    THE COURT:  "These loans" meaning --

 5                    MR. DRY:  The three --

 6                    THE COURT:  -- from AEC.

 7                    MR. DRY:  -- from AEC.

 8           A      The mezzanine loans would have had a

 9        higher interest rate.

10        BY MR. DRY:

11           Q      How much higher?  Substantially?

12        Characterize it.

13           A      Substantially.

14           Q      Okay.  Regarding -- and I apologize.

15        Regarding the three loans, did you do loan documents

16        for those loans?

17           A      We did.

18           Q      What did you do with the loan documents

19        after --

20                    THE COURT:  Excuse me.  The three loans

21        from where?

22                    MR. DRY:  From AEC.

23                    THE COURT:  So these are loans from AEC to

24        who?

25                    Listen.  You-all have to understand
```

1    something.  All of you know more about this case than

2    the jury does and than I do.  We don't make the

3    assumptions when you say "these loans" you're

4    referring to some loan that you know about.  We need

5    to hear and understand the specifics so that we can

6    put it -- they can put it in context and, if I have to

7    rule on the evidence, I can put it in context.  Let's

8    try to be more specific.

9               MR. DRY:  I apologize.

10              THE COURT:  Did you do the paperwork for

11   loans -- the three loans between AEC and IPofA and/or

12   Okun?

13              THE WITNESS:  I did the paperwork for

14   three loans, that's correct.

15              THE COURT:  Well, who were they from?

16              THE WITNESS:  One was from AEC to Columbus

17   Works Trust.  One was from AEC to Parkway Virginia

18   Trust.  And I believe the final one was from AEC to Ed

19   Okun personally.

20              THE COURT:  All right.

21   BY MR. DRY:

22        Q     Okay.  After you drafted those loan

23   documents, what did you do with them?

24        A     I forwarded them to either Lara Coleman

25   and/or Mr. Okun.

1     Q     And as far as you know, were they executed

2  or not?

3     A     As far as I knew, they were executed.

4     Q     But did you ever see signed copies of

5  them?

6     A     I don't -- I don't recall whether I did or

7  not.  There was no -- I was not involved in the

8  closing of them, the execution of the documents.

9     Q     After those --

10           THE COURT:  Excuse me.

11           In those transactions, who did you

12  represent?  Who were your clients in those three

13  transactions that you just described?

14           THE WITNESS:  We represented the Columbus

15  Works Trust.  We represented the Parkway Virginia

16  Trust.  We represented Mr. Okun, in that particular

17  context, as borrower.

18           THE COURT:  So you were representing the

19  borrowers?

20           THE WITNESS:  Absolutely.

21  BY MR. DRY:

22     Q     And you did not represent Atlantic

23  Exchange Company, the lender, correct?

24     A     Absolutely.  And we made that clear.

25     Q     Okay.  When was the timing of these three

1    loans from Parkway Virginia Trust -- or from AEC to

2    Parkway Virginia Trust, Columbus Works Virginia Trust

3    and to Edward Okun?

4         A     It was August/September of 2005, somewhere

5    in that time.

6         Q     After that time frame, were you aware of

7    any further loans from Atlantic Exchange Company to

8    Investment Properties of America, Edward Okun or any

9    of their affiliated companies?

10        A     Have I ever become aware of it?

11        Q     No, at that time.

12        A     No.

13        Q     Turn your to attention to November of

14   2005.

15              Did you do any legal work regarding the

16   acquisition of another qualified intermediary company

17   called Security 1031 Services?

18        A     We did.

19        Q     And what work did you do?

20        A     In that particular transaction, I believe

21   Lara Coleman called me and said that they wanted to

22   acquire another qualified intermediary, and she asked

23   if we would prepare the documents and negotiate the

24   documents for the acquisition of that company.

25        Q     Did you have conversations with Coleman or

1    Okun in which they discussed any additional loans from

2    Security 1031 Services at this time?

3         A     No.

4         Q     Did you do any of the due diligence on

5    Security 1031 Services?

6         A     I don't believe so.

7         Q     Basically all you did was the acquisition

8    contract, the stock purchase agreement; is that

9    correct?

10        A     That's correct.  We may have done an

11   employment agreement for some of the owners as well --

12   former owners, rather.

13        Q     Now, turning your attention --

14             THE COURT:  What month was that that you

15   did the documents for the acquisition of Security 1031

16   Services by IPofA?

17             THE WITNESS:  Your Honor, it was

18   November/December of 2005.  I'm not sure when it was

19   actually closed, but we worked on the documents during

20   those two months.

21   BY MR. DRY:

22        Q     Turning your attention to December of

23   2005.

24             Did you have any conversations with anyone

25   about the transfer -- or additional loans from

```
 1    Atlantic Exchange Company in December of 2005?

 2                 THE COURT:  Loans from Atlantic Exchange

 3    to who?

 4                 MR. DRY:  Your Honor --

 5                 THE COURT:  To anybody?

 6                 MR. DRY:  To anybody.

 7                 THE COURT:  Okay.  That's fine.

 8         A    I did.

 9    BY MR. DRY:

10         Q    Okay.  And how did those come about?

11         A    It was in December of 2005.  I received a

12    telephone call from, I believe, both Chris Hoctor and

13    Rob Kaplan who were also doing some work.  They were

14    kind of doing the local Virginia work for Investment

15    Properties of America.

16         Q    What kind of work?

17         A    They did --

18         Q    I'm sorry.  Was it -- were they attorneys?

19         A    They were attorneys.  I'm sorry.

20         Q    Were they in-house attorneys or an outside

21    law firm?

22         A    They were an outside law firm.

23         Q    Okay.  Go ahead.

24         A    And they -- they did some additional work

25    for Investment Properties of America.  Exactly what
```

1    they did, I'm not sure.  But they called -- they both

2    called, they were both on the call, and expressed

3    concerns about some loans that were being made from

4    AEC to Investment Properties of America.  And it was

5    their belief -- they conveyed to me that it was their

6    belief that these loans were illegal under Virginia

7    law.

8         Q    And did they -- why were they calling you

9    about them?

10        A    Because they had said that they had tried

11   to call people at Investment Properties of America,

12   certainly Lara Coleman.  I believe, and I'm not

13   positive --

14             MR. POLLACK:  I'm going to object on

15   hearsay grounds.

16             MR. DRY:  Your Honor, it's not going for

17   the truth of the matter asserted.  It's going for the

18   next conversations he's about to have with Ms. Coleman

19   and Mr. Okun.

20             THE COURT:  Well, it's -- he's reciting

21   the background of the conversation, and it's relevant

22   to explain why he was on the telephone call or talking

23   with Coleman and Mr. Okun.

24             Overruled.

25   BY MR. DRY:

CHANDLER and HALASZ, INC.
(804)730-1222

1          Q       Go ahead, sir.

2          A       So they had mentioned that they had talked

3     to one or both of those -- Mr. Okun and Ms. Coleman

4     about this issue and were not getting any satisfaction

5     from the standpoint of what they thought to be the

6     requisite level of concern about this issue.

7          Q       Did you subsequently have a -- what did

8     you do about this?

9          A       I called Lara Coleman and talked to her

10    about it.

11         Q       And what did you say during the

12    conversation?

13         A       I said that -- I recanted what Mr. -- or I

14    relayed to her what they had told me about their

15    concerns and that I told her that we -- you know, we

16    talked about this earlier about getting an opinion and

17    that you needed some coverage on this to make sure

18    that they were legal.

19         Q       And what did Coleman say to you?

20         A       She appreciated that.  She said -- she

21    said, Yeah, you're right.  We haven't gotten the

22    opinion yet, but we will get it.  And she kind of

23    thanked me for being concerned about it.

24         Q       Did you subsequently talk to Mr. Okun

25    about it?

1      A     I did.  Mr. Okun then called me within a

2  day or so -- it may have been the same day; I just

3  don't recall -- and -- to discuss this with me.

4      Q     And what did you guys discuss?  Or what

5  did you and Mr. Okun discuss?

6      A     Well, he was -- he was pretty irritated

7  that Hoctor and Kaplan called me about this issue.  He

8  thought that they were wrong.  He thought that this

9  was none of their business and that they should not

10  have done this.

11      Q     They should not have done what?

12      A     They should not have called me and should

13  not be expressing their concerns to the company about

14  this issue.

15      Q     And that was in December of 2005, sir?

16      A     I believe so, yes.

17      Q     Okay.  From December of 2005 through

18  September of 2006, did this issue arise during your

19  representation?  Were there any other conversations or

20  work that you did regarding the issue of loans from

21  Atlantic Exchange Company or any other QI?

22      A     What was the time frame again?

23      Q     From December of 2005 until September of

24  2006.

25      A     No.

1           Q      Okay.  Ultimately, did you have a

2     conversation regarding loans from qualified

3     intermediaries with Edward Okun in September of 2006?

4           A      I did.

5           Q      How did that occur?

6           A      I had not heard from anyone at IPofA for

7     about, certainly, three or four months.  We just

8     really weren't doing that much work with them in 2006.

9     We did a little bit in the start of 2006 but really

10    tailed off after the first quarter.  And so I was a

11    little surprised, but Mr. Okun called me and asked

12    me -- initially he asked me if we would do an opinion

13    to opine that -- that AEC could make loans to

14    Investment Properties of America.

15          Q      And what type of -- what type of opinion

16    was this going to be?

17          A      Well, I mean, that's what he asked for.

18    He asked for an opinion.

19          Q      Okay.  Did you understand what type of use

20    Mr. Okun was going to use of these loans?

21          A      Well, he had told us -- or told me at the

22    time that -- you know, I -- I asked him a few more

23    questions about it, and he had indicated that, you

24    know, AEC had a lot of client funds in these -- in

25    these accounts of AEC, or the intermediaries, and that

1    they were virtually earning no interest and that he

2    thought that by investing these funds he could get a

3    higher rate of interest for the people who invested

4    their money in the qualified intermediaries.

5         Q    What was your understanding of what he was

6    planning on investing client funds in?

7         A    Well, at the time it was -- it was going

8    to be loans, short-term loans for -- backed by --

9    secured by real estate.

10        Q    Okay.  The opinion that you were being

11   given, was he asking you to opine on the legality of

12   prior loans or future loans that he was contemplating?

13        A    He wanted -- he wanted to know whether,

14   for example, in -- and I don't recall what the first

15   state was, but he said, you know, For example, in the

16   state of Massachusetts, if we wanted to do this, could

17   we do it and would you give us an opinion that we

18   could do it?  It was prospective, not retrospective.

19        Q    Okay.  Did the subject of the exchange

20   agreements or the contracts between the qualified

21   intermediary company and the client of that company

22   come up during this conversation?

23        A    It did.

24        Q    And what was the context of that?

25        A    You know, I said the first thing we'd have

1    to determine is whether the contract itself would

2    allow for those funds to be invested.  You know, there

3    may be an absolute prohibition just by way of a

4    contract that says that you can't invest them, period;

5    they have to stay in a certain investment, whatever

6    the case may be.  There may be some restrictions in

7    it.  And so I said that would be the first thing we'd

8    need to do is look at what the contracts say.

9         Q    And what did Mr. Okun say?

10        A    He said, If we could -- if there's a state

11   that we can do this -- for example, if Massachusetts,

12   it's okay to do it in Massachusetts, you're going to

13   give us an opinion that we can do it in Massachusetts,

14   we would amend the future agreements so that those

15   type of investments would be allowed.

16        Q    Just to be clear, what type of research,

17   in your mind, were you being asked to do?

18        A    Well, initially we were asked to do an

19   opinion, a formal opinion.

20        Q    Okay.  To opine on what?

21        A    What we were initially asked to opine on

22   was whether AEC could make loans secured by real

23   estate from AEC to Investment Properties of America

24   using, essentially, their clients' funds.

25        Q    And what kind of work were you going to do

1  reviewing the exchange agreements of the company?

2       A      Nothing.

3       Q      Why?

4       A      Because it wasn't an important factor at

5  that time.  It was whatever we found, if it was legal,

6  we were going to have to amend these agreements anyway

7  for future use.

8       Q      For the future.

9              Okay.  Did you ultimately issue that legal

10 opinion, or your law firm?

11      A      No.  We didn't even try to issue a legal

12 opinion.

13      Q      Why not?

14      A      Well, during the first conversation I --

15 as usual, there's somewhat of a confusion as to what a

16 legal opinion is.  When people ask for an opinion,

17 they don't realize what they're asking for, and so I

18 made it clear that there was no way we were going to

19 give an opinion.

20      Q      Why not?

21      A      Well, opinions are a pretty high standard

22 for law firms to give, and there's a number of

23 different types of opinions that you can give from the

24 standpoint of how comfortable you are with respect to

25 the legal opinion.  And we just were not going to --

1    we were -- it becomes a source of liability for the

2    law firm if we issue an opinion, and we were not going

3    to do that.  We just weren't going to issue an

4    opinion.

5         Q    What states -- were you asked to look at

6    all 50 states' laws or just certain laws?

7         A    Initially, it was all 50.

8         Q    Did you ultimately do research on all 50

9    states?

10        A    No.

11        Q    Did you inform Mr. Okun that you were not

12   going to be able to?

13        A    Yeah.  Initially, you know, he said, Why

14   don't we look for where this could -- this could work.

15   And I said, That's going to cost you a fortune to do a

16   50-state survey.  Then he said, Well, okay.  Let's do

17   these states.  There's a certain number of states that

18   he initially started with.

19        Q    Okay.  I'm going to show you what's

20   Government's Exhibit 92.

21             MR. DRY:  It's already been admitted into

22   evidence.  It can be published to the jury.

23   BY MR. DRY:

24        Q    And, sir, you've reviewed this document

25   before, correct?

1        A     I have.

2        Q     And this is an e-mail containing your

3    research memorandum -- or your firm's research

4    memorandum on October 9; is that correct?

5        A     That's correct.

6        Q     And this was sent at your direction?

7        A     It was.

8        Q     And why was it sent to Eric Perkins?

9        A     Because Eric Perkins was the chief legal

10   officer at Investment Properties of America at the

11   time.

12       Q     We exhaustively have gone through this

13   memo yesterday.  Just going to the last page.

14             Okay.  Sir, without having you go through

15   each of these statements, you say in here that it's

16   very unclear exactly what investment restrictions

17   apply, and you list states.

18             What types -- when you're saying

19   "investment restrictions," are you referring to state

20   law?  Common law?  What are you talking about?

21       A     Well, in an ideal -- what we were looking

22   for -- and this is what made this inquiry so hard was,

23   you know, in an ideal situation we would have found

24   the state statute that says qualified intermediaries

25   shall only invest in the following types of

```
 1   investments, you know, maybe treasury bills or
 2   overnight paper, commercial paper, whatever the case
 3   may be, and list them out.  That's really what we
 4   would have liked to have found because then we know
 5   very clearly what they could and could not do.  We
 6   never found that anywhere.
 7        Q    Was it your intent, in sending this, to
 8   give Mr. Okun comfort that he could do loans from the
 9   qualified intermediary companies?
10        A    Quite the opposite.
11        Q    Did you subsequently have a conversation
12   with Mr. Okun in mid-October about this memorandum,
13   the TICA conference?
14        A    Oh, I did.  Yes.
15        Q    And what was the substance of that
16   conversation?
17        A    There was a conference for the Tenants in
18   Common Association, and I was out there actually to
19   meet with a client and happened by their booth at this
20   conference and happened to run into Mr. Okun.  And I
21   went over to say hi to him.
22        Q    And what did he say to you?
23        A    He asked me how the research was going.
24        Q    What did you say to him?
25        A    I said, Well, you know, I sent -- you've
```

```
 1    seen the memo and here's where we stand and we just

 2    aren't finding anything.

 3          Q     What did he ask you to do?

 4          A     Expand the inquiry.

 5          Q     Expand the --

 6          A     To other states.

 7          Q     He wanted you to look at other states to

 8    find --

 9          A     Correct.

10          Q     For what purpose?

11          A     The same purpose, to try and find out if

12    there were other states that may -- the first inquiry

13    was limited to three or four, five states.  He then

14    said, Let's expand the search to other states.  And he

15    then either called me or told me then -- or certainly

16    very soon thereafter we learned what states that he

17    wanted us to do some further research for.

18          Q     Was one of those states Delaware?

19          A     I believe so, yes.

20          Q     And did you -- did Kutak Rock do any legal

21    research about permissibility of these in Delaware?

22          A     We did.

23          Q     And did you subsequently have a

24    conversation with Okun in which you relayed the

25    results of that?
```

1          A      I don't know if I actually talked to him.

2     I know that we sent him an e-mail with our -- with the

3     conclusion of our research.

4          Q      And what was that conclusion?

5          A      That there was no guidance.  There was no

6     comfort that he could have that he could do those

7     there, that they were legal there.

8          Q      What was Mr. Okun's reaction to that?

9          A      I'm a little unclear on the sequence of

10    it, but it -- I think -- I'm not sure whether Delaware

11    was the last one, but I know there were really kind of

12    three batches to this.  It was the first group of

13    states, there was another group of states that he

14    asked us to go and look at, and then there was a final

15    group of states that he wanted us to look at.  I don't

16    know where Delaware fell in that mix.

17         Q      And did you find any states that, in your

18    opinion, would have given Mr. Okun comfort?

19         A      There were -- we never found any states.

20         Q      Okay.  And, again, you're just looking at

21    state statutory law and common law, correct?

22         A      That's correct.

23         Q      I'm going to show you what's now

24    Government's Exhibit 104.

25                MR. DRY:  This has not been admitted into

1    evidence yet.

2              THE COURT:  What is it?

3              THE CLERK:  104.

4              MR. DRY:  Government's Exhibit 104, Your

5    Honor.

6              THE COURT:  I don't know who it was that

7    did this but -- fixed my books, but whoever did, thank

8    you.

9              MR. DRY:  I'd like to take credit for it,

10   but it wasn't me, Your Honor.

11   BY MR. DRY:

12        Q    Okay.  Mr. Kavan, who is this e-mail from

13   and to?

14        A    This is an e-mail -- this is an e-mail

15   from me to Mr. Okun.  It also copies David Field, Lara

16   Coleman, Lisa Sarver, Grant Leach, and the subject is

17   1031 accommodators.

18             MR. DRY:  I'd like to admit Government's

19   Exhibit 104 at this time.

20             THE COURT:  Any objection?

21             MR. POLLACK:  No objection.

22             THE COURT:  It's admitted.

23   BY MR. DRY:

24        Q    Sir, you e-mail Mr. Okun.  Can you read

25   the first two sentences of this e-mail, please?

1          A     Ed, I just got off the phone with David

2     Field about the 1031 accommodator activities.  David

3     called me in response to your request that he call me

4     for some comfort with respect to the 1031 activities

5     related to the investment of 1031 funds held by the

6     accommodator.

7          Q     Did you have a conversation with Mr. Field

8     about this?

9          A     I did.

10         Q     What was -- how did that occur?

11         A     Just right before I sent this e-mail out,

12    David Field called me and I -- David Field called me

13    and said -- he said -- as I recall, he said, Ed

14    said --

15              MR. POLLACK:  Objection on Mr. Field's

16    comments.  I think that is the 801(d) issue, and I

17    would object to Mr. Kavan's comments to Mr. Field

18    generally as hearsay.

19              MR. DRY:  It's not being offered for the

20    truth of the matter asserted.  It's offered for effect

21    on the listener and to explain the context of this

22    e-mail, Your Honor.

23              THE COURT:  Overruled.

24    BY MR. DRY:

25         Q     Go ahead, sir.

1          A     Mr. Field told me that Ed had told him to

2     call me because Ed said that I had some good news with

3     respect to finding some states that they could do this

4     activity.

5          Q     What was your reaction to Mr. Field?

6          A     I said, That's absolutely incorrect.

7          Q     Going on -- and the -- and was that the

8     genesis of you sending this e-mail, sir?

9          A     Absolutely.

10          Q     Going on --

11          MR. DRY:  Can you go down, please?

12     BY MR. DRY:

13          Q     Starting with the second paragraph, can

14     you read the first four sentences, sir?

15          A     The "We are currently"?

16          Q     Yes.

17          A     We are currently researching whether there

18     is a state that has some guidance with respect to

19     escrow arrangements and perhaps extrapolate these

20     statutes into some level of comfort that that

21     particular state's law would apply to you and, as

22     such, be a state in which to conduct your activity.

23     We do not know whether this will be a situation that

24     would then allow you to export these concepts to other

25     states.  As I have said to you and Lara since the time

1    you purchased your first accommodator, you have no

2    guidance in this area, and although activities with

3    respect to these funds is -- it's "nor," but I think I

4    meant not proscribed by any statute, they are not

5    specifically allowed by any statute.

6         Q    And you're referring to your earlier

7    e-mails and conversations with Okun and Coleman; is

8    that correct?

9         A    I'm referring to the very first time that

10   they asked us to draft that first loan document.

11        Q    Okay.  Can you continue reading, please?

12        A    I also advised you at the same time that,

13   at a minimum, you should be held to a prudent investor

14   standard for any funds invested which would suggest

15   that any funds invested would have to be invested in

16   liquid, short-term, investment-grade investments that

17   would be readily available for any liquidity needs of

18   the accommodator.

19        Q    And continue on with the next sentence.

20        A    As I also advised you at the time, you

21   need to treat these funds in somewhat the same manner

22   as an escrow agent and be cognizant of the fact that

23   these funds are the property of the parties for which

24   the accommodator is holding these funds.

25        Q    Just to be clear, sir, you had not been

asked to opine in August of '05 regarding the loans

from AEC to the two trust companies and to Mr. Okun

personally, correct?

A     Absolutely not.  We made that clear in our

e-mail.

Q     Continue reading, sir.

A     You must be aware that until we find some

guidance in the form of a statute or case law that

specifically allows this type of activity, you are

very much at risk in using any of these funds in any

manner.  Again, it goes to the issue of determining

whether if an activity is not proscribed, does that --

I meant to say does that mean that it is allowed?  At

this time, as we advised you nearly a year ago, the

fact that we can find no prohibition does not mean

that you are allowed to engage in that particular

activity.

Q     And what was your purpose in sending this

portion of the e-mail?

A     Well, obviously, we were not getting --

communicating the fact that we aren't finding anything

that would allow him to do this, and we just wanted to

make it very clear.

Q     Going to the last paragraph.  Sir, "until

such time," third line down, to the right.

1          A     You want me to read that?

2          Q     Please.

3          A     Until such time as we can resolve this

4    issue with some definition, I would advise you to use

5    extreme caution with respect to whether and how you

6    invest these funds, and we certainly cannot give

7    anyone any level of comfort that this activity is the

8    type that does not violate any statute or regulation.

9    We are hopeful that we can give you some additional

10   material in advance of your meeting on Wednesday.

11         Q     Throughout your legal research that you

12   did for Investment Properties of America regarding the

13   loans of QI funds, were you ever asked by Mr. Okun or

14   Ms. Coleman to look at the exchange agreements that

15   those companies had been using?

16         A     Not that I recall.

17               MR. DRY:  One moment, Your Honor.

18               Nothing further at this time, Your Honor.

19               MR. POLLACK:  Your Honor, may I have just

20   a moment to confer with Mr. Okun?

21               THE COURT:  Sure.

22               MR. POLLACK:  Thank you.

23               Thank you, Your Honor.

24

25

                        CROSS-EXAMINATION

1

2    BY MR. POLLACK:

3        Q      Good morning, Mr. Kavan.  How are you?

4        A      Fine.  Thank you.

5        Q      Okay.  Let's see.  If I understood

6    correctly, you were first contacted in about August of

7    2005 in regards to representing IPofA?

8        A      No.

9        Q      Okay.  Help me out.  When was the first

10   contact?

11       A      It was in the winter -- November/December

12   of 2004.

13       Q      Okay.  November/December 2004?

14       A      Correct.

15       Q      And you were contacted by Ms. Coleman?

16       A      Correct.

17       Q      When was it that you were first contacted

18   that you learned that Mr. Okun was interested in

19   purchasing some qualified intermediaries?

20       A      It was in late summer, maybe August, of

21   2005.

22       Q      Okay.  That's -- that's what I was

23   thinking of.  So ballpark, August of 2005, you get

24   that contact where you're told that he may be

25   interested in buying some qualified intermediaries?

1        A      That's correct.

2        Q      And you knew that he was -- that one of

3   his businesses, at least IPofA, was in the commercial

4   real estate business, largely?

5        A      Absolutely.

6        Q      And that it sold to investors through this

7   TIC mechanism?

8        A      Correct.

9        Q      And when you heard that he was planning on

10  purchasing some qualified intermediaries, that made

11  sense to you as kind of a business model that somebody

12  who was in the business of commercial real estate and

13  TIC'ing out properties may also have an interest in

14  purchasing qualified intermediaries?

15       A      Very much so.

16       Q      And you -- I guess at some point in this

17  same time frame, August 2005, you were contacted about

18  assisting Mr. Okun and a couple of trusts who were

19  going to borrow money from AEC, which was this

20  qualified intermediary that Mr. Okun had purchased; is

21  that correct?

22       A      That is correct.

23       Q      And I take it, Mr. Kavan, you're a pretty

24  careful lawyer?

25       A      I do my best.

1          Q       You certainly try to comply with all laws,

2     correct?

3          A       I try.

4          Q       All rules, regulations?

5          A       Correct.

6          Q       Banking rules, SEC rules?  Yes?

7          A       Yes.

8          Q       Okay.  And I take it that if a client came

9     to you and they asked you to do something that you

10    believed to be unlawful, whether or not it was in your

11    area of specific expertise, you wouldn't agree to do

12    it?

13         A       That is correct.

14         Q       And that would be true even if the person

15    coming to you told you, hey, don't worry about it,

16    I've got some other lawyer's told me it's okay?

17             For example, I come to you, Mr. Kavan, and

18    I say, I'd like to hire you to help me with a

19    transaction.  Here's what I want to do.  I want to buy

20    a bail of marijuana.  And don't worry about whether or

21    not that's legal.  I've talked to another lawyer, and

22    he said it's perfectly okay.  Will you do the

23    transaction documents for me?  What would your answer

24    be?

25         A       No.

1          Q       And when you were contacted about doing

2     loans from a qualified intermediary and you were told

3     some other lawyer had said there was no prohibition on

4     that, you were happy to do those loans.

5          A       That's correct.

6          Q       And you mentioned that transactions

7     between affiliates, that is, related companies, cause

8     you to have some concerns that don't necessarily exist

9     with other types of transactions, is that accurate?

10         A       That is correct.

11         Q       Okay.  And, for example, you said there

12    are some SEC rules and some banking rules that relate

13    to affiliate transactions that don't relate to other

14    transactions.

15         A       Correct.

16         Q       And Mr. Okun's entities were not publicly

17    traded companies; is that correct?

18         A       That is correct.

19         Q       They were not regulated by the Securities

20    and Exchange Commission?

21         A       That is correct.

22         Q       They were not banks, were they?

23         A       No, they were not.

24         Q       Okay.  And at that time, in August of

25    2005, you didn't see any reason why you couldn't, as a

1     lawyer, participate in and charge for your services

2     for facilitating a transaction that was a borrowing

3     from a qualified intermediary; is that correct?

4          A     In the context of representing the

5     borrower, that's correct.

6          Q     And initially when you were called to

7     represent -- initially you were representing IPofA,

8     that's right, you said back in late fall, early winter

9     of 2004, correct?

10         A     We didn't start representing IPofA until

11    2005, January of 2005.

12         Q     Okay.  January 2005.  And at that point

13    you were representing IPofA?

14         A     Correct.

15         Q     Okay.  But you had a number of different

16    roles over time; is that correct?

17         A     Very much so.

18         Q     In some instances, you were representing

19    IPofA?

20         A     Yes.

21         Q     In some instances, you represented AEC,

22    did you not?

23         A     We represented AEC in -- with respect to

24    some reorganization matters later that year, that's

25    correct, when they were going to merge with the other

1    accommodator they had acquired.

2         Q    And in some instances, you were

3    representing Mr. Okun personally?

4         A    One or two instances, that's correct.

5         Q    For example, you testified that you were

6    representing him as the borrower from -- when he was

7    borrowing money from AEC, a qualified intermediary?

8         A    That is correct.

9         Q    And you knew that the purpose of that loan

10   was to facilitate the purchase of his home in Miami,

11   Florida?

12        A    Correct.

13        Q    And you understood it was a short-term

14   loan that would be repaid?

15        A    That is correct.

16        Q    Now, Mr. Okun was the sole owner of IPofA;

17   is that correct?

18        A    I believe so, yes.

19        Q    And there is no reason that Mr. Okun could

20   not borrow money from IPofA; is that correct?

21        A    I'm sorry.  I don't understand the

22   question.

23        Q    If Mr. Okun, as the hundred percent owner

24   of IPofA, wanted to borrow money from IPofA, his real

25   estate company, there was no prohibition on that.

1              THE COURT:  Are you asking him whether

2    there was a prohibition, or are you telling him there

3    was and then going to ask him a question?

4              MR. POLLACK:  Well, it is

5    cross-examination.  The way I like to do it, I like to

6    tell him and then see if he'll agree.

7    BY MR. POLLACK:

8         Q    Do you agree with me?

9              THE COURT:  Yeah.  Well, I know, but it

10   needs to be clear.

11             MR. POLLACK:  I'm sorry, Your Honor.

12   That's fair.

13             THE COURT:  Style's one thing.  Clarity's

14   another.  I'm sorry.

15             MR. POLLACK:  It is a very fair point.

16   Let me try to make it more clear.

17   BY MR. POLLACK:

18        Q    Here is my understanding.  I'm going to

19   see if you agree with me.  Okay?

20             My understanding is that Mr. Okun is the

21   hundred percent owner of IPofA, a company that invests

22   in real estate; is that correct?

23        A    That is correct.

24        Q    And my understanding is there would be no

25   prohibition preventing Mr. Okun, as the hundred

1    percent owner of IPofA, from borrowing money from

2    IPofA.

3         A     That's not necessarily true.  I would not

4    agree with that.

5         Q     You would not agree with that.  Okay.

6               Did you ever tell Mr. Okun that he could

7    not borrow from IPofA?

8         A     I don't believe so, no.

9         Q     Did you ever -- softer than telling him he

10   couldn't, did you ever tell him "you shouldn't" or "it

11   wouldn't be advisable" or anything to that effect?

12        A     I would tell him -- I don't --

13        Q     With respect to IPofA.

14        A     I don't recall.  I don't recall that we

15   did, that we told him he couldn't, no.  I'm not sure

16   it ever came up.

17        Q     Okay.  Fair enough.

18              Now, in August of 2005, you assist

19   Mr. Okun in these two real estate trusts with their

20   borrowings from AEC?

21        A     That's correct.

22        Q     And the real estate trusts, let me just

23   make sure we understand that, these two real estate

24   trusts -- Virginia Parkway was one of them?

25        A     Correct.

```
 1        Q     And the other one was --

 2        A     Columbus Works.

 3        Q     Columbus Works.

 4              Those were real estate trusts that

 5    Mr. Okun was the owner of?

 6        A     Correct.

 7        Q     So these aren't under the IPofA umbrella,

 8    but they're other real estate ventures that are owned

 9    by Mr. Okun.

10        A     Well, as I recall, those trusts were owned

11    by IPofA which was, ultimately, owned by Mr. Okun.

12        Q     Okay.  And then -- so that's in August of

13    2005.  And then almost a year later or maybe a little

14    bit more than a year later, in September of 2006,

15    Mr. Okun asked you for an opinion about the

16    permissibility of qualified intermediaries loaning

17    money, is that --

18        A     That is correct.

19        Q     Okay.  And you had said that you didn't

20    give him any formal advice on that topic when you had

21    dealt with him a year earlier.

22        A     That is correct.

23        Q     But you had given him some informal

24    advice.  You had told him, even at that time, that you

25    weren't aware of any prohibition on it.
```

1       A    I don't recall.  I don't recall whether I

2  told him that.

3       Q    Okay.  Well, let's look at Government

4  Exhibit 104 which the Government introduced a little

5  bit earlier.  And if you can look at the last sentence

6  of the second paragraph.

7          At this time, as we advised you nearly a

8  year ago, the fact that we can find no prohibition

9  does not mean that you are allowed to engage in a

10  particular activity.

11       A    That is correct.

12       Q    Okay.  So you had, even back in August of

13  '05, told him you weren't aware of any prohibition.

14       A    Yeah.  Right off the bat I said that if

15  they didn't -- if the -- if the agreements didn't

16  prohibit it -- you know, I didn't know of any off the

17  top of my head that would prohibit it, that's correct.

18       Q    Which is why you were willing to

19  participate in the transaction.

20       A    Sure.  Well, that combined with the fact

21  that someone was going to opine to it on the other

22  end.

23       Q    Okay.  And, in fact, now he is, in

24  September of '06, asking for such an opinion.  So now

25  he's asking you to do some independent research

1    yourself on this issue.

2         A    That is correct.

3         Q    And you said that it was your

4    understanding that he was willing to conform the

5    exchange agreements, the agreements with the qualified

6    intermediary customers, to whatever the law was that

7    you found, is that fair?

8         A    That is correct.

9         Q    Okay.  And so as a result, the exchange

10   agreements that were then in existence simply were not

11   important to you in doing the analysis that you were

12   attempting to do.

13        A    That is correct.

14        Q    So it's not that those exchange agreements

15   were concealed from you.  It's that you didn't need

16   them; is that correct?

17        A    Absolutely.

18        Q    And in -- on October 9, 2006, you issue

19   your memo, correct?

20        A    The first one, that's correct.

21             MR. POLLACK:  If we can go ahead and put

22   that back up.  That is Government 92, I believe.  Is

23   that right?

24             MR. DRY:  Yes.

25             MR. POLLACK:  Why you laughing?  You're

 1    the Government.  I can ask you.

 2                    MR. DRY:  Can I get you some water?

 3                    MR. POLLACK:  I'm fine.  Thank you.

 4                    THE COURT:  All right, Guys.  The show's

 5    over, for the duration.

 6                    MS. GRADY:  Here's 92.  Sorry about that.

 7                    MR. POLLACK:  Okay.  And, I guess, why

 8    don't we go to the last page.

 9    BY MR. POLLACK:

10        Q    And that's your bottom-line conclusion

11    that it's very unclear exactly what restrictions

12    apply.

13                    In fact, the bottom line was that, I

14    think, as you put it, you didn't find anything that

15    specifically allowed for it, but you also didn't find

16    anything that specifically prohibited it.

17        A    That's correct.

18        Q    Okay.  And that, at least at this time, on

19    October 9, that's a statement about the specific

20    states that you had been asked to research.

21        A    That is correct.

22        Q    And did you understand that those specific

23    states were the states in which Mr. Okun was presently

24    operating QIs?

25        A    I did not.

1          Q      Okay.  And by the way, the restrictions

2    that are discussed in this memo, the ones that could

3    potentially apply, those are restrictions that apply

4    primarily to escrow agreements?

5          A      It varied.  We found virtually nothing on

6    point with respect to 1031 accommodators.

7          Q      You found absolutely nothing that

8    addressed 1031 accommodators.

9          A      I believe that's correct.

10         Q      So you were looking for things that one

11   might argue are similar to 1031 accommodators in the

12   hopes that maybe you could find some guidance as to

13   what a 1031 accommodator could do?

14         A      That's correct.

15         Q      And so one idea that you had was let's

16   look at what restrictions apply to escrow agreements.

17         A      Correct.

18         Q      But you didn't know whether a QI was an

19   escrow agreement.

20                THE COURT:  A QI?

21   BY MR. POLLACK:

22         Q      I'm sorry.  A qualified intermediary.

23                You didn't know if the qualified

24   intermediary, if their agreement with their customer

25   or their relationship constituted an escrow

1   relationship.

2        A     That is correct.

3        Q     And if it did not, then all of the escrow

4   restrictions that you're discussing in the memo don't

5   apply to QIs.

6        A     Arguably.  Correct.

7        Q     And your bottom-line conclusion is that

8   there are no explicit prohibitions, but there's

9   nothing that allows for it either.  And you were

10  hoping to find something that specifically allowed for

11  it, correct?

12       A     Correct.

13             THE COURT:  Mr. Pollack, the jury's

14  listening.  Let's go ahead now.  We've had that

15  question three times, that same question slightly

16  different.  Let's go ahead.

17             MR. POLLACK:  Okay.

18  BY MR. POLLACK:

19       Q     And -- now I've lost my train of thought.

20             And so being the careful lawyer that you

21  are, given that there was nothing that specifically

22  provided for it, there was some suggestions you made

23  of things that Mr. Okun's companies may want to do to

24  protect themselves from liability, is that fair?

25       A     That's correct.

     1          Q      Okay.  And when talking about the things

     2     that they may want to do to protect themselves from

     3     liability, you weren't thinking of things that they

     4     needed to do to protect themselves from criminal

     5     prosecution; is that correct?

     6          A      That's correct.

     7          Q      Your memo had nothing to do with criminal

     8     prosecution.

     9          A      Absolutely not.

    10          Q      Right.  And you -- you said that you are a

    11     corporate finance lawyer?

    12          A      Correct.

    13          Q      And you have many areas of expertise; is

    14     that correct?

    15          A      I don't know I'd characterize it that way,

    16     but we -- we delve into a number of areas of law,

    17     that's correct.

    18          Q      Okay.  Well, looking at your -- your Web

    19     site biography, I noted that you had practice areas of

    20     banking and commercial lending, banking regulatory,

    21     corporate compliance, general corporate, joint

    22     ventures, limited liability companies, partnerships --

    23                 MR. DRY:  Objection, Your Honor.  Is

    24     Mr. Pollack testifying?  If he's looking at a Web

    25     site, first of all, I'd like to see it and show it to

 1   the witness.

 2              THE COURT:  Okay.  So was that an

 3   objection or a question you were asking me?

 4              MR. DRY:  Objection, Your Honor, for

 5   Mr. Pollack testifying.

 6              THE COURT:  I think he was asking a

 7   question, which was rather long-winded, but he's --

 8   that's his -- maybe that's a matter of spout, but

 9   he'll clarify.

10              Do you want a copy of the Web site in

11   order that you can see the question, understand the

12   question?  Is that what you're saying?

13              MR. DRY:  Yes, Your Honor.

14              THE COURT:  Then after you ask the

15   question, if you'll hand him a copy of the Web site,

16   if you have it.  Fine.  He may just have written it

17   down, then in which event he doesn't have it.

18              Overruled.

19              Go ahead.  Start again with your train of

20   thought.

21              MR. POLLACK:  I'll try to start where I

22   left off rather than repeating the ones that I had

23   already gone through.

24              THE COURT:  All right.

25   BY MR. POLLACK:

1          Q       Limited liability companies, partnerships,

2     corporate finance, private security offerings, project

3     finance, corporate finance, mergers and acquisitions

4     litigation, corporate taxation, partnership taxation,

5     state and local taxation, tax controversy and

6     litigation.

7               Does that sound like an accurate

8     description of your practice areas?

9          A       The firm's practice areas?

10         Q       You tell me.  I understood those to be

11    your practice areas.

12         A       I've dealt with all those areas, that's

13    correct.  Yeah.

14         Q       And I counted up sixteen of them.  Does

15    that sound about right?

16         A       Sure.

17         Q       And criminal law is not one of them?

18         A       Clearly.

19         Q       Now, you concluded in your October 9 memo

20    that in all five of the states that you were asked to

21    research the potential restrictions that may or may

22    not apply to 1031 accommodators, you could alter those

23    restrictions simply by changing the exchange

24    agreement; is that correct?

25         A       I'm sorry.  I didn't -- I didn't

1    understand the question.

2         Q    In -- you looked at five jurisdictions,

3    correct?

4         A    Correct.

5         Q    And you -- why don't I do this.  Let's

6    look at the first page of the memo and the bottom

7    paragraph.

8              You say, While it's unclear whether 1031

9    accommodators qualify as fiduciaries, all five states

10   discussed within this memorandum permit fiduciaries to

11   expressly modify the prudent investor standard through

12   their trust agreements.

13             Am I correct in understanding that

14   language to mean that even if there's some regulation

15   out there in some state -- or in one of these five

16   states, I should say, that would otherwise apply,

17   which is -- so if you are a fiduciary, we don't know

18   if you are, but if you are and if one of these

19   applies, nonetheless, you wouldn't be bound by that

20   restriction as long as you modify your agreement with

21   your customer to say that you're not so restricted?

22        A    You would not be restricted to the prudent

23   investor standard if the fiduciary and the other party

24   agreed to it, that's correct.

25        Q    And at some point after you issued this

1    memo on October 9, Mr. Field calls you, correct?

2         A    Correct.

3         Q    And he tells you that he was directed to

4    call you by Mr. Okun?

5         A    Correct.

6         Q    And that Mr. Okun has invited him to talk

7    to you directly, in fact, encouraged you to talk to

8    him directly, about your research?

9         A    Correct.

10        Q    And Mr. Okun, having received the October

11   9 memorandum, believed that it was good news; is that

12   correct?

13        A    I don't know.

14        Q    Is that what Mr. Field told you?

15        A    Yes.

16        Q    Because rather than looking at the glass

17   half empty, that there was nothing that specifically

18   allowed for it, he was looking at it --

19             MR. DRY:  Objection, Your Honor.

20   BY MR. POLLACK:

21        Q    -- half full, that there was nothing that

22   prohibited it.

23             THE COURT:  Excuse me a minute.

24             MR. DRY:  Objection.  He's asking the

25   witness to speculate now about Mr. Okun's state of

 1    mind.  He can ask questions about what Mr. Field told

 2    Mr. Kavan but not about Mr. Okun's state of mind about

 3    half glass full, half glass -- glass half empty.

 4              THE COURT:  Objection sustained.

 5    BY MR. POLLACK:

 6         Q    Mr. Kavan, is that half glass full/half

 7    glass empty a fair characterization of what you

 8    understood Mr. Field was saying was Mr. Okun's

 9    reaction to your memo?

10         A    Tell me the glass half empty thing again.

11    I mean, I -- I'm just so confused by this question.

12              THE COURT:  Then I think it's not fair to

13    ask the witness to answer it if he's confused.  I

14    confess to a certain amount of confusion myself.

15              THE WITNESS:  I'm sorry, Your Honor.

16              THE COURT:  But it's his understanding

17    that's important, not mine.

18              Go ahead.  Try again.

19    BY MR. POLLACK:

20         Q    All right.  I'll try it again.  I'll -- I

21    won't use glasses this time.

22              You thought it was bad news, you,

23    yourself, thought it was bad news that there was

24    nothing that specifically allowed for it because

25    that's what you were hoping to find, correct?

```
 1          A      We weren't hoping to find anything.

 2          Q      I misunderstood your testimony earlier,

 3    then, with Mr. Dry.  Didn't you say the best thing to

 4    find would be if there was something that

 5    specifically --

 6          A      The easiest thing to find would have been

 7    an absolute specific prohibition.

 8          Q      Okay.  The easiest thing.

 9          A      That's correct.

10          Q      So you thought it was bad news that you

11    didn't find that?

12          A      We would have liked to have found some

13    definitive answers and some statutes, that's correct.

14          Q      Right.  But Mr. Okun, as you understood

15    what Mr. Field was saying, thought it was good news

16    because you didn't find anything that prohibited it?

17          A      Mr. Field called me and said that Ed told

18    me to -- Ed told Mr. Field to call me because I had

19    some good news.

20          Q      And on October 30, 2006, you followed up

21    with an e-mail to Mr. Okun with a cc to Mr. Field?

22          A      That is correct.

23          Q      Okay.

24                 MR. POLLACK:  Got too much paper.

25                 THE COURT:  You looking for that memo?
```

1          MR. POLLACK:  I'm looking for the one that

2     I so nicely highlighted the parts that I wanted to

3     talk to him about.

4          THE COURT:  I can't help you with that.

5          MR. POLLACK:  Yeah.  No, I know.

6          I didn't leave it over there, did I?

7          THE COURT:  Government Exhibit 104 I think

8     is what you're talking about, but you want a copy of

9     it that's highlighted that you previously marked up.

10         MR. POLLACK:  All right.  That's all

11    right.

12         MS. GRADY:  104, Your Honor?

13         THE COURT:  Isn't that the memo you're

14    talking about, October 30 to Okun, Field, Coleman and

15    others?

16         MR. POLLACK:  Go ahead and put that up.

17    BY MR. POLLACK:

18     Q    Well, I tell you what.  There's a lot of

19    really good stuff in there that, you know, if I had

20    highlighted, we would talk about.  But let's move on.

21         Why don't we do this:  Give me again your

22    purpose in sending this thing, in sending -- your

23    purpose in sending the October 30 memo -- or e-mail, I

24    should say.

25     A    My purpose in sending this was to clarify

1    that I had not found anything that would give any

2    definition -- any definitive answer with respect to

3    whether they could do this stuff.  Let me rephrase

4    that.  To whether they could make these loans.

5         Q     Okay.  And you also reiterate in there --

6              MR. POLLACK:  Give myself one more shot to

7    find this, and then I'm going to give up.

8              THE COURT:  Well, we started at 9:30.  You

9    about finished or not?

10             MR. POLLACK:  I'm getting very close, Your

11   Honor.

12             THE COURT:  The reason I was asking is I

13   was going to take -- we'll go ahead and take a morning

14   recess.  We'll do that, and you can look for that

15   while we're doing that.

16             You can just take your pad with you,

17   Ladies and Gentlemen.

18             MR. POLLACK:  Thank you, Your Honor.  I

19   appreciate that.

20             (The jury exited the courtroom, after

21             which the following proceedings were had:)

22             THE COURT:  All right.  We'll take a

23   recess for twenty minutes.

24             MR. POLLACK:  And --

25             THE COURT:  Yes.

1              MR. POLLACK:  -- am I correct that the

2    attorneys are permitted to speak to a witness if the

3    witness is willing to chat with me?

4              THE COURT:  Sure.

5              MR. POLLACK:  Okay.

6              THE COURT:  He can ask you if you talked

7    to him.  It's been that way forever.

8              MR. POLLACK:  Yeah.

9              THE COURT:  All right.

10             (Recess.)

11             (The jury entered the courtroom, after

12             which the following proceedings were had:)

13             THE COURT:  All right.  I remind you,

14    Mr. Kavan, you're under the same oath you took earlier

15    today.

16             THE WITNESS:  Yes, Your Honor.  Thank you.

17             THE COURT:  All right.  Mr. Pollack.

18             MR. POLLACK:  Thank you, Your Honor.

19

20             CROSS-EXAMINATION CONTINUED

21    BY MR. POLLACK:

22        Q    Okay.  Government Exhibit 104.  I want to

23    ask you about the middle paragraph.  This is the

24    e-mail you send out October 30, 2006, correct?

25        A    Right.

1          Q      And you say, We're currently researching
2     whether there is a state that has some guidance with
3     respect to escrow arrangements and perhaps extrapolate
4     these statutes into some level of comfort that that
5     particular state's laws would apply to you and, as
6     such -- and, as such, be a state in which to conduct
7     your activities.
8               Do I understand correctly that what you're
9     saying there is you're looking for whether there is
10    some state that he might operate in that gives clear
11    guidance than anything that you found to date as of
12    October 30?
13         A      That is correct.
14         Q      And you're not sure if these are escrow
15    agreements, but you want to extrapolate from the law
16    governing escrow agreements to see if you can find
17    some guidance?
18         A      That's correct.
19         Q      And, in fact, a few lines later what you
20    recommend to him is that he treat the QI
21    funds somewhat -- in somewhat the same manner as an
22    escrow agent.
23         A      That's what it says.
24         Q      You're not advising him that he is an
25    escrow agent and that he has to comply with all escrow

1     agent governing regulations.

2          A     That's a correct statement.

3          Q     A couple lines after that, and this is, I

4     think, a line that Mr. Dry asked you about, you say,

5     Even though there's no prohibition, since there's

6     nothing that specifically allows it, you are very much

7     at risk.

8               MR. POLLACK:  Up a couple lines.  It says,

9     "You are very much at risk."  There we go.

10    BY MR. POLLACK:

11         Q     And I want to make clear on this.  You had

12    said that your October 9 memo had nothing to do with

13    criminal law, correct?

14         A     Correct.

15         Q     When you say "you are very much at risk,"

16    you're not advising him that you're at risk of doing

17    something criminal, right?

18         A     Civil liability, at risk for civil

19    liability.

20         Q     And not advice regarding criminal

21    liability?

22         A     We didn't do any inquiry with respect to

23    criminal law.

24         Q     And then after you send him this -- excuse

25    me.

1              After you send him this e-mail on October

2    30 reiterating once again that you haven't found a

3    specific prohibition, do you have any further

4    communications after that with Mr. Okun on the subject

5    of what is or is not permissible for a qualified

6    intermediary to do with its funds?

7         A    I don't believe so.

8              MR. POLLACK:  Okay.  Thank you, Mr. Kavan.

9    I don't have anything further.

10             THE COURT:  Cross-exam -- redirect

11   examination?

12             MR. DRY:  Very briefly, Your Honor.

13             Government Exhibit 104, please, the middle

14   paragraph right where Mr. Pollack highlighted.

15

16                  REDIRECT EXAMINATION

17   BY MR. DRY:

18        Q    Mr. Pollack had you read, As I also

19   advised you at the time, you need to treat --

20             THE COURT:  Wait a minute now.  Get it up,

21   get your voice up, and don't read so fast.  The court

22   reporter is really quite talented.

23   BY MR. DRY:

24        Q    Mr. Pollack had referenced in his

25   cross-examination, "As I also advised you at the time,

1    you need to treat these funds in somewhat the same

2    manner as an escrow agent," and then he had you stop

3    reading.  Can you continue that sentence, sir?  I had

4    one question about that.

5         A    And -- the continuation of that is, And be

6    cognizant of the fact that these funds are the

7    property of the parties for which the accommodator is

8    holding these funds.

9         Q    When you say "the parties for which the

10   accommodator is holding these funds," who are those

11   people?

12        A    The people who had sold properties and

13   given money to the accommodators -- to the

14   accommodator pending the purchase of another property.

15        Q    So the property is the client's money, is

16   that what you're saying?

17        A    That's correct, yes.

18             MR. DRY:  Nothing further.

19             THE COURT:  Can Mr. Kavan be excused

20   permanently?

21             MR. DRY:  He can from the United States,

22   Your Honor.

23             THE COURT:  How about you, Mr. Pollack?

24             MR. POLLACK:  Yes, Your Honor.

25             THE COURT:  Mr. Kavan, thank you for being

1    with us and giving us your evidence.  You're excused

2    and free of your subpoena.

3              THE WITNESS:  Thank you, Your Honor.

4              (Witness excused.)

5

6                    *  *  *  *  *  *  *  *

7

8                    TODD PAJONAS,

9         having been sworn, testified as follows:

10

11                    DIRECT EXAMINATION

12   BY MR. DRY:

13        Q     Please state your full name for the

14   record.

15        A     Todd Pajonas.

16        Q     And how do you spell that, sir?

17        A     Todd, T-O-D-D.  Last name Pajonas,

18   P-A-J-O-N-A-S.

19        Q     And, sir, you -- where do you currently

20   live?

21        A     I live in Easton, Connecticut.

22        Q     And what is your educational background?

23        A     I have a bachelor's degree and a law

24   degree.

25        Q     And when did you first become involved in

1    the 1031 industry?

2         A    Back in 1999.

3         Q    And when did you -- did you eventually

4    start a qualified intermediary company called Security

5    1031 Services?

6         A    I did.

7         Q    And when was that?

8         A    It was very late in 2004.

9         Q    And did you eventually sell -- first of

10   all, Security 1031 Services, is that known by an

11   acronym?

12        A    Yes.  It was sometimes known as SOS 1031.

13        Q    Or just SOS for short?

14        A    Right.

15        Q    When did you sell SOS?

16        A    November 15, 2005.

17        Q    And prior to -- who did you sell the

18   company to?

19        A    I sold it to the 1031 Tax Group.

20        Q    And who owned 1031 Tax Group?

21        A    Edward Okun.

22        Q    Prior to the sale, how did SOS handle

23   client exchange funds, prior to your sale to Mr. Okun?

24        A    All funds were deposited in separate,

25   segregated escrow accounts.

1          Q      Where at?

2          A      They were deposited with -- always with a

3     bank, mainly with Citibank.

4          Q      During your ownership of Security 1031

5     Services prior to the sale, were client exchange funds

6     ever used for anything other than a client exchange?

7          A      No.

8          Q      Why not?

9          A      Well, because they were client money and,

10    you know, they belonged to the client and they were to

11    be used to buy their replacement property.

12         Q      Did you typically enter into exchange

13    agreements with the clients?

14         A      Always.

15         Q      And what did those exchange agreements

16    tell the clients regarding how their money would be

17    held?

18         A      It told them that they would be kept in a

19    separate, segregated escrow account, and many times it

20    listed the banks that we were able to deposit the

21    monies into.

22         Q      How did you meet Edward Okun?

23         A      I met him through Lara Coleman.

24         Q      And when you first spoke to Ms. Coleman

25    about -- about your company, what -- or about -- what

1    did Ms. Coleman initially ask you to do?

2         A     She -- she wanted to hire me on behalf of

3    the 1031 Tax Group to run Atlantic Exchange, which she

4    had advised me, you know, that the 1031 Tax Group had

5    purchased a few months prior.

6         Q     And did she tell you who owned 1031 Tax

7    Group?

8         A     Edward Okun.

9         Q     At the time -- do you -- what was your

10   response to Ms. Coleman?

11        A     I told her that I had started my own

12   company.  She thought that I still worked for a prior

13   employer, and I told her that I had started my own

14   company, you know, roughly a year prior and that I was

15   happy with what I was doing, I was happy being

16   independent, and, you know, I appreciate the offer

17   but -- but no.

18        Q     Did you subsequently have another

19   conversation with Ms. Coleman?

20        A     I did.

21        Q     And what did she say?

22        A     She said that she informed Edward Okun

23   that I owned a qualified intermediary and that that

24   was even better, that, you know, he might have an

25   interest in buying Security 1031 as well.

1      Q      And did you subsequently have a discussion

2    with Mr. Okun about the sale around that same time?

3      A      Yes, I did.

4      Q      And this is all in the fall of 2005?

5      A      That's right.

6      Q      Describe for the members of the jury the

7    purchase negotiations between you and Edward Okun for

8    SOS.

9      A      Sure.

10          One of my first conversations was with

11   Lara Coleman when we were discussing, you know, the

12   desire of Edward Okun to purchase Security 1031.  And,

13   you know, she said that Ed was very happy that I owned

14   a qualified intermediary and that, you know, he would

15   like to buy the company.  And then there was a

16   subsequent call where Mr. Okun was on the phone with

17   me and, you know, I had a conversation with him saying

18   that, you know, the company was only a year old and,

19   you know, I didn't think that it was time to sell; the

20   company hadn't achieved a value that I thought, you

21   know, somebody would want to buy it for for what I

22   wanted to sell it.  And --

23     Q      What did he say in response?

24     A      Well, he said, When -- you know, we had a

25   conversation about when I would want to sell it, and I

1    basically said, you know, in about two/three years the

2    company would have a value, as an ongoing concern,

3    that I think, you know, somebody would pay me what I

4    think I would want to sell it for.  And he said, What

5    do you think that it would be worth in three years'

6    time?  And I said, I think that the company would be

7    worth approximately $3 million.  And he said, Done.

8    I'll buy it from you now for $3 million.

9         Q    That was after you told him that you

10   didn't think it was worth $3 million at that time?

11        A    Right.  And part of -- part of the

12   conversation was that not only did he want my company,

13   but a large part of the conversation was that he

14   wanted to buy my services; that buying my company was

15   part of buying my services.  That was part of it.  He

16   wanted me to run Atlantic Exchange and now combine it

17   with my company.

18        Q    What role were you going to have at -- you

19   were going to be an executive at 1031 Tax Group; is

20   that correct?

21        A    Right.  I was president of 1031 Tax Group,

22   which owned Security 1031 and Atlantic Exchange.  But

23   1031 Tax Group at that point wasn't a brand, wasn't

24   the, you know, the brand that was used for the public.

25   Security 1031 and Atlantic Exchange were still the

1    qualified intermediaries that were in use.

2         Q    So when you say that, you mean that the

3    exchange agreements or a client would -- their

4    contracts would say Atlantic Exchange Company or

5    Security 1031 Services?

6         A    That's right.

7         Q    Okay.  During the purchase negotiations

8    with Okun, you're going to be the president of both

9    AEC and SOS; is that correct?

10        A    That's correct.

11        Q    And what was your understanding -- were

12   there any discussions regarding the use of AEC's

13   client funds?

14        A    None.  I mean, to the extent that, you

15   know, they were -- they were in separate, segregated

16   escrow accounts.

17        Q    That was your understanding?

18        A    Absolutely.

19        Q    What was your understanding of how

20   Mr. Okun was going to pay for SOS, the $3 million?

21        A    I mean, I knew him -- or at least at this

22   point, my due diligence, you know, he owned a lot of

23   real estate, and I just assumed that, you know, he had

24   the wherewithal to buy my company.

25             THE COURT:  You said in your question

1    whether there was any discussion of the use of AEC

2    client funds.  Did you mean AEC client funds?

3                    MR. DRY:  Yes, Your Honor.

4    BY MR. DRY:

5         Q     These purchase negotiations are in

6    approximately October/November of 2005; is that

7    correct?

8         A     They were definitely in October, possibly

9    September, but definitely September/October.

10        Q     And Mr. Okun -- you knew that Mr. Okun had

11   bought AEC sometime before he was in purchase

12   negotiations for SOS?

13        A     That's right.  That was part of the reason

14   why it was stated he wanted to hire me; he was unhappy

15   with the current management of Atlantic Exchange and

16   wanted me to assume control of the company.

17        Q     And so you're going to be the president of

18   both AEC and SOS?

19        A     That's right.  And I become president of

20   Atlantic Exchange before -- approximately a month

21   before he buys Security 1031.

22        Q     Okay.  At the time that you buy -- or

23   Mr. Okun buys Security 1031 Services, SOS, how much

24   money in exchange funds, approximately, was SOS

25   holding?

1        A       It was approximately $40 million.

2        Q       And during the purchase negotiations, did

3    you explain to Okun how SOS currently held the

4    pre-existing client exchange funds?

5        A       Yes, there was a conversation about that.

6        Q       What was the substance of that

7    conversation?

8        A       A large part of it, you know, centered

9    around our relationship with -- with a different bank.

10   So I let him know that as part of the business of

11   being a qualified intermediary, the deposits were very

12   important to us because in addition to the interest

13   that's earned on the accounts, which is part of the

14   profit of a qualified intermediary, also a big part of

15   the business is how you can market, and depositing the

16   monies with various banks was the way that they would

17   cooperate with us.  If I had $40 million with

18   Citibank, they would let us use their conference rooms

19   and things like that and invite their clients and

20   expose them to our services.

21             So there was a big conversation about how

22   we held the money.

23       Q       Okay.  What did Okun tell you about how

24   AEC was holding its clients' money?

25       A       Well, it was represented to me by Okun and

1    Coleman when I went to the Boston office of Atlantic

2    Exchange, I met Lara Coleman there, and I was shown

3    documents -- Atlantic Exchange Company documents which

4    showed various amounts of monies that were supposedly

5    on deposits -- on deposit with various banks Atlantic

6    Exchange dealt with.

7         Q    Just to be clear, were these bank

8    documents, or were these internal AEC documents you

9    were shown?

10        A    They were internal AEC documents.  They

11   were records of the various exchanges and their

12   accounts.

13        Q    As you're in purchase negotiations with

14   Mr. Okun regarding SOS, was there any discussion with

15   Mr. Okun about using SOS clients' exchange funds for

16   anything other than funding client exchanges?

17        A    No, never.  The subject never came up.

18        Q    I'd like to show you what's previously

19   been marked as Government's Exhibit 18A.

20             MR. DRY:  This has not been admitted at

21   this time.

22   BY MR. DRY:

23        Q    What is this?

24        A    This is a stock purchase agreement for the

25   sale of Security 1031 to the 1031 Tax Group.

1        Q        And what is the date of this?

2        A        It's November 15, 2005.

3        Q        Okay.  And turning to page 8 of this

4   document --

5                 MR. DRY:  It's actually going to be 9 on

6   ours.  Sorry.

7                 Okay.  And zooming in on the closing

8   obligations, please.

9                 First of all, can I -- I'd like to admit

10  this exhibit into evidence at this time.

11                THE COURT:  Any objection?

12                MS. GRADY:  No, sir.

13                MR. DRY:  Please publish it to the jury.

14                If you could, go down a little bit.

15  BY MR. DRY:

16       Q        Sir, this -- the following amounts -- turn

17  your attention to B(i).  You were to receive $2.4

18  million personally from the sale?

19       A        That's correct.

20       Q        And who was Regal?

21       A        Regal was an entity that was a --

22  basically a passive investor in Security 1031.

23                MR. DRY:  Okay.  And turning to --

24  actually, that's fine.

25                I'm done with that exhibit.  Thank you.

1    BY MR. DRY:

2         Q    You closed on the transaction on November

3    15.  After the sale, initially, how did things work at

4    SOS operationally as far as the bank accounts, funding

5    exchange clients, things like that?

6         A    Initially at SOS, really, nothing changed

7    at all.

8         Q    And how about for AEC, how were AEC's

9    client exchanges handled?  Who was doing that?

10        A    AEC's client funds were handled out of the

11   Richmond office of IPofA and controlled by Lara

12   Coleman and Edward Okun.

13        Q    Did you have access to the bank accounts

14   for AEC's client exchanges?

15        A    I did not have access to any bank account

16   information, bank statements, or anything like that at

17   all.

18        Q    Okay.  Did there come a point in time when

19   SOS client money was used to fund the client exchanges

20   for AEC's client closings?

21             MS. GRADY:  I'm going to object.  He has

22   no foundation.  He indicated he has no finances -- no

23   access to the finances.  He has no foundation to

24   answer this question.

25             MR. DRY:  That's inaccurate, Your Honor.

1    I'm asking him -- he had access to SOS -- he was the

2    president of SOS.  I asked him how SOS client

3    exchanges were handled, and now I'm asking him was

4    there a point in time where they utilized SOS client

5    funds to pay for AEC's client exchanges.

6            MS. GRADY:  But he indicated he doesn't --

7    maybe I need to hear the question again, Judge,

8    because it sounds like he's going outside of what he

9    knows.  Maybe I'll listen to the question again.

10           THE COURT:  Do you want to ask it again,

11   see if we can eliminate this?

12           MR. DRY:  Sure.

13           THE COURT:  If it needs eliminating.

14   BY MR. DRY:

15       Q    Did there come a point in time when you,

16   as president of SOS, effectuated or used or directed

17   the use of client exchange funds of SOS to fund AEC's

18   client closings?

19       A    Yes.

20           MS. GRADY:  The nature of my objection,

21   and I move to strike that, is he's not president of

22   AEC.  He doesn't know, if money went to AEC, what it

23   went for so he has no foundation, and I object to the

24   question.

25           THE COURT:  Overruled.

1    BY MR. DRY:

2          Q     When was that, sir?

3          A     It was late in January of 2006.

4          Q     How did that come about?

5          A     I received a call from Edward Okun who

6    advised me that Lara Coleman was unavailable, because

7    at this point all Atlantic Exchange closings were

8    being handled by the Richmond office, and that she was

9    unavailable to send a wire out to fund a closing for

10   Atlantic Exchange and that people were sitting at the

11   closing table, there was a closing happening at that

12   moment, and that money needed to be wired out to make

13   that closing happen.

14         Q     What was -- what was your understanding of

15   the reason SOS needed to use its money to fund AEC's

16   client exchanges?

17               MS. GRADY:  I'm going to object, unless he

18   has personal knowledge, Your Honor.

19   BY MR. DRY:

20         Q     Did Mr. Okun --

21               THE COURT:  Yeah, I think the question is,

22   What did Mr. Okun tell you, if anything, about why

23   that was necessary?

24               THE WITNESS:  That Lara Coleman was the

25   only one who could sign off on the withdrawal or the

CHANDLER and HALASZ, INC.
(804)730-1222

1    wire to send out, and since she was unavailable and

2    people were at the closing, the money had to come from

3    somewhere to fund the closing.

4    BY MR. DRY:

5        Q       Now, SOS client exchanges -- exchange

6    agreements required client money to be held at a

7    specific bank, correct?

8        A       That's correct.

9        Q       In segregated escrow accounts?

10       A       That's correct.

11       Q       And now you're going to transfer some of

12   that client money out of those segregated accounts to

13   use that for a completely different exchange for a

14   different company; is that correct?

15       A       That's what happened.

16       Q       Were you comfortable with that at the

17   time?

18       A       I wasn't -- I wasn't comfortable with it

19   at all.

20       Q       What did -- what was your understanding of

21   how quickly the money would be returned?

22       A       It was going to come right back.  It was

23   going to come back as soon as Lara Coleman became

24   available again.

25       Q       If you were not comfortable about doing

1    it, why did you do it?

2         A     Well, people are sitting at a closing and,

3    you know, a closing's a big deal.  There's, you know,

4    attorneys there, title company, bank, and there's

5    consequences if you don't, you know, fund a closing.

6    There could be penalties and loss of reputation to the

7    company.  So as long as I knew that that money was

8    sitting in a bank account with Atlantic Exchange, in

9    my mind, it was a rationalization that the money

10   didn't technically leave the company.

11        Q     What happened -- was the money returned?

12        A     No, it wasn't.

13        Q     What happened next?

14        A     Lara Coleman became unavailable for, you

15   know, several weeks, and we were continually called

16   upon to fund additional Atlantic Exchange closings.

17        Q     When you're saying "continually called

18   upon," who's calling upon you to keep doing these

19   transfers of SOS client funds for AEC?

20        A     Edward Okun.

21        Q     And while you're doing this, what is your

22   understanding of when the money is going to be coming

23   back to SOS?

24        A     As soon as Lara comes back, the money's

25   going to be wired over and we're going to redistribute

1    it into the various segregated escrow accounts.

2          Q      As the president of SOS, why didn't you

3    just transfer the money or have one of your executives

4    transfer the money yourself from AEC's client accounts

5    to fund the AEC closings?  As the president of AEC.

6    I'm sorry.

7          A      Right.  Because I was not -- I did not

8    have access to the lending exchange funds.  It was

9    supposedly something that was going to happen but did

10   not happen at that point, and I had no access to those

11   funds.  I was not a signor on the account.

12         Q      Approximately, on a percentage basis, how

13   much of SOS's client exchange funds that you were

14   holding did you transfer for AEC's client -- or

15   closings in this time frame?

16         A      I'd say out of the $40 million, it was at

17   least $20 million.

18         Q      Did this cause you concern?

19         A      Yes.  Yes.  I was very concerned.  I

20   was -- I was -- you know, I was uncomfortable with the

21   first transfer, and I became increasingly

22   uncomfortable with each subsequent transfer.

23         Q      Did you discuss your concerns with

24   Mr. Okun?

25         A      Absolutely.

1      Q      When?

2      A      I mean, I -- at every -- I don't think I

3  ever sent out any money without a very long

4  conversation about how I was very uncomfortable with

5  extracting a promise of when this money was going to

6  come back.

7      Q      Did you ask Mr. Okun to be provided with

8  access to the Wachovia -- or to the bank accounts of

9  AEC?

10      A      Yes.  And, you know, supposedly that was

11  all going to be in the works and there was going to be

12  documents drawn up to do that, but right now we had

13  this situation to deal with so, you know, let's get

14  through it and we'll worry about, you know, giving you

15  access to that when Lara Coleman comes back.

16      Q      This was in January of 2006?

17      A      That's right.

18      Q      Ultimately, did you have a conversation

19  with Mr. Okun in which he informed you that the money

20  was not sitting in AEC's bank accounts?

21      A      That's right.

22      Q      Describe that for the jury, please.

23      A      I guess -- I shouldn't say "I guess."

24              There came a point where we had a

25  conversation where they were requesting more money

1    again, and now it had gotten to a significant portion

2    of the funds that were out there.  And the money that

3    was used, was being requested for the first time, was

4    a transfer directly to IPofA, Investment Properties of

5    America.

6            So before that -- that time, it was always

7    easy to rationalize that these monies were going to

8    fund a closing.  This was the first time that they

9    asked me to move the money to Investment Properties of

10   America for something other than the closing of an

11   exchange fund.

12       Q    What were you told this -- what were you

13   told?

14       A    Well, at this point, you know, some of

15   what was going on was made clear to me, which was

16   that --

17            MS. GRADY:  I'm going to object, unless he

18   has a source, Your Honor.

19   BY MR. DRY:

20       Q    Who told you?  Is this all in your

21   conversation with Mr. Okun?

22       A    This is in my conversation with Edward

23   Okun.

24       Q    This is in, approximately, January of

25   2006?

1       A       That's right.  I would say at this point

2    it's January/February of 2006.

3       Q       And I'm going to show you Government's

4    Exhibit 22.

5               MR. DRY:  It's not been admitted into

6    evidence at this time.

7    BY MR. DRY:

8       Q       Does this refresh your recollection about

9    the time frame of your conversation with Mr. Okun?

10      A       Yes, absolutely.

11      Q       What time was --

12      A       This is January 31 of 2006.

13      Q       And do you think that your conversation

14   with Mr. Okun -- this conversation occurred at or

15   around this day?

16      A       This conversation took place on -- on --

17   on that date.

18      Q       Okay.  Just to be clear, Mr. Okun's

19   asked -- Mr. Okun's asked you to transfer money

20   directly to IPofA instead of just for an AEC closing,

21   correct?

22      A       That's correct.

23      Q       And what does he tell you the reason is

24   for this transfer?

25      A       Well, for the first time, he's advised me

1    that the bulk of the Atlantic Exchange if not all the

2    Atlantic Exchange monies are invested in commercial

3    real estate that's owned by IPofA, and, you know, a

4    portion of now the Security 1031 monies are to be used

5    to further invest in IPofA property.

6         Q     And what was your reaction to that?

7         A     I -- I was extremely upset.  I told him

8    that the exchange agreements didn't provide for this

9    and that I was, you know, completely uncomfortable

10   with that and basically, you know, very upset that I

11   had been lied to.

12        Q     Did you make any statements to Mr. Okun

13   regarding whether the clients would have approved of

14   this?

15        A     Yeah.  I mean, part of -- it was a long,

16   somewhat acrimonious conversation, and I told him that

17   the exchange agreements didn't provide for this and,

18   you know, that that -- that they didn't provide for

19   being invested in real estate and that, you know, in

20   effect, he was making the exchange clients unwitted

21   investors in his real estate projects.

22        Q     How did Okun justify what he was doing to

23   you in this conversation?

24        A     I mean, basically what he stated was that

25   they were working on the sale of a mall in Houston

1    called the West Oaks Mall and that that project had

2    been delayed because of a combination of funding

3    problems and structuring problems and that this

4    property should have been sold already.  And since it

5    was running behind, they were -- there were capital

6    calls and needs for additional monies and that if I

7    did not send this $5 million, the banks would

8    foreclose on the property and all the monies that had

9    been invested, the Atlantic Exchange monies and now

10   part of the Security 1031 funds, that was all going to

11   evaporate and the clients would get nothing.

12        Q     Did Mr. Okun tell you anything about

13   receiving legal advice about the permissibility of

14   this?

15        A     That was a big part of the conversation as

16   well.  It was -- I was informed that there was a legal

17   opinion from Stephen Burr of Foley and Lardner that

18   had been prepared, and I knew, you know, the firm was

19   a big firm, that had been prepared saying that it was

20   okay for the exchange funds to be used in this

21   fashion.

22             MR. DRY:  I'd like to admit Government's

23   Exhibit 22 at this time.

24             THE COURT:  Any objection?

25             MS. GRADY:  I do have an objection, Judge.

```
 1                    THE COURT:  All right.  What's the
 2      objection?
 3                    MS. GRADY:  It's not authored by Mr. --
 4                    THE COURT:  It's not what?
 5                    MS. GRADY:  It's not authored by
 6      Mr. Pajonas.  And maybe I missed it, but I didn't
 7      think he authenticated that.
 8                    THE COURT:  So the objection is to
 9      authentication, is that what your point is?
10                    MS. GRADY:  No, to this being the right
11      witness to have this document come in through, Judge.
12                    MR. DRY:  Your Honor, he received it.
13      It's been stipulated to as to authenticity.
14                    MS. GRADY:  But this witness is not the
15      competent witness to introduce this through.
16                    THE COURT:  You say he received the
17      document?
18                    MR. DRY:  Yes, sir, Todd@SOS1031.com.
19                    THE COURT:  Objection overruled.
20      BY MR. DRY:
21          Q    Mr. Pajonas -- like to publish that to the
22      jury -- did you receive this e-mail?
23          A    I did.
24          Q    And who sent it to you?
25          A    It was sent by Lara Coleman.
```

1    Q    And who's on the cc line, sir?

2    A    MichiganAce is Edward Okun.

3    Q    And, sir, to the best of your

4  recollection, is this the first $5 million that you

5  were going to send of SOS's client exchange funds to

6  IPofA?

7    A    Yes.  This is the -- this is the first

8  time any funds are going to IPofA.

9    Q    Okay.  Did you eventually send that money?

10   A    I did.

11   Q    Turning your attention -- this has not

12  been -- okay.  Turn your attention to Government's

13  Exhibit 28.

14        MR. DRY:  It's not been admitted into

15  evidence.

16        Like to move for the admission of

17  Government's Exhibit 28.

18        THE COURT:  Any objection?

19        MS. GRADY:  I need to see what it is,

20  Judge.

21        No objection, Your Honor.

22        THE COURT:  It's admitted.

23        MR. DRY:  Okay.  If we could go to the --

24  to the top.

25        Actually -- I'm sorry.  That's Mr. Okun's

1    forwarding it to Ms. Coleman.  Mr. Pajonas' --
2    BY MR. DRY:
3         Q    Sir, did you send this e-mail to Mr. Okun?
4         A    I did.
5         Q    In the e-mail you refer to big money
6    issues.  What's that in reference to?
7         A    The bottom line is is that, you know, as
8    part of an intermediary, money comes in, goes on
9    deposit and then goes out to buy real estate.  And at
10   this point, because we funded Atlantic Exchange
11   closings and paid this $5 million to IPofA, we don't
12   have a lot of money on deposit to cover impending
13   closings for, you know, Security 1031 closings that
14   are coming up.
15        Q    If you go on, "We're going to need Roy
16   ASAP."  Who's Roy?
17        A    Roy was a person who was explained to
18   me --
19        Q    By who?
20        A    -- by Edward Okun that was basically a --
21   a mezzanine financier, a person who you can borrow
22   money from.  You know, Roy was somebody who was used
23   by Ed Okun, to me, as a security blanket; that he was
24   better than a bank because you could, you know, pledge
25   your property and get money from him within several

1   days.

2          And the reason why this comes up is

3   because he says, I have a lot of equity in my various

4   properties.  And I say -- you know, having some

5   knowledge of the way loans work -- it takes a long

6   time to get a commercial loan.  He says, I can get a

7   loan from Roy in, you know, three, four, five days.

8   It's better than a bank.

9          Q    Okay.  Turn your attention to Government's

10  Exhibit 33.

11         MR. DRY:  Like to admit Government 33 into

12  evidence, please.

13         THE COURT:  Any objection?

14         MS. GRADY:  I'm trying to get it, Your

15  Honor.

16         I just have an objection to this second

17  half of the --

18         THE COURT:  You object to what?

19         MS. GRADY:  The second half, Your Honor.

20         THE COURT:  What, you mean the second

21  page?

22         MS. GRADY:  Yeah.  No, I -- I'll withdraw

23  that.  This is fine, Judge.

24         THE COURT:  Okay.  That's admitted.

25         MR. DRY:  Going to the top e-mail,

1    Mr. Pajonas' e-mail.  Right there.  The date's

2    significant.

3    BY MR. DRY:

4         Q    Please read the date of this e-mail.

5         A    It's March 23, 2006.

6         Q    And if could you just read this e-mail for

7    the members of the jury, please.

8         A    I just received word that we will have a

9    wire going out on Friday in the amount of $6 million.

10   That brings our wire total this week to 8 million and

11   would bring our reserves below 10 million, a dangerous

12   level.  We now desperately need the $8 million ASAP

13   and probably a little more depending on how fast the

14   money from the notes gets going.  Based on a 10- to

15   14-day time for the notes, I now estimate we need $15

16   million.  But in all events, we need the $8 million

17   today/tomorrow otherwise we are staring into an empty

18   vault.

19        Q    I'm sorry.  What was your purpose in

20   sending this e-mail?

21        A    It was to ring the fire alarm -- fire bell

22   that, you know, we don't really have enough -- we know

23   that there's impending closings, we know there's going

24   to be requests for money coming out, and we're getting

25   to the point where we have almost no money -- you

1    know, after this money goes out, we'd have almost no

2    money left to cover any additional withdrawals coming

3    in.

4              MR. DRY:  I'd like to now show the witness

5    Government Exhibit 35.

6    BY MR. DRY:

7         Q    Sir, this middle e-mail, is that from you?

8         A    That's correct.

9         Q    And is that to Lara Coleman?

10        A    It's to Lara Coleman and Barry Powlishen.

11        Q    And the top e-mail, that's forward to

12   Mr. Okun?

13        A    That's correct.

14             MR. DRY:  I'd like to move for the

15   admission of Government's Exhibit 35, please.

16             MS. GRADY:  I have no objection, Your

17   Honor.

18             Part of the problem is they never told us

19   what exhibits, and there's hundreds of them.  So I --

20   it just takes me a minute.

21             I have no objection.

22             THE COURT:  I don't think anybody said

23   anything about you.

24             Why don't you have them all committed to

25   memory?

1          MS. GRADY:  I don't know why I don't,

2     Judge.  I just don't have enough time in my day, I

3     guess.

4          MR. DRY::  Going to have you read this

5     entire -- but the middle e-mail, in this middle

6     e-mail, the first part, all of it's in caps, but you

7     say, We're now relying on luck to get us to the $8

8     million boat money.

9          What do you mean by "the $8 million boat

10    money"?

11    A     Well, because we basically have almost no

12    money on deposit at this point.  I'm having constant

13    conversations with Edward Okun saying, you know, how

14    were we going to get some money in, and this is that

15    he's informed me that he's going to get out an equity

16    loan from Wachovia Bank on his yacht in the amount of

17    $8 million.

18    Q     And your second to last sentence, "We are

19    much worse off than when I last rang the alarm bell,"

20    are you trying to convey at this time your concerns to

21    Mr. Okun, sir?

22    A     Absolutely.  In short order it's become

23    the daily topic.  Every day I'm talking about being

24    concerned that, you know, this money's been used and

25    invested in real estate, it's not liquid, and, you

1    know, at points, by the very nature of our business,

2    we need the money back.

3         Q     Okay.?

4               MR. DRY:  Like to move for -- I'd like to

5    show the witness Government Exhibit 36, please.

6               Move for the admission of Government

7    Exhibit 36.

8               MS. GRADY:  I have no objection, Judge.

9               THE COURT:  Admitted.

10   BY MR. DRY:

11        Q     Okay, sir.  Just -- you've had a chance to

12   review this e-mail before your testimony today?

13        A     Yes.

14        Q     Turning your attention to the bottom

15   e-mail.  Actually, page 2, I'm sorry, the middle

16   e-mail.

17               What is in -- this in reference to?

18        A     I received an e-mail from Lydia Renka, who

19   was a bookkeeper at IPofA, and out of the blue I

20   received an e-mail where she's requesting money to be

21   wired to IPofA.

22        Q     And what was your reaction to that?

23        A     I was -- I was really upset when I

24   received this.  I mean, now it's -- it's like -- it's

25   become so commonplace to ask for money that now the

1    bookkeeper's asking me for money.  You know, I was

2    trying to convey each time that this was a big deal,

3    and now it's gotten to the point where, you know, that

4    I don't even get an explanation from Ed Okun.  I'm

5    getting his bookkeeper saying, oh, just wire some more

6    money.

7         Q     Turning your attention to the first page

8    of the e-mail.

9               Okay.  At the bottom, Renka responds to

10   you with cc to Okun, correct?

11              Did you eventually send the $2 million

12   that Renka had requested?

13        A     She -- I believe that she requested

14   $875,000.

15        Q     I'm sorry.  $875,000.  You were expecting

16   2 million --

17        A     Right.  The other big problem with this

18   was that I had been promised back $2 million.  Instead

19   of getting back $2 million, they were requesting,

20   through the bookkeeper, another $875,000.

21        Q     On the top portion of the e-mail you say,

22   The wire has been sent.  Sir, did you have a

23   conversation with Mr. Okun about this particular

24   request?

25        A     Absolutely.  There was never a time that I

1    ever wired money, beginning with the first wire to

2    IPofA, that I did not discuss it personally with

3    Edward Okun.

4         Q    And did you -- did you discuss with him

5    how you were upset that Renka was now requesting the

6    funds?

7         A    Oh, yeah.  I was -- I was really upset

8    about it.

9         Q    And what was his response?

10        A    Don't worry about it.  It's -- it's all

11   being taken care of.  You know, we're going to be

12   selling West Oaks soon, and all this money will come

13   back.  Don't worry about it.

14        Q    Okay.  And was that unusual for him to

15   tell you that?

16        A    That -- I mean, I had the same

17   conversation over and over and over several hundred

18   times maybe.  It was always:  Don't worry.  The

19   money's coming back.

20        Q    I'd like to now show you Government's

21   Exhibit 38.

22             MR. DRY:  Like to move for the admission

23   of Government 38.

24             MS. GRADY:  It's like eight pages long,

25   Judge.  It will just take me a minute.

```
 1              MR. DRY:  If it makes it easier, we can
 2      just admit pages 1 and 2.
 3              MS. GRADY:  I'm sorry?
 4              MR. DRY:  If it makes it easier, we'll
 5      just admit pages 1 and 2.  We don't need all of it
 6      but --
 7              MS. GRADY:  Yeah, that's fine.  I have no
 8      objection, Judge.
 9              THE COURT:  Pages 1 and 2 are admitted.
10      BY MR. DRY:
11          Q    Sir --
12              THE COURT:  So will you remove the rest of
13      the pages from the exhibit?
14              MR. DRY:  Yes, we will, Your Honor.
15      BY MR. DRY:
16          Q    Turning your attention to just the
17      bottom -- actually, just go to the middle e-mail on
18      the front -- first page.  Be actually at the top, your
19      e-mail to Ms. Coleman, Lara Coleman.
20              It says "Lara" there.  Is that Lara
21      Coleman you sent this to?
22          A    That's right.
23          Q    And please read that e-mail.
24          A    I hope we last, no joke.  We are one wire
25      transfer away from oblivion, and I don't think anyone
```

1    understands this.  Even if it works out, which I pray

2    every night it will, this is not the way to do it.  We

3    need some fundamental changes going forward.  We can

4    talk more when we both have more time.  I am preparing

5    for the eight salespeople starting tomorrow.

6         Q     What were -- what was your -- you had a

7    lot of discussions with both Edward Okun and Lara

8    Coleman, correct?

9         A     Multiple times each day generally.

10        Q     And how would you characterize

11   Ms. Coleman -- the number of interactions between

12   Ms. Coleman and Mr. Okun, from your observations?

13        A     It was constant.

14             MS. GRADY:  I don't have any objection.  I

15   was apparently just thinking I was going to have one,

16   Judge.

17             MR. DRY:  I'd like to go to Government's

18   Exhibit 39, please.

19             MS. GRADY:  That's fine, Judge.  No

20   objection.

21   BY MR. DRY:

22        Q     Turning your attention to the middle

23   e-mail from you.

24             MR. DRY:  I'm sorry.  Can you scroll up a

25   little bit, please?

1    BY MR. DRY:

2         Q    It's from you to Mr. Okun and Ms. Coleman.

3              Who was Barry Powlishen?

4         A    Barry Powlishen was the chief operating

5    officer, the COO, of Security 1031 and Atlantic

6    Exchange.

7         Q    In this you're talking about another

8    request.  When you're saying "requesting a minimum of

9    $6.75 million," what do you mean there, sir?

10        A    Well, the e-mail below it is from Wendy

11   Cullivan, and she is one of the exchange coordinators,

12   as we call them, at Atlantic Exchange.  She's the

13   person who does the documents and handles requests for

14   funds.  And what she's doing is -- is, you know, being

15   forwarded in e-mail.  That's letting me know that

16   these are closings that are coming up, and they're the

17   individual exchanges here saying the amounts that

18   they're going to be requesting coming up.

19             So I'm letting them know that roughly

20   $6.75 million is needed to fund each of these

21   individual exchanges sometime next week.

22        Q    When you're saying "this is either or

23   maximum deposit amount or over our maximum amount by a

24   few thousand dollars," what are you trying to convey

25   there?

CHANDLER and HALASZ, INC.
(804)730-1222

1          A      I'm saying that we're probably holding

2     $6.75 million, or possibly even less, meaning that

3     there may not be enough money to fund all of these

4     exchanges.

5                 MR. DRY:  Can you go up in the e-mail,

6     please?

7     BY MR. DRY:

8          Q      This e-mail is from you to -- or from

9     Okun -- Mr. Okun to you, sir?

10         A      That's correct.

11         Q      And in this e-mail he says, I'm supposed

12    to receive the Columbus loan proposal today to close

13    sometime next week.  What was that in reference to?

14         A      There's a property known as Columbus Works

15    in Columbus, Ohio, that IPofA had an interest in and

16    that there was supposedly equity in that, and IPofA

17    was going to borrow against that in order to return

18    some of the money to the qualified intermediary.

19         Q      Sir, you previously testified that

20    Mr. Okun had told you that he was going to pay the

21    client exchange funds back from West Oaks Mall,

22    correct?

23         A      Right.

24         Q      But this one says Columbus Works?

25         A      Right.

1          Q       So did that change over time?

2          A       Yeah, and it continually changed over time

3     at this point.  There was always going to be a

4     different solution, a different source of money.  Not

5     that previous solutions went away.  It was almost like

6     they were additional solutions.  West Oaks at this

7     point was still in the background, potentially, but

8     now Columbus Works was added to that mix.

9          Q      And what time frame were you given for

10    when this money was going to be paid back?  Was it

11    going to be a year from now?  Two years from now?

12         A       No.  It was always short term, that this

13    was just a short-term problem to be fixed; from a few

14    weeks to perhaps a month or so.

15         Q      Did you become -- that was in April of

16    2006.

17               Did you become aware that Okun was

18    considering purchasing another -- a third qualified

19    intermediary in June of '06, sir?

20         A       Yes.

21         Q      Did you have discussions with Mr. -- what

22    qualified intermediary company was that?

23         A       It was NES, National Exchange Services, in

24    San Antonio.

25         Q      I'm sorry.  Before NES, did you have

1    discussion with Mr. Okun regarding Real Estate

2    Exchange Services?

3         A     Yes.  I'm sorry.  Real Estate Exchange

4    Services in Safety Harbor, Florida, we had a

5    conversation about -- well, Edward Okun had identified

6    this qualified intermediary to be purchased, and we

7    had a conversation about purchasing that company.

8         Q     Now, at the time, you're still the

9    president of both AEC and SOS?

10        A     That's correct.

11        Q     And he comes to you and says I'm thinking

12   about buying another qualified intermediary?

13        A     That's correct.

14        Q     And he identifies REES?

15        A     That's right.

16        Q     That's -- Real Estate Exchange Services,

17   the acronym is typically REES?

18        A     Right.  We would refer to it as REES,

19   R-E-E-S.

20        Q     And what did you tell Mr. Okun about

21   whether, as the president of the QI companies, whether

22   he should buy REES?

23        A     I had no -- I said that we should have no

24   interest in purchasing this company.  It was an

25   extremely small company, less than $15 million of

```
 1    deposit.  It was a, you know, a mother and son.  I had
 2    done some research and looked on the Web site.  You
 3    know, it seemed like a -- you know, not to denigrate
 4    them, but it was a real mom-and-pop operation that I
 5    didn't think was something that we could build on.
 6    Plus, their deposits didn't really make sense.
 7              We also had people in Florida at that
 8    point.  It was overlapping.  So I saw no reason to buy
 9    them.
10         Q    And what did Okun say to you in response?
11         A    I agree.
12         Q    So at that time frame was it your
13    understanding he was going to buy Real Estate Exchange
14    Services?
15         A    It was my understanding that the deal was
16    dead.
17         Q    Okay.  To the best of your recollection,
18    when did you actually find out that Mr. Okun had
19    purchased REES?
20         A    In the very beginning of October, maybe --
21    it was very late September, the beginning of October.
22         Q    So you were the president of the company
23    of -- was it your understanding you were supposed to
24    be the president of all of the QI companies that 1031
25    Tax Group/Ed Okun owned?
```

```
 1          A       Absolutely.  That was my job description.

 2          Q       And so he bought REES in June, but you

 3     didn't find out about it until October; is that

 4     correct?

 5          A       Right.  I had specifically advised not to

 6     buy it.

 7          Q       But you were involved in the acquisition

 8     of National Exchange Services, correct?

 9          A       That's correct.

10          Q       Was that another -- was that in June 2006

11     as well?

12          A       I believe it was somewhere around that

13     time.

14          Q       Where was -- National Exchange Services,

15     the acronym for that is NES?

16          A       NES.

17          Q       Where was NES located?

18          A       They were based in San Antonio, Texas.

19          Q       And why were you assisting Mr. Okun in

20     purchasing another qualified intermediary company,

21     given what had occurred before?

22          A       Well, we had a lot of conversations about

23     this.  And, you know, firstly, what was explained to

24     me was that the reason why they're requesting so much

25     money from the qualified intermediaries was because
```

1    basically there had been some issues with the West

2    Oaks offering and that this wasn't the way it was

3    supposed to work.  However, these delays would end and

4    the money would come back.  That being said, we needed

5    a stopgap measure to increase the amount of money that

6    we were -- that we were holding.

7             So, basically, we were buying NES to get

8    their float, to get the money that they were holding.

9         Q     And what was your understanding of what

10   was going to be done with NES's -- when you say

11   "float," is that the client exchange funds?

12        A     Right.  That's the client exchange funds

13   that are being held by -- by NES.

14        Q     And what was your understanding that

15   was -- of what was going to be done with NES's client

16   exchange funds once Okun purchased the company?

17        A     A hundred percent of those funds would be

18   deposited with the qualified intermediaries and be

19   under the control of the qualified intermediaries.

20        Q     And what was that money going to be used

21   for?

22        A     It was going to be used to fund the

23   closings for qualified intermediaries.

24        Q     You said that you were doing -- this was a

25   stopgap measure.

1              First of all, why was it necessary to buy

2     NES to get access to its float?

3          A    Because so much money had been removed

4     from the qualified intermediaries that, you know, each

5     and every day brought a possibility of running out of

6     money.  It was really just every day by luck, by luck

7     alone, that we survived.

8          Q    And how much client exchange funds did NES

9     have at the time of the purchase, approximately?

10         A    It was roughly $40 million.

11         Q    Who was the primary owner of NES at the

12    time?

13         A    Well, the owner that I negotiated with was

14    Bill Bennett.

15         Q    Okay.  Did Mr. -- who negotiated with

16    Mr. Bennett on behalf of Okun, you and Coleman for the

17    sale of NES?

18         A    I did the initial negotiations with Bill

19    Bennett.

20         Q    And at the time that NES was purchased,

21    how did NES hold the client exchange funds?

22         A    In separate, segregated accounts.

23         Q    Before the sale -- or before Okun

24    purchased NES, did you, Okun and Coleman have

25    conversations about what was going to be revealed to

1   Bennett regarding what had been done with the prior

2   client money?

3          A       Yes.  You know, we would -- we would refer

4   to the fact that the money was invested in real estate

5   or how the monies were being invested as the

6   investment policy, and there was a discussion where,

7   you know, basically we said, you know, we're not going

8   to talk about our investment policy.

9          Q       Okay.  With Bennett?

10         A       With -- right, with Bill Bennett.

11         Q       Now, you say "investment policy in

12  commercial real estate."  At this point do you believe

13  that all of the client money that had been taken from

14  AEC and SOS had either gone to commercial real estate

15  or to fund the other clients' exchanges?

16         A       Right.  Those are the only two

17  possibilities.  And as a matter of fact, I'm -- you

18  know, I'm promised that we're going to work on -- that

19  I'm going to receive documentation for the loans that

20  were made to IPofA.

21                 So, yes, at this point all the monies, I

22  believe, that were sent out were used to either fund

23  closings or invested in real estate.

24         Q       And your understanding was the entire $40

25  million of NES client funds, after the purchase, would

1    come to your control at SOS?

2         A    Absolutely.  That was the reason for

3    purchasing NES.

4         Q    And who told you that that was going to

5    occur, that you would get all of the money?

6         A    Edward Okun.

7         Q    Did you -- did you tell Mr. Bennett about

8    what you, Okun and Coleman had done or the investment

9    policy?

10        A    No.  No, we didn't.

11        Q    Why not?

12        A    It was a rationalization, but, you know,

13   the problem was is that if I wasn't comfortable with

14   the way the money was invested, the chances are that

15   Bill Bennett would be, you know, uncomfortable with

16   the way the money was invested and might not sell the

17   company to the 1031 Tax Group.

18        Q    But Bennett didn't know, and he did sell

19   to Mr. Okun, correct?

20        A    That's correct.

21        Q    And after the purchase of NES, did

22   Mr. Okun make good on his promise to send the entire

23   $40 million to SOS of NES client funds?

24        A    No.  No, he didn't.

25        Q    What happened?

1          A      We received roughly half of the money.

2    The other money -- you know, I was expecting a wire

3    for $40 million, and I told, you know, my bookkeepers

4    to keep an eye out for a $40 million wire.  They tell

5    me a $20 million wire comes in.  And I immediately got

6    on the phone with Edward Okun and Lara Coleman and

7    said, you know, Where's -- Where's the other $20

8    million?  And they stated to me that that money was

9    deposited in an account with Wachovia because of a

10   business relationship they had with Wachovia in order

11   to get a loan for another building for IPofA.  So the

12   money was being used not necessarily as collateral but

13   that you had to have this money on deposit to do this

14   business with Wachovia.

15         Q      But they -- Mr. Okun didn't tell you that

16   he had used the money to pay off a loan or anything

17   like that?  It was sitting in the bank?

18         A      No.  No.  I mean, I was unhappy that I

19   didn't receive it, but at least, you know, I was being

20   told that the $20 million was sitting somewhere else.

21         Q      Okay.  Did you ultimately use NES's client

22   money to fund the exchanges of other QI clients at the

23   other QI companies?

24         A      Yes.  It was used, in part, to keep the

25   company going forward and funding, you know, client

CHANDLER and HALASZ, INC.
(804)730-1222

1    exchanges.

2         Q    Okay.  I'm going to show you what's been

3    previously marked as Government Exhibit 54, please.

4    And I'd like to direct your attention to your e-mail.

5              MR. DRY:  Like to admit Government's

6    Exhibit 54 into evidence.

7              THE COURT:  Any objection?

8              MS. GRADY:  I don't have any objection.

9    No, sir.

10             THE COURT:  All right.

11   BY MR. DRY:

12        Q    Sir, this is an e-mail from you to Edward

13   Okun, correct?

14        A    That's correct.

15        Q    And in this e-mail it talks about bonuses,

16   and you're requesting bonuses for yourself and for

17   Mr. Powlishen, correct?

18        A    That's correct.

19        Q    Were you -- under the terms of your

20   employment agreement, were you supposed to get bonuses

21   and profits interest?

22        A    Yes, I was.

23        Q    And what would your bonuses be based on?

24        A    The base -- the bonuses would be based on

25   profitability of the qualified intermediaries, the

1    company that I ran.

2           Q     Okay.  And how does a qualified

3    intermediary make money?

4           A     There's really two different sources of

5    income to a qualified intermediary.  The first is

6    what's referred to in the industry as a setup fee.

7    And typically --

8                 MS. GRADY:  Judge, I'm going to object.

9    Sounds like he's testifying as an expert.  The

10   Government hasn't offered him as an expert.

11                MR. DRY:  It's a lay opinion, Your Honor.

12   He's the president and CEO of the company.  He's

13   giving, basically, fact information to the jury about

14   how a qualified intermediary makes money.

15                THE COURT:  He's talking about his own

16   qualified intermediaries, I think.

17                MS. GRADY:  No.  He's talking --

18                THE COURT:  You talking about all

19   qualified intermediaries?  Is that your question?

20   BY MR. DRY:

21          Q     How did the six QI companies that -- or

22   the five QI companies that you were the president

23   and -- of make their money?

24          A     Sure.

25                MS. GRADY:  That's fine.

1        A       There were two different sources of

2    income.  One was what we referred to as a setup fee.

3    And typically we would charge somewhere between $750

4    and $1500 for an exchange.  And, also, the second part

5    of the way our companies made money is the monies are

6    held in a bank account earning interest, and the

7    difference between what we agreed to pay to the client

8    in interest and what we earn is referred to as

9    interest income.  And we would earn that interest

10   income as well.

11   BY MR. DRY:

12       Q       Okay.  So the client would be entitled to

13   a portion of the interest, and the remainder of it the

14   qualified intermediary would get; is that correct?

15       A       That's correct.

16       Q       And at this time frame when you're asking

17   for this bonus, were the qualified intermediary

18   companies profitable?

19       A       No, they were not.

20       Q       Why not?

21       A       Because all the money that should have

22   been on deposit earning interest and earning income

23   for the company had been taken by Edward Okun and

24   Investment Properties of America and used as

25   investments in their properties.

1    Q    So at this point you're asking for a

2  bonus, but there are no profits for the bonus.  How

3  are you justifying, in your mind, asking for this

4  bonus?

5    A    Well, I mean, what I did, simply put, was

6  calculate the monies as if they were on deposit with

7  the qualified intermediaries.  And -- and, you know,

8  I -- the conversation was that I had no interest in

9  IPofA.  I had no profit interest.  I had no business

10 interest.  I had nothing to do with IPofA.  And so if

11 West Oaks was sold and earned $70 million, I didn't

12 get any of that.  So since Edward Okun and IPofA had

13 taken all the money out of the qualified intermediary,

14 we were entitled to a bonus at least equal to what we

15 would have been earning if the monies were not taken.

16   Q    And going up to the top of this e-mail

17 chain, Mr. Okun -- this is in reference to a telephone

18 conversation, and in the telephone conversation he

19 agreed to pay this bonus, correct?

20   A    Right.  He had previously agreed, and I

21 wanted to make sure that I documented the amounts of

22 money, because we were talking about, you know, a

23 large sum of money, that I got something in writing

24 from Edward Okun saying that he agreed to this.

25        THE COURT:  Mr. Dry, how much longer do

1    you have with this witness?

2              MR. DRY:  It's a while, Your Honor.  I'm

3    about --

4              THE COURT:  "A while" is not a unit of

5    time.

6              MR. DRY:  I apologize, Your Honor.  I am

7    halfway through my direct examination, Your Honor.

8              THE COURT:  Oh, my goodness.

9              MR. DRY:  We're getting to the really good

10   stuff soon, though.  I promise.

11             THE COURT:  All right.  Ladies and

12   Gentlemen, I think you-all have been here a great long

13   time today, and you have already had a couple of days

14   you've had to work hard.  So I think the best thing to

15   do is for us to -- what we're going to do is we'll

16   come in and start tomorrow at 9:00.  We will stop at

17   about somewhere between 1 and 2, so you'll have the

18   rest of the day off.  You'll have a nice long break in

19   the morning but no real lunch break.  And so we'll

20   stop somewhere around 1:00, 2:00, depending on where

21   we are in the testimony.

22             Is there anybody who has a problem getting

23   here at 9:00?

24             Okay.  We'll see you at 9.  Give your --

25   leave your pads back there.

1              Thank you very much for paying attention.

2    And remember my admonitions about not reading

3    anything, not talking about the matter.  And drive

4    safely.

5                   (The jury was excused for the day at

6                   5:08 p.m.)

7              THE COURT:  All right.  I'm sure you're

8    going to work on honing your examination down over the

9    evening, aren't you?

10              MR. DRY:  Yes, Your Honor.

11              THE COURT:  Moving along?

12              MR. DRY:  I will do my best.

13              THE COURT:  All right.  Mr. Pajonas,

14   you're excused for the evening.  You need to be back

15   here and ready to go for testifying at 9 in the

16   morning.  Don't discuss your testimony with anyone,

17   except you may discuss -- talk to the lawyers in the

18   case.

19              THE WITNESS:  Thank you.

20

21                   *  *  *  *  *  *  *

22

23              REPORTER'S CERTIFICATE

24

25         I do hereby certify that the foregoing

1    excerpt is a true and correct transcript of my

2    shorthand notes taken in this matter to the best of my

3    ability.

4

5                    /s/ Valarie L. S. May  3/23/09
                     Valarie L. Schmit May, RPR
6                    Commonwealth of Virginia at Large

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25