1      IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF VIRGINIA
2            RICHMOND DIVISION

3  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                    :
4  UNITED STATES OF AMERICA         :
                                    :
5                                   :
   v.                               :   Criminal No.
6                                   :   3:08CR00132-01
   EDWARD HUGH OKUN                 :
7                                   :   March 10, 2009
   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

8

9

10

             EXCERPT TRANSCRIPT OF **CONTINUED**
11              **TESTIMONY OF DAVID FIELD**
           BEFORE THE HONORABLE ROBERT E. PAYNE
12            UNITED STATES DISTRICT JUDGE

13

14

15  APPEARANCES:

16  MICHAEL DRY, Assistant United States Attorney
    BRIGHAM CANNON, Assistant United States Attorney
17  JESSICA A. BRUMBERG, Assistant United States Attorney
    Richmond, Virginia
18
            Counsel on behalf of the United States
19
    CAROLYN V. GRADY, Assistant Federal Public Defender
20  ROBERT J. WAGNER, Assistant Federal Public Defender
    Richmond, Virginia
21  and
    MILLER & CHEVALIER
22  Washington, D.C. 20005
    BY:  BARRY J. POLLACK, ESQ.
23
            Counsel on behalf of the Defendant.
24
                DIANE J. DAFFRON, RPR
25             OFFICIAL COURT REPORTER
             UNITED STATES DISTRICT COURT

```
 1

 2                           I N D E X

 3

 4                        DIRECT  CROSS  REDIRECT  RECROSS

 5  DAVID FIELD                    3       43        --

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              THE CLERK:  Criminal No. 3:08CR00132-01, the

2  United States of America vs. Edward Hugh Okun.

3  Mr. Michael Dry and Mr. Brigham Cannon and Ms. Jessica

4  Brumberg represent the United States.  Mr. Robert J.

5  Wagner, Ms. Carolyn V. Grady, and Mr. Barry Pollack

6  represent the defendant.

7              Are counsel ready to proceed?

8              MR. DRY:  The United States is ready to

9  proceed.

10             MR. WAGNER:  The defendant is ready, Your

11 Honor.

12

13 * * * * *

14

15             THE COURT:  Mr. Field is back on the stand,

16 right?  Can we get Mr. Field?

17             Just have a seat, Mr. Field. I remind you,

18 you are under the same oath that you took yesterday.

19             Mr. Pollack.

20             MR. POLLACK:  Thank you, Your Honor.

21

22     CROSS-EXAMINATION (Continuing)

23 BY MR. POLLACK:

24 Q    Good morning, Mr. Field.

25 A    Good morning.

1  Q    I'd like to start with something we briefly

2  discussed yesterday.  Isn't it a fact, Mr. Field, that

3  you were never directed by Mr. Okun not to disclose

4  information about the QI loans, the qualified

5  intermediary loans?

6  A    I was directed not to disclose information.

7  Q    So that would be the opposite of what I'm saying,

8  right?

9  A    Yes.

10  Q    Now, you remember meeting with the government

11  agents, I know you may not recall the precise date,

12  June 19, 2007.  Do you recall meeting with them in that

13  time frame?

14  A    Yes.

15  Q    At that time, like all your other meetings with

16  the government agents, you knew it was important to be

17  truthful and to be accurate, correct?

18  A    Yes.

19  Q    Isn't it true that at that time you told the

20  government agents that you were never directed by

21  Mr. Okun not to disclose information about the QI

22  loans?

23  A    I don't remember saying that.

24  Q    I'm going to hand up to you a copy of the

25  interview memorandum dated June 19.  The memorandum is

1 dated June 24, but the interview took place on June 19,

2 2007, and ask you to look at the first sentence in the

3 third full paragraph.

4       Don't read it out loud, but just review it

5 yourself and whenever you're done, take as much time as

6 you need, hand it back to the courtroom security

7 officer, who'll hand it back to me.

8 A    (Complying.)

9 Q    Mr. Field, having had the opportunity to review

10 that document, is it still your testimony that you did

11 not tell the agents that you were never directed by

12 Mr. Okun not to disclose the evidence about the QI

13 loans?

14 A    I do not remember the conversation that that

15 recorded, and I do not remember what the agent thought

16 at the time, but, clearly, in my mind, I was directed

17 not to discuss the QI loans with anyone else.

18 Q    Mr. Field, my question is:  Did you make that

19 statement to the agents on that occasion?

20 A    I don't remember.

21          THE COURT:  He answered that he didn't

22 remember that.  He didn't remember what the question

23 was or what they were talking about or what they knew.

24 He answered it.

25          MR. POLLACK:  I understand.  I want to be

1 clear I wasn't asking what they knew or what they were

2 thinking.  I was asking what you said.

3          THE COURT:  He answered.

4          MR. POLLACK:  Thank you, Your Honor.

5 BY MR. POLLACK:

6 Q    Okay.  Let's move on to something different then.

7          MR. POLLACK:  Ms. Bishop, can you put up

8 Government 139, which is already in evidence.

9 Q    This is the memo that you wrote on November 13,

10 2006, about the issues related to Mr. Pajonas and his

11 performance, correct?

12 A    Yes.

13 Q    And we talked yesterday about the section that's

14 highlighted, "Legal Situation"?

15 A    Yes.

16 Q    And that was about Mr. Pajonas's failure to

17 identify that there was an issue with the exchange

18 agreements and his failure to correct that, correct?

19 A    Yes.

20 Q    Now, I want to be clear.  For you, Mr. Field,

21 prior to the time Mr. Perkins raised the issue of the

22 exchange agreements, that had not been an issue for

23 you?  It hadn't been something you were focused on; is

24 that correct?

25 A    Prior to -- about a week before that in my meeting

1  with Mr. Pajonas who raised all of these issues, but

2  prior to that time I had not been focused on that

3  issue.

4  Q    Okay.  In fact, you, yourself, had not even

5  reviewed the exchange agreements; is that correct?

6  A    That's true.

7  Q    Even though you were a senior executive with the

8  company?

9  A    Right.  My responsibilities do not include QI

10 companies.

11 Q    That was Mr. Pajonas's responsibility?

12 A    Correct.

13 Q    Now, after -- I'm sorry.  Going back to this

14 document, the preceding paragraph, the issue

15 surrounding the exchange agreements wasn't the only

16 concern you expressed about Mr. Pajonas's performance;

17 isn't that right?

18 A    Correct.

19 Q    And let's look at the preceding section,

20 "Accounting Records."  Can you just go ahead and read

21 that paragraph to us?

22 A    Yes, sir.  "Accounting Records - The accounting

23 records of the 1031 Tax Group and operating units are

24 in complete disarray with no viable information

25 available to either management or ownership as to the

1  operating profit or loss or financial stability.  The

2  customer records relating to the details of exchanges

3  is incomplete, inaccurate, and in disarray causing loss

4  of income from fees and an inability to manage the

5  float and cash resources.  While Todd might assert that

6  this was outside his control due to the actions of

7  IPofA and the borrowing of cash, the maintenance of

8  customer records, including the exchange itself and

9  fees earned, were always within his control and

10  responsibility.  This is a serious failure to perform

11  his duties as president."

12  Q    Thank you.

13         MR. POLLACK:  Ms. Bishop, you can go ahead

14  and take down Government 139.

15  Q    On November 9, you had a telephone conversation,

16  you participated in a telephone conversation with some

17  members of the law firm of McGuire Woods?

18  A    Excuse me.  On what date?

19  Q    November 9, 2006.

20  A    Yes, I did.

21  Q    And after that you spoke with Mr. Okun?

22  A    I believe it was the next day, yes.

23  Q    And Mr. Okun agreed that the company should move

24  quickly to have all the exchange agreements redrafted,

25  correct?

1  A    Yes.

2         MR. CANNON:  Objection, Your Honor.  Hearsay.

3         MR. POLLACK:  It's not for the truth.  It's

4  the direction that he's giving to his underlings and

5  it's inconsistent with the notion that he's in a

6  conspiracy to make misrepresentations to the clients if

7  he's directing the changes be made to clarify the

8  clients.

9         MR. CANNON:  It's not relevant if it's not

10  for the truth.

11         MR. POLLACK:  It's relevant because the

12  instruction was given.

13         THE COURT:  Overruled.

14  BY MR. POLLACK:

15  Q    Mr. Okun agreed that the companies should move

16  quickly to have all the exchange agreements redrafted,

17  correct?

18  A    Yes.

19  Q    And all the advertising and websites changed,

20  correct?

21  A    Yes.

22  Q    And he also wanted an employee manual prepared so

23  that employees would know exactly what they could say

24  and what they could not say, correct?

25  A    Yes.

1          MR. POLLACK:  And if we can put up

2 Government's Exhibit 140.

3          THE CLERK:  Has it been published to the

4 jury?

5          MR. POLLACK:  It has.

6 BY MR. POLLACK:

7 Q     This is an e-mail from you, but attached to the

8 e-mail is another memo that you did, correct?

9 A     Correct.

10 Q     And this is a memo to Mr. Okun, Ms. Coleman, and

11 Mr. Perkins, yes?

12 A     Yes.

13 Q     Same date as the memo we just looked at,

14 November 13, 2006, right?

15 A     Yes.

16 Q     And you recommend a number of actions and those

17 are the three bullet points, correct?

18 A     Yes.

19 Q     A complete review and redraft of the legal

20 documents that were used in the exchange process,

21 correct?

22 A     Yes.

23 Q     Those would be what I have been calling the

24 exchange agreements?

25 A     Yes.

1  Q    A complete review and rewriting of the information

2  contained in the website, correct?

3  A    Yes.

4  Q    And the drafting of a sales manual to tell the

5  sales force exactly what they can do?

6  A    Yes.

7  Q    Mr. Okun readily agreed to those recommendations,

8  did he not?

9  A    He did.

10  Q    If I can draw your attention to the next

11  paragraph, starting with "During a discussion with Ed

12  Okun," can you please read from there the rest of the

13  paragraph?

14  A    Yes.  "During a discussion with Ed Okun on Friday,

15  November 10, a decision was reached to outsource the

16  review and redraft of all documents for purposes of

17  completing the task at the earliest possible time.

18  Initial thoughts were to expand McGuire Woods' mission

19  to include this.  Eric and David will present a plan to

20  do this as soon as possible."

21  Q    Mr. Okun's instructions were to get this done at

22  the earliest possible time?

23  A    Yes, sir.

24  Q    And suggested using McGuire Woods for that

25  purpose?

1  A    Yes.

2  Q    However, McGuire Woods did not end up completing

3  the work that the company had wanted McGuire Woods to

4  do for it; is that correct?

5  A    I believe that to be true.

6  Q    In fact, after Mr. Perkins resigned, McGuire Woods

7  indicated they also were going to resign from the

8  representation, correct?

9  A    I was told that by Ms. Coleman.

10  Q    In particular, McGuire Woods stated that they had

11  a conflict of interest that precluded them from

12  continuing to represent both IPofA and the 1031 Tax

13  Group?

14  A    They did.

15  Q    And so as a result of McGuire Woods withdrawing or

16  resigning, a decision was made that another firm would

17  be retained, another law firm would be retained, to

18  complete the same tasks that were going to be assigned

19  to McGuire Woods; is that correct?

20  A    Yes.

21  Q    And that included changing the exchange agreements

22  and the websites?

23  A    Yes.

24  Q    To make sure that they didn't say anything that

25  was inconsistent with the practices of the company?

1  A      Yes.

2  Q      And a Florida firm was retained for that purpose,

3  correct?

4  A      Yes.

5  Q      And that's the firm that is KPKB, correct?

6  A      Yes.

7  Q      And you spoke with the Florida lawyers, is that

8  correct, around the end of November 2006?

9  A      No, I don't believe so.

10  Q      Did you learn at the end of November of 2006 that

11  the news from those lawyers was very good?

12  A      More mid December, but yeah, Mr. Okun called me in

13  mid December.

14  Q      And you were aware that the Florida lawyers did

15  not believe there was anything illegal about the loans?

16  A      That's what Mr. Okun communicated to me.

17  Q      You yourself didn't speak directly to the Miami

18  lawyers?

19  A      I did not.

20  Q      Now, the government showed you Exhibit 217, which

21  is in evidence.  We can put that up.  You can just go

22  down to the bottom.  This is a request for a borrowing

23  from the 1031 Tax Group, right?

24  A      Yes, sir.

25  Q      And in this case, it's a borrowing by Okun

1  Holdings.  By this point Okun Holdings existed?

2  A    Yes.

3  Q    And you are the one who is initiating this

4  request, correct?

5  A    I am.

6  Q    And you want the loan to be documented, correct?

7  A    Absolutely, yes.

8  Q    And the interest rate to be documented?

9  A    Yes.

10  Q    And if we can go up to the top e-mail, Mr. Okun

11  readily agrees?

12  A    He did.

13  Q    Now, in addition to making sure that loans were

14  documented, you also wanted to have it be some

15  accounting effort to make sure that everybody was

16  comfortable that they had quantified the loans that had

17  been taken to date; is that fair?

18  A    Yes.

19  Q    And Mr. Zacarias did some analysis in that regard?

20  A    He did.

21  Q    However, you believe that Mr. Zacarias's figures

22  were really bogus accounting; is that correct?

23  A    No.

24  Q    They were bogus accounting because they didn't

25  take into account the fact that the QIs had some

1  operating losses, not all of the money that was spent

2  by the QIs were borrowings; is that correct?

3  A    Could you say that a different way, please, so I

4  can be sure I understand?

5  Q    You believe that the figure that Mr. Zacarias came

6  up with as what was supposedly an amount that had been

7  borrowed by IPofA or other Okun entities was bogus

8  accounting because it didn't take into account the QI,

9  qualified intermediary, losses, their operating losses?

10  A    I'm not sure what exact figure you're referring

11  to.  Mr. Zacarias worked and produced a number that he

12  said represented the borrowings at December 31, '05, I

13  guess, and that number was to represent the borrowings

14  from customer funds.

15      I don't understand exactly what you mean by

16  separate losses of the entities themselves.  Those two

17  numbers would seem to be different numbers.

18  Q    Okay.  Should be different numbers?

19  A    Should be different numbers.

20  Q    Okay.  The analysis that Mr. Zacarias performed

21  and his calculation of what the borrowings supposedly

22  were for the year ended December 31, 2005?

23  A    Yes.

24  Q    So, in other words, what had been borrowed during

25  the calendar year of 2005?

1  A     Yes.

2  Q     That analysis, you believe, was bogus accounting;

3  is that correct?

4  A     No.

5  Q     Do you recall meeting with the federal agents in

6  this case on August 29, 2007, or thereabouts?

7  A     Yes.

8  Q     Do you recall saying that Zacarias had come up

9  with a loan amount and the liability for the clients,

10  and that this was really bogus accounting because it

11  did not take into account the losses of the QIs?

12  A     Again, I think that we may have been talking about

13  that subject in the discussion with the government, but

14  those two numbers are separate numbers, and she may

15  have written it down incorrectly or whatever, but the

16  loans, which are part of the balance sheet of the 1031

17  Group, and the operating results, which are part of the

18  income statement, would not have been generally lumped

19  into a similar item.

20  Q     They should not have been?

21  A     They should not have been.

22  Q     Are you telling me that if the agent wrote in her

23  report that you used the phrase "bogus accounting" to

24  refer to Mr. Zacarias's analysis, that the agent just

25  got that wrong and you never used that phrase?

1  A     I don't remember that.  That seems odd to me that

2  that would have happened.

3  Q     Would looking at the report help refresh your

4  recollection?

5  A     Yes.

6        MR. POLLACK:  I'm going to show Mr. Field a

7  memorandum of interview from August 29, 2007, and

8  direct him to the first paragraph of page 8.

9  Q     You don't need to read from the report.  My only

10 question is:  Having had the opportunity to review

11 that, do you now recall one way or the other whether

12 you used the phrase "bogus accounting" in your

13 interview with the government to describe Mr.

14 Zacarias's analysis?

15 A     If earlier in this paragraph they talk about the

16 general accounting of the 1031 groups, and my response

17 using that phrase was that they were only looking at

18 the accounting as it related to the liability for

19 customer accounts.  They were mixing their message

20 here.  They were earlier in the sentence before, two

21 sentences before, talking about the accounting of the

22 1031 group of which the liabilities for customer funds

23 would have been only one component.

24       So to have looked at only the liability as related

25 to the entire accounting for the 1031 group would have

1 been inaccurate, and I apparently used the word "bogus

2 accounting" if that's all that they were looking at.

3          THE COURT:  Let me see that document.

4          MR. POLLACK:  Yes.

5          THE COURT:  All right.  You can give it back

6 to Mr. Pollack.

7 Q    Mr. Field, I was confused.  You used the word

8 "they" several times in that last sentence.  In using

9 the term "bogus accounting," were you referring to Mr.

10 Zacarias's accounting or were you referring to the

11 government agent's accounting?

12 A    No, I was saying that the use of Mr. Zacarias's

13 number to represent the whole accounting for the 1031

14 Tax Group was bogus, was not true.

15 Q    Who was doing that?

16 A    I forget who we were talking about earlier in that

17 paragraph.

18 Q    Were you talking about Mr. Zacarias and his team?

19 A    I thought in the sentence -- could I see that

20 again?

21 Q    Yes.  Don't testify from the report.  My question

22 is a simple one.  Having had the chance to review that,

23 whose accounting, who were you referring to when you

24 used the phrase "bogus accounting"?

25          THE COURT:  That wasn't the question you

1 asked him.  You asked him who he was referring to when

2 he said the word "they," and he wanted the document to

3 refresh his recollection about what it was that he

4 meant by "they."  That is what you had on the table at

5 the time you asked the question.  That's why it went

6 over there.  If you want to ask another question, okay,

7 but that's not the one you asked.

8 Q    Maybe I'm confused because I thought it was one

9 and the same.  I thought "they" was the reference to

10 whomever it was that had engaged in the bogus

11 accounting.  Am I correct about that?

12 A    The "bogus accounting" refers to the use of Mr.

13 Zacarias's information in a way that wasn't complete

14 and this was Mr. Perkins.

15 Q    I see.

16          THE COURT:  Perkins is referred to in the

17 first part of the memo, and he's talking about what

18 Perkins said and the way Perkins was using it.

19          Now, look.  Let me tell you both something.

20 Impeachment impeaches, and you get on the stick, and if

21 it actually relates to something that impeaches, that's

22 fine.  But to go off the reservation isn't proper.  And

23 you get up and do your job, and you do your job, and

24 then we'll get it straight, and we won't have to spend

25 15 minutes wasting time talking about matters that may

1  or may not be impeaching.  Let's do it right.

2              MR. POLLACK:  I apologize, Your Honor.

3              THE COURT:  All right.  Let's go.

4              MR. POLLACK:  I was just trying to understand

5  the answer to make sure that I understood correctly.

6  BY MR. POLLACK:

7  Q    So it was Mr. Perkins's use of Mr. Zacarias's

8  analysis that you were referring to as bogus?

9  A    Yes.

10  Q    Okay.  Now, you talked yesterday with the

11  government about a situation where there were funds

12  that Mr. Okun wanted to move, but they were in a

13  segregated account.  Do you recall that, a specific

14  instance?

15  A    Yes.

16  Q    And the funds were not moved.  They were returned

17  to the customer?

18  A    I believe that's right.

19  Q    Okay.  I want to ask you about the opposite

20  situation.  You also learned, did you not, that there

21  were times that pooled accounts were used to pay back

22  an exchanger whose money was in a segregated account?

23  A    I was aware that that happened.

24  Q    Okay.  And just so we're clear, some of the

25  exchangers' monies were kept in segregated accounts,

1  meaning there's a specific account with the customer's

2  name on it, correct?

3  A    Yes.

4  Q    For other exchangers, the monies were pooled,

5  meaning they were commingled, all of the exchange money

6  was put into an account that had different exchangers'

7  balances in them; is that correct?

8  A    Yes.

9         MR. CANNON:  Objection.  I just would like to

10 clarify a time frame for these questions and for

11 Mr. Field's benefit and I think the jury's.

12        THE COURT:  All right.  Time frame, Mr.

13 Pollack?

14 BY MR. POLLACK:

15 Q    When, Mr. Field, did you become familiar enough

16 with the QI part of the business to learn about the

17 distinction between pooled accounts and segregated

18 accounts?

19 A    In the fall of 2006.

20 Q    When did you first start yourself reviewing some

21 exchange agreements?

22 A    I never reviewed -- when -- the first time I saw

23 any of the exchange agreements was when Mr. McElroy

24 from McGuire Woods requested those be assembled and

25 sent to him for his review.  I did look at one of them

1  at that time.

2  Q    Okay.  Did you become aware that some of the

3  exchange agreements called for the use of segregated

4  accounts, but others called for the use of pooled

5  accounts?

6  A    I didn't look at enough of a sample to determine

7  that myself.

8  Q    Did you ever at any point ever determine that?

9  A    No.

10  Q    But you did become aware at some point that money

11  from the pooled account or a pooled account had been

12  used to pay back exchangers or complete an exchange for

13  an exchanger who had a segregated account?

14  A    Mr. Zacarias told me that.

15  Q    As a result, on the books it showed that a

16  particular exchanger was still owed money because his

17  money was still in the exchange account, but the

18  reality is that exchanger had already been paid because

19  he had been paid from a pooled account?

20  A    I was told that that did happen, yes.

21  Q    So as a result, the numbers as to how much money

22  the exchangers were owed were overstated?

23        MR. CANNON:  Objection, Your Honor.  He's

24  testifying about what other people have told him.  I'm

25  not sure there's a foundation for what his personal

1  knowledge is.

2          THE COURT:  I think that's correct, but you

3  let him testify to at least four answers that fit

4  exactly that description and now you object.

5          Sustained.

6  BY MR. POLLACK:

7  Q    Well, Mr. Field, part of your responsibilities

8  became overseeing the efforts to account for the

9  qualified intermediary loans, correct?

10 A    At some time frame in 2007 I had a more direct

11 involvement with the 1031 accounting, but at a very

12 high level.  The accounting was never done in Richmond

13 for individual customer accounts.

14 Q    But you relied on that high level understanding of

15 the accounting and what was being reported back to you

16 by Mr. Zacarias and others in doing your job; is that

17 correct?

18         MR. CANNON:  Objection, Your Honor.  Mr.

19 Zacarias wasn't with the company in 2007.  I mean, it's

20 just not clear.

21         THE COURT:  Sustained.

22 BY MR. POLLACK:

23 Q    What were your sources for gaining a high-level

24 understanding of what the accounting or the borrowings

25 from the qualified intermediaries consisted of?

1  A     At what point?

2  Q     In 2007.

3  A     In 2007, the QI group had a controller who

4  actually was based in Richmond.  The customer

5  accounting was based in Denver, I believe, in 2007.

6  And so they would provide information to the

7  controller, and I would get information from her.

8  Q     And you relied on that information to do your job

9  because you needed a high-level understanding of that

10 issue?

11 A     Yes.

12 Q     And you relied on that information, the

13 conversations that you had with Mr. Okun, on this

14 subject matter?

15 A     I did.

16 Q     In doing that, did you communicate to Mr. Okun

17 that the numbers from the borrowings were overstated

18 because they showed as still outstanding some balances

19 for exchangers who had segregated accounts who, in

20 fact, had already been paid using pooled accounts?

21 A     There was a question whether that was a fact or

22 not as result of the work that was done by a special

23 group that was hired to go in and rebuild the

24 accounting records for 2006.  I'm sorry, I don't

25 remember the name of that group, but a group was hired

1  that literally went into each of the offices to try and

2  rebuild those records, and they were still working on

3  those records well into the spring of 2007.

4  Q    Did you communicate to Mr. Okun well into the

5  spring of 2007 that there was an issue as to whether or

6  not the quantification of the borrowings was overstated

7  as a result of pooled funds being used to pay

8  exchangers that had segregated accounts?

9  A    As I recall, this accounting firm or outside firm

10  that I mentioned had quantified a number of accounts

11  which had not been verified.  I don't remember the

12  amount that they held in question.

13  Q    My question was what have you communicated to

14  Mr. Okun, if you recall?

15  A    I recall telling him that when reporting on the

16  work of this outside accounting agency, that a certain

17  amount had been reviewed and was final, and a certain

18  amount was questionable, and there were several

19  accounts that they had questions on, whether somebody

20  had been paid twice, for example, or whether, you know,

21  they had been paid the first time.

22  Q    Now, in April of 2007, you discussed efforts to

23  obtain some additional financing, correct?

24  A    With?

25  Q    With the government yesterday.

1  A     Excuse me?

2  Q     Yesterday you testified about efforts in April to

3  obtain additional financing.  You talked about the

4  expectation of a $40 million loan?

5  A     Yes.

6  Q     And you expected that that was simply going to be

7  the first tranche of what ultimately was going to be

8  $250 million worth of financing, correct?

9  A     Yes.

10 Q     And the purpose of obtaining that financing was to

11 help both IPofA and the 1031 Tax Group with their

12 short-term liquidity issues?

13 A     Correct.

14 Q     If we can look at Government's Exhibit 265, I

15 think it's 265, and I think it has been admitted, but

16 maybe I'm wrong.

17         THE CLERK:  It has.

18         MR. POLLACK:  265 has been admitted.

19         MS. GRADY:  265 is missing in action from our

20 book.

21         MR. POLLACK:  Here, I have one.

22         THE COURT:  Do you need one, Mr. Pollack?

23 I've got a copy.

24         MR. POLLACK:  I think I'm okay.  Thank you,

25 Your Honor.  I appreciate it.  It's in evidence, so we

1  can go ahead and you put it up on the screen.

2         THE COURT:  Yes, it is.

3  BY MR. POLLACK:

4  Q    This is an e-mail that you sent to Mr. Okun on

5  April 25, 2007, correct?

6  A    Yes, it is.

7  Q    And that is just two days before the government

8  executed a search warrant at IPofA's offices, correct?

9  A    Yes.

10 Q    And at this time you were anticipating immanently

11 a $40 million loan, correct?

12 A    I was, yes, sir.

13 Q    And the borrower for that was going to be Okun

14 Holdings, correct?  You can go ahead and turn to the

15 second page and see if that -- the very top.  Am I

16 correct?

17 A    Okun Holdings was the generic term that is listed

18 there, but in this sense it was used as the sort of

19 umbrella organization.  Okun Holdings itself did not

20 own any of the property on which these loans were being

21 based.  So it couldn't have been Okun Holdings as the

22 only borrower.

23 Q    But it would be some Okun-owned entity or

24 combination of Okun-owned entities?

25 A    Yes.

1 Q     Not the 1031 Tax Group, though?  It didn't own any

2 real estate, right?

3 A     Yes, correct.

4 Q     And the purpose of the loans was to be the first

5 step in addressing the short-term cash flow or

6 liquidity problems?

7 A     Yes.

8 Q     Out of that first $40 million, 16 1/2 million was

9 going to be used immediately as an infusion of cash to

10 the qualified intermediary companies, correct?

11 A     Yes, that was the plan.

12 Q     Following the execution of the search warrant two

13 days later, the lender chose not to make this loan; is

14 that correct?

15           MR. CANNON:  Objection, Your Honor.

16 Relevance.

17           THE COURT:  I can't think of any relevant

18 reason, can you?

19           MR. POLLACK:  I can, Your Honor.

20           THE COURT:  We're in the same position we

21 were in yesterday where if I couldn't think of it, you

22 couldn't.

23           MR. POLLACK:  Well, you know, that was at 5

24 o'clock in the afternoon.  Now that I've had a good

25 night's sleep --

1        THE COURT:  Good.  What's the relevancy?

2        MR. POLLACK:  Well, the relevance is that the

3  government put into evidence that there was a

4  short-term liquidity crisis, and the government

5  believed that to be relevant, and I am trying to rebut

6  the notion that that was a significant crisis or that

7  there was no plan in place to deal with that.

8        THE COURT:  So that's what the relevance is?

9        MR. POLLACK:  It's to directly rebut evidence

10  the government opened the door to by putting on in its

11  direct examination.

12        THE COURT:  I don't know why the government

13  put the exhibit in in the first place.  Why isn't he

14  right?

15        MR. CANNON:  Well, Your Honor, this

16  particular exhibit is introduced as part of an

17  overall -- I mean, I don't want to get into too much

18  detailed evidence in front of the jury, but, in part,

19  it's to talk about Mr. Okun is telling people to keep

20  going on.  And yesterday when we talked about a

21  temporary cash liquidity crisis, that was not in the

22  context Mr. Pollack talks about, but that was actually

23  in the context of Mr. Field's testimony about his

24  conversations with Mr. Okun, and what they would tell

25  people, not that it was a fact.

1          THE COURT:  All right.  Objection sustained.

2   BY MR. POLLACK:

3   Q    Well, let's talk specifically then about that

4   context that Mr. Cannon raises.  You talked yesterday

5   about telling an exchanger that there had been an

6   unanticipated slowdown in the real estate market.  Do

7   you recall that?

8   A    I do.

9   Q    And you told the exchanger that their money was

10  tied up in longer-term, meaning less liquid,

11  investments, correct?

12  A    Yes.

13  Q    But nonetheless, you told the exchanger that it

14  was just a temporary cash flow issue, correct?

15  A    Yes.

16  Q    And you anticipated that it was going to be

17  resolved immanently, correct?

18  A    Yes.

19  Q    And you offered to give an additional amount of

20  interest to the exchanger to make up for the fact that

21  they were going to get their money a little bit late,

22  correct?

23  A    Yes.

24  Q    And the exchanger agreed to accept that additional

25  amount of money in return for getting money late?

1   A      They did.

2   Q      And you believed that, in fact, this was a

3   short-term problem that was going to be resolved

4   immanently?  In fact, you believed that immanently the

5   QIs were going to have $16.5 million of cash?

6            MR. CANNON:  Objection, relevance.  What

7   Mr. Field believed is not relevant to any question the

8   jury has to decide in this case.

9            THE COURT:  Why is his belief relevant is the

10  question?

11           MR. POLLACK:  Well, Mr. Cannon asked

12  specifically about this conversation on

13  cross-examination.  I'm certainly entitled to ask the

14  witness why he communicated the information that he

15  did.

16           MR. CANNON:  I believe that those questions

17  were asked and answered on direct, but, I mean, but in

18  terms of his motivation or why he did what he did is

19  still not relevant to any discussion or any decision

20  that the jury ultimately has to make with regards to

21  Mr. Okun's culpability.

22           MR. POLLACK:  Your Honor, it was discussed on

23  direct.  It explains why somebody did what they did.

24  We've heard that 20 times.  It can't be that's the rule

25  on direct and it's not the rule on cross.

1          THE COURT:  Well, actually there are plenty

2  of times when what's sauce for goose is not sauce for

3  gander, but in this instance the objection is

4  overruled.

5          Look, when you put stuff in, you have got to

6  make decisions ahead of time about what the

7  consequences are, and you have got to live with the

8  consequences.  Now, you chose to put this in.  He's

9  entitled to ask a question about this particular issue.

10  It wasn't true of the preceding one, but it is true of

11  this one.

12  BY MR. POLLACK:

13  Q    When you made the statement to the exchanger, you

14  believed that you were immanently going to get an

15  infusion of $16.5 million for the qualified

16  intermediary companies, didn't you?

17  A    Yes, I did.

18  Q    You truthfully told the exchanger the money was

19  tied up in a longer-term investment.  You didn't

20  conceal that from the exchanger?

21  A    Yes.

22  Q    Now, after the search warrant was executed on

23  April 25, 2007, Mr. Rosen paid a visit to IPofA's

24  offices; is that correct?

25  A    Yes.

1  Q     And Mr. Rosen was one of the Miami attorneys that

2  was hired after McGuire Woods withdrew?

3  A     I believe that's true, yes.

4  Q     And Mr. Rosen in his visit to the office told all

5  of the --

6           MR. CANNON:  Objection, Your Honor.

7           THE COURT:  He hadn't asked the question yet.

8           MR. CANNON:  He is going to repeat what

9  Mr. Rosen said, but that's clearly hearsay.

10           THE COURT:  All right.  It may be, but until

11 I know what the question is, I can't rule on it.  So

12 you make your objection after the question gets out.

13 The jury is paying attention.  If I overrule an

14 objection, they are not going to pay attention to the

15 question like I told them.

16           Now, do you want to ask the question again?

17           It's going to get an objection, so don't

18 answer it until I get a chance to rule on it.

19           MR. POLLACK:  I don't know.  Maybe Mr. Cannon

20 will change his mind when he hears the whole question.

21           THE COURT:  Maybe it can be retooled in such

22 a fashion as to make him want to sit down.  All right.

23 Let's go.

24 BY MR. POLLACK:

25 Q     Mr. Field, when Mr. Rosen visited the office, he

1 told the assembled employees that the company had done

2 nothing illegal; is that correct?

3          MR. CANNON:  Objection, Your Honor.

4          THE COURT:  Sustained.

5          MR. POLLACK:  I am not putting it in for

6 whether or not Mr. Rosen's statement was true or not

7 true, simply for the fact that it was said and the

8 effect that it had on the listeners.

9          THE COURT:  The fact it was said has no

10 relevance at all with the possible exception of

11 confusing the issues and protracting the trial, and

12 it's not relevant, and even if it is relevant, it's

13 excludable under 403.  What Mr. Rosen thought doesn't

14 make any difference anyway.

15          Let's go.

16          MR. POLLACK:  Okay.

17 BY MR. POLLACK:

18 Q    Now, Mr. Field, you discussed on direct

19 examination with the government the fact that you chose

20 to enter into a plea agreement in this case, correct?

21 A    Yes, sir.

22 Q    And that was based on your personal conduct

23 correct?

24 A    Yes.

25 Q    And in making that agreement with the government,

1  you agreed with the government as to how the United

2  States Sentencing Guidelines would apply in your case,

3  correct?

4  A    Yes, sir.

5  Q    And you understand and understood when you entered

6  into the agreement, did you not, that there are United

7  States Sentencing Guidelines that advise a court as to

8  what range it ought to sentence an individual to for

9  various offenses, correct?

10 A    Yes.

11 Q    And the sentencing guidelines range that you

12 agreed to applied in your case with the government was

13 135 to 168 months or about 11 and a quarter years to 14

14 years; is that correct?

15 A    You'd have to explain further where that number is

16 coming from.  I don't quite understand.

17 Q    Okay.

18 A    Is this the point system you're talking about?

19       MR. POLLACK:  Let me show to the witness

20 solely for purposes of refreshing his recollection a

21 copy of his plea agreement, which I'll mark for

22 identification only as Defendant's Exhibit 20.

23 BY MR. POLLACK:

24 Q    I'd ask that you to take a look at page 2 of the

25 document, Mr. Field.

1  A     Okay.

2  Q     As you understand the United States Sentencing

3  Guidelines, they would work on what's called "a point

4  system"?

5  A     Yes.

6  Q     And you were agreeing with the government that

7  under that system, your recommended sentencing range

8  would be 135 to 168 months, which is 11 and a quarter

9  to 14 years?

10         MR. CANNON:  Your Honor, I don't believe that

11 that's actually from the plea agreement.  I think that

12 Mr. Field testified he didn't know what the number is.

13         THE COURT:  Either the plea agreement has it

14 in there or it doesn't, does it not?

15         MR. POLLACK:  It's on page 2.

16         THE COURT:  Is this an 11(C)(1)(c) agreement?

17         MR. POLLACK:  No, it's not.

18         MR. CANNON:  No, Your Honor.

19         THE COURT:  All right.

20         Why are you confused about what's in the plea

21 agreement?  Don't you have it in front of you,

22 Mr. Cannon?

23         MR. CANNON:  Your Honor, I apologize, but I

24 misplaced it.  I had it yesterday, but I don't have it

25 in front of me.

1          MR. DRY:  Do you a copy for us?

2          MR. POLLACK:  I do not have a copy other than

3  the one the witness has.

4          But are you through with it, Mr. Field?

5          THE WITNESS:  I am.

6          THE COURT:  Could I see it on its way back

7  there?

8          Well, Mr. Pollack, it's not actually in the

9  plea agreement.  That's how you calculate the

10  application of those things, right?  I mean, I don't

11  see those numbers in the plea agreement except

12  somebody's handwritten notes.

13          MR. POLLACK:  I see what you're saying.  The

14  offense level is in the plea agreement, but what that

15  offense level means in terms of sentencing is not.

16          THE COURT:  There's no sentencing range in

17  here, which is why he's confused.

18          MR. POLLACK:  I understand.

19          THE COURT:  And the objection is sustained

20  because of that.

21          You can ask him what he thinks -- the United

22  States agreed to make a recommendation.  It's not

23  binding on the Court.  What does he recall that

24  recommendation would yield in the way of a sentence?

25          Can you answer that question?

1            THE WITNESS:  Five years.

2            THE COURT:  What?

3            MR. POLLACK:  Five years is the agreement

4  that I entered into.  But what it might have been I

5  don't remember being discussed.

6            THE COURT:  Five years is 60 months, is it

7  not?

8            MR. POLLACK:  It is, but we'll get to that.

9            THE COURT:  Okay.

10  BY MR. POLLACK:

11  Q    You had an agreement as to what your sentence

12  would look like if you were sentenced under the

13  sentencing guidelines, and what the government's giving

14  you in this plea agreement is saying instead of being

15  sentenced at that range, we'll cap your sentence at

16  five years?

17  A    Yeah, I knew it was less.

18  Q    And you knew, did you not, that it was a lot less?

19  In fact, the range under the sentencing guidelines

20  would have been 11 and a quarter to 14 years?

21  A    I don't remember the 11 years being said out loud,

22  so I don't know how to relate to that except that it

23  was more than the five years.

24  Q    Substantially more?

25  A    Substantially more.

1   Q     Do you recall it more than double the five years?

2   A     I do not remember that being quantified.

3              THE COURT:  Just so I understand it -- excuse

4   me.  This is a recommendation by the government; is

5   this what this is?  This isn't something that's an

6   agreed-upon sentence.

7              MR. POLLACK:  It's not an agreed-upon

8   sentence.  The government and the defendant agreed to

9   jointly recommend to the Court how the sentencing

10  guidelines would apply.

11             THE COURT:  Right.  And that's not binding on

12  the Court.

13             MR. POLLACK:  That is not binding on the

14  Court.  What is binding on the Court is the fact that

15  the government agreed to, regardless of where the

16  sentencing guidelines come out, cap the maximum

17  sentence at five years by offering a five-year statute.

18             THE COURT:  The statute that he's charged

19  under?

20             MR. POLLACK:  Yes.

21             THE COURT:  Yes.

22  BY MR. POLLACK:

23  Q     So that was your understanding.  But for this

24  agreement, you would have gotten substantially more?

25  In this agreement, the government is giving you --

1 you're only pleading guilty to a single offense, right?

2 A     Yes.

3 Q     And that single offense has a five-year maximum

4 sentence?

5 A     Yes.

6 Q     So regardless of where the sentencing guidelines

7 come out, you cannot get more than five years?

8 A     That's my understanding.

9 Q     And that would not be true if the government had

10 not offered you this deal?

11 A     That's right.

12 Q     And when we talk about these years, you understand

13 under the federal sentencing system, there's no such

14 thing as parole, right?

15 A     I was told that, yes.

16 Q     And you, as part of your agreement with the

17 government, you agreed to cooperate with the

18 government, correct?

19 A     I agreed to make myself available and tell the

20 truth in all situations.

21 Q     But specifically you agreed to cooperate, make

22 yourself available, and that would include give your

23 testimony today, right?

24 A     Yes, sir.

25 Q     Because you would otherwise have a constitutional

1 right not to testify, right?

2 A    I believe so.

3 Q    And you gave that up as part of this agreement

4 that you would tell the government yes, I will be

5 willing to testify, right?

6 A    Yes.

7 Q    And you said that you have to testify truthfully,

8 right?

9 A    Yes.

10 Q    And the whether or not you're telling the truth

11 for purposes of whether or not you complied with this

12 agreement is determined by the government, correct?

13 A    No, I don't think so.

14 Q    So you think if I think your testimony hasn't been

15 truthful, I can take this agreement away from you?

16 A    I believe that if the Court believes I'm telling

17 the truth.

18 Q    But if the government thinks you're not telling

19 the truth, it never gets to the Court, does it?

20 A    I don't understand your question.

21 Q    My question is:  As long as the government

22 believes what you are saying, you are in no danger of

23 violating this agreement, correct?

24 A    It's the government who would be the one to

25 challenge whether what I'm telling you the truth is the

1  truth, then you would be correct.

2  Q    And that is in fact your understanding of how it

3  works?

4  A    I don't understand the power of the Court to

5  impose some penalty for failure to tell the truth.

6  Q    In addition to your obligation to cooperate and

7  give what the government believes to be truthful

8  testimony, you also understand, do you not, that you

9  can be sentenced -- or you can't be sentenced for more

10  than five years under this agreement, but you can be

11  sentenced for less than 5 years, correct?

12  A    Yes.

13  Q    And the government asked you yesterday about this

14  cooperation provision, but one thing they didn't ask

15  you about is something that's called substantial

16  assistance in the investigation and prosecution of

17  others.  Are you familiar with that term or that

18  phrase?

19  A    Yes.

20  Q    What that phrase means is that regardless of where

21  the sentencing guidelines come out, you can get a

22  substantially lower sentence, even lower than the five

23  years, if the government tells the Court that you have

24  been in substantial -- that you have provided

25  substantial assistance in the prosecution of other

1  people, people other than yourself, correct?

2  A    Yes.

3  Q    Like Mr. Okun here?

4  A    Yes.

5  Q    And I take it, Mr. Field, you would like to get

6  the least sentence possible?

7  A    Yes, sir.

8        MR. POLLACK:  I have nothing further.  Thank

9  you.

10

11      REDIRECT EXAMINATION

12  BY MR. CANNON:

13  Q    Good morning, Mr. Field.

14  A    Good morning.

15  Q    Briefly touching on what Mr. Pollack covered last

16  in the cross-examination, Mr. Field, have any promises

17  been made to you in regard to your testimony or any

18  reductions in your sentence?

19  A    No.

20      MR. CANNON:  I'd like to pull up Government's

21  Exhibit 217, which has been admitted?

22      THE CLERK:  It has been?

23      MR. CANNON:  Yes, Mr. Neal.

24  Q    You looked at this document on cross-examination

25  this morning, and the questions were about that you

1  wanted this particular loan documented.  Mr. Field, why

2  was it important to you to document these loans?

3  A    It's good business practice, but also in the

4  conversation with Mr. Okun in December when he was

5  indicating the results of the legal review, one of the

6  issues was a more and complete and accurate

7  documentation of the loans.

8  Q    Was there an incomplete and inaccurate

9  documentation in the past?

10          MR. POLLACK:  Objection, lack of foundation.

11          THE COURT:  Overruled.

12          MR. CANNON:

13  A    It's my understanding that that is true.

14          MR. CANNON:  I'd like to move to Government's

15  Exhibit 139, which is in evidence, and the second page.

16  And that second, I believe, legal solution paragraph.

17          THE COURT:  Legal situation?

18          MR. CANNON:  Legal situation.

19  Q    Mr. Field, the information that you're relaying in

20  your memo here, who was providing you that information?

21  A    Mr. Okun and Mrs. Coleman.

22  Q    Did you have any personal knowledge about

23  Mr. Pajonas and his task to change the exchange

24  agreements?

25  A    No, I did not.

1 Q    And prior to the November 7 memo from Mr. Perkins,

2 had you ever heard Mr. Okun or Ms. Coleman identify

3 this issue with Todd Pajonas and the exchange

4 agreements?

5 A    I don't believe so, no.

6 Q    And going up to the first bullet point in the

7 accounting records, if you could look at the sentence

8 that says, "While Todd might assert."

9 A    Yes.

10 Q    "Due to the actions of IPofA and the borrowing of

11 cash," what were you referring to in that sentence?

12 A    In my discussion with Mr. Pajonas, he indicated

13 that the accounting function was taken over or was the

14 responsibility of someone in Richmond, not his

15 organization.

16 Q    And are you referring to the borrowings or taking

17 of money out of the 1031 Tax Group in that sentence?

18 A    That's part of it.

19 Q    Moving along, I think we're done with that

20 exhibit.  Thank you.

21     Following the conversation with the November 9

22 phone call with McGuire Woods, you have talked about

23 your conversation with Mr. Okun.

24 A    Yes, the next day.

25 Q    The next day.  And did you explain to Mr. Okun or

1  did you talk to Mr. Okun about the company's practices

2  being in violation of the exchange agreements?

3  A    Yes.

4  Q    What did you explain to him on that subject?

5  A    That in the conversation with McGuire Woods, that

6  they pointed out that what the company was actually

7  doing was not consistent with or in accord with the

8  documents that we had forwarded to them for their

9  review.

10 Q    Did Mr. Okun disagree with that assessment?

11 A    No.

12 Q    In subsequent conversations with Mr. Okun about

13 exchange agreements, did he ever disagree with the idea

14 that the borrowing practice in the past was not

15 consistent with the exchange agreements?

16 A    No.

17 Q    And then one final point.

18       MR. CANNON:  If we could pull up Government's

19 Exhibit 265, the second page.

20 Q    This is from April 26 or 25, 2007?

21 A    Yes.

22 Q    According to your knowledge at the time, what was

23 the approximate, just a range, of loan values that was

24 owed to the qualified intermediary companies?

25 A    Somewhere in the 120 million, 125 million-dollar

1 range.

2 Q    Had discussions about this loan with Mr. Okun,

3 were those the first discussions you had had with

4 Mr. Okun about retaining borrowing?  Obtaining a loan

5 to repay?

6 A    Oh, no, huh-uh.

7 Q    How far back did those discussions go?

8 A    Certainly back to his assertion or his

9 conversation in mid December where he said it

10 was planned -- he planned -- was going to repay in

11 total all loans.

12 Q    Mr. Field, in conjunction with that amount of

13 borrowings, did you have any conversation with Mr. Okun

14 about the range of outstanding loans from the 1031 Tax

15 Group?

16 A    Yes.

17 Q    When did you have these discussions?

18 A    The total amount of outstanding?  Several times.

19 Many times.

20 Q    Was there ever any dispute that there were loans

21 outstanding to the 1031 Tax Group?

22          THE COURT:  From Mr. Okun?

23 Q    From Mr. Okun.

24 A    From Mr. Okun, no.

25 Q    Was there ever any -- what was the range of

1 outstanding loans to the 1031 Tax Group that you told

2 Mr. Okun?

3          MR. POLLACK:  Objection.  Asked and answered.

4          THE COURT:  I thought he just answered it.

5          MR. CANNON:  The range of loans.  What did he

6 communicate to Mr. Okun as being the range of loans?

7 The amount of loans, I'm sorry.

8          THE COURT:  The amount or the range?

9          MR. CANNON:  The amount of loans.  And if

10 that was a range -- let's start over.

11          THE COURT:  Sustained.

12 BY MR. CANNON:

13 Q    You had conversations with Mr. Okun in which you

14 communicated to him amounts of loans that were

15 outstanding?

16 A    Yes.

17 Q    And what number or numbers did you tell Mr. Okun

18 was the amount of the loans outstanding to 1031 Tax

19 Group?

20          MR. POLLACK:  Objection.  Is there a time

21 frame?

22          THE COURT:  When?

23 BY MR. CANNON:

24 Q    Did you have a discussion with Mr. Okun in late

25 2006 about the loans?

1  A     Yes.

2  Q     At that time what number did you tell Mr. Okun?

3  A     The number that was provided to me by Mr. Zacarias

4  was $130 million.

5        THE COURT:  But the question is:  What did

6  you tell Mr. Okun?

7  A     I'm sorry.  And I communicated that number in

8  discussions with Mr. Okun.

9  Q     What was Mr. Okun's response?

10  A     He did not believe that that number was at all

11  accurate and indicated he believed that all of those

12  borrowings had been repaid and the number, if it was

13  any number at all, was a very small number.

14  Q     Did you have subsequent conversations with

15  Mr. Okun about the amount of the loans?

16  A     Yes.

17  Q     Did he continue in his assertion that all or

18  virtually all of the loans were repaid?

19  A     No.

20  Q     And in April, Mr. Field, did you have discussions

21  with Mr. Okun about the amount of the outstanding

22  loans?

23  A     Yes.

24  Q     Was Mr. Okun continuing in his assertion -- what

25  was Mr. Okun's response to the amount of the loans?

1  A    He had no particular reaction or resistance to the

2  numbers I was using.

3  Q    Earlier you testified, Mr. Field, that your belief

4  that the approximate range of loans or there were

5  approximately $120 million of loans there at the end of

6  April?

7            THE COURT:  Wait a minute.  Why don't you let

8  him testify.  What number were you using in the

9  conversation?

10            THE WITNESS:  120.

11  Q    Is that the number you were relaying to Mr. Okun

12  in this conversation?

13  A    Yes.

14            MR. CANNON:  No further questions, Your

15  Honor.

16            THE COURT:  Can he be excused permanently or

17  does he need to remain available to be recalled?

18            MR. CANNON:  From the government's

19  perspective, he can be excused.

20            MR. POLLACK:  He can be excused.

21            THE COURT:  You can excused and relieved from

22  your subpoena.  Thank you for being with us and giving

23  us your evidence.

24            (The witness was excused from the witness

25  stand.)

1

2          I, Diane J. Daffron, certify that the

3   foregoing is a true and accurate transcription of my

4   stenographic notes.

5
            /S/ Diane J. Daffron          3-21-09
6          _____   _____

7          DIANE J. DAFFRON, RPR, CCR       DATE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25