1

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
2                   RICHMOND DIVISION

3    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                        :
4    UNITED STATES OF AMERICA           :
                                        :
5                                       :
     v.                                 :   Criminal No.
6                                       :   3:08CR00132-01
     EDWARD HUGH OKUN                    :
7                                       :   March 10, 2009
     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

8

9

10

              EXCERPT TRANSCRIPT OF JURY TRIAL DAY 6
11            BEFORE THE HONORABLE ROBERT E. PAYNE
                   UNITED STATES DISTRICT JUDGE

12

13

14

15   APPEARANCES:

16   MICHAEL DRY, Assistant United States Attorney
     BRIGHAM CANNON, Assistant United States Attorney
17   JESSICA A. BRUMBERG, Assistant United States Attorney
     Richmond, Virginia
18
              Counsel on behalf of the United States
19
     CAROLYN V. GRADY, Assistant Federal Public Defender
20   ROBERT J. WAGNER, Assistant Federal Public Defender
     Richmond, Virginia
21   and
     MILLER & CHEVALIER
22   Washington, D.C. 20005
     BY:  BARRY J. POLLACK, ESQ.
23
              Counsel on behalf of the Defendant.
24
                    DIANE J. DAFFRON, RPR
25                 OFFICIAL COURT REPORTER
                UNITED STATES DISTRICT COURT

1

2                          I N D E X

3

4                     DIRECT    CROSS    REDIRECT    RECROSS

5   DAVID FIELD                    3         43         --

6   TIMOTHY HEAPHY        51      65         80         83

7   CHRISTOPHER HOCTOR    84     131         --         --

8

9                    E X H I B I T S

10
                                                    Page
11  **GOVERNMENT'S EXHIBITS:**

12  No. 163   McGuire Woods resignation letter        61

13  No.  46A  REES bill of sale                        95

14  No.  46B  REES stock purchase agreement            96

15  No.  50A  NES purchase and sale agreement         101

16  No.  64A  IXG purchase and sale agreement         103

17  No. 282   Hibiscus Island property                130

18

19

20

21

22

23

24

25

1            THE CLERK:  Criminal No. 3:08CR00132-01, the

2  United States of America vs. Edward Hugh Okun.

3  Mr. Michael Dry and Mr. Brigham Cannon and Ms. Jessica

4  Brumberg represent the United States.  Mr. Robert J.

5  Wagner, Ms. Carolyn V. Grady, and Mr. Barry Pollack

6  represent the defendant.

7            Are counsel ready to proceed?

8            MR. DRY:  The United States is ready to

9  proceed.

10            MR. WAGNER:  The defendant is ready, Your

11  Honor.

12

13  * * * * *

14

15            THE COURT:  Mr. Field is back on the stand,

16  right?  Can we get Mr. Field?

17            Just have a seat, Mr. Field. I remind you,

18  you are under the same oath that you took yesterday.

19            Mr. Pollack.

20            MR. POLLACK:  Thank you, Your Honor.

21

22    CROSS-EXAMINATION (Continuing)

23  BY MR. POLLACK:

24  Q    Good morning, Mr. Field.

25  A    Good morning.

4

1  Q    I'd like to start with something we briefly

2  discussed yesterday.  Isn't it a fact, Mr. Field, that

3  you were never directed by Mr. Okun not to disclose

4  information about the QI loans, the qualified

5  intermediary loans?

6  A    I was directed not to disclose information.

7  Q    So that would be the opposite of what I'm saying,

8  right?

9  A    Yes.

10 Q    Now, you remember meeting with the government

11 agents, I know you may not recall the precise date,

12 June 19, 2007.  Do you recall meeting with them in that

13 time frame?

14 A    Yes.

15 Q    At that time, like all your other meetings with

16 the government agents, you knew it was important to be

17 truthful and to be accurate, correct?

18 A    Yes.

19 Q    Isn't it true that at that time you told the

20 government agents that you were never directed by

21 Mr. Okun not to disclose information about the QI

22 loans?

23 A    I don't remember saying that.

24 Q    I'm going to hand up to you a copy of the

25 interview memorandum dated June 19.  The memorandum is

1  dated June 24, but the interview took place on June 19,

2  2007, and ask you to look at the first sentence in the

3  third full paragraph.

4      Don't read it out loud, but just review it

5  yourself and whenever you're done, take as much time as

6  you need, hand it back to the courtroom security

7  officer, who'll hand it back to me.

8  A    (Complying.)

9  Q    Mr. Field, having had the opportunity to review

10 that document, is it still your testimony that you did

11 not tell the agents that you were never directed by

12 Mr. Okun not to disclose the evidence about the QI

13 loans?

14 A    I do not remember the conversation that that

15 recorded, and I do not remember what the agent thought

16 at the time, but, clearly, in my mind, I was directed

17 not to discuss the QI loans with anyone else.

18 Q    Mr. Field, my question is:  Did you make that

19 statement to the agents on that occasion?

20 A    I don't remember.

21          THE COURT:  He answered that he didn't

22 remember that.  He didn't remember what the question

23 was or what they were talking about or what they knew.

24 He answered it.

25          MR. POLLACK:  I understand.  I want to be

1  clear I wasn't asking what they knew or what they were

2  thinking.  I was asking what you said.

3          THE COURT:  He answered.

4          MR. POLLACK:  Thank you, Your Honor.

5  BY MR. POLLACK:

6  Q    Okay.  Let's move on to something different then.

7          MR. POLLACK:  Ms. Bishop, can you put up

8  Government 139, which is already in evidence.

9  Q    This is the memo that you wrote on November 13,

10 2006, about the issues related to Mr. Pajonas and his

11 performance, correct?

12 A    Yes.

13 Q    And we talked yesterday about the section that's

14 highlighted, "Legal Situation"?

15 A    Yes.

16 Q    And that was about Mr. Pajonas's failure to

17 identify that there was an issue with the exchange

18 agreements and his failure to correct that, correct?

19 A    Yes.

20 Q    Now, I want to be clear.  For you, Mr. Field,

21 prior to the time Mr. Perkins raised the issue of the

22 exchange agreements, that had not been an issue for

23 you?  It hadn't been something you were focused on; is

24 that correct?

25 A    Prior to -- about a week before that in my meeting

1 with Mr. Pajonas who raised all of these issues, but

2 prior to that time I had not been focused on that

3 issue.

4 Q     Okay.  In fact, you, yourself, had not even

5 reviewed the exchange agreements; is that correct?

6 A     That's true.

7 Q     Even though you were a senior executive with the

8 company?

9 A     Right.  My responsibilities do not include QI

10 companies.

11 Q     That was Mr. Pajonas's responsibility?

12 A     Correct.

13 Q     Now, after -- I'm sorry.  Going back to this

14 document, the preceding paragraph, the issue

15 surrounding the exchange agreements wasn't the only

16 concern you expressed about Mr. Pajonas's performance;

17 isn't that right?

18 A     Correct.

19 Q     And let's look at the preceding section,

20 "Accounting Records."  Can you just go ahead and read

21 that paragraph to us?

22 A     Yes, sir.  "Accounting Records - The accounting

23 records of the 1031 Tax Group and operating units are

24 in complete disarray with no viable information

25 available to either management or ownership as to the

1  operating profit or loss or financial stability.  The

2  customer records relating to the details of exchanges

3  is incomplete, inaccurate, and in disarray causing loss

4  of income from fees and an inability to manage the

5  float and cash resources.  While Todd might assert that

6  this was outside his control due to the actions of

7  IPofA and the borrowing of cash, the maintenance of

8  customer records, including the exchange itself and

9  fees earned, were always within his control and

10 responsibility.  This is a serious failure to perform

11 his duties as president."

12 Q    Thank you.

13        MR. POLLACK:  Ms. Bishop, you can go ahead

14 and take down Government 139.

15 Q    On November 9, you had a telephone conversation,

16 you participated in a telephone conversation with some

17 members of the law firm of McGuire Woods?

18 A    Excuse me.  On what date?

19 Q    November 9, 2006.

20 A    Yes, I did.

21 Q    And after that you spoke with Mr. Okun?

22 A    I believe it was the next day, yes.

23 Q    And Mr. Okun agreed that the company should move

24 quickly to have all the exchange agreements redrafted,

25 correct?

1 A    Yes.

2           MR. CANNON:  Objection, Your Honor.  Hearsay.

3           MR. POLLACK:  It's not for the truth.  It's

4 the direction that he's giving to his underlings and

5 it's inconsistent with the notion that he's in a

6 conspiracy to make misrepresentations to the clients if

7 he's directing the changes be made to clarify the

8 clients.

9           MR. CANNON:  It's not relevant if it's not

10 for the truth.

11          MR. POLLACK:  It's relevant because the

12 instruction was given.

13          THE COURT:  Overruled.

14 BY MR. POLLACK:

15 Q    Mr. Okun agreed that the companies should move

16 quickly to have all the exchange agreements redrafted,

17 correct?

18 A    Yes.

19 Q    And all the advertising and websites changed,

20 correct?

21 A    Yes.

22 Q    And he also wanted an employee manual prepared so

23 that employees would know exactly what they could say

24 and what they could not say, correct?

25 A    Yes.

1          MR. POLLACK:  And if we can put up

2   Government's Exhibit 140.

3          THE CLERK:  Has it been published to the

4   jury?

5          MR. POLLACK:  It has.

6   BY MR. POLLACK:

7   Q    This is an e-mail from you, but attached to the

8   e-mail is another memo that you did, correct?

9   A    Correct.

10  Q    And this is a memo to Mr. Okun, Ms. Coleman, and

11  Mr. Perkins, yes?

12  A    Yes.

13  Q    Same date as the memo we just looked at,

14  November 13, 2006, right?

15  A    Yes.

16  Q    And you recommend a number of actions and those

17  are the three bullet points, correct?

18  A    Yes.

19  Q    A complete review and redraft of the legal

20  documents that were used in the exchange process,

21  correct?

22  A    Yes.

23  Q    Those would be what I have been calling the

24  exchange agreements?

25  A    Yes.

1  Q    A complete review and rewriting of the information

2  contained in the website, correct?

3  A    Yes.

4  Q    And the drafting of a sales manual to tell the

5  sales force exactly what they can do?

6  A    Yes.

7  Q    Mr. Okun readily agreed to those recommendations,

8  did he not?

9  A    He did.

10 Q    If I can draw your attention to the next

11 paragraph, starting with "During a discussion with Ed

12 Okun," can you please read from there the rest of the

13 paragraph?

14 A    Yes.  "During a discussion with Ed Okun on Friday,

15 November 10, a decision was reached to outsource the

16 review and redraft of all documents for purposes of

17 completing the task at the earliest possible time.

18 Initial thoughts were to expand McGuire Woods' mission

19 to include this.  Eric and David will present a plan to

20 do this as soon as possible."

21 Q    Mr. Okun's instructions were to get this done at

22 the earliest possible time?

23 A    Yes, sir.

24 Q    And suggested using McGuire Woods for that

25 purpose?

1  A    Yes.

2  Q    However, McGuire Woods did not end up completing

3  the work that the company had wanted McGuire Woods to

4  do for it; is that correct?

5  A    I believe that to be true.

6  Q    In fact, after Mr. Perkins resigned, McGuire Woods

7  indicated they also were going to resign from the

8  representation, correct?

9  A    I was told that by Ms. Coleman.

10  Q    In particular, McGuire Woods stated that they had

11  a conflict of interest that precluded them from

12  continuing to represent both IPofA and the 1031 Tax

13  Group?

14  A    They did.

15  Q    And so as a result of McGuire Woods withdrawing or

16  resigning, a decision was made that another firm would

17  be retained, another law firm would be retained, to

18  complete the same tasks that were going to be assigned

19  to McGuire Woods; is that correct?

20  A    Yes.

21  Q    And that included changing the exchange agreements

22  and the websites?

23  A    Yes.

24  Q    To make sure that they didn't say anything that

25  was inconsistent with the practices of the company?

1  A      Yes.

2  Q      And a Florida firm was retained for that purpose,

3  correct?

4  A      Yes.

5  Q      And that's the firm that is KPKB, correct?

6  A      Yes.

7  Q      And you spoke with the Florida lawyers, is that

8  correct, around the end of November 2006?

9  A      No, I don't believe so.

10  Q      Did you learn at the end of November of 2006 that

11  the news from those lawyers was very good?

12  A      More mid December, but yeah, Mr. Okun called me in

13  mid December.

14  Q      And you were aware that the Florida lawyers did

15  not believe there was anything illegal about the loans?

16  A      That's what Mr. Okun communicated to me.

17  Q      You yourself didn't speak directly to the Miami

18  lawyers?

19  A      I did not.

20  Q      Now, the government showed you Exhibit 217, which

21  is in evidence.  We can put that up.  You can just go

22  down to the bottom.  This is a request for a borrowing

23  from the 1031 Tax Group, right?

24  A      Yes, sir.

25  Q      And in this case, it's a borrowing by Okun

1  Holdings.  By this point Okun Holdings existed?

2  A    Yes.

3  Q    And you are the one who is initiating this

4  request, correct?

5  A    I am.

6  Q    And you want the loan to be documented, correct?

7  A    Absolutely, yes.

8  Q    And the interest rate to be documented?

9  A    Yes.

10 Q    And if we can go up to the top e-mail, Mr. Okun

11 readily agrees?

12 A    He did.

13 Q    Now, in addition to making sure that loans were

14 documented, you also wanted to have it be some

15 accounting effort to make sure that everybody was

16 comfortable that they had quantified the loans that had

17 been taken to date; is that fair?

18 A    Yes.

19 Q    And Mr. Zacarias did some analysis in that regard?

20 A    He did.

21 Q    However, you believe that Mr. Zacarias's figures

22 were really bogus accounting; is that correct?

23 A    No.

24 Q    They were bogus accounting because they didn't

25 take into account the fact that the QIs had some

1 operating losses, not all of the money that was spent

2 by the QIs were borrowings; is that correct?

3 A    Could you say that a different way, please, so I

4 can be sure I understand?

5 Q    You believe that the figure that Mr. Zacarias came

6 up with as what was supposedly an amount that had been

7 borrowed by IPofA or other Okun entities was bogus

8 accounting because it didn't take into account the QI,

9 qualified intermediary, losses, their operating losses?

10 A    I'm not sure what exact figure you're referring

11 to.  Mr. Zacarias worked and produced a number that he

12 said represented the borrowings at December 31, '05, I

13 guess, and that number was to represent the borrowings

14 from customer funds.

15     I don't understand exactly what you mean by

16 separate losses of the entities themselves.  Those two

17 numbers would seem to be different numbers.

18 Q    Okay.  Should be different numbers?

19 A    Should be different numbers.

20 Q    Okay.  The analysis that Mr. Zacarias performed

21 and his calculation of what the borrowings supposedly

22 were for the year ended December 31, 2005?

23 A    Yes.

24 Q    So, in other words, what had been borrowed during

25 the calendar year of 2005?

 1  A      Yes.

 2  Q      That analysis, you believe, was bogus accounting;

 3  is that correct?

 4  A      No.

 5  Q      Do you recall meeting with the federal agents in

 6  this case on August 29, 2007, or thereabouts?

 7  A      Yes.

 8  Q      Do you recall saying that Zacarias had come up

 9  with a loan amount and the liability for the clients,

10  and that this was really bogus accounting because it

11  did not take into account the losses of the QIs?

12  A      Again, I think that we may have been talking about

13  that subject in the discussion with the government, but

14  those two numbers are separate numbers, and she may

15  have written it down incorrectly or whatever, but the

16  loans, which are part of the balance sheet of the 1031

17  Group, and the operating results, which are part of the

18  income statement, would not have been generally lumped

19  into a similar item.

20  Q      They should not have been?

21  A      They should not have been.

22  Q      Are you telling me that if the agent wrote in her

23  report that you used the phrase "bogus accounting" to

24  refer to Mr. Zacarias's analysis, that the agent just

25  got that wrong and you never used that phrase?

1  A     I don't remember that.   That seems odd to me that

2  that would have happened.

3  Q     Would looking at the report help refresh your

4  recollection?

5  A     Yes.

6        MR. POLLACK:  I'm going to show Mr. Field a

7  memorandum of interview from August 29, 2007, and

8  direct him to the first paragraph of page 8.

9  Q     You don't need to read from the report.   My only

10 question is:  Having had the opportunity to review

11 that, do you now recall one way or the other whether

12 you used the phrase "bogus accounting" in your

13 interview with the government to describe Mr.

14 Zacarias's analysis?

15 A     If earlier in this paragraph they talk about the

16 general accounting of the 1031 groups, and my response

17 using that phrase was that they were only looking at

18 the accounting as it related to the liability for

19 customer accounts.  They were mixing their message

20 here.  They were earlier in the sentence before, two

21 sentences before, talking about the accounting of the

22 1031 group of which the liabilities for customer funds

23 would have been only one component.

24       So to have looked at only the liability as related

25 to the entire accounting for the 1031 group would have

1  been inaccurate, and I apparently used the word "bogus

2  accounting" if that's all that they were looking at.

3          THE COURT:  Let me see that document.

4          MR. POLLACK:  Yes.

5          THE COURT:  All right.  You can give it back

6  to Mr. Pollack.

7  Q    Mr. Field, I was confused.  You used the word

8  "they" several times in that last sentence.  In using

9  the term "bogus accounting," were you referring to Mr.

10 Zacarias's accounting or were you referring to the

11 government agent's accounting?

12 A    No, I was saying that the use of Mr. Zacarias's

13 number to represent the whole accounting for the 1031

14 Tax Group was bogus, was not true.

15 Q    Who was doing that?

16 A    I forget who we were talking about earlier in that

17 paragraph.

18 Q    Were you talking about Mr. Zacarias and his team?

19 A    I thought in the sentence -- could I see that

20 again?

21 Q    Yes.  Don't testify from the report.  My question

22 is a simple one.  Having had the chance to review that,

23 whose accounting, who were you referring to when you

24 used the phrase "bogus accounting"?

25          THE COURT:  That wasn't the question you

1  asked him.  You asked him who he was referring to when

2  he said the word "they," and he wanted the document to

3  refresh his recollection about what it was that he

4  meant by "they."  That is what you had on the table at

5  the time you asked the question.  That's why it went

6  over there.  If you want to ask another question, okay,

7  but that's not the one you asked.

8  Q    Maybe I'm confused because I thought it was one

9  and the same.  I thought "they" was the reference to

10  whomever it was that had engaged in the bogus

11  accounting.  Am I correct about that?

12  A    The "bogus accounting" refers to the use of Mr.

13  Zacarias's information in a way that wasn't complete

14  and this was Mr. Perkins.

15  Q    I see.

16        THE COURT:  Perkins is referred to in the

17  first part of the memo, and he's talking about what

18  Perkins said and the way Perkins was using it.

19        Now, look.  Let me tell you both something.

20  Impeachment impeaches, and you get on the stick, and if

21  it actually relates to something that impeaches, that's

22  fine.  But to go off the reservation isn't proper.  And

23  you get up and do your job, and you do your job, and

24  then we'll get it straight, and we won't have to spend

25  15 minutes wasting time talking about matters that may

1 or may not be impeaching.  Let's do it right.

2                MR. POLLACK:  I apologize, Your Honor.

3                THE COURT:  All right.  Let's go.

4                MR. POLLACK:  I was just trying to understand

5 the answer to make sure that I understood correctly.

6 BY MR. POLLACK:

7 Q    So it was Mr. Perkins's use of Mr. Zacarias's

8 analysis that you were referring to as bogus?

9 A    Yes.

10 Q    Okay.  Now, you talked yesterday with the

11 government about a situation where there were funds

12 that Mr. Okun wanted to move, but they were in a

13 segregated account.  Do you recall that, a specific

14 instance?

15 A    Yes.

16 Q    And the funds were not moved.  They were returned

17 to the customer?

18 A    I believe that's right.

19 Q    Okay.  I want to ask you about the opposite

20 situation.  You also learned, did you not, that there

21 were times that pooled accounts were used to pay back

22 an exchanger whose money was in a segregated account?

23 A    I was aware that that happened.

24 Q    Okay.  And just so we're clear, some of the

25 exchangers' monies were kept in segregated accounts,

1  meaning there's a specific account with the customer's

2  name on it, correct?

3  A    Yes.

4  Q    For other exchangers, the monies were pooled,

5  meaning they were commingled, all of the exchange money

6  was put into an account that had different exchangers'

7  balances in them; is that correct?

8  A    Yes.

9         MR. CANNON:  Objection.  I just would like to

10  clarify a time frame for these questions and for

11  Mr. Field's benefit and I think the jury's.

12         THE COURT:  All right.  Time frame, Mr.

13  Pollack?

14  BY MR. POLLACK:

15  Q    When, Mr. Field, did you become familiar enough

16  with the QI part of the business to learn about the

17  distinction between pooled accounts and segregated

18  accounts?

19  A    In the fall of 2006.

20  Q    When did you first start yourself reviewing some

21  exchange agreements?

22  A    I never reviewed -- when -- the first time I saw

23  any of the exchange agreements was when Mr. McElroy

24  from McGuire Woods requested those be assembled and

25  sent to him for his review.  I did look at one of them

1  at that time.

2  Q    Okay.  Did you become aware that some of the

3  exchange agreements called for the use of segregated

4  accounts, but others called for the use of pooled

5  accounts?

6  A    I didn't look at enough of a sample to determine

7  that myself.

8  Q    Did you ever at any point ever determine that?

9  A    No.

10 Q    But you did become aware at some point that money

11 from the pooled account or a pooled account had been

12 used to pay back exchangers or complete an exchange for

13 an exchanger who had a segregated account?

14 A    Mr. Zacarias told me that.

15 Q    As a result, on the books it showed that a

16 particular exchanger was still owed money because his

17 money was still in the exchange account, but the

18 reality is that exchanger had already been paid because

19 he had been paid from a pooled account?

20 A    I was told that that did happen, yes.

21 Q    So as a result, the numbers as to how much money

22 the exchangers were owed were overstated?

23       MR. CANNON:  Objection, Your Honor.  He's

24 testifying about what other people have told him.  I'm

25 not sure there's a foundation for what his personal

1  knowledge is.

2          THE COURT:  I think that's correct, but you

3  let him testify to at least four answers that fit

4  exactly that description and now you object.

5          Sustained.

6  BY MR. POLLACK:

7  Q    Well, Mr. Field, part of your responsibilities

8  became overseeing the efforts to account for the

9  qualified intermediary loans, correct?

10  A    At some time frame in 2007 I had a more direct

11  involvement with the 1031 accounting, but at a very

12  high level.  The accounting was never done in Richmond

13  for individual customer accounts.

14  Q    But you relied on that high level understanding of

15  the accounting and what was being reported back to you

16  by Mr. Zacarias and others in doing your job; is that

17  correct?

18          MR. CANNON:  Objection, Your Honor.  Mr.

19  Zacarias wasn't with the company in 2007.  I mean, it's

20  just not clear.

21          THE COURT:  Sustained.

22  BY MR. POLLACK:

23  Q    What were your sources for gaining a high-level

24  understanding of what the accounting or the borrowings

25  from the qualified intermediaries consisted of?

1  A     At what point?

2  Q     In 2007.

3  A     In 2007, the QI group had a controller who

4  actually was based in Richmond.  The customer

5  accounting was based in Denver, I believe, in 2007.

6  And so they would provide information to the

7  controller, and I would get information from her.

8  Q     And you relied on that information to do your job

9  because you needed a high-level understanding of that

10  issue?

11  A     Yes.

12  Q     And you relied on that information, the

13  conversations that you had with Mr. Okun, on this

14  subject matter?

15  A     I did.

16  Q     In doing that, did you communicate to Mr. Okun

17  that the numbers from the borrowings were overstated

18  because they showed as still outstanding some balances

19  for exchangers who had segregated accounts who, in

20  fact, had already been paid using pooled accounts?

21  A     There was a question whether that was a fact or

22  not as result of the work that was done by a special

23  group that was hired to go in and rebuild the

24  accounting records for 2006.  I'm sorry, I don't

25  remember the name of that group, but a group was hired

1  that literally went into each of the offices to try and

2  rebuild those records, and they were still working on

3  those records well into the spring of 2007.

4  Q    Did you communicate to Mr. Okun well into the

5  spring of 2007 that there was an issue as to whether or

6  not the quantification of the borrowings was overstated

7  as a result of pooled funds being used to pay

8  exchangers that had segregated accounts?

9  A    As I recall, this accounting firm or outside firm

10 that I mentioned had quantified a number of accounts

11 which had not been verified.  I don't remember the

12 amount that they held in question.

13 Q    My question was what have you communicated to

14 Mr. Okun, if you recall?

15 A    I recall telling him that when reporting on the

16 work of this outside accounting agency, that a certain

17 amount had been reviewed and was final, and a certain

18 amount was questionable, and there were several

19 accounts that they had questions on, whether somebody

20 had been paid twice, for example, or whether, you know,

21 they had been paid the first time.

22 Q    Now, in April of 2007, you discussed efforts to

23 obtain some additional financing, correct?

24 A    With?

25 Q    With the government yesterday.

1 A    Excuse me?

2 Q    Yesterday you testified about efforts in April to

3 obtain additional financing.  You talked about the

4 expectation of a $40 million loan?

5 A    Yes.

6 Q    And you expected that that was simply going to be

7 the first tranche of what ultimately was going to be

8 $250 million worth of financing, correct?

9 A    Yes.

10 Q    And the purpose of obtaining that financing was to

11 help both IPofA and the 1031 Tax Group with their

12 short-term liquidity issues?

13 A    Correct.

14 Q    If we can look at Government's Exhibit 265, I

15 think it's 265, and I think it has been admitted, but

16 maybe I'm wrong.

17          THE CLERK:  It has.

18          MR. POLLACK:  265 has been admitted.

19          MS. GRADY:  265 is missing in action from our

20 book.

21          MR. POLLACK:  Here, I have one.

22          THE COURT:  Do you need one, Mr. Pollack?

23 I've got a copy.

24          MR. POLLACK:  I think I'm okay.  Thank you,

25 Your Honor.  I appreciate it.  It's in evidence, so we

1  can go ahead and you put it up on the screen.

2         THE COURT:  Yes, it is.

3  BY MR. POLLACK:

4  Q    This is an e-mail that you sent to Mr. Okun on

5  April 25, 2007, correct?

6  A    Yes, it is.

7  Q    And that is just two days before the government

8  executed a search warrant at IPofA's offices, correct?

9  A    Yes.

10 Q    And at this time you were anticipating immanently

11 a $40 million loan, correct?

12 A    I was, yes, sir.

13 Q    And the borrower for that was going to be Okun

14 Holdings, correct?  You can go ahead and turn to the

15 second page and see if that -- the very top.  Am I

16 correct?

17 A    Okun Holdings was the generic term that is listed

18 there, but in this sense it was used as the sort of

19 umbrella organization.  Okun Holdings itself did not

20 own any of the property on which these loans were being

21 based.  So it couldn't have been Okun Holdings as the

22 only borrower.

23 Q    But it would be some Okun-owned entity or

24 combination of Okun-owned entities?

25 A    Yes.

1  Q     Not the 1031 Tax Group, though?  It didn't own any

2  real estate, right?

3  A     Yes, correct.

4  Q     And the purpose of the loans was to be the first

5  step in addressing the short-term cash flow or

6  liquidity problems?

7  A     Yes.

8  Q     Out of that first $40 million, 16 1/2 million was

9  going to be used immediately as an infusion of cash to

10 the qualified intermediary companies, correct?

11 A     Yes, that was the plan.

12 Q     Following the execution of the search warrant two

13 days later, the lender chose not to make this loan; is

14 that correct?

15          MR. CANNON:  Objection, Your Honor.

16 Relevance.

17          THE COURT:  I can't think of any relevant

18 reason, can you?

19          MR. POLLACK:  I can, Your Honor.

20          THE COURT:  We're in the same position we

21 were in yesterday where if I couldn't think of it, you

22 couldn't.

23          MR. POLLACK:  Well, you know, that was at 5

24 o'clock in the afternoon.  Now that I've had a good

25 night's sleep --

1          THE COURT:  Good.  What's the relevancy?

2          MR. POLLACK:  Well, the relevance is that the

3   government put into evidence that there was a

4   short-term liquidity crisis, and the government

5   believed that to be relevant, and I am trying to rebut

6   the notion that that was a significant crisis or that

7   there was no plan in place to deal with that.

8          THE COURT:  So that's what the relevance is?

9          MR. POLLACK:  It's to directly rebut evidence

10  the government opened the door to by putting on in its

11  direct examination.

12          THE COURT:  I don't know why the government

13  put the exhibit in in the first place.  Why isn't he

14  right?

15          MR. CANNON:  Well, Your Honor, this

16  particular exhibit is introduced as part of an

17  overall -- I mean, I don't want to get into too much

18  detailed evidence in front of the jury, but, in part,

19  it's to talk about Mr. Okun is telling people to keep

20  going on.  And yesterday when we talked about a

21  temporary cash liquidity crisis, that was not in the

22  context Mr. Pollack talks about, but that was actually

23  in the context of Mr. Field's testimony about his

24  conversations with Mr. Okun, and what they would tell

25  people, not that it was a fact.

1          THE COURT:  All right.  Objection sustained.

2  BY MR. POLLACK:

3  Q    Well, let's talk specifically then about that

4  context that Mr. Cannon raises.  You talked yesterday

5  about telling an exchanger that there had been an

6  unanticipated slowdown in the real estate market.  Do

7  you recall that?

8  A    I do.

9  Q    And you told the exchanger that their money was

10  tied up in longer-term, meaning less liquid,

11  investments, correct?

12  A    Yes.

13  Q    But nonetheless, you told the exchanger that it

14  was just a temporary cash flow issue, correct?

15  A    Yes.

16  Q    And you anticipated that it was going to be

17  resolved immanently, correct?

18  A    Yes.

19  Q    And you offered to give an additional amount of

20  interest to the exchanger to make up for the fact that

21  they were going to get their money a little bit late,

22  correct?

23  A    Yes.

24  Q    And the exchanger agreed to accept that additional

25  amount of money in return for getting money late?

1 A     They did.

2 Q     And you believed that, in fact, this was a

3 short-term problem that was going to be resolved

4 immanently?  In fact, you believed that immanently the

5 QIs were going to have $16.5 million of cash?

6            MR. CANNON:  Objection, relevance.  What

7 Mr. Field believed is not relevant to any question the

8 jury has to decide in this case.

9            THE COURT:  Why is his belief relevant is the

10 question?

11           MR. POLLACK:  Well, Mr. Cannon asked

12 specifically about this conversation on

13 cross-examination.  I'm certainly entitled to ask the

14 witness why he communicated the information that he

15 did.

16           MR. CANNON:  I believe that those questions

17 were asked and answered on direct, but, I mean, but in

18 terms of his motivation or why he did what he did is

19 still not relevant to any discussion or any decision

20 that the jury ultimately has to make with regards to

21 Mr. Okun's culpability.

22           MR. POLLACK:  Your Honor, it was discussed on

23 direct.  It explains why somebody did what they did.

24 We've heard that 20 times.  It can't be that's the rule

25 on direct and it's not the rule on cross.

1           THE COURT:  Well, actually there are plenty

2  of times when what's sauce for goose is not sauce for

3  gander, but in this instance the objection is

4  overruled.

5           Look, when you put stuff in, you have got to

6  make decisions ahead of time about what the

7  consequences are, and you have got to live with the

8  consequences.  Now, you chose to put this in.  He's

9  entitled to ask a question about this particular issue.

10 It wasn't true of the preceding one, but it is true of

11 this one.

12 BY MR. POLLACK:

13 Q    When you made the statement to the exchanger, you

14 believed that you were immanently going to get an

15 infusion of $16.5 million for the qualified

16 intermediary companies, didn't you?

17 A    Yes, I did.

18 Q    You truthfully told the exchanger the money was

19 tied up in a longer-term investment.  You didn't

20 conceal that from the exchanger?

21 A    Yes.

22 Q    Now, after the search warrant was executed on

23 April 25, 2007, Mr. Rosen paid a visit to IPofA's

24 offices; is that correct?

25 A    Yes.

1  Q    And Mr. Rosen was one of the Miami attorneys that

2  was hired after McGuire Woods withdrew?

3  A    I believe that's true, yes.

4  Q    And Mr. Rosen in his visit to the office told all

5  of the --

6            MR. CANNON:  Objection, Your Honor.

7            THE COURT:  He hadn't asked the question yet.

8            MR. CANNON:  He is going to repeat what

9  Mr. Rosen said, but that's clearly hearsay.

10           THE COURT:  All right.  It may be, but until

11 I know what the question is, I can't rule on it.  So

12 you make your objection after the question gets out.

13 The jury is paying attention.  If I overrule an

14 objection, they are not going to pay attention to the

15 question like I told them.

16           Now, do you want to ask the question again?

17           It's going to get an objection, so don't

18 answer it until I get a chance to rule on it.

19           MR. POLLACK:  I don't know.  Maybe Mr. Cannon

20 will change his mind when he hears the whole question.

21           THE COURT:  Maybe it can be retooled in such

22 a fashion as to make him want to sit down.  All right.

23 Let's go.

24 BY MR. POLLACK:

25 Q    Mr. Field, when Mr. Rosen visited the office, he

1 told the assembled employees that the company had done

2 nothing illegal; is that correct?

3          MR. CANNON:  Objection, Your Honor.

4          THE COURT:  Sustained.

5          MR. POLLACK:  I am not putting it in for

6 whether or not Mr. Rosen's statement was true or not

7 true, simply for the fact that it was said and the

8 effect that it had on the listeners.

9          THE COURT:  The fact it was said has no

10 relevance at all with the possible exception of

11 confusing the issues and protracting the trial, and

12 it's not relevant, and even if it is relevant, it's

13 excludable under 403.  What Mr. Rosen thought doesn't

14 make any difference anyway.

15          Let's go.

16          MR. POLLACK:  Okay.

17 BY MR. POLLACK:

18 Q    Now, Mr. Field, you discussed on direct

19 examination with the government the fact that you chose

20 to enter into a plea agreement in this case, correct?

21 A    Yes, sir.

22 Q    And that was based on your personal conduct

23 correct?

24 A    Yes.

25 Q    And in making that agreement with the government,

1  you agreed with the government as to how the United

2  States Sentencing Guidelines would apply in your case,

3  correct?

4  A    Yes, sir.

5  Q    And you understand and understood when you entered

6  into the agreement, did you not, that there are United

7  States Sentencing Guidelines that advise a court as to

8  what range it ought to sentence an individual to for

9  various offenses, correct?

10 A    Yes.

11 Q    And the sentencing guidelines range that you

12 agreed to applied in your case with the government was

13 135 to 168 months or about 11 and a quarter years to 14

14 years; is that correct?

15 A    You'd have to explain further where that number is

16 coming from.  I don't quite understand.

17 Q    Okay.

18 A    Is this the point system you're talking about?

19        MR. POLLACK:  Let me show to the witness

20 solely for purposes of refreshing his recollection a

21 copy of his plea agreement, which I'll mark for

22 identification only as Defendant's Exhibit 20.

23 BY MR. POLLACK:

24 Q    I'd ask that you to take a look at page 2 of the

25 document, Mr. Field.

1  A     Okay.

2  Q     As you understand the United States Sentencing

3  Guidelines, they would work on what's called "a point

4  system"?

5  A     Yes.

6  Q     And you were agreeing with the government that

7  under that system, your recommended sentencing range

8  would be 135 to 168 months, which is 11 and a quarter

9  to 14 years?

10          MR. CANNON:  Your Honor, I don't believe that

11 that's actually from the plea agreement.  I think that

12 Mr. Field testified he didn't know what the number is.

13          THE COURT:  Either the plea agreement has it

14 in there or it doesn't, does it not?

15          MR. POLLACK:  It's on page 2.

16          THE COURT:  Is this an 11(C)(1)(c) agreement?

17          MR. POLLACK:  No, it's not.

18          MR. CANNON:  No, Your Honor.

19          THE COURT:  All right.

20          Why are you confused about what's in the plea

21 agreement?  Don't you have it in front of you,

22 Mr. Cannon?

23          MR. CANNON:  Your Honor, I apologize, but I

24 misplaced it.  I had it yesterday, but I don't have it

25 in front of me.

1          MR. DRY:  Do you a copy for us?

2          MR. POLLACK:  I do not have a copy other than

3  the one the witness has.

4          But are you through with it, Mr. Field?

5          THE WITNESS:  I am.

6          THE COURT:  Could I see it on its way back

7  there?

8          Well, Mr. Pollack, it's not actually in the

9  plea agreement.  That's how you calculate the

10 application of those things, right?  I mean, I don't

11 see those numbers in the plea agreement except

12 somebody's handwritten notes.

13         MR. POLLACK:  I see what you're saying.  The

14 offense level is in the plea agreement, but what that

15 offense level means in terms of sentencing is not.

16         THE COURT:  There's no sentencing range in

17 here, which is why he's confused.

18         MR. POLLACK:  I understand.

19         THE COURT:  And the objection is sustained

20 because of that.

21         You can ask him what he thinks -- the United

22 States agreed to make a recommendation.  It's not

23 binding on the Court.  What does he recall that

24 recommendation would yield in the way of a sentence?

25         Can you answer that question?

1           THE WITNESS:  Five years.

2           THE COURT:  What?

3           MR. POLLACK:  Five years is the agreement

4  that I entered into.  But what it might have been I

5  don't remember being discussed.

6           THE COURT:  Five years is 60 months, is it

7  not?

8           MR. POLLACK:  It is, but we'll get to that.

9           THE COURT:  Okay.

10  BY MR. POLLACK:

11  Q    You had an agreement as to what your sentence

12  would look like if you were sentenced under the

13  sentencing guidelines, and what the government's giving

14  you in this plea agreement is saying instead of being

15  sentenced at that range, we'll cap your sentence at

16  five years?

17  A    Yeah, I knew it was less.

18  Q    And you knew, did you not, that it was a lot less?

19  In fact, the range under the sentencing guidelines

20  would have been 11 and a quarter to 14 years?

21  A    I don't remember the 11 years being said out loud,

22  so I don't know how to relate to that except that it

23  was more than the five years.

24  Q    Substantially more?

25  A    Substantially more.

1  Q    Do you recall it more than double the five years?

2  A    I do not remember that being quantified.

3         THE COURT:  Just so I understand it -- excuse

4  me.  This is a recommendation by the government; is

5  this what this is?  This isn't something that's an

6  agreed-upon sentence.

7         MR. POLLACK:  It's not an agreed-upon

8  sentence.  The government and the defendant agreed to

9  jointly recommend to the Court how the sentencing

10 guidelines would apply.

11         THE COURT:  Right.  And that's not binding on

12 the Court.

13         MR. POLLACK:  That is not binding on the

14 Court.  What is binding on the Court is the fact that

15 the government agreed to, regardless of where the

16 sentencing guidelines come out, cap the maximum

17 sentence at five years by offering a five-year statute.

18         THE COURT:  The statute that he's charged

19 under?

20         MR. POLLACK:  Yes.

21         THE COURT:  Yes.

22 BY MR. POLLACK:

23 Q    So that was your understanding.  But for this

24 agreement, you would have gotten substantially more?

25 In this agreement, the government is giving you --

1 you're only pleading guilty to a single offense, right?

2 A    Yes.

3 Q    And that single offense has a five-year maximum

4 sentence?

5 A    Yes.

6 Q    So regardless of where the sentencing guidelines

7 come out, you cannot get more than five years?

8 A    That's my understanding.

9 Q    And that would not be true if the government had

10 not offered you this deal?

11 A    That's right.

12 Q    And when we talk about these years, you understand

13 under the federal sentencing system, there's no such

14 thing as parole, right?

15 A    I was told that, yes.

16 Q    And you, as part of your agreement with the

17 government, you agreed to cooperate with the

18 government, correct?

19 A    I agreed to make myself available and tell the

20 truth in all situations.

21 Q    But specifically you agreed to cooperate, make

22 yourself available, and that would include give your

23 testimony today, right?

24 A    Yes, sir.

25 Q    Because you would otherwise have a constitutional

1  right not to testify, right?

2  A    I believe so.

3  Q    And you gave that up as part of this agreement

4  that you would tell the government yes, I will be

5  willing to testify, right?

6  A    Yes.

7  Q    And you said that you have to testify truthfully,

8  right?

9  A    Yes.

10 Q    And the whether or not you're telling the truth

11 for purposes of whether or not you complied with this

12 agreement is determined by the government, correct?

13 A    No, I don't think so.

14 Q    So you think if I think your testimony hasn't been

15 truthful, I can take this agreement away from you?

16 A    I believe that if the Court believes I'm telling

17 the truth.

18 Q    But if the government thinks you're not telling

19 the truth, it never gets to the Court, does it?

20 A    I don't understand your question.

21 Q    My question is:  As long as the government

22 believes what you are saying, you are in no danger of

23 violating this agreement, correct?

24 A    It's the government who would be the one to

25 challenge whether what I'm telling you the truth is the

1  truth, then you would be correct.

2  Q    And that is in fact your understanding of how it

3  works?

4  A    I don't understand the power of the Court to

5  impose some penalty for failure to tell the truth.

6  Q    In addition to your obligation to cooperate and

7  give what the government believes to be truthful

8  testimony, you also understand, do you not, that you

9  can be sentenced -- or you can't be sentenced for more

10  than five years under this agreement, but you can be

11  sentenced for less than 5 years, correct?

12  A    Yes.

13  Q    And the government asked you yesterday about this

14  cooperation provision, but one thing they didn't ask

15  you about is something that's called substantial

16  assistance in the investigation and prosecution of

17  others.  Are you familiar with that term or that

18  phrase?

19  A    Yes.

20  Q    What that phrase means is that regardless of where

21  the sentencing guidelines come out, you can get a

22  substantially lower sentence, even lower than the five

23  years, if the government tells the Court that you have

24  been in substantial -- that you have provided

25  substantial assistance in the prosecution of other

1 people, people other than yourself, correct?

2 A     Yes.

3 Q     Like Mr. Okun here?

4 A     Yes.

5 Q     And I take it, Mr. Field, you would like to get

6 the least sentence possible?

7 A     Yes, sir.

8          MR. POLLACK:  I have nothing further.  Thank

9 you.

10

11          REDIRECT EXAMINATION

12 BY MR. CANNON:

13 Q     Good morning, Mr. Field.

14 A     Good morning.

15 Q     Briefly touching on what Mr. Pollack covered last

16 in the cross-examination, Mr. Field, have any promises

17 been made to you in regard to your testimony or any

18 reductions in your sentence?

19 A     No.

20          MR. CANNON:  I'd like to pull up Government's

21 Exhibit 217, which has been admitted?

22          THE CLERK:  It has been?

23          MR. CANNON:  Yes, Mr. Neal.

24 Q     You looked at this document on cross-examination

25 this morning, and the questions were about that you

1 wanted this particular loan documented.  Mr. Field, why

2 was it important to you to document these loans?

3 A    It's good business practice, but also in the

4 conversation with Mr. Okun in December when he was

5 indicating the results of the legal review, one of the

6 issues was a more and complete and accurate

7 documentation of the loans.

8 Q    Was there an incomplete and inaccurate

9 documentation in the past?

10          MR. POLLACK:  Objection, lack of foundation.

11          THE COURT:  Overruled.

12          MR. CANNON:

13 A    It's my understanding that that is true.

14          MR. CANNON:  I'd like to move to Government's

15 Exhibit 139, which is in evidence, and the second page.

16 And that second, I believe, legal solution paragraph.

17          THE COURT:  Legal situation?

18          MR. CANNON:  Legal situation.

19 Q    Mr. Field, the information that you're relaying in

20 your memo here, who was providing you that information?

21 A    Mr. Okun and Mrs. Coleman.

22 Q    Did you have any personal knowledge about

23 Mr. Pajonas and his task to change the exchange

24 agreements?

25 A    No, I did not.

1  Q     And prior to the November 7 memo from Mr. Perkins,

2  had you ever heard Mr. Okun or Ms. Coleman identify

3  this issue with Todd Pajonas and the exchange

4  agreements?

5  A     I don't believe so, no.

6  Q     And going up to the first bullet point in the

7  accounting records, if you could look at the sentence

8  that says, "While Todd might assert."

9  A     Yes.

10 Q     "Due to the actions of IPofA and the borrowing of

11 cash," what were you referring to in that sentence?

12 A     In my discussion with Mr. Pajonas, he indicated

13 that the accounting function was taken over or was the

14 responsibility of someone in Richmond, not his

15 organization.

16 Q     And are you referring to the borrowings or taking

17 of money out of the 1031 Tax Group in that sentence?

18 A     That's part of it.

19 Q     Moving along, I think we're done with that

20 exhibit.  Thank you.

21       Following the conversation with the November 9

22 phone call with McGuire Woods, you have talked about

23 your conversation with Mr. Okun.

24 A     Yes, the next day.

25 Q     The next day.  And did you explain to Mr. Okun or

1  did you talk to Mr. Okun about the company's practices

2  being in violation of the exchange agreements?

3  A    Yes.

4  Q    What did you explain to him on that subject?

5  A    That in the conversation with McGuire Woods, that

6  they pointed out that what the company was actually

7  doing was not consistent with or in accord with the

8  documents that we had forwarded to them for their

9  review.

10 Q    Did Mr. Okun disagree with that assessment?

11 A    No.

12 Q    In subsequent conversations with Mr. Okun about

13 exchange agreements, did he ever disagree with the idea

14 that the borrowing practice in the past was not

15 consistent with the exchange agreements?

16 A    No.

17 Q    And then one final point.

18           MR. CANNON:  If we could pull up Government's

19 Exhibit 265, the second page.

20 Q    This is from April 26 or 25, 2007?

21 A    Yes.

22 Q    According to your knowledge at the time, what was

23 the approximate, just a range, of loan values that was

24 owed to the qualified intermediary companies?

25 A    Somewhere in the 120 million, 125 million-dollar

1 range.

2 Q    Had discussions about this loan with Mr. Okun,

3 were those the first discussions you had had with

4 Mr. Okun about retaining borrowing?  Obtaining a loan

5 to repay?

6 A    Oh, no, huh-uh.

7 Q    How far back did those discussions go?

8 A    Certainly back to his assertion or his

9 conversation in mid December where he said it

10 was planned -- he planned -- was going to repay in

11 total all loans.

12 Q    Mr. Field, in conjunction with that amount of

13 borrowings, did you have any conversation with Mr. Okun

14 about the range of outstanding loans from the 1031 Tax

15 Group?

16 A    Yes.

17 Q    When did you have these discussions?

18 A    The total amount of outstanding?  Several times.

19 Many times.

20 Q    Was there ever any dispute that there were loans

21 outstanding to the 1031 Tax Group?

22         THE COURT:  From Mr. Okun?

23 Q    From Mr. Okun.

24 A    From Mr. Okun, no.

25 Q    Was there ever any -- what was the range of

1  outstanding loans to the 1031 Tax Group that you told

2  Mr. Okun?

3              MR. POLLACK:  Objection.  Asked and answered.

4              THE COURT:  I thought he just answered it.

5              MR. CANNON:  The range of loans.  What did he

6  communicate to Mr. Okun as being the range of loans?

7  The amount of loans, I'm sorry.

8              THE COURT:  The amount or the range?

9              MR. CANNON:  The amount of loans.  And if

10  that was a range -- let's start over.

11             THE COURT:  Sustained.

12  BY MR. CANNON:

13  Q    You had conversations with Mr. Okun in which you

14  communicated to him amounts of loans that were

15  outstanding?

16  A    Yes.

17  Q    And what number or numbers did you tell Mr. Okun

18  was the amount of the loans outstanding to 1031 Tax

19  Group?

20             MR. POLLACK:  Objection.  Is there a time

21  frame?

22             THE COURT:  When?

23  BY MR. CANNON:

24  Q    Did you have a discussion with Mr. Okun in late

25  2006 about the loans?

1  A    Yes.

2  Q    At that time what number did you tell Mr. Okun?

3  A    The number that was provided to me by Mr. Zacarias

4  was $130 million.

5         THE COURT:  But the question is:  What did

6  you tell Mr. Okun?

7  A    I'm sorry.  And I communicated that number in

8  discussions with Mr. Okun.

9  Q    What was Mr. Okun's response?

10  A    He did not believe that that number was at all

11  accurate and indicated he believed that all of those

12  borrowings had been repaid and the number, if it was

13  any number at all, was a very small number.

14  Q    Did you have subsequent conversations with

15  Mr. Okun about the amount of the loans?

16  A    Yes.

17  Q    Did he continue in his assertion that all or

18  virtually all of the loans were repaid?

19  A    No.

20  Q    And in April, Mr. Field, did you have discussions

21  with Mr. Okun about the amount of the outstanding

22  loans?

23  A    Yes.

24  Q    Was Mr. Okun continuing in his assertion -- what

25  was Mr. Okun's response to the amount of the loans?

1 A    He had no particular reaction or resistance to the

2 numbers I was using.

3 Q    Earlier you testified, Mr. Field, that your belief

4 that the approximate range of loans or there were

5 approximately $120 million of loans there at the end of

6 April?

7           THE COURT:  Wait a minute.  Why don't you let

8 him testify.  What number were you using in the

9 conversation?

10          THE WITNESS:  120.

11 Q    Is that the number you were relaying to Mr. Okun

12 in this conversation?

13 A    Yes.

14          MR. CANNON:  No further questions, Your

15 Honor.

16          THE COURT:  Can he be excused permanently or

17 does he need to remain available to be recalled?

18          MR. CANNON:  From the government's

19 perspective, he can be excused.

20          MR. POLLACK:  He can be excused.

21          THE COURT:  You can excused and relieved from

22 your subpoena.  Thank you for being with us and giving

23 us your evidence.

24          (The witness was excused from the witness

25 stand.)

1          MR. CANNON:   The government calls Tim Heaphy.

2

3      **TIMOTHY HEAPHY**, called by the United States, first

4  being duly sworn, testified as follows:

5

6      DIRECT EXAMINATION

7  BY MR. CANNON:

8  Q     Good afternoon, Mr. Heaphy.

9  A     Good afternoon.

10 Q     Could you please state your name and spell your

11 last name for the record?

12 A     My name is Tim Heaphy.   The last name is spelled

13 H-e-a-p-h-y.

14 Q     Mr. Heaphy, what's your educational background?

15 A     I have graduated from the University of Virginia

16 in 1986, and then I graduated from the University of

17 Virginia Law School in 1991.

18 Q     Mr. Heaphy, what is your current job?

19 A     I'm a partner at the law firm of McGuire Woods

20 based here in Richmond.

21 Q     Could you briefly describe your job history before

22 you worked at McGuire Woods?

23 A     Been at the firm signs January of 2006.   Before

24 that for about 13 years I was a federal prosecutor.   I

25 worked as an assistant U.S. Attorney in Washington,

1  D.C, for about 10 years, and then in the Western

2  District of Virginia in Charlottesville for about three

3  years.

4  Q    What type of law do you practice at McGuire Woods?

5  A    I'm in the government investigations department,

6  which is sort of a fancy term for being a criminal

7  defense lawyer.

8  Q    Mr. Heaphy, how did you become involved in the

9  McGuireWoods' representation of 1031 Tax Group and

10  IPofA?

11  A    I had a very limited involvement.  I got a call

12  from one of my partners Bob McElroy who I believe had a

13  relationship with someone at 1031 Tax Group, and he

14  said there was an issue that he needed my advice and

15  opinion about.  He ran some facts by me and asked me to

16  give an opinion about that.

17  Q    Step back for a moment, but is that sort of a

18  normal, in your practice at McGuireWoods, is that a

19  normal occurrence?

20  A    Very much so.  As a former prosecutor, I often get

21  consultation requests where there's potentially a

22  criminal issue, and there's a lawyer that represents a

23  client that doesn't have that background and I am

24  called to kind of give an opinion about whether there's

25  a criminal issue in a particular case.

1  Q    So you mentioned that Mr. McElroy brought this

2  case to your attention and explained some facts to you.

3  What was it that he explained to you?  What was the

4  situation?

5  A    He gave me some general background about the whole

6  1031 exchange business, about which I knew nothing at

7  this time.  I had never heard of it, was not familiar

8  with that provision of the tax codes.  He told me a

9  little bit about what the 1031 is.  He's a tax lawyer.

10 And then he gave me some basic facts about what our

11 client was doing.  And the basic facts, as I understood

12 them, were there was an exchange agreement with

13 customers that make certain representations about how

14 the money would be used during the period between the

15 two real estate exchanges and that those

16 representations for customers were not being complied

17 with.

18 Q    Did he ask you to participate in a call with the

19 client?

20 A    Yes.  I believe there was a conference call

21 scheduled with the general counsel and some other folks

22 at the 1031 Tax Group, and he asked me to be on that

23 call and to be prepared to provide the opinion to the

24 client.

25 Q    What was the overall purpose of the call?

1 A    I believe there were several purposes of the call.

2 The main purpose, as I recall, was for us to give them

3 our professional opinion about the legality or

4 potential illegality of these exchange agreements or

5 the use of the money in a manner inconsistent with

6 representations in a customer agreement.

7     There was also an issue of who we represented,

8 what entity was our client.  I was less involved in

9 that conflict issue, but that was also discussed, I

10 believe, on the call.

11 Q    I think you just mentioned that there was

12 inconsistency.  Was that how it was explained to you by

13 Mr. McElroy, that the client was using the funds in a

14 manner inconsistent with the exchange agreement?

15 A    Yes.

16          MR. POLLACK:  Objection, asked and answered.

17          THE COURT:  Yes.

18 Q    So what did you explain -- first of all, to the

19 best of your recollection, who was involved in this

20 conference call?

21 A    Bob McElroy, Tennille Checkovich, an associate at

22 McGuire Woods, and me.  The three of us.  I believe

23 that Eric Perkins, who was the general counsel with

24 whom we were dealing, and some other business people.

25 And I was on the phone, so I don't know exactly who

1 from the client company was participating in the call.

2 Q    So based on the information you were provided,

3 what did you relay to the client about your thoughts on

4 the legality or illegality of the actions?

5 A    I expressed the opinion on the call that if the

6 company was using the money in a manner inconsistent

7 with representations to the customer, that that was

8 potentially fraud.  I remember explaining about wire

9 fraud and mail fraud.  They are extremely broad.  A

10 scheme to defraud can really be anything; promises to a

11 customer that you won't use the money for certain

12 things.  If you do use the money for those things, that

13 could very easily fit within the mail or wire fraud

14 statute.

15      And that as I understood the facts at that time,

16 what was going on with the 1031 business could very

17 well be construed as wire fraud or mail fraud.

18 Q    Mr. Heaphy, did you talk to the client about the

19 potential for the government to the discover what was

20 going on?

21 A    Yes, I did.

22        MR. POLLACK:  Objection.  We object as to the

23 client because I don't think Mr. Heaphy has identified

24 who the client was.

25        THE COURT:  Sustained.

1  BY MR. CANNON:

2  Q     Did you explain to the participants on the phone

3  call or did you discuss with the participants on the

4  phone call, Mr. Heaphy, the potential for the

5  government uncovering this activity?

6  A     Yes, I definitely did.  I remember there was

7  discussion on the call about whether or not this could

8  be discovered, and I remember discussing the view that

9  prosecutors are not generally scrubbing business

10 contracts looking for evidence of crime.  Their

11 attention is drawn to it by people that are victimized.

12     If somebody lost money on one of these deals and

13 wanted to do the second half of one of these deals and

14 the money wasn't there, that would obviously prompt

15 contact with law enforcement.  Or if there was somebody

16 inside of the company who believed what was going on

17 was wrong, was fraudulent, there could be sort of a

18 whistleblower, an internal source that would contact

19 agents.  But without that, without anybody losing

20 money, as long as the money was there for the second

21 half of this exchange, and as long as no one from

22 inside the company raised this with law enforcement,

23 then there was a chance that you could continue without

24 detection.  It didn't mean it was right.  It didn't

25 mean it was okay or legal.  It just meant it wouldn't

1 necessarily draw the scrutiny of law enforcement.

2 Q    Is there a prospective aspect and retrospective

3 aspect to your advice?

4 A    Yes, the advice retrospectively was this is like a

5 criminal.  Prospectively, it was:  Change it.  I

6 remember advising him specifically to change the

7 agreements, do business differently.  But at that point

8 I don't believe it had been -- no law enforcement

9 attention had yet been focused on it.  So at least that

10 was my understanding.

11 Q    In the course of this call, was there any

12 disagreement from the participants in the call about

13 any of your factual assumptions about the exchange

14 agreements and compliance with those exchange

15 agreements?

16 A    You know, I don't recall -- there were questions

17 on the call, but I don't remember any disagreement or

18 anyone pushing back and saying no, that's not what

19 happened, no.

20 Q    Was there any disagreement or pushback about the

21 conclusions that you were explaining?

22 A    Not that I recall, no.

23 Q    And so following that phone call, Mr. Heaphy, did

24 you have much more contact with this matter?

25 A    No, I didn't.  I didn't have any contact with it

1 until I got an e-mail from the general counsel asking

2 if I could essentially put what I had said on the call

3 in writing.

4      I think he said there was some confusion among

5 some business people at the 1031 Tax Group about what I

6 had said and he wanted me to write it down, and I did

7 that.

8 Q    And I direct your attention to the screen to

9 Government's Exhibit 147, which has been admitted.

10     Mr. Heaphy, have you had a chance to review this

11 document before your testimony today?

12 A    I have.

13          THE COURT:  Can you all read it?

14          THE JURY:  Yes.

15          THE COURT:  Is that better?

16          THE JURY:  Yes.

17 Q    In this section, could you describe what this

18 section of this document is?

19 A    This looks to be the e-mail that I sent to Eric

20 Perkins copying my two colleagues, Bob McElroy and

21 Tennille Checkovich, in which I basically respond to

22 his request, put in writing the advice I had given

23 during the phone call.

24 Q    Is the advice that you put in this e-mail, is that

25 consistent with what you told the participants on the

1  phone call?

2  A     Yes.

3  Q     Do you recall whether anything was added or

4  subtracted from your discussion in the phone call?

5  A     No.  This was the basic -- these were the basic

6  points I made.  Again, I don't have a specific memory

7  of every word uttered on the call.  This isn't a

8  transcript of it, but was basically the advice I

9  conveyed a week or so before orally on the conference

10 call.

11 Q     I understand from your testimony that you weren't

12 primarily engaged with the clients here; is that

13 correct?

14 A     That's right.  Really, what you've heard me

15 describe is almost the entire extent of my involvement

16 in the matter.

17 Q     So what was the next involvement that you had in

18 this matter?

19 A     After the e-mail?

20 Q     After the e-mail.

21 A     Some days after the e-mail, someone told me, I

22 don't remember if it was McElroy or someone else, that

23 Eric Perkins was leaving, was resigning, because of his

24 concern that the advice we had given, which I believe

25 he had echoed, wasn't being followed.  We then decided

1  we needed to withdraw.  McGuire Woods institutionally

2  wasn't going to represent a client that we believed was

3  potentially involved in a scheme to defraud.  So we

4  decided we needed to withdraw from representation of

5  the client.

6  Q    So in preparation of withdrawal from

7  representation of the client, did you have a

8  conversation with Mr. Okun?

9  A    Yes, I believe so.  It was a telephone

10 conversation.

11 Q    Who else was involved in that conversation?

12 A    Bob McElroy and I called, I believe it was,

13 Mr. Okun, who I've never met, but we called the client,

14 who I believe is Mr. Okun, and said we're withdrawing

15 from the matter.

16 Q    Did you explain to Mr. Okun why you were

17 withdrawing?

18 A    Briefly.  It was reiterating that we had concerns

19 about the continuing course of conduct and because of

20 that we had a conflict and believed we need to

21 withdraw.

22 Q    What were your concerns about the continuing

23 course of conduct?

24 A    From Mr. Perkins' resignation, my understanding

25 is that --

1          MR. POLLACK:  I'm going to object unless this

2 was relayed by Mr. Heaphy to Mr. Okun.

3          THE COURT:  Just express only what you

4 relayed to Mr. Okun were your concerns.

5 A    I'm sorry.  Ask the question again, if you can.

6 Q    Let's direct your attention, Mr. Heaphy, to

7 Government's Exhibit 163, and this has not been

8 admitted.  Is it on the screen in front of you?

9 A    It is.

10 Q    Do you recognize this document?

11 A    I do.

12 Q    Do you see this document at the time?

13 A    Yes.

14          MR. CANNON:  I move admission of Government's

15 Exhibit 163 into evidence.

16          MR. POLLACK:  No objection, Your Honor.

17          THE COURT:  It's admitted.

18          (Government's Exhibit 163 is admitted into

19 evidence.)

20 Q    Mr. Heaphy, could you please read the -- not the

21 first paragraph, but the next two paragraphs beginning

22 with "concerns"?

23 A    Sure.  It says, "Concerns about both entities'

24 continuing course of conduct and potential conflict of

25 interest between IPofA and the 1031 Tax Group have led

1  to our decision."

2  Q     I apologize, but I'll interrupt.  What is this

3  letter?  Can you please describe what it is?

4  A     Yes.  This is a letter that followed up on the

5  telephone conversation in which we're officially

6  withdrawing, notifying the client as to the reasons why

7  we're no longer going to represent them.

8  Q     Could you continue?

9         MR. POLLACK:  Your Honor, this letter is

10 authored by Mr. McElroy, not by Mr. Heaphy.  Mr.

11 McElroy is going to testify.  I don't have any

12 objection to Mr. Heaphy reading verbatim what's in

13 here, but I would object to any interpretation of the

14 document.  Leave that for Mr. McElroy.

15        MR. CANNON:  Any interpretation would be

16 limited to Mr. Heaphy's knowledge of this letter and

17 conversations with Mr. Okun.

18        THE COURT:  All right.  We'll deal with it

19 when and if an interpretation is called for.

20 A     Continuing it says, "Under the Virginia rules of

21 professional conduct, we are obligated to advise IPofA

22 and the 1031 Tax Group that continuing the prior course

23 of conduct with respect to the transfer or investment

24 of funds received by the 1031 Tax Group and its

25 affiliates in their capacity as qualified

1  intermediaries could result in civil and criminal

2  liability to the entities and individuals involved with

3  that conduct.

4      "We have counseled you that this conduct must

5  cease and that all outstanding funds owed to the

6  qualified intermediary entities should be repaid

7  immediately.  While you have assured us that all of the

8  entities involved are taking steps to cease and cure

9  the improper course of conduct, McGuire Woods cannot

10  continue to represent IPofA and the 1031 Tax Group due

11  to your possibly divergent interests.  Although we are

12  returning the retainer we received from you, which is

13  enclosed with this letter, we will bill you for

14  services rendered."

15  Q    Mr. Heaphy, in the phone call that you had with

16  Mr. Okun, did Mr. Okun represent to you what his

17  companies were going to do going forward regarding your

18  advice?

19  A    No, we did not have a substantive discussion about

20  the legality of the transfers in the call.  We said we

21  were withdrawing.  Mr. Okun said something about having

22  other counsel and there was not any sort of argument or

23  pushback.  We sort of anticipated that there might be,

24  and that's, frankly, why I was on the call, I think,

25  because Bob McElroy was, again, the relationship

1  partner.  But there wasn't.  It was just, We need to

2  withdraw because of the continued course of conduct and

3  this conflict of interest.  And there was not any

4  disagreement or pushback that I recall from Mr. Okun.

5  Q    Did he represent to you that the borrowings were

6  going to continue in the future?

7          MR. POLLACK:  Objection.  Leading.  He's just

8  relayed the conversations as he recalled them.

9          THE COURT:  Actually, the answer wasn't

10  responsive to his first question, which is why he's

11  asking this one.  Go ahead.

12  A    Can you ask again?  I'm sorry.

13  Q    Sure.  Did Mr. Okun relay any information to you

14  in the call regarding whether the borrowings from the

15  qualified intermediaries was going to continue?

16  A    Not that I recall.

17  Q    But, in general, Mr. Heaphy, is the outline in the

18  text of the letter that you just read, does that

19  accurately reflect the phone call?

20  A    Yeah, generally, it does.

21          MR. CANNON:  One moment, Your Honor.

22          Pass the witness, Your Honor.

23

24

25

1        CROSS-EXAMINATION

2   BY MR. POLLACK:

3   Q     Good afternoon, Mr. Heaphy.  How are you?

4   A     Well, Mr. Pollack.  How are you?

5   Q     Good.  As I understand it, someone talked to Bob

6   McElroy, your partner, about retaining McGuire Woods

7   before you were involved in the matter, correct?

8   A     As far as I know.  I'm not sure how we got

9   retained.

10  Q     And that happened at the beginning of November of

11  2006?

12  A     I think so.

13  Q     And you first became involved personally a few

14  days later?

15  A     A few days before that telephone call, which I

16  think was in early November of 2006.

17  Q     November 9 of 2006 sound right for the telephone

18  call?

19  A     I think that's right.

20  Q     And so your personal involvement would have been a

21  few days before November 9?

22  A     Yes.

23  Q     And the time that you had the telephone

24  conversation on November 9, did you have an

25  understanding as to who McGuire Woods' client was that

1  you were advising?

2  A     My understanding was that we represented the

3  companies, not any individual, and I believe there are

4  companies, plural.  1031 Tax Group and Investment

5  Properties of America.

6  Q     So you were trying to provide advice to the

7  corporate entities as opposed to any particular

8  individual?

9  A     That's right, yes.

10  Q     Were you aware at the time that Mr. Okun was not a

11  participant in that November 9 telephone conversation?

12  A     I don't know to this day whether he was or was

13  not.

14  Q     Now, at the time that you had the phone call, your

15  understanding of the factual background was limited to

16  what your colleagues at McGuire Woods had related to

17  you, correct?

18  A     Yes, and I may have seen the exchange agreement.

19  I noticed on my time entry that there's something that

20  says "Document review," so I may very well have seen a

21  contract.  But in terms of fact, I didn't do any

22  independent fact-gathering, any interviews.  I was

23  essentially briefed by Bob and Tennille about what they

24  understood was going on.

25  Q     And you don't recall as you sit here today whether

1  or not you in fact reviewed the exchange agreements?

2  A    I don't recall specifically, but my time entry

3  reflects that I did.  So I did probably look at the

4  actual language of the exchange agreements.

5  Q    The facts that were being relayed to you by your

6  colleagues at McGuire Woods, it was your understanding

7  that they had gotten that information from Mr. Perkins

8  primarily, if not exclusively?

9  A    I'm not sure where it came from.  Contact with the

10  client, yes.

11  Q    But at any rate, you did no independent

12  investigation as to the accuracy or inaccuracy of that

13  information?

14  A    That's right.

15  Q    And you did not do any independent research in

16  terms of what the governing law was, the governing case

17  law personally?

18  A    I did not personally, no, sir.

19  Q    At the time of the phone call this was at what you

20  believed was going to be the beginning of an ongoing

21  representation, correct?

22  A    We had only recently been retained, and, yes, we

23  expected that we would do a series of things for this

24  client, yes.

25  Q    In the phone call, you're giving the participants

1 in the phone call kind of your gut instinct as to

2 whether or not the facts as they have been related to

3 you might have criminal implications for the corporate

4 entities?

5 A    I would probably classify it as a little bit more

6 than a gut instinct.  I was giving them my professional

7 opinion as a former prosecutor that using money in a

8 manner inconsistent with a written agreement with a

9 customer was likely fraudulent.

10 Q    Do you remember talking with FBI agents on

11 December 6, 2007, or other government agents about this

12 case?

13 A    Yes.

14 Q    In December of 2007, was your recollection of this

15 2006 conversation more fresh and immediate to you than

16 your recollection today in 2009?

17 A    Probably, yes.

18 Q    And in 2007, did you tell the government agents

19 that what you were doing was simply giving them your

20 instincts as to whether or not this had criminal

21 implications?

22 A    Perhaps.  I haven't seen the report that the agent

23 wrote, but that very well may be accurate.

24 Q    And the call was a brief call?

25 A    It was, yeah, relatively brief.  Less than an

1  hour.  My portion of it may have started and concluded

2  with other people when I wasn't a participant.

3  Q    The e-mail correspondence that followed up on the

4  conversation or e-mail to Mr. Perkins on November 16

5  was not intended to be a verbatim transcript of what

6  had happened on the November 9 call?

7  A    That's right.

8  Q    But it was your best summary a week later when

9  your recollection was far more fresh as to what had

10  transpired in that November 9th call?

11  A    That's exactly right.

12  Q    Why don't we go ahead and look at Government's

13  Exhibit 147 then.  Let's go to Mr. Perkins's e-mail to

14  you on page 2 of 3.  This is Mr. Perkins, as you

15  understand it, summarizing what Mr. Perkins believes

16  that he heard in that conversation, correct?

17  A    I think so.

18  Q    And he's asking you to respond back to give what

19  you believe that you had said in that phone call?

20  A    That's right.

21  Q    And Mr. Perkins in point one says that what he

22  heard was that the prior course of conduct of funds

23  being transferred out of the qualified intermediary

24  escrow accounts to Ed Okun and Investment Properties of

25  America likely constituted criminal conduct; is that

1  correct?

2  A     That's right.

3  Q     Now, in your response back to him, you sort of

4  break down your response into responding to his point

5  one and his point two, correct?

6  A     That's right.

7  Q     So if we look at your response under one, you're

8  attempting to respond to his question or statement in

9  his point one, correct?

10  A     I think so, yeah.

11  Q     In your response where you're saying what you

12  said, you do not -- well, let me ask you this:  In your

13  response, you say in the second sentence, "Well, I'm

14  not sure there is clear precedence for this."  What do

15  you mean by that statement?

16  A     I was not familiar with any other 1031 company

17  being charged with mail fraud or wire fraud for this

18  kind of arrangement.  That's what I mean when I say

19  "clear precedent."  There's, obviously, a lot of

20  precedent of what wire fraud and mail fraud is, but

21  applied to this type of business, I was unfamiliar,

22  wasn't sure there had been any application of that into

23  the 1031 pattern.

24  Q     That makes it a little more difficult for you to

25  predict whether something would be considered criminal

1 or not than in a situation where there is clear

2 precedent; is that fair?

3 A    Yes, that's fair.

4 Q    And you didn't know of any clear precedent, but on

5 the other hand, you hadn't spent any time at this point

6 researching what the precedent was?

7 A    That's right.

8 Q    Now, if we go down to, it was the last couple of

9 sentences, you say a motivated prosecutor could indict

10 the company and/or specific individuals without much

11 effort beyond gathering documents and interviewing some

12 victims or other witnesses.

13    Now, the facts, as you understood them as they had

14 been related to you, is that there was prior borrowings

15 from the qualified intermediaries that was inconsistent

16 with the exchange agreements, the agreements with

17 customers?

18 A    Yes.

19 Q    And that if something was done that was

20 inconsistent with a contract, that is considered a

21 breach of the contract or violation of the contract,

22 correct?

23 A    Yes.

24 Q    And a violation of a contract does not standing

25 alone make that something that's criminal, correct?

1  A     No, that's right.

2  Q     People violate contracts in the business world

3  every day doesn't mean they are committing a criminal

4  act?

5  A     That's true.

6  Q     But nonetheless, given the inconsistency between

7  your understanding of what was happening in practice

8  and the contract, you believed that a motivated

9  prosecutor could look at that and could bring an

10  indictment?

11  A     The emphasis here is on victims.  I guess the

12  point was if people don't understand that their money

13  was being used in a way that was inconsistent with the

14  contract.  And if they lose the money, there's always

15  sort of an assumption here that people were getting

16  rich and personally enriching themselves, and people

17  were going to lose out, they weren't going to have the

18  money available for the second half, and that would

19  clearly make it a scheme to defraud.

20        Again, that was my opinion at the time.

21  Q     Right.  And at this time, under your understanding

22  of the facts, that had not happened?  In other words,

23  there was no exchanger that you're aware of that had

24  not been able to satisfy their exchange when it came

25  due?

1  A    My understanding at the time was that some of the

2  money was going to the principals of this company in

3  their individual capacity.

4  Q    Mr. Heaphy, that wasn't my question.  My question

5  was your understanding at this time was that there were

6  no exchangers that had not been repaid their funds when

7  their exchanges came due?

8  A    That's right.  I was not aware that any exchangers

9  had lost money yet or hadn't been able to complete the

10  second half of the 1031 transaction.

11          THE COURT:  This testimony, is it offered

12  only for notice to the people who received the

13  communication for the possibility of liability for the

14  civil and criminal loss?  Is that what the purpose of

15  the offer is, Mr. Cannon?

16          MR. CANNON:  Yes, Your Honor.

17          THE COURT:  That's all this testimony is

18  being offered for, ladies and gentlemen.  What his

19  opinion is about, whether it's criminal or not criminal

20  or a violation of the law or not a violation of the

21  law, is not what he's testifying about, and it's not

22  binding on you.  I'll tell you what the law is.

23          I think we're getting into so much detail

24  about his legal opinion, that unless it was

25  communicated to the people at the other end of the

1  line, it's confusing, and it's going to lead them to

2  believe that what he says is the law, and I think we've

3  gone about as far on that as we need to go.

4  BY MR. POLLACK:

5  Q    Let me ask you, in the communication that you give

6  to the company personnel, you make a distinction

7  between bringing an indictment and actually proving

8  that there was in fact a crime, correct, in your last

9  two sentences?

10 A    I'm sorry.  I'm not sure I understand your

11 question.

12 Q    Sure.  In your second to the last sentence you say

13 a motivated prosecutor could indict, right?

14 A    Right.

15 Q    And bringing an indictment is not difficult?

16 A    You need evidence to bring an indictment, but that

17 doesn't equate to a finding of guilt, that's right.

18 Q    In fact, in your 13 years as a federal prosecutor,

19 you've probably heard the phrase "a good federal

20 prosecutor can indict a ham sandwich"?

21 A    Generally, yes, I heard that.

22 Q    But to decide whether somebody actually committed

23 a crime as opposed to merely charging the crime,

24 there's no crime of fraud, mail fraud or wire fraud,

25 unless the specific person that we're talking about had

1  the intent to defraud?

2          MR. CANNON:  Objection, Your Honor.  Lack of

3  foundation for whether this was communicated.

4  BY MR. POLLACK:

5  Q    That's the point you're making in the last

6  sentence, is it not, last sentence of one?

7          THE COURT:  Objection sustained.  I'll tell

8  the jury what the law is.  Mr. Heaphy is not going to

9  need to opine on that.  So just disregard that.

10          Now, look --

11          MR. POLLACK:  My question is --

12          THE COURT:  No, I know what your question is.

13  I told you, I think we're running the risk of confusing

14  the jury here by getting him to opine on legal issues.

15  He can say what he said or you can just simply see what

16  he said in writing, but that's it.  What he told them

17  is admissible for notice and that's all.

18          MR. POLLACK:  May I ask him what it was he

19  was intending to communicate?

20          THE COURT:  No, ask him what he did tell

21  them, not what he intended to tell them.

22          MR. POLLACK:  Okay.

23          THE COURT:  What he did tell them, which I

24  think is in writing.  But if there's more, then you can

25  ask that, too.

1           MR. POLLACK:  Okay.

2  BY MR. POLLACK:

3  Q    With respect to prospectively, you communicated,

4  did you not, that to the extent there was an

5  inconsistency between what was in the exchange

6  agreement and the practice of borrowing from the QIs,

7  that that could be corrected prospectively by changing

8  the exchange agreements to either remove any

9  restriction that would prevent borrowing or, even

10  better yet, to affirmatively say there may be

11  borrowings?

12  A    With respect to new customers, it could be

13  affected prospectively.  That would not in any way

14  affect what had already occurred and the deals that

15  were already in place.

16  Q    I understand.  Your paragraph one is talking about

17  what's already occurred.  And your paragraph two is

18  talking about prospectively?

19  A    Generally, that's right, yes.

20  Q    And the e-mail that we're talking about is sent to

21  Mr. Perkins and then copied to your colleagues at

22  McGuire Woods?

23  A    That's right.

24  Q    But Mr. Perkins is the only company personnel that

25  you're sending it to?

1  A     Yes.

2  Q     Did you not send it to Mr. Okun?

3  A     No.

4         MR. POLLACK:  You can take the document down.

5  BY MR. POLLACK:

6  Q     You later learned that Mr. Perkins was withdrawing

7  or, I'm sorry, resigning his position from the company?

8  A     I did learn that, yes, sir.

9  Q     Were you made aware that he continued on as an

10 employee both of IPofA and of 1031 for months after he

11 tendered his resignation?

12 A     I'm still not aware of how long after he announced

13 his intention to leave that he remained.

14 Q     When you were informed that he was resigning, you

15 had -- let me do it this way:  When McGuire Woods

16 learned that Mr. Perkins was resigning and that

17 Mr. Perkins was citing as a basis for his resignation

18 his belief that there might be continuing conduct that

19 had criminal implications, McGuire Woods made the

20 decision that it also wanted to resign from the

21 representation; is that correct?

22 A     Yes, that's accurate.

23 Q     Because if the facts were as Mr. Perkins

24 understood them, and if Mr. Perkins's legal conclusions

25 were correct, then that would not be a representation

1  that McGuire Woods would want to participate in?

2  A     That's right.

3  Q     So as a result, McGuire Woods withdrew?

4  A     Yes.

5  Q     You were personally on a phone call where that was

6  communicated to Mr. Okun?

7  A     Yes.

8  Q     And you explained to Mr. Okun McGuire Woods's

9  concerns based on Mr. Perkins's statement, correct?

10 A     I don't remember if we tied it specifically to

11 Mr. Perkins's statements or not.  It was we have

12 concerns about the continuing course of conduct.  We

13 must withdraw.

14 Q     You also told him that you thought there was a

15 conflict of interest at the time the contemplation was

16 going to be you were going to represent both IPofA and

17 the 1031 Tax Group, you now had come to the conclusion

18 that there was a conflict of interest such that you

19 couldn't represent both entities?

20 A     We were withdrawing from representing both.  But

21 you're right, Mr. Pollack, that there was an issue in

22 terms of who we could or couldn't represent, but that

23 really wasn't my issue, and I don't remember exactly

24 what the conflict issue was.

25 Q     Do you remember whether you communicated to

1  Mr. Okun that there was a conflict issue?

2  A    I believe I conveyed that there was a continuing

3  course of conduct issue, and Mr. McElroy conveyed

4  there's a conflict of interest issue.

5  Q    Mr. McElroy did that in your presence?

6  A    On the phone call, yes.

7  Q    The phone call that you participated in?

8  A    Yes.

9  Q    So you heard him convey that to Mr. Okun?

10 A    I believe he did, yes.  And I believe, I'm sorry,

11 that both of those issues are reflected in the letter,

12 kind of like e-mail is meant to be sort of a summary or

13 follow-up after the phone call.

14 Q    As a result of McGuire Woods's withdrawal from the

15 representation, McGuire Woods never did complete the

16 various analysis and work that was intended that they

17 were going to undertake on behalf of the companies?

18 A    I believe that work had started, but it ceased

19 when we withdrew.

20 Q    And it was your anticipation, was it not, that the

21 companies and/or Mr. Okun individually would retain

22 other counsel to complete that work?

23 A    Mr. Okun, I believe, told us that he already had

24 other counsel or had talked to someone in Florida, I

25 think is what he said.

1  Q    And I take it you don't know what advice they

2  rendered to the companies after your withdrawal?

3  A    I do not.

4         MR. POLLACK:  I don't have anything further.

5  Thank you.

6         THE COURT:  Any other questions?

7         MR. CANNON:  If could you pull up

8  Government's Exhibit 147, the first page.

9         THE CLERK:  Has it been admitted?

10        MR. CANNON:  Yes.

11

12        REDIRECT EXAMINATION

13 BY MR. CANNON:

14 Q    Mr. Heaphy, on cross-examination, Mr. Pollack had

15 you read the sentence beginning "A motivated

16 prosecutor" in the No. 1 bullet point?

17 A    Yes.

18 Q    Could you just please read the sentence directly

19 before that beginning "A prosecutor"?

20 A    "A prosecutor would have to prove simply that

21 investors were defrauded by some willful conduct by a

22 defendant, individual or company.  Taking investors'

23 money" --

24 Q    That's fine.  I think you read the next sentence

25 before.  But --

1           THE COURT:  Ladies and gentlemen, that's

2  offered only for what he told the people who were on

3  the telephone call.  What the law is will be coming

4  from the Court.

5  Q    Part of your retrospective advice, that's what you

6  communicated to the participants in the phone call?

7  A    Yes.

8  Q    Mr. Heaphy, you testified that you didn't recall

9  whether Mr. Okun had made any representations about

10  continued borrowings from the qualified intermediaries?

11          MR. POLLACK:  I object, Your Honor.  It's

12  beyond the scope of the cross.

13          THE COURT:  I don't think he asked about that

14  on his cross-examination, did he?

15          MR. CANNON:  Discussed the phone call with

16  Mr. Okun and the representations made in that phone

17  call.

18          MR. POLLACK:  This was asked and answered on

19  direct.  I didn't do anything with it on cross.  He now

20  wants another shot on redirect.  It's not appropriate

21  redirect.

22          THE COURT:  Well, the telephone call is.  Go

23  ahead and let me hear what your question is.

24          MR. CANNON:  I was going to make an attempt

25  to refresh the witness's recollection.

1          THE COURT:  About what?  The jury was

2  listening when he said it the first time.

3          MR. CANNON:  Refresh the witness's

4  recollection as to whether Mr. Okun made any

5  representations about the continued borrowing going

6  into the future.

7          THE COURT:  All right.  Let's see if you can

8  get something to do it with.

9  BY MR. CANNON:

10  Q    With the help of the court security officer, the

11  next to the last paragraph --

12          MR. POLLACK:  Can you tell me the page

13  number?

14          MR. CANNON:  I think it's page 4.

15  Q    Mr. Heaphy, does that refresh your recollection

16  about the phone call?

17  A    Yes.  Reading that report, which I guess is of an

18  interview I gave a year or so ago, apparently Mr. Okun

19  did say --

20          MR. POLLACK:  Objection.

21          THE COURT:  Wait a minute.  The question is

22  whether that refreshes your recollection about what he

23  did say.

24          THE WITNESS:  It does, Your Honor, yes.

25  Q    What did Mr. Okun say about the borrowing going

1 forward with qualified intermediaries?

2 A    I now recall that he indicated during the phone

3 call to me that that course of conduct had stopped.

4          MR. CANNON:  No further questions, Your

5 Honor.

6          MR. POLLACK:  Your Honor, I'd like to recross

7 on this issue.

8          THE COURT:  Well, it's California rules, but

9 we'll allow it this time.

10          MR. POLLACK:  Your Honor, I represent to the

11 Court I'm not from California.

12          THE COURT:  I didn't suggest you were.

13

14      RECROSS-EXAMINATION

15 BY MR. POLLACK:

16 Q    Mr. Heaphy, just on this case point, Mr. Okun said

17 something to the effect that it has, "it" meaning the

18 borrowing has stopped or it's not currently happening,

19 something to that effect?

20 A    Yes, I believe he did.

21 Q    And he indicated to you that he was going to

22 consult with Florida counsel?

23 A    Yes.

24 Q    He was indicating to you -- well, strike that.

25 You don't know whether the Florida counsel advised him

1  about whether or not to continue the borrowings and

2  under what circumstances?

3  A    I do not.

4           MR. POLLACK:  Nothing further.

5           THE COURT:  Can he be excused permanently?

6           MR. CANNON:  Yes, Your Honor, from the

7  government's perspective.

8           THE COURT:  All right.  Mr. Pollack?

9           MR. POLLACK:  Yes, Your Honor.

10          Thank you, Mr. Heaphy.

11          THE COURT:  Mr. Heaphy, you are excused.

12  Thank you for being with us and giving us your

13  evidence.  You're relieved from your subpoena.

14          THE WITNESS:  Thank you.

15          (The witness was excused from the witness

16  stand.)

17

18  * * * * * *

19

20      **CHRISTOPHER HOCTOR**, called by the United States,

21  first being duly sworn, testified as follows:

22

23      DIRECT EXAMINATION

24  BY MR. DRY:

25  Q    Mr. Hoctor, please state your full name and spell

1  your last name for the record.

2  A     Christopher Julian Hoctor, H-o-c-t-o-r.

3  Q     What is your educational background, sir?

4  A     I have a bachelor's degree in government from the

5  College of William and Mary, which I earned in 1995.  I

6  have a juris doctor from the T. C. Williams School of

7  Law at the University of Richmond, which I earned in

8  2000.

9  Q     Are you employed as an attorney, sir?

10 A     I am.

11 Q     From 2000 to 2004, what law firm were you with?

12 A     From 2000 to 2004, I worked for First North

13 America National Bank, which is a subsidiary to Circuit

14 City.  I then clerked for a federal bankruptcy judge in

15 Alexandria, Virginia.  I then worked for the law firm

16 of Hirschler, Fleischer here in town.

17 Q     When did you leave Hirschler Fleischer?

18 A     2004 spring.

19 Q     Where did you go to work after that?

20 A     Started my own law firm with a colleague called

21 Hoctor Kaplan.

22 Q     How long did you stay at that law office?

23 A     I was at Hoctor Kaplan from the spring of 2004 to

24 the spring of 2006.

25 Q     Where did you go after that?

1  A    After that -- let me rephrase that.  I was there

2  until mid May of 2006 at which time I split my time for

3  two weeks between my law firm, which had changed names

4  by that point, and IPofA, Investment Properties of

5  America, and began there full time June 1.

6  Q    What was your title at Investment Properties of

7  America?

8  A    I was associate general counsel and vice president

9  for finance and real estate.

10 Q    How did you first meet Lara Coleman?

11 A    Lara Kohlman was a paralegal at Hirschler

12 Fleischer in our corporate section, and I met her while

13 we were both employed at Hirschler Fleischer.

14 Q    How did your first became aware of Edward Okun?

15 A    I believe I knew that Ed Okun was a client of

16 Investment Properties of America which was then called

17 Industrial Properties of America.  It was a client of

18 Hirschler Fleischer at some point around probably 2003.

19 I had not met him, didn't know anything about the

20 business, but really learned about Industrial

21 Properties of America and Investment Properties of

22 America from Lara Coleman in about the summer of 2004.

23 Q    Did your law firm begin doing work for Investment

24 Properties of America?

25 A    We did.  We had spoken with Ed Okun a couple of

1  times trying to woo him as a client.  It took us many

2  months.  The first job we did for Investment Properties

3  of America was around November or December of 2004.

4  Q     Did your law firm continue doing work for

5  Investment Properties of America in 2005?

6  A     Yes, we did.

7  Q     How would you characterize the amount of work you

8  did up until August of 2005 for Investment Properties

9  of America?

10 A     We did a lot of work.  A lot of legal work for

11 Investment Properties of America, which, excuse me,

12 sometimes I call IPofA.  It's all transactional work,

13 mainly involved with their real estate syndication.

14 They were selling commercial real estate property.

15 Q     Did something change in August of 2005 in which

16 you stopped doing work at Investment Properties of

17 America?

18 A     Yes.  Our relationship with Investment Properties

19 of America had gotten strained in late July through

20 August of 2005 for a variety of factors.  Mainly

21 because they were bringing deals to us later and later

22 and asking us to do turnaround a lot sooner.

23        The final straw for us was when Ed Okun purchased

24 his first qualified intermediary.  I received a call

25 from Lara Coleman and she asked whether my partner and

1  I, Rob Kaplan, whether we would be willing to convince

2  one of our clients that I had power of attorney over to

3  borrow money from Mr. Okun's new qualified

4  intermediary.

5  Q     What was the name of that, if you remember?

6  A     Which?

7  Q     The qualified intermediary.

8  A     It was AEC.

9  Q     Atlantic Exchange Company?

10  A     Atlantic Exchange Company.

11       If we would cause our client to borrow money from

12  AEC and then lend it back to Ed so he could do real

13  estate projects with it.

14  Q     What did you do as a result of that request?

15  A     I was actually in the process of working on

16  another project at the time.  I told Ms. Coleman that I

17  would call her back.  I discussed it with my partner,

18  Rob Kaplan.  Immediately, we decided that, you know, in

19  our opinion they couldn't use the money for those

20  purposes.  They couldn't use QI funds for those

21  purposes.

22       We did a little research.  We found a Virginia

23  case out of Fairfax Circuit Court that we felt was

24  directly on point.  We called Ms. Coleman back said,

25  "We're sorry, Lara.  You guys can't use the money for

1  those purposes."

2      She proceeded to tell us that her Massachusetts

3  lawyers told her it was okay; that we were just

4  Virginia lawyers; that, you know, basically, we weren't

5  smart enough to know any better.

6      I indicated that -- I said, "Are you saying that

7  Foley & Lardner is telling you this?  Because they

8  represent the seller.  They'll tell you anything that

9  you want to hear."

10     She argued with us.  At the end of the day, at the

11 end of the call, I said, "Look" -- my partner Rob

12 Kaplan and I were both on the call -- "we don't think

13 you can do it.  And if you bring it to Virginia, you

14 can have a problem."

15 Q    Did Ms. Coleman in that call indicate whether they

16 were going to borrow the funds or not going --

17 A    She didn't say.

18 Q    What did you do in response to this conversation

19 with Ms. Coleman?

20 A    That day or the did after I drafted up a

21 resignation letter from our law firm and on behalf of

22 the client that she was asking to borrow money and said

23 that our organizations are going in separate

24 directions.  We appreciated the opportunity to work

25 with them in the past.  We could no longer represent

1  them.

2  Q     What date, approximately, was that?

3  A     That was the end of August 2005.

4  Q     Going forward after the resignation, did your law

5  firm, Hoctor & Kaplan, do any work for Investment

6  Properties of America?

7  A     Not for several months.  I recall doing something

8  around November, December of 2005.  It was some sort of

9  clean-up project or a rehashing of an opinion for a

10  loan that they had gotten long ago in the past, a real

11  estate loan.  But we really didn't do anything for them

12  in 2005, nor did we do anything for them in 2006 until

13  several months into the spring.  Maybe March or April.

14  Q     Why did you start doing -- well, first of all, did

15  any of the work that you did, did any of that involve

16  the qualified intermediary companies?

17  A     No.

18  Q     Why did you resume, you said in the springtime,

19  doing some work?

20  A     IPofA seemed to have cleaned up any issues they

21  may have had.  They had really gotten fully involved

22  with their outside accounting firm, Cherry, Bekaert &

23  Holland.  They hired a new chief financial officer,

24  Jeff Zacarias.

25            MR. POLLACK:  Excuse me.  I'm going to object

1 to the lack of foundation as to how it is Mr. Hoctor

2 knows what it is he's now relaying.

3 Q    Did you learn these facts in relationship to the

4 work that you were starting to do for Investment

5 Properties of America in the spring of 2006?

6 A    I did, but we were still friendly with Lara

7 Coleman and many of the other folks at Investment

8 Properties of America.  So, you know, we knew who they

9 had hired.  They would tell us.

10 Q    Just going on.  In the spring of 2006, did you and

11 Ms. Coleman have a conversation regarding you coming to

12 work for Investment Properties of America?

13 A    I did.  Lara Coleman and, to some degree, Eric

14 Perkins had both -- who had become the chief legal

15 officer and I had known from my days at Hirschler

16 Fleischer, had indicated that they wanted to bring me

17 in-house with Investment Properties of America.  I had

18 turned it down for sometime.

19     Finally, they were able to convince me.  As part

20 of that, Lara Coleman wanted to have lunch with me.  We

21 had lunch at La Siesta on Midlothian Turnpike.

22 Q    Approximately, when was this?

23 A    This would have been probably April of 2006.

24 Q    Okay.

25 A    We talked about the job, you know, what they were

1 looking for me to do.  The job sounded great.  But I
2 said to her, I said, "I have to know is Ed Okun dipping
3 into the QI funds?"  Her response was, No, hasn't done
4 it in a long time.  Knows he can't do it.  Put all the
5 money back.
6      I never had reason to doubt her.  She had always
7 been trustworthy with me in the past.  And based upon,
8 you know, the advances the company seemed to have made
9 since we had resigned, it seemed like a good thing to
10 go with.
11 Q    So did you take the job offer?
12 A    I did take the job offer.
13 Q    What was your title at the time?
14 A    I was associate general counsel and vice president
15 of finance and real estate.
16 Q    For what company?
17 A    For Investment Properties of America.
18 Q    How would you describe the work that you were
19 doing for Investment Properties of America?
20 A    I was a transactional lawyer.  My job was -- the
21 job title implied and was supposed to be that I would
22 be involved their real estate acquisitions, real estate
23 financing, procuring loans, doing the negotiations for
24 real estate, and to be the in-house head of litigation.
25      The job was much more than that.  Just as an

1 aside, it was a great job.  I loved the job.  It was

2 always fast-paced.  I did real estate acquisitions.

3 Q    Let me just -- I apologize for interrupting.

4 A    Sure.

5 Q    Is it fair to say you were mostly doing

6 transactional work?

7 A    Yes.

8 Q    Were you involved in any of the acquisitions by

9 Mr. Okun of the qualified intermediary companies?

10 A    I was.  Three of them.

11 Q    Which was the first qualified intermediary company

12 that you were involved in?

13 A    Real Estate Exchange Services out of Tampa.

14 Q    Do you remember when approximately that was?

15 A    It was in June.  I think it was early to mid June.

16 Q    Of what year?

17 A    2006.

18 Q    How did your work on Real Estate Exchange Services

19 come about?

20 A    Lara Coleman approached me, said that Mr. Okun was

21 going to be buying a qualified intermediary.  Could I

22 paper the transaction.  I asked, "Who was buying it?"

23 She said it was going to be an organization called the

24 1031 Tax Group, LLC, which was a Delaware limited

25 liability company.

1  Q    When you say "paper the transaction," what does

2  that mean?

3  A    She wanted me to put together whether it was a

4  stock purchase or a membership purchase agreement

5  between the 1031 Tax Group and Real Estate Exchange

6  Services and to put together any ancillary employment

7  agreements.

8  Q    In your conversation with Ms. Coleman, did she

9  tell you who did the due diligence for the transaction?

10 A    She said Ed Okun did the due diligence on REES.

11 Q    During your discussions -- let me first show you

12 what's previously been marked as Government's Exhibit

13 No. 46A.  Have you had an opportunity to review this

14 before testifying today?

15 A    I have.

16         MR. DRY:  I'd like to admit Government's

17 Exhibit No. 46A into evidence.

18         THE COURT:  46?

19         MR. DRY:  46A, sir.

20         THE COURT:  Any objection?

21         MR. POLLACK:  Sorry, Your Honor.  Just got

22 the document.  Give me just a minute, please.

23 BY MR. DRY:

24 Q    Sir, is this the bill of sale?

25 A    This is the bill of sale for Real Estate Exchange

1 Services.

2 Q     Did you participate in drafting this document?

3 A     I did participate in drafting this document.

4           MR. POLLACK:  No objection.

5           THE COURT:  It's admitted.

6           (Government's Exhibit 46A is admitted into

7 evidence.)

8 BY MR. DRY:

9 Q     Who were the sellers of Real Estate Exchange

10 Services?

11 A     The sellers of the stock were Marga Shefman and

12 her son, David B. Shefman.

13 Q     And turning to the second page of the document,

14 please, whose signature is that?

15 A     That's Ed Okun's signature.

16 Q     And turning to the third page of the document --

17 A     Those are the signatures of the Shefmans.

18 Q     Turning to Government's Exhibit 46B, please, which

19 has not been admitted into evidence at this time, have

20 you had an opportunity to review this document?

21 A     I have.

22 Q     What is this document?

23 A     This is the stock purchase agreement between the

24 1031 Tax Group, Real Estate Exchange Services, and both

25 the Shefmans.

1  Q    Can you briefly tell the jury why there would be a

2  bill of sale and a stock purchase agreement?

3  A    The stock purchase was to purchase the shares of

4  Real Estate Exchange Services.  The bill of sale was,

5  not having it in front of me, but was to cover

6  ancillary things that they would be purchasing, any

7  property they may have.

8          MR. DRY:  At this time I'd like to make admit

9  Government's Exhibit 46B into evidence.

10  Q    Did you participate in drafting this document,

11  sir?

12  A    I did.

13          MR. POLLACK:  No objection.

14          THE COURT:  It's admitted.

15          (Government's Exhibit No. 46B is admitted

16  into evidence.)

17  Q    Again, sir, going to the top of the stock purchase

18  agreement, that was the Shefmans?

19  A    Yes.

20  Q    Marga and David Shefman, correct?

21  A    Yes.

22  Q    Going to page 15 of the document, whose signature

23  is that?

24  A    That is Ed Okun's signature.

25  Q    And the next page, 16?

1  A    That's David Shefman and Marga Shefman's

2  signature.

3  Q    I'm done with the document.

4       During the acquisition of Real Estate Exchange

5  Services, first, how quickly were you asked to draft

6  these documents and get the deal done?

7  A    Very quickly.  Within several days.

8  Q    Did you have any conversations with Mr. Okun in

9  which you discussed why there was a need to do it so

10  quickly?

11  A    I don't know whether it was -- I did.  I don't

12  know whether it was in relation to this acquisition,

13  but at some point over the three that I helped the 1031

14  Tax Group acquire there was.  His response was that the

15  faster they closed, the sooner they had qualified funds

16  in their accounts at Citibank where he was earning

17  8 1/2 percent.

18  Q    When you say "the sooner they had qualified

19  intermediary funds in their accounts at Citibank," who

20  are you referring to?

21  A    The 1031 Tax Group.  As soon as the 1031 Tax Group

22  had the exchange funds from their target companies in

23  accounts that they controlled, they could start earning

24  interest on those funds.

25  Q    Interest where?

1  A      At Citibank.

2  Q      At what interest rate did you say?

3  A      Eight 1/2 percent.

4  Q      Turning to Government's Exhibit 46D, was this an

5  e-mail you received, sir?

6  A      It appears that I was copied on this e-mail, yes.

7  Q      Who is it from?

8  A      Lara Coleman to David Shefman with a carbon copy

9  to me.

10            THE CLERK:  Are you saying 46E?

11            MR. DRY:  D, sir.

12            THE CLERK:  D, thank you.

13            MR. DRY:  At this time I'd like to move

14  Government's Exhibit 46D into evidence.

15            THE COURT:  Any objection?

16            MR. POLLACK:  I object that it's hearsay.

17            THE COURT:  It's hearsay.

18            MR. DRY:  It's admissible under 801(d), Your

19  Honor, from Ms. Coleman effectuating the purchase of a

20  REES domestic wire transfer.

21            THE COURT:  How is that?  There's no

22  statement.  It's just some information.

23            MR. DRY:  Your Honor, she's forwarding the

24  wire transfer information to Mr. Shefman informing him

25  of how --

1          MR. POLLACK:  I'm going to object to the

2   substantive discussion of the document.

3          THE COURT:  I see what the e-mail says, but

4   why is a statement by anybody --

5          MR. DRY:  Well, if it's not a statement, Your

6   Honor, it's not hearsay, and it's admissible for that

7   purpose.

8          THE COURT:  So how is it -- well, it can be

9   hearsay.  It's a document.

10         MR. DRY:  Your Honor --

11         THE COURT:  What is it?

12         MR. DRY:  It's --

13         THE COURT:  It's a business record?  It's a

14  what?  What is it?

15         MR. DRY:  Ms. Coleman is forwarding a

16  domestic wire transfer --

17         THE COURT:  I see what's happening, but why

18  is it not hearsay?

19         MR. DRY:  Because it's admissible under

20  801(d).  Ms. Coleman is a member of the conspiracy.

21  This document is used by Ms. Coleman in furtherance of

22  the conspiracy to explain to the owner of REES that

23  they have gotten paid.

24         THE COURT:  Three pages?

25         MR. DRY:  Yes, sir.  The second page shows

1  the amount.

2          MR. POLLACK:  Again, I object to the repeated

3  references.  The Court has the document in front of

4  him.  He doesn't need to tell us what's in the

5  document.  It's not in evidence.

6          THE COURT:  Well, she may be able to explain

7  it.  I'm not sure that it comes in through him.  It's

8  not a document that proves it's as a statement by her.

9  It looks like it's some kind of record of some kind.

10 So I'm sustaining the objection at this time.

11         MR. DRY:  Okay, Your Honor.

12 BY MR. DRY:

13 Q    You said that you were involved in three QI

14 acquisitions?

15 A    That's correct.

16 Q    You just testified about REES.  What is the next

17 qualified intermediary acquisition you were involved

18 with?

19 A    National Exchange Services out of San Antonio,

20 Texas.

21 Q    How did your work on the National Exchange

22 Services' acquisition come about?

23 A    Again, Lara Coleman approached me.  Said that the

24 1031 Tax Group was going to purchase another QI down in

25 San Antonio, Texas.  Could I get on a flight with her

1  the next day or day after and head to San Antonio to

2  look through their corporate documents.

3  Q    What was your involvement?  What did you do in

4  regards to the NES acquisition?

5  A    Again, my role was to paper the transaction, to do

6  the membership or stock purchase agreement, and any

7  employment agreements that might come about.

8         MR. DRY:  One moment, Your Honor.

9  Q    I'd like to direct your attention to Government's

10 Exhibit 50A, please.  What is this, sir?

11 A    This is a purchase and sale agreement between the

12 1031 Tax Group and National Intermediary, LTD.  William

13 Bennett and Reagan Davis were the owners of National

14 Intermediary.

15 Q    Turning your attention to the 15th page --

16         MR. DRY:  At this time I'd like to admit

17 Government's Exhibit 50A into evidence.

18         THE COURT:  Any objection?

19         MR. POLLACK:  No objection.

20         THE COURT:  It's admitted.

21         (Government's Exhibit 50A is admitted into

22 evidence.)

23 Q    Who signed this, sir?

24 A    Ed Okun has signed on behalf of the 1031 Tax

25 Group.  Mr. Bennett and Mr. Davis have signed as well.

1  Q     Okay.  What is the next qualified intermediary

2  company that you were involved in the acquisition?

3  A     That was IXG out of Colorado.

4  Q     How did that come about?

5  A     Again, I was asked by Lara Coleman if I could get

6  on a flight the next day to fly to New Hampshire to

7  meet with Ed Okun and the owners of IXG.  They were

8  meeting in New Hampshire at Mr. Okun's home.  They were

9  going to be -- Mr. Okun was going to be purchasing

10 another qualified intermediary.  Could I have the

11 documents ready by the next morning.

12 Q     Did you get the documents ready for by the next

13 morning?

14 A     Absolutely not.  I did fly up to New Hampshire,

15 met Ed at Mr. Okun's home with the McCabes and

16 Mr. Greenberg.  Flew back to Richmond and at some point

17 over the weekend I probably put the drafts together.

18 Q     Now, when you went up to New Hampshire, whose home

19 were you at?

20 A     Mr. Okun's home.

21 Q     Who was present at that meeting?

22 A     Mr. Okun, Ms. Coleman, Ken McCabe, his wife

23 Shirley McCabe, their son whose name I believe is Drew,

24 and Chad Greenberg.

25 Q     While you were at the meeting, did the subject of

1 loans or borrowing of client funds come up?

2 A    No.

3 Q    All throughout this. were you aware of any

4 transfers of client funds?

5 A    No.

6 Q    Turning your attention to Government's Exhibit

7 64A, what is this, sir?

8 A    This is a purchase and sale agreement between the

9 1031 Tax Group, IXG, Investment Exchange Group, and a

10 variety of their subsidiaries.  Dan McCabe, Shirley

11 McCabe, Andrew McCabe, McCabe Family LLP, Chad

12 Greenberg, and Peter McCann.

13 Q    Turning your attention to the 16th page of the

14 document --

15         MR. DRY:  I'd like to move for the admission

16 of Government's Exhibit 64A.

17         MR. POLLACK:  No objection.

18         THE COURT:  It's admitted.

19         (Government's Exhibit No. 64A is admitted

20 into evidence.)

21 Q    Who signed at the top, sir, as a buyer?

22 A    Ed Okun.

23 Q    Who is the seller on this page?

24 A    The seller is Investment Exchange Group, LLC,

25 signed by Daniel McCabe, Shirley McCabe, Chad

1 Greenberg, Peter McCann, and McCabe Family LLP also

2 signed.  I can't make out the signature.

3 Q    Now, at this time, other than doing the purchase

4 agreements for the qualified intermediaries, what other

5 kind of work were you doing for Investment Properties

6 of America?

7 A    For Investment Properties of America?

8 Q    Yes.

9 A    We were doing a host of real estate acquisitions;

10 real estate financings, refinancings.  We always had

11 some kind of litigation going on, so I was involved in

12 that.  We acquired a trucking company.  Mr. Okun was

13 involved in Indy car racing, so I would have been

14 involved in that at some level.  So a lot of things

15 were going on at Investment Properties.

16 Q    Now, you're doing transaction work.  Are you aware

17 of the accounting or financial records or anything like

18 that of the company?

19 A    No.

20 Q    Did you have any conversations with Ms. Coleman

21 regarding how IPofA was paying for these acquisitions?

22 A    I did.  In August, mid August, late August, after

23 the IXG acquisition, we had been purchasing a lot, a

24 lot of real estate, the qualified intermediaries.  It

25 seemed we were spending a lot of money.  And I asked

1 her, "Where is all the money coming from?"  And her

2 response was, It's either coming from Ed Okun

3 personally, it's coming from IPofA's own monies, or

4 it's coming from the 1031 Tax Group's own monies, the

5 money they had earned off of interest rates on the

6 float.

7 Q     Did the subject matter of client funds ever come

8 up in that conversation?

9 A     Never.

10 Q     Now, did you have any conversations with Mr. Okun

11 regarding how Investment Properties of America was

12 doing financially?

13 A     I don't know that I had any conversations with

14 Mr. Okun.  I take that back.  Yes.  In a roundabout

15 way.  Mr. Okun always gave the impression that his

16 companies were successful, financially successful.

17 Q     Did he ever make statements regarding the success

18 of property?  If you can't remember, you can't

19 remember.

20 A     I don't remember anything specifically.

21 Q     Okay.  At some point did you learn that there had

22 been transfers of qualified intermediary funds?

23 A     Yes.

24 Q     When was that?

25 A     Within the first two weeks of September 2006.

1  Q     And without getting into what was said, who told

2  you?

3  A     Dan Applewhite.

4  Q     And he was?

5  A     He was another associate general counsel for

6  Investment Properties of America.

7  Q     How many attorneys were there at Investment

8  Properties of America?

9  A     There were four of us.

10  Q     You mentioned Mr. Perkins?

11  A     Uh-huh.

12  Q     Yourself, Mr. Applewhite, and who is the fourth?

13  A     Kelly Morrison.

14  Q     Did after hearing of this, did you participate in

15  a management meeting on September 15 in which

16  Ms. Coleman was present?

17  A     I did.

18  Q     What was discussed?  Who all was at the meeting as

19  far as you can remember?

20  A     The meeting was Eric Perkins, myself, Dan

21  Applewhite, Lara Coleman, and David Field.

22  Q     What was discussed at the meeting?

23  A     The meeting started off.  We were talking about

24  some NASD, things with First Montauk, but after those

25  initial discussions we discussed David's discovery,

1 David Field's discovery, that $55 million was missing

2 from the qualified intermediary client funds.

3 Q    Did anybody inquire of Ms. Coleman regarding this?

4 A    Yes.  We asked what was going on.  She said that

5 there were three legal opinions that the company

6 already had or would be getting saying that what they

7 had done with the money was fine.

8 Q    Did she mention any law firm specifically?

9 A    Yes.  She said that Foley & Lardner, they had some

10 e-mails, and they had an opinion from them from back

11 in, you know, August of 2005, that

12 PricewaterHousecoopers through Mr. Pajonas was drafting

13 something up, and Kutak Rock was going to have us

14 something within a couple of weeks.

15 Q    Did Ms. Coleman make any statements regarding

16 whether the money had been paid back?

17 A    Yeah.  After the meeting broke David Field and Dan

18 Applewhite stayed to talk more about First Montauk

19 Securities.  Eric Perkins, Lara Coleman, and I

20 proceeded out to her office.  We continued the

21 discussion in the elevator, at which point I reiterated

22 why we were so concerned about any lending that had

23 happened between the qualified intermediaries and IPofA

24 and Mr. Okun based upon the case research and what I

25 had discussed with her in August of 2005.

1      We continued the discussion down the hall and into

2  her office, at which time she basically said that David

3  Field's numbers were all wet; that he was only looking

4  at the debit side of the accounting equation and not

5  the credits; that he wasn't factoring in all the

6  repayments that had been made, and that there were

7  little to no monies outstanding from the qualified

8  intermediaries.

9  Q     The Foley & Lardner opinion, did you request that

10  from Ms. Coleman?

11  A     I did.

12  Q     Did you receive it?

13  A     No.

14  Q     At some point did you learn that the opinion

15  didn't exist?

16  A     Yes, I did.

17  Q     When was that?

18  A     It would have been within several weeks.  I

19  believe at that meeting there was an e-mail that

20  Mr. Burr had sent to Ms. Coleman and she had forwarded

21  it on to me.

22  Q     From the September 15 meeting up until, you said,

23  several weeks.  Is that the beginning of October

24  regarding learning about that?

25  A     To the best of my recollection, yes.

1  Q    At that point what did the in-house attorneys

2  begin to do?

3  A    We started our own investigation.  Something just

4  didn't smell right.

5  Q    As part of that investigation, were you requesting

6  information?

7  A    Yes, we requested information.  It was difficult

8  to come by.

9  Q    How would you characterize how forthcoming

10  Ms. Coleman was with information?

11  A    She was not.

12  Q    And Mr. Field?

13  A    He was not.

14  Q    Did Mr. Okun volunteer a lot of information?

15  A    Mr. Okun, in large measure, stayed out of it,

16  stayed out of the fray.  He never was one to keep much

17  documentation on hand.  So it would have come from

18  Investment Properties of America's offices.

19  Q    How about Mr. Pajonas?  Was he forthcoming with

20  information?

21  A    Later.  Later.  A couple months later we started

22  getting some information out of Mr. Pajonas.

23  Q    Well, the Burr opinion is in October?

24  A    Or the lack thereof.

25  Q    I apologize.  The lack thereof of the Burr opinion

1  is I believe you testified early October.  Did the

2  in-house attorneys issue a memorandum?

3  A    Yes, we did.

4  Q    When was that memorandum?

5  A    That was November 7.

6  Q    By the time of the memorandum, had Mr. Pajonas

7  provided information to in-house attorneys?

8  A    He indicated to us --

9  Q    Without going into the substance of it, had he

10  provided you information regarding what had been going

11  on?

12  A    Yes, I believe he had.

13  Q    Okay.  I'd like to bring up Government's Exhibit

14  1250, which had been admitted into evidence.  Going to

15  the top.

16       Sir, did you receive this e-mail?

17  A    Yes, I did.

18  Q    Going to the second page of the exhibit, had you

19  reviewed this e-mail before it was sent out?

20  A    I had reviewed it and co-authored parts of it.

21  Q    Who wrote the majority of it?

22  A    Eric Perkins.

23  Q    Who had reviewed it before sending it out?

24  A    All four of the in-house counsel; me, Dan

25  Applewhite, Kelly Morrison, and Eric Perkins.

1  Q     Was it typical for all the in-house attorneys to

2  sign a memoranda?

3  A     No.  Eric Perkins was the primary scribe, but we

4  all had some input on it.  We knew that it was going to

5  cause problems internally and going to ruffle some

6  feathers.  We didn't want him to feel like he was out

7  on a limb by himself.  This was a work that all four of

8  us had contributed to, and so we told him to put all of

9  our names on the memo.

10 Q     Okay.  Now, it's issued on November 7.  On the day

11 that it's issued, did you have a discussion with

12 Mr. Okun about it?

13 A     No, I did not.

14 Q     When was the first discussion that you remember

15 with Mr. Okun about this memorandum?

16 A     It would have been later in the week.  The gist of

17 which was, you know, don't write memos if you have a

18 problem.  Just pick up the phone and call me.

19 Q     Hold on.  Later in the week.  This is issued

20 November 7.  So you think it was a few days later, a

21 couple days later, how much later?

22 A     It was probably a couple days later.

23 Q     Okay.  And who was on that call?  Do you remember?

24 A     It was probably just Ed Okun and I.

25 Q     What did Ed Okun say to you?

1  A      Specifically, he would have said, "Don't write

2  memos.  Pick up the phone and call me."

3  Q      Did you participate in a meeting on November 9

4  with Mr. Field, Ms. Coleman, Mr. Perkins, Mr. Morrison,

5  and Ms. McNamee?

6  A      Yes, I did.

7  Q      During that meeting, what was said by Ms. Coleman?

8  A      Hopefully, I can back up a little bit.  The memo

9  had gone, the November 7 memo, had gone to Todd

10  Pajonas.  And I brought up at the meeting that it had

11  gone outside of Investment Properties of America, and I

12  wasn't too happy about it.  I asked how it had gotten

13  out.

14       At first she indicated that she didn't know, and

15  then later in the conversation said that she had

16  delivered the memo to Mr. Pajonas at Mr. Okun's

17  request.  She then told us that the lawyers needed to

18  do legal work and stay the heck out of business

19  activities of Investment Properties of America and the

20  other companies.

21  Q      What did Mr. Perkins respond?

22  A      He responded and I responded that this was our

23  business.

24  Q      Okay.  What was Mr. Field's discussions?

25  A      Mr. Field had indicated -- this was now probably

1 the third time I had heard Mr. Field say this, but he

2 indicated that he didn't see how --

3          MR. POLLACK:  I'm going to object to

4 Mr. Field's statements.

5          THE COURT:  Because?

6          MR. POLLACK:  They are hearsay.

7          THE COURT:  Why aren't they hearsay?

8          MR. DRY:  801(d), Your Honor.

9          MR. POLLACK:  They are not 801(d) because one

10 of the elements that we discussed the other day is not

11 met for this time frame with Mr. Field.

12          THE COURT:  Perkins, you mean?

13          MR. POLLACK:  No.  His participation at this

14 point.

15          MR. DRY:  Actually, Your Honor, I apologize.

16 It's not under 801.

17          THE COURT:  No, I don't think it is either.

18          MR. DRY:  It's not for the truth of the

19 matter asserted.  It's Mr. Field explaining his view of

20 what the lawyers should be doing.

21          THE COURT:  And what's that relevant for?

22 Ms. Coleman said the for lawyers stay out of the

23 business and do legal work.

24          MR. DRY:  Okay.

25          THE COURT:  And Field says something else.

1  So why is that relevant?

2              MR. DRY:  I'll withdraw the question.

3              THE COURT:  All right.

4  BY MR. DRY:

5  Q    Did you participate in a conference call that same

6  day on November 9 with McGuire Woods attorneys?

7  A    I did.

8  Q    As part of that meeting, did Mr. -- who

9  participated in that call?

10  A    It was me, Eric Perkins, David Field, Kelly

11  Morrison, and McGuire Woods was by telephone.

12  Mr. Heaphy, is I think how you pronounce his name,

13  another lawyer whose name escapes me, and I believe a

14  paralegal named Tennille.

15  Q    What was said during that meeting?

16  A    Mr. Heaphy indicated that based upon the facts as

17  had been outlined to him, he thought there were

18  criminal implications, particularly wire/mail fraud,

19  that this could be a victimless crime, meaning it was a

20  crime even though at a particular moment there may not

21  be a victim without money, and said, though, that a

22  prosecutor probably would not get a hold of this unless

23  there was a victim.

24  Q    Okay.  Did you have a conversation with Edward

25  Okun on November 13 of 2006?  In fact, do you recall

1 that specific meeting, sir?

2 A    I don't recall the specific date.

3         MR. DRY:  Can you bring up Government's

4 Exhibit 136, which has not been admitted into evidence.

5 Q    Go to the bottom part of that, please.  Please

6 review this briefly to refresh your recollection.

7 A    (Complying.)  Okay.

8 Q    Then go to the second page of this document,

9 please.

10         THE COURT:  What is it?

11         MR. DRY:  I'm just using it to refresh his

12 recollection.  It's his handwritten notes of the call

13 with Mr. Okun.

14         THE COURT:  Is it his note?

15         MR. DRY:  Yes, sir.

16         THE COURT:  Well, ask him.

17 Q    Sir, are these your notes?

18 A    Yes, they are.

19 Q    Did you take these at the time with the

20 conversation with Mr. Okun?

21 A    Yes, I had taken them contemporaneously with that

22 call.

23 Q    Did Mr. Okun make any comments to you regarding

24 whether the qualified intermediaries had been paid

25 back?

1          MR. POLLACK:  Can we take down the exhibit if

2   the witness is now supposed to be testifying from his

3   present recollection?

4          THE COURT:  It's not up there.

5          MR. POLLACK:  It was up to the witness.

6          THE COURT:  Yes.

7   A    I didn't get a chance to look at the second page.

8   Q    Okay.

9          THE COURT:  Put it back up if that's what

10  you're going to ask him about.

11         MR. POLLACK:  Are you asking him what his

12  notes say or are you asking him what his present

13  recollection is?

14         MR. DRY:  I'm asking for his present

15  recollection.  He said he hadn't reviewed that part of

16  the document.  So we're bringing it up.  We'll bring it

17  down and we'll ask him about it.

18         MR. POLLACK:  Has he expressed that he

19  doesn't have a recollection?

20         THE COURT:  I think that's why they got it in

21  the first place.

22         MR. POLLACK:  Your Honor, originally he was

23  shown the notes for the sole purpose of refreshing his

24  recollection as to the exact date that the conversation

25  took place.  That was the only purpose to show him the

1    notes.

2              THE COURT:  Right.

3              MR. POLLACK:  So he's now done with the notes

4    and we should be back to talking about his present

5    recollection.  Unless and until there's a failure of

6    the present recollection, he doesn't need it refreshed.

7              MR. DRY:  I agree.

8              THE COURT:  Okay.  Well, go.

9              MR. DRY:  Please take the notes down.

10             THE COURT:  They are down.

11   BY MR. DRY:

12   Q    Mr. Hoctor.

13   A    Yes.

14   Q    Did you have a conversation with Edward Okun on

15   November 13 of 2006?

16   A    Yes, I did.

17   Q    During that conversation, did Mr. Okun make any

18   comments regarding whether any of the QI companies had

19   been paid back for the transfers?

20   A    I do not recall.

21   Q    Going to the second page of Mr. Hoctor's

22   handwritten notes, please review that.  Particularly

23   the middle.

24   A    (Complying.)  Okay.

25             MR. DRY:  Please take that down.

1  Q    Did Mr. Okun make any statements about whether any

2  of the QIs had been paid back for the transfers of

3  client funds?

4  A    Yes, he said that the numbers didn't reflect all

5  the paybacks, that REES had been paid back entirely,

6  and that NES had been all but paid back.  There was

7  some outstanding.

8  Q    Did Mr. Okun make any comments regarding Todd

9  Pajonas?

10  A    Yes, he indicated that Todd Pajonas was

11  threatening to sue him.

12  Q    During that call, did Mr. Okun make any statements

13  regarding his intent to repay the money?

14  A    I don't recall.

15        MR. DRY:  Bring up the notes again, please.

16  Is there a third page?

17  Q    Refresh your recollection with the second

18  paragraph, sir.

19  A    (Complying.)  Yes.

20  Q    Did Mr. Okun indicate whether he planned on

21  repaying the money back?

22  A    He seemed to indicate he was not planning on

23  repaying the money.

24  Q    Now, going on, off this conversation, did anything

25  else happen on November 13 of 2006 that caused you

1  concern?

2  A     I don't recall.

3  Q     Okay.

4         MR. DRY:  One moment, Your Honor.

5  Q     Did you have a conversation with Mr. Okun on

6  November 20 of 2006?

7  A     Again, I don't recall.

8  Q     Okay.

9         MR. DRY:  Bringing up Government's Exhibit

10 157 to refresh the witness's recollection.

11        THE CLERK:  Has it been admitted?

12        MR. DRY:  No, it has not.  I'm sorry.

13 BY MR. DRY:

14 Q     Please review that.

15 A     Okay.

16        MR. DRY:  Please take it down.

17 Q     Do you remember having a conversation with

18 Mr. Okun on November 20 after refreshing your

19 recollection?

20 A     Yes, I do.

21 Q     Do you remember anybody else being on the call?

22 A     I believe that at the end of the call Eric Perkins

23 may have joined.

24 Q     Did Mr. Okun make any statements regarding his

25 intent to continue transferring client exchange funds?

1 A    What I recall was he intended to get into new

2 markets with new qualified intermediary companies.

3 Q    Did he make any statements regarding his intent on

4 using client exchange funds in the future?

5 A    He expressed to me that he was neither going to

6 use client exchange funds to acquire new QIs, nor would

7 he use any new qualified intermediary's monies to prop

8 up the companies that he already owned.

9 Q    Did he make any comments regarding whether things

10 were going to be fixed?

11 A    Yes, he did.  He said McGuire Woods was working to

12 clean up the exchange agreements.

13 Q    In this time frame, did you have any conversations

14 from November 20 forward with Mr. Okun regarding

15 Mr. Perkins?

16 A    I had several conversations with Mr. Okun

17 regarding Mr. Perkins.

18 Q    What did Mr. Okun say about Mr. Perkins?

19 A    A number of things.  He said that he was going to

20 bring Eric's world down with the memos.  Basically, the

21 insubordination, as he saw it.  He was going to have

22 his new lawyers -- this may have been a few days later,

23 but they were going to figure out how to deal with

24 Eric.  Always very threatening language.

25 Q    Did Mr. Okun ask any questions about what

1  Mr. Perkins planned on doing?

2  A    At some point I think he asked me what Perkins

3  planned on reporting.  A second memo had gone out on

4  November 21.

5  Q    Returning to Government's Exhibit 159 --

6        THE CLERK:  Has it been published to the jury

7  yet?

8        MR. DRY:  Yes, it's been admitted into

9  evidence.

10  Q    Did you receive this?

11  A    Yes, I did.

12  Q    Going to the second page, please, did you draft

13  this memo?

14  A    I did not draft this memo.  I read it.  So I got

15  an advanced copy before it was circulated to the

16  officers and directors of IPofA.

17        MR. DRY:  You can bring that down.

18  BY MR. DRY:

19  Q    I'd like to draw your attention to -- actually, do

20  you remember a specific conversation on November 27 of

21  2006, sir?

22  A    Yes, I do.

23  Q    Who is that between?

24  A    Me and Mr. Okun.

25  Q    Who was doing most of the talking?

1 A      Mr. Okun.

2 Q      What did Mr. Okun say during that call?

3 A      He said that he was hiring Richard Simring as a

4 new lawyer.  He was hiring Abby Kaplan as a new lawyer.

5 Q      Did he describe Mr. Kaplan to you?

6 A      Yes, he indicated he was a bend-the-rules kind of

7 lawyer.

8 Q      A bend-the-rules kind of lawyer?

9 A      Yes.

10 Q      Did Mr. Okun make any statements regarding what

11 Mr. Simring was going to do?

12 A      Yes.  He indicated that research had been done

13 regarding the qualified intermediary exchange

14 agreements and they were going to be reworking them.

15 He also indicated Mr. Simring was going to figure out

16 how to fire Mr. Pajonas and was going to figure out how

17 to deal with Eric Perkins.

18 Q      Turn your attention to Government's Exhibit 170,

19 which is not in evidence.  Actually, you know what?

20 No.

21      Did you have a conversation with Mr. Okun on

22 November 29 of 2006?

23 A      Yes, I did.

24 Q      Who was on that call?

25 A      It was Mr. Okun and myself.

1  Q    Describe for the members of the jury the

2  November 29, 2006 call with Mr. Okun.

3  A    It was very early in the morning.  It was about

4  7:30 a.m.  I know Mr. Okun to be awake.  He always

5  awoke early.  I had had some banter with Mr. Simring

6  the day before.  I felt that Mr. Simring was getting

7  involved in IPofA business, and as far as I knew he was

8  not yet IPofA's attorney.  And I called Mr. Okun for

9  several reasons.  One, to tell him to get Mr. Simring

10 to back off and do his job and try not to do my job.

11 And, two, to tell Mr. Okun that based upon the

12 investigation that we in-house attorneys had been

13 conducting, it was putting me in an ethical quandary.

14     I no longer felt I could do the basic tasks of my

15 job in many circumstances, you know, morally or

16 ethically.  I told him that I didn't feel he could do

17 with the QI funds what he had done.  I told him that I

18 thought there were criminal implications at which time

19 he told me that if I ever used the word "criminal"

20 around him again, he'd rip my face off.  And as I

21 actually recall it, he said he would rip my F-ing face

22 off.  "F-ing" being an expletive.

23 Q    Did he say anything regarding his view of the

24 memo, the lawyers signing off?

25 A    Yeah, he said he'd never forgive us.

1  Q     Turn to November 30 of 2006.  Did you have a call

2  with Edward Okun in the afternoon of November 30 of

3  2006?

4  A     Yes, I did.

5  Q     Do you remember who was on that call?

6  A     It was Edward Okun and myself.

7  Q     What time did that call occur, do you remember?

8  A     As I recall, it was about 4:30 in the afternoon.

9  Q     Who was doing most of the talking?

10 A     Mr. Okun.

11 Q     What was said during the call?

12 A     He told me that his liquidity was fine at the

13 qualified intermediaries, that the float, the money

14 that was overall being held by the qualified

15 intermediaries, was up.  He told me that there were

16 things that he couldn't tell me.  I only knew the half

17 of it.  And that he had been told not to tell me.  He

18 said that business was good with the qualified

19 intermediaries, and then proceeded to explain except in

20 New York, Massachusetts, and Tampa.

21       He said that with respect to the QIs' financials,

22 they were going to be erring on the side of

23 super-conservative, and he ended the conversation oddly

24 and said, "The truth is, went a little overboard."

25 Q     That was on November 30th of 2006, sir?

1   A      That's correct.

2   Q      Okay.   What did you do after this call?

3   A      As I had been, I very seriously weighed my options

4   of resigning, and I recall December 2, I think it was a

5   Saturday, I drafted up my resignation letter, and the

6   following Monday, which I believe was the 4th of

7   December, I tendered my resignation.

8   Q      Turning to Government's Exhibit 182, please.

9           THE CLERK:  Has it been admitted?

10          MR. DRY:  No, it has not.

11  Q      What is this?

12  A      This is my resignation letter.

13          MR. DRY:  I'd like to admit Government's

14  Exhibit 182 into evidence.

15          MR. POLLACK:  The letter indicates that a cc

16  was sent to Mr. Okun.  Can we just inquire of the

17  witness if in fact he sent a cc to Mr. Okun?

18          THE COURT:  Did you?

19          THE WITNESS:  I seem to recall doing

20  interoffice mail, but I can't say with specificity.

21          THE COURT:  You mean you sent it to him by

22  interoffice mail; is that what's you're saying?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  Does that answer your question?

25  He thinks he's does, but he's not sure.

1            MR. POLLACK:  Given that answer, I would

2 object to admission of the document.  It's hearsay.

3 The witness can't testify he shared it with Mr. Okun.

4            MR. DRY:  It goes to weight, not

5 admissibility.  And Ms. Coleman is also included on it.

6 It's really not being offered for the truth of the

7 matter asserted.  It's being offered to show that he

8 resigned on December 2nd.

9            THE COURT:  Is there any dispute over the

10 fact that he resigned on December 2?

11            MR. POLLACK:  I don't think there's any

12 dispute over the fact that he resigned.

13            THE COURT:  Why would we need the document,

14 if they agree he resigned?

15            You don't dispute that.

16            MR. POLLACK:  I don't dispute that.  What I

17 am objecting to are the out-of-court statements.

18            THE COURT:  That's not my point.  I'm saying

19 why do we need this if he stipulates it?

20            MR. POLLACK:  I agree, Your Honor.

21            MR. DRY:  That's fine.

22            THE COURT:  I'm beginning to talk like

23 you-all.  I'm telling you what I'm saying.

24            MR. DRY:  Don't do that, Your Honor.

25 BY MR. DRY:

1  Q    You said that you had ethical duties and you were

2  concerned.  Why didn't you report what was going on?

3  A    Mr. Okun maintained through this whole thing that

4  he was cleaning everything up, that none of the

5  activities that had happened in the past were going to

6  happen in the future.  So I did not get the sense that

7  there was going to be --

8           MR. POLLACK:  I'm going to object beyond what

9  Mr. Okun told him.

10          THE COURT:  I think he's entitled to explain

11  what he did based on what Mr. Okun --

12          MR. POLLACK:  He's now explaining why he

13  didn't do something.

14          THE COURT:  Well, that's also why you do or

15  don't do something, why you commit an act or an

16  omission.

17          MR. POLLACK:  I guess, Your Honor, the

18  objection is relevance.  If the fact of him doing it or

19  not doing it was never communicated to Mr. Okun, it's

20  simply not relevant.

21          MR. DRY:  It is relevant, Your Honor, because

22  in the memos they talk about their ethical duties, and,

23  specifically, the duty to report.  And the jury is

24  entitled to understand why Mr. Hoctor didn't report.

25          THE COURT:  He said that.  He said because

1 Mr. Okun said he was going to clean things up.

2          MR. DRY:  That's fine, Your Honor.

3          THE COURT:  Why else do we need to hear it?

4          MR. DRY:  We do not, Your Honor.

5          THE COURT:  All right.  Moving right along.

6 BY MR. DRY:

7 Q    Throughout your conversations with Mr. Okun, did

8 he ever express any confusion to you regarding who

9 Mr. Perkins represented?

10 A    No.

11 Q    Did Mr. Okun ever say that he thought Mr. Perkins

12 represented him personally?

13 A    No.

14          MR. DRY:  Can we have Government's Exhibit

15 280, please?  This has not been admitted into evidence.

16 Q    Mr. Hoctor, do you recognize the boat depicted in

17 these pictures?

18 A    I do.

19 Q    You have visited that boat?

20 A    I have one time, yes.

21 Q    In fact, did you take a tour of the boat?

22 A    I did.

23 Q    Who gave you that tour?

24 A    Mr. Okun.

25          MR. DRY:  At this time I'd like to admit

1 Government's Exhibit 280.

2          THE COURT:  Any objection?

3          MR. POLLACK:  Object under Rule 403.

4          MR. DRY:  Your Honor, it's not more

5 prejudicial than probative.  It's merely showing a

6 picture of Mr. Okun's yacht.  The jury is entitled to

7 see it.

8          THE COURT:  I think I understand.  Overruled.

9          MR. DRY:  Okay.

10 BY MR. DRY:

11 Q    And this was the Simone; is that correct?

12 A    This was the Simone.

13 Q    Turning to Government's Exhibit 282, please.

14          MR. DRY:  This has not been admitted into

15 evidence, Mr. Neal.

16 Q    Do you recognize the house that was depicted in

17 this picture?

18 A    I do.

19 Q    Have you visited that house?

20 A    I have.

21 Q    Is this picture a fair and accurate representation

22 of this home?

23 A    Yes, it is.

24          MR. DRY:  At this time I'd like to admit

25 Government's Exhibit 282 into evidence.

1          MR. POLLACK:  The same objection, Your Honor.

2          THE COURT:  Well, I'm not even sure we

3  established whose home this is yet.  Maybe I

4  misunderstood, but it may not even be relevant.

5  A    This was one of Mr. Okun's homes.

6  Q    And you visited it with Mr. Okun before?

7  A    Yes, it's on Hibiscus Island in Miami.

8          MR. DRY:  I'd like to admit Government's

9  Exhibit 282 into evidence.

10         THE COURT:  Your objection is overruled.

11         (Government's Exhibit 282 is admitted into

12  evidence.)

13  Q    Where did you say this was, sir?

14  A    This is in Miami.

15  Q    Miami, Florida.

16         MR. DRY:  One moment, Your Honor.

17  Q    From your personal observations, how often did

18  Mr. Okun and Ms. Coleman communicate?

19  A    All the time.

20  Q    Could you estimate per day how often from your

21  observations?

22  A    Gosh, dozens.

23         MR. DRY:  I'll tender the witness, Your

24  Honor.

25         MR. POLLACK:  Let me have Government's

1 Exhibit 280.  Unless I stole it from you.

2            MS. BISHOP:  I think you stole it from me.

3            MR. POLLACK:  Never trust a lawyer.

4            THE WITNESS:  I never do.

5            THE COURT:  Before you get started, let's

6 stand up a minute.  This is for me.  My back is stiff.

7            (Addressing the witness)  You don't have to

8 if you have a bum leg.

9            Okay.  Everybody feel a little better now?

10           Excuse me.  Go ahead.

11

12      CROSS-EXAMINATION

13 BY MR. POLLACK:

14 Q    Good afternoon, Mr. Perkins.

15 A    Hoctor.

16 Q    Mr. Hoctor.

17 A    We look the same.  It's just another bald lawyer,

18 I understand.

19 Q    I'll get it straight.  Mr. Hoctor, I apologize.

20      This is the Simone?

21 A    I don't have it up on the screen.

22           MR. POLLACK:  You can go ahead and publish

23 this all around.

24           THE COURT:  It's admitted.  It's 280.  There

25 you go.

1  A    I got it.

2  Q    This is the Simone?

3  A    This is the Simone.

4  Q    It's a nice boat, isn't it?

5  A    Beautiful boat.

6  Q    And Mr. Okun sometimes had meetings on his very

7  nice boat, didn't he?

8  A    As I understand, yes.

9  Q    In fact, you attended one?

10  A    I attended one, yes.

11  Q    He had business meetings that related to IPofA

12  business on the boat?

13  A    Yes.

14  Q    He had business meetings that related to 1031 Tax

15  Group on the boat?

16  A    As I understand, yes.

17         MR. POLLACK:  If we can have -- what is it,

18  279?  The house.  280?

19         THE COURT:  282 is the house.

20  BY MR. POLLACK:

21  Q    282.  This is a house on Hibiscus Island, Miami?

22  A    Yes.

23  Q    Mr. Okun had a nice house, didn't he?

24  A    Beautiful home.

25  Q    Water is nice, lots of palm trees?

1  A    Yes.  It was fantastic.

2  Q    Hopefully, we're done with those now.

3       You had a conversation with Ms. Coleman, as I

4  understand it in approximately August of 2005, where

5  Ms. Coleman told you about a proposal for borrowing

6  money from the qualified intermediaries?

7  A    Correct.

8  Q    And you did some research on that issue?

9  A    I did.

10  Q    At this point you're at your own law firm, Hoctor

11  and Kaplan?

12  A    That's correct.

13  Q    You're not an employee of IPofA?

14  A    That's correct.

15  Q    But you do some research and you get back to her?

16  A    Uh-huh.

17  Q    And you say, Based on my research, you can't do

18  this transaction?

19  A    That's correct.

20  Q    And, specifically, you say that there's a Virginia

21  case that you found that you read to mean that you

22  can't do this transaction?

23  A    Correct.

24  Q    In your conversation with Ms. Coleman, she tells

25  you that Foley & Lardner had expressed a different

1  view?

2  A    What she said was that her Massachusetts lawyers

3  told them that they could do it.

4  Q    Did you understand that or did you come to

5  understand that to be a reference to the law firm of

6  Foley & Lardner?

7  A    I presumed that, yes.

8  Q    And your understanding from Ms. Coleman was that

9  Foley & Lardner represented the seller, meaning the

10  prior owner of Atlantic Exchange Company, in the

11  transaction where Atlantic Exchange Company was being

12  purchased by Mr. Okun?

13  A    Correct.

14  Q    Did you learn then or did you learn later that in

15  fact the exact opposite was true and that Foley &

16  Lardner represented the purchaser in the transaction?

17  A    I'm not aware of that to this day.

18  Q    Okay.  While you -- let me strike that.

19      Your conversations on this subject of

20  permissibility of borrowing from the qualified

21  intermediary in August of 2005, those were with

22  Ms. Coleman?

23  A    That's correct.

24  Q    Not with Mr. Okun?

25  A    Not with Mr. Okun.

1  Q     In fact, during the entire time that you were at

2  your law firm, Hoctor and Kaplan, you never

3  communicated with Mr. Okun on the subject of borrowings

4  from the qualified intermediaries?

5  A     That is correct.

6  Q     Just one point to prevent any confusion.  There's

7  a Miami firm called KPKB.  Are you familiar with that?

8  A     I am.

9  Q     At least one of those K's stands for Kaplan?

10 A     Correct.

11 Q     That's a different Kaplan than the Kaplan that was

12 your law partner?

13 A     Right.  My law partner is Rob Kaplan.  KPKB is

14 Abby Kaplan.

15 Q     No relationship?

16 A     No relation.  Same spelling, no relation.

17 Q     Now, in approximately April of 2006, Ms. Coleman

18 approaches you about the possibility of your coming to

19 work in-house at IPofA, correct?

20 A     Correct.

21 Q     And you have conversations with Mr. Perkins and

22 Ms. Coleman?

23 A     Uh-huh.

24 Q     And you, specifically, ask Ms. Coleman about

25 whether there had been further borrowings from the

1 qualified intermediaries since you had had the

2 conversation with her back in August of 2005, correct?

3 A    Just to clarify, I was not aware of any borrowings

4 that had happened until that point when she said, "He

5 put all the money back," which I then assumed that he

6 had borrowed in the past.  But I was not aware of any

7 prior borrowings.

8 Q    Let me go back then.  In April of 2006, you had a

9 meeting with Ms. Coleman?

10 A    Uh-huh.

11 Q    And you, specifically, asked Ms. Coleman if there

12 had been borrowings from the QIs?

13 A    Correct.

14 Q    And she tells you that there haven't been any for

15 a long time?

16 A    Uh-huh.

17 Q    And that all the borrowings that there had been

18 had been paid back?

19 A    Correct.

20 Q    Now, much later in time you had a conversation

21 with Mr. Okun about the borrowings, right?

22 A    Correct.

23 Q    Mr. Okun tells you that some of the borrowings had

24 been paid back, and he specifies borrowings related to

25 which qualified intermediaries, correct?

1  A    Correct.

2  Q    He doesn't deny there had been other borrowings or

3  there were other borrowings still outstanding?

4  A    I don't know that it came up.

5  Q    He didn't tell you that they had all been paid

6  back?

7  A    What he said was that REES had been all paid back,

8  and NES had almost all been paid back, and that the

9  numbers didn't reflect all the credits.

10 Q    That's right.  But he wasn't suggesting to you

11 that all the borrowings had been paid back.  He was

12 specifying for you which ones had?

13 A    I took it that since NES had not been paid back,

14 that to be the case, yes.

15 Q    You joined IPofA in April of 2006?

16 A    May.

17 Q    May of 2006?

18 A    Part time for two weeks, full time June 1.

19 Q    Okay.  Beginning in June, you get involved in an

20 acquisition by the 1031 Tax Group of an entity referred

21 to as REES or R-E-E-S?

22 A    That's correct.

23 Q    And that's a qualified intermediary down in

24 Florida?

25 A    Uh-huh.

1  Q     And you're a transactional lawyer, right?

2  A     I am.

3  Q     And so it makes perfect sense for you to be

4  involved in drafting or papering the transaction, as

5  you put it, correct?

6  A     Yes.

7  Q     And that means drafting the documents that are

8  going to reflect what the terms of the transaction are?

9  A     Yes.

10 Q     And, specifically, look at 46B, it's a stock

11 purchase agreement.  That's one of the documents that

12 you had a role in creating?

13 A     It's not up, but --

14 Q     Do you recall it?

15 A     I assume so, yes.

16         MR. POLLACK:  46B.

17 Q     While Ms. Bishop is looking for that --

18         THE COURT:  Do you want to get the government

19 to put it up?

20         MS. GRADY:  You may have it, Mr. Pollack.

21         MR. POLLACK:  I do have it.

22         MS. GRADY:  You have our copy.

23         MR. POLLACK:  Hold on one second.  I'll give

24 you this copy.  Let me just find my place here.

25         MS. GRADY:  Thanks.

1          THE CLERK:  Has this been admitted?

2          THE COURT:  46B has been admitted.

3  BY MR. POLLACK:

4  Q     All right.  Now, it's down.  I'll get to specific

5  questions.

6          This is the document that I want to talk about,

7  the transaction I want to talk about.

8  A     Yes.

9  Q     And this is the one that pertains to Real Estate

10  Exchange Services or REES?

11  A     Yes.

12  Q     And in these sort of deal documents, there are

13  sort of standard sections of the document that lay out

14  different responsibilities, correct?

15  A     There should be, yes.

16  Q     Who's going to do what?

17  A     Correct.

18  Q     And what promises are being made to the other

19  side?

20  A     Correct.

21  Q     And the reason that you do a document like this is

22  it's important to capture all the important terms of a

23  deal in writing so there's not any confusion later

24  about what was part of the deal or what wasn't part of

25  the deal?

1  A    As much as you can in the time frame that you

2  have.

3  Q    If you are a part of the transaction, you might be

4  called upon to make --

5         MR. DRY:  Objection, Your Honor.  Is he going

6  to be asking Mr. Hoctor to opine on contractual issues

7  and what's important to have in deal documents and

8  what's not?  If so, it would be expert testimony.  He

9  hasn't been noticed as an expert.

10         MR. POLLACK:  I'm asking about a particular

11  document that he testified on direct that he put

12  together.

13         THE COURT:  I don't think it's expert

14  testimony when he's talking about the deal documents.

15  He prepared them.  So I overrule the objection.

16  BY MR. POLLACK:

17  Q    There are standard provisions in these kinds of

18  documents, and in this document itself the section is

19  called "Representations and Warranties"?

20  A    Should be.

21  Q    And representations or warranties are fancy legal

22  words for promises, right?

23  A    That's correct.

24  Q    Both sides are going to say to the other side, if

25  there's a term that's important to me, I want it to be

1  reflected in the representations and warranty section

2  of the promises that you're making?

3  A     Hopefully.

4  Q     In this transaction, Mr. Okun's entity, the 1031

5  Tax Group is the buyer, correct?

6  A     That's correct.

7  Q     It's buying REES from the former owners, who I

8  guess are the Shefmans?

9  A     He's buying their stock.

10  Q     Will you turn to page 8 of the document.  Section

11  4, representations and warranties of the buyer, right?

12  A     Correct.

13  Q     So these are the promises that Mr. Okun's entity

14  is making to the prior owners of the stock when he's

15  purchasing their stock, correct?

16  A     Correct.

17  Q     And the first one is that the company, the 1031

18  Tax Group, is a duly existing legal company, right?

19  A     Uh-huh.

20  Q     The second one is, essentially, that the agreement

21  is binding on the buyer; is that a fair summary of all

22  that legal language?

23  A     Yes.

24  Q     The third has to do with whether or not a broker's

25  fee is being paid?

1  A    Correct.

2  Q    The fourth has to do with lease obligations?

3  A    It's what the title says, yes.

4  Q    Let's go to page 9.  That's it, right?  That's the

5  end of the buyer's representations and warranties?

6  A    I assume so.

7  Q    There's nothing in the buyer's representations and

8  warranties about how the new owner is going to invest

9  or not invest the client's funds?

10 A    Based upon what you have shown me, no.

11 Q    Nothing in the representations and warranties

12 about whether the buyer intends to borrow from the

13 qualified intermediary once the buyer is the new owner

14 of that intermediary?

15        MR. DRY:  I object, Your Honor.  I think what

16 Mr. Pollack is trying to do is imply that unless it's a

17 representation in this, like this legal document

18 contains the only things that you have to tell a buyer.

19        THE COURT:  He may be making that as a basis

20 for an argument, but he's just asking questions right

21 now.  So why don't you let him ask his questions at

22 this point?

23        Go ahead.

24        MR. POLLACK:  Thank you, Your Honor.

25        I'm through with that document.

1 BY MR. POLLACK:

2 Q    Now, that was in early June.  A couple weeks later

3 you were involved in another qualified intermediary

4 acquisition on behalf of the 1031 Tax Group, right?

5 A    Right, NES.

6 Q    NES being the name of the qualified intermediary

7 that was being purchased?

8 A    Yes.

9 Q    And that stood for?

10 A    National Exchange Services is my recollection.

11 Q    And if we could look at Exhibit 50A.

12        MS. GRADY:  I think you have it again, Mr.

13 Pollack.

14 Q    Is this the purchase and sale agreement that you

15 drafted for the purchase of NES?

16 A    Yes, I drafted it along with Mr. Bennett and

17 Mr. Davis's counsel.

18 Q    I want to just be sure, National Intermediary,

19 Ltd.  Was that the entity that the Bennetts used to

20 hold their interest in this intermediary before it was

21 sold to Mr. Okun's entity?

22 A    Yes.  As I recall, it was probably their holding

23 company.

24 Q    Not unusual for somebody to have a holding company

25 to hold various assets or companies?

1  A     No.  And if you look at the second recital, you

2  see there were several different entities that they

3  used for various types of exchanges.

4  Q     And if we could turn to page 7 at the bottom of

5  that page, again, we have the representations and

6  warranties that the buyer, the 1031 Tax Group, is

7  making to the prior owners, the sellers?

8  A     Correct.

9  Q     And if we can turn to page 8, again,

10  representations and warranties about it being an

11  organization in good standing, right?

12  A     Uh-huh.

13  Q     About having authority to enter into the

14  transaction and to be bound by it?

15  A     Correct.

16  Q     About a broker's fee?

17  A     Correct.

18  Q     Let's look at 44 because this didn't appear in the

19  other document.  "Investment intent.  Buyer is

20  acquiring interest for its own account and not with a

21  view to distribution within the meaning of the

22  Securities Act of 1933."

23  A     Uh-huh.

24  Q     And this means that the buyer is not intending to

25  sell securities or stock in the qualified intermediary

1  and, therefore, the transaction is not going to be

2  governed by the Securities and Exchange Act; is that

3  right?

4  A    That's correct.  It's a means to protect the

5  seller.

6  Q    When it says "investment intent," we're not

7  talking about how the client funds or the funds owned

8  by the qualified intermediary may be invested

9  subsequent to the sale?

10  A    That's correct.  This paragraph does not deal with

11  that.

12  Q    So, again, there is no representation or warranty

13  from the buyer about what it will do or will not do in

14  terms of investing the funds of the qualified

15  intermediary once the purchase is consummated?

16  A    Not to the seller, that's correct.

17  Q    No representation is made to the seller about

18  whether or not there might be borrowings from that

19  qualified intermediary after the sale?

20  A    No representations to the seller to that effect.

21  Q    Thank you.

22       You can go ahead and take that down.

23       If I understood your testimony on direct

24  correctly, the next and final qualified intermediary

25  whose purchase you were involved in was IXG?

1  A     That's correct.

2  Q     And you talked about a meeting that you had with

3  the McCabes?

4  A     Uh-huh.

5  Q     And the McCabes were the prior owners or the

6  sellers of IXG?

7  A     Correct.

8  Q     And that meeting took place at the New Hampshire

9  house of Mr. Okun?

10 A     Yes.

11 Q     Before I give the government the opportunity, was

12 it a nice house?

13 A     It was a beautiful home.

14 Q     Okay.  You said at that meeting with the McCabes,

15 this was shortly before the sale?

16 A     This was at probably less than a week.

17 Q     At that meeting that you attended there wasn't any

18 discussion at all of borrowings from the qualified

19 intermediaries?

20 A     No.

21 Q     And then Government's 64A, which I have, you can

22 start with page 1 so we know what we're looking at.

23 This is the purchase and sale agreement that you

24 participated in drafting for the purchase by the 1031

25 Tax Group of the McCabes' ownership interest in

1 Investment Exchange Group or IXG?

2 A     That's correct, and a couple of subsidiaries.

3 Q     And, again, if we go to page 8 we'll see the

4 representations and warranties that the buyer is making

5 to the seller?

6 A     Uh-huh.

7 Q     And these are the same four promises that we saw

8 in the last document, correct?

9 A     Correct.

10 Q     And if you turn to page 9, just so we make sure

11 that there aren't any additional ones, correct?

12 A     Correct.

13 Q     So, again, the buyer is not making any promises

14 whatsoever to the seller about what he will or will not

15 do with exchange funds after the sale is consummated?

16 A     No promises to the seller.

17 Q     Now, in September of 2006 --

18 A     Uh-huh.

19 Q     -- you have a meeting with or I guess it's a

20 management meeting.  And these were, I guess, routine

21 meetings held by some members of senior management?

22 A     No, this one was special.  This one dealt with the

23 disclosure of $55 million that had been missing.

24 Q     So this was a meeting that was called by

25 management specifically to discuss the issue of funds

1  that Mr. Zacarias had identified that were missing or

2  had been borrowed from the qualified intermediaries,

3  correct?

4  A    Yes, Mr. Field.

5  Q    That Mr. Field had identified?

6  A    Correct.

7  Q    Okay.  And Mr. Okun was not at this meeting?

8  A    He was invited.

9  Q    Did he attend?

10  A    No.

11  Q    Did he typically attend management meetings?

12  A    No.

13  Q    At this meeting, Ms. Coleman says that she has a

14  formal legal opinion from Mr. Burr at Foley & Lardner?

15  A    Yes.

16  Q    And she is representing that she's seen such an

17  opinion, she's had it in her possession?

18  A    She said, "We have one."

19  Q    And she also represents that the accounting firm

20  of PricewaterHousecoopers is doing some sort of

21  analysis about the propriety of borrowing from

22  qualified intermediaries?

23  A    Correct.

24  Q    Did you ever see such analysis?

25  A    No.

1  Q    And she also says that the law firm of Kutak Rock

2  is also is doing an analysis?

3  A    Correct.

4  Q    And you did subsequently see an analysis from

5  Kutak Rock?

6  A    She, actually, if I recall correctly, said they

7  would give us an opinion.  What they did was an

8  analysis.

9  Q    I guess my question was:  Did you subsequently see

10  that analysis?

11  A    From Kutak Rock, yes.

12  Q    Now, on November 7, you, Mr. Applewhite,

13  Ms. Morrison, and Mr. Perkins all issue a memo or at

14  least it comes out jointly in all of your names, right?

15  A    Mr. Morrison.

16  Q    Mister?

17  A    Mister.

18  Q    I'm sorry.  Kelly Morrison is a man?

19  A    He's a man.

20  Q    My apologies to Mr. Morrison.

21       You said it was primarily drafted by Mr. Perkins,

22  but all of you wanted to join in and show joint

23  authorship of it?

24  A    There are provisions that we all edited.

25  Q    So you all had a hand in draft some portion of it,

1 but Mr. Perkins took the lead?

2 A     That's correct.

3             MR. POLLACK:  And if we can put that up.  And

4 I should know it by heart by now, but I don't.  What is

5 it?

6             MR. DRY:  120.

7             MS. GRADY:  We have it here.

8 BY MR. POLLACK:

9 Q     Turn to the next page, which is the first page of

10 the memo itself.  This is November of 2006?

11 A     That's correct.

12 Q     Back in August of 2005, you had told Ms. Coleman

13 that in your view it was not permissible to borrow from

14 a qualified intermediary?

15 A     That's correct.

16 Q     Now, you're over a year later making a

17 communication essentially on the same topic, right?

18 A     Correct.

19 Q     But this time not just to Ms. Coleman, this time

20 to Mr. Field, Mr. Zacarias, and to Mr. Okun?

21 A     Correct.

22 Q     Now, in your background in the section called

23 "Background" --

24             MR. POLLACK:  And this may be easier if the

25 witness has a paper copy so you can flip through it.

1 Q    You don't tell Mr. Okun that you had advised

2 Ms. Coleman that there could not be borrowings from a

3 qualified intermediary or that you viewed them as being

4 impermissible over a year ago?  You don't include that

5 in the memo.

6 A    It is not in this memo.

7 Q    At some point -- let's go back to the top.

8 A    Uh-huh.

9 Q    This memo goes out to the four individuals that I

10 named, right?  Mr. Okun, Ms. Coleman, Mr. Field and Mr.

11 Zacarias, correct?

12 A    Correct.

13 Q    Have you discussed the contents of the memo or the

14 fact of the memo or that you are about to send out a

15 memo with Mr. Okun prior to sending it out to him and

16 all of these other individuals?

17 A    No.

18 Q    And when you had a discussion with him later, he

19 told you that if you had a problem or a concern, that

20 you should have just picked up the phone and called

21 him, correct?

22 A    Correct.

23 Q    In fact, he was a little exercised about that?

24 A    Yes, he was.

25 Q    In fact, he didn't just say pick up the phone, he

1 said pick up the F-ing phone, as you put it earlier; is

2 that fair?

3 A    He probably did.

4 Q    Okay.  You said that he viewed it as an act of

5 insubordination, correct?

6 A    Correct.

7 Q    That the four lawyers would get together, write a

8 memo, and send it out to any number of people without

9 having previously discussed it with him, correct?

10 A    Correct.

11 Q    And he was aware, to your knowledge, was he not,

12 that even though the other three names appear here,

13 that Mr. Perkins was the primary drafter of this memo?

14 A    I don't know.

15 Q    He told you that Mr. Perkins ought to be careful?

16 A    Don't know that he used those words, but probably,

17 yes.

18 Q    Something to the effect that he was going to bring

19 down his world?

20 A    He did say that.

21 Q    Okay.  Mr. Okun was exercised and was, I think you

22 said, making threats against Mr. Perkins?

23 A    Yes.

24 Q    Did you take them as actual physical threats?  Did

25 you think he was going to go beat Mr. Perkins up?

1  A     Not physical threats, no.

2  Q     You had a conversation with Mr. Okun on

3  November 13, correct?

4  A     Correct.

5  Q     We're still in 2006?

6  A     Uh-huh.

7  Q     This is after Government 120, the November 7 memo,

8  has gone out, right?

9  A     Uh-huh.

10 Q     At that time in the conversation he tells you he

11 doesn't think he's done anything wrong, right?

12 A     I don't have it in front of me, but as I recall,

13 yes.

14 Q     And it tells you at that time, as of November 13,

15 you say, he seemed to indicate that he didn't have any

16 intention of changing the present practices surrounding

17 borrowings from the qualified intermediaries?

18 A     He seemed to indicate he wasn't going to repay

19 what he had borrowed.

20 Q     Okay.  He seemed to indicate he had no intention

21 at that point to repay the loans?

22 A     Correct.

23 Q     And that was on November 13?

24 A     As I recall, yes.

25 Q     Were you aware that on November 16, three days

1  later, Mr. Perkins sent an e-mail to McGuire Woods

2  saying that he thought some members of senior

3  management might not understand or fully appreciate the

4  advice that McGuire Woods had given?

5  A    I don't know.  I may have seen the e-mail.

6  Q    The conversation that you had with McGuire Woods

7  was on November 9, right?

8  A    Correct.

9  Q    But Mr. Okun wasn't on that call?

10 A    He was not.

11 Q    November 13, he tells you that he doesn't at that

12 point have an intention to repay the loan?

13 A    He seemed to indicate that, correct.

14 Q    Seemed to indicate that?

15 A    (Nodded head.)

16 Q    Was there some ambiguity about it?

17 A    I don't recall at this point.  I remember that

18 there was an indication he was not going to repay the

19 borrowings.

20 Q    But it's interesting that you chose the language,

21 and this is the language you chose in your notes,

22 saying that he seemed to indicate that?

23 A    Correct.

24 Q    Does that suggest that he may not have been

25 entirely clear about what his plans were?

1   A      Very possibly.

2   Q      In fact, on November 20, after the November 16

3   e-mail conversation with McGuire Woods, on November 20

4   you have another conversation with Mr. Okun, correct?

5   A      As I recall.

6   Q      In this conversation, he tells you that McGuire

7   Woods had told us to stop?

8   A      Uh-huh.

9   Q      And as a result, we're stopping the practice?

10  A      That's what I understand.

11  Q      And then you became aware subsequent to that that

12  McGuire Woods resigned from representing the companies?

13  A      They declined the representation.

14  Q      Declined the representation.  So they never

15  completed the work, an analysis, that they were hired

16  to do?

17  A      They had advised us in some regard and then had

18  declined the representation.

19  Q      Right.  And you understood that Mr. Okun and/or

20  Mr. Okun's companies were going to retain outside

21  counsel from Miami to essentially replace McGuire Woods

22  and complete that analysis?

23  A      As I recall --

24             THE COURT:  Yes or no will be fine.

25  A      Yes.

1 Q    At some point Mr. Okun made a comment to you that

2 you said you found a little odd, that he may have gone

3 a little overboard?

4 A    Uh-huh.

5 Q    I take it you found it a little odd because you

6 weren't sure exactly what he meant?

7 A    No, it's that it was inconsistent with what he had

8 maintained prior to that point, which was that Todd

9 Pajonas had taken the money, that they hadn't done

10 anything wrong.  It was inconsistent with what he had

11 always maintained.

12 Q    Well, when was that comment?

13 A    That was, if I recall, November 30, 2006.

14 Q    Okay.  Now, that was after Mr. Perkins wrote his

15 two memos, correct?

16 A    One was all of ours, but the second was certainly

17 his.

18 Q    And after McGuire Woods passed on whatever advice

19 they had based on the small amount of time that they

20 had to deal with this situation?

21 A    Uh-huh.

22 Q    And in those conversations after the discussions

23 about whether or not there were criminal implications

24 to what had happened, correct?

25 A    I'm sorry.  Could you repeat that question?

1 Q     In the November 7 memo from all of you --

2 A     Correct.

3 Q     -- and the November 9 phone call with McGuire

4 Woods, and the November 21 memo from Mr. Perkins, in

5 all of those conversations, there was some conversation

6 about whether or not there was any criminal

7 implications to the business practices that had

8 occurred up until that date?

9 A     There were.

10 Q     And Mr. Okun's response to whether or not there

11 had been anything done that was criminal was emphatic

12 that he didn't believe that he had done anything wrong?

13 A     Yes, that's my impression, yes.

14 Q     In fact, he was so upset by the allegation, that

15 he again used some colorful language to describe what

16 he would do if people continued to talk about criminal

17 actions?

18 A     At least mine.

19 Q     But borrowing the money or at least borrowing a

20 lot of money might be a poor business practice whether

21 or not it is criminal, correct?

22         MR. DRY:  Objection, Your Honor.  It calls

23 for speculation.

24         THE COURT:  Sustained.

25 BY MR. POLLACK:

1  Q    Mr. Okun's comment to you about going a little

2  overboard related to whether or not he had maybe

3  borrowed more than it was prudent to borrow?

4          MR. DRY:  Objection, Your Honor.  It calls

5  for speculation.

6          THE COURT:  Sustained.

7  BY MR. POLLACK:

8  Q    Was that your understanding of his comment?

9          MR. DRY:  Objection, relevance.

10         THE COURT:  Why is his understanding

11 relevant?  Have you got a good one?  I'll overrule the

12 objection if you can give me a good reason.

13         MR. POLLACK:  I'll give it my best.

14         THE COURT:  Okay.

15         MR. POLLACK:  The government thought that

16 that comment was important enough to discuss in its

17 direct examination.  I'm just trying to get some

18 context for it.

19         THE COURT:  That's a good one.

20         MR. POLLACK:  Thank you, Your Honor.

21         MR. DRY:  You sustained Mr. Pollack's exact

22 objection on this point.

23         THE COURT:  Let him answer the question.  I

24 don't think I did.

25 A    With respect --

1          THE COURT:  What's your understanding of what

2 he meant by this statement?

3          THE WITNESS:  I understood that he meant that

4 he took too much money.

5 Q    Okay.  Now, what was the date of your resignation?

6 A    The letter was dated December 2.  I actually

7 tendered it December 4, 2006.

8 Q    Thank you.  Before ever coming to the company, you

9 knew Ms. Coleman?

10 A    I did.

11 Q    You had a bit of a preexisting relationship with

12 her?

13 A    Yes, I did.

14 Q    In fact, she is the one who contacted you about

15 coming to the company in the first place?

16 A    She did.

17 Q    And you relied on things that she told you in

18 coming to the company?

19 A    Yes, I did.

20 Q    And you said in your direct testimony you didn't

21 have any reason to doubt it because, as far as you

22 knew, she was truthful individual?

23 A    Correct.

24 Q    By the time you left the company you had come to

25 the conclusion, had you not, that Ms. Coleman lied and,

1 in fact, lied on a regular basis?

2 A    Yes, I had.

3            MR. POLLACK:  I don't have anything further.

4            THE WITNESS:  Thank you.

5            THE COURT:  Any redirect?

6            MR. DRY:  No, Your Honor, no redirect.

7            THE COURT:  Can he be excused permanently?

8            MR. DRY:  He can from the United States.

9            THE COURT:  Mr. Pollack?

10           MR. POLLACK:  Yes.

11           THE COURT:  All right.  You're excused, Mr.

12 Hoctor, to go about your business.  Thank you for

13 giving us your evidence.

14           (The witness was excused from the witness

15 stand.)

16           All right.  We'll take the afternoon recess.

17 We'll take 20 minutes.  Take your pads with you.

18           (The jury is out at 4:00 o'clock.)

19           (Recess taken from 4:00 p.m. to 4:20 p.m.)

20           I, Diane J. Daffron, certify that the

21 foregoing is a true and accurate transcription of my

22 stenographic notes.

23

24           /S/Diane J. Daffron          3-21-09
   _____  _____
25           DIANE J. DAFFRON, RPR, CCR     DATE