1

1                IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF VIRGINIA
2                      RICHMOND DIVISION


3   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                     :
4   UNITED STATES OF AMERICA         :
                                     :
5                                    :
    v.                               :   Criminal No.
6                                    :   3:08CR00132-01
    EDWARD HUGH OKUN                 :
7                                    :   March 11, 2009
    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

8


9


10
    EXCERPT TRANSCRIPT OF TRIAL TESTIMONY OF **ERIC MASSELL**
11          BEFORE THE HONORABLE ROBERT E. PAYNE
                 UNITED STATES DISTRICT JUDGE
12


13


14


15  APPEARANCES:

16  MICHAEL DRY, Assistant United States Attorney
    BRIGHAM CANNON, Assistant United States Attorney
17  JESSICA A. BRUMBERG, Assistant United States Attorney
    Richmond, Virginia
18
            Counsel on behalf of the United States
19
    CAROLYN V. GRADY, Assistant Federal Public Defender
20  ROBERT J. WAGNER, Assistant Federal Public Defender
    Richmond, Virginia
21  and
    MILLER & CHEVALIER
22  Washington, D.C. 20005
    BY:  BARRY J. POLLACK, ESQ.
23
            Counsel on behalf of the Defendant.
24
                    DIANE J. DAFFRON, RPR
25                  OFFICIAL COURT REPORTER
                 UNITED STATES DISTRICT COURT

1

2

3                          I N D E X

4

5                    DIRECT   CROSS   REDIRECT   RECROSS

6  ERIC MASSELL              3      20        42        --

7

8                        E X H I B I T S

9
                                                      Page
10  **GOVERNMENT'S EXHIBITS:**

11  No. 269A Line of credit summary                    10

12  No. 269B Year-end statement for 2006               18

13

14  **DEFENDANT'S EXHIBITS:**

15  No.  25  Status report                             29

16  No.  26  1/26/07 e-mail                            33

17  No.  27  Status report dated 1/3/07                33

18  No.  28  3/2/02 e-mail                             34

19  No.  29  e-mail to McCabe                          36

20  No.  30  P&L statement for 2006                    37

21  No.  31  Status report dated 3/9/07                39

22  No.  32  3/24/07 e-mail                            45

23

24

25

3

1  * * * * * *

2          MR. DRY:  The United States would call Eric

3  Massell.

4

5      ERIC MASSELL, called by the United States, first

6  being duly sworn, testified as follows:

7

8      DIRECT EXAMINATION

9  BY MR. DRY:

10  Q    Mr. Massell, please state your full name for the

11  record.

12  A    It's Eric Michael Massell.

13  Q    Please spell your last name.

14  A    M-a-s-s-e-l-l.

15  Q    I'm sorry.  Your first name is spelled how?

16  A    Eric, E-r-i-c.

17  Q    Sir, briefly state your educational background.

18  A    I graduated from James Madison University summa

19  cum laude with a degree in accounting in 2005.

20  Q    Do you hold any professional certifications?

21  A    Yes, I'm currently a licensed CPA in Virginia.

22  Q    Where are you currently employed at, sir?

23  A    I am currently employed at a firm formerly know as

24  PENTA Advisory Services.  It's now know as Protivity.

25  Q    What type of work does PENTA and now Protivity do?

1   A       We do bankruptcy and restructuring work as well as

2   litigation and forensic accounting.

3   Q       So is that accounting work for companies that

4   might be in bankruptcy or distressed companies, things

5   like that?

6   A       That's correct.

7   Q       Was PENTA/Protivity your employer in the fall of

8   2007?

9   A       Yes, it was.

10  Q       During that time frame, during December of 2006,

11  did you come to be -- did you work on the 1031 Tax

12  Group PENTA engagement?

13  A       Yes, I did.

14  Q       How did that come about?

15  A       We have a probably monthly staffing meeting, and

16  we went through the clients that we currently had, and

17  it was determined that based on my history and my

18  availability that I would be best suited for this case.

19  Q       What was your understanding of what PENTA had been

20  engaged or hired to do?

21  A       My understanding was we were to quantify the cash

22  or the main objectives of my work were to quantify how

23  much cash the 1031 Tax Group had as of year-end 2006,

24  quantify the liability that they owed to their

25  exchangers, and then determine where that whole of

1 money went.

2 Q    Did you personally -- were you personally

3 responsible for determining the amount of money that

4 had left -- the client exchange funds that had left

5 1031 Tax Group and gone for non-exchange related

6 purposes?

7 A    Yes, I compiled that analysis with the help of

8 associates.

9 Q    How did you go about compiling that analysis?

10 A    We started with site visits to all of the

11 qualified intermediaries.  We went to IXG in Denver,

12 SOS in Trumbull, AEC in Boston, REES in Safety Harbor,

13 and we went to those qualified intermediaries and

14 determined the availability of their bank records and

15 their accounting records.

16      We asked for copies of all their accounting

17 records and bank records.  And depending on the quality

18 of the accounting records, sometimes we relied on their

19 accounting records.  We then put together with the bank

20 statements a database that included upwards of 10,000

21 lines, which was entered in by temps that we hired to

22 build the database.  That work was vetted by myself and

23 an associate.

24      Then we spent three months tracing those

25 transactions, every single transaction, where the funds

1  ultimately went.

2  Q    You said "the database," what were the source

3  documents for the information in the database?   In

4  other words, what did the database rely on?

5  A    The database relied on the bank statements.   When

6  we performed the tracing of where the funds came from

7  or went to, we used a number of accounting records and

8  various sources.

9  Q    Okay.  Now, who actually inputed the information

10  into the database from the bank statements?

11  A    We hired two temps, as well as I believe I did

12  some just to doublecheck the temps' work and another

13  associate.

14  Q    You said tracing the money with the use of bank

15  statements.  Just so I understand, you would look for

16  the money leaving a qualified intermediary bank account

17  and going into Investment Properties of America; is

18  that correct?

19  A    That was one of the many types of transactions

20  that we traced.

21  Q    If it went into the Investment Properties of

22  America account, did you trace it after that?

23  A    No, we did not.

24  Q    Okay.  What was the purpose of this tracing?  What

25  were you trying to get to?

1  A     We were ultimately -- we determined an amount of

2  liability using accounting records and sometimes client

3  exchange files, and we determined the amount of cash,

4  and there was a shortfall of cash to satisfy that

5  liability.

6          MR. WAGNER:  Objection.  Is he drawing a

7  conclusion now?  I'm not quite sure.  He said "a

8  shortage of cash."  It's unresponsive to the question.

9          MR. DRY:  Let's do it this way.

10 BY MR. DRY:

11 Q     First, what time period were you personally

12 reviewing bank statements for cash?

13 A     For the calendar year of 2006.

14 Q     So from January 1st of 2006 to year-end 2006,

15 that was when you were first personally tracing; is

16 that correct?

17 A     That's correct.

18 Q     I'm going to show you what's previously been

19 marked as Government's Exhibit 269A.  It's not been

20 introduced into evidence.

21          MR. DRY:  Mr. Neal?

22          THE COURT:  I think we need a screen or

23 something.

24 Q     Sir, do you recognize this document?

25 A     I do.

1  Q      What does this document represent?

2  A      This document represents an analysis prepared for

3  David Field in April of 2007.

4  Q      And you have had a chance to review Government's

5  Exhibit 269A before your testimony today, sir?

6  A      Yes, I have.

7  Q      Are there additional schedules behind Government's

8  Exhibit 269A?

9  A      Yes, there are.

10  Q      And that's the supporting schedules for these

11  aggregate numbers; is that correct?

12  A      That is correct.

13         MR. DRY:  At this time I'd like to move

14  Government's Exhibit 269A into evidence.

15         THE COURT:  Any objection?

16         MR. WAGNER:  I would object, Your Honor.  I

17  believe that the information that's provided in

18  Government's Exhibit 269A relied on expert opinion,

19  expert services.  Mr. Massell has indicated he relied

20  on accounting records in order to come up with his

21  determination with the figures and facts.  He used

22  accounting sources, he indicated.  He did not simply

23  rely on bank records to come up with these

24  determinations.

25         It sounds like he used his own accounting

1 experience and expertise in order to come up with these

2 figures.  So for these reasons and reasons we've stated

3 previously we'd object to the admission of this

4 exhibit.

5          MR. DRY:  Your Honor, the government's

6 position is that we have laid the foundation that he's

7 relied on the bank statements for the creation of the

8 database.  This document which Mr. Massell produced as

9 he was employed at PENTA, who had been hired by the law

10 firm that Mr. Okun had engaged, this is basically a

11 business record that was provided on behalf of the

12 company.  It's not expert testimony whatsoever, Your

13 Honor.  It's just tracing exactly what Mr. Zacarias had

14 testified to regarding the 2005 transactions.

15          MR. WAGNER:  Your Honor, he was engaged as an

16 expert by the client or by KPKB.  And he also testified

17 that other people inputted this information into the

18 database, relied on the database.

19          THE COURT:  That doesn't make it expert.

20          MR. WAGNER:  It doesn't make it expert, but

21 --

22          THE COURT:  It doesn't have anything to do

23 with it, does it?

24          MR. WAGNER:  The point I'm trying to make --

25          THE COURT:  The issue is whether he's

1  testifying as to facts or giving of expert analysis of

2  some sort.  Is that what it's about?

3          MR. WAGNER:  That is our objection.

4          THE COURT:  All right.  Objection overruled.

5  He can testify as to the facts.

6          MR. DRY:  At this time Government's Exhibit

7  269A, please.

8          (Government's Exhibit 269A is admitted into

9  evidence.)

10 BY MR. DRY:

11 Q    Sir, can you describe Government's Exhibit 269A

12 for the members of the jury what this reflects?  And

13 concentrate on the 2006 time frame, sir.

14 A    Okay.  This analysis shows that of all the bank

15 activity in 2006, $35.5 million of those funds were

16 sent from the qualified intermediaries into the IPofA

17 operating account 2719.  $20.3 million was sent to

18 other related entities of IPofA.

19       Mr. Okun contributed $9.3 million in 2006.

20          THE COURT:  What do you mean "contributed"?

21          THE WITNESS:  Well, net.  $9.3 million was

22 returned to the qualified intermediaries from

23 Mr. Okun's personal accounts.

24 Q    And the last column, sir?

25 A    $12.3 million of qualified intermediaries funds

1   was used to purchase other qualified intermediaries.

2   Q    Okay, sir.  You testified that the $9.35 million

3   was returned from Mr. Okun's account to qualified

4   intermediaries, correct?

5   A    That's correct.

6   Q    Did you have Mr. Okun's personal bank statements?

7   A    We had two of his personal bank statements.

8   Q    And you had the bank statements for the qualified

9   intermediaries?

10  A    That's correct.

11  Q    Now, you previously testified that money that left

12  the qualified intermediaries and went into IPofA's bank

13  accounts, and I think you're referring to 2719,

14  correct?

15  A    Yes.

16  Q    That after it went into that account, you wouldn't

17  see where it went past that account, correct?

18  A    That's correct.  Once we determined that the funds

19  had left the qualified intermediary, we did not trace

20  them further.

21  Q    So would this --

22          THE COURT:  I thought you said that you

23  traced them into IPofA.

24          THE WITNESS:  To clarify, we traced them into

25  the IPofA 2917 operating account.  We would not have

1 traced where the funds went from the 2719 operating

2 account.

3 Q    So if money had left 2719, IPofA's operating

4 account, and went to Mr. Okun personally, that would

5 not have been captured in this document, correct?

6 A    That's correct.

7 Q    Now, sir, the loan balance as of 12-31-05, that

8 information was provided by Mr. Zacarias?

9 A    That's correct.

10 Q    Then can you read for members of the jury the

11 total amount of the loan balance as of December 31,

12 2006?

13 A    $114,306,478.00.

14 Q    Was there a materiality threshold that was

15 included in your analysis?

16 A    Yes, there was.

17 Q    What is the materiality threshold?

18 A    A materiality threshold was an amount set to best

19 use of -- to budget our time so we did not waste time

20 searching for transactions that would have small

21 impacts to the final analysis.

22 Q    What was that threshold set at, if you remember?

23 A    We set that threshold at, I believe, $5,000.

24 Q    So is it fair to say any transaction that was

25 below $5,000 would not be reflected on your analysis?

1   A     That's incorrect.

2   Q     I'm sorry?

3   A     That's incorrect.

4   Q     Okay.  Please explain.

5   A     We set the materiality threshold at $5,000;

6   however, if information was readily available for us to

7   trace that $5,000, we would have included it in our

8   analysis.  It was only if we needed to spend a

9   substantial amount of time researching a transaction

10  under $5,000.

11  Q     So if it was above $5,000 you would spend the time

12  it took?

13  A     That's correct.

14  Q     How confident are you regarding -- well, first of

15  all, this analysis was current as of what date?

16  A     I believe April of 2007, mid April.

17  Q     Okay.  Is this a conservative figure?  First of

18  all, were there unresolved transactions?

19  A     Yes, there were.

20  Q     Describe to the members of the jury what an

21  unresolved transaction would be.

22  A     An unresolved transaction would be -- an example

23  would be a debit out of a bank account that we could

24  not trace where the funds were ultimately going.  It

25  might have been going to a title company, but we were

1  not sure the funds were used to purchase a property for

2  Investment Properties of America or if they were for a

3  client exchange.

4  Q    For those unresolved transactions, were those

5  included in your number?

6  A    No, there were not.

7  Q    So if there was something that you couldn't

8  determine, just to be clear, that would not be

9  reflected -- the number -- and you later resolved it,

10 would the number have gone down or up?

11 A    The number most likely would have gone up.

12 Q    The number we're talking about is the $114

13 million?

14 A    That's correct.

15       MR. WAGNER:  Objection to the opinion, Your

16 Honor.  Move to strike.

17       THE COURT:  What opinion did he give?

18       MR. WAGNER:  That it was likely to go up.

19       MR. DRY:  Your Honor, all he's simply -- the

20 witness is testifying to a fact that they did not

21 include transactions in this number that they weren't

22 absolutely sure should have been there.  That had they

23 been resolved later, the number would have gone up

24 rather than down.

25       THE COURT:  He said likely.

1          MR. DRY:  Likely would have gone up, not

2  down.

3          THE COURT:  I understand that, but why isn't

4  that an opinion?  I heard the testimony.  Got it.  So

5  why isn't it an opinion?  Likely would have gone up.

6          MR. DRY:  Because --

7          THE COURT:  It is, isn't it?

8          MR. DRY:  I don't believe so, Your Honor,

9  because all he's saying is that he did not include

10 unresolved transactions in that, and all he's

11 explaining to the jury is what that means.

12         THE COURT:  Why isn't that his opinion

13 instead of facts?

14         Objection sustained.  Just disregard what

15 would have happened one way or the other, up or down.

16 BY MR. DRY:

17 Q    What percentage of the transactions -- strike

18 that.

19      Were you able to obtain all of the bank

20 statements?

21 A    No, we were not.

22 Q    Which bank statements did you attempt to get?

23 A    I don't know.

24 Q    Did you get the bank statements for the qualified

25 intermediaries?

1  A    We received all of the main operating accounts for

2  each qualified intermediary as well as every individual

3  money market account or segregated funds we could

4  obtain.  Certain qualified intermediaries we had to

5  make second trips to copy all their documents, to

6  obtain all bank statements.

7  Q    What did you do to find additional bank

8  statements?

9  A    Well, an example would be if there was an

10 unreconciled transaction, we would -- a lot of times

11 the bank statements would note that they were going to

12 another Citibank account, and we would try to track the

13 corresponding credit and find that in another bank

14 account.

15     We also created a matrix of all the accounts that

16 we had making sure that we had all the months necessary

17 to complete the analysis.

18 Q    Turning to Government's Exhibit 269B, please,

19 which has not been admitted into evidence.  Did you

20 prepare this document, sir?

21 A    I believe I did.

22 Q    What is reflected on this document?

23 A    This document shows the client liability as of

24 year-end 2006, has the cash as of 2006 year-end, and

25 shows a deficit, and fills that deficit with the $114

1 million that we previously discussed leaving

2 unreconciled transaction of --

3          MR. WAGNER:  Objection to reading from the

4 exhibit, Your Honor.  It hasn't been introduced.

5          MR. DRY:  At this time the United States --

6 well, at this time the United States would seek to

7 admit Government's Exhibit 269B.

8          MR. WAGNER:  Your Honor, it appears to be

9 incomplete.  There's no supporting documentation for

10 it.  It appears to be one page of a longer report.

11          THE COURT:  That's your objection is that

12 it's incomplete?  Is that it?

13          MR. WAGNER:  And improper foundation for the

14 findings here because these are numbers without any

15 foundation for them.

16          THE COURT:  That's just another way of

17 stating that it's incomplete; is that right?

18          MR. WAGNER:  That's correct, Your Honor.

19          THE COURT:  All right.

20          Is it incomplete or not, Mr. Dry?

21          MR. DRY:  Your Honor, I'm not sure.

22          THE COURT:  So why don't you ask him?

23 BY MR. DRY:

24 Q     Is this document complete, sir?

25 A     When I was provided with the documents, it did

1 have the underlying exhibits, I believe.

2          THE COURT:  "Underlying exhibits?"  What were

3 they?

4          THE WITNESS:  I believe that there was -- I'm

5 sorry.  The underlying exhibit was only for the insider

6 loan number.

7 Q    And that was the document we just referred to?

8 A    That's correct.

9          THE COURT:  So there were no exhibits to 269B

10 or there were?  There were no attachments or exhibits

11 to that?

12          THE WITNESS:  I don't believe so.

13          THE COURT:  All right.  Objection overruled.

14 There weren't any.

15          (Government's Exhibit No. 269B is admitted

16 into evidence.)

17 BY MR. DRY:

18 Q    Sir, going to the bottom of that page, sir -- I'm

19 sorry.  Just blow up the entire thing.

20          THE COURT:  269B?

21          MR. DRY:  Yes, sir.

22 BY MR. DRY:

23 Q    Sir, how current is this document in your

24 analysis?

25 A    This is as of our meeting with Mr. Field in

1  April 23 of 2007.

2  Q     So the date on this document, it should be 2007

3  rather than 2006?

4  A     Correct.

5            THE COURT:  Which date?  There are a lot of

6  dates on it.

7            MR. DRY:  I believe, Your Honor, at the

8  bottom of the screen.  At the very bottom of the page.

9  Q     Can you read that line?

10  A     The hyperlink?

11  Q     Yes.

12  A     "T:/1.cases/THE 1031 Tax Group/Status

13  Reports/4-23-2006 Meeting with D Field." I believe that

14  should be 2007.

15  Q     Okay.

16            THE COURT:  There's also a date of 2006 up at

17  the top on two columns.  One is December 31, 2006 and

18  the other is April 30, 2006.

19  Q     Is either one of those dates incorrect, sir?

20  A     Yes.  The April 30, 2006, should be April 30,

21  2007.

22  Q     Okay, sir.  In fact, had you been -- your original

23  engagement, had you been asked to do any work on 2007

24  financial transactions?

25  A     No, we had not.

1  Q      The date on 12/31/06, is that analysis as of

2  April 23rd of 2007, is that your analysis of the client

3  liability and cash and amount of insider loans that we

4  talked about earlier?

5  A      As of 2006?  I'm sorry.  Could you restate it?

6  Q      It was a confusing question.  I apologize.

7         You gave this information to Mr. Field on April 23

8  of 2007?

9  A      Correct.

10 Q      As of that date, these numbers reflected the

11 year-end numbers for 2006, correct?

12 A      Correct.

13 Q      Okay.  And --

14         MR. DRY:  One moment, Your Honor.

15 Q      Sir, the insider loans figure, that's the figure

16 we talked about earlier, the $114 million?

17 A      Correct.

18 Q      And the unreconciled transactions, is that what we

19 were talking about earlier, the $5 million?

20 A      Correct.

21         MR. DRY:  No further questions.

22         THE COURT:  Mr. Wagner?

23

24     CROSS-EXAMINATION

25 BY MR. WAGNER:

1  Q    Good afternoon, Mr. Massell.

2      When did your engagement first begin with PENTA

3  and KPKB on this project?

4  A    In December of 2006.

5  Q    When did it end?

6  A    Late April 2007.

7  Q    So after April of 2007 your firm no longer had

8  responsibilities in terms of the findings and results

9  that were requested under this engagement, correct?

10  A    I believe we were not paid for our services, so we

11  did not work on the engagement any longer.

12  Q    You met with the government agents in this case a

13  number of times; is that right?

14  A    That's correct.

15  Q    The first time was in July of 2007; is that right?

16  A    I don't recall the date, but I remember the

17  meeting with the government.

18  Q    Do you remember the first time you met with the

19  government, though, regarding this case and your

20  findings here?

21  A    Correct.

22  Q    And isn't it true that you appeared at that

23  meeting with a senior accounting associate of yours,

24  Ms. Roski?

25  A    That is correct.

1 Q     And then you met again with the agents on the 19th

2 of May of 2008.  Do you remember a May 2008 meeting

3 with the agents?

4 A     I don't recall the date, but I remember another

5 meeting.

6 Q     Again, you were present with Ms. Roski at that

7 interview; is that right?

8 A     Correct.

9 Q     Do you recall, specifically?

10 A     The first meeting I was interviewed separately

11 from Ms. Roski.

12 Q     The first meeting you were separate from

13 Ms. Roski?

14 A     I believe so.

15 Q     Let me show you very briefly a memorandum of

16 interview from the -- I'm sorry.

17          THE COURT:  Are you drawing the distinction

18 between whether you came for the interview with

19 Ms. Roski but each of you were interviewed separately?

20          THE WITNESS:  Yes, Your Honor.

21          THE COURT:  All right.  Let's make sure you

22 know what you're doing.

23 BY MR. WAGNER:

24 Q     This is May of 2008, you were there with

25 Ms. Roski, correct?

1            THE COURT:  Are you asking whether he was

2  interviewed separately or --

3  Q    Interviewed at the same time by government agents

4  with Ms. Roski?

5  A    Was that the first meeting?

6            THE COURT:  Second.

7  Q    Second.

8  A    The second meeting I was interviewed with

9  Ms. Roski.

10  Q    And then the last time you met was January of this

11  year with the agents; is that correct?

12  A    That's correct.

13  Q    And that was by yourself?

14  A    Correct.

15  Q    At the time of the engagement, you were a junior

16  member of the accounting staff; is that right?

17  A    Yes.

18  Q    Ms. Roski was the senior member on the project; is

19  that correct?

20  A    That's correct.

21  Q    And you had less then two years of experience in

22  accounting out of undergraduate school?

23  A    That's correct.

24  Q    And at the time you first started the engagement,

25  you had not yet gotten your CPA; is that right?

1  A     I had completed the four sections of my exam, but

2  had not completed the paperwork.

3  Q     Would you characterize the results of your

4  findings here as reliable?

5  A     Yes.

6  Q     Now, when you first took on the task, would it be

7  accurate to say it was complex?

8  A     That would be an understatement.

9  Q     You had a very high volume of transactions that

10 you were dealing with; is that right?

11 A     That is correct.

12 Q     And you did not conduct a formal audit; is that

13 right?

14 A     That is correct.

15 Q     Or review the financials; is that right?

16 A     I do not believe there were financials to review.

17 Q     You relied on three temporary employees for a lot

18 of the information that you compiled in this

19 engagement; is that right?

20 A     That's correct with the caveat that bank

21 statements have a check in them, and all the bank

22 statements were checked at the end of each month.

23 Q     But you don't know if you had all the bank

24 statements; is that right?

25 A     We believed we collected about 98 percent of the

1  bank statements?

2  Q    You believe you collected about 98 percent; is

3  that right?

4  A    That's correct.

5  Q    Did you speak with a Mr. Todd Pajonas in compiling

6  the bank statements in this case?

7  A    I believe he had left prior to the engagement.

8  Q    So you never questioned him about any bank

9  statements that he may or may not have turned over to

10  SOS; is that correct?

11  A    That's correct.

12  Q    Did you speak to Ms. Dashiell about any bank

13  accounts that she might have put away from the 1031

14  Advance?

15  A    I believe 1031 Advance was purchased at the end of

16  2006, and we only traced the funds coming in from the

17  1031 Advance Group.

18  Q    For IXG, did you speak with Mr. McCabe or

19  Mrs. McCabe about any accounts that might have been

20  kept away from the folks at IPofA in Richmond?

21  A    We did.

22  Q    Were you made aware that there were any accounts

23  that they had kept separate that they did not disclose

24  to the folks in Richmond?

25  A    I became aware of that in 2007.

1  Q      You located some bank accounts that the 1031 Tax

2  Group was not aware of; is that right?

3  A      That's correct.

4  Q      Now, you were looking at each of the QIs

5  separately; is that right?

6  A      That's correct.

7  Q      And did you find many dealings with intercompany

8  transfers of funds, for instance, funds from one QI to

9  another?

10  A      Yes, we did.

11  Q      And were you able to track all of those

12  intercompany transfers?

13  A      The vast majority, yes.

14  Q      What percentage would you say?

15  A      About 98 percent.

16  Q      Each QI had problems with their accounting

17  records; isn't that right?

18  A      Some QIs did.

19  Q      With the exception of maybe IXG?

20  A      Yes.

21  Q      All the others had very serious accounting

22  problems; isn't that right?

23  A      I don't believe NES in San Antonio did.

24  Q      You did not do a cash analysis through your

25  engagement; is that right?

1  A     What is a cash analysis?

2  Q     Did you do a cash analysis?

3         THE COURT:  He's asking you what you asked.

4  A     What is a cash analysis?

5  Q     What is a cash analysis?

6  A     Yes.

7  Q     That you track all of the cash going from one

8  company to another into one company and out of the

9  company.

10 A     Yes, we did perform a tracking analysis.

11 Q     Now, in your findings, Exhibit 269A, you came up

12 with a loan balance as of December 31 of 2005, and that

13 came from Mr. Zacarias; isn't that right?

14 A     Correct.  That was put together by Mr. Zacarias.

15 Q     And you can't say whether his numbers were

16 reliable; is that right?

17 A     That is correct.

18 Q     And you did nothing to validate Mr. Zacarias's

19 work; is that right?

20 A     We did not.

21 Q     And you simply assumed that the opening balances

22 were correct as your starting point for your 2006

23 analysis; is that right?

24 A     Yes, we explained that to management.

25 Q     And you started your 2006 analysis when Mr.

1 Zacarias resigned from IPofA, is that right, or a

2 little after?

3 A    A little after, yes.

4 Q    Isn't it true you relied on statements from QI

5 employees and 1031 employees, statements they made

6 about the accounts?

7 A    Yes, we did.

8 Q    And you didn't do all the work yourself?  You had

9 other people helping you to prepare these financials;

10 is that right?

11 A    That's correct.

12 Q    Isn't it also true that you prepared a series of

13 regular status reports of the findings that you made or

14 status reports were prepared by the team, I should say?

15 A    That's correct.

16 Q    And there were notes from the team meetings that

17 were prepared; is that right?

18 A    Correct.

19 Q    Now, you were privy to all of the status reports

20 that were prepared; is that right?  Copies were sent to

21 you?

22 A    Yes.

23 Q    And a lot of them were based on the analysis that

24 you had performed; is that correct?

25 A    That's correct.

1 Q    I'd like to address your attention to Defense

2 Exhibit -- I believe we're on 24.

3        MS. BISHOP:   25.

4 Q    25.   We're going to go to PENTA team status report

5 dated January 24 of 2007.   I hand you a copy of this.

6 Do you see it on the screen?

7 A    Yes.

8 Q    I do want to give you a copy.   You are familiar

9 with this report?

10 A    Kind of.

11 Q    And this was prepared by the PENTA team?

12 A    That's correct.

13        MR. WAGNER:   I would offer this into evidence

14 as Defendant's Exhibit No. 24.

15        MR. DRY:   No objection from the government.

16        MR. WAGNER:   25, I apologize.

17        THE COURT:   It's 25.

18        (Defendant's Exhibit No. 25 is admitted into

19 evidence.)

20 BY MR. WAGNER:

21 Q    I would ask that you go to the fourth paragraph

22 down.   "As per discussion with representatives of the

23 company," could you please read that?

24 A    "As per discussion with representatives of the

25 company, we understand that Jeff Zacarias, a former

1  IPofA employee, and Jorge Guerra, an accounting

2  consultant, reviewed 2005 intercompany transactions.

3  Through their procedures, Messrs. Zacarias and Guerra

4  determined opening beginning loan balances between

5  IPofA, Mr. Okun, AEC, and SOS."

6  Q    Now, then I want you to go two paragraphs down and

7  read that paragraph starting with "PENTA has

8  requested."

9  A    "PENTA has requested but not yet received up to 80

10 monthly bank statements required to complete the

11 above-described analysis.  All of January 25, 2007, the

12 company expected to receive a substantial number of

13 statements in the next two business days."

14 Q    Do you know whether or not you received those

15 statements?

16 A    I believe we received the majority of them.

17 Q    But not all of them?

18 A    Correct.

19 Q    I want to turn your attention to an e-mail, which

20 we'll mark as Defense Exhibit 25.

21        MS. BISHOP:  26.

22        THE COURT:  Mr. Wagner, that was an example

23 of something we just wasted time.  He already testified

24 about both of those topics that were there.  We spent

25 the time going through those exhibits when he had

1  already testified to those things.  So why don't you

2  just focus on -- once you get an answer, go on and do

3  something else.

4          MR. POLLACK:  I will.

5          THE COURT:  Not everything has to be in

6  paper.

7          MR. WAGNER:  Very well.

8  Q    Let me show you an e-mail dated January 26, 2007.

9  Do you recognize that e-mail?  There's an attachment to

10 it.  There's a second page.

11 A    Yes, I do.

12 Q    And this is an e-mail indicating to Mr. Shefman --

13 who is Mr. Shefman?

14 A    Mr. Shefman was a previous owner of REES in Safety

15 Harbor.

16 Q    Indicating to him your inability to trace certain

17 bank statements; is that right?

18 A    That's correct.

19         MR. WAGNER:  I would move this into evidence

20 as Defense Exhibit 26, Your Honor.

21         MR. DRY:  Objection, Your Honor.  Hearsay.

22         MR. WAGNER:  This is an e-mail from him to

23 Mr. Shefman.

24         THE COURT:  Why don't we call it hearsay,

25 which is what it is?

 1            MR. WAGNER:  It's his statement, Judge.  It's

 2  his e-mail.  But what he's doing is he's communicating

 3  information to Mr. Shefman about information he needs,

 4  about accounts that he needs information --

 5            THE COURT:  Why does that change it from

 6  hearsay?

 7            MR. WAGNER:  It's not being offered to prove

 8  the truth of the matter asserted, it's being offered to

 9  show that he didn't have certain things, that he needed

10  these things to be provided in order to do his

11  accounting engagement.

12            THE COURT:  What do you say?

13            MR. DRY:  Your Honor, it's only relevant if

14  it's accepted as true, and, therefore, it's hearsay.

15  And Mr. Wagner is just publishing facts to the jury --

16            THE COURT:  Beyond that, he has already said

17  there were some things they needed and that they didn't

18  get.

19            MR. WAGNER:  Well, I'd like to show that --

20            THE COURT:  Let me tell you something.

21  Horses don't deserve to be beaten when they are dead.

22  Okay?  Objection overruled.

23            You can put the exhibit in, but no more of

24  it.  He's already said this, and there's no point in

25  going after it.

1          MR. WAGNER:  All right.  I'll just touch

2    on --

3          THE COURT:  It's just wasting time.  If you

4    have a point to make, okay, but otherwise, go on with

5    some other point.

6          (Defendant's Exhibit No. 26 is admitted into

7    evidence.)

8    BY MR. WAGNER:

9    Q    Let me show you Defense Exhibit 27.  This is a

10   status report as of January 30, 2007.

11         MR. WAGNER:  I'll try to move through these

12   quickly, Your Honor.

13   Q    Do you recognize this status report?

14   A    I do.

15   Q    And this was one of the status reports prepared by

16   your team, correct?

17   A    That's correct.

18         MR. WAGNER:  I move this into evidence, Your

19   Honor?

20         MR. DRY:  No objection, Your Honor.

21         THE COURT:  It's admitted.

22         (Defendant's Exhibit No. 27 is admitted into

23   evidence.)

24   Q    If you look to the very end of that first page, it

25   indicates that PENTA has requested but not yet received

1 up to 77 monthly bank statements required to complete

2 the above described analysis; is that true?

3 A    That's correct.

4 Q    Now move to page 2, please.  Go to the bottom of

5 page 2, the last full paragraph there.  In the middle

6 of the page, it indicates that the records at SOS,

7 however, were in disarray and were not well

8 organization; is that correct?

9 A    That's correct.

10 Q    Thank you.  Move on to Defense Exhibit 28.  Let me

11 hand you Defense Exhibit 28, an e-mail from you to

12 Susan Roski and Matthew Smith.  This is an e-mail you

13 sent on March 2, 2007; is that correct?

14 A    I forwarded this e-mail.

15 Q    You forwarded an e-mail that you had sent to

16 Bradley Turner; is that right?

17 A    That's correct.

18        MR. WAGNER:  I would offer Defense Exhibit 28

19 into evidence, Your Honor.

20        THE COURT:  Any objection?

21        MR. DRY:  No.

22        THE COURT:  All right.  It's admitted.

23        (Defendant's Exhibit No. 28 is admitted into

24 evidence.)

25 Q    If you look to the bottom, the e-mail that was

1 from you to Bradley Turner, it states that the

2 following table represents SOS files that we were

3 unable to locate in Richmond and Hector does not have

4 in Boston.

5      So in March 1 you're still having problems

6 locating files and statements, correct?

7 A     That's correct.

8           THE COURT:  Is your point trying to say that

9 they didn't get all the bank statements?

10          MR. WAGNER:  That's part of it, Judge.

11          THE COURT:  Well, ask this question:  Try

12 this one on.  At the time you finished, how many of the

13 missing bank statements had you located and how many

14 were missing in action?  And he can either state it as

15 a percentage or a quantity.  And then you have gone

16 through the whole thing in one question.

17          MR. WAGNER:  Very well.

18          THE COURT:  Without a bunch of documents.

19 It's easier for the jury to listen and retain all that

20 stuff if they hear it directly instead of fighting

21 through a document.

22          All right.  Let's go.  Try it and see if you

23 want to try that one.

24          MR. WAGNER:  That's fine, Your Honor.

25 BY MR. WAGNER:

1  Q     How many at the end of your engagement in

2  April 2007, how many of these bank records, bank

3  statements, were you missing, if you know?

4  A     I don't recall.

5  Q     Isn't it true there were unreconciled IXG bank

6  transactions that you noted?

7  A     That's correct.

8  Q     Let me show you Defense Exhibit 29.

9           THE COURT:  Was 28 admitted?

10          THE CLERK:  Yes.

11 BY MR. WAGNER:

12 Q     That's an e-mail from you to Shirley McCabe?

13 A     Yes.

14 Q     It indicates a listing of unreconciled IXG bank

15 transactions?

16 A     That's correct.

17          MR. WAGNER:  I would offer Exhibit 29 into

18 evidence, Your Honor.

19          THE COURT:  Any objection?

20          MR. DRY:  No, Your Honor.

21          THE COURT:  All right.  It's admitted.

22          (Defendant's Exhibit No. 29 is admitted into

23 evidence.)

24          MR. WAGNER:  I'm coming to the end here,

25 Judge.

1 BY MR. WAGNER:

2 Q    Now, you did a draft profit and loss statement, is

3 that correct?

4 A    That is correct.

5 Q    And that was for 2006?

6 A    Yes.

7           THE COURT:  For whom?

8           MR. WAGNER:  For 1031 Tax Group.

9 Q    This is Defendant's Exhibit 30.  That's a copy of

10 the profit and loss statement for 2006 and the

11 forwarding e-mail; is that correct?

12 A    Yes.

13 Q    If you turn to the second page --

14           MR. WAGNER:  We move this into evidence at

15 this time, Your Honor.

16           THE COURT:  Any objection?

17           MR. DRY:  One moment, Your Honor.  No

18 objection, Your Honor.

19           THE COURT:  All right.  It's admitted.  What

20 is it?  29?  30?

21           THE CLERK:  30, Your Honor.

22           (Defendant's Exhibit No. 30 is admitted into

23 evidence.)

24 BY MR. WAGNER:

25 Q    If you'd turn to page 1 of 3 under statement of

1  limitation of information provided.  And the second

2  line down, "This information has not been subjected to

3  an examination in accordance with

4  generally-accepted" --

5          THE CLERK:  Are we still talking about 30?

6          MR. WAGNER:  Yes.

7  Q    "This information has not been subjected to an

8  examination in accordance with generally-accepted

9  auditing or attestation standards."  What does that

10 mean?

11 A    That means it's not in accordance with

12 generally-accepted accounting principles.  It's not --

13 it was not an accrual basis or cash basis accounting.

14 It was using the best information we could compile.

15 Q    And it says, "We do not express an opinion or any

16 form of assurance on this profit and loss statement,"

17 correct?

18 A    Yes, that's standard language.

19 Q    Now, as of March 9, you're still having problems

20 getting accounting records, still having problems

21 getting bank statements, correct?

22 A    I don't recall.

23 Q    Let me show you a status report of March 9, 2007.

24 This is a status report prepared by your group,

25 March 9, 2007?

1  A     That's correct.

2          MR. WAGNER:  I move this into evidence, Your

3  Honor.

4          THE COURT:  Any objection?

5          MR. DRY:  One moment Your Honor.

6          MR. WAGNER:  Defendant's Exhibit 31.

7          MR. DRY:  No objections, Your Honor.

8          THE COURT:  It's admitted.

9          (Defendant's Exhibit No. 31 is admitted into

10  evidence.)

11  Q    In the middle of the page, there's a reference,

12  "We cannot complete this project until obtaining

13  resolution of the following two items"; is that right?

14  A    That's what it says.

15  Q    This was prepared by your team, right?

16  A    That's correct.

17  Q    Would you read those two items or just explain to

18  the jury in your own words what those two items were?

19  A     We had prepared a list of transactions where we

20  could not trace where the funds were coming from or

21  going to.  We were still in the process of reconciling

22  or finding where these transactions went, but had not.

23  At this point we were asking the company for more help

24  in tracing these transactions as they would have a more

25  intimate knowledge of the transactions.  That was the

1  first bullet point.  Let me read the second.

2      The second was we were going back and forth with

3  counsel as to whether once we quantified how much funds

4  had left the qualified intermediaries, if the funds

5  were to be classified as a line of credit or specific

6  notes.  And I think the answer that we got back from

7  counsel is that it should be a type of revolver or line

8  of credit facility.

9          MR. WAGNER:  Thank you.

10  Q    We can move on to the final exhibit.  An E-mail of

11  March 26, engagement observations that were sent from

12  Ms. Roski, a copy to you.  You can see the first page

13  is an e-mail.  I believe this is Defense Exhibit 32.

14  This exhibit has engagement observations attached to

15  it.  Is this something that your team prepared?

16  A    That's correct.  I am not sure if this was the

17  final version, though.

18  Q    And you see there are some handwritten notes on

19  that second page.  Do you know who made those notes?

20  A    I do not.

21  Q    On the third page, there are also some handwritten

22  notes.  Do you know who made those?

23  A    I do not.

24  Q    But you are familiar with this particular exhibit?

25  A    I'm familiar with the final memorandum that was

1  e-mailed to counsel.

2          MR. WAGNER:  And at this time, with the

3  exception of those handwritten notes which we will try

4  to redact, I move in Defense Exhibit 32.

5          THE COURT:  I am unclear whether this is the

6  final or it is not the final.  Do you know?

7          THE WITNESS:  I do not know, Your Honor.

8          THE COURT:  All right.

9  BY MR. WAGNER:

10 Q    Was the final prepared by March 26, 2007?

11 A    I don't recall.

12         THE COURT:  Any objection to the proffer of

13 the exhibit as it is with the redaction of the

14 handwritten notes?

15         MR. DRY:  Can I have just one second to look

16 through this, Your Honor.  It's kind of dense.

17         THE COURT:  Why don't you look at it over

18 lunch hour and we'll decide if it gets admitted then.

19 You're finished with your examination?

20         MR. WAGNER:  I'm pretty close.

21         THE COURT:  I thought you said it was the

22 final.

23         MR. WAGNER:  It's the final exhibit.  I have

24 a few more questions.

25         THE COURT:  Oh, all right.  Any questions?

 1          MR. WAGNER:  I'm sorry?

 2          THE COURT:  I told him to look at it over

 3 lunch.

 4          MR. WAGNER:  I'm sorry, Your Honor.

 5          THE COURT:  I want you to go on and finish

 6 your examination.

 7 BY MR. WAGNER:

 8 Q    Based on your review of these documents, based on

 9 your recollection of the bank statements that were

10 missing, is it still your position that your figures

11 are reliable?

12 A    Yes.

13          MR. WAGNER:  That's all I have, Judge.

14          MR. DRY:  Very briefly, Your Honor.

15

16     REDIRECT EXAMINATION

17 BY MR. DRY:

18 Q    Can you explain to the members of the jury why

19 it's your position that your figures were reliable even

20 though they were missing bank statements?

21 A    In 2006, we traced this dollar-for-dollar, this

22 $58.9 million, leaving the QIs and going to these

23 various entities.

24 Q    And the missing bank statements, whose bank

25 statements were those?  Were those the companies' bank

1 statements or were they typically -- was it IPofA's?

2          THE COURT:  Which bank statements?  The

3 missing ones or the ones he had or what?

4 Q    The missing bank statements, describe what type of

5 statements were missing.

6 A    The majority of the missing bank statements were

7 individual money market accounts or accounts for

8 segregated exchange clients.

9 Q    So as far as the money, the movement of money, did

10 you have the bank statements that would have been

11 necessary for you to come up with this number of

12 $58,984,448 and believe that it's reliable?

13 A    That's correct.  We had not seen any examples of

14 funds being transferred to or from these individual

15 money market accounts that were missing.

16          MR. DRY:  Ms. Bishop, could you do me a huge

17 favor?  Defense Exhibit 30, could you bring that up on

18 the elmo, and going to the fifth page of that exhibit,

19 please.

20          I'm sorry, Mr. Neal.

21          THE CLERK:  That's all right.  I'm switching

22 here.

23          MS. BISHOP:  Which page?

24          MR. DRY:  It's the P&L that Mr. Wagner talked

25 about.

1            THE COURT:   Which page?

2            MR. DRY:   It's Exhibit 1.  It's the 5th page.

3            MS. BISHOP:   Is there a page number on the

4  bottom?

5            MR. DRY:   The 5th page.

6  BY MR. DRY:

7  Q    Directing your attention to the bottom line, sir,

8  what does that number reflect in the bottom left-hand

9  side right next to "net income"?

10  A    For which entity?

11  Q    For AEC.

12  A    For AEC, a plus of $194,000 for the full year of

13  2006.

14  Q    How about for IXG?

15  A    A loss of $1.3 million from August to the end of

16  the year.

17  Q    How about for NES?

18  A    A loss of $165,000 for half the year.

19  Q    How about for REES, sir?

20  A    Another loss of $178,000.

21  Q    How about for SOS?

22  A    A loss of $1.1 million.

23  Q    But, sir, when you get to the 1031 Tax Group, it

24  has a net income figure of what?

25  A    $3.7 million.

1  Q     What was that figure based on?

2  A     That figure was based on if the funds were

3  invested that were sent to IPofA or the qualified

4  intermediaries were invested into 90-day T bills for

5  the year.

6  Q     If they had been invested that way?

7  A     That's correct.  That is a calculated number.

8  Q     Did the 1031 Tax Group actually earn $3.7 million?

9  A     It did not.

10         MR. DRY:  Nothing further, Your Honor.

11         THE COURT:  Have you had an opportunity to

12  deal with 32?

13         MR. DRY:  I have.  No objection from the

14  United States.

15         THE COURT:  It's admitted.

16         (Defendant's Exhibit No. 32 is admitted into

17  evidence.)

18         THE COURT:  Can he be excused?

19         MR. WAGNER:  Yes, Your Honor.

20         MR. DRY:  Yes, Your Honor.

21         THE COURT:  Mr. Massell, you're excused and

22  free of your subpoena.  You may go about your business.

23  Thank you for giving us your evidence.

24         THE WITNESS:  Thank you, Your Honor.

25         (The witness was excused from the witness

1  stand.)

2  * * * * *

3

4        I, Diane J. Daffron, certify that the

5  foregoing is a true and accurate transcription of my

6  stenographic notes.

7

8            /S/ Diane J. Daffron        3/23/09
          _____   _____
9           DIANE J. DAFFRON, RPR, CCR      DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25