1

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                    RICHMOND DIVISION

3   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                        :
4   UNITED STATES OF AMERICA            :
                                        :
5                                       :
    v.                                  :   Criminal No.
6                                       :   3:08CR00132-01
    EDWARD HUGH OKUN                     :
7                                       :   March 10, 2009
    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:
8

9

10

            EXCERPT TRANSCRIPT OF **STEVE SILVERMAN**
11        BEFORE THE HONORABLE ROBERT E. PAYNE
                 UNITED STATES DISTRICT JUDGE
12

13

14  APPEARANCES:

15  MICHAEL DRY, Assistant United States Attorney
    BRIGHAM CANNON, Assistant United States Attorney
16  JESSICA A. BRUMBERG, Assistant United States Attorney
    Richmond, Virginia
17
            Counsel on behalf of the United States
18
    CAROLYN V. GRADY, Assistant Federal Public Defender
19  ROBERT J. WAGNER, Assistant Federal Public Defender
    Richmond, Virginia
20  and
    MILLER & CHEVALIER
21  Washington, D.C. 20005
    BY:  BARRY J. POLLACK, ESQ.
22
            Counsel on behalf of the Defendant.
23

24              DIANE J. DAFFRON, RPR
                OFFICIAL COURT REPORTER
25            UNITED STATES DISTRICT COURT

1

2                        I N D E X

3

4                        DIRECT   CROSS   REDIRECT   RECROSS

5  STEVE IAN SILVERMAN      3        23       36         --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  * * * * *

2      STEVE IAN SILVERMAN, called by the United States,

3  first being duly sworn, testified as follows:

4

5      DIRECT EXAMINATION

6  BY MR. DRY:

7  Q    Good afternoon, Mr. Silverman.

8  A    Good afternoon.

9  Q    Please state your full name for the record.

10  A    Steve Ian Silverman.

11  Q    And Ian is I-a-n?

12  A    Correct.

13  Q    And Silverman?

14  A    S-i-l-v-e-r-m-a-n.

15  Q    Can you please tell the members of the jury your

16  educational background?

17  A    I graduated the state University of New York at

18  Albany in 1982.  I graduated the University of Miami

19  School of Law in 1985.

20  Q    Where do you currently work, sir?

21  A    In Miami at a law firm called Kluger, Peretz,

22  Kaplan & Berlin.

23  Q    What are your titles at that law firm?

24  A    I'm a partner at the law firm.  I chair the

25  litigation department, and I sit on the firm's

1  management committee.

2  Q     How long have you been at Kluger, Peretz, Kaplan &

3  Berlin?

4  A     Next month it will be 20 years.

5  Q     Is the typical acronym that the firm goes by KPKB?

6  A     That's correct.

7  Q     When did your law firm first begin representing

8  Edward Okun?

9  A     In, approximately, November of 2006, I believe.

10 Q     Was it early November or late November?

11 A     It was late November.

12 Q     How did you come to be involved in the

13 representation?

14 A     I got either a phone call or an e-mail on a Sunday

15 night from my partner Abby Kaplan, who as it was

16 related to me was contacted by an attorney by the name

17 of Richard Simring, to assist Mr. Okun with various

18 issues.  And there was a meeting scheduled for the next

19 day, for Monday.  Mr. Kaplan was in trial.  He asked me

20 to cover that meeting for him.

21 Q     Did you attend that meeting?

22 A     I did.

23 Q     As a result of that meeting, what was your

24 understanding of what Kluger, Peretz, Kaplan & Berlin,

25 what the scope of the representation was as of

1  Mr. Okun?

2  A    There were quite a number of issues that were

3  discussed and our representation dealt with various

4  litigation matters, real estate matters, and business

5  matters, many of which didn't pertain to me.  The ones

6  that did pertain to me directly were relating to a

7  piece of litigation and issues relating to cash

8  transfers out of the QI entities.

9  Q    What was your understanding of what had happened

10  up to that point?

11  A    We were told that there were --

12           THE COURT:  I'm not sure I even know who is

13  present at this meeting.  Maybe I just missed it.  Did

14  I?

15  BY MR. DRY:

16  Q    When was the first meeting, approximately?

17  A    Monday morning.  I don't know the date.  It was

18  late November.

19  Q    Of late November.  Who was at the meeting?

20  A    Myself, my partner Eliot Abbott, who is a

21  corporate transactional lawyer, and Richard Simring,

22  who was the referring attorney who called my partner

23  Abby Kaplan.

24  Q    At that meeting did Mr. Simring give you certain

25  facts relating to the transfers of client funds from

1 qualified intermediary companies?

2 A    Yes.

3 Q    What were the facts as you understood them at this

4 meeting that you were being asked to perform legal

5 analysis on?

6 A    With respect to the qualified intermediaries, we

7 were told that there had been --

8        MR. POLLACK:  I'm going to object with

9 respect to what Mr. Simring told Mr. Silverman.

10        MR. DRY:  Your Honor, it's not being offered

11 for the truth of the matter.  Mr. Silverman is going to

12 testify about advice he gave to Mr. Okun.  The

13 predicate for that advice was his understanding of what

14 the factual scenario was that he was advising him

15 about.

16        THE COURT:  Excuse me, but isn't this a

17 statement by a person authorized to make a statement?

18 Why am I dealing with hearsay?  Isn't that what it is?

19 Maybe I just missed it and it's late.  I thought he

20 said that he had gotten a call, and it was Mr. Simring

21 was to meet on Mr. Okun's behalf.  Am I wrong about

22 that?

23        MR. POLLACK:  My understanding, and, frankly,

24 I don't remember if this is from testimony or from what

25 I have seen elsewhere, was that Mr. Simring was not

1  acting as Mr. Okun's counsel in that regard.

2          THE COURT:  He wasn't acting as his counsel.

3  He was acting on his behalf to retain counsel.  Maybe

4  we ought to ask the witness again about the predicate

5  so I can understand.  And if I have an erroneous

6  understanding, I want to get it cleared up.

7  Q   Mr. Silverman, please describe how Kluger, Peretz,

8  Kaplan & Berlin came to be involved in the engagement

9  of representing Mr. Okun.

10  A   Yes.  As I said, Mr. Simring contacted by partner,

11  Abby Kaplan, on Mr. Okun's behalf and asked us to meet

12  that Monday.  And Mr. Kaplan was unavailable.  I went

13  instead and met with Mr. Simring, who relayed to us

14  various business issues that he was bringing to the

15  firm for Mr. Okun and Mr. Okun's entities.

16          And that meeting actually lasted a couple of days.

17  And during that time we spoke with Mr. Okun on the

18  phone and other of his representatives.  And it was

19  clear to us as lawyers that we were being asked to do

20  work on Mr. Okun or the entities' behalves.

21          THE COURT:  Any objection to what Mr. Simring

22  said based on what that foundation has established?

23          MR. POLLACK:  I have no objection to what

24  Mr. Silverman just testified to, but yes, I would still

25  object to what Mr. Simring relayed in terms of

1   Mr. Simring's understanding of the facts to

2   Mr. Silverman because I don't think there's been any

3   testimony about Mr. Okun adopting or even being aware

4   of what representations Mr. Simring was making.  It's

5   multiple hearsay.

6           MR. DRY:  Your Honor, I believe the witness

7   just testified that he participated in a couple of days

8   of phone calls or meetings, and within those

9   meetings --

10          THE COURT:  I heard what he said.  I think it

11  falls within 801(d)(2)(C), a statement made by a person

12  authorized by the party to make a statement concerning

13  a subject or (D) a statement made by the party's agent

14  or servant concerning a matter within the scope of the

15  agency or employment made during the existence of the

16  relationship.

17          The way I understand it, Simring's job at Ed

18  Okun's instruction was to retain a law firm to do

19  certain things, and he was explaining to the law firm

20  what had to be done and why it had to be done.

21          Is that what you said?

22          THE WITNESS:  That's correct, Your Honor.

23          THE COURT:  Then objection seems to me to be

24  not well taken then.

25          MR. POLLACK:  Okay.  My objection is not to

1 the fact that Mr. Simring was authorized to retain

2 counsel.  He's testified that Simring came to him to

3 retain counsel, but in terms of what Mr. Simring relays

4 as Mr. Simring's understanding of the underlying facts,

5 that I object to.  I think that's outside the scope of

6 simply that he's authorized to retain counsel.

7          In terms of the meetings where Mr. Okun was

8 consulted, I have no objection to what was said in

9 those conversations.

10          THE COURT:  Okay.  Well, I believe that what

11 Mr. Simring said it's admissible under 801(d)(2)(C) and

12 (D).

13 Q    What did Mr. Simring tell you?  What facts did he

14 inform you in those initial meetings?

15 A    With respect to the issues identified that I was

16 primarily involved with regarding the qualified

17 intermediaries, he indicated that there had been

18 various large cash transfers out of those companies,

19 that the extent of those transfers, the amount of

20 money, was unknown to the companies and to Mr. Okun,

21 and that he needed advice from us about how to, from a

22 going forward standpoint, deal with that, rectify it,

23 and address those issues.

24 Q    What did you do as a result of these

25 conversations?

1  A     One of the first things I did, my law firm did,

2  was retain an entity called PENTA, P-E-N-T-A, Services.

3  They are a forensic accounting firm, for lack of a

4  better description.  And we retained them as an expert

5  to help us understand the economic transactions that

6  had gone on, to trace the flow of money out from the

7  QIs to where the monies eventually went, to document

8  those transactions, and to let us know and to let the

9  client know how much money they determined was actually

10 taken out of the companies.

11 Q     Why didn't you have Investment Properties of

12 America retain PENTA rather than going through your law

13 firm?

14 A     It's fairly standard procedure, particularly my

15 procedure, where if I'm retaining an expert, my law

16 firm will retain it, rather than the client, in order

17 to help preserve whatever privilege might exist, so I

18 can sit down with the expert very freely and discuss

19 information and my thoughts and it provide some

20 privilege from it being discovered by the adversary.

21 Q     What was PENTA's engagement going to do?

22 A     PENTA was going to do five or six different

23 things, the highlights of which were, they were, my

24 term, audit.  They were going to audit the companies to

25 determine how much exchanger money went into the

1 companies and then went out to other companies or to

2 purchase other items, to document those so we had some

3 records of those cash transfers, and to give us the

4 total amount that they felt was missing from the

5 qualified intermediaries.

6 Q    At the same time were you doing any research or

7 legal analysis about how to fix the situation going

8 forward?

9 A    Yes.  We had, myself and my partner Abby Kaplan,

10 had instructed a colleague of ours, a young associate

11 in the office, to prepare a research memo for our

12 internal use on certain areas that we outlined for him.

13 Q    Did you attend a meeting on December 14 of 2006 in

14 which Mr. Okun was present?

15 A    I did.

16 Q    Who was also present at that meeting?

17 A    In addition to Mr. Okun being present, I was

18 present, my partner Abby Kaplan was present, Eliot

19 Abbott, the corporate transactional lawyer I referred

20 to before, was present, Richard Simring was present,

21 and for some part of the meeting the colleague I

22 referred to before, Jeff Burman, the young associate

23 who did the research, I called him into the meeting to

24 discuss some issues.

25 Q    And Mr. Okun was at that meeting?

1  A     Yes, sir.

2  Q     What was the purpose of this meeting?

3  A     I don't remember the purpose particularly of that

4  meeting.  We had many meetings about many different

5  issues.  Things were happening at a very, very rapid

6  pace.  Most meetings encompassed multiple topics, but

7  we did discuss at that meeting the research results

8  that Mr. Burman of my office had concluded.

9  Q     Had you reviewed those research results?

10  A     I know that I had reviewed the actual cases that

11  Mr. Burman had relied on to prepare his memorandum.  I

12  know that at some point I did review drafts of his

13  memo.  I don't recall whether my review of the drafts

14  occurred by the time of that December 14 meeting or

15  after, but we did review the actual cases at that

16  meeting.

17  Q     Prior to this meeting, had you reviewed any

18  exchange agreements between Mr. Okun's qualified

19  intermediary companies and the clients?

20  A     Again, I'm not sure whether it was before the

21  meeting or after, but I know that I had reviewed at

22  least one or two of these agreements because I had not

23  seen them before and I wanted to understand what they

24  said.

25  Q     At that meeting what was Mr. Okun informed by the

1 Kluger, Peretz, Kaplan & Berlin attorneys regarding the

2 transfers of client exchange funds?

3 A    He was informed that the transfers had to stop,

4 that no more transfers could occur, and that the money

5 had to be repaid.

6 Q    What was Mr. Okun's -- well, first of all, did the

7 subject of the exchange agreements come up?

8 A    Yes, in the sense that we were discussing that

9 taking money out in the way that had been done

10 historically was a violation of the agreements.  I

11 think my partner Eliot Abbott, who's the corporate

12 lawyer, had very significant familiarity with those

13 agreements.

14 Q    What was Mr. Okun's response to the advice to stop

15 taking client funds and to pay the money back?

16 A    He acknowledged his conduct.  He acknowledged that

17 this had been going on.  He came to understand from our

18 advice that it could not continue and that he had to

19 set about a course of conduct to repay that money.

20 Q    Did he express any confusion about the advice?

21 A    No, it was clear.

22 Q    You mentioned Mr. Burman before; is that correct?

23 A    Yes, sir.

24 Q    Who is he?

25 A    Jeffrey Burman.  He was a young associate in our

1  office at the time.  Maybe a first or second-year

2  attorney.  We usually task junior lawyers to help us

3  internally with research issues, and he prepared a

4  memorandum for us.

5  Q    Turning your attention to Government's Exhibit

6  193A, please.  It's not been admitted into evidence.

7         THE CLERK:  It's on up here.

8         THE COURT:  Is it on the right sequence?

9         THE CLERK:  It's on the prosecutor's

10 computer.

11        THE COURT:  It's up.

12        THE CLERK:  It's up.

13 A    There we go.

14 Q    Sir, what is this?

15 A    It's small.

16 Q    The top, please.

17        THE COURT:  Do you have a copy of it for him

18 he can look at?

19        MR. DRY:  Sure.

20        THE COURT:  Let him see a piece of paper.

21        MS. BISHOP:  Here.

22        MR. LANGFORD:  He can see it now.

23        THE WITNESS:  Yes, that's much better.  Thank

24 you.

25 Q    What is this memorandum?

1 A    It's the first -- well, what's on my screen is the

2 first page of the memorandum that I was referring to

3 that Mr. Burman was tasked to write for our internal

4 use.

5 Q    This memo was -- what's the date of it?

6 A    It's dated December 26, 2006.

7 Q    So this was after the meeting on December 14,

8 2006?

9 A    The memo was apparently finalized after that

10 meeting, yes.

11 Q    Did you receive a -- well, first of all, why was

12 Mr. Burman tasked with drafting this memorandum?

13 A    No particular reason other than he's an associate

14 in the office, and he's in the litigation department

15 and probably had time available, and we needed this

16 information.  So we asked him to do it.

17 Q    Was this type of memo meant for distribution to

18 the client?

19 A    No, sir.  It's addressed to two lawyers in the

20 office, and it was meant to be an internal memo, and to

21 my knowledge it was not distributed outside the firm.

22          THE COURT:  What exhibit is this?

23          MR. DRY:  193A.

24          I move for the admission of 193A.

25          THE COURT:  What is the basis for it given

1  that it wasn't distributed outside of the firm?

2          MR. DRY:  Well, Your Honor, the defense has

3  actually shown this memorandum in its opening statement

4  or excerpts of this memorandum in its opening

5  statement.

6          THE COURT:  Does that make it admissible?  I

7  wasn't aware about the rule that allows it to be

8  admitted.

9          MR. DRY:  If the defense is going to publish

10 it in their opening, then the government should at

11 least be able to show the jury the other portions of

12 the memo that the defense did not show to the jury so

13 there's no confusion exactly about what the memo says,

14 Your Honor.  Otherwise --

15         THE COURT:  But publishing it in opening

16 statement doesn't make it admissible.

17         MR. DRY:  I understand.

18         THE COURT:  If it's not admitted, the jury

19 can't consider it in deciding the case, so no matter

20 what was said in opening statement, it doesn't make any

21 difference.  I would tell them to disregard it if it's

22 not admissible.

23         Why is it admissible?  I mean, under what

24 theory does this document get admitted other than the

25 fact they showed it in opening statements, which you

1 didn't object to, and I would have dealt with it had it

2 been brought up.

3          MR. DRY:  Your Honor, we don't know whether

4 Mr. Okun ever received this.  We assume they had a

5 basis to get it in.

6          THE COURT:  Excuse me.  He said that it

7 wasn't distributed outside of the firm to his

8 knowledge.

9          What basis did you all use it in your opening

10 statements?

11          MR. POLLACK:  Your Honor, I had anticipated

12 that it was a document the government was going to

13 introduce into evidence.  I did not know that

14 Mr. Silverman's testimony was going to be that it was

15 to Mr. Silverman's knowledge not shared with Mr. Okun.

16          MR. DRY:  Your Honor --

17          THE COURT:  Has anybody else said they got it

18 outside of the firm?

19          MR. DRY:  Mr. Rosen.

20 Q    To your knowledge did Mr. Rosen ever receive the

21 memo?

22 A    I'm not aware whether he did or did not.

23          THE COURT:  Didn't one of the witnesses talk

24 about -- I mean, I guess people have said that

25 Ms. Coleman said that there was this memo, but I don't

1  know whether -- said one was coming, I guess, or

2  something like that.

3           MR. DRY:  I believe that was in the

4  September 15 management meeting, Your Honor, regarding

5  two or three other memos, not this one.  I don't

6  believe any of the government's witnesses have

7  testified that they received this memo.

8           I do anticipate that Mr. Rosen would say that

9  he received the memo.

10          THE COURT:  All right.  All right.  Mr. Rosen

11  received the memo.  It's outside of the firm now.  He's

12  going to proffer that.  Link it up.

13          If he links it up, does that provide a

14  predicate?

15          MR. POLLACK:  I apologize.  He's represented

16  that Mr. Rosen will testify that Mr. Rosen shared it

17  with Mr. Okun?

18          MR. DRY:  Absolute not.

19          MR. POLLACK:  I missed what was said.  I'm

20  not trying to --

21          THE COURT:  Mr. Rosen will testify that he

22  received the memo, i.e., that it went outside the firm.

23          MR. POLLACK:  Is there going to be testimony

24  either from this witness or Mr. Rosen that they

25  imparted to Mr. Okun the substance of what is in this

1  memo?

2          MR. DRY:  I do not know exactly what

3  Mr. Rosen will testify to regarding this memo.  I

4  believe this witness would testify that the conclusions

5  were consistent with the advice that was given at the

6  December 14 meeting.  If Mr. Pollack is willing to

7  stipulate that Mr. Okun did not receive the memo, then

8  the government will not seek to admit it.

9          MR. POLLACK:  I love that trick, but it

10  hasn't worked yet, and it's still not going to.

11          This is the government's case.  I'm not

12  stipulating to anything.  I would like to have either

13  Mr. Dry or the Court inquire of this witness, if this

14  witness says that the substance of what's in the memo

15  was shared with Mr. Okun, I've got no objection to the

16  memo coming in.  If this witness can't say that, and if

17  Mr. Dry doesn't know whether Mr. Rosen is going to be

18  able to say that, then I would say let's not have it in

19  now, and we'll deal with it again when we hear from

20  Mr. Rosen.

21          MR. DRY:  I believe that Mr. Silverman will

22  testify only that the conclusions in the memorandum

23  were consistent with the advice that was imparted to

24  Mr. Okun on December 14.

25          THE COURT:  The conclusion meaning the end of

1 it, is that what you're saying?

2          MR. DRY:  The end of it.

3          THE COURT:  The conclusion section.

4          MR. DRY:  The conclusion section.  I believe

5 that Mr. Silverman will testify that other portions of

6 the memo were not, to his knowledge, shared with

7 Mr. Okun.

8          THE COURT:  I'm the one who raised the

9 question.  So I guess nobody has really objected to it.

10          MR. DRY:  Well, there are objections all over

11 the place.

12          MR. POLLACK:  If Mr. Dry is offering the

13 exhibit at this point, I object.  I would not object to

14 asking some further questions --

15          THE COURT:  To lay a foundation.

16          MR. POLLACK:  -- to lay a foundation.  Thank

17 you.

18          THE COURT:  All right.  Let's go.  Ask the

19 questions to lay the foundation which you think get it

20 in.

21 BY MR. DRY:

22 Q    Mr. Silverman, you've had an opportunity to review

23 this memorandum?

24 A    I have.

25 Q    Regarding the conclusion section, did you have an

1  opportunity to review that?

2  A    I did.

3  Q    The analysis and the conclusion section, was that

4  consistent with what you informed Mr. Okun, you and the

5  other attorneys at Kluger, Peretz, Kaplan & Berlin

6  informed Mr. Okun on December 14 of 2006?

7  A    That's correct, it was.

8  Q    Was that consistent with what Mr. Okun was

9  informed after December 14, 2006?

10  A    Yes, sir.

11  Q    Was everything that was contained in this

12  memorandum, all of the legal analysis, shared with

13  Mr. Okun?

14  A    Not in the detail that it's in the memorandum.

15  We, the lawyers at my firm and myself, used the

16  memorandum, its conclusions, and the underlying case

17  law, which I did review and reviewed with Mr. Simring,

18  to form our opinions and our instruction and advice to

19  Mr. Okun that I indicated earlier about the repayment

20  of the monies.

21          MR. DRY:  At this time the United States will

22  not seek admission of Government's Exhibit 193A.

23  BY MR. DRY:

24  Q    Was Kluger, Peretz, Kaplan & Berlin's

25  representation of Mr. Okun, was that civil or criminal?

1  A     Civil.

2  Q     As far as you know, who was representing Mr. Okun

3  criminally?

4  A     An attorney in Miami by the name of Michael Rosen.

5  Q     Was it made clear to Mr. Okun that Kluger, Peretz,

6  Kaplan & Berlin represented Mr. Okun civilly?

7  A     Yes, sir.  That's all we do.  We do not do

8  criminal defense, and, yes, it was made clear.

9  Q     In your conversations with Mr. Okun in

10  December 2006 and January 2007, did Mr. Okun ever deny

11  taking client money?

12  A     No, sir.

13  Q     Did he ever deny that that practice violated the

14  exchange agreements?

15  A     No, he was aware.

16  Q     Based on Mr. Okun's statements in December and

17  January, what was your understanding of whether the

18  practice had continued or had ceased?

19  A     My understanding was that it had ceased.  That's

20  what we were told by Mr. Okun.

21  Q     By Mr. Okun?

22  A     Yes, sir.

23        MR. DRY:  I'm going to tender the witness,

24  Your Honor.

25

1      CROSS-EXAMINATION

2

3   BY MR. POLLACK:

4   Q      Good afternoon, Mr. Silverman.

5   A      Good afternoon.

6   Q      Let's start, I guess, where Mr. Dry left off.

7          Your firm was providing civil advice to Mr. Okun,

8   correct?

9   A      That is correct.

10  Q      What that means is, essentially, you were trying

11  to minimize the chance that he was going to be sued in

12  a civil lawsuit, correct?

13  A      That is correct.

14  Q      And it was your view that he needed to repay the

15  loans in order to avoid civil litigation?

16  A      That's correct.

17  Q      You were not thinking of the criminal

18  implications, if any, of any of these business

19  practices?

20  A      No, that was not within the scope of our

21  engagement.  That was Mr. Rosen's purview.

22  Q      By the way, you had some interactions with

23  Mr. Rosen?

24  A      Yes, sir.

25  Q      Is it fair to say that you did not think that he

1  had a very good understanding of the issues?

2  A     I did not particularly initially.  He had to be

3  educated.

4  Q     You were not very impressed with him?

5  A     I don't know whether I was impressed with him or

6  not because I was never able to get -- I wasn't privy

7  to his legal advice.  It took him a while, in my view,

8  to understand the concepts from what I think is a

9  relatively noncomplex set of facts.

10              MR. POLLACK:  I'm looking for a memorandum of

11  interview for Mr. Silverman.

12  Q     Do you remember meeting with government agents in

13  this case approximately October 23, 2008?

14  A     I don't remember the date, but that's probably

15  about right.

16  Q     Do you remember telling them that you were not

17  very impressed with Mr. Rosen?  You didn't think that

18  he understood the issues?

19  A     Yes, as I just told you.

20  Q     Now, you said that Mr. Burman was the lawyer

21  within your offices who was primarily responsible for

22  doing legal research to determine what laws might or

23  might not apply to the business practice of taking

24  loans from qualified intermediaries?

25  A     I don't mean to differ with you.  I would

1 characterize it a little differently.  He was a young

2 lawyer charged with responsibility for doing the legal

3 research that led to that memorandum.  I don't know

4 that he did anything else is what I'm saying.

5 Q    He was the person that was primarily responsible

6 for doing that research?

7 A    Correct.

8 Q    And he did research and conveyed the results of

9 his research to yourself?

10 A    Correct.

11 Q    To Mr. Kaplan?

12 A    Correct.

13 Q    And to Mr. Abbott?

14 A    Correct.

15 Q    And that educated you on the legal landscape to

16 assist you in giving advice to Mr. Okun?

17 A    That's correct.  We had a pretty good

18 understanding before we got the memo, but yes, to

19 assist us.

20 Q    One of the things that Mr. Burman researched were

21 IRS regulations?

22 A    Correct.

23 Q    And Mr. Burman relayed to you that there were

24 IRS --

25          MR. DRY:  Objection, relevancy.  Unless it

1  was related to Mr. Okun, Mr. Pollack is merely trying

2  to get what Mr. Burman researched, which isn't

3  relevant, Your Honor.

4  BY MR. POLLACK:

5  Q    You had Mr. Burr or Mr. Burman on your behalf

6  research IRS regulations?

7  A    Correct.

8  Q    Did you relay to Mr. Okun the results of that

9  research?

10 A    I don't have a specific recollection of relaying

11 the discussion about the IRS regulations, although it's

12 entirely possible.  I just don't remember it.

13 Q    You were trying to give Mr. Okun an overview of

14 the law governing this area?

15 A    No, sir.

16 Q    No?  You didn't want him to know what laws applied

17 to the business conduct that he was asking you about?

18 A    I wasn't trying to give him an overview of the

19 law.  I was trying to counsel him about how best to

20 insulate himself from any civil liability.  I was

21 educating him on the law, so to speak.  I was giving

22 him advice.

23 Q    You were giving him advice?

24 A    Correct.

25 Q    In order for you to give him that advice,

1 Mr. Burman researched for you and reported to you about

2 IRS regulations?

3 A    That was part of what we asked him to look at.

4 Q    Because that was important as part of the advice

5 you were giving to Mr. Okun?

6 A    Actually, we didn't know whether or not it was

7 important.  One of the scopes of the research going

8 forward was we asked him to see if there were any

9 regulations, period, not limited to the IRS, not

10 limited to the code of federal regulations, but just

11 kind of go find out what's out there, and that's what

12 he came back with on the regulation side.

13 Q    Did you convey to Mr. Okun the fact that IRS

14 regulations stated that a qualified intermediary does

15 not have to use a qualified escrow account?

16        MR. DRY:  Objection.  Foundation.  He hasn't

17 even established that Mr. Silverman knew that, much

18 less conveyed it to Mr. Okun.

19        THE COURT:  All right.  Sustained to the form

20 of the question.

21 BY MR. POLLACK:

22 Q    Mr. Silverman, did Mr. Burman convey to you that

23 the IRS regulations stated that a qualified

24 intermediary does not have to use a qualified escrow

25 account or a qualified trust account and that the

1 commingling of taxpayer funds is not improper?

2 A    I don't remember that independently.  It's

3 addressed in the memo, which is not on my screen,

4 otherwise I would tell you definitively, but yes, there

5 were issues in the memorandum regarding IRS

6 regulations, which were in that memoranda.

7 Q    Well, let me hand up, if I can, KPKB-G or J 3548,

8 which is an e-mail from Mr. Burman on which Mr. --

9         MR. DRY:  Objection, Your Honor.  If Mr.

10 Pollack is going to refresh the recollection, he

11 doesn't need to say what he's doing it with.  He can

12 show the document, allow the witness to look at the

13 document, and testify whether that refreshes his

14 recollection or not.

15         THE COURT:  I don't think there's anything

16 wrong with him saying what it is as long as he just

17 describes it as a letter or an e-mail or somebody's

18 notes.

19         MR. DRY:  But, Your Honor, that's publishing

20 to the jury through the side door what he's using to

21 refresh the recollection of a witness with.

22         THE COURT:  Not as long as he just says it's

23 an e-mail.

24         MR. DRY:  If he just says it's an e-mail,

25 that's fine, Your Honor.

1          THE COURT:  I'm going to hand you an e-mail

2   dated such and such.  Read it to see if it refreshes

3   your recollection about what.  But let's get clear, if

4   Mr. Okun didn't get any of this information, it doesn't

5   come in, and I'm going to strike it.  And he's

6   entitled, I suppose, given the nature of the witness's

7   testimony, to find out whether it went to Mr. Okun, and

8   that's what I think he's trying to do.  Am I right?

9          MR. POLLACK:  You're correct.

10          THE COURT:  Okay.  Now, go ahead with it and

11  do it in pieces without saying the substance.  Take a

12  look at this memo, page 1, line 7, or whatever it is,

13  and see if that refreshes your recollection about what.

14  About what.

15          MR. POLLACK:  I'm a little confused.  Am I

16  allowed to say that it's an e-mail and who it's to and

17  from without any reference to the substance of the

18  e-mail?

19          THE COURT:  Sure.

20          MR. POLLACK:  Okay.

21  BY MR. POLLACK:

22  Q    I'd like you to look at an e-mail from Mr. Burman

23  to Mr. Chasen and Mr. Abbott with a cc to Mr. Silverman

24  dated November 30, 2006, to which Mr. Silverman then

25  responded.

1          MR. DRY:  Can I have a copy of it?

2          MR. POLLACK:  He has my copy of it.  Is that

3  an extra copy?

4          MS. BISHOP:  Yes.

5          MR. DRY:  Thank you.

6  A    Okay.  I've read it.

7          MR. POLLACK:  The courtroom security officer

8  can pass it back up.

9  A    Do you want me to refer to it?  Because I'm not

10 going to remember what it says unless I look at it.

11         THE COURT:  In other words, it doesn't

12 refresh his recollection.

13         THE WITNESS:  Not independently, no.

14         THE COURT:  So it doesn't refresh his

15 recollection.  There's another stage you can go

16 through.  Except you can't on part of it because it's

17 not something he recorded.

18 BY MR. POLLACK:

19 Q    Having had the opportunity to review that

20 document, Mr. Silverman, do you recall whether

21 Mr. Burman advised you that the IRS regulations stated

22 that a qualified intermediary did not need to use an

23 escrow or trust account and, in fact, could commingle

24 taxpayer funds?

25 A    This document does not refresh my recollection on

1 that issue.  I see what it says, but --

2          THE COURT:  That's all right.  You have

3 answered.

4 BY MR. POLLACK:

5 Q    That's fine.  In that case, I'm going to hand up

6 what has been marked, but not admitted, as Government's

7 Exhibit 193A, and ask you to look at that to see if it

8 refreshes your recollection on the same issue.

9 A    Yes.  I know that that document speaks to that

10 issue.  Do you have the page reference?

11 Q    I do not.  I can take a look at it.

12 A    I can look at it.  Okay.  I see the reference.

13 Q    Don't tell me what you see.  The question is,

14 simply, now having had the opportunity to review 193A,

15 does it refresh your recollection about whether or not

16 you knew from Mr. Burman that the IRS --

17          THE COURT:  You knew from Mr. Burman about

18 the IRS regulations one way or the other, period.

19 Because otherwise you're just publishing it.

20          Does it refresh your recollection about

21 whether you knew?

22          THE WITNESS:  Yes, Your Honor.

23          THE COURT:  Did you pass that along to Mr.

24 Okun?

25          THE WITNESS:  I don't know that we did.

1          THE COURT:  All right.  That's it.

2  BY MR. POLLACK:

3  Q    When you say you don't know that you did, I take

4  it that means you're not sure one way or another?

5  A    Correct.

6  Q    Did Mr. Burman relay to you that there was little

7  to no regulation, either state or federal, governing

8  the duties and liabilities --

9          THE COURT:  Let's go at it another way.  Did

10  Mr. Burman relay to you the state of legislation on the

11  matter, and then if he remembers, he can say yes or no.

12  And then you can say, Did you pass that along to

13  Mr. Okun?  And then if it was passed along to Mr. Okun,

14  the substance can be dealt with because it's pertinent

15  to his state of mind.  If it wasn't, it's not

16  pertinent, okay?  Because otherwise you're just putting

17  in an opinion that he's already said most of it didn't

18  go to Mr. Okun, and it wasn't distributed outside of

19  the firm.

20          The substance of it didn't go to Mr. Okun,

21  according to his testimony earlier, and the document

22  wasn't distributed outside of the firm, according to

23  his testimony.  We can't do indirectly what we can't do

24  directly here.

25          So if you want to pursue it, pursue it in

1  that incremental fashion, and we'll assure that both

2  sides' rights are adequately protected or don't pursue

3  it.

4  BY MR. POLLACK:

5  Q    Did Mr. Burman relay to you whether there was

6  legislation, either state or federal, governing the

7  duties of qualified intermediaries?

8  A    He did.  And yes, he did.

9  Q    Did you discuss that topic with Mr. Okun?

10 A    I would highly doubt it.

11 Q    If I can have back that document then.

12 A    Yes, sir.

13 Q    Did you discuss with Mr. Okun or was it discussed

14 in your presence with Mr. Okun about whether adequate

15 liquidity would be a complete defense to any allegation

16 of civil wrongdoing?

17 A    I don't think Mr. Okun was ever told that in that

18 way.

19 Q    Mr. Silverman, who was Michael Landon?

20 A    He was at the time an associate with the firm.

21 He's now one of my partners.

22 Q    Did Mr. Landon also do some research pertaining to

23 the advice that you and your partners ultimately gave

24 to Mr. Okun?

25 A    I actually thought he did.  He corrected me in an

1  e-mail that he had not, but I did task him with

2  something else, but he did not do legal research

3  regarding this issue.

4          MR. POLLACK:  I would like to show the

5  witness an e-mail from Mr. Landon to Mr. Silverman,

6  Mr. Kaplan, and Mr. Abbott, dated February 28, 2007,

7  with a particular focus on the third paragraph.

8  A    Yes, sir.

9  Q    Does this refresh your recollection as to whether

10  Mr. Landon did any research or came to any conclusions

11  on the subject of whether there was any bar on a

12  qualified intermediary transferring exchange funds

13  through intercompany transfers?

14  A    I apologize.  I was reading and trying to listen

15  to you.  Could you restate the question?

16          THE COURT:  If you want to read it, you can

17  read it, and then he'll restate the question.

18          THE WITNESS:  Thank you, Your Honor.

19  A    Okay.  I've read the portion of the third

20  paragraph.  I apologize.  If could you restate the

21  question.

22  Q    No problem, Mr. Silverman.  My question was:

23  Having had the opportunity to review that, do you now

24  recall whether you had any input from Mr. Landon as to

25  Mr. Landon's research or opinions or conclusions

1 regarding whether there was any bar on a qualified

2 intermediary transfer and exchange funds through

3 intercompany transfers?

4 A    The answer to this question is yes, which is a

5 little different than what you asked me before.  The

6 memo indicates he was not involved in the initial

7 research.  I don't read this passage to mean he

8 researched the issue.

9     He appears to me to be commenting upon

10 Mr. Burman's memo.  So to that extent, yes, and I do

11 recall this.

12 Q    Do you recall sharing with Mr. Okun, whether

13 citing Mr. Landon or simply as part of your own

14 conclusions, that the cases and the regulations that

15 your firm had reviewed did not appear to discuss any

16 bar on a qualified intermediary engaging in

17 intercompany transfers?

18 A    We generally would have touched upon this topic,

19 yes.

20 Q    With Mr. Okun?

21 A    Yes.

22         MR. POLLACK:  I don't have any other

23 questions, Mr. Silverman.  Thank you.

24         THE COURT:  Any redirect examination.

25         MR. DRY:  Very briefly, Your Honor.

1      REDIRECT EXAMINATION

2  BY MR. DRY:

3  Q    Mr. Pollack just touched on some nuances of legal

4  advice that was communicated to Mr. Okun.  Did the

5  legal advice to stop taking client money and to repay

6  the loans ever change that was provided to Mr. Okun

7  from Kluger, Peretz, Kaplan & Berlin?

8  A    No, sir.

9            MR. DRY:  Nothing further.

10           THE COURT:  Can he be permanently excused?

11           MR. DRY:  Yes.

12           MR. POLLACK:  Yes.

13           THE COURT:  All right.  Mr. Silverman, you're

14  excused and released from your subpoena.  Thank you for

15  being here and giving us your testimony.

16           THE WITNESS:  Thank you, Your Honor.

17           (The witness was excused from the witness

18  stand.)

19

20           I, Diane J. Daffron, certify that the

21  foregoing is a true and accurate transcription of my

22  stenographic notes.

23

24           _____    _____

25             DIANE J. DAFFRON, RPR, CCR       DATE