```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF VIRGINIA

 3                    RICHMOND DIVISION

 4

 5   -------------------------------------
                                         :
 6   UNITED STATES OF AMERICA            :   Criminal No.
                                         :   3:08CR00132-01
 7   vs.                                 :
                                         :
 8   EDWARD HUGH OKUN                    :   March 6, 2009
                                         :
 9   -------------------------------------

10

11   COMPLETE TRANSCRIPT OF THE TESTIMONY OF TODD R. PAJONAS

12           BEFORE THE HONORABLE ROBERT E. PAYNE

13        UNITED STATES DISTRICT JUDGE, AND A JURY

14

15   APPEARANCES:

16   Michael S. Dry, Esquire
     Jessica A. Brumberg, Esquire
17   U.S. Attorney's Office
     600 East Main Street
18   Suite 1800
     Richmond, Virginia  23219
19   and
     Brigham Cannon, Esquire
20   United States Department of Justice
     1400 New York Avenue, NW
21   3rd Floor
     Washington, DC  20530
22   Counsel for the United States

23

24               Peppy Strahan, RPR
                Official Court Reporter
25            United States District Court
```

```
 1    APPEARANCES:  (cont'g)

 2    Carolyn V. Grady, Esquire
      Robert J. Wagner, Esquire
 3    Office of the Federal Public Defender
      701 East Broad Street
 4    Suite 3600
      Richmond, Virginia  23219
 5    and
      Barry J. Pollack, Esquire
 6    Miller & Chevalier
      655 Fifteenth Street, NW
 7    Suite 900
      Washington, D.C.  20005-5701
 8    Counsel for the defendant.

 9

10

11

12

13

14

15

16

17                       I N D E X

18

19                         DIRECT   CROSS   REDIRECT   RECROSS

20    Todd R. Pajonas            4      57        98       --

21

22

23

24

25
```

1            E X H I B I T S

2                                              Page

3    Government's Exhibit 24 ...........................   83

4    Government's Exhibit 65 ...........................    5

5    Government's Exhibit 66 ...........................    6

6    Government's Exhibit 69 ...........................    9

7    Government's Exhibit 85-A .........................   24

8    Government's Exhibit 85-B .........................   26

9    Government's Exhibit 85 ...........................   28

10   Government's Exhibit 88 ...........................   30

11   Government's Exhibit 90 ...........................   30

12   Government's Exhibit 91 ...........................   32

13   Government's Exhibit 93 ...........................   36

14   Government's Exhibit 97 ...........................   52

15   Government's Exhibit 113 ..........................   36

16   Government's Exhibit 123 ..........................   38

17   Government's Exhibit 126 ..........................   41

18   Government's Exhibit 178 ..........................  102

19

20   Defendant's Exhibit 13 ............................   74

21   Defendant's Exhibit 15 ............................   92

22   Defendant's Exhibit 16 ............................   94

23

24

25

1                    P R O C E E D I N G S

2

3          THE CLERK:  Criminal number 3:08CR00132-01, United

4    States of America versus Edward Hugh Okun.  Mr. Michael Dry,

5    Mr. Brigham Cannon, and Ms. Jessica A. Brumberg represent the

6    United States.  Mr. Robert J. Wagner, Carolyn V. Grady, and Mr.

7    Barry J. Pollack represent the defendant.  Are counsel ready to

8    proceed?

9          MR. DRY:  United States is ready to proceed.

10          MR. POLLACK:  We are ready.  Mr. Wagner is in another

11    proceeding.  He'll be here shortly, but we can go ahead.

12          THE COURT:  All right, sir.  Thank you very much.

13    Good morning, ladies and gentlemen.  Good morning, counsel.

14    All right, Mr. Pajonas is on the witness stand.

15          MR. DRY:  That's correct, Your Honor.  The United

16    States would recall Mr. Todd Pajonas to the stand.

17

18                    **TODD R. PAJONAS,**

19    a witness, called by the United States, having been

20    previously duly sworn, testified as follows:

21

22          THE COURT:  All right, Mr. Pajonas, I remind you you

23    are under the same oath that you took yesterday.

24          THE WITNESS:  Thank you.

25

```
 1                        DIRECT EXAMINATION

 2    BY MR. DRY:   (Resuming)

 3    Q    Mr. Pajonas, I believe when we concluded yesterday, we had

 4    just finished talking about National Exchange Services.   Was

 5    there another qualified intermediary company after National

 6    Exchange Services was bought in June of 2006 that was acquired?

 7    A    I believe that that was IXG.

 8    Q    Sir, IXG is an acronym for?

 9    A    Investment Exchange Group.

10    Q    And I'd like to bring up Government's Exhibit 65, please.

11    Sir, did you receive this e-mail on the bottom, and did you

12    send the response?

13    A    It's not up yet.  Here it is.  Yes, I did.

14              MR. DRY:  I'd like to introduce Government's Exhibit

15    65 into evidence.

16              THE COURT:  Any objection?

17              MS. GRADY:  No objection.

18              THE COURT:  Admitted.

19

20              (Government's Exhibit 65 admitted.)

21

22    Q    Sir, can you tell the members of the jury what this bottom

23    e-mail was in reference to?

24    A    Well, they are asking for $6 million of client funds to

25    purchase the IXG company out of Denver, Colorado.
```

1   Q    And Ms. Coleman says, will return the funds today.  From

2   your conversations with Ms. Coleman and Mr. Okun, what was your

3   understanding of how that was going to occur?

4   A    It was going to come back from client funds from IXG.

5              THE COURT:  What?

6              MS. GRADY:  Nothing, Judge.  Just clearing my throat.

7              THE COURT:  Sorry.

8   Q    I'd like to now show you Government's Exhibit 66.  This is

9   an e-mail from Ms. Coleman to yourself courtesy copying Edward

10  Okun; is that correct?

11  A    That's right.

12             MR. DRY:  I'd like to admit Government's Exhibit 66

13  into evidence, please.

14             MS. GRADY:  That's fine.  No objection, Your Honor.

15             THE COURT:  Admitted.

16

17             (Government's Exhibit 66 admitted.)

18

19  Q    Sir, what is -- this is the same day as Government's

20  Exhibit 65.  What is the $7 million in reference to?

21  A    Again, I believe it's that they are needing all that money

22  to purchase IXG.

23             MS. GRADY:  Judge, I'm going to object as to who the

24  "they" is.

25             THE COURT:  Can you clarify, please.

Pajones - Direct

1            MS. GRADY:  Clarify who the conversation was with.

2    He keeps using "they."

3    Q    At this time frame, Ms. Coleman is the one that's asking

4    for another million dollars; is that correct?

5    A    That's correct.

6    Q    Okay.  Did you ultimately wire transfer funds for the

7    purchase -- I'm sorry, SOS client funds for the purchase of

8    IXG?

9    A    I did.

10   Q    Were those funds returned to you almost immediately after

11   you wired them?

12   A    Yes.

13   Q    What was your understanding of how those funds were

14   repaid?

15           MS. GRADY:  I'm going to object unless he has

16   firsthand knowledge, Judge.  He didn't send the wire, he

17   doesn't know firsthand.

18           THE COURT:  Well, that's two different issues, so why

19   don't you lay a foundation.

20   Q    You testified that the money came back almost immediately

21   after you sent the six million; correct?

22   A    That's correct.

23   Q    From what you -- from your conversations -- from what you

24   could observe from the source of the funds, where did that

25   money come from?

Pajones - Direct

1   A    Came from IXG client funds.

2          MS. GRADY:  Again, I'm going to object, Your Honor.

3          MR. DRY:  She can cross-examine Mr. Pajonas about how

4   he knows that, Your Honor.

5          THE COURT:  Actually, I think probably the

6   establishment of a foundation lies with the questioner.  At

7   least that's what the obligation usually is.  Would you mind

8   doing it or not so I can determine whether her objection to the

9   substantive question is appropriate or not?

10  Q    Did you have a specific conversation with Ms. Coleman

11  regarding how she paid the funds back?

12  A    Both Ms. Coleman and with Mr. Okun.

13  Q    And from your conversation with Ms. Coleman, how were the

14  funds paid back?

15  A    They represented to me that they needed the funds to buy

16  the company, and once the company was purchased, they would use

17  the funds that IXG was holding to repay the monies that I had

18  advanced.

19  Q    That was both Mr. Okun and Ms. Coleman?

20  A    Yes.

21  Q    Turning your attention to Government's Exhibit 69, you had

22  an opportunity to review this e-mail prior to your testimony

23  today?

24  A    I have.

25  Q    This was -- the e-mail at the bottom was an e-mail you

Pajones - Direct

1    sent to Mr. Okun and Ms. Coleman; is that correct?

2    A    That's correct.

3         MR. DRY:  And at this time, I'd like to admit

4    Government's Exhibit 69 into evidence.

5         THE COURT:  Any objection?

6         MS. GRADY:  No objection, Your Honor.

7         THE COURT:  Admitted.

8

9         (Government's Exhibit 69 admitted.)

10

11   Q    This was the day after IXG was purchased?

12   A    That's correct.

13   Q    Why did you -- if you could scroll down, please.  Why did

14   you send this e-mail?

15   A    I was very upset.  I had had a big disagreement with Ed

16   Okun, and, you know, after getting off the phone, I thought

17   about a few things and wanted to document it and sent him an

18   e-mail regarding our conversation.

19   Q    When did that conversation with Mr. Okun occur?

20   A    It happened either earlier that day or the day before.  It

21   was very recent to this e-mail.

22   Q    Okay.  Can you please read bullet point one for me,

23   please?

24   A    Sure.  First off, I am calm, very, very calm.  I'm also

25   very, very concerned but calm.

Pajones - Direct

1    Q     Why were you writing that?

2    A     Well, because at this point, I had been complaining and

3    arguing so much about the way the company was being run that it

4    was -- Mr. Okun was trying to tell me that I was irrational and

5    that everything was fine and trying to tell me that I was way

6    too excited, that this was not a problem.  And I felt that he

7    was trying to marginalize me by telling me that I was making

8    too much of the problem.

9    Q     Going down to bullet point number three, please.  Picking

10   up with the "we have been working hard," can you please just

11   read that sentence?

12   A     Sure.  We have been working hard for months now to figure

13   out exactly how much money is owed by IPofA and where our cash

14   position is.

15   Q     And why had it been difficult to determine how much IPofA

16   owed to the QI company?

17   A     Well, because first off, all the money was taken out of

18   Atlantic Exchange, you know, before I ever came on board, so I

19   wasn't aware and there was no documentation to it, and

20   secondly, when IPofA, Edward Okun and Lara Coleman requested

21   the money from Security 1031, they had said that it was being

22   used to fund various closings, and at this point, I wasn't

23   quite certain what the money had been used for.

24   Q     Going to bullet point number six, please.  Please read

25   that.

Pajones - Direct

1   A    I have some work cut out for me such as unifying our

2   exchange documents.

3   Q    First of all, did the qualified intermediary documents,

4   the exchange agreements that had been used, did those permit

5   any use of the client funds other than to fund client

6   exchanges?

7   A    None of them did.

8   Q    And when you are saying that you are going to unify the

9   exchange documents, what did that mean?

10  A    Well, we had several different companies at this point.

11  We had Atlantic Exchange, Security 1031, NES, and now IXG.

12  Each company used a separate exchange agreement.  They were

13  very similar, but they were still different, and, you know, in

14  terms of running a company, it wasn't, you know, proper, good,

15  or easy, made our job more difficult to have four different

16  types of exchange agreements, so we were going to take the best

17  out of all of them and make one uniform exchange agreement.

18  Q    Sir, but you said four different companies, but at this

19  point, there's actually five different qualified

20  intermediaries; correct?

21  A    Well, I know that now, but at this point I was not aware

22  that they had purchased REES.

23  Q    Now, were you going to change the exchange agreements to

24  inform the clients that their money was being used for things

25  other than exchanges?

Pajones - Direct

1   A    No.

2   Q    Why didn't you do that?

3   A    Well, I mean, the reason why I didn't do that and the

4   reason why I never did that is because each time was supposed

5   to be the last time, and at this point, I was extremely

6   uncomfortable with it, and, quite frankly, I didn't want to

7   make it right.

8   Q    When you say each time was supposed to be the last time,

9   what did you mean by that?

10  A    Each time there was a request for funds, it was supposed

11  to be the last time that funds were borrowed from a QI.

12  Q    Who told you that?

13  A    Edward Okun.

14  Q    Had Mr. Okun ever instructed you to change the exchange

15  agreements to inform the clients what was being done with their

16  money?

17  A    As far as I can recall, we never had any discussions about

18  exchange agreements, including discussing changes to make the

19  borrowing allowable under the exchange agreement.

20  Q    What was -- you mean after the borrowings had occurred?

21  A    That's correct.  At any time during my employment.

22  Q    What was your understanding at this point -- I'm sorry.

23  Do you recall a meeting in September 7th, 2006, with managers

24  from Investment Exchange Group?

25  A    I do.

Pajones - Direct

1  Q    Please tell the members of the jury what happened during

2  that meeting.

3  A    Sure.  It was a meeting at a hotel, myself, Jeff Zacarias,

4  Barry Powlishen, Dan McCabe, Shirley McCabe, and the McCabes'

5  son whose name -- Drew McCabe.

6  Q    Who were the McCabes?

7  A    The McCabes were the owners of IXG.

8  Q    The former owners?

9  A    The former owners of IXG and now presently the managers of

10 IXG.

11 Q    What happened at that meeting?

12 A    At that meeting, I had stepped out of the room for a

13 moment, and Barry Powlishen and Dan McCabe started discussing

14 the investment policy; in other words, the investment of

15 exchange funds and real estate.

16 Q    And what happened when you returned in the meeting?

17 A    When I returned to the meeting, there was a discussion

18 ongoing where Dan McCabe was expressing concern about this, but

19 he also said that he knew that it had to be something like this

20 because of the rate of interest that Edward Okun had promised

21 them.  He knew it couldn't be a normal type of investment

22 scenario.

23 Q    Did Mr. McCabe express his opinion regarding the

24 legality or illegality --

25          MS. GRADY:  I'm going to object at this point, Judge.

Pajones - Direct

1         MR. DRY:  It's effect on a listener because there's

2    going to be a call that the witness is going to testify with

3    Mr. Okun discussing Mr. McCabe's accusations, Your Honor.

4         MS. GRADY:  It's still hearsay, Judge.  He's offering

5    it for the truth.

6         THE COURT:  I think he's offering it for a

7    non-hearsay purpose, ladies and gentlemen, not as to whether or

8    not it is correct, that the assertion is correct that it was

9    unlawful, but to explain why Mr. Pajonas did what he did and

10   the subsequent conversation with Mr. Okun.

11   Q    Did Mr. McCabe make any accusations regarding the

12   legality?

13   A    Mr. McCabe had brought with him, it was either an article

14   or ruling regarding a group of individuals who had been

15   indicted in Colorado for taking money and investing it in

16   nonexistent real estate, and he was waving that around saying,

17   you know, I'm very concerned, you know, because these people

18   are indicted for fraud.

19   Q    Now, did you subsequently have a conversation with Mr.

20   Okun, Ms. Coleman about the accusation?

21   A    Yes.  I excused myself from the room, attempted to call

22   them, sent them an e-mail, and then the e-mail prompted both of

23   them to call me as a conference call at the same time.

24   Q    What was said during that call?

25        MS. GRADY:  I'm sorry.  Who was on the conference

Pajones - Direct

1  call?

2          THE WITNESS:  It was Lara Coleman, Edward Okun, and

3  myself.

4  A    During the conference call, I was explaining that I was

5  having conversations, or at this point kind of an argument,

6  with Dan McCabe about the investment policy.  I informed him

7  that we have a legal opinion that I would provide him with --

8  Q    I'm sorry --

9          THE COURT:  Can you help us get some specifics,

10 please.

11         THE WITNESS:  Sorry.

12 Q    You are on the call with Mr. Okun and Lara Coleman.

13 A    I'm on the call with Lara Coleman and Edward Okun, and I'm

14 explaining to them that Dan McCabe is questioning this.  Mr.

15 Okun instructs me to fire Dan McCabe.

16 Q    Okay.  And did you inform Mr. Okun and Ms. Coleman that

17 you, in your conversation with McCabes, had told the McCabes

18 that there was legal opinion saying this was okay?

19 A    Absolutely.  That was a big part of the conversation.  I

20 said you have to -- it had been promised for awhile, and I

21 said, you have to get me that legal opinion so that I can

22 provide it.

23 Q    Who did you say that to?

24 A    I'm sorry.  I said during that call to Lara Coleman and

25 Edward Okun, you have to provide me with that legal opinion

1    that you've been promising me.

2    Q    But you had represented to the McCabes in a meeting that

3    there was a legal opinion?

4    A    That's right.  I said to the McCabes there was one.

5    Q    What was your basis for telling McCabes that there was a

6    legal opinion?

7    A    That Lara Coleman and Edward Okun had represented that

8    there was a legal opinion.

9    Q    Had you ever seen a legal opinion?

10   A    I had not.

11   Q    You told Mr. Okun and Ms. Coleman, you have to give me a

12   copy of that; correct?

13   A    Absolutely.

14   Q    And you said that Mr. Okun initially said to fire the

15   McCabes.  Was there any conversation between you, Mr. Okun, and

16   Ms. Coleman about whether to actually go through with that?

17   A    Yes.  There was a lot of conversation.  Ms. Coleman was

18   pretty much in agreement with me that to fire the McCabes would

19   be the worst thing in the world.  It would kind of make them

20   get really suspicious.  Edward Okun kept saying, I want them

21   fired, I want them fired, but eventually I told him that was

22   crazy to do and I wasn't going to do it, and eventually he

23   said, fine.

24   Q    Why would it have been crazy to fire the McCabes?

25   A    Well, because, you know, quite possibly then they were

Pajones - Direct

1   going to --

2           MS. GRADY:  I'm going to object to the possibilities,

3   Judge.  He's assuming facts beyond his knowledge.

4           THE COURT:  No.  I think what he's doing is he's

5   explaining why he was opposing firing the McCabes, and he's

6   explaining his own thoughts, not what was going to happen but

7   what he was fearful of, thereby explaining his motivation for

8   the decision or position he took.  Objection overruled.

9   Q    Why were you --

10  A    I was, quite frankly, and to be blunt, I was concerned

11  that he might go to the authorities and, you know, say that

12  what was going on was a fraud, as he had already stated, as

13  McCabe had already stated.

14  Q    Was that concern made clear to Mr. Okun and Ms. Coleman on

15  the call?

16  A    Absolutely.  It was a big part of the call.

17  Q    Ultimately was the decision made not to fire the McCabes?

18  A    It was.

19  Q    At around this time, in September of 2006, what is

20  occurring at Security 1031 Services regarding accounting and

21  re-creating accounting?

22  A    We hire an accounting firm to start auditing all of the

23  bank records.  We begin to get all of the bank records, even

24  bank records that we had never seen before to review, you know,

25  all the money that has been taken out of the company.

Pajones - Direct

1   Q    And who is up there assisting that from Investment

2   Properties of America?

3   A    Jeff Zacarias and occasionally Lydia Renka.

4           THE COURT:  Who was being audited?

5           THE WITNESS:  It was our own company, Your Honor.

6           THE COURT:  You all talked about so many companies.

7   Which company is it?

8           THE WITNESS:  All of them.  All of the qualified

9   intermediary records were brought to our office.  All the bank

10  records for all the qualified intermediaries were brought to

11  our office.

12          THE COURT:  So that would be Atlantic Exchange.

13          THE WITNESS:  Security 1031.

14          THE COURT:  And also SOS?

15          THE WITNESS:  Right, which is also SOS.

16          THE COURT:  NES.

17          THE WITNESS:  NES.

18          THE COURT:  IXG.

19          THE WITNESS:  That's right.

20          THE COURT:  Was REES included at this time?

21          THE WITNESS:  Not yet, because it was still hidden

22  from us.

23  Q    What was the purpose -- was this a formal audit as there's

24  going to be an audit opinion or something like that?

25  A    No.  This was to try to get at a number that we could say

1    that -- you know, that IPofA had taken from the qualified

2    intermediaries.

3    Q    During this process, did you have any conversations with

4    Jeffrey Zacarias regarding his review of those bank records?

5    A    Sure.  We spoke --

6               MS. GRADY:  I'm going to object to anything that was

7    said by Mr. Zacarias.  It's clearly hearsay, Judge.

8               MR. DRY:  Your Honor, Mr. Zacarias is about to inform

9    Mr. Pajonas of a very --

10              THE COURT:  Wait a minute.  You can generally deal

11   with objections without presaging the testimony and thereby

12   getting out something that may not be admissible until I rule

13   on it.  So would you mind addressing the objection in that

14   fashion.

15              MR. DRY:  Yes, Your Honor.

16              THE COURT:  It's hearsay.  It's clearly hearsay;

17   right?

18              MR. DRY:  It would be if it was being offered for the

19   truth of the matter asserted.  It's being offered for not the

20   truth but the effect on the listener and what Mr. Pajonas is

21   about to do.

22              THE COURT:  To explain what Mr. Pajonas is doing.

23              MR. DRY:  Yes, sir.

24              MS. GRADY:  Your Honor, he doesn't need the details.

25   He can say he had a conversation with Mr. Zacarias, and based

Pajones - Direct

1   on that conversation, he can go forward.  The details of the

2   conversation the Government wants in for the truth of what the

3   conversation is, not what he did.  He's clearly trying to argue

4   in the back door some hearsay.

5            THE COURT:  But, Ms. Grady, doesn't that depend on

6   what's being said, because quite frequently it is true that

7   something that is being said can animate a particular course of

8   action, and it's necessary to put it in context, so isn't -- do

9   you have such an explanation, or is it sufficient to do what

10  she says?

11           MR. DRY:  I believe it would be insufficient, Your

12  Honor, to do what she's saying.

13           THE COURT:  All right.  Try it, and the objection is

14  overruled, and remember, if the non-hearsay purpose is not

15  relevant or offends Rule 403, it gets stricken, and there are

16  consequences.  So don't ask the question unless you have a

17  reason for putting in the substance of the context.

18           MR. DRY:  Yes, sir.

19  Q    Did Mr. Zacarias inform you of anything that caused you

20  increased concerns?

21  A    Yes.  He informed me and pointed out in records that

22  Edward Okun had taken some of the Atlantic Exchange qualified

23  intermediary funds and used them personally.

24  Q    What did you do as a result of that discovery?

25  A    I mean, came unglued a little bit, but after that, you

Pajones - Direct

1   know, we decided to -- my mission at that point was, along

2   with --

3              THE COURT:  The question is, what did you do as a

4   consequence of that statement.

5              THE WITNESS:  Okay.  Sorry, Your Honor.

6              THE COURT:  What did you do as a consequence of that

7   statement?

8              THE WITNESS:  The whole purpose of our being was try

9   and arrange things so that we could get the money back.

10  Q    Did you set up a meeting with Ms. Coleman to discuss this

11  concern?

12  A    That's right.  We did.

13  Q    Who was at the meeting?

14  A    It was Lara Coleman, Jeff Zacarias, Barry Powlishen, and

15  myself.

16  Q    Did you confront Ms. Coleman regarding Mr. Okun's personal

17  use of client funds?

18  A    Absolutely I did.

19  Q    Did she agree?

20  A    Yes.  Eventually she agreed with me that it was

21  problematic how the money was being taken.

22  Q    But did she admit that there had been personal use of

23  client funds initially?

24  A    No, not initially.

25             THE COURT:  During the course of the conversation, I

Pajones - Direct

1  think, is what he's trying to say, did she say that Mr. Okun

2  had actually personally used AEC funds?

3           THE WITNESS:  No, sir.

4           THE COURT:  She did not say it during the course of

5  that conversation?

6           THE WITNESS:  No.

7  Q    Did you set up a subsequent meeting in which Mr. Okun

8  participated?

9  A    I did.

10  Q    Who attended that meeting?

11  A    It was Edward Okun, Lara Coleman, Jeff Zacarias, Barry

12  Powlishen, and myself.

13  Q    Where was that meeting held?

14  A    It was held in Boston, Massachusetts, on Edward Okun's

15  yacht.

16  Q    That was the Simone?

17  A    The Simone.

18  Q    When did that meeting occur?

19  A    It occurred on September 21st, 2006.

20  Q    What happened at that meeting?

21  A    At that meeting, I confronted Edward Okun with the -- now

22  the auditors had provided me with a very rough number, and, you

23  know, the number was large, and also I confronted him with the

24  fact that there had been personal use of the money, and I told

25  him that this was illegal and that this was extremely

Pajones - Direct

1   problematic.

2   Q    And did Mr. Okun admit that he had used money for personal

3   use?

4   A    No.

5   Q    Did you -- you said that you told Mr. Okun this was

6   illegal.  Did you tell him anything -- did you call him any

7   names?

8   A    I said that he was a thief and a liar.  It was a screaming

9   match.  I was very upset.  I was stomping around the room.  It

10  was quite a small room, and I was yelling at him and saying

11  that he's a thief and a liar.

12  Q    What was his reaction?

13  A    He was arguing back with me, and he told me that he would

14  sell the company or just close the company.  He said it to me

15  like, what are you going to do now, I'm just going to close the

16  company, I'll shut it down, shut it down, what are you going to

17  do now, and I said, fine.  I said, put the money back and close

18  it down, I don't care, you've just got to put the money back.

19  Q    What did -- was there anything that had been brought to

20  the meeting that you demanded Mr. Okun sign?

21  A    Yeah, there was a stack of notes.  I finally wanted to

22  document all the monies that had been taken from the qualified

23  intermediaries by IPofA and Edward Okun.

24         MR. DRY:  Government's Exhibit 85, please.  I'm

25  sorry.  I this is 85-A.  I apologize, Ms. Grady.

Pajones - Direct

 1          MS. GRADY:  Sure.

 2          MR. DRY:  I'd like to admit Government's Exhibit 85-A

 3    into evidence.

 4          THE COURT:  Is there an 85-A?  I don't see it.

 5          MR. DRY:  It's right behind 85, Your Honor.  We

 6    didn't have A tabs.  I apologize.

 7          MS. GRADY:  I have no objection.

 8

 9          (Government's Exhibit 85-A admitted.)

10

11    Q    Sir, what is this?

12    A    This is a promissory note whereby Investment Properties of

13    America is borrowing $5 million from the 1031 Tax Group -- I'm

14    sorry, Security 1031 in this instance.

15    Q    The date of this is?

16    A    January 31st, 2006.

17    Q    What is the maturity date?

18    A    July 30th, 2006.

19    Q    Turning to the second page, and what is the date on the

20    bottom that the notary puts there, sir?

21    A    It was signed on September 21st, 2006.

22    Q    And this was signed after the maturity date was already

23    passed?

24    A    That's correct.

25    Q    Was there any discussion regarding the dating of these

 1  promissory notes?

 2  A    Absolutely.  Edward Okun wanted to backdate it to the date

 3  of the original making of the loan.

 4  Q    And what did you respond?

 5  A    I said no.  I said I wouldn't do it.

 6  Q    Why?

 7  A    Because at this point, I wanted to document the money

 8  taken.  I didn't want to try and make it look like it was

 9  correct.  I wanted his signature on a document saying he took

10  the money, and the fact that it was dated that day was fine by

11  me.

12  Q    How many -- can you characterize how many of these --

13  A    There's like a telephone book worth of them.

14            THE COURT:  Telephone book worth of what?

15            THE WITNESS:  Of stacks of these notes that were

16  signed that day by Edward Okun.

17  Q    This is just one out of many that you presented to Mr.

18  Okun and he sat there and signed them?

19  A    That's correct, sir.

20  Q    Okay.  Just to be clear, Mr. Bush was not present at the

21  meeting.

22  A    That's correct.

23            THE COURT:  Who?

24            MR. DRY:  I'm sorry, the Notary Public.  On the

25  second page on the bottom, it says Gregory Bush.

```
 1   A     Right.  That's correct.  He notarized it on an --

 2   Q     You don't know how he notarized it --

 3         MS. GRADY:  Judge, I'm going to object.  He has no

 4   knowledge of this.

 5         THE COURT:  That's what he's going to ask him, I

 6   think, is to establish that he has no knowledge.  Do you

 7   stipulate that Mr. Bush has no knowledge?  I mean Mr. Pajonas

 8   doesn't know how it was notarized?

 9         MS. GRADY:  I would agree.

10         THE COURT:  Is that what you are trying to say?

11         MR. DRY:  Exactly, Your Honor.

12   Q     And that Mr. Bush wasn't present?

13   A     He was not present.

14         MR. DRY:  Okay.  Government's Exhibit 85-B, please.

15   This is the admission, Ms. Grady.

16         MS. GRADY:  That's fine.

17         THE COURT:  Admitted.

18

19         (Government's Exhibit 85-B admitted.)

20

21   Q     Sir, what are these documents?

22   A     This is a consent of a sole member of Security 1031 to

23   borrow for -- I'm sorry, for Security 1031 to loan the money,

24   the $5 million to Investment Properties of America.

25   Q     This was a consent that corresponded to the note that I
```

Pajones - Direct

1   just showed you; is that correct?

2   A    That's right.  Companies need a document saying that they

3   have permission to loan monies, and this was that document.

4   Q    Go to the second page, please.  Is that Mr. Okun's

5   signature?

6   A    That is.

7   Q    Were these also presented with the loan documents from Mr.

8   Okun's signature at that meeting on September 21st?

9   A    That's correct.

10  Q    Prior to these notes and consents being signed, the stats,

11  had you ever seen any loan documentation or consents or any

12  type of documentation for the taking of client money from the

13  QI companies?

14  A    No.  Not for a lack of trying.  I had --

15          MS. GRADY:  I object.  It's not responsive to the --

16          THE WITNESS:  No, I had not.

17  Q    Had you tried to get documentation to at least have

18  something that showed that there had been transfers to

19  Investment Properties of America?

20  A    Since the first wire that went out for IPofA, yes.

21  Q    Who did you ask for that?

22  A    Lara Coleman and Edward Okun.

23  Q    Were they ever provided to you?

24  A    Not up until this date.

25  Q    I now show you what's been marked as Government's

1    Exhibit 85.  What is this document, sir?

2    A    This is the investment policy for the 1031 Tax Group.

3              MR. DRY:  I'd like to admit Government's Exhibit 85

4    into evidence.

5              MS. GRADY:  That's fine.  No objection, Your Honor.

6              THE COURT:  Admitted.

7

8              (Government's Exhibit 85 admitted.)

9

10   Q    Sir, going to the second page of this, the second from the

11   bottom signature, whose is that?

12   A    That's my signature.

13   Q    The date?

14   A    Is September 21st, 2006.

15   Q    And is this document also signed at the yacht meeting?

16   A    Yes, it is.

17   Q    Going to the first page, please, what was the purpose of

18   setting up this investment policy?

19   A    Two purposes:  To prevent Edward Okun from taking any more

20   money out of the qualified intermediaries, and to get

21   Investment Properties of America and Edward Okun to repay the

22   money that it had taken.

23   Q    But Mr. Okun -- how many members are there on the

24   investment policy?

25   A    There are five members.

Pajones - Direct

1    Q    And how many members were going to be required to agree

2    before any new loans were going to be --

3    A    Three.  A majority.

4    Q    And had there been an agreement between any of the three

5    not to authorize any new loans?

6    A    That's correct.  There was an agreement between myself,

7    Jeff Zacarias, and Barry Powlishen.

8    Q    Okay.

9           THE COURT:  Who are these other signatures?

10   Q    I'm sorry.  Mr. Pajonas, on page two, who else signed?

11   A    The first signature is Edward Okun.  The second signature

12   is Jeff Zacarias.  The third is myself.  The fourth signature

13   is Barry Powlishen.  The only person who did not sign is

14   Kenneth Bolton.

15   Q    Was he at that meeting?

16   A    He was not.

17   Q    What was your reaction to the outcome of the meeting?

18   A    I was happy that I got Edward Okun to sign all these

19   documents to finally document all the money that he had taken.

20   Q    Government's Exhibit 88, please.  That's an e-mail from

21   you to Ms. Coleman and Mr. Okun?

22   A    Yes, it is.

23          MR. DRY:  Move for admission of Government's

24   Exhibit 88.

25          MS. GRADY:  That's fine.  I have no objection, Your

Pajones - Direct

1  Honor.

2                THE COURT:  Admitted.

3

4                (Government's Exhibit 88 admitted.)

5

6  Q    This is another -- in general terms, what is this e-mail?

7  A    This is another in a long line of e-mails where I'm asking

8  for money to come back to the qualified intermediaries so that

9  we can fund exchanges.

10 Q    Why are you asking about West Oaks money?

11 A    West Oaks refers to a mall in Houston, and it's supposed

12 to be sold, and that's where money is supposed to come back

13 from.

14 Q    Okay.  Who is telling you the money was supposed to come

15 back from West Oaks Mall?

16 A    Edward Okun and Lara Coleman.

17               MR. DRY:  Going to Government's Exhibit 90, please.

18 I'd like to admit Government's Exhibit 90 into evidence.

19               MS. GRADY:  Hold on.  I have no objection, Your

20 Honor.

21               THE COURT:  Admitted.

22

23               (Government's Exhibit 90 admitted.)

24

25 Q    Who is that from and to?

Pajones - Direct

1    A    It's from myself to Edward Okun.

2    Q    Turning to the second sentence, or the second line

3    starting at $750, can you please read that?

4    A    $750 and five percent would look desperate and like

5    something is wrong.  Remember, we are in the trust business.

6    Q    Why are you writing this to Mr. Okun?

7    A    Mr. Okun had a conversation with Jeff Zacarias, and they

8    wanted to lower the exchange fee to 750 and raise the interest

9    we would pay to the clients to five percent.

10   Q    And why did you think that -- why were you so opposed to

11   this?

12   A    Because nobody was paying five percent, and I was very

13   concerned that if we were paying a lot more than our

14   competitors, people would say, how can they do that.  It's more

15   than banks were paying at that time.

16   Q    At this point, did the clients of the QI companies know

17   what had been done with their money?

18   A    No.

19   Q    Can you go to the top, please.  Did you receive this

20   e-mail from Mr. Okun?

21   A    I did.

22   Q    And what was his reaction?

23   A    He was unhappy, and he's requesting additional

24   information, wanting to know office by office what the

25   competition is doing, so he's still disagreeing with me, but

Pajones - Direct

1    I'm refusing to carry out what he's saying.

2              MR. DRY:  And Government's Exhibit 91, please.  I'd

3    like to admit Government's Exhibit 91 into evidence, please.

4              MS. GRADY:  I have no objection, Your Honor.

5              THE COURT:  Admitted.

6

7              (Government's Exhibit 91 admitted.)

8

9    Q    Going to the top, who is this e-mail from and to?

10   A    From myself to Lara Coleman.

11   Q    And turning to the second paragraph, please read Ed's

12   request.  I think it's three sentences, two sentences long.

13   A    Just starting with Ed's request?

14   Q    Yes.

15   A    Ed's request.  I have no problem, as I've previously

16   stated, with providing Ed with whatever he wants or needs in

17   the way of information.  My only concern before the investment

18   policy was in place was that by providing him with a float

19   balance, he routinely stripped the company down to nothing.

20   Q    Had you always provided Mr. Okun and Ms. Coleman with

21   accurate figures on how much client money the QIs were holding

22   up to this point?

23   A    Up to this point, yes.

24   Q    You had always told Mr. Okun and Ms. Coleman how much

25   client money was available at the QI companies?

Pajones - Direct

1   A    That's correct.

2   Q    Number three, please.  Would you please read the first

3   paragraph, Ed's decision-making?

4   A    Ed's decision-making.  You stated that Ed has poured

5   millions of dollars into this company and therefore he has a

6   right to demand certain things.  I don't agree at all.  Ed may

7   have millions of dollars at stake, but we all have our lives,

8   reputations, family, and freedom at stake which is worth all

9   the money in the world.  I was not in control of the decisions

10  that brought us to this point.  Edward was.  We all got dragged

11  along, and we all have liability.

12  Q    At this point, did you realize that Mr. Okun was -- had

13  used client money for things other than even commercial real

14  estate?

15  A    That's right.  I realized that Edward Okun had used money

16  to purchase things of a personal nature.

17  Q    When you were saying that your lives, reputation, family,

18  and freedom was at stake, what were you concerned about?

19  A    I was concerned about criminal liability.

20  Q    Going to the second page of this e-mail, in the second

21  paragraph -- yeah, second paragraph, second sentence, I speak

22  -- or third line.  I speak very plainly.  Can you read from

23  that point forward?

24  A    Sure.  I speak very plainly, and that can sometimes hurt

25  people's feelings and make them get defensive.  That is not my

Pajones - Direct

```
 1    intent.  I'm just very scared and very tired, and I'm trying to
 2    keep going for the sake of my family and other people who might
 3    get hurt.  I am really unconcerned for myself, but I worry for
 4    them.  I just never thought my life would play out like this,
 5    and I am very sad.
 6    Q    What was Ms. Coleman's and Mr. Okun's -- did you express
 7    your concerns to Mr. Okun?
 8    A    This was almost an hour-by-hour conversation every day.
 9    From the moment I woke up until the moment I went to sleep, I
10    would discuss this with Edward Okun.
11              MR. DRY:  Let's go to Government's Exhibit 93 which
12    has been admitted -- actually, no, it has not.  I apologize.
13    I'd like to admit Government's Exhibit 93 into evidence.
14              MS. GRADY:  That's fine, Your Honor.  I think parts
15    of it have been admitted.
16              THE COURT:  93?
17              MS. GRADY:  Well, part of the e-mail chain in the
18    bottom was admitted earlier.
19              THE COURT:  Okay.  I see it.
20    Q    Sir, you received the Kutak Rock memo on October 9th; is
21    that correct?
22    A    That's correct.
23    Q    And you send this e-mail at the top to Ms. Coleman in
24    response?
25    A    That's correct.
```

Pajones - Direct

1  Q    Did you review the Kutak Rock memo?

2  A    I did.

3  Q    Was that consistent with what you had been told the legal

4  opinion was that had been given to Mr. Okun or Ms. Coleman?

5  A    It was pretty much the exact opposite of what I had been

6  told.

7  Q    Why are you sending this e-mail to Ms. Coleman?

8  A    Because it didn't agree with that, and it rocked the whole

9  foundation of the reasons why they were able to take the money.

10  Q    But to be -- one, at this point, did you actually believe

11  that there was legal opinion authorizing the transfers of QI

12  client funds?

13  A    I started doubting everything that I was told at this

14  point, so I had concerns about whether it was -- it existed,

15  but I was rationalizing in my mind and hoping that it was still

16  out there.

17  Q    Why were you rationalizing in your mind?

18  A    Because it was the basis for all the money that was out

19  there that didn't exist.  What we did was definitely wrong.

20  Q    Okay, going to Government's Exhibit 113 --

21            THE COURT:  Did you offer -- what did you end up

22  saying about 93?

23            MS. GRADY:  I didn't have any objection.

24            THE COURT:  That's what I thought.  It's admitted.

25

Pajones - Direct

1              (Government's Exhibit 93 admitted.)

2

3              MR. DRY:  I'd like to offer Government's Exhibit 113

4    into evidence.

5              MS. GRADY:  I don't have any objection.

6              THE COURT:  Admitted.

7

8              (Government's Exhibit 113 admitted.)

9

10   Q    Sir, this e-mail was sent from Barry Powlishen.  Who was

11   he again?

12   A    Barry Powlishen was the chief operating officer of the

13   1031 Tax Group.

14   Q    Who is the e-mail sent to?

15   A    It's sent to Lara Coleman, myself, Edward Okun, David

16   Field, and Jeff Zacarias.

17   Q    And were there updates, or were you trying to track the

18   cash that was available on hand at this point?

19   A    Absolutely.

20   Q    And it says liquidity is $14.2 million.  What did that

21   mean?

22   A    Well, liquidity means how much cash is on hand to fund

23   closings of real estate.

24   Q    But here you've got total cash of 39.2 and segregated cash

25   of 25.  Liquidity was the difference?

Pajones - Direct

1   A    Well, right.  Liquidity was supposed to be the difference,

2   but in this case, this number is probably not accurate.

3   Q    Why?

4   A    Because we were taking the number down lower to not show

5   Edward Okun how much money we actually had, because he would

6   routinely take almost the money that we had.

7   Q    So you were falsifying these?  You were underreporting how

8   much money was on hand?

9   A    Absolutely.

10  Q    And your reason for doing so -- he is the owner of the

11  company.  What is your reason for doing so?

12  A    Because whenever we would show any amount of money in the

13  bank account, he would take it.

14  Q    Now, when it says liability, how much -- what does that

15  number mean?

16  A    Liability means that if we were to fund every exchange

17  that we had open, that was the amount of money that it would

18  require.

19  Q    So just to be clear, you said you are underreporting how

20  much actual cash is on hand, but was -- from your perspective

21  as the president of 1031 Tax Group, what was the financial

22  condition of 1031 Tax Group?

23  A    Complete shambles.  We weren't lying by very much because

24  there wasn't a lot of money to begin with.  It's not that this

25  is $14 million and we were really holding 50, but we -- it was

Pajones - Direct

1    shambles.

2    Q    Okay.  Did you receive a copy of the November 7th, 2006,

3    Perkins memorandum discussing the QI issues?

4    A    I did.

5    Q    Did you review that?

6    A    I did.

7    Q    Were you surprised by its conclusions regarding criminal

8    liability?

9    A    No.

10   Q    What is your relationship like at this point with Edward

11   Okun?  Are there a lot of calls going back and forth?  What is

12   going on?

13              THE COURT:  You mean in November of 2006?

14              MR. DRY:  I apologize, Your Honor.  Right around the

15   time of the Perkins memorandum, early November of 2006.

16   A    Prior to that point, we spoke multiple times a day.  At

17   this point, we barely speak at all.

18   Q    I'd like to show you what's been marked Government's

19   Exhibit 123.

20              MR. DRY:  I'd like to admit Government's Exhibit 123

21   into evidence.

22              MS. GRADY:  I have no objection.

23

24              (Government's Exhibit 123 admitted.)

25

Pajones - Direct

1    Q    Do you remember sending this e-mail, sir?

2    A    I did, yes.

3    Q    Who did you send it to?

4    A    I sent it to Edward Okun, Lara Coleman, David Field, and

5    Barry Powlishen.

6    Q    What was your purpose in sending this e-mail?

7    A    To convince them that it was not okay to keep borrowing

8    money from the qualified intermediaries.

9    Q    What is the FEA?

10   A    The FEA is the Federation of Exchange Accommodators.  It's

11   a trade group, which we belong to, of qualified intermediaries.

12   Q    Are these -- this investment guideline, are these

13   regulations?  Are they mandatory?

14   A    No.  No.  They are just guidelines that were published by

15   the FEA as being prudent operation of a qualified intermediary.

16   Q    If you can go to the top.  In general terms, what is the

17   FEA guidelines?  What is this laying out for QIs?

18   A    It's laying out what's acceptable investments for the

19   client funds.

20   Q    Okay.  And going to B, what are the two key criteria?

21   A    The first criteria is safety of principal, and the second

22   is adequate liquidity.

23   Q    1031 Tax Group at this time frame, did you have adequate

24   liquidity?

25   A    Real estate is one of the most illiquid investments you

Pajones - Direct

1   can have.

2   Q    Going to the safety of the principal, these are the

3   criteria, according to FEA, that investment funds -- the

4   investment of client funds, these are five criteria that they

5   say are usually the appropriate ones?

6   A    That's correct.

7   Q    Best case, even for the money that had been used for

8   commercial real estate, did that meet this criteria?

9   A    No.

10  Q    Going to adequate liquidity on D, please.  It says, funds

11  for replacement properties can be requested any time, need to

12  be available within a few hours to a few days.  Is that

13  consistent with your understanding of how things worked at 1031

14  Tax Group, clients can request their funds at any time?

15  A    It's pretty much the exact opposite.

16  Q    I'm sorry.  At 1031 -- well, I apologize.  It was an

17  inartful question.  Is it true, from your experience as 1031

18  Tax Group's president, that -- you did not know when clients

19  were going to need their money?

20  A    That's correct.

21  Q    And you are aware of examples where a client would deposit

22  their funds with the qualified intermediary and request their

23  funds for a closing very shortly thereafter, couple days, three

24  days, four days after?

25  A    Absolutely.  In some cases, the same day.

Pajones - Direct

1         MR. DRY:  Nothing further with this exhibit.  Turning

2    to Government's Exhibit 126, please, bottom -- well, I'd like

3    to admit Government's Exhibit 126 into evidence.

4         MS. GRADY:  No objection, Your Honor.

5         THE COURT:  Admitted.

6

7         (Government's Exhibit 126 admitted.)

8

9    Q    Turning to the bottom e-mail, who are you sending this

10   e-mail to?

11   A    David Field, Edward Okun, Lara Coleman, and Barry

12   Powlishen.

13   Q    In the first line, you say, David, pursuant to my

14   conversation with you this afternoon.  Did you have a

15   conversation with Mr. Field that afternoon?

16   A    I did.

17   Q    What was the purpose of you sending this e-mail?

18   A    To document that conversation.

19   Q    Were you also informing the others about the substance?

20   A    That's correct.

21   Q    In the first paragraph, you discuss that you were

22   proposing a meeting, and Field wanted to cancel it?

23   A    That's correct.

24   Q    Why were you proposing a meeting at that time?

25   A    I was proposing the meeting with the lawyers of IPofA and

Pajones - Direct

1   other officers of IPofA and the 1031 Tax Group to, you know,

2   let everybody know what was going on with the 1031 Tax Group

3   and try to get a solution to get the money back.

4   Q    And what was Mr. Field's reaction to that proposal?

5   A    He killed the meeting.

6   Q    The second paragraph says, I was further advised by you,

7   do not concern yourself with how IPofA returns the money.  Did

8   he, in fact, tell you that?

9          THE COURT:  That isn't what it says.  I was further

10   informed by you that I was not to concern myself.

11         MR. DRY:  I'm sorry.

12         THE COURT:  If you are reading, read.  If you're not,

13   use your own words.

14         MR. DRY:  I'll just stick to having the witness read

15   it.

16   Q    Sir, please read the first sentence of the second

17   paragraph.

18   A    Sure.  I was further advised by you that I was not to

19   concern myself with how IPofA returns the monies that it took

20   from the various QIs making up the 1031 Tax Group.

21   Q    Had Mr. Field expressed that to you?

22   A    Sure.  He was basically trying to relieve me of command.

23   Q    Going to the second page of it, can you read that top

24   sentence?

25   A    You further advised me that I'm not to call Ed Okun or

Pajones - Direct

1   Lara Coleman anymore as I am wasting their time.  I would ask

2   Ed to please confirm this.

3   Q    Did he, in fact, advise you of that?

4   A    Yes.

5   Q    Going to the last statement, please read that paragraph.

6   A    I'm sorry, which paragraph?

7   Q    The second paragraph.

8   A    Lastly, I want to go on record stating that I disagree

9   with your method of resolving this crisis.  I'm not in favor of

10  governing this company by committee; however, involving the

11  people who can help fix the problem is the only recipe for

12  success.  By isolating the IPofA attorneys from the problem,

13  you are removing the people who can most properly explain the

14  properties and loan documents to you.  I am uncertain about the

15  obligations of a CPA, but I can assure you that attorneys have

16  obligations that are statutory and/or regulatory.

17  Q    What did you mean by the term by isolating the IPofA

18  attorneys?

19  A    They refused to include the IPofA attorneys in any

20  solution about getting the client funds back.

21  Q    When you say they --

22       MS. GRADY:  I'm going to object unless he has

23  personal knowledge.  I don't think he has a foundation.

24  Q    What was your basis for saying that they were isolating

25  the IPofA attorney?

Pajones - Direct

1    A    David Field told me that they were not going to be

2    included in any solution because Edward Okun was not going to

3    govern this company by committee.

4         THE COURT:  Objection overruled.

5    Q    Turning to the last paragraph, accordingly, first

6    sentence, please?

7    A    Accordingly, you can fix this problem however you want to

8    fix it so long as it gets done.

9    Q    And the next sentence?

10   A    Okay.  Please keep in mind that the QI is now down to

11   $6 million of liquid funds.

12        THE COURT:  16 million.

13        THE WITNESS:  I'm sorry, $16 million of liquid funds.

14   Q    Do you know whether that was accurate or inaccurate about

15   the amount at this point?

16   A    I doubt I was telling them any accurate liquidity figures

17   at this point.

18   Q    You were underreporting it?

19   A    Absolutely.

20   Q    Was the 1031 Tax Group in a stable financial condition?

21   A    No.  Far from it.

22   Q    Going to the first page, top.  This is Mr. Okun's

23   response.  It discusses you being a salesperson.  What role was

24   Mr. Field recommending for you in that call with -- between you

25   and Mr. Field?

Pajones - Direct

1  A    What he told me furthermore was that I should have nothing

2  to do with the management of the company anymore, and I should

3  really act as a salesman or sales manager, and that was it.

4  Q    What was your role, as you understood it -- I'm sorry.

5  When was your last day working for 1031 Tax Group?

6  A    November 30th, 2006.

7  Q    What happened on that day?

8  A    I got fired.

9  Q    Can you describe events that led up to you being fired?

10 A    Sure.  I was home because at this point I was not going

11 into work anymore, and I received a call that there were more

12 withdrawals pending than money we actually had in the bank

13 accounts, and Edward Okun and Lara Coleman and David Field had

14 been informed of that, and there was no solution.

15 Q    What did you do?

16 A    I went down to the office, took stock of the situation,

17 realized that this was happening, that we were running out of

18 money, and I made three calls.

19 Q    Who did you call?

20 A    I called Edward Okun -- I made all three calls on

21 speakerphone so the whole office could hear.  I called Edward

22 Okun, and I got on the phone with him completely agitated, and

23 I said, where's the money, Ed, where's the money.

24      At this point we were negotiating my leaving the company.

25 And he kept saying to me, my lawyers say I can't speak to you,

Pajones - Direct

1   I can't speak to you, my lawyers say I can't speak to you.  And

2   I'm shouting, where's the money, what are you doing, where's

3   the money, and finally he hangs up on me.

4   Q   Who else did you call?

5   A   The next call was to David Field, again on speakerphone,

6   and I was shouting at him as well, and I said, David, we're out

7   of money, where's the money coming from, where's the money

8   coming from, and he basically had almost no reply and hung up

9   on me.

10   Q   And who is the next call?

11   A   Lara Coleman.  I did not get her on the phone.  I received

12   her voice mail, and I was shouting at her saying that we had

13   run out of money, and I shouted into the phone, I said, you're

14   going to go to jail, and you're never going to see your kids

15   again.

16   Q   Ultimately on that day, on November 30th, did 1031 Tax

17   Group run out of money?

18   A   No, it didn't.

19   Q   Why?

20   A   Luck.  Nothing but luck.  One of the closings requesting

21   the money got canceled, and at the same time another property

22   where the money was incoming closed, so we received the money.

23   Nothing but dumb luck saved the company that day.

24   Q   Did you later that afternoon, did you overhear a

25   conversation between Mr. Okun and Mr. Zacarias?

Pajones - Direct

1   A    Yes, I could.

2   Q    How did that happen?

3   A    Mr. Zacarias was talking to Mr. Okun on a cordless headset

4   and had walked into another office.  I pressed the speakerphone

5   button so the whole office could listen in on the conversation.

6   Q    What did Mr. Okun tell Mr. Zacarias?

7   A    He was telling him to fire me, to have the locks changed

8   and to call the police to have me removed from the premises.

9   Q    And ultimately you were fired that day?

10  A    I was.

11  Q    Did Mr. Zacarias do it?

12  A    No, he didn't.  He left.

13  Q    Mr. Zacarias left?

14  A    Mr. Zacarias left after the conversation with Mr. Okun.

15  He did not fire me.

16  Q    Who did fire you?

17  A    I received a call from my attorney telling me that a

18  letter had been faxed over from Mr. Okun's attorneys firing me.

19  Q    You said you had an attorney at this point.  Why did you

20  have an attorney?

21  A    I was negotiating my severance from the company.

22  Q    Under the terms of your severance or your employment

23  agreement, how much were you entitled to receive as severance?

24  A    I believe it was roughly about $330,000.

25  Q    How much severance did you ultimately receive?

Pajones - Direct

1    A    I negotiated --

2    Q    Negotiated?

3    A    I negotiated a severance.  I did not receive, but I

4    negotiated a severance of $950,000.

5    Q    Approximately $600,000 more?

6    A    That's correct.

7    Q    And during -- did you participate in purchase negotiations

8    with Mr. Okun's attorneys?

9    A    I did.

10   Q    During those purchase negotiations, what was said?

11         MS. GRADY:  I'm sorry, purchase negotiations?

12         MR. DRY:  I'm sorry.  Not purchase.  Severance

13   agreement negotiations.

14   Q    Did you participate in severance agreement negotiations

15   with Edward Okun's attorneys?

16   A    I did.

17   Q    What was said during those meetings?

18         MS. GRADY:  I'm going to object, Judge.  It's clearly

19   hearsay.

20         MR. DRY:  No, it's not, Your Honor.  It's agent.

21   They are Mr. Okun's agents negotiating on his behalf with Mr.

22   Pajonas.

23         THE COURT:  What does that have to do with this case?

24         MR. DRY:  Because some of the things that were said

25   will explain how Mr. Pajonas got $600,000 more than his

1    employment agreement entitled him to.

2              THE COURT:  How is that relevant to this case?

3              MR. DRY:  It's the Government's position it was a

4    payoff to keep Mr. Pajonas quiet, Your Honor.

5              MS. GRADY:  Your Honor, the Government hasn't

6    established any kind of agency.  We don't know these lawyers.

7    We don't know any of Mr. Okun's authority to ask these lawyers

8    to negotiate anything.  It's completely speculative, and it's

9    hearsay.

10              THE COURT:  You say this didn't come from his

11    lawyers?

12              MS. GRADY:  I don't know, Judge.  There's been no

13    proof of that at this point.  He's calling them agents, but

14    there's been no agency established.

15              THE COURT:  His lawyer is his agent, isn't he?

16              MS. GRADY:  Yes, but there's no specific authority

17    established by the Government they can act on this particular

18    subject.

19              MR. DRY:  I don't understand.  I can ask him who the

20    attorneys are.

21              THE COURT:  The issue is whether or not it's being

22    made by the agent, so you have to establish.

23    Q    Sir, who represented Mr. Okun in the severance

24    negotiations, which law firm?

25    A    It was Kluger Peretz.

Pajones - Direct

1    Q    Kluger, Peretz, Kaplan, and Berlin?

2    A    Right.  I'm sorry.  I don't recall all the names, but it

3    was Kluger Peretz.

4    Q    Did you participate in a meeting with Abbey Kaplan from

5    that law firm?

6    A    I did.

7    Q    And did Mr. Kaplan represent to you that he was

8    negotiating on behalf of Edward Okun?

9    A    Absolutely.

10   Q    During your negotiations with Mr. Kaplan, describe -- was

11   there any discussion regarding the potential for litigation?

12   A    Absolutely.  Both sides were both threatening litigation

13   and at the same time pointing to the other side saying, you

14   don't want litigation.

15   Q    Why did neither side want litigation?

16   A    Because it's an ugly mess, and nobody wanted it to see the

17   light of day.

18   Q    What do you mean, see the light of day?

19   A    The allegations of how the money was being used was not

20   something --

21        MS. GRADY:  Judge, I'm going to object to his

22   conclusions that both sides wanted to avoid litigation.  I

23   think that's an assumption he can't make.  He can only testify

24   about his own knowledge.

25        THE COURT:  I think what he said is the lawyers from

1    both sides were saying that, but I'm not sure.  I think it

2    would be a good idea if you asked specific -- get in there and

3    deal with it.  She's got a legitimate objection to the way it's

4    coming in, and if it doesn't belong in, it doesn't belong in,

5    so do it right or do it not at all.

6    Q    Did Mr. Kaplan threaten you with litigation and tell you

7    that you did not want litigation because things would come out

8    about what had happened?

9    A    Many, many times during that meeting.

10   Q    Did you tell Mr. Kaplan that Mr. Okun had more to worry

11   about than you did?

12   A    I did.

13   Q    Ultimately, you received $900,000; correct?  You

14   negotiated for $900,000 in severance; correct?

15   A    $950,000 in settlement.

16   Q    As part of that settlement, were you required to sign an

17   agreement that included a confidentiality provision?

18   A    I did.

19   Q    Did you perceive at the time that you were being given

20   extra money in order to keep you quiet?

21   A    Yes.  I would say that that's a fair statement.

22   Q    Sir, you've been granted immunity in this case; correct?

23   A    I have.

24   Q    And that means you can't be prosecuted for your actions

25   during all this; correct?

1    A    That's correct.

2    Q    But you can be prosecuted for perjury if you perjure

3    yourself here today?

4    A    That's been made clear to me.

5              MR. DRY:  One moment, Your Honor, please.

6              THE COURT:  Ladies and gentlemen, I'll give you some

7    instruction later on in the case about what immunity means, but

8    it means basically that he can't be prosecuted, but -- is it

9    use immunity or immunity for past conduct?

10             MR. DRY:  6001 immunity.

11             THE COURT:  It's immunity from prosecution for what

12   he's testified to or for what he did.  The reason you are

13   allowed to hear this information is because it's something you

14   can consider in assessing the believability of a witness's

15   testimony, and I'll explain that to you, but that's why it's

16   being -- you are hearing that information at this time.

17             MR. DRY:  Just very briefly.  I'm not going to have

18   many questions.  Bring up Government's Exhibit 97.

19             MS. GRADY:  I have no objection.

20             MR. DRY:  I'd like to admit Government's Exhibit 97

21   into evidence.

22             THE COURT:  All right.

23

24             (Government's Exhibit 97 admitted.)

25

Pajones - Direct

1    Q    Just the top portion of the e-mail, scroll down just a

2    little bit.  This is from you to Mr. Okun, correct, on

3    October 11th, 2006?

4    A    That's correct.

5    Q    And this was after you received the Kutak Rock memo;

6    correct?

7    A    That's correct.

8    Q    Had you learned that Mr. Burr had not, in fact, given a

9    legal opinion by this point?

10        MS. GRADY:  I'm going to object, Judge.  That's

11   assuming facts not in evidence and beyond his knowledge.

12        THE COURT:  What fact does it assume that's not in

13   evidence?

14        MS. GRADY:  The Government says that Mr. Burr did not

15   give an opinion.  That's not been --

16        THE COURT:  The jury can decide that about what Mr.

17   Burr said.

18        MS. GRADY:  Yes, sir.

19        THE COURT:  Objection overruled.

20   Q    Did you learn that Mr. Burr had not given a legal opinion

21   by this point?

22   A    That's correct.

23   Q    What is your purpose in sending this e-mail?

24   A    My sole purpose of this e-mail is to let Edward Okun know

25   that he has to return all the money, that there is no basis for

1    borrowing not even a penny of qualified intermediary funds.

2    Q    Can we go down a little bit.  Right there, the second

3    paragraph.  Our recent accounting project shows IPofA owes to

4    QIs approximately -- almost -- approximately almost

5    $130 million.  Were you surprised by this figure?

6    A    Absolutely.  Absolutely.

7    Q    And turning to the last paragraph -- can we --

8    accordingly.  Can you read this for the members of the jury,

9    please.

10   A    Accordingly, it is my conviction that the monies loaned to

11   IPofA do not constitute a prudent investment.  I am not even of

12   the belief that the QI could loan small sums of money to IPofA

13   and still remain within the confines of these prudent investor

14   statutes.

15   Q    Going to the second page, please, at the top.  Can you

16   read it?

17   A    These loans simply do not amount to a prudent investment

18   when we have no documentation to support the creditworthiness

19   of these investments.  Therefore, 100 percent of these funds

20   must be returned to the QIs without delay.

21   Q    This was based on review of the Kutak Rock memo?

22   A    The Kutak Rock memo as well as some additional research on

23   my part.

24   Q    Okay.  Had you discussed the Kutak Rock memo with Edward

25   Okun?

Pajones - Direct

1   A    I had.

2   Q    What did he say about it?

3   A    He said that -- what he said to me was that since the 1031

4   Tax Group was formed in Delaware, that Delaware law controlled,

5   that none of these other state statutes that were stated in the

6   Kutak Rock memo affected the ability to loan money.

7   Q    Did he tell you that --

8   A    So it was still okay.

9   Q    Did he tell you that the Kutak Rock memo allowed him to do

10  what he was doing in those states that he researched or just

11  that Delaware controlled?

12  A    He said that Delaware controlled.

13  Q    Had you done any research on Delaware?

14  A    After that conversation, I pulled up Delaware's statute --

15         MS. GRADY:  Judge, I'm going to object.  He's telling

16  about Mr. Okun's belief.  His belief after that is completely

17  irrelevant.  It's what Mr. Okun said to him and what Mr. Okun's

18  belief was, not what the law is.  What the law actually was or

19  is is irrelevant.

20         MR. DRY:  Your Honor, I'm about to show where Mr.

21  Pajonas, on the first page of his memo, talks about Delaware

22  and explains to Mr. Okun in this e-mail that Mr. Okun's

23  Delaware theory does not hold water, so it goes to --

24         THE COURT:  Objection overruled.  It goes to Mr.

25  Okun's state of mind.

1    Q    So did you do some research on Delaware, sir?

2    A    I did.

3    Q    Going to the first page of the memo, that I-was-also

4    paragraph, you talk about the legal opinion, that you had been

5    told that no such opinion issued.  Can you start with the when

6    I mentioned this to you?  It's almost --

7    A    I see it.  When I mentioned this to you the other day, you

8    stated that since we are formed in Delaware, these state

9    statutes would not apply to us.  I do not believe that we are

10   somehow exempted from these state statutes by virtue of being

11   formed in Delaware.  Furthermore, Delaware has a Prudent

12   Investor Act that is very similar to Massachusetts, Texas,

13   Colorado, and New York.  Then I cite the statute in Delaware.

14   We would have the same problems even if we interpreted our

15   situation according to what you stated.

16   Q    Second page in that I-know paragraph.  You sit there and

17   say, I have not benefited.  Can you read that sentence for me,

18   or two sentences, please.

19   A    I have not benefited from all these loans to IPofA, yet I

20   worry that I have a heavy burden of risk if things should go

21   wrong.  Let's not wait for that to happen.  You don't want

22   that, and I don't want that.  I want this fixed now.  Please

23   help me to do this because I simply cannot and will not go on

24   like this.

25   Q    You weren't on this, but you never saw this response from

Pajones - Direct

1    Mr. Okun?

2    A    No, I did not.

3    Q    But at this time frame, your relationship with Mr. Okun is

4    deteriorating?

5    A    It is.

6          MR. DRY:  Nothing further, Your Honor.

7          THE COURT:  Ms. Grady.

8

9                    CROSS-EXAMINATION

10   BY MS. GRADY:

11   Q    Good morning.

12   A    Good morning.

13   Q    I think you told the Government -- sorry.  You told the

14   members of the jury today that you routinely lied to the

15   president of your company, to the owner of your company?

16   A    About the amount of money on hand, yes, I did.

17   Q    You had no problem lying to Mr. Okun about the money in

18   the company; correct?

19   A    Not on that issue, no.

20   Q    And you were not just lying to him, you were lying to

21   other members that were on the e-mail, weren't you; Mr. Field,

22   Ms. Coleman, Mr. Zacarias in the variety of e-mails that the

23   Government put forward today?

24   A    I think that's an overstatement.  I'm not sure that that's

25   accurate.

Pajones - Cross

1    Q    Well, overstatement.  You called it an overstatement, but

2    it's really much more of a lie; correct?

3    A    You included certain people in that statement who knew

4    that that was not a true statement as well, so it wouldn't be

5    that I was lying to them.

6    Q    But you had no problem lying to Mr. Okun?

7    A    No, not on that issue.  None at all.

8    Q    Now, you testified about the FEA standards, and that was

9    one of the Government's exhibits, and you read through some of

10   the standards; correct?

11   A    That's correct.

12   Q    And at that time, you had sent that to Mr. Okun.

13   A    That's correct.

14   Q    That indicated that clients could get funds at any time.

15   A    That's correct.

16   Q    And clients did request funds at any time.

17   A    That's correct.

18   Q    And Mr. Okun never missed an exchange, did he?

19   A    Up until the point the company went bankrupt, no.

20   Q    But until the time you left, Mr. Pajonas, at the end of

21   November, he hadn't missed an exchange, did he?

22   A    No, he did not.

23   Q    He had a great source of funds in Roy MacDowell's capital,

24   didn't he?

25   A    I don't know that.

1          MR. DRY:  Objection, Your Honor.

2          THE COURT:  He said, I don't know.

3    Q    Well, you testified yesterday about an e-mail,

4    Government's Exhibit Number 28, and you sent this to Mr. Okun

5    on February 15th, and in that e-mail you said, Ed, I need you

6    to call the office.  We are having big money issues, we're

7    going to need Roy ASAP.  That's Roy MacDowell; right?

8    A    Absolutely.

9    Q    You knew that Mr. Okun could get a loan at the drop of a

10   dime, or as you said, ASAP, when money needed to be in the

11   company; correct?

12   A    That's what Mr. Okun represented to me.

13   Q    And you relied on that because you said, we're having

14   money issues, and we're going to need Roy?

15   A    Absolutely.

16   Q    Going back a little bit to a couple of things that were

17   said yesterday, you know that Lara controlled all the wires;

18   right?

19          THE COURT:  Maybe the jury is not as familiar with

20   these people as you are.

21          MS. GRADY:  I'm sorry, Judge.  You're right.

22   Q    Mr. Pajonas, it's your understanding that Lara Coleman was

23   the only one who could wire funds to and from AEC and

24   eventually all of the companies; correct?

25   A    I'd say that's a fair assumption, yes.

Pajones - Cross

1    Q    Mr. Okun didn't control any wiring ability, did he?

2    A    Well, it's also my assumption that he was the one who told

3    Lara Coleman to make these wires.

4    Q    That's not the question.

5    A    I thought it was.

6    Q    No.  The question was, did Mr. Okun have the ability to

7    send a wire?

8    A    You mean physically send the wire?

9    Q    Correct.

10   A    I don't know whether he did or didn't.

11   Q    Now, these -- just to make sure the jury understands, you

12   are the president of 1031 Tax Group?

13   A    That's correct.

14   Q    And underneath, as 1031 Tax Group grew, there were first

15   AEC and then SOS; correct?

16   A    That's correct.

17   Q    And those are the first two qualified intermediaries,

18   those were brought under 1031?

19   A    1031 Tax Group.

20   Q    Those were both owned by Mr. Okun.

21   A    That's correct.

22   Q    Whether or not you knew REES was bought, you know that

23   REES was eventually brought under 1031 Tax Group.  REES is the

24   Florida QI that was bought in June; correct?

25   A    Right, without my knowledge.

Pajones - Cross

1   Q    That was brought under 1031 Tax Group, too, wasn't it?

2   A    To be honest with you, I never saw the documentation for

3   it, but I would make that assumption.

4   Q    You know that Mr. Okun bought that, because it was told to

5   you that Mr. Okun bought that?

6   A    That's correct.

7   Q    And you know that Mr. Okun bought the NES, that San

8   Antonio, you testified about that yesterday.  You know he

9   bought that?

10  A    That's correct.

11  Q    And you know that -- you helped with that purchase of that

12  other QI, didn't you?

13  A    That's correct.

14  Q    So that again was brought under the umbrella of the 1031

15  Tax Group?

16  A    That's correct.

17  Q    And then when he bought IXG, which was the Colorado QI,

18  you helped with that one as well, didn't you?

19  A    No, I did not.

20  Q    You tried to stop Mr. Okun from buying it?

21  A    Absolutely.

22  Q    And that's when you had the conversation with the McCabes

23  when the McCabes actually found out about the fact that Mr.

24  Okun invested some of this money in real estate?

25  A    No.  That happened before that.  That happened before the

1   purchase.  That conversation happened after the purchase.

2   Q    Right.  Let's go to that for a minute.  You indicated to

3   the members of the jury that in that conversation that you had

4   with Mr. McCabe, you said he was concerned about fraud because

5   he had some indictment where people had been charged with

6   fraud; right?

7   A    You are talking about the meeting that we referred to at

8   the hotel after IXG was purchased?

9   Q    Yes.

10  A    Yes.  He did say that he had some concern about how the

11  funds were invested.

12  Q    And he pointed out to you -- you testified on direct just

13  a little while ago that there was some legality, an article or

14  indictment or something, 52 counts, brought that to your

15  attention?

16  A    I didn't say how many counts there were, but, yes, he had

17  an article of some sort.

18  Q    And that was an article regarding fraud of nonexistent

19  real estate; you said that on direct?

20  A    That's correct.

21  Q    So that Colorado, or that case was about nonexistent real

22  estate, and that's why fraud was brought; correct?

23  A    That's correct.

24  Q    And in this case, you actually said to Mr. McCabe in an

25  e-mail that that's different because we don't have the intent

Pajones - Cross

1   to defraud; they had the intent to defraud?

2   A    I stated that in an e-mail to Lara Coleman and Edward

3   Okun, not Dan McCabe.

4   Q    I'm sorry.  You're correct.  So you did say that their

5   case was different because you didn't have the intent to

6   defraud?

7   A    That's correct.

8   Q    Going back to my earlier point, with all of these

9   companies in 1031 Tax Group, it's fair to say that they -- they

10  are really brand names at this point?  Since they are all

11  underneath the 1031 Tax Group, they just kept the brand names

12  of the five different QI companies; correct?

13  A    I'm not sure what you mean by the question.

14  Q    Well, they were all owned by Mr. Okun?

15  A    That's correct.

16  Q    They are all in the same company, they are all owned by

17  1031 Tax Group?

18  A    That's correct.

19  Q    They are not individual entities anymore?

20  A    Some of them are run as individual entities still.

21  Q    They are run by managers who report to Mr. Okun because

22  he's the owner of the company.

23  A    That's correct.

24  Q    And these loans that you spoke about yesterday were

25  intracompany loans, in other words, between the QIs, between

1    the companies that Mr. Okun owns?

2              THE COURT:  Ms. Grady, you are confusing me.

3              MS. GRADY:  Okay.  Sorry, Judge.

4              THE COURT:  And I think maybe we better get this

5    straight.  You have made the assertion in your questions that

6    the QIs aren't any longer -- after they are under the

7    management or brought within the umbrella of the 1031 Tax

8    Group, that they aren't separate companies anymore.  Then in

9    your next question, you refer to them as companies.  They

10   either are companies or they are not companies.  Which is it?

11             And you have to stay on one track or the other unless

12   they have been converted into something that is not a company.

13   I think I understand what you are saying, but let's keep it

14   straight so that we don't -- this is a complex area.  Let's

15   don't confuse people any more than have to be.

16             MS. GRADY:  I'm going to try, Judge.  I agree.

17             THE COURT:  So the bottom line is that those QIs all

18   remained as companies, didn't they?  Is that right?  They

19   remained as corporations or not?

20             THE WITNESS:  They were still legal entities, but

21   they were owned by the 1031 Tax Group.

22             THE COURT:  All right.  Now we know that.  Let's go

23   ahead and proceed from that.

24             MS. GRADY:  Okay.

25   Q    It's fair to say as things progressed with Mr. Okun, I

Pajones - Cross

1   think you said it to the members of the jury, that you screamed

2   at him?

3   A    Absolutely.

4   Q    You screamed at a lot of people?

5   A    I wouldn't say a lot of people.

6   Q    Ms. Coleman?

7   A    Absolutely.

8   Q    You screamed at some of the people at SOS?

9        MR. DRY:  Objection to relevance.

10       THE COURT:  Ms. Grady, what does that have to do with

11   it?

12       MS. GRADY:  I'll move it to a different avenue,

13   Judge.

14   Q    The day that you were fired, you indicated just plain and

15   simple, that Mr. Zacarias just left the building.

16   A    That's correct.

17   Q    That was after you threw a chair at him; correct?

18   A    That was much earlier in the day, and I did not throw it

19   at him.  I threw it in his direction.  I had no intent to hit

20   him.  It's a fine distinction, but I wouldn't injure him.

21   Q    Okay, so you threw a chair -- this was a big leather

22   chair?

23   A    No.  It was a folding chair.

24   Q    Okay.

25   A    I don't think I'm capable of throwing a big leather chair.

Pajones - Cross

1  Q    You clearly had anger issues, and you threw a folding

2  chair in the general direction.

3           MR. DRY:  Objection, Your Honor.

4           THE COURT:  Look, you are the one who put on the

5  testimony about he was angry -- look, Ms. Grady, I think it's

6  pretty clear that he was really frosted, and everybody knows

7  that.  I think the Government will stipulate that, Mr. Pajonas

8  will stipulate it, and they are paying attention over here in

9  the box.

10          MS. GRADY:  I understand, Judge.  I just wanted to

11 make sure they got the full picture --

12          THE COURT:  Oh, I think they got it.

13          MS. GRADY:  -- of how frosted he was.  I'm with you.

14 Q    Now, when you were negotiating your termination, that was

15 before you were actually terminated; correct?

16 A    That's correct.  Well, I had been relieved of command but

17 not fired.

18 Q    And you were relieved of command when?

19 A    It was sometime late in October.  I don't recall the

20 specific date.

21 Q    So you still received e-mails even though you were

22 relieved of command; correct?

23 A    That's correct.

24 Q    And you knew the dire consequences, the dire money

25 situations that each of the companies was in?

Pajones - Cross

1   A    That's correct.

2   Q    And your employment contract only called for 90 days

3   severance; right?

4   A    I don't believe that to be the case.  I can't recall the

5   specifics of it.

6            THE COURT:  90 days notice or payment of a severance

7   package of 90 days salary?  Which are you talking about, Ms.

8   Grady?

9            MS. GRADY:  I'm talking about 90 days salary.

10           THE WITNESS:  Actually, my understanding of it, my

11  recollection of it is different.

12  Q    Okay.  Well, at any rate, you are negotiating for a huge

13  sum of money as a severance package upon your release from the

14  company?

15  A    Sure.

16  Q    At one point, you even asked for a $2 million severance,

17  didn't you?

18  A    I believe my attorneys were asking for as much as they

19  could.

20  Q    And you authorized your attorneys to ask for as much as

21  you could?

22  A    Sure.

23  Q    And you knew the financial status of the company at that

24  time?

25  A    I'm not sure that that's a fair statement.  I didn't have

Pajones - Cross

1    knowledge of IPofA's financial condition nor --

2    Q    You saw the e-mails.  You just testified that you saw the

3    e-mails where they're scraping up money and making exchanges

4    from all kinds of places; correct?

5    A    Right, but I had also been provided with a statement by

6    David Field, Edward Okun's and IPofA's CPA showing he was worth

7    $300 million.  There was a difference between a liquidity

8    problem and actual asset value.

9    Q    But at the time that you were negotiating and received

10   this money, you didn't want to admit it, but you knew it was

11   coming from QI money, didn't you?

12   A    I don't think that I would say it that way.  I did want

13   out of the company, and a part of me -- I'll be brutally

14   honest.  I didn't care.  I wanted out.  I took some comfort in

15   the fact that I was shown a financial statement that he was

16   worth $300 million, but I wanted out.

17   Q    Mr. Pajonas, answer the question really carefully, and

18   listen --

19            THE COURT:  You mean the one he just answered?

20            MS. GRADY:  No, the one he's about to.

21            THE COURT:  He doesn't need a preface like that.

22   Q    You knew at the time you were taking this severance money

23   that this was coming from qualified intermediaries, the client

24   funds, didn't you?

25   A    No.  No.  I didn't know that for a fact, no.  Could I make

Pajones - Cross

1    an assumption?  Perhaps.  But I didn't know that as a fact.

2    Q    You remember talking to the Government, one of the ladies

3    at this table right here, on August 18th of 2008?  You had a

4    lot of conversations --

5    A    I had a lot of conversations with the Government.

6    Q    In particular, you told her that you didn't want to

7    admit --

8              THE COURT:  Let's ask a question, please, and do this

9    in the correct way.

10             MS. GRADY:  Yes, sir.

11   Q    Do you deny telling this lady over here --

12             MR. DRY:  Which lady?

13             THE COURT:  It looks like there are about four of

14   them over there.  Depending how far back you go, there are more

15   than that.  I don't know who they are.

16   Q    I'm looking at the interview.  We can start with the

17   fact that Mr. Dry was there.

18             THE COURT:  He is not a lady.

19             MS. GRADY:  No, Judge, I think he's not.

20             MR. DRY:  I agree to that.

21             MS. GRADY:  I thought I'd go to the easiest one.  Mr.

22   Dry is right there.  Seems to be most appropriate.

23             THE COURT:  A better way to do this is, on such and

24   such a date, you were being interviewed by representatives of

25   the Government, and on such and such a date, did you say, and

Pajones - Cross

1   then you can deal with it later in another way.  That's how you

2   ask him.

3   Q    So on August 18th with Mr. Dry, Ms. Newman, and Ms. Onks,

4   not her, not first and last, two ladies in the middle, did you

5   tell them, I did realize that the money came from the QIs?

6   A    I don't recall.  There was a lot of meetings.  I could

7   have said that that was one of the possibilities as I stated

8   here right now.  That could be one of the possibilities.

9   Q    How many meetings did you have with the Government?

10  A    I don't recall.  Maybe four or five or so.  There was one

11  telephone conference as well.

12  Q    I had seven interviews with the Government.  Would that

13  sound about right?

14  A    I think so, sure.

15  Q    Were you shown copies of all of these before you came to

16  court today?

17  A    What's that?

18  Q    These are the reports that they wrote up after your

19  conversation.

20  A    I was shown none of those.

21  Q    Did you prepare with Mr. Dry?

22  A    Sure, we had conversations.

23  Q    How many times did you prepare between the time that you

24  arrived into town and the time that you hit the stand today?

25  A    Once.

Pajones - Cross

1   Q    Just once.

2   A    Just once.

3   Q    Now, you were negotiating for a bonus in July of 2006;

4   correct?  That's a Government's exhibit, Exhibit 54.

5   A    Okay.  That sounds about right.  If you could show me the

6   document, I might be able to recollect a little further.

7          MS. GRADY:  Sure.  Government's Exhibit 54.  Can you

8   turn the lights down again?  I hate to do that.

9   Q    This is the Government's Exhibit 54 which talks about the

10  bonuses; correct?

11  A    Yes.

12  Q    And you indicated that even though -- you indicated you

13  were entitled to these bonuses regardless of the profit of the

14  company because Mr. Okun was taking the money and investing it

15  in IPofA and wasn't keeping it with 1031 Tax Group; right?

16  A    Maybe you could state that question again.  I'm not sure I

17  caught the drift of what you are asking.

18          THE COURT:  What is the question?

19          MS. GRADY:  I'll try to make it simple, Judge.

20  Q    You felt you were entitled to this bonus even though your

21  company, 1031 Tax Group, wasn't making a profit.

22  A    That's an overstatement.  By my contract, I was entitled

23  to a bonus.  The only reason why the company was not profitable

24  was because Edward Okun took all the money that would be

25  earning interest.

Pajones - Cross

1   Q    And you knew the status of the 1031 accounting because you

2   are the president; right?

3   A    Yes.

4   Q    And you knew that the accounting in July wasn't good, was

5   it?

6        THE COURT:  That the accounting?

7        MS. GRADY:  I'm sorry.

8   Q    State of the accounts, income, that it wasn't so stable;

9   correct?

10       MR. DRY:  Objection, Your Honor.  I'm still on form.

11  Are we talking about accounting, or are we talking about

12  profitability?

13       THE COURT:  I think you are correct.  Why don't you

14  ask it again.

15  Q    You knew in July that the profitability of 1031 Tax Group

16  was not good.  You say that in the e-mail.

17  A    Well, that is twisting what I meant in that e-mail,

18  absolutely.  There was profitability in terms of that IPofA

19  owed the 1031 Tax Group not only the exchange funds but that

20  they were going to pay interest to the 1031 Tax Group once

21  these properties were sold.  So the profits were locked up

22  because Edward Okun took the money.

23  Q    Right.  But even at that time, you were demanding and took

24  $175,000?  Sorry, $150,000, because you didn't want to disrupt

25  payroll?

Pajones - Cross

1    A     That's correct.  But again, I had no --

2              THE COURT:  Wait a minute.  That's correct.  Let's go

3    on now.

4    Q     The bottom sentence that says, we are also using 85,000 to

5    put a deposit on the three condos we are buying, that's condos

6    that the business was buying?

7    A     That's correct.

8    Q     Those condos were going to house the business of SOS?

9    A     That's correct.

10   Q     And that was IPofA money that was being put down for SOS's

11   building; right?

12   A     This was -- the $85,000 being put down on the contract was

13   funds from our operating account, not the qualified

14   intermediary.

15   Q     It wasn't Mr. Okun's money that came from IPofA?

16   A     Eventually IPofA does complete the purchase, but the

17   initial deposit came from the operating account of the 1031 Tax

18   Group.

19   Q     You talked about interest a second ago.  I'm going to show

20   you what will be Defense Exhibit -- it's an e-mail on

21   August 11.  It'll be Defense Exhibit Number 13.

22             MR. DRY:  I'd like to see it.

23   Q     This e-mail, if you focus down to the bottom part, an

24   e-mail down to yourself -- from Lara Coleman to yourself, Barry

25   Powlishen, indicating that a wire was made to the Citibank

Pajones - Cross

1   operating account of $500,000.

2   A    That's correct.

3   Q    That was an interest payment from IPofA to Citibank

4   operating account?

5   A    That's correct.

6   Q    That was SOS's Citibank account; correct?

7   A    I'm not certain at this point whether it was a 1031 Tax

8   Group operating account or Security 1031 operating account, but

9   you can suffice it to say it was an operating account in

10  regards to the qualified intermediaries.

11  Q    It's clear, at least on this occasion, interest was being

12  paid on the loan?

13  A    Sure.  That happened from time to time.

14         MS. GRADY:  Your Honor, I would move to introduce

15  that exhibit as Defense Exhibit 13.

16         MR. DRY:  No objection to Defendant's 13.

17         THE COURT:  Admitted.

18

19         (Defendant's Exhibit 13 admitted.)

20

21  Q    Going to the promissory notes, those were introduced by

22  the Government, and you indicated that they were -- that Mr.

23  Okun wanted to backdate them; correct?

24  A    That's correct.

25  Q    He wanted to backdate them to actually make them reflect

Pajones - Cross

1    when the loan was actually taken?

2    A    He wanted to backdate them to the date when the loan was

3    taken, that's correct.

4            MS. GRADY:  Sorry, Judge.  There's a lot of paper

5    here.

6    Q    Mr. Okun was always relaying on West Oaks Mall and

7    Columbus Works to come through with a big profit --

8            MR. DRY:  Objection, Your Honor.

9            THE COURT:  Sustained.

10           MS. GRADY:  Your Honor, he testified about it on

11   direct.

12           THE COURT:  Ms. Grady, he cannot testify about what

13   Mr. Okun thought or relied on.  He can testify about what he

14   said, but he can't testify about what he relied on, and whether

15   he can testify about what he said is the subject of another

16   issue in the case, but at least I took the objection as to the

17   form of the question.

18           Now, I'm ruling on that one right now.  Whether or

19   not there's another objection in the second round, I'll deal

20   with that if and when that comes.  You know he can't answer

21   that question.

22   Q    As you said yesterday on direct examination, Mr. Okun told

23   you numerous times that he was waiting for West Oaks Mall to be

24   completely profitable, bring the profits back from West Oaks

25   Mall as well as Columbus Works; correct?

Pajones - Cross

1    A    Sure, that was one of the things that he told us.

2    Q    He told it to you often; correct?

3    A    That's correct.

4    Q    You knew -- I'm going to go to Government's Exhibit 97.

5    Let's go to the highlighted portion.  You indicate in your

6    e-mail that the original plan for the QIs was to become

7    involved in various short-term mezzanine financing while

8    property was TIC-ed out; is that correct?

9    A    Well, it depends on what you mean by the original plan.

10   When I knew what was happening with the money or when the QI's

11   were originally purchased?

12   Q    Well, it's up to you because the next sentence says, this

13   is the only thing I agreed to.  So did you agree or disagree

14   with what you wrote here that you agreed with the mezzanine

15   loans?

16         THE COURT:  All right, if you would like to ask

17   questions, that will be fine.  If you want to argue, we'll go

18   somewhere else and let you all go somewhere else without

19   witnesses present.

20         MS. GRADY:  I'll reframe my question.

21         THE WITNESS.  I'm sorry, did you ask a question?

22         THE COURT:  No.  She's going to start again.

23   Q    The original plan was for the QIs to become involved in

24   very short-term mezzanine financing while the property was

25   TIC-ed out.  This was the only thing I ever agreed to.

1   A    Well, once the monies had already been taken in January,

2   that was the first time it was disclosed to me how the monies

3   were going to be used, and it's at that point -- it's at that

4   point -- I mean I agreed because I was given no choice.  The

5   money was already gone and invested.

6   Q    And you knew that the plan was to use those loans until

7   the property was TIC-ed out, meaning sold and improved, tenants

8   in common, the money would come back to Mr. Okun, and those

9   loans would be satisfied.

10  A    That's what I was told, sure.

11  Q    Let's go to the exchange agreements for a minute.  You

12  testified on direct that you were -- Government's Exhibit 69.

13  You probably don't have that either, do you?  Go to number six

14  on 69, please.  This is what the Government had you read.  It

15  says, I have some work cut out for me such as unifying our

16  exchange documents.

17  A    Uh-huh.

18  Q    You agree that that was your job, to unify the exchange

19  agreements?

20  A    I was president of the company.

21  Q    And as president of the company, you need to make sure

22  that the company is following the exchange agreements; right?

23  A    That would be one of my jobs.

24  Q    So one of the problems that you had was that the exchange

25  agreements weren't matching what Mr. Okun was doing; right?

Pajones - Cross

1   A     Yeah.  I knew that.

2   Q     At some point, you considered that just a civil liability,

3   didn't you?

4   A     I'd say early on, yes, I thought it was just a contractual

5   issue.

6   Q     And Mr. Okun, he wanted you to change the exchange

7   agreements, didn't he?

8   A     No, not at all.  We never had a conversation about the

9   exchange agreements the entire time I was employed.

10  Q     Ms. Coleman asked you to change the exchange agreements.

11  A     To unify them, yes.  We never had a conversation about

12  changing them in any fashion.  It was merely for operation of

13  the company.  That's it.  That's what I'm referring to here.

14  Q     Now, you told the members of the jury -- I don't need the

15  exhibit anymore.

16        You told the members of the jury that you were concerned

17  about criminal liability because Mr. Okun wasn't following the

18  exchange agreements.

19  A     It wasn't just the fact that the exchange agreements

20  didn't provide for it, because I also began to think that

21  regardless of a memo or what the exchange agreements said, that

22  no amount of documentation would make what was happening right.

23  Q     But you made no attempt to change the language, as

24  president, to match what Mr. Okun was doing?

25  A     That's correct, because each time was supposed to be the

Pajones - Cross

1    last time.

2    Q    But you knew that that wasn't going to be the case; right?

3    A    I sure hoped it was going to be, but, no, in theory, it

4    didn't work out that way.

5    Q    Even though you knew the next time the borrowing happened,

6    you didn't say to yourself, gee, I think this is a good time

7    for me to change the exchange agreement language so that it

8    matches what the owner of the company is doing?

9    A    No.  I didn't think that way.  As a matter of fact, each

10   borrowing had the exact opposite effect on me.

11           THE COURT:  Are you at a point where you can stop

12   your questions?

13           MS. GRADY:  Yes, I could, Judge.

14           THE COURT:  I think this would be a good time for us

15   to take a morning break.  We'll take about 25 minutes.

16

17           (Jury out.)

18

19           THE COURT:  Ms. Grady, I'm going to tell you the same

20   thing I told Mr. Dry.  You all have a great deal of knowledge

21   about the case, and in your questions, you are making

22   assumptions.  If you are going to ask him about changing the

23   exchange agreements, you've got to distinguish about changing

24   the agreements going forward or going backward.

25           You change an agreement going backward, you've got a

1  problem -- without getting the consent of the person.  You're

2  going to confuse the jury, and I'm going to tell them that they

3  can't change it going backwards.  I don't want to have to get

4  into instructions such as that.  Of course it can be changed

5  going backwards if everybody agreed to it, but I don't want you

6  all building in problems by being imprecise in your questions.

7        It is a complex area.  You all have generally done a

8  good job keeping it relatively straightforward, but you are

9  sliding into this imprecision, and I don't want to have to do

10  it, and I don't want to interrupt your questioning to

11  straighten it out, and I don't want to have to give

12  instructions on it.  Be precise.

13        We'll take 25 minutes.  Wait.  Oh, yeah, excuse me.

14  Sit down just a minute.  That's right.  Mr. Dry did it.  I

15  learned how to do it.

16        MS. GRADY:  Can I sit down too, Judge?

17        THE COURT:  Sure.

18        MS. GRADY:  Thank you.

19        THE COURT:  There's a question about whether the

20  Government wants to file a brief or not in response on the

21  privilege issue.  Do you or don't you?

22        MR. DRY:  We do, Your Honor.

23        THE COURT:  When do you propose to file it?

24        MR. DRY:  We'd like to file it Monday morning.

25        THE COURT:  Any objection?

Pajones - Cross

```
 1           MR. POLLACK:  No, Your Honor.

 2           THE COURT:  All right.  It will be filed Monday

 3   morning.  We'll now be in recess.

 4

 5           (Recess taken.)

 6

 7           THE COURT:  Mr. Pajonas, you are under the same oath

 8   you took yesterday, or this morning.

 9   BY MS. GRADY:  (Resuming)

10   Q   Going to Government's Exhibit 85, that's the investment

11   policy.  If you could put that up on the screen, please.  It's

12   already been admitted.

13       This is the investment policy that you and Mr. Zacarias

14   and Mr. Powlishen -- and Mr. Bolton was not present; correct?

15   A   That's correct.

16   Q   And Mr. Okun, he was present?

17   A   No, he was not.

18   Q   So this document that's entitled 1031 Tax Group Investment

19   Policy, you are saying that he wasn't present when this

20   document was presented to him?

21   A   No.  He wasn't present when it was, when it was formed,

22   but he signed it.

23   Q   Right.  You are saying that he signed this document on the

24   boat the same day he signed the promissory notes?

25   A   Right.  He agreed to it.
```

Pajones - Cross

1          THE COURT:  And he signed it.

2          THE WITNESS:  That's right.  That's his signature.

3    Q    His signature is -- if you turn to the second page,

4    please.  His signature is not dated, though?

5    A    Okay.

6    Q    And so that's his signature; you know that?

7    A    That appears to be his signature.

8    Q    It's not one of the stamps that was used by the company?

9    A    I saw him sign it on the boat.

10   Q    Now, so it was pretty clear, clearly made to him that he

11   could invest up to 25 percent of the float; correct?

12   A    Well, that's -- you have to read the whole document to

13   understand what that figure means.

14   Q    I understand that, but this document gives permission for

15   Mr. Okun, from his officers in his company, your blessing that

16   he could borrow money?

17   A    No, not exactly.  We're giving him the appearance that we

18   are, but it requires a majority of people to let him borrow it,

19   and we're saying we're not going to any longer.

20   Q    So this permission was another lie that you told to Mr.

21   Okun.

22   A    It wasn't a lie.

23   Q    Well, this document gives permission to Mr. Okun; correct?

24   A    It gives conditional permission.

25   Q    But nowhere in here does it say that you three agree that

Pajones - Cross

1    this document really wasn't going to be in effect?

2    A    Doesn't say we are going to, either.  I would dispute that

3    it's a lie.

4           THE COURT:  I think that's enough.  Next question.

5    Q    Back to clean up a couple of small points.  Government's

6    Exhibit 24, this was an e-mail on February 6th --

7           THE CLERK:  Has this been admitted?

8           MS. GRADY:  It's not been admitted yet.

9           THE COURT:  February 6th of what?

10          MS. GRADY:  2006, Your Honor.

11   Q    This was -- do you recognize this e-mail?

12   A    I do.

13   Q    It's an e-mail between yourself, Lara Coleman, sent to

14   both Lara Coleman and Edward Okun; correct?

15   A    That's correct.

16          MS. GRADY:  Move to introduce -- I don't know how the

17   Court wants to do it.  Government's 24.

18          THE COURT:  Any objections?

19          MR. DRY:  I'll offer it as Government's Exhibit 24.

20          THE COURT:  It's admitted.

21

22          (Government's Exhibit 24 admitted.)

23

24   Q    This e-mail refers to meeting with accountants today for a

25   second time and strongly considering hiring for auditing and

Pajones - Cross

1   policy procedures; right?

2   A    That's correct.

3   Q    This was part of the effort to find out the amount of

4   money and document the loans; right?

5   A    That's correct.

6   Q    It also refers to, in the second paragraph, every time we

7   make a long-term investment in IPofA property.

8   A    Uh-huh.

9   Q    The "we" that that's referring to in that second sentence,

10  that's "we" of 1031 Tax Group?

11  A    What portion of this e-mail are you specifically referring

12  to?

13  Q    The second paragraph, last line right above the word

14  thanks, it says, can you please forward me these documents, and

15  let's put procedures in place to make these documents happen

16  every time we make a long-term investment in IPofA property.

17  A    Uh-huh.

18  Q    That "we" is 1031 Tax Group investing in long-term

19  investments in IPofA property?

20  A    That's correct.

21  Q    I don't have any more for that.  Mr. Dowdall, that was one

22  of the first things you did when you came to the, under the

23  employment of Mr. Okun?

24          THE COURT:  What are you talking about?  That was not

25  a question.

Pajones - Cross

1          MS. GRADY:  I'm sorry, Judge.

2          THE COURT:  Mr. Dowdall was one of the first things

3    he did?

4          MS. GRADY:  I'm thinking way, way too fast.  It's

5    been a long morning.  I apologize.  I'll rephrase.

6    Q    You started working for Mr. Okun when?

7    A    I believe it was sometime in October.  I don't recall the

8    specific date, but it was before he purchased my company.

9    Q    Were you present for the firing of Mr. Dowdall?

10   A    Yes, I was.

11   Q    And that was the first time you met Mr. Dowdall?

12   A    That was.

13   Q    And you didn't know what you were going to expect firing

14   somebody you had never met; correct?

15   A    I'd say that's a fair assumption.

16   Q    So you were the one who asked for the armed security

17   guard?

18   A    No, not at all.  As a matter of fact, I was embarrassed by

19   it and made apologies to Mr. Dowdall for it.

20   Q    Now, as time went by in the spring of 2006, you started

21   putting money in separate accounts in different banks like the

22   Long Island -- State Bank of Long Island; correct?

23   A    That's correct.

24   Q    You didn't tell Mr. Okun about it?

25   A    That's not true.

Pajones - Cross

1   Q    You refused to give the money back to him at some point,

2   didn't you?

3   A    I refused to give it back directly to IPofA, but I

4   specifically said that I would send the money to fund exchange

5   closings.  I believe there's an e-mail documenting that.

6   Q    That was actually after your termination?

7   A    I believe so.

8   Q    So you put client funds in State Bank of Long Island?

9   A    Uh-huh.

10  Q    And you were terminated?

11  A    Uh-huh.

12  Q    And you refused to give those client funds unless you had

13  something specific in writing from Mr. Okun; correct?

14  A    That would be true.

15  Q    And at that point, you were no longer the president of the

16  company whose client funds those were?

17  A    That's true.

18  Q    Going to one more point, you -- the severance package, you

19  testified that -- well, you didn't testify.  Your salary was

20  275,000; correct?

21  A    300,000.

22  Q    300,000.  I apologize.  And the severance was three months

23  of that; correct?

24  A    Like I said previously, that's not my recollection.  My

25  recollection is that it was, the severance was a year, but I

Pajones - Cross

1    could be wrong.

2    Q    So assuming even that you are right it's at a year,

3    300,000, you went into the negotiations asking for two million?

4              MR. DRY:  Already asked and answered.

5              THE COURT:  Ms. Grady, I think we've already done

6    this.  Why are we getting back into it again?

7              MS. GRADY:  I just wanted to clarify one point.

8              THE COURT:  Get to the point.  In your severance

9    negotiations, did you blank.

10             MS. GRADY:  Okay.

11   Q    During the severance negotiations, you settled for

12   975,000?

13   A    950,000.

14   Q    950,000.  And you indicated that there was a

15   confidentiality agreement.

16   A    That's true.

17   Q    That was presented to you by Mr. Okun's lawyers?

18   A    That's true.

19   Q    You have no idea if Mr. Okun authorized or suggested that

20   process happen; correct?

21   A    Generally, when somebody is represented by attorneys --

22   Q    That's not the question.  You do not have any idea whether

23   Mr. Okun told them to do that.

24             MR. DRY:  Actually, Your Honor, if she's asking if he

25   had an idea, he's entitled to say generally.

Pajones - Cross

 1                    THE COURT:  Yeah, he is.

 2                    MS. GRADY:  I'm going to rephrase the question then.

 3                    THE COURT:  All right.

 4    Q    You don't have any specific knowledge on that date from

 5    those lawyers whether Mr. Okun suggested that confidentiality

 6    agreement.

 7    A    I'm not sure that I can say no, because they constantly

 8    referred to Mr. Okun's wishes all throughout the negotiations.

 9    He was represented to me to be in New York at hand that day of

10    the negotiations.  As a matter of fact, I was surprised not to

11    see him there.

12    Q    How many severance negotiations have you gone through in

13    your life?

14    A    Luckily, this is the only one.

15    Q    You've left other jobs, though; correct?

16    A    Sure.

17    Q    You've signed --

18    A    I've never been fired, though.

19    Q    You've signed other confidentiality agreements; isn't that

20    correct?

21    A    No.  To my recollection -- I've signed confidentiality

22    agreements in my lifetime, but not -- I don't believe in

23    regards to my employment.  I'm thinking of situations of -- I'm

24    sorry.  Maybe one or two jobs I did have a confidentiality

25    agreement upon further recollection.  I'd say that was true.

Pajones - Cross

1    Q    Now, this severance -- you ended up having to sue Mr. Okun

2    in open court for the full payment of this particular severance

3    package?

4    A    That's correct.

5    Q    That was an open lawsuit where you accused him of not

6    paying the rest of your money.

7                MR. DRY:  Objection, relevancy.

8                THE COURT:  He objects that it's not relevant.

9                MS. GRADY:  The Government alleges that this is some

10   sort of payoff and that they wanted to keep it quiet.  This

11   impeaches the witness because he, in fact, made it public

12   knowledge.

13               MR. DRY:  Time frame for the lawsuit, Your Honor.

14               THE COURT:  I'm not sure it's impeaching, but it

15   might go to credibility.

16               MS. GRADY:  The lawsuit is July 17th, 2007.

17               MR. DRY:  Renew my objection, Your Honor.

18               THE COURT:  Why?

19               MR. DRY:  It's after the time frame of the charges in

20   the indictment.  I don't understand how Mr. Pajonas suing Mr.

21   Okun after the company was already in bankruptcy is relevant or

22   impeaching.

23               THE COURT:  I doubt it is.  I'm going to sustain the

24   objection so far.  If you lay some foundation.

25   Q    You indicated in the severance meeting that your lawyers

1    and Mr. Okun's lawyers wanted to keep this quiet, didn't want

2    to have it make the news; right?

3    A    I'd say that's a fair assumption.

4    Q    And Mr. Okun paid you pursuant to part of the severance,

5    and then his company ran out of money and he didn't pay the

6    rest of it, did he?

7    A    That's correct.

8    Q    And --

9    A    It wasn't just his company.  It was a personal guarantee

10   as well.

11   Q    Two months later, you sued him in open court for the rest

12   of that money.

13   A    I sued him -- I filed a lawsuit against him, yes.

14   Q    Now, let's talk about the last topic at issue which is not

15   at my table here.

16        The search warrant, you weren't working for them then, but

17   the search warrant --

18   A    Working?

19   Q    You weren't working for Mr. Okun's companies on April 27th

20   of 2007; correct?

21   A    No, I was not.  I was fired previous to that.

22   Q    And you found out about the search warrant; right?

23   A    Sure.  I mean, it was news.

24   Q    And you got a lawyer, and you went to the Government and

25   talked to the Government, didn't you?

Pajones - Cross

1   A    Absolutely.

2   Q    And before you would even talk to the Government, you

3   signed a piece of paper saying that your words couldn't be used

4   against you in any kind of criminal procedure?

5   A    I don't recall signing a piece of paper.

6   Q    Well, if I could put up for his -- the proffer agreement.

7          THE CLERK:  What exhibit is this?

8          MS. GRADY:  It will be a defense exhibit.

9          THE COURT:  It hasn't gotten to you just yet.

10  Q    Look at the bottom.  It's dated June 11th, 2007?

11  A    That's right.  I did sign this document.  It seems so long

12  ago.

13  Q    Mr. Martini is the lawyer that you hired to make sure that

14  you weren't criminally prosecuted for the statements that you

15  told the Government about.

16  A    I'm not sure I'd --

17          MR. DRY:  Objection.

18          THE COURT:  What?

19          MR. DRY:  Your Honor, I think that's a

20  mischaracterization of the proffer agreement.  If she wants him

21  to read the proffer agreement or just say what was your

22  understanding of the proffer agreement, that would be okay.

23          MS. GRADY:  I'm going to move the whole document in,

24  Your Honor.

25          THE COURT:  Any objection?

Pajones - Cross

1              MR. DRY:  No.

2              THE COURT:  All right.  What is it?

3              MS. GRADY:  Defense Exhibit 15.

4              THE COURT:  What happened to 14, or does it make a

5     difference?  Is there a 14?

6              THE CLERK:  Not that I have, Your Honor.

7              MS. GRADY:  It was an e-mail, Judge.  My focus is on

8     my world.  They're telling me there was a 14.

9              THE CLERK:  I'm sorry, there was.

10             THE COURT:  Is it admitted?

11             THE CLERK:  Yes, sir.

12             THE COURT:  All right.  15.  No objection.  It's in.

13

14             (Defendant's Exhibit 15 admitted.)

15

16    Q    So this document was entered into, contract or agreement

17    between you and the Government, on June 11th, 2007.

18    A    That's correct.

19    Q    And it indicates that -- in the first paragraph, if you

20    can focus in on that just a little bit more.  It says, in any

21    prosecution brought against client, and that's you; right?

22    A    That's correct.

23    Q    By the United States, except for prosecution for false

24    statement, obstruction of justice, or perjury, the United

25    States will not offer into evidence any statements made by the

Pajones - Cross

1   client at the meeting -- either at the -- sorry, I'll just read

2   it -- made by client at the meeting (a) in its case in chief,

3   or (b), at sentencing.  I read that correctly finally, didn't

4   I?

5   A    You read it, yeah, sure.

6   Q    That statement to you means that they can't use your

7   statements at that meeting against you.

8   A    Right.

9        THE COURT:  Ms. Grady, it says exactly they can't use

10  it in the case in chief or at sentencing.  You and I both know

11  there's more to a case than just the case in chief.  Just let

12  stand for itself.  Don't try to extrude its meanings.

13       MS. GRADY:  Okay.

14  Q    Now, you had -- after this first meeting, you had

15  telephone calls and then four other meetings before you even

16  came to Richmond to testify, right, with the Government?

17  A    There was -- as I previously testified, there was a number

18  of meetings at various locations and a telephone call.

19  Q    And one of the things that you needed your lawyer to do

20  before you came in and testified to these members of the jury

21  was to get immunity from prosecution in an order from the

22  court; right?

23  A    My attorney negotiated on my behalf and felt that it was

24  prudent.

25       MS. GRADY:  Can I have the order?

Pajones - Cross

1    Q    You probably haven't seen this order.  Have you seen this

2    order?

3    A    No.  I was told of its existence.

4    Q    You were told that --

5              MS. GRADY:  I would move to introduce Defense

6    Exhibit 16.

7              MR. DRY:  No objection.

8              THE COURT:  It's admitted.

9

10             (Defendant's Exhibit 16 admitted.)

11

12   Q    You said you were told of the existence of this?

13   A    By my attorney.

14   Q    You wouldn't testify unless this order was in existence;

15   correct?

16   A    No, that's not exactly true.  It gave me comfort, but I

17   think if the Government refused to give it to me, I would still

18   be testifying here today.

19   Q    You knew you had criminal liability back -- you can take

20   that off.  You knew you had criminal liability back when you

21   were talking to both Mr. Okun and Ms. Coleman and Mr.

22   Powlishen?  You knew, thought you had criminal liability then,

23   didn't you?

24   A    I didn't know that then, and I'm not sure I know that now.

25   I was concerned about it.

Pajones - Cross

1   Q    You wrote in an e-mail that your family -- you've risked

2   your family, your livelihood, and your freedom?

3   A    I was concerned about it, absolutely.

4   Q    Did you go to the police then?

5   A    Did I go to the police?  No, I did not.

6   Q    And after that, you continued to work for Mr. Okun?

7   A    I'm sorry, what date is that that we're talking about?

8   Q    I don't remember the Government e-mail.  Suffice it to

9   say, you didn't say that after you left employment; right?

10  A    Say what?

11  Q    That you were concerned for your family and your freedom.

12  A    I didn't say that after I left the employment?

13  Q    Right.

14  A    I said that probably every day of my life after leaving

15  his employment.  I was very concerned.

16  Q    And the first time that you went to the Government was

17  after the search warrant, and you went with your criminal

18  lawyer.

19  A    I forget when the dates were for the search warrant.  I

20  don't recall the dates.

21  Q    We talked about it a minute ago, and you agreed it was

22  April 27 of 2006.

23  A    Okay.  Yeah, it was probably after that, because that's

24  when it all started to come together.  They arrested Edward

25  Okun, and that's when I visited with the Government, sure.

Pajones - Cross

1   Q    The last thing I'll talk to you about is that you

2   indicated on direct that you refused to carry out anything that

3   Mr. Okun said for you to do as an owner of the company.

4          THE COURT:  Now, wait a minute.  Come on, Ms. Grady.

5          MS. GRADY:  Judge, I'm reading my notes.

6          THE COURT:  I don't care what your notes say.  Your

7   notes are a truncated version of what was said, and you didn't

8   put it in point of time.  Get your question right.  He didn't

9   say that.  It's okay for you to ask the question if you put it

10  in context and do it right, but that isn't what he said.

11         MS. GRADY:  Can we have Government's Exhibit 88?

12  Q    It was during the discussion of this e-mail, discussion

13  (sic) 88, that you asked for an update on where we were on some

14  of the solutions and whether there was any West Oaks money

15  slated to come in; right?

16  A    That's correct.

17  Q    And you indicated that -- pursuant to a Government's

18  question that you were refusing to carry out what Mr. Okun

19  said.

20  A    I believe that I very narrowly stated what I was not

21  agreeing with him on.  I mean, to say that I wasn't doing

22  anything that he wanted me to do is a gross exaggeration.

23  Q    You would agree that you said --

24         THE COURT:  Let's don't worry about what he said.

25  The jury is going to remember it, and that's fine.  On or after

1    October 4, 2006, did you blank.  That's a good way to ask that

2    question.

3             MS. GRADY:  Okay.

4    Q    On or about October 4th --

5             MS. GRADY:  No, I don't think that's the purpose of

6    my question, Judge.

7             THE COURT:  All right.

8    Q    You refused to change the exchange agreement language to

9    comport to what Edward Okun was doing with the money.

10   A    Refusal implies that somebody asked me to do it.  Nobody

11   asked me to change the agreements.

12   Q    You knew he was doing something in --

13            MR. DRY:  Objection, Your Honor.  I'm going to ask

14   that she clarify changing the exchange agreements for

15   preexisting funds or post funds that were coming in.

16            MS. GRADY:  I'll rephrase the question.

17   Q    For all future exchange agreements, going forward, you

18   knew that the behavior of borrowing funds was not in with the

19   language that those exchange agreements said; correct?

20   A    That's correct.

21   Q    And you knew that Mr. Edward Okun's behavior of borrowing

22   those funds to invest in property was going to continue?

23   A    I was specifically advised by Edward Okun each time he

24   took the money that that would be the last time, so I saw no

25   reason to change the documents going forward.

Pajones - Cross

1   Q    But each time you heard that, you knew that that wasn't

2   true because Edward Okun continued --

3            THE COURT:  Ms. Grady, we've already been through

4   this right before the recess.  If you have something else on

5   it, okay.  He had the exact same question.

6   Q    The short of it is, you did not change the language going

7   forward of the exchange agreements.  You refused.

8            MR. DRY:  That was asked and answered.  He said he

9   did not refuse to do it.

10           THE COURT:  Sustained.

11           MS. GRADY:  I don't have any other questions.

12           THE COURT:  Any redirect?

13           MR. DRY:  Very briefly, Your Honor.

14

15                    REDIRECT EXAMINATION

16  BY MR. DRY:

17  Q    Mr. Pajonas, Ms. Grady asked you about occasional interest

18  payments that were made to 1031 Tax Group; correct?

19  A    That's correct.

20  Q    Were those made in the ordinary course of business?  Was

21  there a payment plan, or was that something that was routinely

22  done?

23  A    No.  When the company was just about to run out of

24  money --

25           THE COURT:  What company?

Pajones - Redirect

1          THE WITNESS:  I'm sorry.  When the qualified

2    intermediaries were just about to run out of money --

3          MS. GRADY:  This is not responsive to the question.

4    The question was narrow.  It's not responsive to the question.

5          THE COURT:  Overruled.

6    Q    Go ahead, sir.

7    A    When the companies were just about to run out of money and

8    we told them that we had no money left, we would get some money

9    in to cover operations.  We had rent, payroll, taxes, things

10   like that that needed to be paid.

11   Q    Were there occasionally -- as far as -- do you remember an

12   occasion in which money was put back into 1031 Tax Group from

13   IPofA in which you did not demand that it be done?

14   A    Never.  Never.  The money always came -- the money always

15   came after urgent, urgent requests, and generally speaking, it

16   was much less than we asked for.

17   Q    Ms. Grady spoke about changing exchange agreements.  Would

18   it have been possible to change the exchange agreements to

19   allow for what had been done with client money in the past

20   without the consent of the clients?

21   A    No.  They would have to sign off on it.  It's a contract.

22   Q    Going to Government's Exhibit 24 that I believe was

23   admitted as Defendant's 14 --

24          MR. DRY:  Ms. Grady, can you confirm that --

25          THE COURT:  I don't think it is.  I think

1    Government's 24 was admitted as Government's Exhibit 24.

2          MS. GRADY:  Then I stand corrected.  It may not be.

3    It may be a jointly named exhibit.

4          THE COURT:  It was also admitted as 14?

5          MS. GRADY:  Yes, sir.

6          THE COURT:  All right.

7    Q    Ms. Grady had you read the first sentence.  Can we go to

8    the second sentence of that top paragraph?  Can you start

9    reading from one of the things that came to mind?

10   A    One of the things that came to mind with me, and not so

11   much in the conversation, is that in order to account for the

12   money that has been loaned to IPofA, we should really have

13   documents on hand evidencing those loans.

14   Q    That e-mail was to Ms. Coleman and Mr. Okun?

15   A    Yes, it was.

16   Q    And were those -- in this time frame, February of 2006,

17   the money that had been taken in 2005, which qualified

18   intermediary had that been taken out of?

19   A    Atlantic Exchange.

20   Q    Were you aware that money was being taken at the time?

21   A    No.  I was not employed at the time.

22   Q    And who were you told was going to document those loans

23   after the fact?

24   A    Lara Coleman and --

25         MS. GRADY:  Objection, Judge.  He's told by somebody

Pajones - Redirect

1   else after the fact of when he was employed there.  Lack of

2   foundation.

3           MR. DRY:  All right.

4   Q    In this timeframe, in February of 2006, were you told by

5   anybody that those transfers or loans would be documented?

6   A    Actually, I believe that I was advised that they had been

7   documented.

8   Q    And who advised you of that?

9   A    Edward Okun and Lara Coleman.

10  Q    Did you request those documents?

11  A    I did.

12  Q    Were you provided those documents?

13  A    No, I was not.

14  Q    Government's Exhibit 178, which has not been introduced

15  into evidence, do you recognize this e-mail?

16  A    I do.

17  Q    First of all, Ms. Grady mentioned that you were refusing

18  to give money, at the end of November of 2006, to Edward Okun;

19  correct?

20  A    Yes.

21          MR. DRY:  I'd like to admit Government's Exhibit 178

22  into evidence.

23          MS. GRADY:  That's fine, Your Honor.

24          THE COURT:  No objection.

25

1          (Government's Exhibit 178 admitted.)

2

3    Q    The bottom e-mail, sir, who is that from and who is that

4    to?

5    A    The bottom e-mail is from myself to Edward Okun, Lara

6    Coleman, and David Field.

7    Q    November 30th of 2006, what happened on that day?

8    A    I got fired that day.

9    Q    Is this the same day that you had the conversations with

10   all three of these individuals?

11   A    Yes, that is true.

12   Q    Please read this e-mail, sir.

13   A    Ed, if you want me to move the funds from the State Bank

14   of Long Island to the Citibank client escrow account, please

15   fax a formal letter to the office at 877-767-3295 directing me

16   to do so.  You own the company, so if you direct me to move the

17   money so that we can pay exchangers, I will do so.  You also

18   better hurry with advising me of your plan to resolve this cash

19   crisis.  Time is running out.  Tick tock, tick tock.

20          THE COURT:  What exhibit number was that?

21          MR. DRY:  Government's Exhibit 178, Your Honor.

22   Nothing further, Your Honor.

23          THE COURT:  All right.  Can he be released

24   permanently?

25          MR. DRY:  He can be released from the United States'

Pajones - Redirect

1    perspective, Your Honor.

2             MS. GRADY:  Yes, sir, he can be released.

3             THE COURT:  Mr. Pajonas, you are excused from your

4    subpoena.  Thank you for being with us and giving us your

5    evidence.  You may be excused.

6

7             (End of requested transcription.)

8

9

10

11

12             I certify that the foregoing is a correct transcript

13   from the record of proceedings in the above-entitled matter.

14

15

16   _____/s/_____          _____

17   P. P. Strahan, RPR                Date

18

19

20

21

22

23

24

25