

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                              Criminal No. 3:08cr132

EDWARD HUGH OKUN

### MEMORANDUM OPINION

Edward Hugh Okun, a federal inmate proceeding pro se, submitted this motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence ("§ 2255 Motion," ECF No. 427).[1] Okun contends that he experienced ineffective assistance of counsel[2] and prosecutorial misconduct and was denied due process in conjunction with his trial. Specifically, Okun demands relief because:

Claim One:    "Petitioner's conviction and sentence must be set aside because the exchange proceeds that were the subject of the Indictment were the legal property of Petitioner's wholly-owned qualified intermediary companies." (§ 2255 Mot. 2.)

Claim Two:    "Ineffective assistance of appellate counsel." (Id. at 5.)

---

[1] The Court employs the pagination assigned to Okun's submissions by the CM/ECF docketing system. The Court corrects the capitalization and emphasis in the quotations from Okun's submissions.

[2] "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

Claim Three:   "Trial counsel cited their own lack of preparedness in improperly pressuring Petitioner not to testify in his own defense." (Id. at 7.)

Claim Four:    "Trial counsel failed to investigate available exculpatory evidence and call available exculpatory witnesses." (Id.)

Claim Five:    "Trial counsel failed to introduce evidence and seek jury instructions concerning the proper interpretation of Petitioner's right to use exchange funds under the terms of the exchange contracts." (Id. at 9.)

Claim Six:     "Trial counsel failed to investigate the theft of funds by the Government's key witnesses." (Id. at 10.)

Claim Seven:   "Counsel Barry Pollack's unprofessional errors allowed the government to obtain a conviction based upon erroneous legal premises pursuant to the IRS 1031 tax law, United States Bankruptcy law, and common law statutes governing trusts, which laws, if they had been rightly interpreted and set before the court, would have proven the Petitioner's innocence because he was in fact the lawful owner of the exchange proceeds in question via a legally obtained debt and was, contrary to the allegations in Counts 1 and 3-15 of the Indictment, only participating in business transactions that were legal acts of interstate commerce." (Id. at 13.)

Claim Eight:   "Attorney conflict of interest provides motive for frivolous no-criminal-intent defense." (Id. at 27.)

Claim Nine:    "Pollack withheld exculpatory evidence which caused the Petitioner to be wrongfully convicted for perjury." (Id.)

2

Claim Ten:        "Counsel's unprofessional errors caused a
                  wrongful conviction pursuant to 31 USC
                  §5332, bulk cash smuggling." (Id. at 28.)

Claim Eleven:     "AUSA Michael Dry violated his oath of
                  office and the Petitioner's Fifth Amendment
                  right by prosecuting a United States citizen
                  under criminal theories that were knowingly
                  conceived in opposition to correct legal
                  presumptions governing ownership of bank
                  deposits pursuant to 11 USC §541, state laws
                  governing trusts, the IRS 1031 Tax Code, a
                  conjunctive interpretation of the 1031 TG
                  exchange contracts, and against controlling
                  case law in the Fourth Circuit." (Id. at
                  29.)

The Government has responded, asserting that Okun's claims lack
merit. (ECF No. 481.) Okun has filed a motion for permission
to file a reply ("Reply," ECF No. 485-1) that exceeds this
Court's Local Rules page limitations (ECF No. 485). The motion
will be granted and Okun's Reply will be filed and considered.
For the reasons set forth below, Okun's § 2255 Motion (ECF
No. 427) will be denied.

## I. PROCEDURAL HISTORY

On July 10, 2008, a grand jury returned a twenty-seven
count Superseding Indictment charging Okun with conspiracy to
commit wire fraud and mail fraud, conspiracy to commit money
laundering, thirteen counts of wire fraud, and multiple other
counts of mail fraud, money laundering, bulk cash smuggling, and
making a false declaration. (Superseding Indictment 1-32, ECF

3

No. 42.)   On February 27, 2009, the Court granted the Government's motion to dismiss one wire fraud count and one mail fraud count (Counts 9 and 18).  (ECF No. 207.)

On March 3, 2009, the jury trial commenced.   After the Government rested, Okun moved for a judgment of acquittal on all counts pursuant to Federal Rule of Criminal Procedure 29.  (ECF No. 232.)   The Court granted the motion with respect to the two remaining mail fraud charges (Counts 16 and 17), but denied the motion on the remaining counts.   (Id.)   Okun put forth no evidence in his defense.   After two days of deliberations, the jury returned its verdict, finding Okun guilty of the remaining twenty-three counts.  (ECF No. 243.)

On August 4, 2009, the Court sentenced Okun to 1,200 months of imprisonment.  (J. 3, ECF No. 328.)   Okun appealed, and the United States Court of Appeals for the Fourth Circuit affirmed Okun's conviction and sentence.   United States v. Okun, 453 F. App'x 364, 374 (4th Cir. 2011).   On April 16, 2012, the United States Supreme Court denied a petition for certiorari.   Okun v. United States, 132 S. Ct. 1953, 1953 (2012).   Okun subsequently filed a motion for a new trial, which was denied.   United States v. Okun, No. 3:08CR132, 2015 WL 1402142 (E.D. Va. Mar. 25, 2015), aff'd by 610 F. App'x 272, 2015 WL 4497067 (4th Cir. July 24, 2015).

4

## II.  SUMMARY OF EVIDENCE

The Fourth Circuit summarized the evidence of Okun's guilt as follows:

> In 2005, Okun was the sole owner of Investment Properties of America (IPofA), a Virginia limited liability company, with its principal place of business in Richmond, Virginia.  IPofA was involved in the business of commercial real estate investment and management.  In 2005, Okun formed 1031 Tax Group, a Delaware limited liability company with its principal place of business in Richmond.
>
> In connection with 1031 Tax Group, Okun became involved in the business of operating qualified intermediary (QI) companies.[3]  Between August 2005

---

[3]  Section 1031 of the Internal Revenue Code permits individuals (exchangers) to defer the payment of capital gains tax on the sale of certain assets when such assets are properly exchanged in a "like kind" exchange.  26 U.S.C. [§] 1031.  In general, a like-kind exchange occurs when one piece of property is sold and, within a given period of time, a similar piece of property is purchased.  The like-kind exchange allows the exchanger to delay recognizing a gain on the sold property, as the tax basis of the sold property carries forward to the newly-acquired property. Thus, the recognition of a gain and the payment of capital gains tax are delayed. Id. § 1031(d).  For the newly-acquired property to qualify as "like kind," it must be identified within forty-five days and be purchased within one hundred and eighty days of the sale of the sold property. Id. § 1031(a)(3).  In addition, the exchanger must not receive the proceeds from the sale of the sold property, either actually or constructively, during the prescribed period.  26 C.F.R. § 1.1031(k)-1(a).  A QI company can be used to hold the sale proceeds in the interim, preventing the exchanger's receipt of the funds.  Id. § 1.1031(k)-1(g)(4).  The Internal Revenue Code and regulations contain no requirement or restriction as to how the QI company is to hold the proceeds and, so far as the Internal Revenue Code is concerned, the QI company may invest the proceeds.

and December 2006, Okun acquired six different QI companies, which in turn became subsidiaries of 1031 Tax Group.

After acquiring his first QI company, Atlantic Exchange Company (AEC), Okun began to wire AEC client funds to his personal bank account and IPofA's bank account, with the assistance of Lara Coleman, IPofA's Chief Operating Officer. During the conspiracy, Coleman continued to assist Okun in the fraudulent scheme, which enabled Okun to use money held by the QI companies on behalf of the exchangers for personal use and for purposes related to IPofA's business. The uses of the funds held by the QI companies were not disclosed to the exchangers and were in violation of the agreements between the exchangers and the QI companies.

In 2007, Janet Dashiell, who had managed one of the QI companies acquired by Okun, began to work for 1031 Tax Group. Dashiell alerted the government to the manner in which the QI funds were being used by Okun and 1031 Tax Group.

In May 2007, 1031 Tax Group filed for bankruptcy. The collapse of 1031 Tax Group ultimately resulted in a loss in excess of $125 million dollars to exchangers who had deposited funds with the QI companies affiliated with 1031 Tax Group.

United States v. Okun, 453 F. App'x 364, 366-67 (4th Cir. 2011).

### III.  DUE PROCESS CLAIM

In Claim One, Okun argues that his "conviction and sentence must be set aside because the exchange proceeds that were the subject of the Indictment were the legal property of [his] wholly-owned qualified intermediary companies." (§ 2255 Mot. 2.)  He further asserts that his due process rights were violated because he "has been sentenced to spend over 100 years

---

Such investment typically is governed by the agreement between the exchanger and the QI company.

6

in prison based upon conduct that <u>did</u> <u>not</u> <u>breach</u> <u>the</u> <u>exchange</u> <u>agreements</u>."  (<u>Id.</u> at 4-5.)

As an initial matter, Okun cites several cases to support his argument that he owned legal title to the qualified intermediary ("QI") funds and did not breach the exchange contracts by using such funds.[4]  Essentially, Okun asserts that he could not be guilty of criminal fraud because his QI companies owned the exchange funds and, therefore, he could do what he wished with those funds.

However, these cases and the issue of who possessed legal title to the funds are irrelevant because breach of contract did not form the Government's theory of the case.  Rather, the Government's theory was as follows:

---

[4] The cases Okun cites are <u>Terry v. SunTrust Banks, Inc.</u>, 493 F. App'x 345 (4th Cir. 2012), and <u>In re LandAmerica Financial Group, Inc.</u>, No. 08-35994-KRH, 2009 WL 1269578 (Bankr. E.D. Va. May 7, 2009) (hereinafter, "<u>LandAmerica</u>").  In <u>Terry</u>, the Fourth Circuit considered the question of "whether LandAmerica 1031 Exchange Services, Inc. ("LES"), which (before it filed a petition for bankruptcy) acted as a 'qualified intermediary' ("QI") in the exchange of investment properties pursuant to 26 U.S.C. § 1031(a)(1), assumed fiduciary duties with respect to the proceeds of the sale of the relinquished properties."  493 F. App'x at 347.  The Fourth Circuit affirmed the district court's ruling that LES had not assumed fiduciary duties; therefore, SunTrust "could not be liable for aiding and abetting the breach of a fiduciary duty by LES."  <u>Id.</u>  In <u>LandAmerica</u>, the Bankruptcy Judge held that the exchange funds at issue were not excluded from the property of the estate under consideration because neither LES nor the plaintiffs intended to create an express trust.  2009 WL 1269578, at *15.

7

The Government has two theories for Okun's liability for the offenses of mail and wire fraud. Okun, as a conspirator and aider and abettor, executed a "scheme to defraud" and a "scheme to obtain money and property by means of false or fraudulent representations and promises." The scheme to defraud allowed Okun to gain access to the pre-existing client exchange funds held by the QI companies at the time of Okun's acquisition of the QI companies. The scheme to obtain money and property by false or fraudulent representations and promises allowed Okun to obtain exchange funds deposited by client exchangers after Okun purchased the QI companies.

(Bill of Particulars ¶ 1, ECF No. 164.) At no time did the Government argue that Okun's crimes were based on a breach of fiduciary duties, or a breach of contract. In its closing arguments, the Government once again argued that Okun executed a scheme to defraud to gain access to QI funds after Okun acquired the QI companies, and executed a scheme to obtain the funds through fraudulent promises and representations. (Mar. 17, 2009 Tr. 7.) Simply put, Okun's argument about who held legal title to the QI funds and that he breached no contract has no bearing on his criminal liability for fraud. Claim One will be dismissed.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

To demonstrate ineffective assistance of counsel, a convicted defendant must show first, that counsel's representation was deficient and second, that the deficient

8

performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of Strickland, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" Burch v. Corcoran, 273 F.3d 577, 588 (4th Cir. 2001) (quoting Strickland, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. Id. at 697.

## A.    Appellate Counsel

In Claim Two, Okun asserts that appellate counsel "never met with [him] or communicated with [him] to discuss appeal strategy or the issues to be raised on appeal." (§ 2255 Mot. 5.) He argues that counsel's "failure to communicate was compounded by a more troubling failure: in drafting the appeal, he failed to present argument in support of the basic

9

proposition that is the subject of [Claim One] above."  (Id.) Okun argues that counsel failed to raise the issue that he "could not properly have been convicted of stealing or converting exchange funds by expending funds from commingled accounts that were the property of Petitioner's wholly-owned QI companies."  (Id.)

"In order to establish a claim that appellate counsel was ineffective for failing to pursue a claim on direct appeal, the applicant must normally demonstrate" that appellate counsel performed deficiently and that a reasonable probability of a different result exists. Bell v. Jarvis, 236 F.3d 149, 164 (4th Cir. 2000) (citing Strickland, 466 U.S. at 688, 694).  Counsel had no obligation to assert all non-frivolous issues on appeal. Rather, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones v. Barnes, 463 U.S. 745, 751-52 (1983)).  A presumption exists that appellate counsel "'decided which issues were most likely to afford relief on appeal.'"  Bell, 236 F.3d at 164 (quoting Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993)). "'[O]nly when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of

10

counsel be overcome.'" <u>Id.</u> (quoting <u>Smith v. Robbins</u>, 528 U.S. 259, 288 (2000)).

As an initial matter, contrary to Okun's vague, unsupported statements that counsel failed to communicate with him, appellate counsel avers that on "approximately 15 different occasions," he or an associate conferenced with Okun via telephone. (Gov't Resp. Ex. 2 ("Protogyrou Aff.") ¶ 1, ECF No. 481-2.) In any event, as discussed above, Okun's theory that he held legal title to the QI funds is entirely meritless. (<u>See</u> <u>supra</u> Part III.) Counsel prudently declined to advance such a frivolous argument on appeal. Thus, Okun has failed to demonstrate that his argument was a clearly stronger argument than those counsel chose to pursue on appeal. <u>See Bell</u>, 236 F.3d at 164. Accordingly, Okun has demonstrated no deficiency or prejudice, and Claim Two will be dismissed.

**B.   Trial Counsel**

### 1.   Trial Counsel Pressured Okun Not To Testify

In Claim Three, Okun asserts that "[t]rial counsel cited their own lack of preparedness in improperly pressuring [Okun] not to testify in his own defense." (§ 2255 Mot. 7.) Okun opines that "the relevance of [his] exculpatory testimony concerning his own understanding of the contracts, as well as his planned approach for funding exchanges when like-kind

11

property was identified, would have been highly relevant."
(Id.) However, according to Okun, trial counsel pressured him
not to testify because "they had not prepared a defense, and
were not prepared to engage in direct examination." (Id.)

To prevail on his claim, Okun must "show both that h[is]
attorneys violated h[is] right to testify and that [his]
testimony had a 'reasonable probability' of changing the outcome
of h[is] trial." United States v. Squillacote, 183 F. App'x
393, 394 (4th Cir. 2006) (alterations in original). Okun fails
to make either showing.

First, trial counsel Barry Pollack squarely refutes Okun's
contention that counsel pressured him into not testifying.
Pollack explains that, after defense counsel were unable to
"marshal significant evidence" to corroborate Okun's proposed
testimony, they unanimously believed that Okun would not be
believed by the jury if he did testify, and this belief was
communicated to Okun. (Gov't Resp. Ex. 1 ("Pollack Decl.")
¶¶ 11-14, ECF No. 481-1.) Pollack clarified that the decision
whether or not to testify was Okun's decision alone, and that,
if he chose to testify, they were willing to "spend considerable
time" preparing him to do so. (Id. ¶¶ 15-16.) Ultimately, Okun
chose to follow counsel's advice and not testify. (Id. ¶¶ 17-

12

18.)   The Court accepts Pollack's averments as true.   Thus, on this record, Okun demonstrates no deficiency of counsel.

Moreover, Okun offers no details concerning what his testimony would have included.   He suggests that he would have testified about "his own understanding of the contracts." (§ 2255 Mot. 7.)   In his Reply, Okun opines that his testimony would have been "highly relevant and crucial to the no intent to defraud element," because he would have testified about the legal advice he received, the permitted use of the exchange funds, and his planned approach for funding exchanges.   (Reply 26.)   However, Okun's proposed testimony would have been impeached by testimony from Government witnesses establishing that "Okun ignored repeated advice that his acts were criminal, actively concealed his misappropriations of the client funds, and continued to defraud the exchangers."   United States v. Okun, No. 3:08CR132, 2015 WL 1402142, at *6 (E.D. Va. Mar. 25, 2015).   Thus, Okun fails to demonstrate that he "would have offered genuinely exculpatory testimony."   Owens v. United States, 483 F.3d 48, 59 (1st Cir. 2007); see also United States v. Terry, 366 F.3d 312, 316 (4th Cir. 2004) (explaining that defendant was not prejudiced by attorney's advice not to testify when defendant "omit[ted] any details that explain why the district court would have given his claims any weight").   Okun

13

fails to demonstrate that, but for any deficient advice of counsel not to testify, the result of his trial would have been different.  Because Okun has shown neither deficient performance of counsel nor prejudice, Claim Three will be dismissed.

### 2.  Failure To Investigate Exculpatory Evidence And Witnesses

In Claim Four, Okun asserts that "counsel failed to investigate available exculpatory evidence and call available exculpatory witnesses."  (§ 2255 Mot. 7.)  Specifically, he claims that counsel failed to "gather documents and subpoena witnesses that would have allowed the jury to understand the strength of [his] overall financial position, and would have substantially negated the Government's theory of motive."  (§ 2255 Mot. 7-8.)  Okun provides the names of several individuals whom he believes would have presented testimony to establish that Okun had no need to commit fraud because of his wealth.  (Id. at 7-9; Reply 36-45.)

As an initial matter, Okun has not shown that he specifically requested that counsel interview the many individuals he names in his § 2255 Motion and Reply.  For that reason alone, he fails to demonstrate any deficiency of counsel.  Moreover, Pollack avers that, by the Fall of 2008, "it was apparent that the forensic accounting analysis had not yet

14

produced evidence that would corroborate Mr. Okun's assertions that he was financially secure and therefore had no motive to commit the alleged fraud." (Pollack Decl. ¶ 22.) Pollack explains that the defense team attempted to interview relevant witnesses regarding Okun's financial position, however, "[w]itnesses . . . either could not be found, declined to speak to the defense team, or did not corroborate any viable theory of the defense." (Id. ¶ 25.) Presented with a lack of defense witnesses, counsel prudently decided that it was best to cross-examine Government witnesses rather than put on an "affirmative defense case." (Id. ¶ 29.) Given this, the Court finds that Okun has not "overcome the presumption that, under the circumstances," the decision not to put on evidence of his financial position "'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (citation omitted). Moreover, given the substantial evidence against him, Okun has not demonstrated a reasonable probability that, but for counsel's failure to investigate evidence of his financial position, the jury's verdict would have been different. Accordingly, Claim Four will be dismissed.

### 3.  Failure To Seek Proper Jury Instructions

In Claim Five, Okun argues that counsel was ineffective for failing to "seek jury instructions concerning the proper

15

interpretation of [Okun's] right to use exchange funds under the terms of the exchange contracts." (§ 2255 Mot. 9.) As previously explained, the Government's theory of prosecution was based upon fraud, not breach of contract. (Pollack Decl. ¶ 33(b).) Thus, counsel cannot be faulted for failing to seek jury instructions that had no bearing on Okun's criminal liability for fraud. Okun has not alleged that any of the jury instructions that were given were improper, and "counsel is not ineffective for failing to offer alternatives to proper jury instructions." Bennett v. Angelone, 92 F.3d 1336, 1350 (4th Cir. 1996). Accordingly, Claim Five will be dismissed.

### 4. Failure To Investigate Theft Of Funds

In Claim Six, Okun asserts that counsel was ineffective for failing to investigate the "theft of funds from the QI companies by key Government witnesses," and to argue that "these thefts provided a motive for these witnesses (in the spring of 2007) to destroy company records and falsely implicate [him] in an alleged 'scheme' to defraud his own companies." (§ 2255 Mot. 10.) In support of his claim, Okun relies heavily upon the alleged "newly discovered evidence" of theft that he identified in his motion for a new trial. (Id.)

The Court has already determined that Okun's arguments concerning whether Government witnesses "stripped [him] of

16

available assets thereby preventing him from repaying customers are immaterial to his conviction." Okun, 2015 WL 1402142, at *6. Furthermore, the Court concluded that evidence of the alleged theft would likely not "'result in acquittal at a new trial.'" Id. at *6 (quoting United States v. Moore, 709 F.3d 287, 292 (4th Cir. 2013)). As this Court stated:

> Simply put, extensive and overwhelming evidence existed that Okun misappropriated client exchange funds for his own use from six QI companies between August 2005 and April 2007 in violation of each company's exchange agreement. Okun ignored repeated advice that his acts were criminal, actively concealed his misappropriations of the client funds, and continued to defraud the exchangers. (See generally PSR ¶¶ 16-97 (aptly summarizing evidence from trial)). Okun's criminal acts began in 2005, well before Okun contends Dashiell and McCabe purportedly removed money from Okun's grasp in 2007. (See PSR ¶¶ 16-17.) Okun has not established that the proffered bank accounts 'would probably result' in a jury finding him not guilty of the twenty-three counts of fraud.[] Moore, 709 F.3d at 292. And, in fact, the bank account records on which Okun relies would not yield such a result.

Okun, 2015 WL 1402142, at *6. Counsel cannot be faulted for failing to advance this meritless theory. Moreover, given the Court's determination that the evidence of alleged thefts would have little to no impact on his trial, Okun cannot demonstrate the requisite prejudice. Accordingly, Claim Six will be dismissed.[5]

---

[5] In his Reply, Okun raises, for the first time, a claim that counsel was ineffective for failing to assert that the

### 5.   Pollack's Errors Caused Conviction Based Upon Erroneous Legal Principles

In Claim Seven, Okun reiterates that counsel's errors caused him to be convicted based upon "erroneous legal premises." (§ 2255 Mot. at 13.)   Specifically, Okun asserts that, but for counsel's errors, he would have been found innocent because "he was in fact the lawful owner of the exchange proceeds in question via a legally obtained debt." (Id.)   Overall, Okun asserts that counsel erred by not presenting evidence and argument concerning his legal theories advanced in Claim One; i.e., that Okun was not criminally responsible because he possessed legal title to the QI funds and did not breach any contracts.   (Id. at 13-22.)   As Pollack prudently observed, the Government's theory of prosecution was "based in fraud, not breach of contract," and a defense based upon such would "only be a defense to a civil claim of breach of contract."   (Pollack Decl. ¶ 33(b).)   Given this, the Court

---

Government committed a violation of Brady v. Maryland, 373 U.S. 83 (1963), for failing to provide to defense counsel evidence concerning the alleged theft of money by Government witnesses. (Reply 60.)   For a Brady violation to have occurred, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999).   However, as the Court previously determined, the evidence to which Okun refers is not exculpatory or impeaching because it has no bearing on his guilt, and no prejudice ensued.

finds that it was reasonable trial strategy for counsel to choose not to present evidence and argument concerning the lack of a breach of contract, as it had no bearing on whether Okun defrauded exchangers.

Okun also asserts that counsel was ineffective for failing to file a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure based upon his frivolous theory pertaining to breach of contract and ownership as well as the Bankruptcy Court's decision in In re LandAmerica Financial Group, Inc., No. 08-35994-KRH, 2009 WL 1269578 (Bankr. E.D. Va. May 7, 2009) (hereinafter, "LandAmerica"). (§ 2255 Mot. at 22-24.) On multiple occasions, Pollack discussed with Okun that the decision in LandAmerica had no bearing on the issues in his criminal case, and that LandAmerica provided no basis for a motion for a new trial. (Pollack Decl. ¶¶ 44-45.) Moreover, Okun simply has not shown that, but for counsel's alleged error, a motion for a new trial based upon LandAmerica and theories unrelated to his fraud conviction would have been granted and his conviction overturned. This Court, in denying Okun's pro se motion for a new trial, has already noted that "extensive and overwhelming evidence" existed to support Okun's convictions. Okun, 2015 WL 1402142, at *6. Accordingly, Okun fails to show

19

either deficiency or prejudice, and Claim Seven will be dismissed.

### 6. Pollack's Alleged Conflict Of Interest

In Claim Eight, Okun asserts that an "[a]ttorney conflict of interest provide[d] motive for frivolous no-criminal-intent defense." (§ 2255 Mot. 27.) Specifically, Okun contends that defense attorney Barry Pollack had a conflict of interest because Assistant United States' Attorney ("AUSA") Michael Dry referred the president of LandAmerica, a company under criminal investigation, to Mr. Pollack ten weeks before Okun's trial. (Id.) For a claim concerning a conflict of interest, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 348 (1980).

First, AUSA Dry swears that he "never referred anyone to Mr. Pollack for representation." (Gov't Resp. Ex. 3 ("Dry Decl."), ¶ 3, ECF No. 481-3.) Second, while the president of LandAmerica did retain Pollack, to Pollack's knowledge, AUSA Dry "had no role whatsoever in recommending [him] to the former president." (Pollack Decl. ¶ 48.) At the time of Okun's trial, Pollack did not know that the president of LandAmerica "would subsequently be named as a defendant in a civil suit or that [he] would represent her in that matter." (Id. ¶ 51.)

20

In response, Okun asserts that, after his sentencing, he was taken into an interview room to meet with his other attorneys, Carolyn Grady and Robert Wagner of the Federal Public Defender's Office. (Reply 73.) He claims that, in that room, Mr. Wagner proceeded to inform him about Mr. Pollack's conflict of interest. (Id. at 73-75.) However, Okun has not provided any evidence, such as an affidavit from Wagner, to support his self-serving allegation. Furthermore, it is beyond belief that Wagner, who was part of Okun's defense team, would not have raised the issue of such a conflict of interest, if one existed, well before Okun's sentencing. Okun simply has not demonstrated that an actual conflict of interest existed, and he has not shown that it adversely affected Pollack's performance. Cuyler, 446 U.S. at 348. Accordingly, Claim Eight will be dismissed.

### 7. Exculpatory Evidence For Perjury Conviction

In Claim Nine, Okun asserts that "Pollack withheld exculpatory evidence which caused [Okun] to be wrongfully convicted for perjury." (§ 2255 Mot. 27.) He contends that Pollack was ineffective for failing to submit as evidence two legal memoranda from Eric Perkins that allegedly would have shown that Okun "was innocent of the perjury charge" and that Okun did not lie in an evidentiary hearing because Perkins "did in fact render personal legal advice to [Okun]." (Id.) As

21

background, Eric Perkins was the Chief Legal Officer for Investment Properties of America, LLC ("IPA"). (Superseding Indictment 29, ECF No. 42.) On August 27, 2007, a grand jury issued a subpoena to Perkins for his "testimony as it related to transactions involving the misuse of funds by IPA and its CEO and sole shareholder, Edward H. Okun." <u>United States v. Okun</u>, 281 F. App'x 228, 229 (4th Cir. 2008). As the Fourth Circuit explained:

> IPA's legal staff began looking into the allegedly improper loan transactions in October 2006, first obtaining a memorandum from outside counsel that discussed investment restrictions applicable to funds held by Qualified Intermediaries. After receiving this memorandum from outside counsel, IPA's in-house counsel Eric Perkins began investigating the loan transactions himself, requesting information from various IPA employees. Thereafter, Perkins prepared two memoranda for IPA, one dated November 7, 2006 (the "November 7 Memo") and the other dated November 21, 2006 (the "November 21 Memo"). . . . In the November 7 Memo, Perkins repeatedly referred to himself as "in-house counsel" and recommended actions that IPA should take going forward. In the follow-up November 21 Memo, Perkins stated that he was "obligated to advise the company that continuing this course of conduct will likely result in both civil and criminal liability (in multiple jurisdictions) to the entities and individuals involved with such conduct." (Emphasis added). He also clarified his role as Chief Legal Officer of the company, stating that he "represent[ed] the company [IPA] as opposed to its sole owner, officers, managers, or individual employees." He stated that such individuals "should understand that their personal interests may be conflict (currently or in the future) with those of the company and/or other involved individuals" and advised that they therefore "may wish to obtain

22

independent legal representation to protect their individual interests."

Id. at 229-30.  Okun filed a motion to quash the subpoena based upon "personal attorney-client privilege and 'common interest' privilege." Id. at 230.

During the hearing on the motion to quash, Okun falsely testified that, while speaking to Perkins, Okun told Perkins that Okun believed Perkins was his personal attorney. (Superseding Indictment 29-30.)  However, the record clearly reflected that no attorney-client relationship existed between Okun and Perkins, and Perkins made it abundantly clear that he acted as counsel for IPA, not Okun personally.  See Okun, 281 F. App'x at 231.  Based upon his false testimony, Okun was then indicted for perjury.  (Superseding Indictment 29-30.)

During trial, the Government introduced the two memoranda from Perkins into evidence.  (Pollack Decl. ¶ 54; see also Mar. 4, 2009 Tr. 56-62, 83-85, ECF No. 248.)  Counsel cross-examined Perkins about the memoranda and how they could be interpreted as suggesting that he represented Okun in a personal capacity. (Pollack Decl. ¶ 56; see also Mar. 4, 2009 Tr. 202-07.)  Counsel also argued to the jury that Okun believed that Perkins was his individual counsel and therefore had not lied under oath during the hearing on the motion to quash.  (Id.; see also Mar. 17,

23

2009 Tr. 2120-23, ECF No. 370.) Additionally, counsel moved for judgment of acquittal as to the false declaration count. (Mar 13, 2009 Tr. 1830, 1881-83, ECF No. 365.) Counsel cannot be faulted because the memoranda fail to support Okun's contention that Perkins was his personal attorney. Given this, the Court fails to discern any deficiency of counsel or prejudice, as the legal memoranda were introduced as evidence during trial.

### 8. Bulk Cash Smuggling Conviction

In Claim Ten, Okun argues that counsel's errors "caused a wrongful conviction pursuant to 31 USC §5332, bulk cash smuggling." (§ 2255 Mot. 28.) As background, Okun was convicted based upon the following evidence presented at trial:

> [O]n January 22, 2007, Mr. Okun emailed an IPofA employee and Ms. Coleman with the following instructions: "[C]ould you fed ex $15,000 cash (large bills and pad the package with paper on both sides so it looks like a thick document, you may want to put it in several envelopes so they can't tell what it is) to me here in Nassau people don't like credit cards here. I would suggest cashing two checks one for 5,200 and one for 9,800 so you stay under the 10,000 cash reporting with the IRS or better yet take someone else with you, you cash one and they cash the other. I need it sent priority next day to: Atlantis Marina, Paradise Island, Nassau Bahamas, c/o motor Yacht Simone slip $4041."

(Pre-Sentence Investigation Report ¶ 78 (alteration in original) (capitalization corrected).) The employee who originally received the email was Hope Elkins who was out sick. (Mar. 11,

2009 Tr. 32, ECF No. 269.) The email was then forwarded to Lydia Renka, a bookkeeper at IPA. (Mar. 11, 2009 Tr. 5, 32.) Renka sent the $15,000.00 to Okun. (Mar. 11, 2009 Tr. 33.) Okun now contends that the Government "presented no evidence that [he] intended to evade the reporting requirement." (Id.) He further asserts that Lydia Renka, as his agent, was responsible for shipping the currency and filing the report. (Id. at 28-29.) Okun also argues that Pollack never raised these arguments "in a Rule 29 motion." (Id. at 29.)

First, contrary to Okun's assertion, Pollack did argue, as part of his Rule 29 motion for acquittal, that there was insufficient evidence to convict Okun of bulk cash smuggling. (Pollack Decl. ¶ 64; see also Mar. 13, 2009 Tr. 1880-81, ECF No. 365.) Specifically, Pollack argued that there was "no indication" that Okun knew that it was "impermissible to send more than $10,000 of cash out of the country at one time." (Mar. 13, 2009 Tr. 1880.) Counsel cannot be faulted for the Court's decision to reject this argument. Moreover, Okun fails to explain how the outcome of the Rule 29 motion would have been different had counsel decided to focus on blaming Renka for the smuggling.

Furthermore, Pollack did argue in his closing to the jury that there was insufficient evidence to establish that Okun knew

25

that "there was an obligation to report the fact that he was taking more than $10,000 out of the country at one time." (Pollack Decl. ¶¶ 61-62; see also Mar. 17, 2009 Tr. 2124, ECF No. 370.)[6]   Counsel cannot be faulted for the jury's determination that sufficient evidence existed to convict Okun of bulk cash smuggling.   Moreover, Okun fails to explain how, given the "extensive and overwhelming evidence" against him, he would have been acquitted of this charge.   Okun, 2015 WL 1402142, at *6.  Okun has failed to demonstrate both deficiency of counsel and prejudice, and Claim Ten will be dismissed.[7]

### V.   PROSECUTORIAL MISCONDUCT

In  Claim  Eleven,  Okun  makes  several  allegations  of prosecutorial  misconduct.   A  viable  claim  of  prosecutorial misconduct  requires  a  defendant  to  demonstrate  "that  the

---

[6] In his § 2255 motion, Okun refers to Renka as his agent. (§ 2255 Mot. 28.)   Given this, Okun could be held criminally responsible for actions that he directed Renka to take.   Cf. United  States  v.  Kenofskey,  243  U.S.  440,  442-43  (1917) (defendant criminally liable for mail fraud when he gave a false claim to his agent for mailing).   Thus, counsel prudently chose not to place the blame on Renka in his arguments to the jury.

[7] For the first time in his lengthy, rambling Reply, Okun raises  new  vague,  unsupported  allegations  of  ineffective assistance.   For  example,  he  mentions  that  Pollack  was ineffective for not properly opposing the intent to repay motion in  limine.   (Reply 20.)   He also asserts that Pollack was ineffective for failing to ask for a continuance to allow the defense team more time to "assemble Okun's financial picture and trace the informants thefts."   (Id. at 21.)   To the extent these claims are even properly before the Court, they lack merit.

prosecutor's remarks or conduct were improper and, second, the defendant must show that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial." United States v. Scheetz, 293 F.3d 175, 185 (4th Cir. 2002) (citing United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993)).

Okun first asserts that AUSA Dry engaged in misconduct by "announc[ing] in a national press conference that [Okun] was under a federal criminal investigation" that caused "catastrophic" financial damage to Okun. (§ 2255 Mot. 29.) However, contrary to Okun's assertion, no communication with the press occurred until the grand jury returned an indictment against Okun. (Dry Decl. ¶ 5.) Okun responds that, between April and May 2007, press announcements concerning investigations of fraud against the 1031 Tax Group were reported in several newspapers and aired on several television and radio stations, and refers the Court to the archives of these media outlets. (Reply 82.) While Okun provides no evidence of these announcements, even if the Government made statements to the press, Okun has simply failed to show that the remarks were improper and that the remarks "prejudicially affected his substantial rights so as to deprive him of a fair trial." Scheetz, 293 F.3d at 185. The voir dire examination of the

27

venire inquired into knowledge of the case and there is no showing that any seated juror should have been disqualified because of prior knowledge.

Okun further argues that AUSA Dry "elected to proceed with an indictment which was based upon . . . erroneous legal presumptions." (§ 2255 Mot. 30.) Okun then repeats the meritless arguments that he raised in Claim One. The Court discerns no prosecutorial misconduct based on this baseless argument.

Okun further alleges that AUSA Dry used a "scandalous abuse of official power" to threaten the President of LandAmerica Financial Group with criminal prosecution. (§ 2255 Mot. 30-31.) In his Reply, Okun also asserts that AUSA Dry threatened to prosecute several individuals "for obstruction of justice if anyone helped [him], [his] wife or [his] son." (Reply 85 (alterations in original).) Okun provides no evidence to support these statements. Furthermore, assuming arguendo that AUSA Dry had threatened to prosecute these individuals, Okun has failed to show that Dry's actions somehow affected Okun's criminal proceedings. Because Okun has failed to demonstrate that AUSA Dry's alleged conduct deprived him of a fair trial, Scheetz, 293 F.3d at 185, Claim Eleven will be dismissed.

## VI. OUTSTANDING MOTIONS

Okun has filed a motion to be released on bond (ECF No. 459) that the Court will deny as moot because the petition is being denied. Okun has also filed a motion to compel the production "of the [c]omplete Deloitte Accounting Report of the 1031 Tax Group, LLC" (ECF No. 472) that will be denied as lacking merit and as out of time. Finally, Okun has filed a motion for copies of attorney's affidavits in § 2255 proceedings. (ECF No. 480.) The Government supplied Okun with all affidavits and declarations as part of its response; accordingly, this motion will be denied as moot.

## VII. CONCLUSION

For the foregoing reasons, Okun's § 2255 Motion (ECF No. 427) will be denied. Okun's motion for bond (ECF No. 459), motion to compel (ECF No. 472), and motion for copies of attorney's affidavits (ECF No. 480) will be denied as moot. Okun's motion for permission to exceed the page limitation permitted by the Local Rules (ECF No. 485) will be granted. The action will be dismissed.

An appeal may not be taken from the final order in a § 2255 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(B). A COA will not issue

unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Okun has not satisfied this standard. Accordingly, the Court will deny a certificate of appealability.

The Clerk is directed to send a copy of the Memorandum Opinion to Okun and counsel of record.

It is so ORDERED.

/s/ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: October 26, 2015

30